**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID BALDACCI, TAYLOR BRANCH, MICHAEL CONNELLY, SYLVIA DAY, JONATHAN FRANZEN, CHRISTOPHER GOLDEN, ANDREW SEAN GREER, JOHN GRISHAM, DAVID HENRY HWANG, MATTHEW KLAM, GEORGE R.R. MARTIN, JODI PICOULT, STACY SCHIFF, JAMES SHAPIRO, THE AUTHORS GUILD, BELFRY HOLDINGS, INC., COLUMBUS ROSE, LTD., DARING GREATLY CORPORATION, GATTOPARDO, LLC, HIERONYMUS, INC., SYLVIA DAY LLC, WO & SHADE LLC, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>OPEN AI INC., OPENAI OPCO LLC, OPENAI GP LLC, OPENAI, LLC, OPENAI GLOBAL LLC, OAI CORPORATION LLC, OPENAI HOLDINGS LLC, OPENAI STARTUP FUND I LP, OPENAI STARTUP FUND GP I LLC, OPENAI STARTUP FUND MANAGEMENT LLC, and MICROSOFT CORPORATION,<br><br>Defendants. | Case No. 1:25-md-3143 (SHS) (OTW)<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs David Baldacci, Taylor Branch, Michael Connelly, Sylvia Day, Jonathan Franzen, Christopher Golden, Andrew Sean Greer, John Grisham, David Henry Hwang, Matthew Klam, George R.R. Martin, Jodi Picoult, Stacy Schiff, James Shapiro, The Authors Guild, Belfry Holdings, Inc., Columbus Rose, Ltd., Daring Greatly Corporation, Gattopardo, LLC, Hieronymus, Inc., Sylvia Day LLC, and Wo & Shade LLC on behalf of themselves and all other similarly situated (the "Class" as defined below), for their complaint against Defendants OpenAI, Inc.,

OpenAI GP LLC, OpenAI, LLC, OpenAI OpCo LLC, OpenAI Global LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund I LP, OpenAI Startup Fund GP I LLC, OpenAI Startup Fund Management LLC (collectively "OpenAI"), and Microsoft Corporation ("Microsoft") (all collectively "Defendants"), allege as follows:

## NATURE OF THE CASE

1.     OpenAI and Microsoft have built a business valued into the hundreds of billions of dollars by taking the combined works of humanity without permission. Rather than pay for intellectual property, they knowingly ignored the laws protecting copyright. Yet the United States Constitution sets forth the fundamental principle that authors deserve compensation for their works. And the Copyright Act grants "a bundle of exclusive rights" to creators, including "the rights to reproduce the copyrighted work[s]." *Andy Warhol Found for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023).

2.     Plaintiffs, owners of copyrights in a broad array of books, bring this action seeking redress for Defendants' flagrant and harmful infringements of their copyrights. Defendants copied Plaintiffs' works and then fed them into their "large language models" or "LLMs," algorithms designed to generate human-like text responses to users' prompts and queries. These algorithms are at the heart of Defendants' massive commercial enterprise. And at the heart of these algorithms is systematic theft on a mass scale.

3.     Defendants' LLMs endanger authors' ability to make a living, in that the LLMs allow anyone to generate—automatically and freely (or very cheaply)—texts that they would otherwise pay writers to create. And by making it as easy as a press of a button to generate a book, the LLMs risk overwhelming the market for books and destroying the market for Plaintiffs' works—both those already published and those yet to come. OpenAI's willful copying thus makes

Plaintiffs' works into engines of Plaintiffs' own destruction, notwithstanding that professional writers often spend years conceiving of and writing their creations.

4.     Beginning in 2018, OpenAI created a series of large language models beginning with GPT-1 and GPT-2.

5.     Defendants OpenAI and Microsoft collaborated closely to create and monetize the next iteration of generative artificial intelligence models known as GPT-3, GPT-3.5, GPT-3.5 Turbo, GPT-4, GPT-4 Turbo, GPT-4V, GPT-4o, GPT-4o Mini, GPT-4.5 (also known as Orion), and the as-yet unreleased GPT-5 model, their derivatives, and their successors. These models power the popular ChatGPT chatbot and related services, which Defendants have followed with a suite of other commercial offerings, like ChatGPT Enterprise, ChatGPT Plus, the OpenAI API, Bing Chat, Browse with Bing, Microsoft Copilot, GitHub CoPilot, and others. Defendants' GPT models have been designed to recognize and process text inputs from a user and, in response, generate text that has been calibrated to mimic a human written response.

6.     That end product—a computer model and chatbot built to mimic human written expression—came at a price. Defendants' models were "trained," in Defendants' parlance, by reproducing a massive corpus of copyrighted material, including at least hundreds of thousands of books. The only way that Defendants' models could be trained to generate text output that resembles human expression is to copy and analyze a large, diverse corpus of text written by humans. Defendants made an intentional decision to use pirated libraries—vast quantities of books obtained for free. This use of pirated material allowed Defendants to gain huge advantages in the timing and efficiency of their LLMs. Meanwhile, Defendants' use of pirated libraries helped sustain and foster rampant copyright violations by keeping these pirated libraries in business and providing them a seal of approval.

7.     In training their models, Defendants reproduced copyrighted texts to exploit precisely what the Copyright Act was designed to protect: the elements of protectible expression within them, like the choice and order of words and sentences, syntax, flow, themes, and paragraph and story structure. In OpenAI's words, the goal of the training process was to teach their model to "learn" "how words fit together grammatically," "how words work together to form higher-level ideas," and "how sequences of words form structured thoughts."[1] In other words, by training its models on certain works, OpenAI copied the works' expression so that the models could memorize, mimic, and paraphrase that expression.

8.     Defendants copied and data-mined the works of writers, without permission or compensation, to build a machine that is capable (or, as technology advances, will soon be capable) of performing the same type of work for which these writers would be paid. Indeed, on March 11, 2025, Sam Altman announced that OpenAI had "trained a new model that [was] good at creative writing," though he was not sure "yet how/when it will get released."[2]

9.     OpenAI could have "trained" its LLMs on works in the public domain. It could have paid a reasonable licensing fee to use copyrighted works. Either of those, however, would have taken longer and cost more money. What Defendants could *not* do was evade the Copyright Act altogether to power their lucrative commercial endeavor, taking whatever datasets of relatively recent books they could get their hands on without authorization. There is nothing fair about this. Defendants' unauthorized use of Plaintiffs' copyrighted works thus presents a straightforward infringement case applying well-established law to well- recognized copyright harms.

---

[1] Fred von Lohmann, response to Notice of Inquiry and Request for Comment 5, (Oct. 30, 2023), *available at* https://downloads.regulations.gov/COLC-2023-0006-8906/attachment_1.pdf.
[2] Sam Altman, X Post at 2:58 PM on Mar. 11, 2025, https://x.com/sama/status/1899535387435086115 (last accessed Mar. 16, 2025).

10.     OpenAI's chief executive Sam Altman has told Congress that he shares Plaintiffs' concerns. According to Altman, "Ensuring that the creator economy continues to be vibrant is an important priority for OpenAI. . . . OpenAI does not want to replace creators. We want our systems to be used to empower creativity, and to support and augment the essential humanity of artists and creators."[3] Altman testified that OpenAI "think[s] that creators deserve control over how their creations are used" and that "content creators, content owners, need to benefit from this technology."[4] Altman also has represented that OpenAI has "licens[ed] content directly from content owners" for "training" purposes.[5] Not so from Plaintiffs. As to them, Altman and Defendants have proved unwilling to turn these words into actions.

11.     For its part, Microsoft, as of November 2024, entered into a licensing deal for AI training data, namely books, with publisher HarperCollins. This license provides the right to use a given work in training for three years in exchange for a payment of $5,000 split evenly between the author and the publisher.[6] Microsoft thus acknowledges the right of creators to be compensated when their works are used for the training of AI models, including LLMs.[7]

12.     Defendants OpenAI and Microsoft have enjoyed enormous financial gain from their free exploitation of copyrighted material. In 2023, OpenAI reported that it is "generating

---

[3] Sam Altman, *Questions for the Record*, at 9–10 (June 22, 2023), *available at* https://www.judiciary.senate.gov/imo/media/doc/2023-05-16_-_qfr_responses_-_altman.pdf (last accessed Dec. 4, 2023).

[4] *Oversight of A.I.: Rules for Artificial Intelligence: Hearing Before the S. Judiciary Comm. Subcomm. on Privacy, Tech. and the Law*, 118th Cong. (2023) (testimony of OpenAI CEO Sam Altman), *available at* https://techpolicy.press/transcript-senate-judiciary-subcommittee-hearing-on-oversight-of-ai (last accessed Dec. 4, 2023).

[5] Altman, *Questions for the Record*, *supra*, at 10.

[6] Andrew Albanese and Jim Milliot, *Agents, Authors Question HarperCollins AI Deal*, Publisher's Weekly (Nov. 19, 2024), *available at* https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/96533-agents-authors-question-harpercollins-ai-deal.html (last visited Mar. 2, 2025)

[7] Hannah Miller and Dina Bass, *Microsoft Signs AI Learning Deal With News Corp.'s HarperCollins*, Bloomberg (Nov. 19, 2024), *available at* https://www.bloomberg.com/news/articles/2024-11-19/microsoft-signs-ai-learning-deal-with-news-corp-s-harpercollins (last visited Feb. 7, 2025).

revenue at a pace of $1.3 billion a year."[8] Microsoft, for its part, has seen its investment in OpenAI increase many-fold and its own GPT-based products, like BingChat, succeed in the marketplace. And its stock price has increased as Microsoft has touted its ability to exploit and leverage AI across its products. Analysts project that the integration of GPT into Microsoft products could generate more than $10 billion in annualized revenue by 2026,[9] with just one version of this integration—"GitHub CoPilot"—already generating more than $100 million in annual recurring revenue.[10] In developing and monetizing these AI products, Microsoft and OpenAI have been close partners every step of the way, from the training of GPT-3 to today.

13.    OpenAI and Microsoft's commercial gain has come at the expense of creators and rightsholders like Plaintiffs and members of the Class. A person who reads a book typically buys it from a store. But Defendants did not even do that. Neither OpenAI nor Microsoft have paid for the books used to train their models. Nor have Defendants—with the late-breaking exception of Microsoft's deal with HarperCollins mentioned above—sought to obtain or pay for a license to copy and exploit the protected expression contained in the copyrighted works used to train their models. Instead, Defendants took these works; they made unlicensed copies of them; and they used those unlicensed copies to digest and analyze the copyrighted expression in them, all for commercial gain. The end result is a computer model that is not only built on the work of thousands of creators and authors but also built to generate a wide range of expression—from shortform

---

[8] AJ Hess, *The Biggest Challenges Facing OpenAI's Mira Murati, the Newly Minted Most Powerful Woman in Tech*, FAST COMPANY, *available at* https://www.fastcompany.com/90985829/the-biggest-challenges-facing-openais-mira-murati-the-newly-minted-most-powerful-woman-in-tech (last visited Nov. 20, 2023).

[9] Jordan Novet, *Microsoft Starts Selling AI Toll for Office, Which Could Generate $10 Billion a Year by 2026*, CNBC (Nov. 1, 2023), *available at* https://www.cnbc.com/2023/11/01/microsoft-365-copilot-becomes-generally-available.html (last visited Nov. 20, 2023).

[10] Aaron Holmes, *Microsoft's GitHub AI Coding Assistant Exceeds $100 Million in Recurring Revenue*, THE INFORMATION, https://www.theinformation.com/briefings/microsoft-github-copilot-revenue-100-million-ARR-ai (*available at* https://perma.cc/5S7F-4GBY) (last visited Nov. 20, 2023).

articles to book chapters—that mimics the syntax, voice, and themes of the copyrighted works on which it was trained.

14.    Plaintiffs seek to represent a Class of book copyright holders whose works were used by Defendants in conjunction with their artificial intelligence models. Plaintiffs, on behalf of themselves and the Class, seek damages from Defendants for their largescale infringement of their copyrighted works, as well as injunctive relief.

## JURISDICTION & VENUE

15.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq*.

16.    The Court also has personal jurisdiction over Defendants because they have purposely availed themselves of the privilege of conducting business in New York.

17.    OpenAI and Microsoft's copyright infringement, contributory copyright infringement, and vicarious copyright infringement occurred, in substantial part, in this District. OpenAI sold and distributed, and continues to sell and distribute, its GPT products, including ChatGPT, ChatGPT Enterprise, ChatGPT Plus, Browse with Bing, and application programming interface tools (API) within New York and to New York residents. OpenAI marketed and sold GPT-based products to New York residents and New York-based companies.

18.    Microsoft distributed and sold GPT-based products, like Bing Chat and Azure products that incorporate GPT-3 and GPT-4. Upon information and belief, Microsoft also assisted OpenAI's copyright infringement from New York, including from Azure datacenters located in New York, which were used to facilitate OpenAI's use and exploitation of the training dataset used for development of OpenAI's GPT models. Microsoft maintains offices and employs personnel in New York. Upon information and belief, Microsoft's New York personnel were involved in the

creation and maintenance of the supercomputing systems that powered OpenAI's widespread infringement, as well as in the commercialization of OpenAI's GPT models.

19.    Plaintiffs Hwang, Schiff, Shapiro, and The Authors Guild are residents of New York. The injuries alleged here from Defendants' infringement occurred in this District.

20.    Venue is proper under 28 U.S.C. § 1400(a) because Defendants or their agents reside or may be found in this District due to their infringing activities, along with their commercialization of their infringing activities, that occurred in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the sales of Defendants' GPT-based products within this District.

## THE PARTIES

### A.    Plaintiffs

21.    Plaintiff David Baldacci is an author and a resident of Virginia.

22.    Plaintiff Taylor Branch is an author and a resident of Maryland.

23.    Plaintiff Michael Connelly is an author and a resident of Florida.

24.    Plaintiff Sylvia Day is an author and a resident of Nevada.

25.    Plaintiff Jonathan Franzen is an author and a resident of California.

26.    Plaintiff Christopher Golden is a writer and a resident of Massachusetts.

27.    Plaintiff Andrew Sean Greer is an author and a resident of California.

28.    Plaintiff John Grisham is an author and a resident of Virginia.

29.    Plaintiff David Henry Hwang is a playwright and a resident of New York.

30.    Plaintiff Matthew Klam is an author and a resident of Washington, D.C.

31.    Plaintiff George R.R. Martin is an author and a resident of New Mexico.

32.    Plaintiff Jodi Picoult is an author and a resident of New Hampshire.

33.    Plaintiff Stacy Schiff is an author and a resident of New York.

34.    Plaintiff James Shapiro is an author and a resident of New York.

35.    Plaintiff The Authors Guild is a nonprofit 501(c)(6) organization based in New York, New York.

36.    Plaintiff Belfry Holdings, Inc. is a corporation owned by Plaintiff John Grisham.

37.    Plaintiff Columbus Rose, Ltd. is a company owned by Plaintiff David Baldacci.

38.    Plaintiff Daring Greatly Corporation is a company owned by Plaintiff Christopher Golden.

39.    Plaintiff Gattopardo, LLC is a company owned by Plaintiff Stacy Schiff.

40.    Plaintiff Hieronymus, Inc. is a loan-out corporation owned by Plaintiff Michael Connelly.

41.    Plaintiff Sylvia Day LLC is a loan-out company owned by Plaintiff Sylvia Day.

42.    Plaintiff Wo & Shade LLC is a loan-out company owned by Plaintiff George R.R. Martin.

43.    The registration information for the infringed works of Plaintiffs is identified in Exhibit A to this Complaint.

**B.    <u>OpenAI Defendants</u>**

44.    Defendant OpenAI, Inc. is a Delaware nonprofit corporation with a principal place of business in San Francisco, California. OpenAI, Inc. was formed in December 2015. OpenAI, Inc. owns and controls all other OpenAI entities.

45.    Defendant OpenAI GP, LLC is a Delaware limited liability company with a principal place of business in San Francisco, California. OpenAI GP, LLC wholly owns and controls OpenAI OpCo LLC, which until recently was known as OpenAI LP. OpenAI, Inc. uses OpenAI GP LLC to control OpenAI OpCo LLC and OpenAI Global, LLC. OpenAI GP LLC was

9

involved in the copyright infringement alleged here through its direction and control of OpenAI OpCo LLC and OpenAI Global LLC.

46.    Defendant OpenAI OpCo LLC is a Delaware limited liability company with a principal place of business in San Francisco, California. OpenAI OpCo LLC was formerly known as OpenAI LP. OpenAI OpCo LLC is the sole member of OpenAI, LLC, and has been directly involved in OpenAI's mass infringement and has directed this infringement through its control of OpenAI, LLC. OpenAI OpCo LLC serves as the for-profit arm of OpenAI.

47.    Defendant OpenAI, LLC is a Delaware limited liability company with a principal place of business in San Francisco, California. OpenAI, LLC was formed in September 2020. OpenAI LLC monetizes and distributes OpenAI's GPT-based products, all of which born out of OpenAI's copyright infringement. Upon information and belief, OpenAI, LLC is owned and controlled by both OpenAI, Inc. and Microsoft Corporation, through OpenAI Global LLC and OpenAI OpCo LLC.

48.    Defendant OpenAI Global LLC is a Delaware limited liability company with a principal place of business in San Francisco, California. Microsoft Corporation has a minority stake in OpenAI Global LLC and OpenAI, Inc. has a majority stake in OpenAI Global LLC, indirectly through OpenAI Holdings LLC and OAI Corporation, LLC. OpenAI Global LLC was involved in the copyright infringement alleged here through its ownership, control, and direction of OpenAI LLC.

49.    Defendant OAI Corporation, LLC is a Delaware limited liability company with a principal place of business in San Francisco, California. OAI Corporation, LLC's sole member is OpenAI Holdings, LLC. OAI Corporation, LLC was and is involved in the unlawful conduct alleged herein through its ownership, control, and direction of OpenAI Global LLC and OpenAI LLC.

50.     Defendant OpenAI Holdings, LLC is a Delaware limited liability company, whose sole members are OpenAI, Inc. and Aestas, LLC. The sole member of Aestas, LLC is Aestas Management Company, LLC. Aestas Management Company, LLC is a Delaware company created to facilitate a half-billion-dollar capital raise for OpenAI. OpenAI Holdings LLC was involved in the infringement alleged herein through its indirect ownership, control, and direction of OpenAI OpCo LLC.

51.     Defendant OpenAI Startup Fund I LP is a limited partnership formed under the laws of Delaware with its principal place of business in San Francisco, California.

52.     Defendant OpenAI Startup Fund GP I LLC is a limited liability company formed under the laws of Delaware with its principal place of business in San Francisco, California.

53.     Defendant OpenAI Startup Fund Management LLC is a limited liability company formed under the laws of Delaware with its principal place of business in San Francisco, California.

C.     **Microsoft**

54.     Microsoft Corporation is a Washington corporation with a principal place of business and headquarters in Redmond, Washington. Microsoft has invested at least $13 billion in OpenAI, in exchange for which Microsoft is said to receive 75% of OpenAI's profits until its investment is repaid,[11] and reportedly owns a 49% stake in the company's for-profit operations. Microsoft has described its relationship with the OpenAI Defendants as a "partnership." This Microsoft–OpenAI partnership has included creating, developing and operating the supercomputing systems that the OpenAI Defendants used to house and make copies of copyrighted material in the training set for OpenAI's large language models. In course of designing

---

[11] Tom Warren, *Microsoft extends OpenAI partnership in a 'multibillion dollar investment'*, The Verge (Jan 23, 2023), *available at* https://www.theverge.com/2023/1/23/23567448/microsoft-openai-partnership-extension-ai.

and operating these tailored supercomputing systems for OpenAI's needs, Microsoft was both directly involved in making reproductions of copyrighted material, facilitated and supervised the copyright infringement committed by OpenAI.

## FACTUAL ALLEGATIONS

### A.   Generative AI and Large Language Models

55.   The terms "artificial intelligence" or "AI" refer generally to computer systems designed to imitate human cognitive functions.

56.   The terms "generative artificial intelligence" or "generative AI" refer specifically to systems that are capable of generating "new" content in response to user inputs called "prompts."

57.   For example, the user of a generative AI system capable of generating images from text prompts might input the prompt, "A lawyer working at her desk." The system would then attempt to construct the prompted image. Similarly, the user of a generative AI system capable of generating text from text prompts might input the prompt, "Tell me a story about a lawyer working at her desk." The system would then attempt to generate the prompted text.

58.   Recent generative AI systems designed to recognize input text and generate output text are built on "large language models" or "LLMs."

59.   OpenAI's LLMs are complex mathematical functions comprised of a series of algorithms that break down input text into smaller pieces—words or portions of words, called "tokens"—then translate those pieces into "vectors," or a sequence of numbers that is used to identify the token within the series of algorithms. Those vectors help place each token on a map, by identifying other tokens closely associated with the word.

60.   According to OpenAI, "the process begins by breaking text down into roughly word-length 'tokens,' which are converted to numbers. The model then calculates each token's

12

proximity to other tokens in the training data—essentially, how near one word appears in relation to any other word. These relationships between words reveal which words have similar meanings and functions." As the model trains and digests more expression, the algorithms depicting the relationship between various tokens changes with it.

61.    "Training" an LLM refers to the process by which the parameters that define an LLM's behavior are adjusted through the LLM's ingestion and analysis of large "training" datasets.

62.    The "training" of an LLM requires inputting large numbers of parameters in the model and then supplying the LLM with large amounts of text for the LLM to ingest—the more text, the better. That is, in part, and hand-in-hand with number of model specifications, the *large* in *large language model*.

63.    As the U.S. Patent and Trademark Office has observed, LLM "training" "almost by definition involve[s] the reproduction of entire works or substantial portions thereof."[12]

64.    "Training" in this context is therefore a technical-sounding euphemism for "copying and ingesting expression."

65.    Moreover, in some form and to some degree currently unknowable to the public, OpenAI's LLMs have "memorized" or stored their "training" data (even if in a "translated" form, such as a unique statistical profile), such that the data (at least in part) can be accessed, recalled, and reproduced by the LLM at will.[13]

---

[12] U.S. Patent & Trademark Office, *Public Views on Artificial Intelligence and Intellectual Property Policy* 29 (2020), *available at* https://www.uspto.gov/sites/default/files/documents/USPTO_AI-Report_2020-10-07.pdf (last accessed Jan. 22, 2024).

[13] *See* Jason Koebler, *Google Researchers' Attack Prompts ChatGPT to Reveal Its Training Data*, 404 Media (Nov. 29, 2023), *available at* https://www.404media.co/google-researchers-attack-convinces-chatgpt-to-reveal-its-training-data/ (last accessed Jan. 22, 2024); Kent K. Chang *et al.*, *Speak, Memory: An Archaeology of Books Known to ChatGPT/GPT-4* (2023), *available at* https://arxiv.org/pdf/2305.00118v1.pdf (last accessed Jan. 22, 2024).

66.     The quality of the LLM (that is, its capacity to generate human-seeming responses to prompts) is dependent on the quality of the datasets used to "train" the LLM.

67.     Professionally authored, edited, and published fiction and nonfiction books—such as those authored by Plaintiffs here—are an especially important source of LLM "training" data.

68.     Books have always been a key ingredient in training datasets for large language models because books offer the best examples of high-quality longform writing.

69.     As one group of AI researchers (not affiliated with Defendants) has observed, "[b]ooks are a rich source of both fine-grained information, how a character, an object or a scene looks like, as well as high-level semantics, what someone is thinking, feeling and how these states evolve through a story."[14]

70.     Once the "training" data is ingested, OpenAI can then control how closely the LLMs' outputs adhere to probability. Software engineers refer to this parameter as "temperature." If OpenAI engineers set its LLMs at a "hotter" temperature, the model will bias *against* what it calculates as the most probable response in favor of more random outputs. Likewise, the "cooler" the LLMs are set, the more closely their outputs will adhere to statistical probability. In this way, OpenAI can control the very perception of copying.

71.     LLMs can also be fine-tuned after "training" by adjusting the parameters to perform specific tasks.

72.     Once the OpenAI Language Models are trained on Plaintiffs' and the proposed class's works, they cannot function without exploiting expressive information extracted from Plaintiffs' works and retained inside the models. As such, the OpenAI Language Models are

---

[14] Yukun Zhu *et al.*, *Aligning Books and Movies: Towards Story-like Visual Explanations by Watching Movies and Reading Books* 1 (2015), *available at* https://arxiv.org/pdf/1506.06724.pdf (last accessed Jan. 22, 2024).

themselves infringing copies, made without Plaintiffs' permission and in violation of their exclusive rights under the Copyright Act.

73.    Finally, and as discussed below, OpenAI continues to produce new versions of their LLMs supported by increasingly more "training" data, much of which is copyrighted material. These new versions hone the performance of OpenAI's consumer-facing products through the ingestion of more copyrighted material.

74.    In other words, books are the high-quality materials Defendants want and have therefore outright pilfered to develop generative AI products that produce high-quality results: text that appears to have been written by a human writer.

75.    This use is highly commercial.

**B.    OpenAI's Willful Infringement of Plaintiffs' Copyrights**

      **1.    OpenAI**

76.    OpenAI (specifically, Defendant OpenAI Inc.) was founded in 2015 as a non- profit organization with the self-professed goal of researching and developing AI tools "unconstrained by a need to generate financial return."

77.    Four years later, in 2019, OpenAI relaunched itself (specifically, through Defendant OpenAI GP LLC and Defendant OpenAI OpCo LLC) as a for-profit enterprise dedicated to conducting the lion's share of OpenAI's operations—including product development—and to raising capital from investors seeking a return. OpenAI's corporate structure grew into an intricate web of for-profit holding, operating, and shell companies that manage OpenAI's day-to-day operations and grant OpenAI's investors (most prominently, Microsoft) authority and influence over OpenAI's operations.

78.     Investments began pouring in. Microsoft Corporation, one of the world's largest technology companies, invested $1 billion in 2019, an estimated $2 billion in 2021, and a staggering $10 billion in 2023, for a total investment of $13 billion.

79.     Industry observers valued OpenAI at up to $157 billion in October 2024.

## 2.     GPT-N and ChatGPT

80.     OpenAI's LLMs are collectively (and typically) referred to as "GPT-N," which stands for "Generative Pre-trained Transformer" (a specific type of LLM architecture), followed by a version number. "Pretrained" refers to the use of textual material for training, "generative" refers to the model's ability to emit text, and "transformer" refers to the underlying training algorithm.

81.     GPT-1 was released by OpenAI in June 2018.

82.     GPT-2 was released by OpenAI in February 2019.

83.     GPT-3 was released in 2020 and exclusively licensed to Microsoft the same year.

84.     OpenAI further refined GPT-3 into GPT-3.5, which was released in 2022.

85.     In November 2022, OpenAI released ChatGPT, a consumer-facing chatbot application built on GPT-3.5.

86.     ChatGPT's popularity exploded virtually overnight. By January 2023, less than three months after its release, the application had an estimated 100 million monthly active users, making it one of the fastest-growing consumer applications in history.

87.    The number of users grew to more than 180 million in September 2023,[15] and, according to OpenAI, reached 200 million as of August 2024.[16]

88.    GPT-4, the successor to GPT-3.5, was released in March 2023.

89.    GPT-4, and its successors including GPT-4V (September 2023), GPT-4 Turbo (November 2023), GPT-4o (May 2024), and GPT-4o Mini (July 2024), underly OpenAI's new subscription-based chatbot. Users can subscribe at the "Plus" tier for $20 per month or at the "Pro" tier for $200 per month.

90.    GPT-4.5 is OpenAI's "strongest GPT model."[17] In February 2025, OpenAI released a research preview of GPT-4.5. GPT-4.5 is available to the "Pro" tier users of OpenAI's subscription-based chatbot.

91.    Defendants intend to earn billions of dollars from this technology.

92.    When announcing the release of ChatGPT Enterprise, a subscription-based high-capability GPT-4 application targeted for corporate clients, in August 2023, OpenAI claimed that teams in "over 80% of Fortune 500 companies" were using its products.[18]

93.    GPT-4 and the successor models also underly Microsoft's Bing Chat product, offered through its Bing Internet search engine, and is integrated into its sales and marketing software, coding tools, productivity software, and cloud storage services.

---

[15] Anna Tong, *Exclusive: ChatGPT traffic slips again for third month in a row*, Reuters (Sept. 7, 2023) *available at* https://www.reuters.com/technology/chatgpt-traffic-slips-again-third-month-row-2023-09-07/ (last accessed Jan. 24, 2024).

[16] Juby Babu, *OpenAI says ChatGPT's weekly users have grown to 200 million*, Reuters (Aug. 29, 2024), *available at* https://www.reuters.com/technology/artificial-intelligence/openai-says-chatgpts-weekly-users-have-grown-200-million-2024-08-29/ (last accessed Feb. 7, 2025).

[17] OpenAI, *Introducing GPT–4.5* (Feb. 27, 2025), available at https://openai.com/index/introducing-gpt-4-5/ (last accessed June 6, 2025).

[18] OpenAI, *Introducing ChatGPT Enterprise* (Aug. 28, 2023), *available at* https://openai.com/blog/introducing-chatgpt-enterprise (last accessed Jan. 24, 2024).

94.    OpenAI's annualized revenue reached over $1.6 billion in 2023 due, in large part, to strong growth from its ChatGPT product.[19] OpenAI has made other language-model variants that are in commercial use but are not publicly accessible.

95.    Analysts estimate that Microsoft could earn more than $10 billion in annual revenue by 2026 *only* from AI add-ons to its Microsoft 365 productivity software, "at the core" of which lies OpenAI technology.[20]

### 3.    Knowingly "Training" GPT-N on Copyrighted Books

96.    OpenAI does not disclose or publicize with specificity what datasets GPT-1, GPT-2, GPT-3, GPT-3.5, GPT-4, or GPT-4.5 or their successors were "trained" on. Despite its name, OpenAI treats that information as proprietary.

97.    To "train" its LLMs—including GPT-3, GPT-3.5, GPT-4 and their successors— OpenAI has reproduced copyrighted books—including copyrighted books authored by Plaintiffs here— without their authors' consent.

98.    OpenAI has admitted as much.

99.    OpenAI has admitted that it has "trained" its LLMs on "large, publicly available datasets that include copyrighted works."[21]

100.    OpenAI has admitted that "training" LLMs "require[s] large amounts of data," and that "analyzing large corpora" of data "necessarily involves first making copies of the data to be analyzed."[22]

---

[19] Maria Heeter et al., *OpenAI Annualized Revenue Tops $1.6 Billions as Customers Shrug Off CEO Drama*, The Information (Dec. 30, 2023), *available at* https://www.theinformation.com/articles/openais-annualized-revenue- tops-1-6-billion-as-customers-shrug-off-ceo-drama (last accessed Jan. 22, 2024).

[20] Jordan Novet, *Microsoft starts selling AI tool for Office, which could generate $10 billion a year by 2026*, CNBC (Nov. 1, 2023), *available at* https://www.cnbc.com/2023/11/01/microsoft-365-copilot-becomes-generally-available.html (last accessed Jan. 22, 2024).

[21] OpenAI, *Comment Regarding Request for Comments on Intellectual Property Protection for Artificial Intelligence Innovation*, U.S. Patent and Trademark Office Dkt. No. PTO-C-2019-0038, at 1 (2019), *available at* https://www.uspto.gov/sites/default/files/documents/OpenAI_RFC-84-FR-58141.pdf (last accessed Jan. 22, 2024).

[22] *Id.*

101.    OpenAI has admitted that, if it refrained from using copyrighted works in its LLMs' "training," it would "lead to significant reductions in model quality."[23]

102.    OpenAI thus has conceded that reproduction of copyrighted works is central to the quality of its products.

103.    In response to a query submitted to it in January 2023, ChatGPT responded, "[i]t is possible that some of the books used to train me were under copyright. However, my training data was sourced from various publicly available sources on the internet, and it is likely that some of the books included in my training dataset were not authorized to be used. . . . If any copyrighted material was included in my training data, it would have been used without the knowledge or consent of the copyright holder."

104.    In another example, when prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *The Last Juror*, one of Plaintiff John Grisham's infringed works, and titled the infringing and unauthorized derivative "The Juror's Dilemma," using the same characters from Grisham's existing book.[24]

105.    Until recently, ChatGPT could be prompted to return quotations of text from copyrighted books with a good degree of accuracy, evidencing that the underlying LLM likely or must have ingested these books in their entireties during its "training."

106.    Now, however, ChatGPT generally responds to such prompts with the statement, "I can't provide verbatim excerpts from copyrighted texts." Thus, while ChatGPT previously provided such excerpts and in principle retains the capacity to do so, it has been restrained from doing so, if only temporarily, by its programmers.

---

[23] *Id.* at 7 n.33.
[24] Additional examples of OpenAI's plaintiff-specific infringement are detailed below.

107.    Instead of "verbatim excerpts," ChatGPT offers to produce a summary of the copyrighted book, which usually contains details not available in reviews and other publicly available material—again suggesting that the underlying LLM must have ingested the entire book during its "training."

108.    Notably, though, even when OpenAI fine-tunes a base model, it does not alter the fact of reproduction.

109.    OpenAI is characteristically opaque about where and how it procured the entirety of these books, including Plaintiffs' copyrighted works.

110.    OpenAI has disclosed limited details about the datasets used to "train" GPT-3.

111.    OpenAI admits that among the "training" datasets it used to "train" the model was "Common Crawl," and two "high-quality," "internet-based books corpora" which it calls "Books1" and "Books2."[25]

112.    Common Crawl is a vast and growing corpus of "raw web page data, metadata extracts, and text extracts" scraped from billions of web pages. It is widely used in "training" LLMs, and has been used to "train," in addition to GPT-N, Meta's LlaMa, and Google's BERT. It is known to contain text from books copied from pirate sites.[26]

113.    OpenAI previously refused to discuss the source or sources of the Books1 and Books2 datasets, but it has now admitted that these datasets were sourced and downloaded from the notorious pirate website LibGen.

---

[25] Tom B. Brown *et al.*, *Language Models Are Few-Shot Learners* 8 (2020), *available at* https://arxiv.org/pdf/2005.14165.pdf (last accessed Jan. 22, 2024).
[26] Alex Hern, *Fresh Concerns Raised Over Sources of Training Material for AI Systems*, The Guardian (Apr. 20, 2023), *available at* https://www.theguardian.com/technology/2023/apr/20/fresh-concerns-training-material-ai-systems-facist-pirated-malicious (last accessed Jan. 22, 2024).

114.    LibGen is already known to this Court as a notorious copyright infringer and is subject to a permanent injunction.[27]

115.    Since at least 2020, LibGen has also been listed on the Office of the United States Trade Representative (USTR) Review of Notorious Markets for Counterfeiting and Piracy.[28] The 2023 Review states the following about LibGen: "LibGen, also known as the 'Library Genesis Project,' hosts a large number of digital copies of books, manuals, journals, and other works, many of which are unauthorized copies of copyright protected content. According to LibGen, the site hosts 2.4 million non-fiction books, 80 million science magazine articles, 2.2 million fiction books, and 2 million comic strips."

116.    The books aggregated by these websites have also been available in bulk via torrent systems. These flagrantly illegal shadow libraries have long been of interest to the AI-training community: for instance, an AI researcher attempting to recreate Books1 and Book2 created the "Books3 dataset," a dataset comprised of nearly 200,000 books downloaded from Bibliotik—a pirate torrent tracker.

117.    OpenAI has not discussed the datasets used to "train" GPT-3.5, GPT-4 (or its successors), or their source or sources. GPT-3.5 and GPT-4 are significantly more powerful than their predecessors. GPT-3.5 contains roughly 200 billion parameters, and GPT 4 contains roughly 1.75 trillion parameters, compared to GPT-3's roughly 175 billion parameters.

---

[27] *See Elsevier Inc. v. Sci-Hub*, No. 1:15-cv-4282-RWS (S.D.N.Y.).
[28] 2020 Review *available at* https://ustr.gov/sites/default/files/files/Press/Releases/2020%20Review%20of%20Notorious%20Markets%20for%20Counterfeiting%20and%20Piracy%20(final).pdf (page 29); 2021 Review *available at* https://ustr.gov/sites/default/files/IssueAreas/IP/2021%20Notorious%20Markets%20List.pdf (page 25); 2022 Review available at https://ustr.gov/sites/default/files/2023-01/2022%20Notorious%20Markets%20List%20(final).pdf (page 29); 2023 Review *available at* https://ustr.gov/sites/default/files/2023_Review_of_Notorious_Markets_for_Counterfeiting_and_Piracy_Notorious_Markets_List_final.pdf (page 27).

118.    The growth in power and sophistication from GPT-3 to GPT-4 suggests a correlative growth in the size of the "training" datasets, raising the inference that one or more very large sources of pirated ebooks discussed above must have been used to "train" GPT-4.

119.    OpenAI downloaded books from LibGen. OpenAI has also admitted to using books downloaded from LibGen to train its models.[29]

120.    In short, OpenAI admits it needs[30] and uses[31] "large, publicly available datasets that include copyrighted works"[32]—and specifically, "high-quality"[33] copyrighted books—to "train" its LLMs; pirated sources of such "training" data are readily available; OpenAI admits it uses such sources; and these sources contain Plaintiffs' works.

121.    Defendants thus knew that their "training" data included texts protected by copyright but willfully proceeded without obtaining authorization.

## C.    **The Microsoft-OpenAI Partnership**

122.    OpenAI's "training" its LLMs could not have happened without Microsoft's financial and technical support.

123.    In 2020, Microsoft announced that it had developed Azure, "one of the top five publicly disclosed supercomputers in the world" which was "[b]uilt in collaboration with and exclusively for OpenAI," and "designed specifically to train that company's AI models."[34]

---

[29] "The Unbelievable Scale of AI's Pirated-Books Problem," *The Atlantic*, Alex Reisner, Mar. 20, 2025, https://www.theatlantic.com/technology/archive/2025/03/libgen-meta-openai/682093/ (last accessed Jun. 12, 2025).
[30] OpenAI, *Comment Regarding Request for Comments*, *supra*, at 7 n.33.
[31] *Id.* at 2.
[32] *Id.* at 1.
[33] Brown *et al.*, *Few-Shot Learners*, *supra*, at 8.
[34] Jennifer Langston, *Microsoft announces new supercomputer, lays out vision for future AI work*, Microsoft (May 19, 2020), *available at* https://news.microsoft.com/source/features/ai/openai-azure-supercomputer/ (last accessed Jan. 22, 2024).

124.    Furthermore, in 2023, Microsoft CEO Satya Nadella reminded the world that the "heavy lifting" for OpenAI's LLM "training" was done by Microsoft "compute infrastructure."[35]

125.    While OpenAI was responsible for designing the calibration and fine-tuning of the GPT models—and thus, the largescale copying of this copyrighted material involved in generating a model programmed to accurately mimic Plaintiffs' and others' expression—Microsoft built and operated the computer system that enabled this unlicensed copying in the first place.

126.    Since at least 2019, Microsoft has been deeply involved in the training, development, and commercialization of OpenAI's GPT products. Microsoft CEO Satya Nadella has called its relationship with OpenAI a "great commercial partnership."

127.    Given the volume of the training corpus—the equivalent of nearly four billion pages of single-spaced text—and the complexity of OpenAI's large language models, OpenAI required a specialized supercomputing system to train GPT-3, GPT-3.5, and GPT-4, GPT-4o, GPT-4.5 and their successors,—and thus copy and exploit the copyrighted material in its training set. That is where Microsoft came in. Microsoft's Azure provided the cloud computing systems that powered the training process and continues to power OpenAI's operations to this day. Microsoft and OpenAI worked together to design this system, which was used to train all OpenAI's GPT models. Without these bespoke computing systems, OpenAI would not have been able to execute and profit from the mass copyright infringement alleged herein.

128.    That compute infrastructure was not just general-purpose computer systems for OpenAI to use as it saw fit. Microsoft designed the system for the purpose of training OpenAI's LLMs, which Microsoft could then integrate into their commercial products.

---

[35] CNBC, *First on CNBC: CNBC Transcript: Microsoft CEO Satya Nadella Speaks with CNBC's Jon Fortt on "Power Lunch" Today* (Feb. 7, 2023), *available at* https://www.cnbc.com/2023/02/07/first-on-cnbc-cnbc-transcript-microsoft-ceo-satya-nadella-speaks-with-cnbcs-jon-fortt-on-power-lunch-today.html (last accessed Jan. 22, 2024).

129.    To ensure that the supercomputing system suited OpenAI's needs, Microsoft needed to test the system, both independently and in collaboration with OpenAI's software engineers. According to Mr. Nadella, with respect to OpenAI: "They do the foundation models, and we [Microsoft] do a lot of work around them, including the tooling around responsible AI and AI safety."

130.    Microsoft has in public statements acknowledged its intimate involvement in the development of OpenAI's GPT models. In a 2020 press release, Microsoft announced that it had built a bespoke supercomputing infrastructure "in collaboration and exclusively for OpenAI," "designed specifically to train that company's AI models. It represents a key milestone in a partnership announced last year to jointly create new supercomputing technologies in Azure." The press release went on to describe the computer "developed for OpenAI" as "top five" in the "world," and "a single system with more than 285,000 CPU cores, 10,000 GPUs and 4,000 gigabits per second of network connectivity for each GPU server."

131.    After the release of ChatGPT, Microsoft also took credit for its substantial role in the training process. In a February 2023 interview with Fortt Knox on CNBC, Mr. Nadella said that "beneath what OpenAI is putting out as large language models, remember, the heavy lifting was done by the Azure team to build the compute infrastructure." A few months later, in his keynote speech at the Microsoft Inspire conference, Mr. Nadella acknowledged that Microsoft "buil[t] the infrastructure to train [OpenAI's] models."

132.    That "heavy lifting" included (i) exchanging know-how and data and (ii) developing, maintaining, troubleshooting, supporting, and controlling the supercomputing system used by OpenAI to train its LLMs. Microsoft employees worked closely with OpenAI personnel

to understand the training process and training dataset used for OpenAI's GPT models. Indeed, Microsoft embedded several software engineers at OpenAI.[36]

133.   Through that process, Microsoft would have known that OpenAI's training data was scraped indiscriminately from the internet and included a massive quantity of pirated and copyrighted material, including a trove of copyrighted books. Through its creation and maintenance of the supercomputing system, Microsoft directly made unlicensed copies and provided critical assistance to OpenAI in making unlicensed copies of copyrighted material—including Plaintiffs' works and other copyrighted books—for the purpose of training the GPT models.

134.   The large-scale copyright infringement would have been obvious to OpenAI and its business partners. Microsoft also became aware of OpenAI's largescale copyright infringement in the course of conducting the due diligence required for its multibillion-dollar investments in OpenAI. As Andreesen Horowitz, another OpenAI investor, put it: "the only practical way generative AI models can exist is if they can be trained on an almost unimaginably massive amount of content, much of which . . . will be subject to copyright."[37] As the public company made its decision to invest $13 billion into OpenAI, Microsoft—like Andreesen Horowitz—was fully aware that OpenAI was taking a massive corpus of copyrighted content, without compensation to rightsholders, and copying it for the purpose of training and developing its GPT models to mimic the human writing.

---

[36] Cade Metz et al., *Microsoft and OpenAI's Close Partnership Shows Signs of Fraying*, New York Times (Oct. 21, 2024), *published a*t https://www.nytimes.com/2024/10/17/technology/microsoft-openai-partnership-deal.html (last visited Mar. 18, 2025).
[37] Andreeson Horowitz, Notice of Inquiry on Artificial Intelligence and Copyright, (Oct. 30, 2023), *available at* https://s3.documentcloud.org/documents/24117939/a16z.pdf.

135.    Microsoft's investment in OpenAI provided it an immediate incentive to ensure that OpenAI's LLMs were trained on the quantity and quality of data necessary to ensure their competitiveness.

136.    Indeed, in a November 2023 interview, Mr. Nadella stated: "We have all the IP rights and all the capability. If OpenAI disappeared tomorrow, I don't want any customer of ours to be worried about it quite honestly, because we have all of the rights to continue the innovation. Not just to serve the product, but *we can go and just do what we were doing in partnership ourselves. We have the people, we have the compute, we have the data, we have everything.*"[38] (emphasis added). Mr. Nadella continued, "And also this thing, it's not hands off, right? W*e are in there. We are below them, above them, around them*. We do the kernel optimizations, we build tools, we build the infrastructure. So that's why I think a lot of the industrial analysts are saying, 'Oh wow, it's really a joint project between Microsoft and OpenAI.'"[39] (emphasis added).

137.    The close partnership between OpenAI and Microsoft was publicly confirmed when Microsoft hired OpenAI CEO Sam Altman when Mr. Altman was terminated in November 2023. Shortly afterwards, under pressure from Microsoft and others, OpenAI reinstated Mr. Altman as CEO and granted Microsoft a nonvoting seat on the board of OpenAI, Inc.

138.    In addition to facilitating the training process, Microsoft has played a key role in commercializing OpenAI's GPT-based technology, and in doing so has profited from OpenAI's infringement of content owned by Plaintiffs and the proposed Class. At Microsoft's largest partner event of the year, Inspire, Mr. Nadella said that while OpenAI is "innovating on the algorithms

---

[38] Intelligencer Staff, *Satya Nadella on Hiring the Most Powerful Man in AI When OpenAI threw Sam Altman overboard, Microsoft's CEO saw an opportunity*, INTELLIGENCER (Nov. 21, 2023), available at https://nymag.com/intelligencer/2023/11/on-with-kara-swisher-satya-nadella-onhiring-sam-altman.html https://nymag.com/intelligencer/2023/11/on-with-kara-swisher-satya-nadella-onhiring-sam-altman.html (last accessed Dec. 11, 2023).
[39] *Id.*

and the training of these frontier models, [Microsoft] innovate[s] on applications on top of it." For example, Microsoft unveiled Bing Chat, a generative AI chatbot feature on its search engine powered by GPT-4, and, in turn, ChatGPT integrated a "Browse with Bing" feature on paid ChatGPT Plus offering. Microsoft has also made extensive use of OpenAI's models in its "Copilot" application offerings and in the "GitHub Copilot" AI coding editor.

139.    On January 21, 2025, Microsoft announced that Microsoft was continuing its "strategic partnership with OpenAI" through 2030.[40] The announcement further stated that "Microsoft has approved OpenAI's ability to build additional capacity, primarily for research and training of models."[41] When asked in an interview about certain of Microsoft's future commitments to OpenAI's infrastructure, Mr. Nadella stated "[a]ll I know is I'm good for my $80 billion."[42]

### D.    GPT-N's and ChatGPT's Harm to Authors

140.    ChatGPT and the LLMs underlying it seriously threaten the livelihood of the very authors—including Plaintiffs here, as discussed specifically below—on whose works they were "trained" without the authors' consent or authorization.

141.    Goldman Sachs estimates that generative AI could replace 300 million full-time jobs in the near future, or one-fourth of the labor currently performed in the United States and Europe.

---

[40] *Microsoft and OpenAI evolve partnership to drive the next phase of AI*, Microsoft Corporate Blogs (Jan. 21, 2025), *published at* https://blogs.microsoft.com/blog/2025/01/21/microsoft-and-openai-evolve-partnership-to-drive-the-next-phase-of-ai/#:~:text=In%20addition%20to%20this%2C%20OpenAI,of%20first%20refusal%20(ROFR) (last accessed Feb. 7, 2025).

[41] *Id.*

[42] "Satya Nadella on Elon's Stargate accusations: 'All I know is I'm good for my $80 billion.'" *The Verge* (Jan. 22, 2025) https://www.theverge.com/2025/1/22/24349798/satya-nadella-on-elons-stargate-accusations-all-i-know-is-im-good-for-my-80-billion.

142.     Already, writers report losing income from copywriting, journalism, and online content writing—important sources of income for many book authors. The Authors Guild's most recent author earnings study[43] shows a median writing-related income for full-time authors of just over $20,000, and that full-time traditional authors earn only half of that from their books. The rest comes from activities like content writing—work that is starting to dry up as a result of generative AI systems like ChatGPT.

143.     Another content writer told the *Washington Post* that half of his annual income (generated by ten client contracts) was erased when the clients elected to use ChatGPT instead.[44]

144.     Recently, the owner of popular online publications such as *Gizmodo*, *Deadspin*, *The Root*, *Jezebel* and *The Onion* came under fire for publishing an error-riddled, AI-generated piece, leading the Writers Guild of America to demand "an immediate end of AI-generated articles" on the company's properties.[45]

145.     In a survey of authors conducted by The Authors Guild in March 2023 (early in ChatGPT's lifecycle), 69 percent of respondents said they consider generative AI a threat to their profession, and 90 percent said they believe that writers should be compensated for the use of their work in "training" AI.

146.     As explained above, ChatGPT initially provided verbatim quotes of copyrighted text. Currently, it instead readily offers to produce summaries of such text. These summaries are

---

[43] Authors Guild, "Top Takeaways from the 2023 Author Income Survey (2023), *available at* https://authorsguild.org/news/key-takeaways-from-2023-author-income-survey/#:~:text=Though%20overall%20author%20incomes%20are,coming%20in%20a%20close%20second (last accessed Jan. 22, 2024).

[44] Pranshu Verma & Gerrit De Vynck, *ChatGPT Took Their Jobs. Now They Walk Dogs and Fix Air Conditioners*, The Washington Post (June 2, 2023), *available at* https://www.washingtonpost.com/technology/2023/06/02/ai-taking-jobs (last accessed Jan. 22, 2024).

[45] Todd Spangler, *WGA Slams G/O Media's AI-Generated Articles as 'Existential Threat to Journalism,' Demands Company End Practice*, Variety (July 12, 2023), *available at* https://variety.com/2023/digital/news/wga-slams-go-media-ai-generated-articles-existential-threat-1235668496 (last accessed Jan. 22, 2024).

themselves derivative works, ineluctably based on original unlawfully copied work that could be—but for ChatGPT—licensed by the authors of the underlying works to willing, *paying* licensees.

147.    ChatGPT creates other outputs that are derivative of authors' copyrighted works. Businesses are sprouting up to sell prompts that allow users to enter the world of an author's books and create derivative stories within that world. For example, a business called Socialdraft offers long prompts that lead ChatGPT to engage in "conversations" with popular fiction authors like Plaintiff Grisham, Margaret Atwood, Dan Brown, and others about their works, as well as prompts that promise to help customers "Craft Bestselling Books with AI."

148.    OpenAI also allows third parties to build their own applications on top of ChatGPT by making it available through an "application programming interface" or "API." Applications integrated with the API allow users to generate works of fiction, including books and stories similar to those of Plaintiffs and other authors.[46]

149.    Defendants' unauthorized commercial copying of Plaintiffs' works and works owned by the proposed Class was manifestly unfair use. Even OpenAI's attempt to anthropomorphize its commercial product underscores the unlawful nature of its conduct. By OpenAI's own telling, ChatGPT uses copyrighted texts for the same purpose OpenAI claims an ordinary reading consumer may use a book—to review, understand, and learn from the expression in it, including the order of words, presentation of facts, and syntax, among other expressive elements. Yet humans who learn from books—even those who might describe their reading experience as merely a series of parts not summed into any whole—do not routinely copy them, and inherently must buy them, or borrow them from libraries that buy them, providing some

---

[46] Adi Robertson, *I Tried the AI Novel-Writing Tool Everyone Hates, and It's Better than I Expected*, The Verge (May 24, 2023), *available at* https://www.theverge.com/2023/5/24/23732252/sudowrite-story-engine-ai-generated-cyberpunk-novella (last accessed Jan. 22, 2024).

measure of compensation to authors and creators. OpenAI copies books and provides no compensation. It has usurped authors' content for the purpose of creating a machine built to generate the very type of content for which authors usually would be paid.

150.    Furthermore, ChatGPT is being used to generate low-quality ebooks, impersonating authors, and displacing human-authored books.[47] For example, author Jane Friedman discovered "a cache of garbage books" written under her name for sale on Amazon.[48]

151.    Even OpenAI CEO Sam Altman admitted in testimony to the Senate that "creators deserve control over how their creations are used, and what happens sort of beyond the point of releasing it into the world" and that "creators, content owners need to benefit from this technology."[49]

152.    Plaintiffs and other professional writers are thus reasonably concerned about the risks OpenAI's conduct poses to their livelihoods specifically and the literary arts generally.

153.    To this end, The Authors Guild, among others, have given voice to these concerns on behalf of working American authors.

154.    The Authors Guild is the nation's oldest and largest professional writers' organization. It "exists to support working writers and their ability to earn a living from authorship."[50]

---

[47] Jules Roscoe, *AI-Generated Books of Nonsense Are All Over Amazon's Bestseller Lists*, Vice (June 28, 2023), *available at* https://www.vice.com/en/article/v7b774/ai-generated-books-of-nonsense-are-all-over-amazons-bestseller-lists (last accessed Jan. 22, 2024).
[48] Pilar Melendez, *Famous Author Jane Friedman Finds AI Fakes Being Sold Under Her Name on Amazon*, The Daily Beast (Aug. 8, 2023), *available at* https://www.thedailybeast.com/author-jane-friedman-finds-ai-fakes-being-sold-under-her-name-on-amazon (last accessed Jan. 22, 2024).
[49] Ted Johnson, *OpenAI CEO Sam Altman Says Content Owners Need To Get "Significant Upside Benefit" From New Technology*, Deadline (May 16, 2023), *available at* https://deadline.com/2023/05/ai-chat-gpt-senate-sam-altman-1235368420/ (last accessed Jan. 22. 2024).
[50] Authors Guild, https://authorsguild.org (last accessed Jan. 22, 2024).

155.    Among other principles, The Authors Guild holds that "authors should not be required to write or speak without compensation. Writers, like all professionals, should receive fair payment for their work."[51]

156.    In June 2023, The Authors Guild wrote an open letter (the "Open Letter") calling on OpenAI and other major technology companies to fairly license authors' works for use in LLM "training."

157.    The Open Letter emphasizes that "[g]enerative AI technologies built on large language models owe their existence to our writings," and protests "the inherent injustice in exploiting our works as part of your AI systems without our consent, credit, or compensation."[52]

158.    The Open Letter also points to the risks to authors' livelihoods posed by generative AI like GPT-N and ChatGPT: "As a result of embedding our writings in your systems, generative AI threatens to damage our profession by flooding the market with mediocre, machine-written books, stories, and journalism based on our work. The introduction of generative AI threatens to make it even more difficult, if not impossible, for writers—especially young writers and voices from under-represented communities—to earn a living from their profession."[53]

159.    To date, the Open Letter has been signed by more than 15,000 authors,[54] including many Plaintiffs here.[55]

---

[51] Authors Guild, *Principles*, https://authorsguild.org/about/principles (last accessed Jan. 22, 2024).
[52]    Open Letter from The Authors Guild to Sam Altman *et al.*, at 1, *available at* https://authorsguild.org/app/uploads/2023/07/Authors-Guild-Open-Letter-to-Generative-AI-Leaders.pdf    (last accessed Jan. 22, 2024).
[53] *Id.*
[54] Authors Guild, *Open Letter to Generative AI Leaders*, *available at* https://actionnetwork.org/petitions/authors-guild-open-letter-to-generative-ai-leaders (last accessed Jan. 22, 2024).
[55] *See* Open Letter, *supra*, at 2–124.

160.    In short, the success and profitability of OpenAI are predicated on mass copyright infringement without a word of permission from or a nickel of compensation to copyright owners, including Plaintiffs here. OpenAI knows it; its investors know it; and Plaintiffs know it.

### E.    Defendants Have Profited From Their Unlicensed Exploitation of Copyrighted Material At the Expense of Authors

161.    Microsoft and OpenAI have enjoyed substantial commercial gain from their GPT-based commercial offerings, including ChatGPT Plus, ChatGPT Enterprise, Bing Chat, and the licensing of the OpenAI API for businesses seeking to develop their own generative AI systems built on top of GPT-3, GPT-3.5, GPT-4, GPT-4o, GPT-4.5, and their successors.

162.    As of November 2023, ChatGPT has reported over 100 million weekly active users. Included among those users are 92% of all Fortune 500 companies.[56] OpenAI has generated revenue through its subscription services, ChatGPT Plus ($20/month) and its business-focused ChatGPT Enterprise. OpenAI is currently generating revenue of more than $100 million per month, on pace for $1.3 billion per year.

163.    Microsoft has also reaped the benefits from its investment and development of ChatGPT. Since incorporating GPT-3 into its Bing search engine, Bing surpassed more than 100 million daily active users for the first time in its history. That surge was in large part attributable to the incorporation of OpenAI's GPT models, as large percentage of Bing's new users are using Bing Chat daily.

164.    Microsoft has also been integrating ChatGPT and OpenAI's LLMs into Azure and Office 365 products and charging add-on fees for users seeking to take advantage of generative AI offerings. Microsoft Teams is charging an additional license for use of AI features. Microsoft has

---

[56] Aisha Malik, OpenAI's ChatGPT Now Has 100 Million Weekly Active Users, (last visited Nov. 20, 20230, https://techcrunch.com/2023/11/06/openais-chatgpt-now-has-100-million-weekly-active-users/.

also unveiled a GPT-4-powered product called Microsoft 365 Copilot, which, according to Microsoft, "combines the power of large language models (LLMs) with your data in the Microsoft Graph and the Microsoft 365 apps to turn your words into the most powerful productivity tool on the planet." Microsoft Copilot is $30 per month. Analysts project that the integration of GPT into Microsoft products could generate more than $10 billion in annualized revenue by 2026,[57] with just one version of this integration—"GitHub Copilot"—already generating more than $100 million in annual recurring revenue.[58]

165.    Microsoft has also been benefitting, and continues to benefit, from the copyright infringement as a stakeholder of OpenAI through its profit-sharing arrangement with OpenAI and through the use of its own models trained on pirated data to aid in its commercialization efforts.

### F.    Defendants Exploited Each of Plaintiffs' Copyrighted Works

166.    Plaintiffs' works collectively span a wide range of commercial fiction and nonfiction whose continuing commercial viability is endangered by Defendants.

167.    Each author represented here has a distinct voice, a distinct style, and distinct creative expression. But all Plaintiffs have suffered the same types of harms from Defendants' infringing reproductions of their works.

168.    Plaintiffs make the specific allegations of infringement below based on what is known about OpenAI's training practices; what is known about the contents, uses, and availability of the pirate book repositories such as LibGen, Bibliotik, and Z-Library; and the results of Plaintiffs' testing of ChatGPT.

---

[57] Novet, *supra* Note 3, (last visited Nov. 20, 2023).
[58] Holmes, *supra* Note 4, (last visited Nov. 20, 2023).

169.    As OpenAI investor Andreesen Horowitz has admitted, "large language models," like Defendants' GPT models, "are trained on something approaching the entire corpus of the written word," a corpus that would of course include Plaintiffs' works.

170.    The Books3 dataset, similar in size to Books2, was built from a corpus of pirated copies of books available on the site Bibliotik. Many of the works authored and owned by Plaintiffs, including Plaintiff Baldacci, are available on Books3.

171.    ***Plaintiffs Baldacci and Columbus Rose, Ltd.*** Baldacci is a best-selling author, philanthropist, and lawyer whose novels have been adapted for film and television, published in over 45 languages and in more than 80 countries, with 150 million copies sold worldwide. Some of Baldacci's most popular works include books in the Camel Club series, Vega Jane series, and Archer series. Columbus Rose, Ltd. is a company owned by Baldacci.

172.    Baldacci is a member of The Authors Guild.

173.    Baldacci is the author and owner of the registered copyrights listed under his name in Exhibit A. Baldacci is also the author of the registered copyrights listed under Columbus Rose, Ltd. in Exhibit A. Columbus Rose, Ltd. is the legal and/or beneficial owner of the registered copyrights listed under its name in Exhibit A. OpenAI ingested and copied all or many of the works listed under Baldacci and Columbus Rose, Ltd. without permission (the "Baldacci Infringed Works").

174.    The registration information for the Baldacci Infringed Works is contained in Exhibit A to this Complaint, at 1–2.

175.    OpenAI and Microsoft unlawfully and willfully copied the Baldacci Infringed Works and used them to "train" OpenAI's LLMs without Baldacci's permission.

176. For example, when prompted, ChatGPT accurately generated summaries of several of the Baldacci Infringed Works, including summaries of *The Collectors, The Finisher*, and *One Good Deed*.

177. When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of The Simple Truth, one of the Baldacci Infringed Works, and titled the infringing and unauthorized derivative "The Complex Justice," using the same characters from Baldacci's existing book.

178. When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of Total Control, one of the Baldacci Infringed Works, and titled the infringing and unauthorized derivative "Total Control: Unfinished Business," using the same characters from Baldacci's existing book.

179. When prompted, ChatGPT generated an accurate summary of the final chapter of Long Road to Mercy, one of the Baldacci Infringed Works.

180. ChatGPT could not have generated the material described above if OpenAI's LLMs had not ingested and been "trained" on the Baldacci Infringed Works.

181. Similarly, Baldacci's works *One Good Deed, The Collectors,* and *The Finisher* (and other works) appear in the pirated Books3 dataset.

182. ***Plaintiff Branch***. Branch is the author of, among other works, *America in the King Years*, a three-volume history of Martin Luther King Jr. and the Civil Rights Movement. He received the 1989 Pulitzer Prize in History for the first volume in the series, *Parting the Waters: America in the King Years, 1954-63*. Five of his books, including *Parting the Waters*, are a part of the Books3 dataset. Pirated copies of each of nearly all of his books are available on the internet through websites like LibGen, ZLibrary, and/or Bibliotik.

183. When prompted with questions about Branch's books, ChatGPT returned detailed, accurate summaries of them, including of *Parting the Waters*. Upon information and belief, ChatGPT is able to return such detailed information only because it was trained on Plaintiff Branch's books.

184. Branch is the author and owner of the registered copyrights listed under his name in Exhibit A to this Complaint, at 2.

185. ***Plaintiffs Connelly and Hieronymus, Inc.*** Connelly is a best-selling author with over 85 million copies of his books sold worldwide and translated into 45 foreign languages. Some of Connelly's most popular novels include *The Lincoln Lawyer*, *City of Bones*, and *The Law of Innocence*. Hieronymus, Inc. is a loan-out corporation owned by Connelly.

186. Connelly is a member of The Authors Guild.

187. Connelly is the author of and owner of the registered copyrights under his name in Exhibit A. Connelly is also the author of the registered copyrights listed under Hieronymus, Inc. in Exhibit A. Hieronymus, Inc. is the legal and/or beneficial owner of the registered copyrights listed under its name in Exhibit A. OpenAI ingested and copied all or many of the works listed under Connelly and Hieronymus, Inc. without permission (the "Connelly Infringed Works").

188. The registration information for the Connelly Infringed Works is contained in Exhibit A to this Complaint, at 2–4.

189. OpenAI unlawfully and willfully copied the Connelly Infringed Works and used them to "train" OpenAI's LLMs without Connelly's permission.

190. For example, when prompted, ChatGPT accurately generated summaries of several of the Connelly Infringed Works, including summaries for *The Black Echo*, *The Poet*, and *The Crossing*.

191.     When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *The Lincoln Lawyer*, one of the Connelly Infringed Works, and titled the infringing and unauthorized derivative "The City's Shadows," using the same characters from Connelly's existing book.

192.     When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *The Brass Verdict*, one of the Connelly Infringed Works, and titled the infringing and unauthorized derivative "Double-Edged Justice," using the same characters from Connelly's existing book.

193.     When prompted, ChatGPT generated an accurate summary of the final chapter of *The Late Show*, one of the Connelly Infringed Works.

194.     ChatGPT could not have generated the material described above if OpenAI's LLMs had not ingested and been "trained" on the Connelly Infringed Works.

195.     Similarly, Connelly's works *The Lincoln Lawyer, Echo Park, The Brass Verdict* (and others) appear in the pirated Books3 dataset.

196.     ***Plaintiffs Day and Sylvia Day LLC.*** Day is a best-selling author of over twenty award-winning novels, including ten *New York Times* best sellers and thirteen *USA Today* best sellers. Her work has been translated into forty-one languages. Some of Day's most popular novels include books in *The Crossfire® Saga* series, the *Georgian* series, and the *Marked* series. Sylvia Day LLC is a loan-out company owned by Day.

197.     Day is a member of The Authors Guild Council and a member of The Authors Guild.

198.     Day is the author of and owner of the registered copyrights listed under her name in Exhibit A. Day is also the author of the registered copyrights listed under Sylvia Day LLC in Exhibit A. Sylvia Day LLC is the legal and/or beneficial owner of the registered copyrights listed

under its name in Exhibit A. OpenAI ingested and copied all or many of the works listed under Day and Sylvia Day LLC in Exhibit A without permission (the "Day Infringed Works").

199. The registration information for the Day Infringed Works is contained in Exhibit A to this Complaint, at 4–6.

200. OpenAI and Microsoft unlawfully and willfully copied the Day Infringed Works and used them to "train" OpenAI's LLMs without Day's permission.

201. For example, when prompted, ChatGPT accurately generated summaries of several of the Day Infringed Works, including summaries for *Bared to You*, *One With You*, and *Ask For It*.

202. When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *A Touch of Crimson*, one of the Day Infringed Works, and titled the infringing and unauthorized derivative "Crimson Temptations: A Love Rekindled," using the same characters from Day's existing book.

203. When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *Butterfly in Frost*, one of the Day Infringed Works, and titled the infringing and unauthorized derivative "Butterfly in Frost: Embers of Desire," using the same characters from Day's existing book.

204. When prompted, ChatGPT generated an accurate summary of the final chapter of *The Stranger I Married*, one of the Day Infringed Works.

205. ChatGPT could not have generated the material described above if OpenAI's LLMs had not ingested and been "trained" on the Day Infringed Works.

206. Similarly, Day's works *All Revved Up, Aftershock,* and *Captivated by You* (and others) appear in the pirated Books3 dataset.

207.    ***Plaintiff Franzen***. Franzen is a novelist whose honors include the National Book Award, the James Tait Black Memorial Award, the Heartland Prize, Die Welt Literature Prize, the Budapest Grand Prize, and the first Carlos Fuentes Medal awarded at the Guadalajara International Book Fair. Franzen is a member of the American Academy of Arts and Letters, the American Academy of Arts and Sciences, the German Akademie der Künste, and the French Ordre des Arts et des Lettres. Some of Franzen's most popular novels include *The Corrections, Purity,* and *Freedom*.

208.    Franzen is a member of The Authors Guild.

209.    Franzen is the sole author and owner or beneficial owner of the registered copyrights in five (5) written works of fiction, all or many of which OpenAI ingested and copied without permission (the "Franzen Infringed Works").

210.    The registration information for the Franzen Infringed Works is contained in Exhibit A to this Complaint, at 6.

211.    OpenAI unlawfully and willfully copied the Franzen Infringed Works and used them to "train" OpenAI's LLMs without Franzen's permission.

212.    For example, when prompted, ChatGPT accurately generated summaries of several of the Franzen Infringed Works, including summaries for *The Corrections*, *Purity*, and *Freedom*.

213.    When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *The Corrections*, one of the Franzen Infringed Works, and titled the infringing and unauthorized derivative "Revisions," using the same characters from Franzen's existing book.

214.    When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *The Twenty-Seventh City*, one of the Franzen Infringed

Works, and titled the infringing and unauthorized derivative "The Rising Metropolis," using the same characters from Franzen's existing book.

215.    When prompted, ChatGPT generated an accurate summary of the final chapter of *Freedom*, one of the Franzen Infringed Works.

216.    ChatGPT could not have generated the material described above if OpenAI's LLMs had not ingested and been "trained" on the Franzen Infringed Works.

217.    Similarly, Franzen's works *How to Be Alone, Spring Awakening, Strong Motion,* and *The Discomfort Zone* (and others) appear in the pirated Books3 dataset.

218.    ***Plaintiffs Christopher Golden and Daring Greatly Corporation.*** A New York Times best-selling author and Bram Stoker Award winner, Golden is the author of *Ararat*. Golden owns copyrights in multiple works. Daring Greatly Corporation is a loan-out corporation owned by Golden.

219.    Golden is the author and owner of the registered copyrights listed under his name in Exhibit A. OpenAI ingested and copied all or many of the works listed under Golden in Exhibit A (the "Golden Infringed Works").

220.    The registration information for the Golden Infringed Works is contained in Exhibit A to this Complaint, at 6.

221.    OpenAI and Microsoft unlawfully and willfully copied the Golden Infringed Works and used them to "train" OpenAI's LLMs without Golden's permission.

222.    For example, when prompted, ChatGPT accurately generated summaries of *Ararat.*

223.    ChatGPT could not have generated the material described above if OpenAI's LLMs had not ingested and been "trained" on the Golden Infringed Works.

224.    ***Plaintiffs Andrew Sean Greer.*** Winner of the Pulitzer Prize for Fiction, Greer is a novelist and the author of *The Confessions of Max Tivoli.* Greer owns copyrights in multiple works ("Greer Infringed Works").

225.    The registration information for the Greer Infringed Works is contained in Exhibit A to this Complaint, at 6.

226.    OpenAI and Microsoft unlawfully and willfully copied the Greer Infringed Works and used them to "train" OpenAI's LLMs without Greer's permission.

227.    For example, when prompted, ChatGPT accurately generated summaries of *The Confessions of Max Tivoli.*

228.    ChatGPT could not have generated the material described above if OpenAI's LLMs had not ingested and been "trained" on the Greer Infringed Works.

229.    ***Plaintiffs Grisham and Belfry Holdings, Inc.*** Grisham is a civically engaged and best-selling author. His award-winning work has been translated into approximately 50 languages and adapted for both television and film. Some of Grisham's most popular novels include *The Pelican Brief*, *The Runaway Jury*, and *The Rainmaker*. Belfry Holdings, Inc. is a company owned by Grisham.

230.    Grisham is a member of The Authors Guild.

231.    Grisham is the author and owner of the registered copyrights listed under his name in Exhibit A. Grisham is also the author of the registered copyrights listed under Belfry Holdings, Inc. in Exhibit A. Belfry Holdings, Inc. is the legal and/or beneficial owner of the copyrights listed under its name in Exhibit A. OpenAI ingested and copied all or many of the works listed under Grisham and Belfry Holdings, Inc. in Exhibit A without permission (the "Grisham Infringed Works").

232. The registration information for the Grisham Infringed Works is contained in Exhibit A to this Complaint, at 6–7.

233. OpenAI and Microsoft unlawfully and willfully copied the Grisham Infringed Works and used them to "train" OpenAI's LLMs without Grisham's permission.

234. For example, when prompted, ChatGPT accurately generated summaries of several of the Grisham Infringed Works, including summaries for *The Chamber*, *The Client*, and *The Firm*.

235. When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *The King of Torts*, one of the Grisham Infringed Works, and titled the infringing and unauthorized derivative "The Kingdom of Consequences," using the same characters from Grisham's existing book.

236. When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *The Last Juror*, one of the Grisham Infringed Works, and titled the infringing and unauthorized derivative "The Juror's Dilemma," using the same characters from Grisham's existing book.

237. When prompted, ChatGPT generated an accurate summary of the final chapter of *The Litigators*, one of the Grisham Infringed Works.

238. ChatGPT could not have generated the material described above if OpenAI's LLMs had not ingested and been "trained" on the Grisham Infringed Works.

239. Similarly, Grisham's works *The King of Torts*, *Runaway Jury*, *The Street Lawyer*, *Rogue Lawyer*, *The Appeal, The Associate*, and *The Last Juror* (and others) appear in the pirated Books3 dataset.

240. ***Plaintiff David Henry Hwang.*** Hwang is a playwright and screenwriter and author of *The Dance and the Railroad.* Hwang owns copyrights in multiple works ("Hwang Infringed Works").

241.    The registration information for the Hwang Infringed Works is contained in Exhibit A to this Complaint, at 7.

242.    OpenAI and Microsoft unlawfully and willfully copied the Hwang Infringed Works and used them to "train" OpenAI's LLMs without Hwang's permission.

243.    For example, when prompted, ChatGPT accurately generated summaries of *The Dance and the Railroad.*

244.    ChatGPT could not have generated the material described above if OpenAI's LLMs had not ingested and been "trained" on the Hwang Infringed Works.

245.    ***Plaintiff Matthew Klam.*** Klam is a fiction writer and magazine journalist. His works include *Who is Rich?* and *Sam the Cat.* Klam owns copyrights in multiple works ("Klam Infringed Works").

246.    The registration information for the Klam Infringed Works is contained in Exhibit A to this Complaint, at 7.

247.    OpenAI and Microsoft unlawfully and willfully copied the Klam Infringed Works and used them to "train" OpenAI's LLMs without Hwang's permission.

248.    For example, when prompted, ChatGPT accurately generated summaries of *Sam the Cat.*

249.    ChatGPT could not have generated the material described above if OpenAI's LLMs had not ingested and been "trained" on the Klam Infringed Works.

250.    ***Plaintiff Martin and Wo & Shade LLC***. Martin is an award-winning author, television producer, and writer who is widely known for his fantasy, science fiction, and horror writing. Some of Martin's most popular novels include *A Game of Thrones*, *A Clash of Kings*, and *A Storm of Swords*. Wo & Shade LLC is a loan-out company owned by Martin.

251.    Martin is the author of and owner of the registered copyrights listed under his name in Exhibit A. Martin is also the author of the registered copyrights listed under Wo & Shade LLC in Exhibit A. Wo & Shade LLC is the legal and/or beneficial owner of the registered copyrights listed under its name in Exhibit A. OpenAI ingested and copied all or many of the works listed under Martin and Wo & Shade LLC in Exhibit A without permission (the "Martin Infringed Works").

252.    The registration information for the Martin Infringed Works is contained in Exhibit A to this Complaint, at 7–8.

253.    OpenAI unlawfully and willfully copied the Martin Infringed Works and used them to "train" OpenAI's LLMs without Martin's permission.

254.    In July 2023, Liam Swayne used ChatGPT to generate versions of *The Winds of Winter* and *A Dream of Spring,* intended to be the final two books in the series *A Song of Ice and Fire*, which Martin is currently writing.

255.    An experiment conducted by researchers at the University of California, Berkeley, into the "memorization" of works by ChatGPT found that Martin's novel *A Game of Thrones* ranked 12th with respect to the degree of "memorization."[59]

256.    When prompted, ChatGPT accurately generated summaries of several of the Martin Infringed Works, including summaries for Martin's novels *A Game of Thrones*, *A Clash of Kings*, and *A Storm of Swords,* the first three books in the series *A Song of Ice and Fire*.

257.    When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for an alternate sequel to *A Clash of Kings*, one of the Martin Infringed Works, and titled

---

[59] *See* Kent K. Chang *et al.*, *Speak, Memory: An Archaeology of Books Known to ChatGPT/GPT-4* (2023), *available at* https://arxiv.org/pdf/2305.00118v1.pdf (last accessed Dec. 4, 2023).

the infringing and unauthorized derivative "A Dance With Shadows," using the same characters from Martin's existing books in the series *A Song of Ice and Fire*.

258. When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for a prequel book to *A Game of Thrones*, one of the Martin Infringed Works, and titled the infringing and unauthorized derivative "A Dawn of Direwolves," using the same characters from Martin's existing books in the series *A Song of Ice and Fire*.

259. When prompted, ChatGPT generated an accurate summary of the final chapter of *The Armageddon Rag*, one of the Martin Infringed Works.

260. ChatGPT could not have generated the results described above if OpenAI's LLMs had not ingested and been "trained" on the Martin Infringed Works.

261. Similarly, Martin's works *A Game of Thrones* and *A Clash of Kings* (and others) appear in the pirated Books3 dataset.

262. ***Plaintiff Picoult***. A *New York Times* best-selling author, Picoult writes popular fiction. Picoult is also the recipient of many awards, including the New England Bookseller Award for Fiction, the Alex Awards from the YALSA, a lifetime achievement award for mainstream fiction from the Romance Writers of America, the NH Literary Award for Outstanding Literary Merit and the Sarah Josepha Hale Award. Some of Picoult's most popular novels include *My Sister's Keeper*, *Nineteen Minutes*, and *House Rules*.

263. Picoult is a member of The Authors Guild.

264. Picoult is the sole author of and owner or beneficial owner of the registered copyrights in twenty-seven (27) written works of fiction, all or many of which OpenAI ingested and copied without permission (the "Picoult Infringed Works").

265. The registration information for the Picoult Infringed Works is contained in Exhibit A to this Complaint, at 8–9.

266.    OpenAI unlawfully and willfully copied the Picoult Infringed Works and used them to "train" OpenAI's LLMs without Picoult's permission.

267.    For example, when prompted, ChatGPT accurately generated summaries of several of the Picoult Infringed Works, including summaries for *Keeping Faith*, *Handle With Care*, and *Sing You Home*.

268.    When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *The Small Great Things*, one of the Picoult Infringed Works, and titled the infringing and unauthorized derivative "Small Great Things: Unfinished Business," using the same characters from Picoult's existing book.

269.    When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *My Sister's Keeper*, one of the Picoult Infringed Works, and titled the infringing and unauthorized derivative as "My Sister's Legacy," using the same characters from Picoult's existing book.

270.    When prompted, ChatGPT generated an accurate summary of the final chapter of *Change of Heart*, one of the Picoult Infringed Works.

271.    ChatGPT could not have generated the material described above if OpenAI's LLMs had not ingested and been "trained" on the Picoult Infringed Works.

272.    Similarly, Picoult's works *My Sister's Keeper*, *Keeping Faith*, and *Between the Lines* (and others) appear in the pirated Books3 dataset.

273.    ***Plaintiffs Schiff and Gattopardo, LLC***. Schiff is the recipient of the 2000 Pulitzer Prize in Biography for *Véra (Mrs. Vladimir Nabokov)*. Plaintiff Schiff is also the author of the *New York Times* bestsellers *Cleopatra: A Life*; *The Witches: Salem, 1692*; and *The Revolutionary: Samuel Adams*. Her work has appeared in *The New Yorker*, *The New York Review of Books*, and *The New York Times*. Gattopardo, LLC is a company owned by Schiff.

274.    Schiff is the author and owner of the registered copyrights listed under her name in Exhibit A. Gattopardo, LLC is the beneficial owner of the copyrights listed under its name in Exhibit A. OpenAI ingested and copied all or many of the works listed under Schiff in Exhibit A without permission (the "Schiff Infringed Works").

275.    The registration information for the Schiff Infringed Works is contained in Exhibit A to this Complaint, at 9.

276.    OpenAI and Microsoft unlawfully and willfully copied the Schiff Infringed Works and used them to "train" OpenAI's LLMs without Schiff's permission.

277.    For example, when prompted with questions about Plaintiff Schiff's books, ChatGPT returned detailed, accurate summaries of them, including of *The Witches* and *Cleopatra*. Upon information and belief, ChatGPT is able to return such detailed information only because it was trained on Plaintiff Schiff's books.

278.    ***Plaintiff Shapiro***. Shapiro is the author of a number of nonfiction books, including *Oberammergau: The Troubling Story of the World's Most Famous Passion Play* and *1599: A Year in the Life of William Shakespeare.* He is the Larry Miller Professor of English and Comparative Literature at Columbia University.

279.    At least four of his books, including *The Year of Lear* and *Contested Will*, are a part of the Books3 dataset. Pirated copies of nearly all his books are available on the internet through websites like LibGen, ZLibrary, and/or Bibliotik.

280.    When prompted with questions about Plaintiff Shapiro's books, ChatGPT returned detailed, accurate summaries of them, including of *Contested Will*. Upon information and belief, ChatGPT is able to return such detailed information only because it was trained on Plaintiff Shapiro's books.

281.    Shapiro is the author and owner of the registered copyrights listed under his name in Exhibit A to this Complaint, at 9.

282.    ***Plaintiff The Authors Guild,*** The Authors Guild is the owner of the registered copyrights in Mignon Eberhart's works, including *While the Patient Slept* and *The Patient in Room 18*.

283.    Mignon G. Eberhart (1899–1996), dubbed "America's Agatha Christie," was the author of dozens of mystery novels over nearly sixty years. Several of Eberhart's novels have been adapted for film, including *Hasty Wedding*, *Mystery House*, *While the Patient Slept*, *The Patient in Room 18*, and *The White Cockatoo*.

284.    The Authors Guild is the owner or beneficial owner of the registered copyrights in eleven (11) written works of fiction, all or many of which OpenAI ingested and copied without permission (the "Authors Guild Infringed Works").

285.    The registration information for the Authors Guild Infringed Works is contained in Exhibit A to this Complaint, at 10.

286.    OpenAI and Microsoft unlawfully and willfully copied the Authors Guild Infringed Works and used them to "train" OpenAI's LLMs without The Authors Guild's permission.

287.    For example, when prompted, ChatGPT accurately generated summaries of several of the Authors Guild Infringed Works, including summaries for *While the Patient Slept* and *The Patient in Room 18.*

288.    When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *While the Patient Slept*, one of the Authors Guild Infringed Works, and titled the infringing and unauthorized derivative "Shadows Over Federie House," using the same characters from Eberhart's existing book.

289.     When prompted, ChatGPT generated an infringing, unauthorized, and detailed outline for the next purported installment of *The Patient in Room 18*, one of the Authors Guild Infringed Works, and titled the infringing and unauthorized derivative "Echoes from Room 18," using the same characters from Eberhart's existing book.

290.     When prompted, ChatGPT generated an accurate summary of the final chapter of *While the Patient Slept*, one of the Authors Guild Infringed Works.

291.     ChatGPT could not have generated the material described above if OpenAI's LLMs had not ingested and been "trained" on the Authors Guild Infringed Works.

292.     Similarly, Eberhart's works *Escape the Night* and *Postmark Murder* appear in the pirated Books3 dataset.

## CLASS ALLEGATIONS

### A.     Class Definitions

293.     This action is brought by Plaintiffs individually and on behalf of the following Class, as defined below, pursuant to Rules 23(b)(3), 23(b)(2), and Rule 23(c)(4) of the Federal Rules of Civil Procedure.

294.     The Class consists of:

All legal or beneficial owners of copyrighted works that: (A) were registered with the United States Copyright Office within five years of the work's first publication; (B) were downloaded or otherwise reproduced by OpenAI or Microsoft; (C) were registered with the United States Copyright Office before being downloaded or otherwise reproduced by OpenAI or Microsoft, or were registered within three months of first publication; and (D) are assigned one or more International Standard Books Number(s) (ISBN) or Amazon Standard Identification Number(s) (ASIN).

295.     Excluded from the definition of the Class above are Defendants; Defendants' co-conspirators, aiders and abettors, and members of their immediate families; Defendants' corporate parents, subsidiaries, and affiliates; Defendants' directors, officers, employees, and other agents,

as well as members of their immediate families; and any judge who may preside over this action, the judge's staff, and members of their immediate families.

**B.    Rules 23(a) and 23(g)**

296.    The Class consists of more than one hundred thousand authors and copyright holders and thus are so numerous that joinder of all members is impractical.

297.    The identities of members of the Class can be readily ascertained from business records maintained by Defendants and other sources.

298.    The claims asserted by Plaintiffs are typical of the claims of the Class because their copyrights were infringed in materially the same way and their interests in preventing future infringement and redressing past infringement are materially the same.

299.    The Plaintiffs will fairly and adequately protect the interests of the Class and do not have any interests antagonistic to those of other members of the Class.

300.    Plaintiffs have retained attorneys who are knowledgeable and experienced in copyright and class action matters, as well as complex litigation.

301.    There are questions of fact or law common to the Class, including:

    a.    Whether Defendants copied works owned by Plaintiffs and the members of the Class;

    b.    Whether Defendants' copying of Plaintiffs' and the Class's copyrighted works consisted direct, vicarious, or contributory infringement; and

    c.    Whether Defendants' copying of Plaintiffs' and the Class's copyrighted works entitles the Plaintiffs and Class members to damages, including statutory damages and the amount of statutory damages; and

    d.    Whether Defendants' copying of works owned by Plaintiffs and the Class was willful.

C.    **Rule 23(b)**

302.    Defendants have acted on grounds common to Plaintiffs and the Class by treating all Plaintiffs' and Class Members' works equally, in all material respects, in their reproducing and maintaining the Class's works without consent and or compensation, and in Defendants' LLM "training."

303.    Common questions of liability for infringement predominate over any individualized damages determinations as may be necessary. To decide liability, the Court will necessarily apply the same law to the same conduct, which Defendants engaged in indiscriminately with respect to all Plaintiffs and all members of the Class.

304.    Further, to the extent Plaintiffs elect to pursue statutory rather than actual damages before final judgment, the damages inquiry will likewise be common across Plaintiffs and members of the Class.

305.    A class action is superior to any individual litigation of Plaintiffs' and Class Members' claims. Class Members have little practical ability or interest, distinct from Plaintiffs' and other Class Members', in prosecuting individual actions. It would waste judicial resources to decide the same legal questions repeatedly, thousands of times over, on materially indistinguishable facts. The Class presents no special manageability problems.

306.    This action is also appropriate as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants infringing conduct is applicable generally to Plaintiffs and the proposed Class and the requested injunctive relief is appropriate respecting the proposed Class as a whole.

**D.**    **Rule 23(c)(4)**

307.    In the alternative to certification under Rule 23(b)(3) and 23(b)(2), common questions predominate within the determination of liability for infringement, therefore the issue of liability may be separately certified for class treatment even if the entire action is not.

## CLAIMS FOR RELIEF

## COUNT I: COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)

### By Plaintiffs and the Class Against OpenAI and Microsoft

308.    Plaintiffs and the Class, incorporate by reference the allegations in Paragraphs 1 to 307 as though fully set forth herein.

309.    Plaintiffs and members of the Class have created literary works that are original and fixed in a tangible medium of expression, and they own the registered copyrights in the works that Defendants reproduced and appropriated to train their artificial intelligence models.

310.    Plaintiffs and members of the Class therefore hold the exclusive rights, including the rights of reproduction, to those works under 17 U.S.C. § 106.

311.    Defendants infringed on the rights, under 17 U.S.C. § 106, of Plaintiffs and members of the proposed Class by, among other things, reproducing the works owned by Plaintiffs and the proposed Class from shadow libraries and to create and develop datasets used to train their artificial intelligence models. Specifically, Plaintiffs and members of the Class assert claims for direct infringement against both Microsoft and OpenAI.

312.    On information and belief, Defendants' infringing conduct alleged herein was and continues to be willful. Defendants infringed on the rights of Plaintiffs and members of the proposed Class knowing that they were profiting from mass copyright infringement.

313.    Plaintiffs and members of the proposed Class are entitled to statutory damages, actual damages, disgorgement, and other remedies available under the Copyright Act.

314.    Plaintiffs and members of the proposed Class have been and continue to be irreparably injured due to Defendants' conduct, for which there is no adequate remedy at law. Defendants will continue to infringe on the exclusive right of Plaintiffs and the proposed class unless their infringing activity is enjoined by this Court. Plaintiffs are therefore entitled to permanent injunctive relief barring Defendants' ongoing infringement.

## COUNT II: VICARIOUS COPYRIGHT INFRINGEMENT

### By Plaintiffs and the Class Against Microsoft, OpenAI Inc. and OpenAI GP LLC

315.    Plaintiffs and the Class incorporate and reallege Paragraphs 1 through 314 above.

316.    Microsoft controlled, directed, and profited from the infringement perpetrated by OpenAI. Microsoft controls and directs the supercomputing platform used to store, process, and reproduce the training datasets containing the works owned by Plaintiffs and the proposed Class. Under the terms of their agreements, Microsoft had the power to supervise OpenAI's use of copyrighted material to train its LLMs.

317.    Microsoft profited from OpenAI's direct infringement through its investment in OpenAI and its monetization of GPT-based products.

318.    Defendants OpenAI Inc. and OpenAI GP LLC had the right and ability to control the direct infringement alleged in Count I because Defendant OpenAI Inc. fully controls Defendant OpenAI GP LLC, and Defendant OpenAI GP LLC fully controls Defendant OpenAI OpCo LLC, according to the corporate structure outlined above.

319.    Defendants OpenAI Inc. and OpenAI GP LLC have a direct financial interest in the direct infringement alleged in Count I because they benefit from the profits and investments generated by Defendant OpenAI OpCo LLC's infringing activities.

320.    Defendants Microsoft, OpenAI Inc. and OpenAI GP LLC are vicariously liable for the direct infringement alleged in Count I.

## COUNT III: CONTRIBUTORY INFRINGEMENT

**By Plaintiffs and the Class Against Microsoft, OpenAI, Inc., OpenAI GP LLC, OpenAI Global LLC, OpenAI LLC, OAI Corporation LLC, OpenAI Holdings LLC, OpenAI Startup Fund I LP, OpenAI Startup Fund GP I LLC, and OpenAI Startup Fund Management LLC**

321.    Plaintiffs and the Class incorporate by reference and reallege the allegations in Paragraphs 1 to 320 as though fully set forth herein.

322.    Microsoft materially contributed and facilitated OpenAI's direct infringement alleged in Count I by providing billions of dollars in investments and designing, creating, and maintaining the bespoke supercomputing system that OpenAI used to maintain and copy the copyrighted works owned by Plaintiffs and the proposed Class. This assistance was necessary for OpenAI to perpetrate the largescale copyright infringement alleged herein.

323.    Microsoft knew, or had reason to know, of the direct infringement alleged in Count I because OpenAI, upon information and belief, informed Microsoft as part of the due diligence process that it was copying and scraping copyrighted material in order to train its generative artificial intelligence models. Furthermore, in the course of designing and maintain its bespoke supercomputing system, Microsoft became aware of OpenAI's direct infringement and directly assisted the copying of copyrighted content owned by Plaintiffs and the proposed Class.

324.    Microsoft profited from OpenAI's direct infringement through its investment in OpenAI and its monetization of GPT-based products.

325.    Microsoft is liable for contributing to the direct infringement alleged in Count I.

326.    OpenAI, Inc., OpenAI GP LLC, OpenAI Global LLC, OpenAI LLC, OAI Corporation LLC, OpenAI Holdings LLC, OpenAI Startup Fund I LP, OpenAI Startup Fund GP I LLC, and OpenAI Startup Fund Management LLC each directly and indirectly control, direct, and manage other OpenAI entities, including OpenAI OpCo LLC, that are and were responsible for

the direct infringement alleged in Count I. These OpenAI entities, through their direction and control of other OpenAI entities, were aware of the direct infringement perpetrated by a variety of OpenAI entities, as alleged in Count I. These OpenAI entities profited from the infringement perpetrated by OpenAI as a whole through their ownership of other OpenAI entities.

327.    Defendants Microsoft, OpenAI, Inc., OpenAI GP LLC, OpenAI Global LLC, OpenAI LLC, OAI Corporation LLC, and OpenAI Holdings LLC, OpenAI Startup Fund I LP, OpenAI Startup Fund GP I LLC, and OpenAI Startup Fund Management LLC, are each liable for contributing to the direct infringement alleged in Count I.

## PRAYER FOR RELIEF

328.    Plaintiffs, on behalf of themselves and all others similarly situated, pray for the following relief:

a.  Certification of this action as a class action under Federal Rule of Civil Procedure 23;

b.  Designation of Plaintiffs as class representatives;

c.  Designation of Plaintiffs' counsel as class counsel;

d.  An injunction prohibiting Defendants from infringing on Plaintiffs' and class members' copyrights, including without limitation enjoining Defendants from using, offering, deriving revenue from or otherwise operating any models that were trained on Plaintiffs' and class members' copyrighted works without express authorization and likewise continuing to train on the same works without such authorization;

e.  An award of actual damages to Plaintiffs and class members;

f.  An award of Defendants' additional profits attributable to infringement to Plaintiffs and class members;

g.  An award of statutory damages up to $150,000 per infringed work to Plaintiffs and members of the Class, in the alternative to actual damages and profits, at Plaintiffs' election before final judgment;

h.  Restitutionary and non-restitutionary disgorgement;

i.  Reasonable attorneys' fees and costs, as allowed by law;

j.  Pre-judgment and post-judgment interest, as allowed by law; and

k.  Such further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial for all claims so triable.

Dated:  June 13, 2025

<u>*/s/ Justin A. Nelson*</u>
Justin A. Nelson (*pro hac vice*)
SUSMAN GODFREY L.L.P
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Tel.: 713.651.9366
jnelson@susmangodfrey.com

***Interim Lead Class Counsel***

Alejandra C. Salinas (*pro hac vice*)
Amber B. Magee (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Tel.: 713.651.9366
asalinas@susmangodfrey.com
amagee@susmangodfrey.com

Rohit D. Nath (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: 310.789.3100
rnath@susmangodfrey.com

J. Craig Smyser
Charlotte Lepic
SUSMAN GODFREY L.L.P.
One Manhattan West, 51st Floor
New York, NY 10001
Tel.: 212.336.8330
csmyser@susmangodfrey.com
clepic@susmangodfrey.com

Jordan W. Connors (*pro hac vice*)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel.: 206.516.3880
jconnors@susmangodfrey.com

*Counsel for Class Plaintiffs*

*/s/ Rachel Geman*
Rachel Geman
Anna J. Freymann
Wesley Dozier (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Tel.: 212.355.9500
rgeman@lchb.com
afreymann@lchb.com
wdozier@lchb.com

Reilly T. Stoler (pro hac vice)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel.: 415.956.1000
rstoler@lchb.com

*/s/ Scott J. Shoulder*
Scott J. Shoulder
CeCe M. Cole
COWAN DEBAETS ABRAHAMS & SHEPPARD LLP
60 Broad Street, 30th Floor
New York, NY  10010
Tel.: 212.974.7474
ssholder@cdas.com
ccole@cdas.com

*Counsel for Class Plaintiffs*

/s/ *Joseph R. Saveri*
Joseph R. Saveri (pro hac vice anticipated)
Cadio Zirpoli (pro hac vice anticipated)
Christopher K.L. Young (pro hac vice anticipated)
Holden Benon (pro hac vice anticipated)
Aaron Cera (pro hac vice anticipated)
Alexander Y. Zeng (pro hac vice anticipated)
JOSEPH SAVERI LAW FIRM,
601 California Street, Suite 1505
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile:  (415) 395-9940
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
cyoung@saverilawfirm.com
hbenon@saverilawfirm.com
acera@saverilawfirm.com
azeng@saverilawfirm.com


Matthew Butterick (pro hac vice anticipated)
1920 Hillhurst Avenue, 406
Los Angeles, CA 90027
Telephone:   (323) 968-2632
Facsimile:   (415) 395-9940
mb@buttericklaw.com

Bryan L. Clobes (pro hac vice anticipated)
Mohammed A. Rathur (pro hac vice anticipated)
Krishna Motta (pro hac vice anticipated)
Alex Lee (pro hac vice anticipated)
CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP
135 South LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone: (312) 782-4880
bclobes@caffertyclobes.com
mrathur@caffertyclobes.com
kmotta@caffertyclobes.com
alee@caffertyclobes.com


*Counsel for Class Plaintiffs*

*/s/ David Boies*
David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8201
Fax: (914) 749-8300
dboies@bsfllp.com

Jesse Michael Panuccio (pro hac vice anticipated)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, DC 20005
(202) 237-2727
jpanuccio@bsfllp.com

Maxwell V. Pritt  (pro hac vice anticipated)
Joshua Michelangelo Stein (pro hac vice anticipated)
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
(415) 293-6813
(415) 293-6800
jstein@bsfllp.com
mpritt@bsfllp.com

*Counsel for Class Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify this 13th day of June 2025, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the court using the CM/ECF system which will send notification to the attorneys of record and is available for viewing and downloading.

<em>/s/ Justin A. Nelson</em>
Justin A. Nelson