**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In Re: OpenAI, Inc. Copyright Infringement Litigation

This Document Relates To:

No. 1:23-cv-08292
No. 1:23-cv-10211
No. 1:23-cv-11195
No. 1:24-cv-03285
No. 1:24-cv-04872
No: 1:24-cv-01515
No: 1:25-cv-04315

Case No. 1:25-md-3143-SHS-OTW

**REDACTED – PUBLIC VERSION**

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1
LEGAL STANDARD ..... 1
ARGUMENT ..... 2
I. SEVERAL OPINIONS OF BOOKS PLAINTIFFS' TECHNICAL, INDUSTRY, AND HARM EXPERTS SHOULD BE EXCLUDED. ..... 2
A. Technical Expert Dr. Ben Zhao ..... 2
1. Zhao's Improper Factual Narrative & Intent Opinions ..... 2
2. Zhao's "Memorization" Opinions ..... 3
3. Zhao's "AI Risk" Opinions ..... 3
B. Harm Expert Michael Lasinski ..... 4
1. Lasinski's "Substitution" Opinion ..... 4
2. Lasinski's "Market Dilution" Opinion ..... 6
C. Attorney Expert Mark Seeley ..... 8
II. A NUMBER OF OPINIONS OF NEWS PLAINTIFFS' TECHNICAL EXPERTS SHOULD BE EXCLUDED. ..... 8
A. Goldstein ..... 9
1. Goldstein's "Copies" Opinion ..... 9
2. Goldstein's CMI-Removal Opinion ..... 11
a. Invalid "CMI" ..... 11
b. Deficient Searching ..... 12
3. Goldstein's Analyses of Copilot Logs ..... 13
a. "Inflated" Matches ..... 13
b. Flawed "Leak" Analysis ..... 15
c. Misleading Web-Domain and "Impressions" Counts ..... 15
d. Untimely Supplemental Report ..... 17
4. Goldstein's Opinion On Microsoft's Role ..... 18
B. Wenger ..... 19
1. Wenger's Text-Matching Analysis ..... 19
2. Wenger's Other "Regurgitation" Analyses ..... 20
3. Wenger's CMI-Removal Opinion ..... 20
4. Wenger's Copilot Log Extrapolations ..... 22

**TABLE OF CONTENTS**
(continued)


**Page**

C. Delorey ........ 23

1. Delorey's "Copies" Opinion ........ 23

2. Delorey's CMI-Removal Opinion ........ 24

D. Etzioni ........ 25

III. CERTAIN OPINIONS OF NEWS PLAINTIFFS' INDUSTRY EXPERTS SHOULD BE EXCLUDED. ........ 28

A. Industry Expert Jessie Stricchiola ........ 28

1. Stricchiola's Copilot and Bing Click-Through-Rate Comparisons ........ 28

2. Stricchiola's Meta tag Opinion ........ 30

B. Industry Expert Jonathan Krein ........ 32

C. Industry Experts Professor Emily Bell, Professor Taylor Owen, Sue Cross ........ 33

1. Owen, Bell, and Cross's Market-Substitution and Harm Opinions ........ 34

2. Owen and Bell's Reliance on Marketing Surveys ........ 35

3. Bell's "News Websites" and "Pink Slime Websites" Lists ........ 36

D. Attorney Expert Antoinette Tease ........ 37

IV. NEWS PLAINTIFFS' HARM EXPERT OPINIONS SHOULD BE EXCLUDED. ........ 38

A. James Malackowski ........ 38

1. Malackowski's Market-Harm Opinion ........ 38

2. Malackowski's Reliance on Others ........ 39

B. Michael McDonald ........ 41

CONCLUSION ........ 42

## TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) .................. 1, 15, 18, 34

*Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 167479 (S.D.N.Y. May 2, 2011)........................ 41

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ........................................................ 6

*Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530 (D. Md. 2002)........................... 39

*CCM Touring LLC v. Moonbug Ent. Ltd.*, 2026 WL 848392 (S.D.N.Y. Mar. 27, 2026) ............ 11

*Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992) ......................................... 9

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .......................................... 1, 17, 37

*Deere & Co. v. Kinze Mfg., Inc.*, No. 4:20-cv-00389-RGE-HCA (S.D. Iowa Feb. 8, 2024) ....... 37

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 539489 (S.D.N.Y. Feb. 10, 2015) ........................................................................................................................ 42

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020) ....... 20

*Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21 (2d Cir. 2017)............................................. 35

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ................................................................ 1, 3, 16

*Gutierrez v. St. Teresa of Avila Church*, 2025 WL 2403361 (S.D.N.Y. Aug. 19, 2025) ......... 2, 37

*Hayden v. Int'l Bus. Machines Corp.*, No. 21 CV 2485 (VB), 2025 WL 1697021 (S.D.N.Y. June 17, 2025) ........................................................................................................................ 35

*Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005).................... 2, 19

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453 (S.D.N.Y. 2014) ............... 2, 35, 37

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213 (S.D.N.Y. 2018) ........................................................................................... 6, 28, 40, 41

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................ 2, 19

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268 (S.D.N.Y. 2000) 5, 35, 39

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................................. 1

*Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315 (S.D.N.Y. 2015).................... *passim*

*Munoz v. Orr*, 200 F.3d 291 (5th Cir. 2000)................................................................................... 35

*Nimely v. City of New York,* 414 F.3d 381 (2d Cir. 2005) .................................................. *passim*

*Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106 (S.D.N.Y. 2021) .............. 37

*Ryoo Dental, Inc. v. Han*, 2016 WL 6138413 (C.D. Cal. April 25, 2016) .................................. 30

*SEC v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013)............................................................... 2, 3

*See In re Terrorist Attacks on Sep. 11, 2001*, 2025 WL 2383768 (S.D.N.Y. Aug. 18, 2025)...... 11

*Skillz Platform Inc. v. Papaya Gaming, Ltd.*, 2026 WL 395323 (S.D.N.Y. Feb. 12, 2026)......... 11

**Statutes**

17 U.S.C. § 1202(c) ....................................................................................................... 13

17 U.S.C. § 401.................................................................................................................. 25, 26

17. U.S.C. § 1202(b)(1) .................................................................................................. 40

**Other Authorities**

Fed. R. Evid. 702, Committee Notes on Rules – 2023 Amendment ............................................. 1

**Rules**

Federal Rule of Evidence 702......................................................................................... *passim*

## INTRODUCTION

Defendants OpenAI and Microsoft jointly move to exclude the identified opinions of Plaintiffs' experts on the grounds set forth below. Because these opinions are inadmissible under Federal Rule of Evidence 702, they are not evidence properly considered in connection with either side's pending motions for summary judgment.

## LEGAL STANDARD

Rule 702 imposes a gatekeeping obligation on district courts to ensure that expert testimony admitted at trial is relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The gatekeeping obligation applies to all forms of specialized expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999). The Court must undertake "a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

The 2023 amendments confirmed that the sufficiency of an expert's basis and reliable application of methodology go to admissibility, not weight. *See* Fed. R. Evid. 702, Committee Notes on Rules – 2023 Amendment. Opinion evidence is not admissible where it is "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Courts must exclude testimony when "there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 146. The offering party must prove by a preponderance of the evidence that each opinion passes muster under all four requirements: (a) ***helpful*** to the trier of fact; (b) based on ***sufficient*** facts or data; (c) the product of a ***reliable method***; and (d) the method must be ***reliably applied*** to the facts of the case. 2023 Committee Notes.

# ARGUMENT

## I. SEVERAL OPINIONS OF BOOKS PLAINTIFFS' TECHNICAL, INDUSTRY, AND HARM EXPERTS SHOULD BE EXCLUDED.

### A. Technical Expert Dr. Ben Zhao

#### 1. Zhao's Improper Factual Narrative & Intent Opinions

An expert who merely recites documents "usurps . . . the role of . . . the jury" and provides no specialized assistance. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). Expert testimony must apply specialized knowledge to the facts at hand and be more than "merely a narrative of the case." *Id.* at 551 (citation modified); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (expert's factual narrative inadmissible). Zhao quotes internal documents, paraphrases deposition testimony, and cites publicly available papers—with no meaningful analysis connecting these facts to any technical conclusion. Instead, Zhao repeats a pattern of quoting or paraphrasing a document or deposition excerpt, then asserts that it supports the conclusion that books are valuable for LLM training—without applying any technical methodology. *See, e.g.,* ECF1787(Ex.A), Section IV; *id.*(Ex.B), Section V.B; *id.*(Ex. C) ¶¶9-11.

Zhao also improperly offers scienter and legal opinions. "[S]tate of mind is not a proper subject of expert testimony." *SEC v. Tourre*, 950 F. Supp. 2d 666, 681 (S.D.N.Y. 2013); *Gutierrez v. St. Teresa of Avila Church*, 2025 WL 2403361, at *5 (S.D.N.Y. Aug. 19, 2025) (prohibiting experts' "legal conclusions"); *In re Longtop Fin. Techs. Ltd. Sec. Litig*., 32 F. Supp. 3d 453, 460 (S.D.N.Y. 2014) (prohibited legal conclusions include "whether a party acted with objective reasonableness . . . or with any other relevant state of mind."). Assertions about what Microsoft and OpenAI "knew" and were "motivated" to do pervade Zhao's reports (*see, e.g.*, ECF1787(Ex. A) ¶20; *id*.(Ex. B) ¶111; *id*.(Ex. C) ¶110)—yet at deposition, Zhao repeatedly

disclaimed that he was opining on intent, *see, e.g.*, Paven Malhotra ISO Defendants' Rule 702 Motion ("Malhotra Decl.") Ex. 21, 119:8-11, and beyond reading documents could not explain how he knows what Microsoft and OpenAI knew, *id.* 243:12-246:4. These opinions require exclusion. *Tourre*, 950 F. Supp. 2d at 681.

**2. Zhao's "Memorization" Opinions**

Zhao's belated opinions that the GPT models at issue "memorize" copyrighted works during training in his rebuttal and reply reports should also be excluded as untethered to the facts of the case. He conducted no original testing on the actual GPT models at issue. The only experiment behind his compression opinion is a replication of a blog post in which a generic file-compression program (Gzip), run over Shakespeare, generates text. ECF1787(Ex. C) ¶¶25-29. It was a compression exercise, not an LLM experiment. Malhotra Decl., Ex. 21, 300:1-301:3, 349:16-350:1 ("Your . . . experiment used no model at all, correct? ... [Y]es, that's true"). Other studies Zhao relies upon analyzed third-party LLMs, not the models in the case. ECF1787(Ex. A) ¶¶39, 55-58, 64. Where there is "too great an analytical gap between the data and the opinion proffered," the opinion must be excluded. *Joiner*, 522 U.S. at 146. Zhao does not bridge the gap between the theoretical possibility that LLMs could memorize training data and whether the accused models in fact memorized Plaintiffs' works.

**3. Zhao's "AI Risk" Opinions**

Zhao opines that "AI Poses Substantial Risks" citing Sam Altman's testimony, a 2023 Statement on AI Risk, a declaration from a global safety summit, and internal OpenAI memos—but without adding technical insight beyond what those documents say. *See* ECF1787(Ex. B) ¶¶140-164. Moreover, speculative risks of unalleged harms posed by AI are not reliable nor helpful in analyzing whether Defendants infringed copyrights or training an LLM constitutes fair use.

### B. Harm Expert Michael Lasinski

Books Plaintiffs assert that ChatGPT and Copilot have harmed the Asserted Works in their traditional market and will cause future harm because of alleged "market dilution." While Defendants' experts applied traditional economic analysis to conclude that ChatGPT and Copilot had no statistically significant impact on Books Plaintiffs' sales or revenues, Plaintiffs' expert Lasinski offers no reliable method or data to assess harm from purported substitution of AI outputs for Plaintiffs' books. Part 1, *infra.* His opinion on market dilution, which is not a cognizable form of harm, is based on assumption, rather than evidence. Part 2, *infra.* Lasinski's overall lack of evidence is consistent with Books Plaintiffs' admissions that ChatGPT and Copilot outputs have not harmed them, much less replaced them. *See, e.g.*, ECF1741 (Exs. 132, 135, 136 at Interrogatory No. 22); Malhotra Decl., Ex. 5, 56:16-57:11 (Jonathan Franzen describing ChatGPT's attempt to write in his "[redacted]" as "[redacted]").[1]

#### 1. Lasinski's "Substitution" Opinion

Assessing market harm is an economic exercise. An expert opining on substitution must apply specialized knowledge or methodology in a manner designed to assist the jury, based on "sufficient facts or data," reliably analyzed. *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315, 319 (S.D.N.Y. 2015). In practice, that means considering "information about consumer tastes and preferences"—such as sales or revenue data, consumer surveys, or other market evidence—and grounding the opinion in "data-driven" analysis. *Id.* at 319. Lasinski could have attempted to identify harm in Books Plaintiffs' sales or revenue data and trace that harm back to

[1] Lasinski also offered damages opinions. Should Books Plaintiffs proceed to trial on any claims, Defendants reserve the right to challenge Lasinski's damages opinions based on at least his failure to assess causation in any but-for analysis; improper hypothetical license analysis; and improper recitation and narration of extensive record evidence without any expert analysis.

Defendants' products. He did not—and indeed ignored available book-sales and revenue data he could have used to test his conclusions. This failure is "fundamental and fatal." *Id*. at 315, 319 ("failure to obtain information about consumer tastes and preferences" when assessing consumer demand "create[s] 'too great an analytical gap between the data and the opinion proffered'").

Lasinski did not conduct any analysis identifying declines in Plaintiffs' sales or revenue or testing whether any such declines were attributable to Defendants' products rather than other causes. Malhotra Decl., Ex. 9, 82:13-15, 97:16-98:11, 100:12-17 (admitting he did not conduct an empirical analysis). He ignored revenue and sales data from Books Plaintiffs and also failed to assess the sales data Defendants' experts obtained from third-party provider Circana. Indeed, Lasinski confirmed at deposition that he is not making a "causal claim" that ChatGPT or Copilot reduced revenues for human-generated books. *Id.* 97:16-98:11. Nor did he conduct market research. He did not survey consumers about their purchasing preferences, analyze consumer behavior to determine whether readers "[redacted]" *id.* 236:13-23, or identify ***any AI*** (let alone ChatGPT or Copilot) output or book that caused Plaintiffs to lose a sale. *Id*. 100:6-17. Because an expert may not disregard "readily-obtainable" data bearing directly on his hypothesis (here, at least the Circana data), his opinion that Defendants' use of the Asserted Works caused harm in the market should be excluded. *Laumann*, 117 F. Supp. 3d at 315; *see also Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) (excluding opinion based on estimated importation rates, rather than the actual invoices provided by the defendant).

Lasinski's reliance on purported "regurgitations" likewise does not provide a sufficiently reliable basis for finding substitution. The "regurgitations" identified by Books Plaintiffs' regurgitation expert, Dr. Shawn Shan, had a median length of 44 to 46 words. Malhotra Decl.,

Ex. 42 at 22; *id*. Ex. 43 at 119. Lasinski conducted no analysis showing that excerpts of that length effectively substitute for books; he merely assumes substitution. Book publishing contracts provide far greater excerpts to be offered as free promotional content. *See* ECF1816-25, 73:3-22. No wonder the Second Circuit has already held that book snippets "[do] not give [users] access to effectively competing substitutes." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223-224 (2d Cir. 2015).

**2. Lasinski's "Market Dilution" Opinion**

Lacking evidence of harm to book sales or licensing, Lasinski resorts to a "marketplace dilution" theory—if AI results in more books, they will necessarily compete with Plaintiffs' works. He performs no analysis to support this hypothesis. He instead relies on hearsay articles and [redacted] that he claims note [redacted] that [redacted] in this case. ECF1825(Ex.B) ¶412. The sources do not support his opinion, as all they even arguably show is an increase in the number of AI-generated books in the marketplace. No study purports to show a causal link between AI books and adverse impacts on human-authored books (much less Plaintiffs' best sellers). Nor does Lasinski offer any reliable methodology to infer such a connection. He simply assumes that any increase of books in the marketplace will harm Plaintiffs in the future. ECF1825(Ex.B) ¶363. An expert cannot reliably "find [] causation where the studies that comprise the expert's central source material have not so found." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 239 (S.D.N.Y. 2018).

Lasinski claims a 2026 study by Imke Reimers and Joel Waldfogel "provides informative evidence of these harms." ECF1825(Ex.B) ¶412. That study reported an increase in the number of ebooks released each month since the launch of ChatGPT but expressly concluded that "the arrival of LLMs does not appear to have displaced activity by incumbent authors." ECF2034-30

at 26; ECF1825(Ex.B) at 198-201. Indeed, one of the surveys cited by Reimers and Waldfogel reveals that 93.5% of readers would not buy an AI-authored book, even if cheaper. Malhotra Decl., Ex. 43 at 123-124.

Lasinski also claims that [redacted] is an indicator of harm. ECF1825(Ex.B) ¶412. That sales data shows that, as of May 2026, [redacted] But the mere existence of such books does not establish substitution with Plaintiffs' works.

Finally, Lasinski cites a 2026 paper by Tuhin Chakrabarty ("Paper") describing the sales data of self-published books on Amazon in which the Paper's authors claim to "detect" AI-generated material. ECF1825(Ex.D) at 3. The Paper does not purport to show that allegedly AI-generated (or AI-assisted) books cause harm to human-authored books. Indeed, the authors explain that "their [revenue] comparisons are associational"—not causal. ECF2034-31 at 10; Malhotra Decl., Ex. 9, 121:19-122:11. Even assuming Lasinski could reliably infer substitution from the Paper's associational findings, he offers no analysis explaining why trends among self-published books can be reliably extrapolated to works with materially different publishers, distribution channels, and marketing support. Malhotra Decl., Ex. 41 at 6, 21-24.[2]

At most, these sources indicate that AI has increased the number of ebooks in the market, and that some AI-assisted books generate revenue. But Lasinski more broadly concludes that AI outputs ***displace*** human-authored books – and nowhere does he offer an explanation, much less

[2] Lasinski's supplemental report relying on the Chakrabarty paper is the subject of a separate motion to strike. ECF2045; ECF2046.

economic analysis, for how he reached this conclusion. Because none of Lasinski's sources supports the causal harm he infers, his "market dilution" opinion lacks sufficient facts or data.

### C. Attorney Expert Mark Seeley

Books Plaintiffs also rely on attorney Seeley to opine on purported market harm, but his opinions lack methodological or factual support.

Seeley's opinion that "[digital] piracy poses a significant harm to the market for copyrighted books," ECF1804(Ex. C) ¶29, is irrelevant and unsupported because the studies he relies upon (i) address video piracy; (ii) rely on methodologies and assumptions that are unexplained; or (iii) directly contradict or do not support Seeley's conclusions. *See* Malhotra Decl., Ex. 14, 80:5-82:20, 91:22-92:4, 93:23-94:19, 95:25-96:19, 99:3-10, 105:12-107:10, 120:3-20, 124:3-126:17, 130:24-134:5, 140:8-141:2, 153:18-155:9. Seeley's opinion on the so-called "existential threat," ECF1804(Ex.A) ¶76, posed by digital piracy to trade book publishing has no bearing on any alleged harm stemming from OpenAI's use of Plaintiffs' works.

Seeley's opinion that Defendants "normalized" shadow libraries, causing an increase in their use, should be excluded for the same reason. Malhotra Decl., Ex. 14, 175:10-25. The supposed connection between Defendants' conduct and the increase in use of shadow libraries by the public at large rests solely on conjecture unrelated to Defendants' conduct. *Id.* 178:8-180:5. Indeed, Seeley relies on piracy web traffic reports that do not even purport to identify Defendants as the source of any such traffic and admits that he did not "[redacted]" *Id.* 284:8-13; *see also id.* 122:1-123:15.

## II. A NUMBER OF OPINIONS OF NEWS PLAINTIFFS' TECHNICAL EXPERTS SHOULD BE EXCLUDED.

News Plaintiffs' technical experts Dr. Thomas ***Goldstein***, Dr. Emily ***Wenger***, and Mr. Daniel ***Delorey*** all used text-matching analyses to opine on alleged (1) reproduction of Asserted

Works in the LLM training process, (2) removal of copyright management information ("CMI") in extracting data for training, (3) "regurgitation" in model outputs, and (4) reproduction as part of grounding data in retrieval-augmented-generation. These experts then used string matches to opine that certain "copies" were made. Significant errors in methodology and application were made at every step, as set out in detail below. Parts A-C, *infra*.

Separately, the opinions of Dr. Oren ***Etzioni*** are fundamentally flawed because he relied upon hallucinated outputs of another provider's LLM and his substitution opinion is merely speculative. Part D, *infra*.

**A. Goldstein**

**1. Goldstein's "Copies" Opinion**

In his "copies" analysis, Goldstein, on behalf of The New York Times ("NYT") and Daily News ("DN") Plaintiffs, applied similarity metrics comparing the "Asserted Works" corpus to OpenAI's training data records, ChatGPT output logs, and Microsoft's Copilot logs. But he admitted he did not audit authorship, verify copyright registrations, or otherwise attempt to determine whether the material supplied to him matched text that came from unprotected sources such as a wire service, public-domain text, or other third-party. Malhotra Decl., Ex. 6, 214:7-18; 215:15-216:6; 243:4-244:13. At each step of his analysis, he failed to examine the results for false positives or validate that "matches" he identified show infringement. The result is that Goldstein identified as "copies" matches ranging from third-party press releases to historical documents—none of which reflects News Plaintiffs' copyrightable expression.

Indeed, Goldstein's text-string-matching methodology ignores the requirements of the "substantial similarity" test where copyright infringement can only be determined after non-protectable elements have been "sift[ed] out[.]" *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 706–12 (2d Cir. 1992). Goldstein's failure to filter out non-protectable elements as part

of his methodology resulted in significant false positives in his so-called "copies," and he made no effort to quantify that error rate. For example, Goldstein identified as "copies" of NYT and DN articles: President Washington's Thanksgiving Proclamation, the Bill of Rights, and MLK's "I Have a Dream" speech. Malhotra Decl., Ex. 6, 298:3-310:20, 314:18-317:1; *id.* Ex. 55-57. Goldstein even counted a training data match to a Denver Post article that he admitted was "[redacted]" Malhotra Decl., Ex. 6, 281:10-283:25, 285:11-23, 284:10-12; *id.* Ex. 54.

When confronted with obvious false positives, Goldstein responded that he was never charged with performing a "copyrightability analysis" and any "[redacted]" *Id*. Ex. 6, 316:17-317:1. Nonetheless, Goldstein plans to testify that he identified ***millions*** of NYT/DN articles in OpenAI's training data, ECF1819(Ex. A) ¶¶58-59, which risks misleading the factfinder into concluding these textual "matches" amount to infringement without regard to the critical issues of authorship, ownership, and protectability.

Because Goldstein does nothing to confirm whether any match contains Plaintiffs' protected expression, his aggregate "copy" counts will only confuse the factfinder. His additional characterizations of matches using the terms "regurgitation," "memorization," and "leak" further risk misleading the jury and displacing their own evidentiary assessments. *See Nimely v. City of New York,* 414 F.3d 381, 397-98 (2d Cir. 2005) (expert must not usurp jury's role or create unfair prejudice or confusion). And the analysis lacks fit to the evidence: mechanical text string matching does not, without validation and filtering on both ends, quantify instances in which Asserted Works were infringed. Goldstein's "copies" characterizations "make it appear that he has actually measured" reproduction of copyrighted works when his methodology (as he

acknowledged) is "decidedly not measuring that." *Skillz Platform Inc. v. Papaya Gaming, Ltd.*, 2026 WL 395323 at *10 (S.D.N.Y. Feb. 12, 2026).

Goldstein's failure to audit the Asserted Works or validate his results renders his methodology and data "simply inadequate to support the conclusions [he] reached[.]" *CCM Touring LLC v. Moonbug Ent. Ltd.*, 2026 WL 848392, at *4 (S.D.N.Y. Mar. 27, 2026).

**2. Goldstein's CMI-Removal Opinion**

Goldstein's CMI-removal analysis suffers two fatal defects, making his opinions unreliable and outright misleading regarding whether CMI was removed. *See In re Terrorist Attacks on Sep. 11, 2001*, 2025 WL 2383768 at *3 (S.D.N.Y. Aug. 18, 2025) ("[C]ourts exclude opinions . . . supported 'only by the *ipse dixit* of the expert.'").

**a. Invalid "CMI"**

Goldstein failed to validate whether the text he extracted from raw source HTML reflected accurate CMI for a corresponding Asserted Work. For titles, Goldstein's extractions included publication names, column names, and other descriptions that were not the actual "title" of the work asserted by Plaintiffs (and therefore not CMI), *e.g.*, "the New York Times" for an article titled "Ford Foundation Head Steps Down," and "Political Points" for an article titled "We Got a Check From Whom?". Malhotra Decl., Ex. 35 ¶207 & Table 11. His "publisher" extractions were almost always populated by a metadata tag for the website's name ("og:site_name"), ECF1819(Ex. C) ¶149, while the copyright notice and terms of service that he identified are almost always found in boilerplate that is applied indiscriminately to every page on the website. *See* Malhotra Decl., Ex. 35 ¶¶216-217 (finding that in 100% of 1,000 randomly sampled NYT WARC files, the copyright notice, and terms of service that Goldstein identified appeared in sitewide footers).

Because he failed to distinguish boilerplate from information conveyed in connection with an Asserted Work, Goldstein should be prohibited from opining that OpenAI removed millions of Plaintiffs' "copyright notices" when his methodology counted boilerplate footers relating to different copyrights to an entire website. For example, OpenAI's expert Dr. Krishnan counted "New York Times," without a copyright claim or year, in ***over 2 million*** instances, *id.* ¶¶202-203, Krishnan separately identified notice-year discrepancies of Plaintiffs' Asserted Works, *i.e.*, the extracted year did not match the copyright registration year of the Asserted Work, *id.* ¶¶208(c)-209, and identified many examples of pages maintained by Plaintiffs that do not contain Asserted Works or even potentially copyrightable works but nonetheless contain Plaintiffs' copyright notices, including, *e.g.*, a NYT webpage that presents only the full text of the U.S. Constitution, AP articles, and other third-party materials. *Id.* ¶¶213-214.

In sum, notwithstanding his claims to hand-auditing thousands of WARC files and insistence that sitewide notices can qualify as CMI, ECF1819(Ex. C) ¶¶114-115, 134-135, Goldstein fails to reliably identify accurate CMI information "conveyed in connection with" the Asserted Work as required under 17 U.S.C. § 1202(c).

**b. Deficient Searching**

Goldstein purported to identify instances of "CMI removal" where he searched for and did not find "CMI" in OpenAI's training-data records, but his selective searches ignored relevant fields in those records. For example, Goldstein did not reliably account for CMI retained in another form or field when he only searched the training record's "text" field, while excluding the preserved "url" and "domain" fields and disregarding retained titles and author names. ECF1819(Ex. C) ¶¶136-137; Malhotra Decl., Ex. 35 ¶¶224-227. As a result, for NYT records alone, the supposedly omitted information was actually retained in another training-data field for 100% of alleged publisher removals identified in his opening report, over 80% of alleged title

removals, and 99.996% of alleged publication date removals. Malhotra Decl., Ex. 35 ¶¶222-223 & Table 14. Goldstein also acknowledged that his extraction pipeline obtained publication dates from URLs (which OpenAI had preserved). ECF1819(Ex. C) ¶¶128-130. And, in 3,234,215 of his alleged publication-date removals, the extracted date was sourced from OpenAI's retained URL. Malhotra Decl., Ex. 37, Table B.0. The absence of CMI substrings in a single "text" field does not indicate OpenAI removed that CMI from its training data, particularly where it was preserved in a separate field in the same training data records.

### 3. Goldstein's Analyses of Copilot Logs

Goldstein's analyses of Copilot output log text string "matches" are also highly problematic because he mixes up the data, improperly conflating separate infringement theories of LLM "regurgitation," grounding data retrieval during Copilot response formulation, and the contents of final outputs. He also improperly includes the user-supplied text in his data soup.

#### a. "Inflated" Matches

Goldstein's Opening Report 4-gram method uses design choices that inflate matches, and he provided no error rate. Goldstein searched 8.2 million Copilot conversation logs for text strings that "match" text in News Plaintiffs' articles. His unit of matching is the "n-gram," a run of n consecutive words; a "4-gram" is any four consecutive words. In the Opening Report, Goldstein searched conversation output logs in the [redacted] fields (containing both user input and Copilot output) and [redacted] fields (retrieved grounding data) for 4-grams that also appear in one of NYT's or DN Plaintiffs' articles. He reported the number of messages containing at least six matching 4-grams (sorted by number of matches). ECF1819(Ex. A) ¶398 (Exs. O & P).

The [redacted] field search was, by Goldstein's admission, "[a] search over the entire conversation[,]" with no filter limiting results to Copilot's outputs. Malhotra Decl., Ex. 7, 484:13-485:23. His method counts ***user prompts*** as purportedly infringing matches generated by

Copilot. As a result, the headline figure of Goldstein's Opening Report table, ECF1819(Ex. A) ¶398 & tbl., ¶400—more than 8.5 million messages with at least six matching 4-grams, including "over a million hits having at least 20 matching four-grams"—improperly counts as Copilot matches ***all user-generated content in prompts***. Malhotra Decl., Ex. 7, 472:13-21, 484:13-485:5 ([redacted] row is "[a] search over the entire conversation"). Goldstein admittedly applied no filter excluding user-generated text. *Id.* 485:4-5, 21-23; *see* ECF1723 ¶351.

As for his [redacted] analysis, the method of looking at grounding data included noncontiguous four-word fragments—this means one message fragment could match multiple underlying articles. As a result, Goldstein's method does not require that a substantial portion of any article was included in the retrieved grounding data. ECF1819(Ex. A) ¶398 & tbl.; ECF1723 ¶346 & n.263.

The four-word unit compounds the problem with both analyses. Phrases such as "in addition to the," "at the same time," and "in the bay area" match Plaintiffs' articles. ECF1723 ¶352. Goldstein double-counts words in overlapping windows and combines fragments from unrelated articles. The largest so-called matches, then, could be as few as 204 words total assembled from a number of different articles, not any significant single passage. ECF1723¶¶ 354-55; Malhotra Decl., Ex. 7, 474:11-475:4. When confronted with this problem, Goldstein claimed he didn't understand his own method: "[redacted]" Malhotra Decl., Ex. 7, 476:22-25; *see also id.* 477:2-478:10 ("[redacted]").

Goldstein's analysis fails at each task. Offered for Copilot output infringement, Goldstein counts the user's contribution. Offered for grounding infringement, he counts fragments without demonstrating any article's share. Offered as evidence of LLM regurgitation, he counts text

retrieved by the Copilot system instead of text generated by the model. Goldstein's Copilot log analysis should be excluded. Fed. R. Evid. 702(a), (d); *Amorgianos*, 303 F.3d at 267.

**b. Flawed "Leak" Analysis**

In his rebuttal report, Goldstein belatedly proposed a new method of measuring infringement by Copilot outputs, counting what he termed grounding data "leaks": conversations in which at least one 16-gram (16 consecutive words) appeared both in the retrieved grounding material and in the displayed Copilot output. ECF1819(Ex. B) ¶¶77-79, 82. The "leakage" results, including Table 1 (*id.*¶82), should be excluded because they are derived from a flawed methodology and are likely to confuse the jury.

Goldstein first identified Copilot conversations containing a Plaintiff domain in the grounding data. He then counted ***any*** 16-word match between ***any*** of the retrieved material and the Copilot output as a "leak." *Id.* ¶¶77-78, 82. Goldstein's inclusion of ***any*** 16-gram match, whether the matched text comes from a Plaintiff work or from other sources, dooms this analysis. The 1.66 million conversations he claims contain a "leak" may have no displayed match whatsoever to Plaintiffs' Asserted Works. Malhotra Decl., Ex. 7, 521:7-524:1 (report "[redacted]," whatever the source); *see* ECF1723 ¶399 (Goldstein's code permits matching text to come from other sources).

Additionally, Goldstein labels as "regurgitation" a table that is not limited to LLM outputs. Again, the analysis does not test whether any matched text came from an Asserted Work. ECF1819(Ex. B) ¶¶76-77, 83-84.

**c. Misleading Web-Domain and "Impressions" Counts**

To identify alleged infringement in retrieved grounding data, Goldstein produced tables counting (1) the conversations in which a News Plaintiff's web domain appeared in particular

fields of Copilot's grounding data, and (2) the number of "impressions" (records that a web domain was displayed to the user) of each website citation in a Copilot answer. ECF1819(Ex. A) ¶¶393-97 & tbls. 9–11; (Ex.D) ¶¶43-48 & tbls. 13-15. From this data, Goldstein concludes that News Plaintiffs' content was used for grounding "a significant amount of times" and infers that "[f]or each impression ... Microsoft likely copied substantial portions of News Plaintiffs' articles and website content" in RAG and output. *Id.*(Ex. A.) ¶418; *id*.(Ex. D) ¶43.

These counts should be excluded under Rule 702 for two independent reasons. *First*, the counts are unreliable because the critical inferential step—from citation count to "substantial portions" copied—is unmeasured. Fed. R. Evid. 702(b), (d). A domain count or impression citation never records ***what*** was retrieved. Whether the retrieved material included an article or merely a title is a question Goldstein did not answer. The log fields he chose show only that "***some*** content is retrieved and processed," not that each retrieval involved a substantial portion of an article. ECF1723 ¶¶308-11. As Microsoft's expert Dr. Lafferty explains, "[a]n impression records that the grounding system retrieved and referenced a source in forming a response. It does not measure whether, or how much, a Plaintiff's article text was supplied to the model as context, and it does not measure whether any such text outside of the URL appeared in the user-facing output." *Id*. ¶308. Goldstein acknowledged that his domain-hit analysis is a "population-level analysis" and that he has not "done, you know, a page-by-page analysis of every single log." Malhotra Decl., Ex. 7, 507:13-22. An opinion whose critical step—the inference from citation count to volume copied—rests on an unmeasured assumption rather than an examined methodology is unreliable. *See Joiner*, 522 U.S. at 146 (testimony may be excluded when there's "too great an analytical gap between the data and the opinion proffered").

Additionally, Goldstein's counts are more likely to mislead than help the trier of fact. Fed. R. Evid. 702(a). Because the counts cannot establish how much of any webpage was retrieved or reproduced in any given Copilot conversation, the testimony does not assist the jury in determining whether any copyrightable expression was copied in actionable quantity. A trier of fact shown that nytimes.com was cited 16,662,505 times, without any evidence of what text those citations actually retrieved, is no closer to deciding whether any asserted article was substantially copied. *See Daubert*, 509 U.S. at 591 . As Lafferty concluded, "[d]omain hits, snippets, impressions, and redaction counts similarly do not establish that Copilot output copied substantial portions of Plaintiffs' works." ECF1723 ¶442.

**d. Untimely Supplemental Report**

In his "Supplemental Report" served July 14, 2026, ***months*** after the disclosure date for matters on which a party bore the initial burden of proof, Goldstein produced yet a ***third*** method of purporting to measure infringement in Copilot output logs. He finally added a filter intended to screen out third-party text, and for the first time counted the number of News Plaintiffs' articles (as opposed to the number of Copilot conversations) with a qualifying "match." ECF1819(Ex. D) ¶¶22-32. This third analysis (and extrapolations from this third analysis) impermissibly rely upon an unvalidated "originality" filter he created using another provider's LLM.

Goldstein first attempted to remove text enclosed in quotation marks. He then ***asked Google's Gemini model***, for each surviving passage, whether it "appears to have been written by the author of the article, or whether it is reproduced from a third-party source." *Id.* ¶28. He instructed Gemini to answer "yes," and thus to count the passage whenever "the highlighted text is a mix of author-written prose and third-party content"—so any author prose saves a passage even when the matched sixteen words are not part of it. *Id.*; ECF1723 ¶405. Quotation marks do

not catch reprinted government documents, tweets, wire copy, or republication, making Gemini the only real screen. Yet Goldstein discloses no robustness/statistical verification, classification-error rate, or human review. ECF1723 ¶405. He had "no knowledge of the training data sets for the Gemini models," Malhotra Decl., Ex. 7, 516:9-10, and agreed he "could have omitted it entirely" but "chose to include it." *Id*. 517:24-518:3. An expert may use software, but must show that it performs the assigned task; this process, whose tie-breaker is "count it," is unverified. Fed. R. Evid. 702(b), (d).

A method that cannot distinguish an NYT sentence from the senator it quotes, retrieved text from memorized text, or retrieval events from copied articles, has an unknown, untested error rate for the question presented and must be excluded. *See Amorgianos*, 303 F.3d 256 at 267.

**4. Goldstein's Opinion On Microsoft's Role**

Section XIV of Goldstein's opening report summarizes documents and testimony discussing Microsoft's investment in OpenAI, the computing resources it supplied, portions of the Bing search index it shared, and the parties' web-crawling arrangements. Goldstein concludes that Microsoft "conferred the practical ability to supervise and control training," that "had Microsoft cut off OpenAI's access ... OpenAI's unauthorized use of News Plaintiffs' content would have been reduced[,]" and that Microsoft "could have—and should have—stepped in and put an end to OpenAI's infringement[.]" ECF1819(Ex. A) ¶¶547-48, 559. This is unvarnished lawyer argument. To the extent these are judgments about corporate control, legal duty, and speculation about counterfactuals involving corporate resources (without any analysis of available alternatives), Goldstein does not "have any degrees in corporate governance," has "never studied Delaware corporate law," and, when asked about an investor's rights to direct the company it invests in, answered, "I'm not a lawyer." Malhotra Decl., Ex. 7, 444:1-18. His

conclusions on vicarious liability should be excluded as an improper narrative of the record with legal conclusions attached. *In re Rezulin*, 309 F. Supp. 2d at 541, 551; *Highland Cap. Mgmt.*, 379 F. Supp. 2d at 469.

### B. Wenger

#### 1. Wenger's Text-Matching Analysis

In opining about "copies" and "regurgitations" for The Intercept and CIR, Dr. Emily Wenger relied on the same unreliable text-matching approach as Goldstein. She accepted the Asserted Works files from these News Plaintiffs' counsel from the outset without validating what they contained. Malhotra Decl., Ex. 58, 36:9-39:2 ([redacted]).

Wenger's failure to validate her methodology produced numerous false positives. She identified training data "copies" where the matched text was drawn from third-party sources such as CNN or consisted of public statements such as President Biden's statement on the passing of his son. *Id*. 79:20-84:20, 97:11-100:25, 238:18-243:5; *id*. Exs. 45, 47, 49; *id*. Ex. 36 ¶¶101-111 & Figures 15-24. She identified a training-data record as a "copy" of an Intercept article where it contained no text at all. *Id*. Ex. 36 ¶¶112-13.

Wenger's text-matching "regurgitation" analyses suffered the same problem. She labeled model outputs as "regurgitations" where the matched text was from public social media posts, such as a tweet from President Trump. *Id*. Ex. 58, 181:24-184:24; *id.* Ex. 48. Her conversation log analyses identifying so-called "regurgitations" failed to distinguish user input from model-generated text. *Id.* 189:4-192:3. Despite these false positives, Wenger failed to calculate an error rate or correct her methodology. ECF1858(Ex. F) at 18-19 (admitting failure to measure false positive rate because she "[redacted]"); Malhotra Decl., Ex. 58, 64:17-65:21.

### 2. Wenger's Other "Regurgitation" Analyses

Wenger's keyword matching and summarization analyses, which she characterizes as an analysis of the prevalence of "regurgitation," should also be excluded.

Wenger conceded that "[redacted]" *Id*. 187:12-21. She acknowledged that does not measure regurgitation, and that she found hundreds of keyword hits without identifying a single regurgitation in her 20-million-conversation analysis. ECF1858(Ex. A) at 87-89; Malhotra Decl., Ex. 58, 187:22-188:1, 184:25-186:1.

Wenger's "Summarization Analysis" purporting to identify non-literal infringement fares no better. That analysis simply "found several instances of users requesting summarizations of Plaintiff articles and at least one instance of a user asking ChatGPT to write an article 'in the style of Mother Jones.'" ECF1858(Ex. A) at 89-90. She says nothing about whether ChatGPT generated the requested content. Even assuming summarization outputs exist, they do not constitute copyright infringement. ECF514(*NY Times v. Microsoft, et al.*)(No. 23-cv-11195) at 40-42.

Wenger admits neither of these opinions measures ChatGPT's regurgitation rates. Malhotra Decl., Ex. 58, 186:20-187:21. Accordingly, these analyses "'do[] not bear on the relevant inquiry' of the claims at issue," and are inadmissible. *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 2020 WL 4251229, at *9-10 (S.D.N.Y. Feb. 19, 2020).

### 3. Wenger's CMI-Removal Opinion

Wenger's CMI-removal opinion is unreliable because she did not reliably establish what CMI appeared in the source material before concluding that OpenAI had "removed" it. She reviewed fewer than 1% of Asserted Works' corresponding Common Crawl files from which she

asserted OpenAI removed Plaintiffs' CMI ("the 1%"). Malhotra Decl., Ex. 58, 137:17-139:1. She then extrapolated those observations across the entire Common Crawl training dataset, despite admitting that inconsistencies and changes in webpage structure over time could affect the presence or location of CMI. *Id*. 138:21-140:20; ECF1858(Ex. A) at 32-35.

Wenger's spot checking did not cure this fundamental flaw. For each news organization, she examined over time only "several dozen" of 17,631 available snapshots corresponding to the 1% to determine whether the underlying structures changed. Malhotra Decl., Ex. 58, 140:15-141:13; ECF1858(Ex. A) at 32-35. From this limited review, Wenger concluded that the Common Crawl files OpenAI obtained contained Plaintiffs' CMI. She then extended the same assumptions to the WebText training datasets without having any files against which to validate them. Malhotra Decl., Ex. 58, 141:18-142:11; ECF1858(Ex. A) at 35-36.

Wenger also used mismatched tests for CMI presence and removal. For author and title, she searched training-data records using metadata supplied by Plaintiffs' counsel rather than the authors and titles appearing in the Common Crawl files, despite conceding the two could differ. Malhotra Decl., Ex. 58, 145:2-147:24. For copyright notices, Wenger conceded that she did not search for "all rights reserved" to establish CMI presence, but did search for that phrase to establish removal—meaning her removal count included instances where that phrase was never present in the Asserted Work. *Id*. 143:12-25, 149:21-150:16, 151:13-25.

The resulting analysis produced false positives. Wenger counted CMI as "removed" even when OpenAI's training data came from a non-Plaintiff source that never contained Plaintiffs' CMI. *See, e.g., id*. 238:18-245:20 (admitting she treated The Guardian-sourced data as CMI removal merely because it lacked Plaintiffs' CMI); *id*. Ex. 36 ¶¶168-173 & Figure 28. Without

establishing the source material contained CMI, its absence from the training-data record cannot show that OpenAI removed it.

Finally, Wenger failed to account for CMI-related information retained elsewhere in the training record. OpenAI retained the "url" field in all 165,855 instances in which Wenger alleged CMI was removed; 70.1% of those URLs retained the title of the Asserted Work and 34.8% retained the author. *Id.* Ex. 36 ¶188.

**4. Wenger's Copilot Log Extrapolations**

Wenger identified 51 Copilot conversations matching Mother Jones (based on her flawed "match" criteria). ECF1858(Ex. A) at 106. Using a single day's Copilot user rate, she extrapolated those 51 conversations to 16,425 per year for Mother Jones and 257,325 per year for Mother Jones, Reveal News, and The Intercept combined. ECF1858(Ex. A) at 106-107, 109-110. The Court should exclude these annualized extrapolations—and those in her reply report, ECF1858(Ex. F) at 117-118—as unreliable.

Wenger's extrapolations derive not from a random sample but from a biased census of conversations matching Plaintiffs' keywords, *e.g.* "Mother Jones," and "Reveal News." ECF1858(Ex. A) at 105; ECF1723 ¶¶342, 364; Malhotra Decl., Ex. 58, 255:12-15, 256:6-8; *id*. Ex. 19. Wenger agreed this dataset is more likely to contain plaintiff-related content than a random sample, *id*. Ex. 58, 257:4-11, 258:23-259:2, and that Dr. Lafferty's criticism on this point "is somewhat valid" for her Mother Jones and Reveal projections, *id*. 278:23-279:11, 279:22-280:3; ECF1858(Ex. F) at 116. Extrapolating to a quarter-million "matched" conversations per year from just 51—on a biased dataset—is not the product of reliable principles reliably applied.

### C. Delorey

#### 1. Delorey's "Copies" Opinion

Ziff Davis ("ZD") expert Delorey's analysis of "copies" began with a flawed Asserted Works corpus derived from ZD's content-management systems. ECF1774(Ex.A) ¶¶132, 135-36. Knowing that the source dataset of ZD "works" contained substantial third-party content, he purported to "appl[y] a series of quality filters" to "[redacted]" *Id.* ¶¶135-36, 139-40. But he failed to confirm his quality filters performed adequately, and substantial third-party content persisted, including press releases, Malhotra Decl., Ex. 22, advertising content, *id*. Ex. 25, and content republished from other news outlets, *id*. Ex. 23, *id*. Ex. 24. When asked about the error rates of his "quality filters," Delorey testified he never intended to limit the Asserted Works to only ZD-copyrighted materials in the first place, and it was "not a problem" that the resulting corpus contained press releases and articles published by third parties. *Id*. Ex. 2, 67:18-24.

Delorey also failed to validate his text-matching heuristics to confirm the "confirmed matches" were based on ZD and not third-party authored content. Consequently, Delorey identified "confirmed matches" that plainly are not ZD-copyrighted works, including a written statement authored by President Obama, *id*. Ex. 26, an SEC press release, *id*. Ex. 27, sections of the United States Code, *id*. Ex. 38, an investor letter by Apple CEO Tim Cook, *id*. Ex. 39, and several "regurgitations" including third-party quotations and public statements, *id*. Ex. 28.

At deposition, Delorey rationalized that he offered no "[redacted]" *Id*. Ex. 2, 119:17-22. In response to instances where his "confirmed matches" were clearly false positives—for instance, a White House press statement, *id.* 118:1-13—Delorey tautologically insisted there was "[redacted]" *id.* 106:13-14, because he merely computed "[redacted]" *Id.* 268:9-

11. But if Delorey is not opining on whether ZD-copyrighted works are present in the training data, then his conclusions have no relevance. For him to tell the jury that OpenAI's records contain "millions" of copies of text that ZD may or may not own will create confusion and prejudice.

### 2. Delorey's CMI-Removal Opinion

Like Goldstein and Wenger, Delorey also failed to reliably identify CMI in the Asserted Works, and to search the entirety of OpenAI's records. OpenAI's expert Krishnan estimated that 80% of Delorey's so-called "strong" extracted copyright notices and 91% of his "weak" notices likely included inaccurate information due to inconsistencies between (1) what Delorey extracted from the website footer and called a "copyright notice," and (2) what must legally be included in a "copyright notice" (correct publication year and copyright holder), 17 U.S.C. § 401(b). *Id*. Ex. 33 ¶¶177, 195-197. Other extracted CMI was malformed: hundreds of thousands of his "[redacted]" had no copyright holder name. *Id*. Ex. 2, 145:13-14. Delorey cannot be permitted to opine that a "copyright notice" was removed when the so-called notice does not comply with the statutory requirements in at least 77% of instances. *Id*. Ex. 33, ¶188 & Table 12.

Effectively conceding the point, Delorey served an eleventh-hour supplement the night before summary judgment was due,[3] completely revising his CMI methodology to attempt to validate extracted titles, authors, and publication names against the Asserted Works. *See* ECF1774(Ex. D) ¶18. He again failed. *First*, while claiming to use counsel-supplied patterns to detect only ZD copyright notices, Delorey actually applied several generic patterns (including "[redacted] and "[redacted]) that included no publisher information whatsoever, and thus would

[3] In addition to offering inadmissible opinions under Fed. R. Evid. 702, Delorey's extremely untimely report should also be stricken altogether pursuant to Fed. R. Civ. P. 26(a)(2), 37.

have continued to detect and search for non-ZD copyright notices. ECF1774(Ex. D), Appendix E. *Second*, even though copyright notices must disclose the work's copyright holder and publication date (17 U.S.C. § 401(b)), Delorey failed to implement any validation to confirm these items were present (or accurate). While Delorey's untimely supplement altered his CMI-removal totals, it did not resolve his methodological flaws.

Delorey's CMI-removal opinion is also unreliable because he searched only the OpenAI training-data record's "text" field and ignored other fields that OpenAI retained. For example, in over 80% of Delorey's identified instances of title removal, the title was retained in another training-data field; the same was true in over 94% of instances of alleged "publisher" removal. Malhotra Decl., Ex. 33 ¶¶211-12 & Table 14; *id*. Ex. 34. Because he relied on inaccurately extracted CMI and disregarded contrary evidence showing retained information, his opinion that OpenAI stripped CMI from ZD records should be excluded.

**D. Etzioni**

News Plaintiffs' expert Etzioni's opinions as to the supposed importance of news content in LLM training should be excluded because they are based on now-withdrawn AI-generated charts. *See* ECF1806(Ex. A) ¶¶71-122. To support his opinions, Etzioni offered a series of figures that included hallucinated figures based on the cited academic papers. *See* ECF1806(Ex. A) ¶¶76, 94, 109; Malhotra Decl., Ex. 4, 135:19-136:7, 143:2-8, 148:7-15.

**Figure 1:**




*Figure 1. Smaller models trained on curated data outperform larger models on noisy data, illustrating the GIGO principle.*

**Figure 2:**




*Figure 2. Model collapse (Shumailov et al., 2024) shows that training on model-generated text causes progressive loss of diversity and accuracy across generations.*

**Figure 3:**




*Figure 3. In the SILO experiment (Min et al., 2023), models were evaluated on their ability to predict the next word in held-out news articles. The model trained without copyrighted news in its training data scored roughly 36% worse on this task, demonstrating that news content is not fungible with permissively licensed alternatives.*

None of the numbers or measurements above were in the cited papers. Etzioni had used Anthropic's Claude to generate the figures, which generated fake numbers. Etzioni admitted he failed to verify whether the figures were supported. *Id.* 143:15-21; *see also id.* 142:1-7, 144:1-16, 163:25-164:9. Etzioni conceded the charts did not meet his "standards for academic rigor," *id.* 144:17-19, and following his deposition withdrew them. He also removed ***another*** AI-generated chart from his Rebuttal Report.[4] Etzioni provided no other evidence to compensate, and his opinions concerning the value of news should be excluded.

Dr. Etzioni's opinions regarding Copilot's alleged substitutive function are also unsupported and unreliable. Indeed, Dr. Etzioni opines only that each of his cited "[redacted]

[4] Etzioni amended his Opening Report to delete Figures 1, 2, 3, and 5, as well as paragraphs 76, 77, and 86. *See* ECF1806(Ex.D) ¶1. Etzioni also deleted Figure 5, as well as part of paragraph 314 in his Rebuttal Report. *See id.* ¶3.

[redacted].” ECF1806(Ex. A) ¶ 227 (emphasis added). Notably, during his deposition, Dr. Etzioni admitted that users might not have otherwise visited news publishers’ websites. Malhotra Decl., Ex. 4, 247:23-250:5, 287:11-288:2. Accordingly, Dr. Etzioni’s substitutive opinions are not grounded in fact and are based on mere speculation.

## III. CERTAIN OPINIONS OF NEWS PLAINTIFFS’ INDUSTRY EXPERTS SHOULD BE EXCLUDED.

### A. Industry Expert Jessie Stricchiola

#### 1. Stricchiola’s Copilot and Bing Click-Through-Rate Comparisons

NYT and DN Plaintiffs’ expert Jessie Stricchiola misleadingly implies that her opinions demonstrate harm when they plainly do not, necessitating exclusion. *Mirena*, 341 F. Supp. 3d at 253-263 (excluding causation expert). The rest of News Plaintiffs’ harm experts all blindly pointed to Stricchiola for support in asserting harm from substitution, and because her methodology fails, they all fail as well.

News Plaintiffs posit that they will be harmed by ChatGPT and Copilot because of “reduced” traffic to their websites. And while parroting the word “reduction” throughout her reports in referring to her click-through-rate (“CTR”) tables, Stricchiola admits that she has never actually demonstrated any reduction in anything. Malhotra Decl., Ex. 15, 79:20-80:10. Rather, she has simply made tables with a side-by-side comparison of rates for traditional Bing search results and rates calculated from Copilot data. When pressed, Stricchiola admitted that she had not done any analysis necessary to demonstrate resulting losses or substitution.

*First*, Stricchiola’s analysis is flawed because CTR is not a proper metric to gauge substitutional harm in the first place. Stricchiola is not an economist, *see id.* 44:22-23; she is a search engine optimization expert—someone who helps websites get better search rankings—

with a recent degree in Data and AI Ethics. *Id.* 14:20-23, 18:8-20. She is not qualified to construct an economic model measuring substitutional harm. A CTR is merely a ratio of the number of times a user clicks on a link divided by the number of times a user is presented with a link. *See* ECF1798(Ex. A) ¶67. That ratio does not indicate whether an individual used Copilot instead of Bing Search or whether traffic from Copilot displaced traffic from Bing Search or any other traditional search engine. ECF1733 ¶¶105-118.

*Second*, Stricchiola admits she offers no opinions on AI chatbots substituting for traditional search. Malhotra Decl., Ex. 15, 96:24-97:1 (admitting she is not "[redacted]"). This critical admission means that Stricchiola cannot identify any harm from purported consumer movement away from traditional search due to GenAI products. To the contrary, Stricchiola also acknowledged GenAI tools are "[redacted]" *Id*. Ex. 16, at 7; *id*. Ex. 15, 90:21-97:9. As a result, the entire exercise of comparing Copilot and Bing Search CTR is misguided. Absent evidence that users are substituting Copilot for Bing Search, which Stricchiola admits she also did not study, *see id.* Ex. 15, 74:13-79:13, any difference between the products' CTRs cannot establish substitutional harm.

*Third*, Stricchiola did not even look at whether the number of clicks or amount of traffic to Plaintiffs' websites from Microsoft changed after the introduction of GenAI tools. *Id.* 81:13-21; 83:5-10. Stricchiola failed to even consider that although Copilot's CTR (a ratio) might be lower than Bing traditional search, both products operating together could actually be ***increasing*** the total amount of traffic sent to Plaintiffs' websites. *See* ECF1733 ¶¶106-107. But Stricchiola ***did no traffic analysis***. Nor did she analyze subscriber-conversion rates, or other "monetization

opportunities" (such as revenue) to determine whether any of these metrics changed after the introduction of GenAI. Malhotra Decl., Ex. 15, 79:20-81:21, 97:21-99:24.

*Fourth*, Stricchiola failed to analyze the CTR of ChatGPT at all; she simply assumes she can extrapolate from the Copilot data without providing any sufficient explanation or analysis. *See* ECF1798(Ex. A) ¶¶428-436.

Stricchiola's CTR comparison tables are nothing more than a side-by-side list of rates for two different products without any expert methodology to demonstrate a causal relationship between the two. Yet throughout her reports she opines that there is a great risk of harm from "reduction" in such rates. *See, e.g.*, ECF1798(Ex. A) ¶¶63, 389-396; *id*.(Ex. C) ¶¶29-30, 115; *id*.(Ex. D) ¶¶84-85,103; Malhotra Decl., Ex. 15, 79:20-80:10. The implication is that such a reduction will cause harm from substitution, and that is exactly how all the other News Plaintiffs' experts relying on Stricchiola use her opinion. But that is not what her charts show, and her opinion must therefore be excluded.

**2. Stricchiola's Meta Tag Opinion**

Stricchiola also offers opinions calculating rates of Microsoft's purported "disregard" for Plaintiffs' use of meta tags. ECF1798(Ex. A) ¶¶60, 282-297. These should be excluded because her methodology is "simply inadequate to support the conclusions reached." *Nimely*, 414 F.3d at 396. Indeed, Stricchiola's opinions previously have been excluded on such grounds. *See Ryoo Dental, Inc. v. Han*, 2016 WL 6138413, at *5 (C.D. Cal. April 25, 2016) (opinion excluded as "without foundation and therefore unreliable" where Stricchiola failed to "explain[] beyond a speculative degree how these algorithms are actually applied . . .").

Again, causation is Stricchiola's Achilles' heel, as she failed to consider an obvious alternative explanation for the claimed non-compliance. She acknowledges that News Plaintiffs could use Microsoft's NOARCHIVE meta tag to exclude their content from Copilot web

grounding. ECF1798(Ex. A) ¶¶146-147; Malhotra Decl., Ex. 17; *id*. Ex. 15, 167:2-168:8. ***But,*** as News Plaintiffs understood from Microsoft's various resources, that meta tag only takes effect after Plaintiffs update their web page to include it ***and*** the Bing web crawler re-crawls the content and the Bing Index is updated. ECF1704 ¶26; ECF1782-26; Declaration of Padma Gaggara in Support of Defendants' Rule 702 Motion ("Gaggara 702 Declaration") ¶4. Yet Stricchiola's opinions on rates of non-compliance fail to take into account whether Plaintiffs' content was recrawled ***after they applied the NOARCHIVE meta tag***. In fact, Plaintiffs had the ability to trigger the recrawl using Microsoft's "IndexNow" feature. ECF1798(Ex. A) ¶¶79 n.47, 80; Malhotra Decl., Ex. 15, 141:22-142:22; ECF1704 ¶27. Lack of such an update is an obvious alternative cause of seeming non-compliance.

The DN Plaintiffs did not apply NOARCHIVE to their websites until March 2025. ECF1798(Ex. A) ¶240; ECF1823-1, No. 6; ECF1989-3, 425:4-18. Stricchiola performed her analysis in early 2026. But older web pages are not re-crawled as frequently as recently published pages. ECF1704 ¶26; Gaggara 702 Decl. ¶6. Indeed, the majority of the articles cited by Stricchiola as examples of non-compliance were published decades ago and over 90% were not re-crawled after the NOARCHIVE meta tag was applied. Gaggara 702 Decl. ¶7, Appx. A.

Stricchiola could have checked for this problem because "last crawl date" data was available to Plaintiffs in their webmaster tools accounts. ECF1798(Ex. A) ¶¶79 n.47; *see also* Malhotra Decl., Ex. 50; *id.* Ex. 51; Gaggara 702 Decl. ¶4. It was also obvious that there was a problem, because Stricchiola found that over 99% of NYT's webpages ***were compliant*** (as she put it, "not in violation") with the NOARCHIVE meta tag. ECF1798(Ex. A) ¶294.[5] It makes no sense that an automated system would have such disparate performance under seemingly

[5] 2,041,633 URLs "not in violation of noarchive" / 2,044,718 total URLs x 100 = 99.85%.

identical conditions. The answer was right in front of her. Not only had NYT been using the NOARCHIVE meta tag on its content for years, but also NYT regularly uses the IndexNow feature to refresh its content in the Bing Index—knowledge within Stricchiola's ken as NYT's expert. *See* Malhotra Decl., Ex. 10, 174:6-175:12, 200:7-202:3. Stricchiola admitted she "[redacted]" *Id*. Ex. 15, 157:2-3. Her failure to rule out an obvious alternative cause for her results necessitates exclusion. *See R.F.M.A.S, Inc. v. So*, 748 F.Supp.2d 244, 273 (S.D.N.Y. 2010) (excluding expert opinion as unreliable where expert failed to "investigate[] any other possible causes" of the conduct at issue).

**B. Industry Expert Jonathan Krein**

ZD expert Krein similarly opines that OpenAI "[redacted]" ECF1769(Ex.B) ¶19. That opinion should be excluded because, even after five iterations, Krein's analysis remains riddled with errors and lacks a reliable method for determining when operative robots.txt files disallowed OpenAI's bots.

*First*, Krein lacks a reliable methodology for determining when operative robots.txt files disallowed OpenAI's bots. He relies on two sources, ZD's internal revision logs and public robots.txt files (preserved by Internet Archive's Wayback Machine), but gave precedence to the internal logs. ECF1769(Ex.A) ¶97; Malhotra Decl., Ex. 8, 115:1-12, 117:10-118:11. Yet he admitted that internal revisions may precede public deployment, public robots.txt files may change without corresponding log entries, and the two sources diverged by as much as [redacted] or [redacted] days. Malhotra Decl., Ex. 8, 132:20-134:11, 136:9-137:17, 138:16-139:16; ECF1769(Ex.A) ¶98. He also could not consistently explain how he reconciled the two sources, and his latest code selectively relies on revision-history evidence for some properties while disregarding it for others. Malhotra Decl., Ex. 8, 123:2-125:15, 132:1-19; *id*. Ex. 52, at ll. 14-45, 106-116, 129-169

([redacted]).

*Second*, Krein's analysis, by his own admission, is a mess. Krein has repeatedly corrected material errors without arriving at a reliable result.

- Krein's first two reports relied on an "incorrect" dataset. *Id*. Ex. 30, at i.
- His August results were still "[redacted]" with unfinished calculations needed for his "final figures." *Id*. Ex. 8, 77:5-79:9, 57:1-3.
- At deposition, he could not reconcile multiple ZD materials that contradicted his disallow windows. *Id*. 142:5-148:13, 151:11-157:20.
- After deposition, he found "additional bugs" that reduced the supposed robots.txt violations by [redacted]. *See* ECF1769(Ex.B) ¶13; ECF1769(Ex.C) ¶4, nn.4-6, ¶6.

*Third*, Krein claims that OpenAI "scraped millions of pages," but he counts "successful requests" without deduplicating repeated requests to the same page. ECF1769(Ex.B) ¶¶19-20; ECF1769(Ex.C) ¶¶6-8. The Court should therefore exclude Krein's opinions quantifying robots.txt violations and, in all events, preclude him from equating request totals with counts of distinct "pages."

*Finally*, Krein's opinion that OpenAI enables "substitutive content" diminishing ZD articles' value should be excluded: he admitted that generation cost alone does not establish substitution, performed no substitution analysis, and is neither an accountant nor economist. ECF1769(Ex.A) ¶¶86-87; Malhotra Decl., Ex. 8, 200:18-208:23.

### C. Industry Experts Professor Emily Bell, Professor Taylor Owen, Sue Cross

News Plaintiffs' experts Bell, Owen, and Cross proffer opinions regarding the purported harm and substitutive effect that Defendants' products have caused to the News Plaintiffs. But

those opinions are not "the product of reliable principles and methods" or their "application . . . to the facts of the case" and should be excluded. Fed. R. Evid. 702(b)–(d).

### 1. Owen, Bell, and Cross's Market-Substitution and Harm Opinions

Each of these experts (none of whom is an economist[6]) failed to offer a "data driven basis" for concluding that there has been market substitution or harm. *See Laumann*, 117 F. Supp. 3d at 319 (finding that analysis of substitution or market harm requires an expert to evaluate "information about consumer tastes and preferences" such as sales, revenue, or consumer survey data). None of the experts looked at Plaintiffs' audience metrics or financial data. Malhotra Decl., Ex. 1, 79:6-11, 81:7-16, 136:6-139:18; *id*. Ex. 13, 78:3-7, 107:13-23, 117:4-14; *id*. Ex. 3, 142:4-21, 221:15-20. Nor did they conduct surveys to assess whether there was any change in consumer behavior caused by Defendants' products. *Id*. Ex. 1, 48:25-49:8, 54:2-7; *id*. Ex. 13, 70:18-72:25; *id*. Ex. 3, 47:16-19, 56:25-57:4. None of them performed any statistical analysis to determine whether Defendants' products have had any impact on the market for Plaintiffs' Asserted Works. *Id*. Ex. 1, 46:7-10, 55:3-10, 99:7-22; *id*. Ex. 13, 73:13-74; *id*. Ex. 3, 84:21-85:7, 141:17-21.

Rather, the opinions of these witnesses rely heavily on irrelevant third-party research. Courts have repeatedly rejected reliance on inapposite studies to reach case-specific conclusions. *Nimely*, 414 F.3d at 396-97; *Amorgianos*, 303 F.3d at 269-70. Bell, Owen and Cross each rely on studies of Google AI Overviews, a product not at issue in this case, powered by a different LLM, different click-through mechanism, and different user behavior profile. Malhotra Decl., Ex. 1, 152:4-153:17, 279:6-24; *id*. Ex. 13, 108:3-24, 113:11-116:19; ECF 1821(Ex. A), at 18 n.32, 19 n.34, 42 n.106. They cite no studies specifically addressing the impact of Defendants'

[6] *See* Malhotra Decl., Ex. 1, 99:4-22; *id*. Ex. 13, 28:3-10; *id*. Ex. 3, 46:16-17.

Products and could not articulate a basis to apply the Google research to them. *Id*. Ex. 1, 152:4-153:17, 155:15-157:14; *id*. Ex. 13, 69:7-17, 70:14-72:25, 148:18-149:11, 152:13-23; *id*. Ex. 3, 158:2-5, 159:6-11, 196:9-22, 247:6-248:1. This is the type of inferential leap that Rule 702 prohibits. *Nimely*, 414 F.3d at 396; *Johnson Elec.*, 103 F. Supp. 2d at 283-84 (excluding opinion based on assumptions rather than available data).

**2. Owen and Bell's Reliance on Marketing Surveys**

Having performed no analysis of their own, Bell and Owen also attempt to fill the evidentiary void by relying on hearsay orchestrated by Plaintiffs: a NYT Brand Tracker Survey and a DN GenAI Survey. These are not ordinary business records—they were questionnaires administered after this litigation commenced but without regard to any of the protocols governing litigation surveys. ECF1716 ¶¶23-26. Worse, Bell and Owen did not analyze the survey instruments and data, but simply parrot back Plaintiffs' slide decks full of self-serving conclusions. *See* ECF1794(Ex. A) ¶¶117-118 (citing ECF 2003-14); Malhotra Decl., Ex. 1, 58:12-59:3; ECF 1811(Ex.A) ¶135 (citing ECF 1922-7); Malhotra Decl., Ex. 13, 74:22-75:6. But the law is clear: simply reading from a slide is something the jury could do, rendering these portions of Plaintiffs' Experts' opinions inappropriate and excludable. *See Hayden v. Int'l Bus. Machines Corp.*, No. 21 CV 2485 (VB), 2025 WL 1697021, at *8 (S.D.N.Y. June 17, 2025) (excluding expert opinion based on facial comparison of two slide decks without applying any further methodology); *In re Longtop*, 32 F. Supp. 3d at 460. And an expert's reliance on data provided by a plaintiff, without conducting independent verification, "gives rise to 'common-sense skepticism' regarding the expert's evaluation." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000); *see also Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 23-24 (2d Cir. 2017) (affirming district court's exclusion of opinion where expert "did not independently verify any of the data he used in the report—he simply input the numbers he was given [by plaintiff]"). This is

precisely what occurred here. Had the experts conducted their own validation, they would have found that Plaintiffs' survey evidence suffers from serious design flaws that undermine any conclusions that can be drawn from them and render them inadmissible. *See generally* Amir Decl.

**3. Bell's "News Websites" and "Pink Slime Websites" Lists**

Bell's lists of "news websites" and "pink slime websites," and any opinions that rely on them, should be excluded because Bell merely recites the conclusions of others without applying a reliable methodology to validate those conclusions. *See* ECF1794(Ex. B) ¶¶206-11; ECF1811(Ex. B) ¶126.[7]

*First*, Bell discloses no reliable method for verifying her "news websites" list. *See Nimely*, 414 F.3d at 399 (excluding expert opinion based on "unverifiable subjectivity"). Bell combined three lists prepared by third parties and then "[redacted]" ECF1794(Ex. B) ¶207. But even for the publishers she purportedly "verified," Bell's Rebuttal Report does not specify any criteria used to determine that a publisher does "original reporting" or that it "employ[s] journalists." Nor are the criteria she used embodied in a protocol or other written notes that have been produced. Malhotra Decl., Ex. 1, 241:17-243:18. Absent a testable approach, Bell's process fails to meet any of the Daubert

[7] Goldstein relied on these lists to analyze the percentages of Copilot and ChatGPT conversations from the output logs produced in this litigation that retrieved a news domain or a pink slime domain as part of retrieval-augmented generation ("RAG"). ECF1819(Ex. B) ¶¶109-28. Bell, Alter, Etzioni, and Malackowski then parroted Goldstein's conclusion in their Rebuttal Reports. *See* ECF1794(Ex. B) ¶¶212-13; ECF1811(Ex. B) ¶126; ECF1784(Ex. A) ¶¶131-34; ECF1806(Ex. B) ¶89; ECF1800(Ex. B) at 30 n.159, 56 n.283; *see also* ECF1806(Ex. C) ¶¶70-71, 81.

reliability factors. *See Daubert*, 509 U.S. at 579. Accordingly, Bell's "news websites" list and opinions derived therefrom should be excluded.

Second, Bell's "pink slime websites" list merely repackages lists created by others. ECF1794(Ex. B) ¶208. Bell did not verify whether any websites were actually "pink slime" and simply reviewed the list for "accuracy," which meant "[redacted]," Malhotra Decl., Ex. 1, 253:22-254:11. Courts routinely "preclude proffered [expert] witnesses who simply aggregate or recite the opinions of others." *Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 115 (S.D.N.Y. 2021).

**D. Attorney Expert Antoinette Tease**

Experts are not permitted to offer "legal conclusions" because such opinions "trespass on the province of the jury and the trial court." *Gutierrez*, 2025 WL 2403361, at *5. That bar includes opinions on "legal standards or conclusions of law" and "whether a party acted with objective reasonableness . . . or with any other relevant state of mind." *In re Longtop*, 32 F. Supp. 3d at 460.

Tease offers both. She opines that OpenAI satisfied the second scienter requirement of Plaintiffs' 17. U.S.C. § 1202(b)(1) claims by concluding what OpenAI had reasonable grounds to know based on what a competent copyright lawyer would have advised. Malhotra Decl., Ex. 44, at 13-29; *id*. Ex. 18, 47:19-23, 68:12-69:22. She likewise opines on fair-use law, concluding OpenAI's conduct is not a fair use and OpenAI had reasonable grounds to know it. *Id*. Ex. 44 at 6-13, 22-29; *id.* Ex. 18, 98:19-124:22. Indeed, Tease's opinions have been excluded on precisely these grounds before. Order at 16–18 (ECF 540), *Deere & Co. v. Kinze Mfg., Inc.*, No. 4:20-cv-00389-RGE-HCA (S.D. Iowa Feb. 8, 2024) (excluding scienter opinions and legal conclusion that a party violated statutory duty). Her opinions here should be excluded in their entirety.

## IV. NEWS PLAINTIFFS' HARM EXPERT OPINIONS SHOULD BE EXCLUDED.

News Plaintiffs assert that ChatGPT and Copilot have harmed the traditional markets for their asserted works. *See*, *e.g.*, ECF1728 at 59-70. While Defendants' experts presented findings that ChatGPT and Copilot had no statistically significant impacts on subscriptions, web traffic, or News Plaintiffs' revenues, none of Plaintiffs' experts offered the opinion that any News Plaintiff has lost even a single dollar of revenue.

### A. James Malackowski

NYT, DN, and ZD retained Malackowski to offer opinions on damages and factor-four harm.[8] While Malackowski opines that "Defendants' use of News Plaintiffs' Copyrighted Works provides a directly competing substitute and harms News Plaintiffs in multiple concrete ways," ECF1800(Ex. A) at 21, he failed to examine any data reflecting revenue or subscriptions, let alone present any analysis demonstrating substitution or harm. Rather, Malackowski relies on flawed analyses conducted by other experts (chiefly, Stricchiola's discussion of click-through rates), surveys conducted by Plaintiff newspapers, and various third-party sources -- none of which remedy his lack of a reliable and testable method for ascertaining actual harm.

#### 1. Malackowski's Market-Harm Opinion

Malackowski's traditional market-harm opinion suffers from the same basic defect as Lasinski's does with respect to Books Plaintiffs: he has no "data-driven basis" for finding substitution or harm. *Laumann*, 117 F. Supp. 3d at 316; *Berlyn, Inc. v. Gazette Newspapers, Inc.*,

---

[8] Should Plaintiffs prevail on the merits of any of their claims, Defendants reserve the right to challenge Malackowski's damages opinions on at least the following grounds: his failure to establish causal nexus for revenues he discusses as attributable to the alleged infringement, his bottom-up approach to apportionment consisting of a "cost of news" calculation, the methodology of his "cost of news" lost license fee, and his use of a 50% adjustment factor in that calculation.

214 F. Supp. 2d 530, 539 (D. Md. 2002). As discussed above, *supra* 4-5, analysis of substitution or market harm requires an expert to evaluate "information about consumer tastes and preferences" such as sales, revenue, or consumer survey data. *Laumann*, 117 F. Supp. 3d at 320. Malackowski conducted no such analysis. He did not perform or cite any consumer surveys or empirical studies of harm or substitution. Malhotra Decl., Ex. 11, 98:22-101:12. He also fails to test his theory that ChatGPT and Copilot harm the market for the Asserted Works by using "actual, readily-obtainable information" about consumer behavior: News Plaintiffs' revenue, subscription, or traffic data. *Laumann*, 117 F. Supp. 3d at 315.

In fact, Malackowski (who is not an economist) testified that he consulted with a Ph.D. economist to assess how to calculate harm and ultimately concluded it was too "complicated." Malhotra Decl., Ex. 11, 344:11-345:2, 345:14-346:17. He therefore does not test whether News Plaintiffs' financial performance changed after ChatGPT or Copilot's introduction, does not attempt to isolate any effect attributable to GenAI, or otherwise use Plaintiffs' available financial and traffic data to test his causal hypothesis. By contrast, Defendants' economists – Dr. Goldfarb and Dr. Tucker presented findings that ChatGPT and Copilot had no statistically significant impact on News Plaintiffs' revenue, subscription, or traffic. *See* ECF1863-10, Section VI.B-D; ECF1733 ¶ 11, Section III; ECF1863-15, Section VI.B-D. Because Malackowski's opinions are not based on sufficient facts or data, ignore highly relevant market indicators, and are not the product of any reliable methodology, they must be excluded. *See, e.g.*, *Johnson Elec. N. Am. Inc.*, 103 F. Supp. 2d at 283 (excluding opinion based on assumptions).

**2. Malackowski's Reliance on Others**

Instead of presenting sufficient data to support his market-harm opinions, Malackowski relies on the report of another expert (Stricchiola), NYT and DN consumer questionnaires, and various other studies purporting to show consumers use GenAI instead of search engines to get

"news" information. But none of these materials purport to show substitution between ChatGPT or Copilot and News Plaintiffs' materials.

Malackowski relies on Stricchiola's CTR side-by-side chart (and similar third-party CTR data) to support his opinion that traffic to the Asserted Works has been negatively affected by substitution. Malhotra Decl., Ex. 11, 213:14-214:9; *see, e.g.*, ECF1800(Ex. A), at 30, 46-47. For the same reasons that Stricchiola's CTR analysis does not demonstrate market harm, it also cannot support Malackowski's market harm opinion, as he conceded at his deposition. Malhotra Decl., Ex. 11, 384:13-16. That would have required "[redacted]," which neither Stricchiola nor Malackowski performed. *Id.*

Malackowski's other evidence fares no better. The Plaintiff-administered NYT and DN questionnaires are inadmissible, as discussed above Part III(C), and neither measured whether ChatGPT or Copilot changed respondents' behavior. *Mirena*, 341 F. Supp. 3d at 242 (studies not finding causation cannot form the basis of a causation opinion). And Malackowski's remaining sources (including OpenAI usage research, third-party surveys, market analytics, and opinions from Goldstein and Microsoft's expert, Dr. On Amir) purport to show, at most, that some users use GenAI for search or to seek "news" information—but not that users are using ***ChatGPT or Copilot instead of NYT and DN Plaintiffs' content***. They might otherwise have used other information sources such as television, for example, or be using GenAI as a complement to news consumption. Malackowski's first and only citation to an "econometric" analysis – a cite to ZD's expert Dr. Keith Waehrer's rebuttal report – appears in Malackowski's ZD Reply report, confirming ***his*** News Plaintiff opinions lacked any empirical basis.

For these reasons, Malackowski's opinion that News Plaintiffs have been harmed in their traditional markets must be excluded. *See Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL

1674796, at *10 (S.D.N.Y. May 2, 2011) (excluding opinion that was "only a summary of what other experts have said, without application of his own expertise").

**B. Michael McDonald**

Like Malackowski, CIR/Intercept expert Dr. Michael McDonald opines that GenAI products compete with news publishers and "satisfy demand for news content that would otherwise bring readers to Plaintiffs' content." ECF1875(Ex. A), at 6, 12-13, 36. For support, McDonald points to: (1) data from third-party TollBit reporting that "AI chatbots generate approximately 95.7% less click-through traffic than traditional Google search," *id*. at 13, and (2) a regression analysis purporting to show that web traffic to CIR/Intercept websites decreased since ChatGPT launched. *Id*. at 16-21. But McDonald's analysis fails to identify any users who chose an AI platform over CIR/Intercept, or measure how many visits those publishers would have received without AI platforms.

McDonald does not reliably establish that GenAI has caused News Plaintiffs to lose web traffic. He cites TollBit data reporting that "AI chatbots generate approximately 95.7% less click-through traffic [to news websites] than traditional Google search." *Id*. at 13. But, as with Stricchiola's analysis, this comparison is descriptive, not causal. It says nothing about what the user would have done without AI – *i.e*., whether the user would have used Google or another source for news (rather than a news website), or simply never sought the information. Nor does it account for users employing AI alongside, rather than instead of, News Plaintiffs' content. It therefore provides no evidence that AI chatbots—much less the products at issue—substituted for Plaintiffs' content. If the third-party study does not establish causation, the opinion cannot rely on it to do so. *See Mirena*, 341 F. Supp. 3d at 249.

McDonald's regression analysis neither reliably isolates GenAI (let alone ChatGPT or Copilot) as a *cause* of observed traffic trends nor supports his opinion that GenAI platforms

"satisfy demand for news content that would otherwise bring readers to Plaintiffs' content." ECF 1875(Ex.A), at 36. He simply measures web traffic over time and claims any declines are "[redacted]." Malhotra Decl., Ex. 12, 95:22-96:14. McDonald himself concedes that his regression does not prove that GenAI caused harm to CIR/Intercept. *Id.* 92:6-13. Indeed, it does not even include GenAI usage as a variable. *Id.* 148:5-9; *see Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 539489, at *5 (S.D.N.Y. Feb. 10, 2015) (valid control group must lack variable whose effect is being tested). Nor does McDonald identify any relationship between traffic changes and lost subscriptions, advertising revenue, or other concrete economic harm. Malhotra Decl., Ex. 12, 157:22-158:1 (regression did not analyze revenue). CIR/Intercept revenue remained flat or increased during the relevant period. ECF1875(Ex.A) at 50; *Laumann*, 117 F. Supp. 3d at 315 (excluding economic expert who ignored "actual, readily-obtain[ed] information" about consumer demand).

McDonald does not reliably attribute reductions in traffic to News Plaintiffs' websites to substitution from GenAI. This gap in analysis is fatal, and his traditional market harm opinion should be excluded.

**CONCLUSION**

For the foregoing reasons, the opinions identified by paragraph number in the Motion should be excluded.

Dated: September 24, 2026

Respectfully submitted,[9]

*/s/ Lisa Simpson*

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Annette L. Hurst (admitted pro hac vice)
Daniel Justice (admitted pro hac vice)
Robert Scott Shwarts
Catherine Lui (admitted pro hac vice)
Amanda H. Schwartz (admitted pro hac vice)
Ana Mendez-Villamil (admitted pro-hac vice)
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759
ahurst@orrick.com
djustice@orrick.com
aschwartz@orrick.com
amendez-villamil@orrick.com

Christopher J. Cariello
Lisa T. Simpson
Marc Shapiro
Vanessa Sorrentino
Hilda Obeng
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-3778
Facsimile: (212) 506-5151
ccariello@orrick.com
lsimpson@orrick.com
mrshapiro@orrick.com
vsorrentino@orrick.com
hobeng@orrick.com

Sheryl Koval Garko (admitted pro hac vice)
Laura Brooks Najemy (admitted pro hac vice)
222 Berkley Street
Boston, MA 02116
Telephone: (617) 880-1800
Facsimile: (617) 880-1801
sgarko@orrick.com
lnajemy@orrick.com

[9] All parties whose electronic signatures are included in this filing have provided consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

Isaac Sawlih Behnawa (admitted pro hac vice)
Johnathan Vaknin (admitted pro hac vice)
355 S. Grand Ave. Suite 2700
Los Angeles, CA 90071
Telephone: (213) 612-2179
Facsimile: (213) 612-2499
ibehnawa@orrick.com
jvaknin@orrick.com

Monica Svetoslavov (admitted pro hac vice)
Louis Andrew Schreiber
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
msvetoslavov@orrick.com
aschreiber@orrick.com

**FAEGRE DRINKER BIDDLE & REATH LLP**
Jeffrey S. Jacobson
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 248-3191
jeffrey.jacobson@faegredrinker.com

Jared B. Briant (admitted pro hac vice)
Kirstin L. Stoll-DeBell (admitted pro hac vice)
Timothy Scull (admitted pro hac vice)
Shelby Pickar-Dennis (admitted pro hac vice)
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone: (303) 607-3588
jared.briant@faegredrinker.com
kirstin.stolldebell@faegredrinker.com
timothy.scull@faegredrinker.com
shelby.pickar-dennis@faegredrinker.com

Lora A. Brzezynski (admitted pro hac vice)
Brianna Lynn Silverstein (admitted pro hac vice)
Faith Maggard (admitted pro hac vice)
1500 K Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 230-5000
Facsimile: (202) 842-8465
lora.brzezynski@faegredrinker.com

brianna.silverstein@faegredrinker.com
faith.maggard@faegredrinker.com

Carrie A. Beyer (admitted pro hac vice)
320 South Canal Street, Suite 3300
Chicago, IL 60606-5707
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
carrie.beyer@faegredrinker.com

Elizabeth M.C. Scheibel (admitted pro hac vice)
2200 Wells Fargo Center, 90 S. 7th Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
elizabeth.scheibel@faegredrinker.com

Andrew Lawrence Van Houter
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7018
Facsimile: (973) 360-9831
Andrew.vanhouter@faegredrinker.com

*Attorneys for Defendant Microsoft Corporation*

*<u>/s/ Paven Malhotra</u>*
**KEKER, VAN NEST & PETERS LLP**
Robert A. Van Nest (pro hac vice)
rvannest@keker.com
R. James Slaughter (pro hac vice)
rslaughter@keker.com
Paven Malhotra
pmalhotra@keker.com
Michelle S. Ybarra (pro hac vice)
mybarra@keker.com
Reid P. Mullen (pro hac vice)
rmullen@keker.com
Nicholas S. Goldberg (pro hac vice)
ngoldberg@keker.com
633 Battery St.
San Francisco, CA 94111
Telephone: 415.391.5400

*/s/ Caitlin Sinclaire Blythe*
**MORRISON & FOERSTER LLP**
Joseph C. Gratz (pro hac vice)
jgratz@mofo.com
Tiffany Cheung (pro hac vice)
tcheung@mofo.com
Caitlin Sinclaire Blythe (pro hac vice)
cblythe@mofo.com
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000

Lily Li (pro hac vice)
YLi@mofo.com
755 Page Mill Road
Palo Alto, CA 94304
Telephone: 650.813.5600

*/s/ Herman H. Yue*
**LATHAM & WATKINS LLP**
Andrew M. Gass (pro hac vice)
andrew.gass@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415.391.0600

Sarang V. Damle
sy.damle@lw.com
Herman H. Yue
herman.yue@lw.com
Luke A. Budiardjo
luke.budiardjo@lw.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200

Elana Nightingale Dawson (pro hac vice)
elana.nightingaledawson@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

*Attorneys for Defendant OpenAI*

## CERTIFICATE OF WORD COUNT COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the foregoing Memorandum of Law complies with the Court's order of August 7, 2026 (ECF 1664), as it contains 11,948 words, according to the word processing program used to prepare it.

*/s/ Lisa Simpson*
Lisa Simpson
*Attorney for Defendant*
*Microsoft Corporation*