UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION<br><br>This document relates to:<br><br>No. 1:23-CV-08292<br>No. 1:23-CV-10211<br>No. 1:23-CV-11195<br>No. 1:24-CV-03285<br>No. 1:24-CV-04872<br>No. 1:24-CV-01515<br>No. 1:25-CV-04315 | Case No. 25-md-3143-SHS-OTW<br><br>Hon. Sidney H. Stein |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT *DAUBERT* MOTION AND MOTION TO STRIKE**

# TABLE OF CONTENTS

INTRODUCTION ........ 1
LEGAL STANDARDS ........ 4
ARGUMENT ........ 5
I. Joint Class and News Arguments ........ 5
A. The Court Should Exclude Portions of the Testimony of OpenAI's Experts Dr. Berg-Kirkpatrick, Dr. Feamster, and Dr. Callison-Burch that Rely on the Sample of 20 Million ChatGPT Conversations. ........ 5
B. The Court Should Exclude Dr. Callison-Burch's Improper Legal Conclusion that OpenAI's Use of Plaintiffs' Works was "Transformative." ........ 7
C. The Court Should Exclude Dr. Krishnan's Unreliable Opinions on the Accuracy of the LibGen Metadata and Dr. Krishnan's Improper Opinions Outside His Expertise. ........ 8
1. The Court Should Exclude Dr. Krishnan's Opinion That Class Plaintiffs' LibGen Metadata Matches Are Unreliable Because that Opinion Has Neither a Factual Foundation Nor a Reliable Methodology. ........ 8
2. The Court Should Exclude Dr. Krishnan's Opinions About "False Positives" Because These Opinions Rest on Legal Determinations Outside His Expertise. ........ 10
D. The Court Should Exclude All of Dr. Tucker's Opinions Because of Her "Opinions First, Facts Later" Approach or Alternatively Exclude Her Opinions Relating to Book Sales and Website Traffic Trends Because They Fail to Assess Causation. ........ 11
1. The Court Should Exclude Dr. Tucker's Opinions in Full Because She Formed Them Without First Considering the Evidence. ........ 11
2. Dr. Tucker Acknowledges that Many Factors Affect Book Sales and News Traffic but Concludes Copilot and ChatGPT Had No Impact Without Analyzing Those Factors. ........ 13
II. Class Plaintiffs' Arguments ........ 16
A. The Court Should Exclude Dr. Nonnecke's "Common Industry Practice" Opinion Because It Lacks Any Foundation and Is Not Helpful to the Jury. ........ 16
III. News Plaintiffs' Arguments ........ 18
A. The Court Should Exclude Certain Testimony of Dr. Nick Feamster That Offers Improper Legal Opinions, Relies on Previously

Undisclosed OpenAI Employees, and Concerns a Flawed Script Regarding Robot.txt Bypasses. .......... 18

B. The Court Should Exclude Dr. Berg-Kirkpatrick's Opinions on ChatGPT's Propensity to Regurgitate Because He Ignores OpenAI's Mitigation Efforts and His Methodology is Flawed. .......... 23

1. Dr. Berg-Kirkpatrick's Opinions About the Regurgitation Rate of News Plaintiffs' Asserted Works in the 20 Million Sample of ChatGPT Conversations Should Be Excluded. .......... 23

2. Dr. Berg-Kirkpatrick's [redacted]" Study for Ziff Davis Should Be Excluded. .......... 25

C. The Court Should Exclude Dr. Goldfarb's Licensing Testimony, His Analysis Comparing Traffic and Engagement Trends of ChatGPT Users and Non-Users, and His Asset-Turnover Ratio Opinions. .......... 29

1. Dr. Goldfarb's Licensing Testimony Should Be Excluded Because He Admitted He Lacks Licensing Expertise. .......... 29

2. Dr. Goldfarb's Analysis Comparing Traffic and Engagement Trends of ChatGPT Users and Non-Users Should Be Excluded Due to Sample Bias. .......... 31

3. Dr. Goldfarb's Trend Analysis Fails to Consider Causation. .......... 33

4. Dr. Goldfarb's "Asset-Turnover Ratio" Purporting to Show No Harm is Unreliable and Misleading. .......... 34

D. The Court Should Exclude Opinions of Ms. Frederiksen-Cross That Fall Outside Her Qualifications and Express Impermissible Views on Intent. .......... 35

1. Ms. Frederiksen-Cross's Testimony on LLM Training, Model Behavior, and Memorization Should be Excluded Because She Lacks Relevant Expertise. .......... 35

2. Ms. Frederiksen-Cross Impermissibly Opines on OpenAI's Mental State When Removing News Plaintiffs' CMI. .......... 36

CONCLUSION .......... 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ....................17

*Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*,
743 F.Supp.3d 530 (S.D.N.Y. 2024) ....................19, 25

*Amorgianos v. National R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)....................15, 23

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)....................18

*Arista Records LLC v. Usenet.com, Inc.*,
608 F.Supp.2d 409 (S.D.N.Y. 2009) ....................20, 24, 25

*Arista Recs. LLC v. Lime Grp. LLC*,
784 F. Supp. 2d 398 (S.D.N.Y. 2011) ....................36

*BMG Music v. Gonzalez*,
430 F.3d 888 (7th Cir. 2005) ....................17

*Buckley v. Deloitte & Touche USA LLP*,
888 F. Supp. 2d 404 (S.D.N.Y. 2012) ....................4

*Bustamante v. KIND, LLC*,
100 F.4th 419 (2d Cir. 2024) ....................27

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....................7, 18

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ....................28

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 597 (1993).................... *passim*

*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
367 F.Supp.2d 413 (W.D.N.Y. 2005)....................24

*Emmerich Newspapers, Inc. v. Particle Media, Inc.*,
629 F. Supp. 3d 497 (S.D. Miss. 2022) ....................7

*Estate of Jaquez v. City of New York*,
104 F.Supp.3d 414 (S.D.N.Y. 2015) ....29

*Faulkner v. Arista Records LLC*,
46 F.Supp.3d 365 (S.D.N.Y. 2014) ....13

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....4, 9

*Google LLC v. Oracle America, Inc.*,
593 U.S. 1 (2021)....7

*In re Mirena IUD Prod. Liab. Litig.*,
169 F.Supp.3d 396 (S.D.N.Y. 2016) ....21

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) ....2, 13

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008)....4, 16

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ....15

*Micone v. Sarene Servs., Inc.*,
2025 WL 736638 (E.D.N.Y. Mar. 8, 2025)....28

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
67 F.3d 435 (2d Cir. 1995)....31

*Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*,
598 F.Supp.3d 158 (S.D.N.Y. 2022) ....36

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005)....9, 23, 36

*Pac. Life Ins. Co. v. Bank of New York Mellon*,
571 F. Supp. 3d 106 (S.D.N.Y. 2021) ....27

*Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*,
No. 16-CV-4488, 2025 WL 2592224 (S.D.N.Y. Sept. 8, 2025)....4

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014) ....33

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
No. 98-cv-8272, 2003 WL 22124991 (S.D.N.Y. 2003) ....33

*Souza v. Exotic Island Enters.*
68 F.4th 99 (2d Cir. 2023) ....................27

*United States v. Duncan*,
42 F.3d 97 (2d Cir. 1994)....................4, 5, 7

*United States v. Menendez*,
2025 WL 547794 (S.D.N.Y. Feb. 19, 2025) (Stein, J.) ....................25

*United States v. Scop*,
846 F.2d 135 (2d Cir. 1988)....................25

*United States v. Williams*,
506 F.3d 151 (2d Cir. 2007)....................5

*Wills v. Amerada Hess, Corp.*,
379 F.3d 32 (2d Cir. 2004)....................15

**Rules**

Fed. R. Civ. P. 26 ....................1, 19

Fed. R. Civ. P. 37 ....................8

Fed. R. Evid. 403 ....................21, 23

Fed. R. Evid. 702 .................... *passim*

## INTRODUCTION

Expert opinions must be grounded in fact and reliable methodology—not speculation or *ipse dixit.* Many of the opinions of Defendants' experts lack the factual foundation or reliable methodology *Daubert* requires or violate Rule 26's disclosure requirements. The Court should exclude the following opinions:

**Section I: Joint Class and News Arguments**

A. Three OpenAI experts, Drs. Berg-Kirkpatrick (computer science expert on regurgitation), Feamster (computer science expert on web crawling and internet practices), and Callison-Burch (computer science expert on the purpose and design of OpenAI's LLMs), rely on the sample of 20 million ChatGPT conversations that is the subject of News Plaintiffs' sanctions motion against OpenAI. ECF 1618. If the Court grants that motion, it should also preclude the testimony from these experts in all cases that rely on this improper sample.

B. Dr. Callison-Burch opines that OpenAI's use of Plaintiffs' works was "transformative." This is an unvarnished legal conclusion that is improper and must be excluded.

C. Dr. Krishnan (OpenAI's computer science rebuttal expert on the technical and scientific reliability of Plaintiffs' experts' infringement and CMI removal analyses) offers two opinions that should be excluded. First, Dr. Krishnan opines that some metadata may sometimes be unreliable and then jumps from this general observation to opining that the LibGen metadata is unreliable, without any analysis of the actual metadata. This is classic *ipse dixit* that should be excluded. Second, Dr. Krishnan's opinions about "false positives" require him to make determinations of subject matter eligibility, copyright ownership, and fair use. These are determinations of copyright law that are outside his area of expertise, requiring exclusion.

D. Dr. Tucker (Microsoft's expert on economics relating to its fair use defense) admitted that she formed her opinions without reviewing any of the evidence in this case, and only after

forming her opinions did she send members of her team to find evidence to support them. She also admitted that she did not review virtually any of the documents OpenAI and Microsoft produced in the case. Her opinions should therefore be excluded. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 550 (S.D.N.Y. 2004) ("[A]n expert may not reach his conclusion first and do the research later."). At a minimum, the Court should exclude Dr. Tucker's opinions that the introductions of ChatGPT and Copilot had no impact on Class Plaintiffs' book sales and royalty earnings and News Plaintiffs' website traffic, revenues, subscriptions, and conversions. They are unreliable because they are based on mere observation of "trend lines" without any causation analysis.

**Section II: Class Argument**

A. Dr. Nonnecke's (OpenAI's expert on responsible AI practices) opinion that OpenAI's use of Library Genesis was "common industry practice" should be excluded for two reasons. First, the opinion lacks any support. Dr. Nonnecke's "understanding" of this purportedly common practice is derived exclusively from another expert, Dr. Callison-Burch. But Dr. Callison-Burch has not offered any such opinion. On the contrary, he has refuted that use of Library Genesis was "common industry practice." Second, her opinion is neither relevant nor helpful to the jury because "everyone was doing it" is not a defense to copyright infringement.

**Section III: News Arguments**

A. The Court should exclude three news-specific opinions from Dr. Feamster. First, the Court should exclude Dr. Feamster's improper legal conclusion that OpenAI's use of Plaintiffs' works for RAG was transformative. Second, the Court should exclude Dr. Feamster's opinions relying on ten conversations with previously undisclosed OpenAI employees (whom Plaintiffs were never afforded the opportunity to depose and cross examine regarding personal knowledge,

bias, credibility, or memory). Third, the Court should exclude Dr. Feamster's unreliable methodology that undercounts OpenAI's robots.txt bypasses of News Plaintiffs' websites.

B. The Court should exclude Dr. Berg-Kirkpatrick's opinions relying on a filtering methodology that rests on improper legal conclusions to discount regurgitations of News Plaintiffs' content in ChatGPT outputs. This Court should also exclude Dr. Berg-Kirkpatrick's opinions relying on a flawed annotation study that discounts model regurgitations of Ziff Davis's content.

C. The Court should exclude four opinions from Dr. Goldfarb (OpenAI's expert on economics relating to fair use defense). First, the Court should exclude Dr. Goldfarb's opinions relating to licensing between AI developers and content providers because he admits he is not a licensing expert, has no expertise in characterizing intellectual property agreements, and lacks specialized knowledge or experience in accounting or intellectual property valuation. Second, the Court should exclude Dr. Goldfarb's unreliable analysis comparing traffic and engagement trends of ChatGPT users and non-users because of sample bias that infects his analysis and conclusions. Third, the Court should exclude Dr. Goldfarb's evaluation of harm to Plaintiffs because he fails to control for any of the alternative factors he acknowledges affect news traffic, revenues, and subscriptions. Fourth, the Court should exclude Dr. Goldfarb's opinions relating to Ziff Davis because he uses an unreliable and misleading "asset-turnover ratio" borrowed from an Investopedia article.

D. Finally, the Court should exclude the opinions of Ms. Frederiksen-Cross (OpenAI's expert in computer programming and source code) that go beyond her knowledge, skill, expertise, training, or education. She offers several opinions relating to LLM training, behavior, and memorization even though she admitted she is not a large language model ("LLM") or generative

artificial intelligence ("GAI") expert. She also improperly opines about OpenAI's mental state in removing copyright management information from News Plaintiffs' content.

* * *

For these reasons and the others explained below, the challenged opinions should be excluded.

## LEGAL STANDARDS

"Under *Daubert*, the district court functions as the gatekeeper for expert testimony, whether proffered at trial or in connection with a motion for summary judgment." *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 412 (S.D.N.Y. 2012).[1] Before admitting expert testimony, a court must consider: "(1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*, No. 16-CV-4488, 2025 WL 2592224, at *6 (S.D.N.Y. Sept. 8, 2025).

A court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" or where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Nor is a court required to accept testimony "without factual basis," that is "based on speculation or conjecture," or that is "conclusory." *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 311 (2d Cir. 2008). Finally, a court is not required to accept testimony "stating ultimate legal conclusions." *United States v. Duncan*, 42 F.3d 97, 103 (2d Cir. 1994). "When an expert undertakes to tell the

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes, and citations are omitted, and all alterations in the quoted cases (such as brackets) are adopted and omitted. Emphases are added unless otherwise indicated.

jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Id.* at 101.

Defendants, as the proponents of the expert testimony, have "the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied[.]" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

## ARGUMENT

## I. Joint Class and News Arguments

### A. The Court Should Exclude Portions of the Testimony of OpenAI's Experts Dr. Berg-Kirkpatrick, Dr. Feamster, and Dr. Callison-Burch that Rely on the Sample of 20 Million ChatGPT Conversations.

Both News and Class Plaintiffs seek an order from this Court excluding those portions of the testimony of OpenAI's experts Dr. Berg-Kirkpatrick, Dr. Feamster, and Dr. Callison-Burch that rely on the sample of 20 million ChatGPT conversations. As described in News Plaintiffs' Motion for Sanctions (ECF 1618), OpenAI should be precluded from relying on this sample for any purpose because of its discovery misconduct, misrepresentations to Plaintiffs and this Court about its ability to search for Plaintiffs' copyrighted content in its datasets, and irreparable corruption of the sample (including through its deletions and substitutions of over 10% of that dataset). That motion is now fully briefed.

Dr. Berg-Kirkpatrick relies exclusively on the sample of 20 million ChatGPT conversations (what he refers to as the [redacted] to support his [redacted] and [redacted]." *See, e.g.*, Ex. 1 (Berg-Kirkpatrick Opening Rpt.), Section VII (User Behavior Study) and Section VIII (Conversation Regurgitation Study). Dr. Callison-Burch relies on Dr. Berg-Kirkpatrick's [redacted] in his Rebuttal and Reply reports. Ex. 6 (Callison-Burch Rebuttal Rpt.) ¶ 91; Ex. 7 (Callison-Burch Reply Rpt.) ¶¶ 55, 89, 97. Dr. Feamster also performs analysis that relies exclusively on the sample of 20 million

ChatGPT conversations in formulating his opinions about whether [redacted] and [redacted] admitting at his deposition that he did not [redacted] on the additional samples and his [redacted]." Ex. 2 (Feamster Dep. Tr. at 97-99); Ex. 3 (Feamster Opening Rpt.) ¶¶ 316-319. Dr. Berg-Kirkpatrick and Dr. Feamster also submitted declarations to this Court in support of OpenAI's motion for summary judgment with opinions that rely exclusively on their analysis of the 20 million sample. *See, e.g.*, ECF 1766 (Feamster News Decl.) ¶¶ 11, 12, 24, 52, 58, Exhibits 1 and 3; ECF 1750 (Berg-Kirkpatrick News Decl.) ¶¶ 10, 11, 23-33, Tables 1-2.

If this Court grants Plaintiffs' sanctions motion and precludes OpenAI from relying on the sample of 20 million ChatGPT conversations, as it should, then this Court should exclude (and preclude OpenAI from relying on) the following:

1. Dr. Feamster's opinions related to the 20 million sample of ChatGPT conversations, including: [redacted] *See, e.g.*, Ex. 3 (Feamster Opening Rpt.) ¶¶ 182-234, 237, 238, 248, 249, 253, 255, 256, 257, 316-319, 324-343, Appendix D, Appendix E.

2. Dr. Berg-Kirkpatrick's opinions related to the 20 million sample of ChatGPT conversations he refers to as the [redacted] and the studies he performed using that sample. *See* Ex. 1 (Berg-Kirkpatrick Opening Rpt.) ¶¶ 13-16, 22-26, Section VI(A) (¶¶ 89-113), Section VII (¶¶ 146-179), Section VIII (¶¶ 180-245), ¶¶ 270-271, 368-369, 376, 381-420, Appendix C;[3] *id.* Figure A.15; Ex. 4 (Berg-Kirkpatrick Rebuttal Rpt.) ¶¶ 2, 17, 22, 23, 41-43, 175, 228, 230, 255-277, 330, 332, Table A.8[4]; Ex. 5 (Berg-Kirkpatrick Reply Rpt.) ¶¶ 7(a)-(b), 9-11, Section III

[2] OpenAI deleted and substituted over 1.7 million conversations in the 20 million sample, resulting in only a small fraction – approximately 1% – of the dataset containing conversations invoking RAG. ECF 1618 at 18.
[3] This includes all tables, figures, and appendices referenced in these paragraphs.
[4] Only the entries whose source is the 20 million sample.

(¶¶ 14-25, 27-31), Section IV (¶¶ 32-161), Section V (¶¶ 162-298), Appendix A, Appendix B.

3. Dr. Callison-Burch's testimony [redacted] on Dr. Berg-Kirkpatrick's [redacted] *See* Ex. 6 (Callison-Burch Rebuttal Rpt.) ¶ 91; Ex. 7 (Callison-Burch Reply Rpt.) ¶¶ 55, 89, 97.

**B. The Court Should Exclude Dr. Callison-Burch's Improper Legal Conclusion that OpenAI's Use of Plaintiffs' Works was "Transformative."**

Dr. Callison-Burch, a computer scientist who is one of OpenAI's technical experts, opines that OpenAI's use of Plaintiffs' asserted works was [redacted]," and that it [redacted] from Plaintiffs' works. Ex. 8 (Callison-Burch Opening Rpt.) ¶¶ 9-13, 265-269, 308. These are not technical opinions within his expertise as a computer scientist. They are unvarnished legal opinions. "Transformative" is a term of art in copyright law. And whether a use is "transformative" is a legal question that turns on whether the new work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *see also Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 24 (2021) (agreeing that whether "facts showed 'a fair use' is a legal question for judges to decide *de novo*"). Dr. Callison-Burch's opinions that OpenAI's use was [redacted] and had a [redacted] do not assist the jury in understanding technical facts. They parrot the language of the first fair use factor and "tell the jury what result to reach." *Duncan*, 42 F.3d at 101. They should be excluded. *See Emmerich Newspapers, Inc. v. Particle Media, Inc.*, 629 F. Supp. 3d 497, 500-01 (S.D. Miss. 2022) (excluding expert testimony on "legal issues regarding fair use," including "the various criteria which go into determining whether fair uses applies," because "experts cannot render conclusions of law or provide opinions on legal issues").

**C. The Court Should Exclude Dr. Krishnan's Unreliable Opinions on the Accuracy of the LibGen Metadata and Dr. Krishnan's Improper Opinions Outside His Expertise.**

Dr. Krishnan is an OpenAI technical expert who attempts to rebut Plaintiffs' allegations that OpenAI copied Plaintiffs' works to train OpenAI's large language models and that Plaintiffs' works [redacted] the training data. The Court should exclude two sets of Dr. Krishnan's opinions. First, the Court should exclude Dr. Krishnan's opinion on the accuracy of the LibGen metadata that Class Plaintiffs rely on. Second, the Court should exclude Dr. Krishnan's improper opinions about Plaintiffs' experts' "false positives" that are outside his expertise.

1. The Court Should Exclude Dr. Krishnan's Opinion That Class Plaintiffs' [redacted] Are Unreliable Because that Opinion Has Neither a Factual Foundation Nor a Reliable Methodology.

OpenAI intentionally deleted millions of copyrighted books that its employees downloaded from LibGen. ECF 846 at 1-2. Given this deletion, Class Plaintiffs' expert Dr. Shan used publicly available LibGen metadata to [redacted] Ex. 9 (Shan Opening Rpt.) ¶¶ 64-65.[5] Dr. Krishnan criticizes [redacted] because they purportedly rely on [redacted] LibGen metadata. Ex. 10 (Krishnan Class Rebuttal Rpt.) ¶¶ 18, 66-67, 113.

This opinion should be excluded because it lacks any foundation. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (requiring that expert testimony "rests on a reliable foundation"). Though Dr. Krishnan spends considerable time criticizing [redacted] *see* Ex. 10 (Krishnan Class Rebuttal Rpt.) ¶¶ 67-68, Books3 is separate from LibGen. Books3 is a curated dataset of approximately 196,000 copyrighted books, compiled in

[5] If Defendants dispute the number and identification of works they downloaded from LibGen in their opposition to Class Plaintiffs' Motion for Partial Summary Judgment, Class Plaintiffs will file a Rule 37 motion on this issue.

2020 to give other AI companies access to "OpenAI-grade training data." Ex. 11 (Presser X.com message). LibGen, by contrast, is a massive library of pirated works that has operated since 2008 and contains more than 2.4 million non-fiction books and 2.2 million fiction books. Ex. 12 (2025 USTR Report); Ex. 13 (LibGen Wikipedia page). Because the two are not the same, Dr. Krishnan's [redacted]a cannot and do not apply to the LibGen metadata.

Unsuccessfully trying to fill this analytical gap, Dr. Krishnan testified during his deposition that some [redacted]" and "[redacted]" Ex. 14B (Krishnan Dep. Tr.) 567:1–4. But Dr. Krishnan failed to perform any analysis showing that the specific metadata at issue here, for LibGen, is unreliable. He did not, for example, compare more than 600,000 MD5 hashes of Plaintiffs' works against the metadata and cross-check author and title metadata, as Plaintiffs' expert did. Instead, Dr. Krishnan leaps from a general statement that "metadata can be unreliable" to his conclusion that [redacted] without any explanation or analysis connecting the two.

This is improper. It is precisely the kind of "analytical gap" that courts time and again have warned against and excluded. *See Joiner*, 522 U.S. at 146 (excluding expert opinion where "there is simply too great an analytical gap between the data and the opinion proffered"); *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (same). Dr. Krishnan takes a general statement—[redacted]and seeks to apply that statement to the specific facts of the case without ever connecting the two. Dr. Krishnan's opinion on the reliability of the LibGen metadata are thus classic *ipse dixit* lacking any factual or methodological foundation. The Court should exclude these opinions.

2. The Court Should Exclude Dr. Krishnan's Opinions About "False Positives" Because These Opinions Rest on Legal Determinations Outside His Expertise.

Dr. Krishnan improperly opines on questions of copyright law outside his expertise. First, he opines that News Plaintiffs' experts have inflated infringement counts because the Asserted Works include subject matter purportedly ineligible for copyright protection, works purportedly owned by third parties, and works purportedly constituting "fair use," all of which Dr. Krishnan characterizes as "false positives." *See, e.g.,* Ex. 15 (Krishnan NYT/DNP Rebuttal Rpt.) ¶¶ 72, 109, and 245(C), (E) (copyrightability), ¶¶ 110 and 245(A), (B) (ownership), and ¶¶ 125 and 245(D) (fair use); Ex. 14A (Krishnan Dep. Tr.) 57:6-59:25 (agreeing that [redacted] and 66:25-67:25 (discussing [redacted]); Ex. 16 (Krishnan CIR/Intercept Rebuttal Rpt.) ¶¶ 101-02; Ex. 15 (Krishnan NYT/DNP Rebuttal Rpt.) ¶ 130 (ownership). Second, Dr. Krishnan improperly opines that the copies of the Asserted Works News Plaintiffs' experts found in OpenAI's training data involve uncopyrightable elements, such as sharing only [redacted] and deriving too much of their content from third-party sources. Ex. 16 ¶¶ 100, 103-11.

Dr. Krishnan is not a lawyer, and he lacks expertise in copyrightable subject matter and copyright ownership. He is not an expert on, for example, what makes a phrase [redacted]" or what constitutes fair use. Ex. 14A (Krishnan Dep. Tr.) 215:22-217:4. He also admitted to [redacted] *Id.* 225:1-14. Thus, he should not be permitted to opine on those issues. Ex. 15 (Krishnan NYT/DNP Rebuttal Rpt.) ¶ 12 [redacted]; Ex. 14A (Krishnan Dep. Tr.) 20:2-21:9 (admitting [redacted]

[redacted] *id*. 100:17-23 (admitting [redacted] Ex. 14B 668:13-17 (when asked if [redacted], he said, [redacted] Ex. 14A 216:19-23 (answering [redacted] to the question, [redacted] *See* Fed. R. Evid. 702(a). In sum, Dr. Krishnan's opinions on "false positives" (copyright eligibility, ownership, and fair use) should be excluded.

### D. The Court Should Exclude All of Dr. Tucker's Opinions Because of Her "Opinions First, Facts Later" Approach or Alternatively Exclude Her Opinions Relating to Book Sales and Website Traffic Trends Because They Fail to Assess Causation.

Dr. Tucker is Microsoft's expert on the market impact of ChatGPT and Copilot on Class and News Plaintiffs' works. The Court should exclude all of Dr. Tucker's opinions because she improperly formed her opinions without reviewing the evidence. At minimum, the Court should exclude Dr. Tucker's opinions on trends in Class Plaintiffs' book sales and royalties and News Plaintiffs' website traffic, revenues, subscriptions, and conversions because she fails to account for other factors that impact these trends.

#### 1. The Court Should Exclude Dr. Tucker's Opinions in Full Because She Formed Them Without First Considering the Evidence.

Dr. Tucker's opinions should be excluded in full because she admitted in her deposition that [redacted].[6] When asked about her process, Dr. Tucker testified:

[6] Dr. Tucker's reports in the Class case are attached as Exhibit 17 (Opening Rpt.) and Exhibit 18 (Reply Rpt.). Dr. Tucker's reports in the News cases are attached as Exhibits 19 (Opening Rpt.), 20 (Rebuttal Rpt.), and 21 (Reply Rpt.).

[redacted]

Ex. 22 (Tucker Dep. Tr.) 51:7-10.

[redacted]

*Id.* 55:2-8; *see also* 54:6-55:2.

[redacted]. *Id.* 52:3-53:10; Ex. 19 (Tucker Opening News Rpt.) at Appendix C.2. Rather, Dr. Tucker testified that those were just [redacted] Ex. 22 (Tucker Dep. Tr.) 52:19-25. Dr. Tucker attached a separate "Materials Relied Upon" list to her report, but that list included [redacted] *See* Ex. 19 (Tucker Opening News Rpt) at Appendix C.1. Thus, although Dr. Tucker is Microsoft's "fair use" expert (from an economics perspective), [redacted] (Ex. 24 (MSFT_AI_MDL_001513956 at -959)). Perhaps unsurprisingly, Ms. Tucker's opinions fly in the face of this ignored fact. For example, she opined that [redacted] Ex. 19 (Tucker Opening News Rpt.) at 33.

Courts have several times excluded expert testimony in similar circumstances. In *In re Rezulin Products Liability Litigation*, Judge Kaplan excluded an expert's testimony where the expert admitted that he "wrote a lot of the declaration without having the raw information in hand under the assumption that it would be provided to me, so it was sort of coming in around that time, but I wasn't able to reference it when I wrote the declaration[.]" 309 F. Supp. 2d at 550. As Judge Kaplan explained, "an expert may not reach his conclusion first and do the research later." *Id.* Similarly, in *Faulkner v. Arista Records LLC*, Judge Preska excluded an expert's opinion as unreliable where the expert disclosed at deposition that he had failed to review the relevant documents before issuing his report, while also testifying that his subsequent review did not change his opinion. 46 F.Supp.3d 365, 381 (S.D.N.Y. 2014). The court explained that the expert's "opinions first, facts later" approach renders his opinions "unreliable." *Id.* Dr. Tucker's opinions are no different. Dr. Tucker reached her "conclusion[s] first and" asked her team to do "the research later." *In re Rezulin*, 309 F. Supp. 2d at 550. For this reason, all of Dr. Tucker's opinions are unreliable and should be excluded.

2. Dr. Tucker Acknowledges that Many Factors Affect Book Sales and News Traffic but Concludes Copilot and ChatGPT Had No Impact Without Analyzing Those Factors.

At minimum, Dr. Tucker's opinions that Copilot and ChatGPT had no impact on the market for Plaintiffs' Works should be excluded. In the Class case, Dr. Tucker opines that [redacted] and that Copilot and ChatGPT are [redacted] Copilot and ChatGPT [redacted]" in traffic to Plaintiffs' websites or trends in Plaintiffs' revenues, subscriptions, or conversions (elsewhere referred to just as "traffic"). Ex. 22 (Tucker Depo Tr.) 86:10-17; *see also* Ex. 19

(Tucker Opening News Rpt.) Section III.C; Ex. 20 (Tucker Rebuttal News Rpt.) ¶¶ 32-33. She does not run any regression or other statistical analysis to reach her conclusions on causation. Instead, the sum-total of her analysis consists of comparing [redacted]" in sales and traffic data from before and after the introduction of Defendants' products.

Dr. Tucker's opinions should be excluded because she fails to consider any alternative explanations for the trends she observed, despite acknowledging other factors could be at play. In particular, Dr. Tucker acknowledges that numerous factors like [redacted] impact book sales. *See* Ex. 17 (Tucker Opening Class Rpt.) ¶¶ 22-29; Ex. 18 (Tucker Reply Class Rpt.) ¶ 10. She also acknowledges that many factors have affected traffic to News sites, [redacted]s. *See* Ex. 19 (Tucker Opening News Rpt.) ¶¶ 67-69. Though Tucker acknowledges these alternative factors, she did not consider whether a single one impacted sales of Class Plaintiffs' books or traffic to News Plaintiffs' sites during the relevant period. Tucker examined only [redacted]" and [redacted] rather than considering the impact of any alternative factors on the overall trend in sales. Ex. 22 (Tucker Dep. Tr.) 172:17-173:1; 174:5-14.

Dr. Tucker's opinions therefore cannot distinguish between an absence of market harm and market harm offset by other forces. For example, Dr. Tucker's own report notes [redacted]. Ex. 17 (Tucker Opening Class Rpt.) ¶¶ 57, 59. But she does not consider whether those increases offset declines caused by introduction of ChatGPT. Similarly, Dr. Tucker does not consider whether increased marketing boosted sales to offset any AI-related declines. If a series release or increased marketing boosted sales by 10% while Defendants' AI products depressed sales by 9%, for example, Dr. Tucker's

trend lines would show a 1% increase—and she would conclude no harm. Dr. Tucker, accordingly, has no basis for saying why the trend lines show what they show—she failed to account for the various factors she acknowledged impacted sales of Class Plaintiffs' books or traffic to News Plaintiffs' sites. Dr. Tucker certainly cannot unequivocally opine, as she does, that the introduction of Copilot and ChatGPT had no impact. *See Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (expert testimony may be excluded where "the flaw is large enough that the expert lacks good grounds for his or her conclusions").

Courts routinely exclude expert opinions, like these, that fail to account for alternative explanations. In *Wills v. Amerada Hess, Corp.*, the plaintiff's expert attributed the decedent's cancer to exposure to chemicals on the defendant's ship but "failed to account" for other causes of cancer like smoking and alcohol consumption. 379 F.3d 32, 50 (2d Cir. 2004). The Second Circuit affirmed exclusion, holding (in part) that the expert's failure to consider alternative causes "strongly indicated" that the expert's "conclusions were not grounded in reliable scientific methods." *Id*. Similarly, in *Malletier v. Dooney & Bourke, Inc.*, another court in this district excluded expert opinions "that Dooney & Bourke's choice of colors [for a handbag logo] was [not] by chance," because the expert "looked only at whether the choice was made at random" without considering alternative explanations for the choice of colors (such as "fashion trends"). 525 F. Supp. 2d 558, 643 (S.D.N.Y. 2007). The court explained: "[a] statistical analysis conducted without attempting to rule out obvious alternative causes, as here, renders the expert opinion unreliable under *Daubert*." *Id.*

Dr. Tucker's opinions suffer from the same flaw. Like these experts, Dr. Tucker observes data (trend lines), identifies a potential explanation (no impact from Defendants' AI products), and assumes that explanation is correct without ruling out alternatives. Dr. Tucker simply concludes

"no harm" without examining the other factors she identified. Because Dr. Tucker did not analyze these other factors, her opinions that Class Plaintiffs' sales and News Plaintiffs' traffic were not impacted by the launch of ChatGPT and Copilot are unreliable and should be excluded.

## II. <u>Class Plaintiffs' Arguments</u>

### A. The Court Should Exclude Dr. Nonnecke's "Common Industry Practice" Opinion Because It Lacks Any Foundation and Is Not Helpful to the Jury.

Dr. Nonnecke, OpenAI's purported expert on "responsible AI practices" opines that [redacted] was "common industry practice." Ex. 25 ¶ 85. The Court should exclude this opinion because it lacks any support or foundation and because the opinion will not aid the jury.

<u>First</u>, the Court should exclude Dr. Nonnecke's opinion because it lacks any foundation. *See Daubert*, 509 U.S. at 597 (requiring that expert testimony "rests on a reliable foundation"); *Major League Baseball Props.,* 542 F.3d at 311 (court not required to accept testimony "without factual basis"). Dr. Nonnecke opines that it is her "understanding" that using [redacted]" Ex. 25 (Nonnecke Class Rebuttal Rpt.) ¶ 85 (citing Ex. 8 (Callison-Burch Class Opening Rpt. ¶¶ 85-86)). The only support Dr. Nonnecke cites for her "understanding" is paragraphs 85 and 86 of Dr. Callison-Burch's opening report. *Id.* ¶ 85 n. 145.

But Dr. Callison-Burch did not offer any such opinion. Nowhere in his opening report does he mention [redacted] much less opine that their use is "common industry practice."[7] The paragraphs from Dr. Callison-Burch cited by Dr. Nonnecke

[7] To the extent Dr. Callison-Burch mentioned LibGen in his rebuttal and reply reports, he was rebutting Class Plaintiffs' conclusions that their works were located in LibGen. Dr. Callison-Burch's rebuttal reports thus do not support Dr. Nonnecke's opinion either.

(paragraphs 85 and 86) discuss [redacted], which are general-purpose technologies that have no bearing on Defendants' [redacted]. Ex. 8 (Callison-Burch Opening Rpt.) at ¶¶ 85-86. And Dr. Callison-Burch, at his deposition, testified that he had only a [redacted] that it was "[redacted] Ex. 26 (Callison-Burch Dep. Tr.) 505:24-506:2; 508:13-15; 515:12-19. Thus, far from supporting Dr. Nonnecke's opinion, Dr. Callison-Burch's testimony [redacted] *refutes* Dr. Nonnecke's opinion. Because Dr. Nonnecke's opinion is predicated on phantom opinions that Dr. Callison-Burch does not offer (and in fact refutes), Dr. Nonnecke's opinion lacks any foundation and must be excluded. *Daubert*, 509 U.S. at 597.

Second, the Court should exclude Dr. Nonnecke's opinion because it has no bearing on any claim or defense in this case and is thus not helpful to the jury. *See Daubert*, 509 U.S. at 591 (Rule 702 permits exclusion of expert testimony that "does not relate to any issue in the case" and is thus "non-helpful"). "Other people were doing it" is not a defense to copyright infringement. If it were, cases against copyists who downloaded pirated music from file-sharing networks used by myriad users would have come out differently. *E.g.*, *BMG Music v. Gonzalez*, 430 F.3d 888, 890–91 (7th Cir. 2005) (downloading copyrighted must from the "KaZaA file-sharing network" was not fair use); *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014–19 (9th Cir. 2001) (concluding "that Napster users are not fair users"). Because "common industry practice" has no bearing on OpenAI's infringement, Dr. Nonnecke's opinion is irrelevant and unhelpful to the jury and should be excluded.

## III. News Plaintiffs' Arguments

### A. The Court Should Exclude Certain Testimony of Dr. Nick Feamster That Offers Improper Legal Opinions, Relies on Previously Undisclosed OpenAI Employees, and Concerns a Flawed Script Regarding Robot.txt Bypasses.

Three categories of testimony proffered by OpenAI's web crawling and scraping expert, Dr. Feamster, should be excluded.

First, the Court should exclude testimony where Dr. Feamster inappropriately opines on the legal issue of "transformativeness" in support of OpenAI's fair use defense. Dr. Feamster opines that OpenAI's Browse/Search Functionality was [redacted] or [redacted] and "[redacted] *See, e.g.*, Ex. 3 (Feamster Opening Rpt.) ¶¶ 320, 334; Ex. 27 (Feamster Rebuttal Rpt.) ¶ 275. Courts have routinely held that "transformativeness" is a term of art in copyright law, and whether a use is "transformative" is a legal question that turns on whether the work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *E.g., Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 545 (2023) ("whether a work is transformative cannot turn merely on the stated or perceived intent of the artist"; "[w]hether the purpose and character of a use weighs in favor of fair use is, instead, an objective inquiry into what use was made, *i.e.*, what the user does with the original work"); *see also supra* Section (I)(B).

Because Dr. Feamster admitted he is not a lawyer and has no intent to offer legal opinions as a non-lawyer, his opinions on transformativeness should be excluded under Federal Rule of Evidence 702(a). Ex. 2 (Feamster Dep. Tr.) at 141:23–142:6 ("[redacted]). "The rule prohibiting experts from providing their legal

opinions or conclusions is so well-established that it is often deemed a basic premise or assumption of the evidence law — a kind of axiomatic principle." *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F.Supp.3d 530, 542–43 (S.D.N.Y. 2024). Because Dr. Feamster's opinions of "transformativeness" also rely on his analysis of the 20 million sample (*see, e.g.,* Ex. 3 (Feamster Opening Rpt.) ¶¶ 320, 334), they should also be excluded for the reasons set forth above. *See supra* Section I(A).

<u>Second</u>, the Court should exclude portions of Dr. Feamster's testimony regarding the design and function of OpenAI's bots and products because that testimony relies on conversations with three previously undisclosed OpenAI employees, whom Plaintiffs were never afforded the opportunity to depose and cross examine regarding personal knowledge, bias, credibility or memory. *See* Ex. 3 (Feamster Opening Rpt.) ¶¶ 178 n.136, 193 n.149, 199 n.160, 199 n.163, 245 n.240, 245 n.242, 246 n.243, 246 n.244, 252 n.259, 254 n.261 ("Conversation with [redacted]); Ex. 27 (Feamster Rebuttal Rpt.) ¶¶ 55, 205 (same); Ex. 28 (Feamster Reply Rpt.) ¶ 89 n.122 (same); Ex. 29 (Feamster Supplemental Rpt.) ¶¶ 7, 9, 10 (same); Ex. 27 (Feamster Rebuttal Rpt.) ¶¶ 61, 86, 100 n.95 ("Conversation with [redacted] and [redacted]").

Dr. Feamster confirmed that [redacted] (Ex. 2 (Feamster Dep. Tr.) at 31:1–19), even though these individuals were never disclosed under Fed. R. Civ. P. 26(a) or deposed. Further, while Dr. Feamster testified that the [redacted] (*id.* at 36:23–37:19), in most instances they are not. The citation to the conversation is made without any further description beyond a conclusory point lacking independent analysis. For example, Dr. Feamster only cites "conversation with [redacted]" for the opinions:

- [redacted]" Ex. 3 (Feamster Opening Rpt.) ¶ 199 n.160;
- [redacted] *id.* ¶ 199 n.163;
- [redacted] *id.* ¶ 246 n.244;
- [redacted]" ¶ 254 n.261.

Dr. Feamster similarly cites a "conversation with [redacted] id and [redacted]" for a conclusory opinion dismissing hundreds of thousands of impermissible bypasses by OpenAI's bots on News Plaintiffs' websites because the bypasses "[redacted]." Ex. 27 (Feamster Rebuttal Rpt.) ¶¶ 86, 100 (emphasis added)[8]; *see also* Ex. 29 (Feamster Supplemental Rpt.) ¶¶ 7, 10 (disputing Plaintiffs' expert Dr. Goldstein's analysis of ChatGPT RAG grounding based on "Conversation with [redacted]").

As Dr. Feamster admitted in his deposition, [redacted]. Ex. 2 (Feamster Dep. Tr.) at 36:20–22.

In view of the foregoing, Dr. Feamster's testimony relying on previously undisclosed witnesses should be stricken because it: (1) serves as a conduit for unproduced witnesses, and/or (2) parrots OpenAI's arguments. Both are improper for expert opinion. *See Arista Records LLC v. Usenet.com, Inc.*, 608 F.Supp.2d 409, 424 (S.D.N.Y. 2009) ("An expert who simply regurgitates

[8] "Not only does Dr. Feamster rely on an undisclosed witness for this conclusive statement, but he further takes this speculative statement, assumes it to be true (i.e., [redacted], and, in doing so, discounts instances where OpenAI bypassed News Plaintiffs' robots.txt directives." *See also* discussion regarding bypasses *infra*.

what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge."). This testimony should further be stricken under Fed. R. Evid. 403 because its probative value is substantially outweighed by the danger of unfair prejudice. *See In re Mirena IUD Prod. Liab. Litig.*, 169 F.Supp.3d 396, 473 (S.D.N.Y. 2016) (excluding expert testimony after finding Plaintiffs could not "effectively cross-examine her or dissipate the aura of credibility from her 'insider' testimony") (citing *United States v. Deutsch*, 987 F.2d 878, 884 (2d Cir. 1993) ("[T]he probative value of this evidence is lessened by the inability of the other party to cross-examine.")).

Third, Dr. Feamster offers testimony in rebuttal to News Plaintiffs' expert Jessie Stricchiola, who reviewed News Plaintiffs' server logs and opined on the prevalence of OpenAI's bots bypassing robots.txt directives that disallow scraping by those bots. Ex. 30 (Stricchiola New York Times and Daily News Opening Rpt.) ¶¶ 270, 276–78; Ex. 31 (Stricchiola Ziff Davis Opening Rpt.), Appendix C. Dr. Feamster set forth several bases for challenging the alleged bypasses and then designed scripts to count purportedly misclassified crawls in the server logs for The Times, *Daily News* Plaintiffs, and Ziff Davis. Ex. 27 (Feamster Rebuttal Rpt.) ¶¶ 32–104, Table 2 (NYT Server Logs), Table 7 (DNP Server Logs), Table 9 (Ziff Davis Server Logs). The problem is that Dr. Feamster's scripts contradict the methodology set forth in his report and improperly overcount OpenAI's compliance with robots.txt directives. The result is that Dr. Feamster discards [redacted] f instances where OpenAI bypassed robots.txt restrictions on News Plaintiffs' websites that proscribed OpenAI from scraping and copying Plaintiffs' content. *E.g.*, Ex. 27 (Feamster Rebuttal Rpt.) ¶¶ 32-36, 57-64, 71-74, 83-84, 91-96, 99; Ex. 32 (annotated Feamster scripts). *See* Ex. 33 (Stricchiola Reply Rpt.) ¶ 36 (overcounting "requests as compliant" by [redacted] when in fact they are bypasses for the Daily News Plaintiffs); *id.* ¶¶ 39-40

(overcounting requests classified as "in compliance" by [redacted]*n* log entries for Ziff Davis).

For example, in his report, Dr. Feamster acknowledges [redacted] Ex. 27 (Feamster Rebuttal Rpt.) ¶ 59. Yet his script applied [redacted]. *Compare* Ex. 27 (Feamster Rebuttal Rpt.) ¶¶ 59-60, 83, 99 *with* Ex. 32 (annotated Feamster scripts) (relevant portion highlighted in yellow). This led to an increased counting of "requests issued in compliance" following the alleged "fetch failure." *E.g.*, Ex. 33 (Stricchiola Reply Rpt.) ¶¶ 32, 33. Similarly, Dr. Feamster opined that [redacted] *E.g.*, Ex. 27 (Feamster Rebuttal Rpt.) ¶¶ 59–60, 83, 99. However, in his script [redacted] Ex. 32 (annotated Feamster scripts) (relevant portion highlighted in orange); *see also* Ex. 33 (Stricchiola Reply Rpt.) ¶¶ 35–36 (Dr. Feamster's application of the broader definition of "fetch failure" and rounding down of the timestamp led to mistakenly over-counting the requests within 24 hours of "fetch failures" by [redacted] for Daily News Plaintiffs); *id.* ¶¶ 40-41 (mistakenly overcounting the requests within 24 hours of "fetch failures" by *nearly* [redacted] *log entries* for Ziff Davis, with [redacted] log entries mistakenly identified as compliant even under Dr. Feamster's own over broad "fetch failure" definition due to the inflated timestamp methodology).

In view of the foregoing, Dr. Feamster's testimony and opinions related to his server log analysis and exclusion of [redacted] instances where OpenAI bypassed News Plaintiffs' robots.txt

restrictions should be excluded as unreliable under Fed. R. Evid. 702(c) and 403. *See Nimely*, 414 F.3d at 396 ("[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions."); *see also Amorgianos*, 303 F.3d at 268 (affirming district court's exclusion of expert's opinion because he failed to reliably apply his own methodology).

**B. The Court Should Exclude Dr. Berg-Kirkpatrick's Opinions on ChatGPT's Propensity to Regurgitate Because He Ignores OpenAI's Mitigation Efforts and His Methodology is Flawed.**

1. <u>Dr. Berg-Kirkpatrick's Opinions About the Regurgitation Rate of News Plaintiffs' Asserted Works in the 20 Million Sample of ChatGPT Conversations Should Be Excluded.</u>

Dr. Berg-Kirkpatrick is OpenAI's expert on model regurgitation, which refers to the model's tendency to output verbatim or near-verbatim portions of the data it was trained on. *E.g.*, Ex. 1 (Berg-Kirkpatrick Opening Rpt.) ¶ 16. Dr. Berg-Kirkpatrick's [redacted]" confirms that ChatGPT regurgitates News Plaintiffs' content, but his opinions on the propensity for it to do so are unreliable. *Id.* ¶¶ 16, 181-186 [redacted] Specifically, Dr. Berg-Kirkpatrick identified [redacted] instances in which ChatGPT outputs matched at least a 25-word ("25-gram") sequence from News Plaintiffs' Asserted Works. *Id.* ¶¶ 210, 387, 394, 400, 407. But he then applied a multi-step filtering methodology that reduced the [redacted] matches to just [redacted] admitted regurgitations of News Plaintiffs' Asserted Works. *Id.* ¶¶ 16, 181-186, Table 21. Because that filtering methodology was based on a flawed sample (Section I(A), *supra*) and legal determinations, his testimony on the resulting regurgitation rates is unreliable and should be excluded. *Amorgianos*, 303 F.3d at 267 ("[I]t is critical that an expert's analysis be reliable at every step.").

First, Dr. Berg-Kirkpatrick's Conversation Regurgitation Study was based solely on the sample of 20 million ChatGPT conversations and should be excluded for the reasons discussed in Section I(A), *supra*.

Second, in what he refers to as [redacted] Dr. Berg-Kirkpatrick attempted to remove ChatGPT "regurgitations" of content that Plaintiffs purportedly did not own by comparing the matching outputs to unvalidated "third party datasets." Ex. 1 (Berg-Kirkpatrick Opening Rpt.) ¶¶ 186, 199, 379. Those datasets ***were not*** solely third-party content but included Plaintiffs' own original content. As one example, Dr. Berg-Kirkpatrick filtered the ChatGPT regurgitations against the WikiQuote dataset, which includes verbatim content from News Plaintiffs. *See, e.g.*, Ex. 65 (showing 14 quotes from The New York Times); *see also* Ex. 61 (Delorey Rebuttal Rpt.) ¶ 50 (identifying instances where ZD content is included in the quote aggregation database); Ex. 64 (Goldstein Rebuttal Rpt.) ¶¶ 242-43; Ex. 5 (Berg-Kirkpatrick Reply Rpt.) ¶ 218. Dr. Berg-Kirkpatrick did nothing to validate the "third-party" datasets, and his filter improperly removed regurgitations of Plaintiff content, resulting in an undercounting. *See* Ex. 35A (Berg-Kirkpatrick Dep. Tr.) at 169:24-170:4, 180:2-9 (admitting [redacted]; *see also Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F.Supp.2d 413, 446 (W.D.N.Y. 2005) ("An analysis is only as good as the data upon which it rests."); *Arista Records*, 608 F.Supp.2d at 429 (excluding expert who failed to "do any independent analysis to validate information").

Third, in what he refers to as [redacted] Dr. Berg-Kirkpatrick (who lacks copyright expertise) appointed a team of [redacted] annotators (who also lack copyright expertise) to determine whether the regurgitated text that survived automatic filtering was authored and owned by Plaintiffs or originated from a third-party source. Ex. 1 (Berg-

Kirkpatrick Opening Rpt.) ¶¶ 186, 212; *compare* Ex. 1 (Berg-Kirkpatrick Opening Rpt.) ¶ 214 *with id*. n.184 *and* Ex. 35B (Berg-Kirkpatrick Dep. Tr.) 332:11-17 (disclaiming competence to opine on questions of copyright law). He then removed [redacted] additional counts of regurgitation based on the legal determination that they were [redacted] despite the fact that Plaintiffs published the matching texts. Ex. 1 (Berg-Kirkpatrick Opening Rpt.) ¶¶ 212-214. For example, in one conversation, Dr. Berg-Kirkpatrick's annotators [redacted] *See, e.g.,* Ex. 53 (Berg-Kirkpatrick NYT Working Papers) at row 55 (labeled [redacted] Courts in this district have repeatedly barred experts from giving testimony on issues of law, and Dr. Berg-Kirkpatrick's analysis here should be no different. *Am. Empire Surplus Lines Ins.*, 743 F.Supp.3d at 542-43 (it is "a kind of axiomatic principle" that "an expert is ... barred from giving testimony on issues of law"); *see also United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988) (holding that it is impermissible for experts "to offer opinions embodying legal conclusions"); *United States v. Menendez*, 2025 WL 547794, at *4 (S.D.N.Y. Feb. 19, 2025) (opining on legal terms is not proper expert testimony) (Stein, J.).

Accordingly, Dr. Berg-Kirkpatrick's opinions about ChatGPT's regurgitation rate of News Plaintiffs' content should be excluded. *See, e.g.*, Ex. 1 (Dr. Berg-Kirkpatrick Opening Rpt.) Section VIII(B) (Conversation Regurgitation Study), Appendix C.

2. <u>Dr. Berg-Kirkpatrick's [redacted]" Study for Ziff Davis Should Be Excluded.</u>

The Court should also exclude Dr. Berg-Kirkpatrick's [redacted] study[9] related to Ziff Davis, which he offers in rebuttal to a Model Inspection conducted by Ziff Davis expert Daniel Delorey.[10] *E.g.*, Ex. 4 (Berg-Kirkpatrick Rebuttal Rpt.) ¶¶ 143, 147, 149; Ex. 36 (Berg-Kirkpatrick Addendum) ¶¶ 22-24; Ex. 35B (Berg-Kirkpatrick Dep. Tr.) 444:10-11. Dr. Berg-Kirkpatrick used a team of five annotators (again, from [redacted] to categorize [redacted] of the outputs from the Model Inspection (which he later increased to [redacted] outputs) into one of six categories—every single one designed to discredit the study offering the annotators no way to validate the results.[11] Dr. Berg-Kirkpatrick relies on the [redacted] study to opine that [redacted]%" of the [redacted] Ex. 36 (Berg-Kirkpatrick Addendum) ¶ 24; Dkt. 1750 (Berg-Kirkpatrick Declaration) ¶ 64. Dr. Berg-Kirkpatrick also submitted a declaration in support of OpenAI's pending summary judgment motion, in which he extrapolates a rate of regurgitation of about [redacted] based on the number of prompts Mr. Delorey tested. Dkt. 1750 (Berg-Kirkpatrick Declaration) ¶¶ 58-67. Dr. Berg-Kirkpatrick's [redacted]" study should be excluded for three reasons:

First, Dr. Berg-Kirkpatrick's study is "plainly designed to validate" OpenAI's theories because it did not permit the annotators to categorize any output as a "match" or a "copy" of a Ziff

---

[9] At his deposition, Dr. Berg-Kirkpatrick dubbed this the [redacted]" study. Ex. 35B (Berg-Kirkpatrick Dep. Tr.) 444:8-19.

[10] Mr. Delorey's model inspection tested reproduction in OpenAI's LLMs using simple prompts and confirmed that OpenAI's LLMs in suit reproduced verbatim and near-verbatim Ziff Davis content in its outputs. Ex. 60 (Delorey Opening Rpt.) ¶ 19, 158-160, 277-323, 402-426; Ex. 61 (Delorey Rebuttal Rpt.) ¶ 19; Ex. 34 (Delorey Reply Rpt.) ¶ 66; Ex. 62 (Delorey Supplemental Rpt.) ¶¶ 29, 33, 46, Appendix D.

[11] The annotators were directed to categorize each output into one of the following six categories: [redacted]" Ex. 4 (Berg-Kirkpatrick Rebuttal Rpt.) ¶¶ 126, 147-148; Ex. 36 (Berg-Kirkpatrick Addendum) ¶ 24; Ex. 35B (Berg-Kirkpatrick Dep. Tr.) 472:4-11.

Davis Asserted Work. *See Bustamante v. KIND, LLC*, 100 F.4th 419, 429 (2d Cir. 2024) (affirming exclusion of survey testimony because of leading questions that inappropriately directed participants to the correct answer); *Souza v. Exotic Island Enters.* 68 F.4th 99, 114 (2d Cir. 2023) (affirming exclusion of a survey because respondents were not provided with a "don't know" option nor instructed "not to guess"). In other words, Dr. Berg-Kirkpatrick did not even attempt to measure how many responses would have favored Ziff Davis. Instead, Dr. Berg-Kirkpatrick asserts that all six categories represent [redacted]" Ex. 4 (Berg-Kirkpatrick Rebuttal Rpt.) ¶ 148; Ex. 36 (Berg-Kirkpatrick Addendum) ¶24. Because the annotators were not given the option to validate Mr. Delorey's (or Plaintiff's) conclusions, any opinions based on the study should be excluded.

Second, Dr. Berg-Kirkpatrick fails to apply any coherent methodology, and his "lack of involvement and familiarity" with his [redacted] study further renders that analysis unreliable. *See Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 116 (S.D.N.Y. 2021) (finding the expert's analysis "highly suspect" where he could not recall any details of directions he gave for its preparation). He does not know and could not explain (either in his report or deposition) [redacted]. Ex. 35B (Berg-Kirkpatrick Dep. Tr.) 452:25–453:17, 454:17-24, 456:3–14, 458:17–20, 463:19–466:2, 468:10-19. He initially testified that [redacted] but when confronted with his report, he acknowledged that [redacted]. *Id.* 451:18–452:24. Even then, Dr. Berg-Kirkpatrick could only say [redacted]

than one category for a given output), but he admits [redacted] *Id.* 457:22–458:20. He also does not explain [redacted][2] Ex. 35B (Berg-Kirkpatrick Dep. Tr.) 468:20-479:9; Ex. 63 (Ex. 15 to the Berg-Kirkpatrick Dep.) [redacted] Indeed, he could not explain [redacted] Ex. 35B (Berg-Kirkpatrick Dep. Tr.) 468:23-471:9, 490:15–496:19. Ultimately, there is no coherent methodology, much less one that Dr. Berg-Kirkpatrick articulates. *Micone v. Sarene Servs., Inc.*, 2025 WL 736638, at *30 (E.D.N.Y. Mar. 8, 2025) (precluding opinions where expert "was unable to recall the specific document(s) on which she relied to reach these opinions").

<u>Third</u>, Dr. Berg-Kirkpatrick provides no analysis to show how his choice of [redacted] outputs for annotations is representative, statistically significant or random to extrapolate across the entire population of [redacted]) of Mr. Delorey's identified regurgitations.[13] At his deposition, he could only point to the phrase [redacted]" in his report (*see* Ex. 4 (Berg-Kirkpatrick Rebuttal Rpt.) ¶ 143; Ex. 35B (Berg-Kirkpatrick Dep. Tr.) 476:6-477:25, 482:4-12), and relied solely on *ipse dixit* that [redacted]

---

[12] The annotator's only credentials were [redacted] Ex. 35B (Berg-Kirkpatrick Dep. Tr.) 417:12-25; Ex. 23 (Berg-Kirkpatrick Working Papers) at p. 396 (listing qualifications of five annotators).

[13] Dr. Berg-Kirkpatrick did not disclose [redacted]. 37 (June 16, 2026 Email from A. Blanco); Ex. 35B (Berg-Kirkpatrick Dep Tr.) 482:17-490:3 [redacted] Plaintiffs could not verify that Dr. Berg-Kirkpatrick's selection was random. Ex. 34 (Delorey Reply Rpt.) ¶ 83; *see Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1313 (9th Cir. 1995) (whether the study can be tested is a key factor in determining admissibility).

[redacted] Ex. 35B (Berg-Kirkpatrick Dep. Tr.) 489:16-490:1, 477:1-25 [redacted] That is insufficient to provide a "basis upon which to assess reliability." *See Estate of Jaquez v. City of New York*, 104 F.Supp.3d 414, 426 (S.D.N.Y. 2015) (excluding expert testimony because it largely consisted of *ipse dixit* and conclusory interpretations).

**C. The Court Should Exclude Dr. Goldfarb's Licensing Testimony, His Analysis Comparing Traffic and Engagement Trends of ChatGPT Users and Non-Users, and His Asset-Turnover Ratio Opinions.**

The Court should exclude four sets of opinions from Dr. Goldfarb, OpenAI's economic "harm" expert.

1. <u>Dr. Goldfarb's Licensing Testimony Should Be Excluded Because He Admitted He Lacks Licensing Expertise.</u>

First, the Court should prevent Dr. Goldfarb from offering opinions relating to OpenAI's license agreements with content providers because he testified that he is not a licensing expert, has no expertise in interpreting or characterizing such intellectual property agreements, and lacks specialized knowledge or experience in accounting or intellectual-property valuation. Dr. Goldfarb's opinions exceed the boundaries of his expertise and would not assist the finder-of-fact.

In his reports, Dr. Goldfarb opines that certain agreements between AI developers (including OpenAI) and content providers "[redacted] *See, e.g.,* Ex. 38 (Goldfarb CIR Opening Rpt.) ¶ 253; Ex. 58 (Goldfarb

Intercept Opening Rpt.) ¶ 233. According to Dr. Goldfarb, [redacted] Ex. 38 (Goldfarb CIR Opening Rpt.) at p. 107; Ex. 58 (Goldfarb Intercept Opening Rpt.) at p. 91. Defendants' motions for summary judgment make similar arguments to those of Dr. Goldfarb. *See* ECF 1698, Microsoft Memorandum ISO MSJ (News) at 28-29; ECF 1753, OpenAI Memorandum ISO MSJ (News) at 11 and n.5.

Dr. Goldfarb, however, admitted in his deposition that he is not a licensing expert:

[redacted]

Ex. 39 (Goldfarb Dep. Tr.) 155:21-23, 159:1-10.

Likewise, Dr. Goldfarb testified that he has "[redacted]" *Id.* at 140:3-6; *see also id.* at 140:20-141:4 (stating, [redacted]), 141:15-17 (admitting, "[redacted] Goldfarb also testified that he has never [redacted] *id.* at 138:2-19, and that he is [redacted]. *See id.* at 240:18-23.

By his own admission, Dr. Goldfarb is not a licensing expert, has no expertise in interpreting or characterizing IP agreements, and lacks specialized knowledge or training in accounting or IP valuation. Lacking proper qualifications, Dr. Goldfarb's testimony that there is

no [redacted]" would not help the jury evaluate the evidence on fair use factor four and is also contradicted by Dr. Goldfarb's own admissions. As Dr. Goldfarb himself and other OpenAI experts make clear, there are nearly twenty agreements (that Dr. Goldfarb says [redacted] between OpenAI and news publishers but which provide OpenAI with the right to use news content for LLM training. *E.g.*, Ex. 40 (Goldfarb DNP Opening Rpt.) ¶¶ 303-12, n. 400; Ex. 41 (Stamm Ziff Davis Rebuttal Rpt.) ¶¶ 18, 175(a) (noting [redacted], 184, Table 9.1, App. C1. Dr. Goldfarb also conceded that [redacted] (*see* Ex. 39 (Goldfarb Dep. Tr.) 171:1-172:7), an amount OpenAI could easily afford and which is in line with other industries and markets. *See, e.g.,* Ex. 42 (Malackowski Ziff Davis Rebuttal Rpt.) at 35, 58 (noting that Spotify pays rights holders upwards of $11 billion annually for the use of their content). Accordingly, Dr. Goldfarb's opinions relating to OpenAI's license agreements with content providers should be excluded under Rule 702 and *Daubert*. *See Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 444 (2d Cir. 1995) (affirming the exclusion of an accountant's opinions on subjects outside his field of expertise).

2. Dr. Goldfarb's Analysis Comparing Traffic and Engagement Trends of ChatGPT Users and Non-Users Should Be Excluded Due to Sample Bias.

Dr. Goldfarb's analysis comparing traffic and engagement trends of ChatGPT users to non-users is unreliable because of sample bias that infects the analysis and conclusions. *See, e.g.,* Ex. 40 (Goldfarb DNP Opening Rpt.) ¶¶ 191-223; Ex. 43 (Goldfarb NYT Opening Rpt.) ¶¶ 225-246.

Dr. Goldfarb's analysis compares visits to News Plaintiffs' sites from "ChatGPT users" versus non-users over the same period and assesses whether their trends diverged after ChatGPT's release in November 2022 and after ChatGPT users started using ChatGPT. *E.g.*, Ex. 40 (Goldfarb DNP Opening Rpt.) ¶¶ 191-223. Because Dr. Goldfarb's sample definitions are critical to the outcome being tested, and because those sample definitions are biased, the analysis is fatally flawed and should be excluded as unreliable. More specifically:

- Dr. Goldfarb defines [redacted]" as [redacted] *Id*. at ¶ 193.
- Dr. Goldfarb defines [redacted] as [redacted] *Id*. at ¶¶ 194 and n.277; Ex. 43 (Goldfarb NYT Opening) ¶ 227.
- Further, Comscore provides separate databases for desktop and mobile activity, and the datasets of each are independent and use different identifiers. Ex. 40 (Goldfarb DNP Opening) ¶ 356; Ex. 43 (Goldfarb NYT Opening) ¶ 377. Thus, use of ChatGPT on a mobile device would not count as ChatGPT use for the "ChatGPT user" definition.

These sample restrictions exclude several categories of users who likely reduced visits to News Plaintiffs' websites and turned to ChatGPT as a substitute for visiting News Plaintiffs' websites. For example, if a "relevant user" regularly visits DNP, then used ChatGPT <u>in a single month</u> and stopped visiting DNP and starting using ChatGPT as a result, that user is excluded from the sample. As another example, if a "relevant user" regularly visits DNP websites <u>on a desktop computer</u>, then started using ChatGPT <u>on a mobile device</u> regularly as a substitute for visiting the DNP websites, that user is excluded from the sample because Comscore's data for desktop and mobile activity are independent and use different identifiers; thus, the mobile use of ChatGPT would essentially "not be picked up" in the sample. Both of the foregoing are relevant examples

of substitution (and lost traffic) and yet Dr. Goldfarb's analysis ignores them.[14] Other courts in this district have excluded expert testimony based on similarly biased samples. *See, e.g., Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014) ("the regression analyst may not 'cherry-pick' the time-frame or data points so as to make her ultimate conclusion stronger"); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98-cv-8272, 2003 WL 22124991, *1-3, 9 (S.D.N.Y. 2003) (excluding expert testimony where the underlying sample was neither random nor representative, but instead was biased toward the intended result).

Because of this sample bias, the opinions derived from Dr. Goldfarb's econometric analysis comparing ChatGPT users and non-users is unreliable, likely to confuse a jury, and should be excluded.

3. Dr. Goldfarb's Trend Analysis Fails to Consider Causation.

In the News cases, Dr. Goldfarb opines that numerous factors impact traffic, subscriptions, and revenues, such as search and social media algorithm changes, changes to paywall settings, and staffing reductions. *See, e.g.,* Ex. 40 (Goldfarb DNP Opening Rpt.) ¶¶ 143-147, 175; Ex. 38 (Goldfarb CIR Opening Rpt.) § VI(B)-(C); Ex. 58 (Goldfarb Intercept Opening Rpt.) § V(B); Ex. 59 (Goldfarb CIR/Intercept Reply Rpt.) § II(D); *see also* Ex. 45 (Malackowski Dep. Tr.) 93:18-94:4 (one thing experts on both sides agree on "is that there are many factors that make it challenging to isolate the direct harm [from Defendants' products] in a quantitative way"). Though Dr. Goldfarb identifies alternative factors, he made no attempt to determine if these alternative factors were offsetting traffic harm caused by ChatGPT and Copilot. He did not even conduct a

[14] Dr. Goldfarb's own data shows how diluted the "ChatGPT user" category is: half of the "ChatGPT users" in his Ziff Davis samples had six or fewer ChatGPT sessions, and three-quarters had fewer than thirty sessions, over the full multi-year observation period. Ex. 44 (Waehrer Rebuttal Rpt.) at 61, 63 (Figs. 15, 17).

causation analysis after this flaw was identified by Plaintiffs' experts. *See, e.g.*, Ex. 46 (Malackowski DNP/NYT Rebuttal Rpt.) pp. 71-73 (identifying factors that "masked" harm caused by Copilot and ChatGPT, including introductory offers, tightening of paywalls, newsletters); Ex. 47 (Owen Rebuttal Rpt.) ¶¶ 26, 72 ("The decline of the news industry has many causes. Generative AI is among them."); Ex. 48 (Bell Rebuttal Rpt.) ¶ 90 (similar). Dr. Goldfarb's opinions should be excluded for the reasons discussed above in Section I(D).

4. <u>Dr. Goldfarb's "Asset-Turnover Ratio" Purporting to Show No Harm is Unreliable and Misleading.</u>

Dr. Goldfarb opines that Ziff Davis revenues did not decline as a result of the introduction of ChatGPT, but admits that he failed to account for revenue fluctuations due to acquisitions and de-acquisitions of Ziff Davis properties during the relevant timeframe. Ex. 39 (Goldfarb Dep. Tr.) at 239:8-240:15. Tacitly acknowledging his methodological flaw, Dr. Goldfarb's reply report introduces an entirely new metric—an "asset-turnover ratio" (total revenue divided by total assets)—that appears nowhere in his opening or rebuttal reports and that he had never previously used in his professional work. Ex. 49 (Goldfarb ZD Reply Rpt.) ¶ 188, n.246; Ex. 39 (Goldfarb Dep. Tr.) at 259:17-260:12, 266:18-267:2.

Dr. Goldfarb's only cited authority for the asset-turnover concept is [redacted]—not a peer-reviewed source, not an accounting or finance treatise, and not a metric Ziff Davis itself reports in its 10-K filings. *See id.* Dr. Goldfarb is not an accountant, has no expertise in financial-statement analysis, and offered no explanation in his report of how the revenue and asset inputs to the ratio are derived from Ziff Davis's financial statements or why dividing one by the other sheds light on the economic question at issue—whether and to what extent the introduction of ChatGPT has had on the market for Ziff Davis's content. This is precisely the kind

of unreliable and misleading testimony Rule 702 and *Daubert* are designed to prevent. The asset-turnover-ratio analysis in Figure 6 of Dr. Goldfarb's Ziff Davis reply report should be excluded.

**D. The Court Should Exclude Opinions of Ms. Frederiksen-Cross That Fall Outside Her Qualifications and Express Impermissible Views on Intent.**

OpenAI introduced opinions from Barbara Frederiksen-Cross on various issues related to CMI removal. The Court should exclude the opinions for which she lacks expertise and her impermissible opinions on mental state.

1. <u>Ms. Frederiksen-Cross's Testimony on LLM Training, Model Behavior, and Memorization Should be Excluded Because She Lacks Relevant Expertise.</u>

Ms. Frederiksen-Cross is a source code expert, not a large language model ("LLM") or generative artificial intelligence ("GAI") expert. Yet she offers a host of opinions about LLM training, model behavior, and memorization:

1. <u>LLM Training:</u> Ms. Frederiksen-Cross opines on training data selection and quality, including that: [redacted] (Ex. 50 (Frederiksen-Cross News Rebuttal Rpt.) ¶ 43); [redacted] *d.* ¶ 44); [redacted] (*id.* ¶ 46), [redacted] (*id.* ¶ 28).

2. <u>Model behavior:</u> Ms. Frederiksen-Cross opines that OpenAI's removal of Plaintiffs' CMI from its training data records is of no consequence to downstream model behavior because that CMI [redacted] (*id.* ¶ 151), thus making it [redacted] (*id.* ¶ 152).

3. <u>Memorization:</u> Ms. Frederiksen-Cross opines about whether the [redacted] pruning process was a memorization study and that heuristics measured by the source code "[redacted]" *Id.* ¶¶ 181-191.

These opinions should be excluded because Ms. Frederiksen-Cross lacks the necessary expertise. While Ms. Frederiksen-Cross may have source code expertise, that does not make her

qualified to opine on topics related to LLM technology. *See Nimely,* 414 F.3d at 399 n.13 (emphasizing that "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields"). Ms. Frederiksen-Cross admittedly has no LLM or GAI expertise. Ex. 51 (Frederiksen-Cross Dep. Tr.) 28:2-8, 29:24-30:3. She has never designed, trained, or evaluated an LLM beyond evaluating model citations during her [redacted] *Id.* 26:23-27:15. She did not know what type of text would be helpful in training an LLM and admitted [redacted] *Id*. 46:17-47:2. She has never performed a memorization study on an LLM and admitted she is not [redacted] *Id.* 70:25-72:8. And she could not even define generative AI, explaining [redacted] *Id.* 29:24-30:3. In fact, she characterizes herself as [redacted] *Id*. 70:14-16.

In view of Ms. Fredericksen-Cross's admitted lack of expertise in LLMs and GAI, her opinions on LLM training, model behavior, and memorization should be excluded.

2. <u>Ms. Frederiksen-Cross Impermissibly Opines on OpenAI's Mental State When Removing News Plaintiffs' CMI.</u>

Experts may not opine on a party's subjective mental state. *See Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*, 598 F.Supp.3d 158, 194 (S.D.N.Y. 2022). That includes source codes experts. While a source code expert may permissibly opine on a computer program's design, she may not opine on the subjective mental state of the designers. *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 414 (S.D.N.Y. 2011) (declining to exclude opinion of expert who "has not opined on the parties' state of mind, but rather has provided information on the *design* and *functionality* of the ... program").

Ms. Frederiksen-Cross crossed that line. She impermissibly opines on OpenAI's subjective mental state when performing text extraction—specifically, that OpenAI did not perform text extraction to intentionally remove CMI, and that OpenAI had certain subjective purposes for acting as it did. *See, e.g.*, Ex. 50 (Frederiksen-Cross News Rebuttal Rpt.) VIII.1 [redacted] ¶ 28 [redacted], ¶ 42 [redacted] Worse, she reached those opinions not only by examining the design of the text extractors' source code, but also by citing statements by OpenAI staff about their subjective intent. *See, e.g.*, *id.* ¶ 42 (noting that sources consulted include [redacted]), ¶ 43 n.15 (citing OpenAI deposition testimony about [redacted] and [redacted] ¶ 56 [redacted] ¶ 65 [redacted] ¶ 136 (citing interview with OpenAI employee who [redacted]. While Ms. Frederiksen-Cross may permissibly opine about the technical design and functionality of OpenAI's text extractors, as reflected in their source code, the Court should preclude her from offering opinions about OpenAI's subjective mental states, including OpenAI's intent when operating its text extractors.

**CONCLUSION**

Plaintiffs' request to exclude the aforementioned opinions should be granted.

Dated: September 24, 2026

Respectfully submitted,

*/s/ Justin A. Nelson*
Justin A. Nelson (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Tel.: 713-651-9366
jnelson@susmangodfrey.com

*Interim Lead Counsel for Class Plaintiffs*

*/s/ Davida Brook*
Davida Brook
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: 310-789-3100
dbrook@susmangodfrey.com

*Counsel for The New York Times Company*
*News Plaintiffs' Liaison Counsel*

**CERTIFICATE OF WORD COUNT COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the foregoing Memorandum of Law complies with the Court's order of August 7, 2026 (ECF 1664), as it contains 11,910 words, according to the word processing program used to prepare it.

*/s/ Amber B. Magee*
Amber B. Magee (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Tel.: 713-651-9366
amagee@susmangodfrey.com

*Counsel for Class Plaintiffs*