# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>Case No. 1:23-cv-08292<br>Case No. 1:25-cv-04315<br>Case No. 1:23-cv-11195 | 25-md-3143 (SHS) (OTW)<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang |

**[PROPOSED] BRIEF OF AMICUS CURIAE KEVIN KELLY IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Dated: October 16, 2026

Serena Orloff
Steven P. Lehotsky
Robert B. Dunteman
Jonathan DeWitt
Lehotsky Cohn LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, D.C. 20001
(512) 693-8350
serena@lehotskycohn.com
steve@lehotskycohn.com
bobby@lehotskycohn.com
jdewitt@lehotskycohn.com

*Counsel for Amicus Curiae Kevin Kelly*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTEREST OF AMICUS CURIAE .......... 1

INTRODUCTION .......... 2

ARGUMENT .......... 3

I. Training innovative AI models is a transformative use similar to the methods by which humans learn and create. .......... 4

II. AI advances the creation of new, non-infringing works. .......... 9

III. AI models promote vast public benefits, consistent with the objectives underpinning copyright and the fair-use doctrine. .......... 11

A. AI accelerates the creation of new works without harming Plaintiffs' copyright interests. .......... 12

B. The public benefits of AI are vast and extend well beyond accelerating the creation of original works of literature. .......... 14

C. Copyright is not a shield from disruptive technology. .......... 15

CONCLUSION .......... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)....3, 4, 12

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014)....12, 13

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)....13, 15

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025)....12

*BUC Int'l Corp. v. Int'l Yacht Council Ltd.*,
489 F.3d 1129 (11th Cir. 2007)....8

*Cambridge Univ. Press v. Patton*,
769 F.3d 1232 (11th Cir. 2014)....13, 14

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....8

*Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*,
150 F.3d 132 (2d Cir. 1998)....12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)....4, 8, 11

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)....3, 4, 9, 14, 15, 16

*NXIVM Corp. v. Ross Inst.*,
364 F.3d 471 (2d Cir. 2004)....13

*Romanova v. Amilus Inc.*,
138 F.4th 104 (2d Cir. 2025)....14

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992), *as amended* (Jan. 6, 1993) .....11

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984).....16

*Stewart v. Abend*,
495 U.S. 207 (1990).....3

*Walker v. Time Life Films, Inc.*,
784 F.2d 44 (2d Cir. 1986) .....9

**Statutes & Constitutional Provisions**

17 U.S.C. § 107 .....1, 2, 3, 16

U.S. Const. art. I, § 8, cl. 8.....11

**Other Authorities**

Christie Mealo, *The Minimum Viable Author*, Superabundance (Sept. 7, 2026), https://perma.cc/UCP8-FV86.....10, 11

David Bevington, *Romeo and Juliet*, Encyclopædia Britannica, https://perma.cc/M5Z6-JN87 (last visited Oct. 9, 2026) .....8

The Editors of Encyclopædia Britannica, *A Thousand Acres*, Encyclopædia Britannica, https://perma.cc/47Y5-Y98V (last visited Oct. 9, 2026) .....8

*How Are Federal Agencies Harnessing Artificial Intelligence?: Hearing Before the Subcomm. on Cybersecurity, Info. Tech., & Gov't Innovation of the H. Comm. on Oversight & Accountability*, 118th Cong. 3 (2023), https://perma.cc/Z7HA-GA66 .....14

J.D. Lasica, *How Authors Are (Really) Using AI*, Authors A.I. (Sept. 26, 2025), https://perma.cc/3H8X-8PPP.....9

Joseph Howlett, *OpenAI Announces AI's Biggest Math Breakthrough Yet*, Sci. Am. (May 21, 2026), https://perma.cc/W2GY-YE83 .....14

Kevin Kelly, *Arguments in Favor of AI Fair Use*, KK (Sept. 7, 2026), https://perma.cc/R2LG-39RE .....1, 15

Kevin Kelly, *The Inevitable: Understanding the 12 Technological Forces That Will Shape Our Future* (2017) ....................1

Kevin Kelly, *Latent Space as a New Medium*, KK (July 13, 2026), https://perma.cc/6KNK-8WAP....................1, 5, 6, 7, 9

Kevin Kelly, *The Silver Cord* (2015) ....................1

Kevin Kelly, *Why Are LLMs Smart?*, KK (June 22, 2026), https://perma.cc/A3YH-SXNL....................1

Pamela Samuelson, *Fair Use Defenses in Disruptive Technology Cases*, 71 UCLA L. Rev. 1484 (2024) ....................15

Zuojun Xu et al., *A Generative AI-Discovered TNIK Inhibitor for Idiopathic Pulmonary Fibrosis: A Randomized Phase 2a Trial*, 31 Nature Med. 2602 (2025), https://perma.cc/M95S-3454....................14

# INTEREST OF AMICUS CURIAE

Amicus curiae Kevin Kelly is an author, like Plaintiffs, who creates original works of nonfiction and fiction and has an interest in the proper application of the fair-use doctrine under 17 U.S.C. § 107. Mr. Kelly is the founding executive editor of *Wired* magazine. He is also a *New York Times* bestselling author, futurist, and photographer who writes fiction and nonfiction about the future of technology. *See* Kevin Kelly, *The Inevitable: Understanding the 12 Technological Forces That Will Shape Our Future* (2017); Kevin Kelly, *The Silver Cord* (2015). Mr. Kelly writes on generative artificial intelligence ("AI"), including its development and applications. *See* Kevin Kelly, *Latent Space as a New Medium*, KK (July 13, 2026), https://perma.cc/6KNK-8WAP; Kevin Kelly, *Arguments in Favor of AI Fair Use*, KK (Sept. 7, 2026), https://perma.cc/R2LG-39RE; Kevin Kelly, *Why Are LLMs Smart?*, KK (June 22, 2026), https://perma.cc/A3YH-SXNL.

AI is a transformative technology that accelerates the creation of novel works across countless disciplines in the arts and sciences. Mr. Kelly has experience in how AI advances the field of literature. In his view, each AI model can be understood as an entirely new medium that offers authors the capability to create new texts and ideas, and to reason. A ruling for Plaintiffs on fair use would therefore grant Plaintiffs far more than the limited monopoly to their original expression Congress intended to confer. It would hinder the development of technologies capable of disseminating previously

unimaginable quantities of information. It would also impede new modes of thought and the creation of new original works in both the arts and sciences.

Amicus files this brief in support of Defendants' argument that the use of copyrighted works to train large language models is a fair use under 17 U.S.C. § 107. Based on his lifelong pursuits of writing, the protections afforded to copyright owners are important to Mr. Kelly. Equally vital is preserving room for permissible uses of copyrighted material and the growth of transformative technologies. Otherwise, copyright will stifle the very creativity, innovation, and spread of knowledge it exists to encourage. The fair-use doctrine is critical to ensuring that balance.

## INTRODUCTION

This case asks whether copyright can be invoked on a mass scale to block a transformative technology with extraordinary potential to advance the arts and sciences. In Amicus's view, the clear answer is no, for at least two independent reasons.

*First*, AI is not trained or designed to create copies of original works. Rather, AI mimics the way humans have learned and innovated for millennia, by ingesting and integrating information into a broader structure of knowledge derived from a vast number of inputs. People likewise use AI in countless transformative ways, from testing new ideas to innovating on age-old ideas, and everything in between. This includes using the capabilities of AI to accelerate and enhance the creative process. For example, authors can use AI as a research assistant, continuity tracker, and visual reference creator, while

retaining the creative control, tone, and style of the work as their own. Neither the creation nor the application of the model harms any interest that copyright law seeks to protect.

*Second*, AI offers the potential to revolutionize human knowledge and creativity, with massive benefits for humankind. Beyond literature, AI is advancing drug discovery, solving long-unsolved mathematical problems, and cracking cold criminal cases—all without infringing upon any copyrighted interests as traditionally understood. Plaintiffs' theory would impede all of these new, non-infringing works and applications. And it would slow the development of new revolutionary technologies. The adverse implications for society are enormous and would turn copyright on its head.

## ARGUMENT

Fair use is a statutory exception to copyright infringement that prevents copyright enforcement that "would stifle the very creativity which that law is designed to foster." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)); *see* 17 U.S.C. § 107. Although the Copyright Act confers on the copyright holder "a bundle of exclusive rights" to "encourage[] creativity," those individual incentives "must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023) (citation modified). Courts invoke the fair-use doctrine to balance the interests of "creativity and availability," including "for use in new works."

*Id.* The doctrine also keeps "a copyright monopoly within its lawful bounds." *Oracle*, 593 U.S. at 22.

This case presents an application of that time-tested principle to a novel technology: whether ingesting copyrighted information to develop AI technology that has the capability to create *new* works is fair use. Training AI models on an immense corpus of text—of which Plaintiffs' works are an infinitesimal fraction—creates a new technological tool that generates new expression rather than reproducing others' original works.

## I. Training innovative AI models is a transformative use similar to the methods by which humans learn and create.

Copyright grants "authors the right to their original expression" while "encourag[ing] others to build freely upon the ideas and information conveyed by a work." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50 (1991). AI training is transformative because it creates an innovative and groundbreaking technology that unlocks the capability to harness the ideas and information on countless subjects to create new text. And it does this on a scale previously unimaginable. Both the transformative use (training) and the result (an AI model) are a technological analog to what humans have done for countless generations: use their experience, skill, and knowledge acquired over long periods of time to create new works.

AI models are created through a process, referred to as "training," that resembles the way humans have gained knowledge and skills to create new works. AI training involves analyzing billions and trillions of words across vast quantities of materials to iteratively "learn" patterns in language. During this process, the AI model quantifies the relationships accumulated in human language and knowledge, including trillions of concepts, styles, ideas, facts, and their attributes. Kelly, *Latent Space as a New Medium*, *supra* (in training, a model analyzes the data in order to "extract out all the hidden patterns of language below our awareness contained within those billions of documents"). The model maps these relationships as trillions of weights known as "parameters." *Id*. As a model trains, it adjusts its parameters to better represent the relationships between concepts with increasing complexity and depth, iteratively expanding its map. ECF No. 1983 at 7. It does this through shared facts that are verified, shared logical steps that are emphasized, and shared concepts that are mapped. *See* Kelly, *Latent Space as a New Medium*, *supra*.

The models do not copy or store works in their original, expressive form. *See* ECF No. 1983 at 22 (OpenAI's LLMs produced only 0.6% of a work, at most, across millions of prompts). Rather, they create a digital neural network reflecting "hidden patterns of language below our awareness contained within . . . billions of documents" that can answer questions or complete tasks based on prompts containing text they have never seen. Kelly, *Latent Space as a New Medium*, *supra*. Likewise, the answers to human prompts

do not live stored within the model. They are iteratively created as the model is queried. *See id.* (AI "finds the answer as it writes the words" based on its "search for patterns nearby"). The sophistication of the map is what enables a model to generate a cogent response to any input, such as a question or a task. *See id.* ("When you ask an LLM a question, it will find the answer in latent space.").

The power of any part of this network map rests on all the other parts. In an indirect way, every text that a model is trained on improves the quality of the answers and work done in any other subject. *See id.* ("The more information [AI] is trained on, the more connections, the better it gets."). Training a model on a book about vintage locomotives will improve the quality of answers for a question about garden pests. Although the contribution from a single source is too small to measure, every contribution strengthens the power of this collective common good. *See id.*

Both this training and the resulting AI model mirror the process by which humans engage with new information, learn, and apply their newly acquired knowledge to new situations, tasks, and endeavors. Take, for example, "dogs" and "cats"—separate but related concepts. During training, a model might train on thousands of materials concerning dogs and cats across different scenarios (as well as texts on garden pests and locomotives). Over time, the model maps and refines parameters that account for the various characteristics, words, and ideas associated with dogs and cats as reflected across all materials in the training set. The concept of a "dog" might carry a large value for

"man's best friend," and cats might be associated with different attributes, such as "independence" or "skittishness." *See id.* Over time, training adjusts the values of its parameters so that "friendly" and "loyal" have stronger dog-like associations than cat-like associations. *See id*. The model also represents and maps the *shared* attributes of cats and dogs, such as ears, tails, and legs. *See id*. Across all of these iterations, the model "learns" both how dogs and cats are similar, and how they differ. Separately, dogs and cats are themselves parameters of traits that can be mapped, so anything, including friendliness, loyalty, and inanimate objects, can be viewed as more dog-like or more cat-like. *Id*. In this way, Defendants' training develops "model[s] [of] intelligence." ECF No. 1983 at 8. As a model trains on more parameters, it better understands these complex relationships between concepts, iteratively expanding its map. *Id.* at 7.

Authors can draw upon these learnings in the same way they would draw upon knowledge from other sources without violating copyright. Absent AI, an author interested in writing a story about a dog might recall his own experience of having a dog as a child, consult photographs and training manuals, observe how dogs behave in real life, and reread copyrighted novels like *Old Yeller* and *Lassie Come-Home*. The result might be a brand-new work about a loyal dog and its owner. A writer can use AI in precisely the same way, drawing inspiration and knowledge without copying a protected work. Alternatively, a writer might use AI to brainstorm in an entirely different way, for example, creating a human character with dog-like characteristics or creating cat and dog

cartoon characters with swapped personalities. In each case, the results are new and transformational, even if they draw on a shared knowledge base.

This is how authors have created new works for generations without violating copyright. Indeed, "every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (citation modified). For instance, William Shakespeare's *Romeo and Juliet* built upon elements of Arthur Brooke's poem *The Tragical History of Romeus and Juliet*, which in turn invoked elements in stories about family feuds in Italy, secret marriages, sleeping potions, and tragic misunderstandings.[1] Similarly, Jane Smiley's *A Thousand Acres* is a modern retelling of Shakespeare's *King Lear*, set on a farm in Iowa in the 1980s.[2]

The hypothetical author described above follows this same lineage. The concept of a story about a dog who is a loyal and protective friend of a story's human protagonist is not copyrightable. Nor does such a story infringe *Old Yeller* or *Lassie Come-Home* simply because those books build on similar archetypes. Copyright does not extend to concepts, ideas, methods, or facts. *Feist Publ'ns*, 499 U.S. at 350; *see BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1143 (11th Cir. 2007) ("[T]he idea of hunting a formidable

[1] David Bevington, *Romeo and Juliet*, Encyclopædia Britannica, https://perma.cc/M5Z6-JN87 (last visited Oct. 9, 2026).

[2] The Editors of Encyclopædia Britannica, *A Thousand Acres*, Encyclopædia Britannica, https://perma.cc/47Y5-Y98V (last visited Oct. 9, 2026).

whale at the lead of an eccentric captain is not protected by copyright law."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) ("Foot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction. As such, they are not copyrightable except to the extent they are given unique—and therefore protectible—expression in an original creation."). The result should be no different solely because AI processes and produces information more efficiently than prior technologies.

Indeed, if anything, AI is more transformative than the iteration and innovation of prior eras. AI's capabilities are not limited to literature and creative writing. A single model connects all ideas, concepts, and facts based on the data set it trains on. *See* Kelly, *Latent Space as a New Medium*, *supra*. Thus, an AI model can create new text based on virtually limitless topics, including connecting ideas and concepts *across* disciplines from the sciences and arts. *Id.* ("[T]he style of a solution [to a prompt] can be transferred from one domain to another.").

## II. AI advances the creation of new, non-infringing works.

AI training, which "seeks to create new products," creates a "highly creative and innovative tool" for authors that accelerates and enhances their ability to create new works. *See Oracle*, 593 U.S. at 30. AI is a highly innovative tool for advancing the creation of new novels in less time. And many authors are experiencing the benefits of AI in the writing process. J.D. Lasica, *How Authors Are (Really) Using AI*, Authors A.I. (Sept. 26,

2025), https://perma.cc/3H8X-8PPP (noting 81% of surveyed authors are using AI for research and 71% for editing). Previously, authors with teams of assistants, editors, and researchers had greater support in refining, editing, and developing manuscripts into published novels. Christie Mealo, *The Minimum Viable Author*, Superabundance (Sept. 7, 2026), https://perma.cc/UCP8-FV86. In this way, AI provides self-published and individual authors support that was previously unavailable to them in the form of a technological assistant.

An example is illustrative. Self-published author Aaron Black uses AI in the research, editing, and development of his novels, which has allowed him to publish four high-quality works in ten months while writing all the prose himself. *Id.* For example, Mr. Black wrote a supernatural series set in a fictional Connecticut town. *Id.* Although the novels were his own—from the concept to the precise text—AI performed many tasks that moved them forward, such as researching historical facts, weather patterns, and the terrain of Connecticut towns based on his description of the setting for his novels. *Id.* AI also helped maintain continuity in the manuscripts as he drafted, creating references for where in the story various characters and objects appeared and interacted with each other. *Id.* As a result, AI reduced the amount of time Mr. Black needed to spend rereading "90,000 words" of manuscripts to find "where a character last appeared, what happened to an important object, or which chapter contained a particular interaction." *Id.* And Mr. Black used AI to create visual references, providing a reference point to enhance spatial

detail in the text. *Id.* For example, "if a character crossed the library, he could see where the desk and staircases were." *Id.* He retained all creative control over the novels and the prose, while using AI to help him "research, organize, and remember" the creative decisions he made in creating his stories. *Id.*

The end result: not only a faster process, but a high-quality work of Mr. Black's own creation. AI served the same role as "researchers, assistants, editors, illustrators, and continuity experts" that have helped generations of authors refine, perfect, and enhance their works. AI puts this power in the hands of millions of creators. *Id.*

Thus, AI, and the training that creates it, is a technological tool that helps authors create new, high-quality original works. This is precisely the "growth in creative expression, based on the dissemination of other creative works and the unprotected ideas contained in those works, that the Copyright Act was intended to promote." *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992), *as amended* (Jan. 6, 1993).

## III. AI models promote vast public benefits, consistent with the objectives underpinning copyright and the fair-use doctrine.

The fair-use inquiry asks whether permitting this use would better advance copyright's ultimate purpose. "The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" *Feist Publ'ns*, 499 U.S. at 349 (quoting U.S. Const. art. I, § 8, cl. 8). Thus, "the ultimate test of fair use is whether the copyright law's goal of 'promoting the Progress of Science and useful Arts'

'would be better served by allowing the use than by preventing it.'" *Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (citation modified).

AI training meets that test in two related ways. It gives authors a new tool for creating original works without substituting for Plaintiffs' books. It also supports advances in the arts and sciences far beyond literature. As another court has recognized, AI may be "among the most transformative many of us will see in our lifetimes," *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1033 (N.D. Cal. 2025), with benefits that far outweigh any harms to legitimate copyright interests.

### A. AI accelerates the creation of new works without harming Plaintiffs' copyright interests.

These and other experiences of authors who use AI undercut Plaintiffs' asserted injury. Plaintiffs argue that "AI-generated competing works reduce the incentive for authors to create." ECF No. 1982 at 34 (citation modified). As the above examples show, AI enables authors to create more high-quality works in less time. AI does not reduce the "economic incentive to create original works," *Warhol*, 598 U.S. at 535; it increases it.

The relevant harm question is whether the challenged use substitutes for the copyrighted works, not whether it helps others write new books. Copyright is "concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99 (2d Cir. 2014). Substitutes in this context "deprive the rights

holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy *in preference to the original*." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015) (emphasis added).

By contrast, Plaintiffs' claimed harm is competition from *non-infringing* "AI-generated competing works." ECF No. 1982 at 34. Plaintiffs' theory of harm is that they will have to compete with authors who publish original, non-infringing works with the assistance of AI. In other words, Plaintiffs seek to prevent *other* authors from using AI as a creative tool to write non-infringing works that compete with Plaintiffs' works.

That is not a cognizable copyright interest. Copyright does not grant the holder "control over all markets," *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014), only protection from "the secondary use usurp[ing] *the market of the original work*." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004) (emphasis added). And the secondary use at issue here is training AI models that create a transformative tool, not any individual who uses AI to generate new text.

That claimed competition is also disconnected from the challenged use: training a model to develop a technological tool. Plaintiffs thus rely on harms and seek relief not commensurate with the scope of their copyrights. *See HathiTrust*, 755 F.3d at 96 (stating "transformative work is one that serves a new and different function from the original work and is not a substitute for it").

### B. The public benefits of AI are vast and extend well beyond accelerating the creation of original works of literature.

The same capacity that helps authors also enables work across many disciplines. AI models draw on relationships among ideas and information to generate new text on a wide range of subjects. AI's abilities have been used to advance medical research, to solve math problems that had long eluded mathematicians, and to make breakthroughs in open criminal investigations.[3] Courts "must take into account" these public benefits in the fair-use inquiry. *Oracle*, 593 U.S. at 35. Any one of these benefits is significant and weighs in favor of fair use—here, AI training provides all of them in one tool and many more through its ability to generate new text in response to problems posed by users. *See Cambridge Univ. Press*, 769 F.3d at 1282 ("[A]pplying fair use in a manner which promotes the dissemination of knowledge is consistent with the goals of copyright."); *Romanova v. Amilus Inc.*, 138 F.4th 104, 115 (2d Cir. 2025) (recognizing that the "furnishing of valuable information on any subject of public interest" and "render[ing] a valuable service to the public" support fair use). AI training produces a technological tool that provides all these

---

[3] Zuojun Xu et al., *A Generative AI-Discovered TNIK Inhibitor for Idiopathic Pulmonary Fibrosis: A Randomized Phase 2a Trial*, 31 Nature Med. 2602, 2602-03 (2025), https://perma.cc/M95S-3454; Joseph Howlett, *OpenAI Announces AI's Biggest Math Breakthrough Yet*, Sci. Am. (May 21, 2026), https://perma.cc/W2GY-YE83; *How Are Federal Agencies Harnessing Artificial Intelligence?: Hearing Before the Subcomm. on Cybersecurity, Info. Tech., & Gov't Innovation of the H. Comm. on Oversight & Accountability*, 118th Cong. 3 (2023), https://perma.cc/Z7HA-GA66 (statement of Eric Hysen, Chief Info. Officer, U.S. Dep't of Homeland Sec.) (using AI, "[Homeland Security Investigations] were able to turn formerly cold cases into rescues and arrests").

benefits without disseminating copyrighted works themselves. *See Google*, 804 F.3d at 224 (that Google Books "does not give searchers access to effectively competing substitutes" weighs in favor of fair use).

The benefits of training also extend to the development of future models. *See* ECF No. 1983 at 4. Innovation in this field continues. As Mr. Kelly has observed, "[t]here are lots of alternative [AI] models to LLMs being experimented with, and they could become the default models next." Kelly, *Arguments in Favor of AI Fair Use*, *supra*. The fair-use doctrine keeps copyright from stifling that development and the creative potential it promises to continue to advance. *Oracle*, 593 U.S. at 30.

### C. Copyright is not a shield from disruptive technology.

Plaintiffs' prediction that AI-generated books will replace "human-authored books" does not settle whether training is fair use. ECF No. 1982 at 26. Claims about displacement have accompanied earlier technologies that enabled new uses of copyrighted works. Indeed, "[v]irtually all of the copyright challenges brought against developers of disruptive technologies that enable new uses of copyrighted works have called for an interpretation of the fair use limitation on copyright's exclusive rights." Pamela Samuelson, *Fair Use Defenses in Disruptive Technology Cases*, 71 UCLA L. Rev. 1484, 1487 (2024). But courts have recognized that copyright does not prevent fair use that results in technological breakthroughs that change, augment, and accelerate how human creativity is put into motion. In *Oracle*, the Supreme Court held that Google's

reimplementation of Oracle's APIs to create new mobile operating systems was fair use as a matter of law, and it noted that the harm to the public of permitting Oracle to enforce copyrights compared to any harm to Oracle weighed in favor of fair use. 593 U.S. at 39. The Court stressed that "significant changes in technology" must be considered in the fair-use analysis. *Id.* at 19 (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 430 (1984)).

Amicus recognizes serious questions about AI's technical capabilities and its effects on society. Copyright law does not answer all of them. It asks only whether allowing the use better serves the progress of science and the useful arts than preventing it would. AI training does.

## CONCLUSION

This Court should hold that Defendants' use of copyrighted works to train AI models is a fair use under 17 U.S.C. § 107.

Dated: October 16, 2026

By: *<u>/s/ Serena Orloff</u>*
Serena Orloff
Steven P. Lehotsky
Robert B. Dunteman
Jonathan DeWitt
Lehotsky Cohn LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, D.C. 20001
(512) 693-8350
serena@lehotskycohn.com
steve@lehotskycohn.com
bobby@lehotskycohn.com
jdewitt@lehotskycohn.com

*Counsel for Amicus Curiae Kevin Kelly*

## CERTIFICATE OF COMPLIANCE

I, Serena Orloff, an attorney duly admitted to practice law in this Court, hereby certify that this brief complies with the word count limit because it contains 4,013 words, excluding the parts exempted by Local Civil Rule 7.1(c). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this brief.

Dated: October 16, 2026

By: /s/ *Serena Orloff*
Serena Orloff
Lehotsky Cohn LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, D.C. 20001
(512) 693-8350
serena@lehotskycohn.com

*Counsel for Amicus Curiae Kevin Kelly*