**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION<br><br>This document relates to:<br><br>No. 1:23-cv-08292 (SHS) (OTW)<br>No. 1:23-cv-10211 (SHS) (OTW)<br>No. 1:25-cv-03482 (SHS) (OTW) | Case No. 25-MD-03143-SHS/OTW<br><br>Hon. Sidney H. Stein<br><br>**PUBLIC REDACTED** |

# CLASS PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MICROSOFT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS


INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 5

I. Microsoft Trailed Google In the Race to Develop AI Technology ..... 5

II. The Microsoft-OpenAI Partnership ..... 7

A. Microsoft Partnered With OpenAI to Race Ahead of Google ..... 7

B. Microsoft Formed a Strategic Partnership To Support OpenAI's Commercial Products Knowing That OpenAI Was Using Pirated Material ..... 7

C. The Joint Development and Collaboration Agreements ..... 9

D. Microsoft Had the Contractual Right to Supervise OpenAI and Control the Development of OpenAI's Models ..... 9

III. Microsoft Used Books as Currency Throughout Its Commercial Relationship With OpenAI ..... 10

A. Microsoft Distributed Bing Index Data to OpenAI Through Project Taxi ..... 10

B. Microsoft Distributed Crawled Data to OpenAI Through Project Mango ..... 13

C. Microsoft Received and Downloaded OpenAI's LibGen Datasets ..... 13

IV. Microsoft Benefitted Financially From Its Copyright Infringement ..... 15

V. Microsoft and OpenAI Exploited Plaintiffs' Works to Train the At-Issue LLMs to Displace Human Authors ..... 16

VI. Microsoft Has Paid to License Books ..... 17

VII. Microsoft Now Attempts to Change Its Course By Disavowing Piracy ..... 18

LEGAL STANDARD ..... 19

I. Summary Judgment ..... 19

II. Copyright Law ........ 19

A. Direct Infringement ........ 19

B. Vicarious Infringement ........ 20

C. Fair Use ........ 20

ARGUMENT ........ 21

I. Microsoft Does Not Dispute Any Element of Direct Infringement ........ 23

II. Microsoft Has Failed to Establish That Distributing Plaintiffs' Works Through Project Taxi Was Fair Use ........ 23

A. Factor One: Microsoft's Distribution of Plaintiffs' Works in the Bing Index Was Not Transformative or Justified ........ 24

1. Trading Copyrighted Works in Exchange for Money and Valuable Data Is Not Transformative or Justified ........ 24

2. Microsoft's Corporate Representative Admitted That Its Distribution of the Bing Index Was Unrelated To Any Allegedly Transformative Use ........ 26

3. Microsoft Cannot Borrow OpenAI's Allegedly Lawful Purpose to Justify Its Distribution of Plaintiffs' Works ........ 27

B. Factors Two and Three: Plaintiffs' Copyrighted Works Are at the Core of Copyright Protection and Microsoft Distributed Those Works in Their Entirety to OpenAI ........ 30

C. Factor Four: Unlicensed Distribution of Plaintiffs' Works Threatens Plaintiffs' Traditional and Derivative Markets ........ 30

III. Microsoft Has Failed to Establish That Copying and Distributing Plaintiffs' Works Through Project Mango Was Fair Use ........ 33

A. Factor One: Microsoft's Downloads and Distributions From LibGen and Other Piracy Domains Were Commercial, Not Transformative ........ 34

B. Factor Two and Three Favor Plaintiffs ........ 37

C. Factor Four: Microsoft's Conduct Harms the Market for Plaintiffs' Copyrighted Works ........ 37

IV. Copying and Distributing Plaintiffs' Works to Assist LLM Training Is Not Fair Use ........ 38

V. Microsoft Is Vicariously Liable for OpenAI's Infringement ........ 39

VI. Microsoft Is Liable for Contributory Infringement ........ 40

CONCLUSION ........ 40

**TABLE OF AUTHORITIES**

Cases

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) .......... 30, 38

*Am. Geophys. Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) .......... 28, 29, 38

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... 3, 20, 21, 24

*Arista Records, Inc. v. MP3Board, Inc.*,
2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) .......... 32

*Arista Recs., LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) .......... 19, 20

*Arista Recs. LLC v. Usenet.com, Inc.*,
633 F. Supp. 2d 124 (S.D.N.Y. 2009) .......... 20

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) .......... 38

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
758 F. Supp. 1522 (S.D.N.Y. 1991) .......... 28, 29, 36

*Bird v. Microsoft*,
1:25-cv-05282 (S.D.N.Y.) .......... 18

*BMG Music v. Gonzalez*,
430 F.3d 888 (7th Cir. 2005) .......... 38

*Campbell v. Acuff-Rose Music Inc.*,
510 U.S. 569 (1994) .......... 24, 30

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016) .......... 20, 39

*Fin Guar. Ins. Co. v. Putnam Advisory Co.*,
12 Civ. 7372 (AT), 2020 WL 264146 (S.D.N.Y. Jan. 17, 2020) .......... 40

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) .......... 28

*Griffin v. Sheeran*,
351 F. Supp. 3d 492 (S.D.N.Y. 2019) .......... 19

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) .......... *passim*

*Hachette Book Grp., Inc. v. Internet Archive*,
664 F. Supp. 3d 370 (S.D.N.Y. 2023), aff'd, 115 F.4th 163 (2d Cir. 2024) ............................ 19, 32, 33

*In re Crude Oil Commodity Litig.*,
No. 06 Civ. 6677, 2007 WL 2589482 (S.D.N.Y. Sept. 8, 2007)........................................................ 40

*In re Frontier Commc'ns Corp.*,
658 B.R. 277 (Bankr. S.D.N.Y. 2024) ........................................................................................ 20, 39

*Infinity Broad. Corp. v. Kirkwood*,
150 F.3d 104 (2d Cir. 1998) ................................................................................................ 24, 29, 31

*Jorgensen v. Epic/Sony Recs.*,
351 F.3d 46 (2d Cir. 2003) .............................................................................................................. 19

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025)...................................................................................... 25, 38

*L.A. News Serv. v. Reuters Television Int'l*,
149 F.3d 987 (9th Cir. 1998) ............................................................................................................ 29

*L.A. News Serv. v. Tullo*,
973 F.2d 791 (9th Cir. 1992) ...................................................................................................... 29, 36

*Manon v. Pons*,
131 F. Supp. 3d 219 (S.D.N.Y. 2015) ............................................................................................... 34

*O'Neil v. Ratajkowski*,
563 F. Supp. 3d 112 (S.D.N.Y. 2021) ............................................................................................... 20

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
99 F.3d 1381 (6th Cir. 1997) ...................................................................................................... 29, 36

*Thomson Reuters v. Ross Intel.*,
2026 WL 2932557 (3d Cir. Sept. 29, 2026) ..................................................................................... 4, 6

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000) ................................................................................................. 24

*Williams v. Crichton*,
84 F.3d 581 (2d Cir. 1996) .............................................................................................................. 19

Statutes

17 U.S.C........................................................................................................................................ 19

17 U.S.C. § 106(3) .............................................................................................................................. 32

17 U.S.C. § 107 ............................................................................................................................ 21, 24, 31

17 U.S.C. § 501(b) .............................................................................................................................. 20

Rules

Fed. R. Civ. P. 30(b)(6) .......... 26

## INTRODUCTION

From Lord Byron to the Milky Way, Microsoft's motion for summary judgment focuses on everything except record evidence. Microsoft Br. at 1, 7, 32. Once Microsoft's infringing conduct is set out in full, it's clear why Microsoft ignores the facts and spins this case into a battle between "literary pursuits and scientific innovation" that is as fanciful as Lord Byron's *Don Juan*. Microsoft Br. at 32.

All told, Plaintiffs' claims against Microsoft are in no way "narrow." Microsoft Br. at 9. Microsoft is directly liable for copyright infringement because it distributed troves of copyrighted works to OpenAI in exchange for [redacted] and valuable data. Moreover, Microsoft is vicariously liable for OpenAI's own infringement. Despite bargaining for the ability to supervise OpenAI, and control model development, Microsoft never required OpenAI to retrain its models using lawful data, instead of pirated works, even though it knew the models contained books acquired from LibGen, the notorious shadow library.

Microsoft turned to infringement because it was racing to commercialize AI technology. Before Microsoft partnered with OpenAI, Google enjoyed a "decade long" headstart across every critical metric. SUF¶618. [redacted] ASUF¶21; Nelson Decl. Ex. 166 at –444-45.

For Microsoft, catching up meant cutting corners. Microsoft knew that OpenAI trained models on copyrighted books pirated from LibGen but nevertheless agreed to join forces through a commercial partnership. As the parties collaborated, Microsoft learned more about OpenAI's use of copyrighted materials. Still, Microsoft never exercised its "unambiguous" contractual right to

require OpenAI to retrain its models. SUF¶694. Instead, Microsoft "instructed" its teams not to ask about training data. SUF¶691.

As its partnership with OpenAI progressed, Microsoft continued taking shortcuts. Recognizing that [redacted]—Microsoft used Plaintiffs' books as currency in an arrangement Microsoft itself called "***horse trading.***" SUF¶¶775,589 (emphasis added). On multiple occasions, Microsoft sent vast quantities of copyrighted materials to OpenAI in exchange for [redacted] and valuable data. Microsoft sourced these materials from shadow library domains, including LibGen.

Through its partnership with OpenAI, Microsoft profited from models that mine and mimic the protected expression in Plaintiffs' books. These same models harm Plaintiffs, and other authors, by threatening their livelihood. Because of products like Microsoft Copilot—"one of the best AI for creative writing"—market-competitive books are available in minutes and at a fraction of the cost. SUF¶743. [redacted]

Microsoft's Director of Applied Science, Dr. Brent Hecht, presaged this paradigm, calling it a "doom loop." SUF¶765 Hecht foresaw that Microsoft's failure to "distribut[e] economic value down the supply chain, necessarily threatens the economic sustainability of those who create the content." SUF¶765. And Hecht warned that unless Microsoft compensated content creators like Plaintiffs, Microsoft would become "***the Napster of AI.***" SUF¶754 (emphasis added).

Building bigger and faster LLMs did not—and does not—have to come at Plaintiffs' expense. The robust AI licensing market shows that technology companies *can* compensate authors while developing new commercial products. Microsoft understands as much. [redacted]. And Microsoft now

represents to shareholders that it does not train "on data from domains listed in the Office of the United States Trade Representative (USTR) Notorious Markets for Counterfeiting and Piracy List," including LibGen. SUF¶663 Microsoft's own CEO, Satya Nadella, testified that he "wish[ed] that OpenAI had not gone to a pirated site" and admitted that training models with works acquired from LibGen is "not legal." SUF¶384; ASUF¶45.

Faced with this evidence, Microsoft does not dispute that it copied and distributed Plaintiffs' books without authorization. Nor does Microsoft dispute that it had the right and ability to supervise OpenAI's infringing conduct. Instead, Microsoft banks on a single mistaken argument, contending that *any* infringing conduct related to LLM training is fair use as matter of law. Microsoft Br. at 9–32. Microsoft's sweeping position fails for several reasons.

*First*, copying and distributing copyrighted works in exchange for valuable consideration is different from LLM training. Microsoft ignores this use altogether, but when Microsoft's conduct is analyzed separately, as *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023) requires, its commercial horse trades do not amount to a fair use.

*Second*, record evidence shows that Microsoft distributed copyrighted works in exchange for money and other data all while contractually *restricting* OpenAI from using these works to train models. Because this evidence contradicts Microsoft's assertion that its distribution to OpenAI was "indisputably a part of training LLMs," summary judgment is improper. Microsoft Br. at 23.

*Third*, even if the arguments above are not sufficient to deny summary judgment, Microsoft still fails to carry its burden; as a matter of law, training an LLM on copyrighted materials is not fair use.

*Fourth*, Microsoft is vicariously liable for OpenAI's infringements. Despite bargaining for the right to require OpenAI to retrain its models, Microsoft never exercised this contractual provision even though it knew OpenAI used works pirated from LibGen. With its reputation on the line, and enormous profits at stake, Microsoft chose to press ahead and cash in on tainted technology. Here, too, Microsoft's fair use defense fails.

*Fifth*, summary judgment on Plaintiffs' contributory infringement claim is improper. Microsoft has not adequately briefed this issue, but even if it had, its fair use defense would fail here as well.

* * *

Microsoft moves for summary judgment without acknowledging, let alone defending, its own conduct. With its witnesses plagued by mass amnesia—conveniently unable to recall Defendants' documented reliance on LibGen—Microsoft runs from the record. ASUF¶¶23–24. Rather than reckon with material facts, Microsoft accuses Plaintiffs of asserting their rights in order to "prevent technological progress" and "extract rents on innovation." Motion at 32. "Under [Defendant]'s framing, this case *appears* to concern the future of AI legal technology. But appearances can be deceiving. In truth, this is no more than an ordinary copyright case." *Thomson Reuters v. Ross Intel.*, 2026 WL 2932557 at *1 (3d Cir. Sept. 29, 2026) (emphasis in original). As Microsoft CEO Nadella admitted, "I think I would regret using a pirated site"—"it's not legal." SUF¶384; ASUF¶45. Nadella is right. Settled law does not allow Microsoft to use Plaintiffs' works without permission. Accordingly, this Court should reject Microsoft's fair use defense and deny its motion for summary judgment.

## FACTUAL BACKGROUND

Plaintiffs are bestselling and award-winning book authors,[1] and The Authors Guild, which is the oldest and largest professional organization for published writers in the United States. Plaintiffs' Asserted Works[2] span a variety of styles, subject matters, sales volumes, and genres, including literary fiction, genre fiction, drama, history, and biography.[3]

Microsoft is a technology company that develops and sells software, cloud computing services, and artificial intelligence products. SUF¶121. In July 2019, Microsoft formed a strategic partnership with OpenAI. SUF¶122. Since then, Microsoft has deployed OpenAI's GPT models across more than [redacted] Microsoft products, including Bing, Microsoft Copilot, and Microsoft 365 Copilot. SUF¶125.

### I. Microsoft Trailed Google In the Race to Develop AI Technology

Before Microsoft partnered with OpenAI, Google had emerged as the world's leading artificial intelligence company. SUF¶612. Google made an early splash in 2014 by acquiring DeepMind, an AI startup that aimed "to develop computers that think like humans." ASUF¶6. Capitalizing on this investment, Google publicly declared itself an "AI First" company in 2016. SUF¶615. Google built on its momentum in 2017, publishing "Attention Is All You Need," a seminal research paper announcing the transformer architecture used by OpenAI years later. SUF¶616. Google's war chest also included approximately 40 million digital books that it stockpiled following a decade-long scanning operation. SUF¶628.

---

[1] Several of the named Plaintiffs are entities through which authors conduct professional activities, called loan-out companies. SUF¶1.

[2] The 194 Asserted Works ("Works") are listed in Appendix A to Plaintiffs' Statement of Undisputed Material Facts. Dkt. 1987-1.

[3] In addition to Plaintiffs' Statement of Undisputed Material Facts ("SUF"), filed alongside Plaintiffs' motion for partial summary judgment, Plaintiffs have filed with this opposition brief a statement of additional undisputed material facts ("ASUF").

Across critical metrics—from talent to infrastructure—Microsoft knew that it trailed Google in the race to develop and commercialize AI technology. Microsoft's CEO, Satya Nadella, testified that from 2018, Google had "all the training, compute and talent." SUF¶617. For Nadella, it had "been clear that since then, that unless we can somehow make this entire market a little more competitive, none of us would stand a chance." *Id.* By 2019, Nadella suspected that Google's technology was "way ahead," such that it likely enjoyed a "decade long" headstart. SUF¶618.

Bill Gates also understood that Microsoft's capabilities were second rate. [redacted] ASUF¶21.

Scott reached the same conclusion. [redacted] SUF¶631. [redacted] *Id.* [redacted] SUF¶618.

Other Microsoft employees understood that the company was on the back foot. [redacted] Nelson Decl. Ex 217(b) at –345; SUF¶629. Testifying as Microsoft's corporate designee, Jon Tinter acknowledged Google's "inherent advantages," including its "interrelationships to search," "the systems and scale expertise," and "just the absolute level of investment that they

had." [SUF¶619. As Tinter admitted, Google "represented a sort of leader" whereas "Microsoft was "coming late" to AI. SUF¶620.

## II. The Microsoft-OpenAI Partnership

### A. Microsoft Partnered With OpenAI to Race Ahead of Google

Fixated on Google's lead, and aware of its own deficiencies, Microsoft targeted OpenAI in search of commercial success.

[redacted] SUF¶622. [redacted] Nelson Decl. Ex. 166 at –445.

[redacted] Nelson Decl. Ex. 166 at –444-45. [redacted] *Id.*

### B. Microsoft Formed a Strategic Partnership To Support OpenAI's Commercial Products Knowing That OpenAI Was Using Pirated Material

Microsoft raced to partner with OpenAI despite learning that OpenAI trained its models on copyrighted materials pirated from LibGen.

In April 2019, OpenAI's leadership—including Sam Altman, Dario Amodei, and Iyla Sutskever—prepared to demonstrate an early version of GPT-3 to Gates and other Microsoft executives. SUF¶335. Before the demonstration, Gates's assistant, Greg Martinez, asked Altman

for "materials that Bill can look at ahead of time." Nelson Decl. Ex. 810 at –432. In response, Altman sent Gates a document touting OpenAI's latest model. SUF¶336. Scott and Microsoft employee Umesh Madan later received this same document. SUF¶336; Nelson Decl. Ex. 702. Under the heading "Data," the document stated that, compared to GPT-2, the model had grown nearly tenfold in size because OpenAI "added another ~11B words from Library Genesis (LibGen), which contains books, textbooks, science magazine articles, and similar context." SUF¶188, 336.

The document also included a link to LibGen's Wikipedia page. SUF¶190. At the time, this page described LibGen as providing "free access to content that is otherwise paywalled or not digitized elsewhere." SUF¶190, 337. The Wikipedia page also stated that, "[i]n late October 2015, the District Court for the Southern District of New York ordered LibGen to shut down and to suspend use of the domain name (libgen.org), but the site is accessible through alternate domains." SUF¶337.

Deposition testimony confirms that OpenAI revealed its use of copyrighted materials to Microsoft. Madan, who attended the demonstration, testified that OpenAI disclosed it had trained its model on books. SUF¶656. Altman agreed that he sent the document identifying LibGen "ahead of time" to Gates, but that "I don't think I knew either way" if Gates reviewed it before the meeting. ASUF¶19. And Dario Amodei testified that "[a]nyone who had read the Wikipedia article would have read that" LibGen has been "accused of providing pirate access to articles and books." SUF ¶ 338.

[redacted]. ASUF¶20. [redacted]

[redacted] ASUF¶ 22. Scott kept his foot on the gas. [redacted]. Nelson Decl. Ex. 166 at –445. The Board approved the investment. ASUF¶58.

### C. The Joint Development and Collaboration Agreements

In July 2019—just months after the demonstration—Microsoft and OpenAI formally agreed to exchange information, share data, and jointly develop new technology. The parties memorialized their partnership in three "Joint Development and Collaboration Agreements" ("JDCAs") executed in 2019, 2021, and 2023. *See* SUF¶¶637, 646, 649.

Pursuant to the JDCAs, Microsoft invested at least $13 billion into OpenAI, with a portion in cash and a portion in discounted "compute credits." SUF¶¶635, 637, 638. In return, OpenAI committed to exclusive use of Microsoft's cloud supercomputing platform—Azure—and further compensated Microsoft in the form of capped redemption amounts totaling $92 billion across the three JDCAs. SUF¶652.

### D. Microsoft Had the Contractual Right to Supervise OpenAI and Control the Development of OpenAI's Models

Under the JDCAs, Microsoft enjoyed substantial access to, and control over, the development of OpenAI's models. Microsoft representatives sat on a Governing Board, which met at least monthly to manage "the parties' relationship," including by "providing advice," "recommendations," and "strategic direction." SUF¶645. And Microsoft also placed engineers "on site" at OpenAI [redacted] SUF¶ 647, 681; 683.

Microsoft also had the contractual right to inspect OpenAI's models and veto training data. Under the JDCAs, Microsoft enjoyed the "unambiguous" right to download model weights and code used by OpenAI. SUF¶694. What's more, Microsoft could contractually require OpenAI to respond to "requests to provide additional detail or answer specific questions regarding Models . . . (e.g., specifically what data was used to train any given Model)." SUF¶689. And if Microsoft expressed "concerns regarding the use of any particular data to train a Model," OpenAI was required to "promptly retrain that Model using solely data approved by Microsoft." SUF¶690.

Microsoft never exercised this contractual right even though it "was aware before the release of GPT-3 that OpenAI used Library Genesis or LibGen to train GPT-3." SUF¶696; Nelson Decl. Ex. 59(a) at 292:2–17, 296:22–297:2. Instead of requiring OpenAI to retrain its models using lawful data, Microsoft allowed the infringement to continue. Testifying as Microsoft's corporate designee, Jamie Huynh admitted that despite concerns regarding copyrighted materials, Microsoft "always limited and instructed our teams to not ask about the data" used by OpenAI. SUF¶691; Nelson Decl. Ex. 28 at 246:4–247:6, 251:2–13.

## III. Microsoft Used Books as Currency Throughout Its Commercial Relationship With OpenAI

[redacted] SUF ¶775. So, throughout their business relationship, Microsoft and OpenAI bartered over books, using Plaintiffs' Works as both "critical negotiating leverage" and currency in an arrangement Microsoft employee Karmel Allison called "horse trading." SUF¶¶589, 590.

Using data as "oil" to fuel their race against Google, Microsoft and OpenAI dealt troves of copyrighted materials to each other on multiple occasions. SUF¶¶75, 573–596, 597–606. These unauthorized distributions contained Plaintiffs' Works. SUF¶¶937, 939, 940.

### A. Microsoft Distributed Bing Index Data to OpenAI Through Project Taxi

From the start of their collaboration, OpenAI set its sights on acquiring Microsoft's Bing Index, a colossal web crawl comprised of [redacted] SUF¶¶580, 583. The Bing Index supports Microsoft's search engine—Bing. SUF¶580. Microsoft's web crawlers enable Bing searches by, in Microsoft's words, "collect[ing] the Internet," including paywalled and copyrighted content. SUF¶¶ 580, 584; ASUF¶25. Microsoft stores data downloaded by its crawlers in a compilation called the "Bing Index." SUF¶580

Microsoft's Bing Index contained copyrighted materials sourced from shadow libraries, including Plaintiffs' Works. SUF¶940. [redacted] ASUF¶26. Testifying as Microsoft's corporate designee, Hyunh stated that each of these URLs denoted "books, individual books." ASUF¶27. [redacted]. SUF¶594.

[redacted] Nelson Decl. Ex. 143 at –215. That was until OpenAI sweetened the deal in two ways. First, OpenAI agreed to pay Microsoft [redacted]. ASUF¶¶33–34. And second, OpenAI agreed to [redacted] SUF¶587. Explaining this facet of the deal, Bob McGrew, OpenAI's Chief Research Officer, stated: "the idea [was] that we're giving data to them and they are giving data to us, [redacted] SUF¶588.

Although Microsoft eventually dealt the Bing Index to OpenAI, it drove a hard bargain. [redacted] SUF¶592.

[redacted] Nelson Decl. Ex. 173 at –441. All the while, OpenAI employee Katie Mayer described the "Bing data" as "Mikhail [Parakhin's] to sell." SUF¶591.

Microsoft's requirements did not end there. According to the testimony of Padma Gaggara, Microsoft's corporate designee, OpenAI was "not supposed to use [the Bing Index] for training" because Microsoft contractually restricted OpenAI's use of this data to "computational analysis only." ASUF¶29. As Gaggara testified, "computational analysis" did *not* encompass LLM training and, indeed, Gaggara further insisted that Microsoft "never gave [Bing Index] data for training to OpenAI." ASUF¶¶29–30. Describing the purpose of this restriction, Gaggara explained that in "Microsoft's mind," it "wasn't right for us to give the data for them to use it for training." ASUF¶30.

After receiving OpenAI's payment, and its GPT-3 data, Microsoft distributed full copies of the Bing Index to OpenAI in 2022 through "Project Taxi." SUF¶593; ASUF¶28. While this distribution contained Plaintiffs' Works, [redacted] no longer mattered to Microsoft. *See* Nelson Decl. Ex. 143 at –215; SUF¶940. Asked "Does Microsoft care whether there [are] copyrighted works and copyrighted books in Bing index data that it shares with third parties," Fabrice Canel, Microsoft's corporate designee, testified "No." SUF¶605; Nelson Decl. Ex. 12 at 38:3–38:9.

[redacted] ASUF¶36. [redacted] SUF¶594. Just like the deal with OpenAI, Microsoft's corporate designee, Gaggara, testified that [redacted] ASUF¶37

**B. Microsoft Distributed Crawled Data to OpenAI Through Project Mango**

Defendants horse traded again in 2023, when Microsoft helped OpenAI conduct an internet-wide crawl through a "secret" initiative codenamed "Project Mango." SUF¶¶604–606.

OpenAI lacked the infrastructure and experience required for large-scale crawling, and so it paid Microsoft to crawl half of the web and then transfer the downloaded content to OpenAI. SUF¶¶ 599–600. In exchange for this "crawling service," Microsoft invoiced—and OpenAI paid—[redacted]. ASUF¶¶41–42.

Like the Bing Index, the data Microsoft acquired for OpenAI through Project Mango contained copyrighted material sourced from shadow libraries. The list of "50k top domains to be crawled by MSFT" included the LibGen domain "libgen.ee," as well as domains associated with other shadow libraries, including thepiratebay.ee, zlibrary.cc, and e-books.com. SUF¶604.

In September 2023, Microsoft started transferring the Project Mango data to OpenAI. SUF¶604. Plaintiffs' Expert has identified 27 copies of the Asserted Works in the Project Mango data. SUF¶939. Testifying as Microsoft's corporate designee, Canel admitted sending the Project Mango data to OpenAI but did not know whether OpenAI intended to use this data to train models. ASUF¶43.

**C. Microsoft Received and Downloaded OpenAI's LibGen Datasets**

As part of Defendants' commercial agreement, and their ongoing horse trades, OpenAI distributed —and Microsoft downloaded—copies of the pirated datasets LibGen1 and LibGen2. These datasets together contained 124 of Plaintiffs' Works. SUF¶936.

*First*, under an amendment to the 2019 JDCA, Microsoft bargained for the contractual right to [redacted] SUF¶573. Testifying as OpenAI's corporate designee, Benton Gaffney agreed that this contractual

provision [redacted]. SUF¶¶573–574; ¶¶517–519.

Microsoft exercised this right. [redacted] SUF¶575. Microsoft downloaded the GPT-3 training data in January 2021, and deleted it later. SUF¶577; *see* Nelson Decl. Ex. 777 at -380; Nelson Decl. Ex. 882.

*Second*, and as stated above, Microsoft horse traded for OpenAI's GPT-3 training data in 2022 as part of Project Taxi. *Supra* at 11–13.

Microsoft knew that OpenAI used LibGen—and that LibGen contained copyrighted materials—but downloaded the datasets anyway. SUF¶653. As noted above, OpenAI told Microsoft that it trained its model on LibGen material in April 2019. *Supra* at 9. Months later, in September 2019, Madan and other Microsoft employees received research papers from OpenAI. SUF¶658. One of these papers, authored by Dario Amodei, Alec Radford, and other senior OpenAI researchers, ended a paragraph describing training data with an unanswered question—"Is LibGen legit?" SUF¶658.

In February 2020, OpenAI disclosed its use of LibGen to Microsoft once again. SUF¶659. Before Dario Amodei met with Microsoft's Saurabh Tiwary, OpenAI sent senior Microsoft employees a document titled "Details, Results, and Benchmarking of OpenAI Large Models for MSFT." SUF¶659. The document stated that to address "low-quality data from CommonCrawl," OpenAI had "mixed in known high-quality datasets," including 18 billion tokens from "a dataset from Library Genesis (Libgen), which contains books and novels." SUF¶659. At her deposition,

OpenAI's former Chief Technology Officer, Mira Murati, acknowledged that OpenAI "clearly" disclosed its use of LibGen material to Microsoft in this document. SUF¶660.

## IV. Microsoft Benefitted Financially From Its Copyright Infringement

After investing in OpenAI for its own "commercial purposes," Microsoft profited from the development of LLMs in several ways. Nelson Decl. Ex. 40 at 210:11-211:2

Pursuant to the Second Amended and Restated JDCA, OpenAI agreed to transfer to Microsoft twenty percent of net revenue generated through the commercial use of technology embodying licensed intellectual property. SUF¶701. Using data produced for January 2023 through December 2024, Plaintiffs' Expert has determined that Microsoft received [redacted] in gross profit from [redacted]. SUF¶702.

OpenAI's use of Azure and Bing services also benefitted Microsoft. For the period of July 2022 to December 2024, Microsoft generated [redacted] in gross profits from Azure services purchased by OpenAI. SUF¶703. And from April 2024 through December 2024, Microsoft generated approximately [redacted] in gross profits from Bing services sold to OpenAI. SUF¶704.

[redacted] Nelson Decl. Ex. 167 at -407; SUF¶705. [redacted] Nelson Decl. Ex. 167 at -407; SUF¶705.

[redacted] ASUF¶21; SUF¶705. But Microsoft did not need to infringe

to get ahead. Nelson Decl. Ex. 160 at -906; SUF¶705. Experts from *every* party agree that Plaintiffs' Works were *not* necessary to develop the in-suit LLMs. Class Br. at 30–31; SUF¶¶495–516. However, rather than take time to license Plaintiffs' Works, or require OpenAI to retrain its models, [redacted] SUF¶622; Nelson Decl. Ex. 166 at -445.

## V. Microsoft and OpenAI Exploited Plaintiffs' Works to Train the At-Issue LLMs to Displace Human Authors

Microsoft's decision to rely on pirated data to get to market quicker has harmed Plaintiffs and other authors. SUF¶622; *see* Class Br. at 10–16. After powering its products with Plaintiffs' Works, Microsoft has marketed Copilot as "one of the best AI for creative writing." SUF¶743. A Microsoft product page titled "How AI Can Help You Write a Novel" describes Copilot as "[a]n AI novel writing assistant for every step," from "Idea generation," to "Outlining," and "Writing assistance." SUF¶741. A separate Microsoft product page, titled "Write and Self-Publish Your Book with AI," states that "[w]hether you want to publish a sweeping epic or share a cozy children's bedtime story, Copilot can act as your assistant at every stage of the process," including by providing "AI-powered brainstorming" and "AI writing assistance," among other functions. SUF¶742.

Microsoft's Director of Applied Science, Dr. Brent Hecht, understood that such substitutive products would both upend the market for Plaintiffs' books and, in turn, endanger their livelihoods. As Hecht cautioned, Microsoft's failure to license data for training "has started a doom loop" in which the LLM "end product threatens the economic foundations of its essential suppliers"—human creators. SUF¶765. Recognizing that LLMs "replicate the patterns in the training content," Hecht presaged that Microsoft's failure to "distribut[e] economic value down

the supply chain, necessarily threatens the economic sustainability of those who create the content." SUF¶765. Consistent with this "doom loop," Hecht testified that he had serious concerns that uncompensated book authors would suffer "economic harm and perhaps not be able to continue in their business[]" due to the outputs of LLMs trained on their work. SUF¶767. For these reasons, Hecht warned his colleagues that the public may come to view Microsoft "as the Napster of AI." SUF¶754.

Hecht's concerns about market substitution have come to pass. [redacted]. SUF¶853. In comparison, the five largest book publishers combined publish approximately 30,000 books *each year*, confirming the extent to which AI generated content dilutes the market for book sales. SUF¶852. Researchers have confirmed this surge, finding that the number of new book titles appearing each month on Amazon nearly tripled between 2022 and late 2025. SUF¶855.

Beyond flooding the market, books with AI-generated content have achieved financial success. [redacted]. SUF¶854.

## VI. Microsoft Has Paid to License Books

Although Microsoft has not paid Plaintiffs a cent for their Works, [redacted] SUF¶¶775-814. [redacted] SUF¶813. [redacted]

[redacted] ASUF¶¶47–49. The employee who created this project testified that Microsoft already had books from the "Bing Index or open source book repositories." ASUF¶50. [redacted]. SUF¶¶801-805.

Microsoft is not alone. Across the industry, AI companies are paying copyright holders for licenses or for past use of copyrighted data in AI development. SUF¶¶825-36.

## VII. Microsoft Now Attempts to Change Its Course By Disavowing Piracy

After catching up by taking shortcuts, Microsoft now rebukes the shadow libraries that helped it compete with Google. Microsoft's 2024 and 2025 proxy statements both state that "we do not train on data from domains listed in the Office of the United States Trade Representative Notorious Markets for Counterfeiting and Piracy list[,]" which has long included LibGen.[4] SUF¶663 Explaining this stance, CEO Nadella testified that Microsoft does not train on data from LibGen, or other illicit domains, because "it's not legal." ASUF¶45 (emphasis added). Asked if it is "illegal to download pirated material," Nadella answered "Absolutely. That's correct." SUF¶382. Looking back, Nadella testified that he "wish[ed] that OpenAI had not gone to a pirated site. . . . I think I would regret using a pirated site[.]" Nelson Decl. Ex. 40 at 302:8–303:1.

---

[4] It appears that Microsoft has engaged in its own separate mass piracy, which is the subject of a different case (currently stayed) in this MDL, *Bird v. Microsoft*, 1:25-cv-05282 (S.D.N.Y.). Although Class Plaintiffs have not received direct discovery, it appears that Microsoft possessed [redacted] ASUF¶¶54–55. Like Books1, Books2, and Books3, Books4 may also be comprised of pirated books. ASUF¶¶55–56.

# LEGAL STANDARD

## I. Summary Judgment

Courts grant summary judgment "'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Griffin v. Sheeran*, 351 F. Supp. 3d 492, 496 (S.D.N.Y. 2019) (quoting Fed. R. Civ. P. 56(a)). Microsoft "bears the initial burden of informing the district court of the basis of its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact." *Hachette Book Grp., Inc. v. Internet Archive*, 664 F. Supp. 3d 370, 378 (S.D.N.Y. 2023) (internal citations and quotations omitted), aff'd, 115 F.4th 163 (2d Cir. 2024). "If the moving party meets its burden, the nonmoving party must produce evidence in the record and may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Id.* (quotations omitted). "In deciding a motion for summary judgment, the district court 'must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.'" *Griffin*, 351 F. Supp. 3d at 496 (quoting *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)).

## II. Copyright Law

### A. Direct Infringement

Establishing a *prima facie* case of direct copyright infringement requires "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996). "A certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 51 (2d Cir. 2003). "'[C]opying' is shorthand for the infringing of any of the copyright owner's five exclusive rights described in [17 U.S.C.] § 106," *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010), including the right of reproduction

and distribution. *Id.* "The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b).

### B. Vicarious Infringement

Vicarious infringement occurs where a defendant (1) "had the right and ability to supervise" the infringing conduct and (2) a "direct financial interest" in the same. *EMI Christian Music Grp., Inc. v. MP3tunes, LLC,* 844 F.3d 79, 99 (2d Cir. 2016) (internal quotations omitted). "[A] defendant need not have 'formal power to control' where a direct infringer 'depend[s] upon [the defendant] for direction.' . . . Rather, '[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise.'" *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009) (cleaned up). Where "a defendant has the right to block access, such right must be 'exercised to its fullest extent' to 'escape imposition of vicarious liability.'" *In re Frontier Commc'ns Corp.,* 658 B.R. 277, 294 (Bankr. S.D.N.Y. 2024) (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001)).

### C. Fair Use

Microsoft does not argue that Plaintiffs have failed to establish a *prima facie* case of direct or vicarious copyright infringement and instead moves for summary judgment based on fair use. Microsoft Br. at 9–32. Because fair use is an affirmative defense, Microsoft bears the burden of proof. *See O'Neil v. Ratajkowski*, 563 F. Supp. 3d 112, 128 (S.D.N.Y. 2021). At summary judgment, Microsoft's fair use defense fails where "there is an absence of evidence to support an essential element of [Microsoft's] case." *Id.* (quotation omitted).

Under *Warhol*, courts assess fair use with respect to each specific "use" of a copyrighted work because "[t]he same copying may be fair when used for one purpose but not another." *Warhol*, 598 U.S. at 533. To determine whether a particular use is fair, courts consider four factors:

(1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and (4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. The fourth factor is "undoubtedly the single most important element of fair use." *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024) (internal quotations omitted).

## ARGUMENT

Although *Warhol* instructs courts to consider each use separately, 598 U.S. at 533, Microsoft seeks summary judgment "on all claims" for a single reason, contending that infringing conduct related to LLM training is fair use as a matter of law. Microsoft Br. at 9-33. By resting on this argument—and nothing more—Microsoft asks this Court to hold that a mere affiliation with OpenAI, which trained LLMs, immunizes Microsoft from liability for all copyright infringement that is even loosely related to that partnership. Because Microsoft has not established its affirmative defense beyond any genuine dispute of material fact, summary judgment is improper.

Plaintiffs set forth the reasons the Court should deny summary judgment in six parts.

*Part I* states only that, as an initial matter, Microsoft has failed to dispute any element of Plaintiffs' *prima facie* case of copyright infringement against Microsoft.

*Part II* applies copyright law's four "fair use" factors to Microsoft's distribution of Plaintiffs' Works through "Project Taxi" and Microsoft's downloading of OpenAI's LibGen datasets. The record evidence confirms that Microsoft distributed Plaintiffs' Works in exchange for money and valuable data. Moreover, Microsoft's own corporate witnesses categorically rejected the explanation that these distributions were made for LLM training—the purpose Microsoft trumpets in its brief. Based on this evidence, a reasonable juror could find that

Microsoft's distribution of Plaintiffs' Works for the purpose of "horse trading" is not transformative, and is not fair use.

*Part III* analyzes these same "fair use" factors as they apply to a secret Microsoft initiative, Project Mango, through which Microsoft acted as a commercial, web-scraping "service provider" and distributed still more of Plaintiffs' Works to OpenAI. Because the evidence demonstrates that Microsoft's "Project Mango" data was distributed to OpenAI in exchange for [redacted] and for the purpose of [redacted] associated with Project Taxi, a reasonable juror could find that fair use does not immunize Microsoft's conduct. Here as well, Microsoft's "training is fair use" slogan does not apply.

*Part IV* incorporates by reference Plaintiffs' brief in opposition to OpenAI's motion for summary judgment, and the arguments therein, which state an independent reason to deny summary judgment—LLM training is not a fair use as a matter of law. *See* Class OAI Opp. Br. at § II.

*Part V* explains that a reasonable juror could find Microsoft vicariously liable for OpenAI's direct infringements. Despite bargaining for the ability to supervise and control model development, and extensive knowledge about OpenAI's infringing conduct, Microsoft did not exercise its contractual right to stop that conduct and retrain the model without using pirated, copyrighted works. At the same time, Microsoft had a direct financial interest in OpenAI's conduct because of the lucrative incentives memorialized in the JDCAs. Fair use does not exculpate Microsoft here either.

*Part VI* addresses Plaintiffs' contributory infringement claim, which Microsoft mentions only in a two-sentence footnote. Microsoft has not adequately briefed this issue, but even if it had, its fair use defense would fail here as well.

## I. Microsoft Does Not Dispute Any Element of Direct Infringement

As an initial matter, Microsoft does not dispute any of the elements of Plaintiffs' direct copyright infringement claims against Microsoft. *See generally* Microsoft Br. at 9-33. Nor can it. Plaintiffs have established a *prima facie* case of copyright infringement resulting from Microsoft's copying of Plaintiffs' Works and distribution of those works to OpenAI through Project Taxi and Project Mango. *See* Class Br. at 38–39. And Plaintiffs have established a *prima facie* case of copyright infringement resulting from Microsoft's download of the LibGen datasets it received from OpenAI. *Id.*

## II. Microsoft Has Failed to Establish That Distributing Plaintiffs' Works Through Project Taxi Was Fair Use

Microsoft's own documents, and the testimony of its own employees, demonstrate that Microsoft used the Works in the Bing Index as bargaining chips to extract money and data from OpenAI. *See supra* at 11–13.

[redacted]. *Id.* at 11. Microsoft knew that there were copyrighted books contained in the Bing Index. *Id.* Nevertheless, Microsoft used the Bing Index data as leverage to extract data and money from OpenAI. *Id.* at 12. Microsoft transferred the Bing Index to OpenAI only after OpenAI sent Microsoft the data that Microsoft valued. *Id.* And Microsoft then invoiced OpenAI and received a payment of [redacted]. *Id.* As a part of this exchange, Microsoft downloaded still more copies of Plaintiffs' Works when it bargained for—and received—the GPT-3 training data from OpenAI. *Id.* Microsoft's own witness referred to the use here as "horse trading." *Id.* at 11. And in yet another act of infringement, Microsoft downloaded copies of OpenAI's LibGen datasets for the commercial purpose of [redacted] *Id.* at 14–15.

Instead of adhering to *Warhol*'s command, Microsoft ignores whether this particular use—trading copyrighted works for other data or money—is considered fair. It is easy to understand. All four factors weigh against horse trading as fair use.

### A. Factor One: Microsoft's Distribution of Plaintiffs' Works in the Bing Index Was Not Transformative or Justified

The first fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107. Under this factor, courts consider whether a defendant had a sufficient "independent justification" for a use, *Warhol*, 598 U.S. at 547; whether and the degree to which a use is "transformative"—that is, whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message," *Campbell v. Acuff-Rose Music Inc.*, 510 U.S. 569, 579 (1994); and "the commercial nature of the use," *Warhol*, 598 U.S. at 532–33.

A commercial use weighs more strongly against fair use if it is likely to substitute for the original. *Id.* at 531–32. A defendant's ability to identify "a particularly compelling justification" is necessary where "an original work and copying use share the same or highly similar purposes" or "where wide dissemination of a secondary work would otherwise run the risk of substitution for the original[.]" *Id.* at 532, 547.

#### 1. Trading Copyrighted Works in Exchange for Money and Valuable Data Is Not Transformative or Justified

Distributing full, unmodified copies of copyrighted works is not transformative. As the Second Circuit has explained, quoting Judge Leval's "frequently-cited article on fair use": "a use of copyrighted material that 'merely repackages or republishes the original' is unlikely to be deemed a fair use." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (quoting Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990)); *accord UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) ("Here, although

defendant recites that My.MP3.com provides a transformative 'space shift' by which subscribers can enjoy the sound recordings contained on their CDs without lugging around the physical discs themselves, this is simply another way of saying that the unauthorized copies are being retransmitted in another medium—an insufficient basis for any legitimate claim of transformation."). Far from transformative, Microsoft's distribution of Plaintiffs' Works to OpenAI merely repackaged and distributed the copyrighted books that Microsoft scraped from shadow libraries. *See supra* at 11–13.

Although the evidence shows that Microsoft distributed Plaintiffs' Works to OpenAI as part of a commercial exchange, Microsoft cites an out-of-context sentence from *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025), to argue that distributing the Bing Index to OpenAI was "a reasonable first step towards training an LLM." *See* Microsoft Br. at 23. But *Kadrey*'s reference to a "reasonable first step towards training" described the *Defendant's* "download of LibGen to see whether the books in the database made for good training data." *Kadrey*, 788 F. Supp. 3d at 1048. And Judge Chhabria in *Kadrey* first found that "all of the downloads the plaintiffs identify had the ultimate purpose of LLM training." *Id.*

Unlike in *Kadrey*, neither Microsoft nor OpenAI used the distributed copies of the Bing Index for training. ASUF¶¶28–32. And Microsoft did not know what OpenAI was going to do with these copies, other than "computational analysis," which Microsoft has repeatedly—and categorically—insisted ***is distinct from training LLMs***. ASUF¶29.

Microsoft's reliance on *Kadrey* is also misplaced because here Microsoft's "ultimate purpose" was obtaining money and data from OpenAI. When Microsoft employees discussed using the Bing Index as leverage to extract valuable data from OpenAI, they did *not* consider what

OpenAI might do with the Bing Index afterwards—rather, they focused on what Microsoft could get in exchange:

[redacted]

Nelson Decl. Ex. 173 at –440. At her deposition, the same Microsoft employee did *not* describe this exchange as a step in the process of training LLMs, but instead stated: [redacted] Nelson Decl. Ex 1 at 69:11-24. [redacted] ASUF¶34. OpenAI's documents confirm that Microsoft used the "Bing data" in exchange for value—OpenAI employee Katie Mayer described that data as "Mikhail [Parakhin's] to sell." SUF¶591.

In sum, Microsoft did not execute Project Taxi for any purportedly transformative purpose. Record evidence shows that Microsoft copied and distributed Plaintiffs' Works to OpenAI in order to receive money and valuable data in return. For this reason, the purpose and character of Microsoft's use weighs heavily against fair use.

**2. Microsoft's Corporate Representative Admitted That Its Distribution of the Bing Index Was Unrelated To Any Allegedly Transformative Use**

The only justification Microsoft offers with respect to its distribution of Bing Index is that this "transfer of works to OpenAI was indisputably a part of training LLMs." Microsoft Br. at 23–24.

Far from undisputed, Microsoft's mischaracterization is contradicted by its own Rule 30(b)(6) representatives. As Gaggara testified:

> Q. Okay. And when Microsoft shared the full Bing index with OpenAI around 2022, the purpose of doing that was for training large language models; is that correct?
>
> A. That's not correct.

Nelson Decl. Ex. 874 at 60:20-60:24. Gaggara further testified that "Microsoft never gave [Bing Index] data for training to OpenAI"; that OpenAI was "not supposed to use [the Bing Index] for training. I cannot tell what they did"; and that OpenAI was contractually restricted from using the Bing Index copy to train LLMs. ASUF¶32. When asked if she was "aware of any document, in which Microsoft told OpenAI that the provision of that Bing Index data is *only to be used for experiments and isn't to be used for training*," Gaggara testified: "That is the intent of . . . *every* document that we wrote, that it was supposed to be *only* for experimental purposes[.]" Nelson Decl. Ex. 875 at 128:6–15 (emphasis added).

A second Microsoft corporate designee, Canel, added that Microsoft did not know whether "OpenAI wanted the Bing Index data to train and develop its large language models." Nelson Decl. Ex. 867 at 32:9–18.

So, while Microsoft contends that its repeated distribution of the Plaintiffs' Works was "indisputably part of training," Microsoft's witnesses and documents say the opposite. Microsoft Br. at 23. This disputed material fact dooms Microsoft's entire motion. Microsoft argues that "training an LLM is fair use as a matter of law," Microsoft Br. at 9–32—and that training LLMs is highly transformative, Microsoft Br. at 10–16—but Microsoft has failed to establish that its own uses of Plaintiffs' Works were for the purpose of training LLMs. For this reason, Microsoft's motion for summary judgment must be denied.

### 3. Microsoft Cannot Borrow OpenAI's Allegedly Lawful Purpose to Justify Its Distribution of Plaintiffs' Works

As stated above, Microsoft's copying and distribution of Plaintiffs' Works to OpenAI as part of Project Taxi was not for the purpose of training. But even if the purpose was training, and contradictory Microsoft testimony and prohibitive contractual language did not exist, Microsoft still could not prevail on a fair use defense by latching on to the conduct of OpenAI, a third-party recipient.

As courts applying factor one have held, the conduct of third-party recipients of copyrighted works is irrelevant to the *distributor*'s fair use defense. In *Am. Geophys. Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994), the Second Circuit explained that a company could not make unlimited photocopies of copyrighted articles, even if all the copies were ultimately in pursuit of "research." *Id.* at 924. Under such a rule, "the concept of a 'transformative' use would be extended beyond recognition." *Id. Texaco* is unequivocal: "Texaco cannot gain fair use insulation for [its employee's] archival photocopying of articles (or books) simply because such copying is done by a company doing research." *Id.* As the *Texaco* court explained: "It would be equally extravagant for a newspaper to contend that because its business is 'news reporting' it may line the shelves of its reporters with photocopies of books on journalism." *Id.*; *see also Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 178 n.4 (2d Cir. 2018) ("[t]hat a secondary use can facilitate research does not itself support a finding that the secondary use is transformative.").

Similarly, a series of "copyshop" cases have also held that the uses by third-party recipients of copyrighted works do not exculpate the defendant-distributor's infringing conduct. In *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991), plaintiffs alleged that Kinko's copied excerpts of their books without permission, assembled them into course packets, and distributed those course packets to college students in exchange for money. 758 F. Supp. at 1526. Kinko's argued that the downstream use of the course packets was educational—not

commercial—but the court focused on the use of the defendant-distributor: "The use of the Kinko's packets, in the hands of the students, was no doubt educational. However, the use in the hands of Kinko's employees is commercial." *Id.* at 1531.

Similarly, in *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1389 (6th Cir. 1997), the Sixth Circuit rejected a fair-use defense where a commercial copyshop defendant relied on the educational uses of books by its student-customers. As the *Princeton Univ. Press* court reasoned: "the fact is that the copying complained of here was performed on a profit-making basis by a commercial enterprise. And '[t]he courts have . . . properly rejected attempts by for-profit users to stand in the shoes of their customers making nonprofit or noncommercial uses.'" *Id.* at 1389 (quoting Patry, Fair Use in Copyright Law, at 420 n. 34); *see also Infinity*, 150 F.3d at 112 ("[L]arge-scale photocopying, even for the statutorily-approved purpose of educational use, can still infringe.").

And in *L.A. News Serv. v. Tullo*, 973 F.2d 791 (9th Cir. 1992), the Ninth Circuit rejected the same downstream-use justification. The court held that, in direct copyright infringement cases involving a violation of the distribution right, "the ultimate use to which the customer puts the tape is irrelevant, as is the use [defendant's] customers make of the tapes [defendant] sells." *Id.* at 797 (citing *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417 (1984)); *accord L.A. News Serv. v. Reuters Television Int'l*, 149 F.3d 987, 994 (9th Cir. 1998) ("[T]he question of whether defendants' copying and transmission of the works constitutes fair use is distinct from whether their subscribers' broadcasts of the works are fair use.").

Like the copyists in *Texaco*, *Basic Books*, *Princeton Univ. Press*, and *L.A. News. Serv.*, Microsoft is a commercial enterprise that distributed copyrighted works in exchange for commercial value. In those cases, the copies distributed by the defendants had an ultimate,

downstream, educational purpose, and yet each court focused on a different use—specifically, the act of a commercial enterprise copying from copyrighted works and distributing those works for value without authorization. Thus, when the inquiry is correctly focused on Microsoft's use of the Bing Index to "horse trade" with OpenAI for valuable data and money—not OpenAI's purported downstream use—the commercial purpose and character of the use weighs heavily against Microsoft.

### B. Factors Two and Three: Plaintiffs' Copyrighted Works Are at the Core of Copyright Protection and Microsoft Distributed Those Works in Their Entirety to OpenAI

The second fair use factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. "[B]oth fiction and nonfiction books," like those authored by Plaintiffs, "contain original expression close to the core of intended copyright protection." *Internet Archive*, 115 F.4th at 187 (internal quotation omitted). This factor thus weighs against fair use.

Under the third factor, courts consider whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole . . . are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. "[C]opying an entire work militates against a finding of fair use," which is what Microsoft did here. *Napster*, 239 F.3d at 1016 (citation omitted).

Microsoft offers no argument whatsoever regarding the application of factors two and three to its distribution of full copies of books to OpenAI in exchange for money and valuable data. Microsoft concedes, as it must, that these factors weigh against fair use.

### C. Factor Four: Unlicensed Distribution of Plaintiffs' Works Threatens Plaintiffs' Traditional and Derivative Markets

The fourth and final factor is the effect of the copying on the "potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor encompasses "not only the market harm caused by the particular actions of the alleged infringer, but also the market harm that would result from unrestricted and widespread conduct of the same sort." *Internet Archive*, 115 F.4th at 189 (quoting *TVEyes*, 883 F.3d at 179). In other words, this factor considers both the actual market harm caused by the defendant's actions and the potential market harm that would occur if everyone engaged in the same conduct. Microsoft bears the burden to show its distribution did *not* harm Plaintiffs. *Infinity*, 150 F.3d at 110 ("[Defendant] bears the burden of showing that his use does not cause this type of harm to Infinity's interests").

Microsoft has offered no evidence of any kind to carry its burden. Microsoft's discussion of market harm focuses entirely on training. Microsoft Br. at 25-33. But Plaintiffs' direct infringement claims against Microsoft are not about Microsoft training its own LLMs. And as the testimony of Microsoft's corporate designees shows, Microsoft's download and distribution of the Bing Index to OpenAI was *not* for the purpose of training an LLM. *See* ASUF¶¶29–32.

Microsoft's failure to offer evidence on this factor is unsurprising. As Plaintiffs' expert Michael Lasinski has documented, "[e]xamples of common book licensing categories include . . . digital and print-on-demand distribution rights." Lasinski Decl. Ex. B ¶43. Copyright owners, absent Court-sanctioned distribution of their copyrighted works, have benefited from these rights by reaching agreements, for example, (a) to distribute works as ebooks and audiobooks (*id.* ¶¶ 27-28, 35, 38-39, 167, 174, 308) and (b) to distribute works in connection with Amazon Alexa (*id.* ¶¶ 133-136).

If distributing unlicensed books for free as part of any commercial relationship or third-party use were widespread, it would destroy the market for Plaintiffs' works. Just as the Second

Circuit explained in *Internet Archive*: "Publishers' library eBook licensing market is both reasonable and developed." 115 F.4th at 192. Plaintiffs, not Microsoft, possess the right to distribute their Works in exchange for value. *See* 17 U.S.C. § 106(3). But just like in *Internet Archive*, Microsoft has "usurped a market that properly belongs to the copyright holder." *Internet Archive*, 115 F. 4th at 192. (citing *TVEyes*, 883 F.3d at 180); *Arista Records, Inc. v. MP3Board, Inc.*, 2002 WL 1997918, at *13 (S.D.N.Y. Aug. 29, 2002) (such conduct "on [its] face could harm the market for the original works.").

Moreover, [redacted] *Supra* at 17–18. [redacted] SUF¶¶ 775-790. [redacted] SUF¶777. [redacted]. Nelson Decl. Ex. 204 at -007; ASUF¶¶47-49. [redacted] SUF¶791. [redacted] SUF¶801.

None of Microsoft's agreements covered Plaintiffs' Works and none of Microsoft's payments went to Plaintiffs. As the evidence shows, the explanation for this is simple. [redacted]

[redacted] ASUF¶49. The Microsoft employee who created the slide confirmed that this would have included books from the "Bing Index or open source book repositories." ASUF¶50. [redacted], it did not intend to (and didn't) offer payments to copyright owners of books that Microsoft already obtained for free through horse trades with OpenAI or by scraping the Internet. As the *Internet Archive* court held, even absent "empirical data" regarding the impact of such widespread use, courts may "rely on" the simple "logical inference[]" that widespread free acquisition of the works would harm the market for the works. *Internet Archive*, 115 F.4th at 193.

For these reasons, the fourth factor weighs against Microsoft's fair use defense with regard to its distribution of the Bing Index through Project Taxi, and Microsoft has not met its burden to establish otherwise.

## III. Microsoft Has Failed to Establish That Copying and Distributing Plaintiffs' Works Through Project Mango Was Fair Use

For many of the same reasons, and some additional ones, Microsoft has also failed to establish its fair use defense with respect to its copying and distribution of Plaintiffs' Works to OpenAI through Project Mango. Indeed, Microsoft ignores Project Mango altogether.

As Class Plaintiffs establish in their motion for summary judgment, Microsoft brokered a "secret" deal—codenamed "Project Mango"—to crawl the half of the internet and then copy and distribute this data to OpenAI. Class Br. at 7-8. OpenAI paid Microsoft [redacted] for these services, which included acquiring Plaintiffs' Works from notorious piracy domains such as LibGen. ASUF¶42;SUF¶604. Microsoft's corporate designee testified that Microsoft did not know whether OpenAI intended to use the Project Mango data to train models; did not make any effort

to determine whether there were copyrighted books in the data it transferred; and did not care. *See* SUF¶¶604–605.

Microsoft makes no effort to defend Project Mango. Instead, Microsoft asserts the unrelated point that: "The undisputed factual record establishes that Microsoft did not download—and indeed had no involvement at all in acquiring—the datasets from LibGen that OpenAI *used in connection with the development of its early models*." Microsoft Br. at 18 (emphasis added). But whether Microsoft downloaded or helped acquire the early LibGen datasets is irrelevant (even putting aside its *knowledge* of OpenAI's use). Here, Microsoft glosses over its *own* crawling and scraping of books from LibGen separate and apart from OpenAI's early downloads, and its subsequent distribution of those books to OpenAI. Microsoft's failure to even *discuss* its infringing conduct means that summary judgment in Microsoft's favor is improper. And having failed to defend its distributions of Plaintiffs' Works through Project Mango in its motion, Microsoft may not raise it for the first time in its reply. *See Manon v. Pons*, 131 F. Supp. 3d 219, 238 (S.D.N.Y. 2015) (declining to address summary judgment argument raised for first time in reply based on "standard rule" that "'arguments may not be made for the first time in a reply brief'") (quoting *Simpson v. City of New York*, 793 F.3d 259, 264 (2d Cir. 2015)).

Regardless, Microsoft cannot defend Project Mango on fair use grounds.

### A. Factor One: Microsoft's Downloads and Distributions From LibGen and Other Piracy Domains Were Commercial, Not Transformative

Similar to Project Taxi, the purpose and character of Microsoft's Project Mango was commercial and non-transformative. Microsoft earned [redacted] to crawl a specified set of domains that included LibGen, and other shadow libraries, and then distribute this data to OpenAI. *Supra at* 14.

Here, as with Project Taxi, Microsoft cannot defend its conduct by claiming that LLM training is fair use and therefore any infringement in pursuit of that purpose is fair use *ipso facto*. Microsoft's own corporate representative testified that Microsoft *did not know* what OpenAI intended to do with the data that it distributed through Project Mango:

> Q. Okay. Microsoft understood that Project Mango was in order to collect data for OpenAI to use to train their next commercial large language model; isn't that correct?
> A. I don't know.
>
> Q. Microsoft doesn't know what OpenAI was going to do with the data that Microsoft crawled and gave to OpenAI?
> Object to the form.
> A. I don't know.
>
> Q. Well, you're Microsoft's corporate representative –
> A. Yes.
>
> Q. -- to testify on this topic, aren't you?
> A. Yes.
>
> Q. So Microsoft – Microsoft's testimony is that Microsoft didn't know what OpenAI was going to do with the data that Microsoft crawled and gave to OpenAI for Project Mango?
> Object to the form and scope.
> A. Again, I don't know usage of the data by OpenAI. I provided the data to OpenAI.

Nelson Decl. Ex. 867 at 81:1-23; ASUF¶43.

In light of this testimony, Microsoft cannot now claim that the purpose and character of the Project Mango distribution was to "help pro bono attorneys" or "assist scientists researching new compounds," which are the lofty purposes Microsoft ascribes to artificial intelligence generally. Microsoft Br. at 3.

To the contrary, Microsoft executed Project Mango in its capacity as a commercial "service provider." ASUF¶41. After Microsoft and OpenAI had a dispute about—in Microsoft's words—[redacted] of sharing the Bing Index with OpenAI, Defendants crafted Project

Mango as a “secret” workaround. SUF¶594, 604–606; ASUF¶¶38–39. As Microsoft’s corporate designee admitted: “[the] Project Mango plan was designed to reduce risk for Microsoft, so that [Microsoft] would have both companies crawl the web and use that data as opposed to having Microsoft sharing the whole Bing Index with OpenAI.” ASUF¶39. Indeed, Microsoft did not impose restrictions to protect copyright holders on the basis that Microsoft had limited its role to “purely a crawling service”:

> Q. Okay. You didn’t add any restrictions or limitations to protect the copyright of copyright owners, correct?
> Objection. Beyond the scope.
> A. As I said, we were a service provider. They could -- they may as well have an agreement with the provider and, hence, their crawling. We wouldn’t know, right? So we were purely a crawling service.

Nelson Decl. Ex. 875 at 148:7-14.

Because Microsoft was, in its own words, a “service provider” rendering “purely a crawling service,” Microsoft’s conduct fits squarely within the copyshop cases *Basic Books*, *Princeton Univ. Press*, and *L.A. News. Serv. See supra* at 30–31. Just like the defendants in those cases, Microsoft cannot rely on the fair use alleged by the recipient of the copyrighted works because “‘[t]he courts have . . . properly rejected attempts by for-profit users to stand in the shoes of their customers making nonprofit or noncommercial uses.’” *Princeton Univ.*, 99 F.3d at 1389 (quoting Patry, Fair Use in Copyright Law, at 420 n. 34).

Microsoft’s position is even weaker than the defenses rejected in the copyshops cases. In those cases, the copyshop defendants at least understood that they were distributing copies of copyrighted works to “university professors and students” for the ultimate purpose of education. *See, e.g.*, *Basic Books*, 758 F. Supp. at 1528. Here, however, Microsoft did not know the intended “usage of the data by OpenAI,” and only concocted Project Mango in an attempt at an end-run around [redacted]. Nelson Decl. Ex. 867 at 81:22-23;

SUF¶594. Because Microsoft's Project Mango did not transform anything, *including* Microsoft's legal risk, the first factor weighs against fair use.

### B. Factor Two and Three Favor Plaintiffs

As above, these factors weigh in favor of Plaintiffs.

### C. Factor Four: Microsoft's Conduct Harms the Market for Plaintiffs' Copyrighted Works

Microsoft has not even attempted to meet its burden with regard to the market harm to Plaintiffs' resulting from Microsoft's unauthorized distribution through Project Mango. Nor can it. Similar to Microsoft's unauthorized distribution of the Bing Index, distribution of Microsoft's scraped Project Mango data directly harmed the markets for Plaintiffs' Works. *See supra* at 14. Microsoft distributed unauthorized, pirated copies of Plaintiffs' Works to OpenAI, received [redacted] for its services, and never paid compensation to Plaintiffs. However, just months after this distribution, [redacted]. *Supra* at 31. It requires no more than a simple "logical inference[]" to conclude that widespread distribution among technology companies of this kind would harm the market for Plaintiffs' Works. *Internet Archive*, 115 F.4th at 193. Namely, Microsoft received consideration for the distribution of Plaintiffs' Works rather than the copyright holders themselves.

Sticking its head above the parapet, Microsoft attempts to defend OpenAI's piracy with an argument OpenAI itself does not advance—that OpenAI's pirated downloads from LibGen are simply an issue relevant to "bad faith." Microsoft Br. at 19. Microsoft is wrong.

*First*, OpenAI's affirmative acts of seeking out, torrenting, and storing millions of books from LibGen expressly to avoid the cost, time, and administrative burdens associated with legitimate acquisition demonstrates its substitutive purpose, not—or rather not only—its bad faith. The long-line of piracy cases confirms this. The Ninth Circuit held peer-to-peer downloaders liable

because they "got for free" what they would "otherwise have to buy," not because they downloaded in bad faith. *Napster,* 239 F.3d at 1015; *BMG Music v. Gonzalez*, 430 F.3d 888, 890 (7th Cir. 2005). Even outside the piracy context, the Texaco researchers infringed because their copying displaced subscription and licensing fees, not because the researchers had any malintent. *Texaco*, 60 F.3d at 931. The facts here tell the same story: as in *Bartz v. Anthropic PBC*, "the initial copies [of Plaintiffs' works] were pirated to create a central, general-purpose library, as a substitute for paid copies to do the same thing." *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1026 (N.D. Cal. 2025).

*Second,* even if it were a matter of "bad faith," *Kadrey*—Microsoft's sole citation—is inapposite. Even the *Kadrey* court recognized that evidence that a defendant's piracy "benefitted those who created the libraries and thus supported and thus supported and perpetuated their unauthorized copying and distribution of copyrighted works" would constitute copyright infringement "[i]n the vast majority of cases." 788 F. Supp. 3d at 1047. *Kadrey* found such evidence lacking in its record, but the Court can make no similar finding here. As Plaintiffs' Expert explains, piracy annually costs authors hundreds of millions of dollars in lost sales. *See* Seeley Decl. Ex. A at ¶¶53–62. And Defendants' actions, in particular, have the additional effect of harming authors by "normaliz[ing] piracy" throughout the AI industry and thus "encourag[ing] others to use shadow libraries." *Id.* at ¶63. Indeed, as the shadow library Anna's Archive recently boasted: "shadow-libraries were dying" until "[v]irtually all major companies building LLMs contacted us to train on our data." *Id.* at ¶¶65, 63–76.

## IV. Copying and Distributing Plaintiffs' Works to Assist LLM Training Is Not Fair Use

As stated above, record evidence contradicts Microsoft's assertion that its "transfer of works to OpenAI was indisputably a part of training LLMs." Microsoft Opening Br. at 23. Even if the reasons stated *supra* were not sufficient to deny summary judgment, Microsoft still fails to

carry its burden because training an LLM on copyrighted materials is not fair use as matter of law, as explained in Class Plaintiffs' Memorandum of Law in Opposition to OpenAI's Motion for Summary Judgment, and any contrary finding could not be made on this record. *See generally* Class OAI Opp. Br. Accordingly, this Court should reject Microsoft's only argument in support of its Motion. Microsoft Br. at 9–33.

## V. Microsoft Is Vicariously Liable for OpenAI's Infringement

Summary judgment in favor of Microsoft is improper for a separate reason. In addition to its direct liability for copying and distributing Plaintiffs' Works, Microsoft is also vicariously liable for OpenAI's direct infringements. *See* Class Br. at 40. Microsoft does not dispute that Plaintiffs have established a *prima facie* claim for vicarious infringement. Nor can it.

*First*, Microsoft had "the right and ability to supervise" OpenAI's infringing conduct. *EMI Christian*, 844 F.3d at 99. For instance, Microsoft controlled the Azure servers on which OpenAI downloaded and stored its data, and trained and deployed its models. *Supra* at 10–11; Class Br. at 40. Furthermore, the JDCAs gave Microsoft the right and ability to inspect and "retrain" OpenAI's models "using solely data approved by Microsoft." *Id.* at 10–11. Microsoft did not exercise this right, nor did it otherwise limit or stop OpenAI's infringing conduct. *Id.*; *see In re Frontier*, 658 B.R. at 293 (defendant must exercise its control rights to "fullest extent" to avoid vicarious liability).

*Second*, Microsoft had a "direct financial interest" in OpenAI's infringing actions. *EMI Christian*, 844 F.3d at 99. Microsoft received a portion of OpenAI's revenues and further benefitted from the additional users that OpenAI's infringing conduct brought to Microsoft's Azure and Copilot products. *Supra* at 15–16; Class Br. at 40; *see also EMI Christian*, 844 F.3d at 99 (increase in subscribers/customers due to infringement qualifies as "obvious and direct financial

interest.”). Additionally, OpenAI paid Microsoft to provide Bing and Azure services. *Supra* at 15–16.

*Finally*, Microsoft’s fair use defense fails here too for the reasons stated in Plaintiffs’ Opposition to OpenAI’s Motion for Summary Judgment.

## VI. Microsoft Is Liable for Contributory Infringement

In a footnote, Microsoft asserts that a “finding that LLM training is fair use” would “independently foreclose” Plaintiffs’ contributory infringement claim. Microsoft Br. at n.2. Microsoft does not explain why.

Summary judgment is improper for three reasons. First, Microsoft’s assertion—buried in a two-sentence footnote—is inadequately raised and therefore waived. *See Fin Guar. Ins. Co. v. Putnam Advisory Co.*, 12 Civ. 7372 (AT), 2020 WL 264146, at *2 (S.D.N.Y. Jan. 17, 2020) (“The Court did not expressly address this argument in its summary judgment order because courts routinely decline[] to consider arguments mentioned only in a footnote on the grounds that those arguments are inadequately raised.”) (internal quotation marks and citation omitted); *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 8, 2007) (“Arguments which appear in footnotes are generally deemed to have been waived.”). Second, even if the Court considers Microsoft’s *ipse dixit*, its fair use defense fails for the reasons stated *supra* and in Class Plaintiffs’ Opposition to OpenAI’s motion for summary judgment. Third, Plaintiffs’ contributory infringement claim depends on disputed factual questions. *See* Class Br. at n.4; Class Pls. Opp. Br. to Microsoft’s Motion for Judgment on the Pleadings.

## CONCLUSION

For the reasons set forth above, and in Plaintiffs’ Opening Motion, this Court should deny Microsoft’s motion for summary judgment and grant Plaintiffs’ motion for partial summary judgment.

Respectfully submitted,

/s/ Justin Nelson

Justin A. Nelson
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: 713.651.9366
jnelson@susmangodfrey.com
***Interim Lead Counsel for Class Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2026, I caused the foregoing document to be electronically filed with the Clerk of the United States District Court for the Southern District of New York using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Tyler Alabanza-Behard*
Tyler Alabanza-Behard

**CERTIFICATE OF WORD COUNT**

In accordance with Local Civil Rule 7.1(c) and the Court's Order at Dkt. 1664, 25-md-3143, I certify that the foregoing Memorandum of Law is 12,029 words, including footnotes but exclusive of the caption page, table of contents, table of authorities, certificates and signature block. The basis of my knowledge is the word count feature of the word-processing system used to prepare this memorandum.

*/s/ Tyler Alabanza-Behard*
Tyler Alabanza-Behard