**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In Re: OpenAI, Inc. Copyright Infringement Litigation

This Document Relates To:[1]

No. 1:23-cv-08292
No. 1:23-cv-10211
No. 1:23-cv-11195
No. 1:24-cv-03285
No. 1:24-cv-04872
No. 1:24-cv-01515
No. 1:25-cv-04315

Case No. 1:25-md-3143-SHS-OTW

**CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL UNDER THE STIPULATED PROTECTIVE ORDER**

**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

# MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' JOINT *DAUBERT* MOTION AND MOTION TO STRIKE

[1] Microsoft is not a party to Case Nos. 1:24-cv-01515 or 1:25-cv-04315. Only OpenAI opposes Plaintiffs' motions filed in those cases.

# TABLE OF CONTENTS


INTRODUCTION ..... 1

ARGUMENT ..... 1

I. THE 20 MILLION CHATGPT CONVERSATION SAMPLE ..... 1

II. DR. CHRIS CALLISON-BURCH ..... 4

III. DR. SANJAY KRISHNAN ..... 6

A. Krishnan Properly Analyzed Plaintiffs' Experts' False Positives. ..... 6

B. Krishnan's "Metadata Matching" Analysis Was Likewise Proper. ..... 15

IV. DR. BRANDI NONNECKE ..... 16

A. Nonnecke Never Opined That Shadow Library Usage Was Common Industry Practice. ..... 16

B. Class Plaintiffs Cannot Put Responsible AI At Issue And Then Bar Rebuttal. ..... 17

V. DR. NICK FEAMSTER ..... 17

A. Feamster Offers Technical Opinions, Not Legal Conclusions. ..... 17

B. Feamster Properly Consulted With OpenAI Engineers To Corroborate His Independent Technical Analysis. ..... 19

C. Plaintiffs' Technical Criticisms Do Not Undermine The Reliability Of Feamster's Analysis. ..... 22

VI. DR. TAYLOR BERG-KIRKPATRICK ..... 24

A. Berg-Kirkpatrick Reliably Applied Widely Accepted NLP Principles. ..... 24

1. Using Third-Party Datasets For Filtering Is Accepted And Reliable. ..... 25

2. Berg-Kirkpatrick's Manual Filtering Does Not Constitute Legal Testimony. ..... 28

B. Berg-Kirkpatrick's "600 Annotation" Study Is Reliable. ..... 29

1. Berg-Kirkpatrick's Study Was Not Biased. ..... 29

2. Berg-Kirkpatrick Properly Articulated His Methodology. ..... 30

3. Berg-Kirkpatrick Used A Representative Sample For His Study. ..... 33

VII. MS. BARBARA FREDERIKSEN-CROSS ..... 34

A. Frederiksen-Cross Is Fully Qualified To Render Her Technical Opinions. ..... 34

B. Frederiksen-Cross Does Not Opine On Mental State. ..... 35

VIII. DR. AVI GOLDFARB ..... 37

A. Goldfarb Is Qualified To Evaluate The Economic Significance Of Data Access And Collaboration Agreements. ..... 37

B. Goldfarb's Traffic And Engagement Data Do Not Contain Sample Bias. ............38

C. News Plaintiffs' Critique Of Goldfarb's Trend Analysis Is Unfounded And Underscores Their Experts' Failure To Offer Empirical Evidence Of Harm. ..........39

D. Goldfarb Properly Used Asset-Turnover Ratio To Respond To Plaintiffs' Rebuttal Criticism. ..........41

IX. DR. CATHERINE TUCKER .......... 43

A. An Outline Of Issues Does Not Render Tucker's Opinions Unreliable. ...............43

B. Tucker's Reliable Market Analyses Did Not Require Regressions. ......................46

CONCLUSION .......... 53

**TABLE OF AUTHORITIES**

Page(s)

Federal Cases

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*,
364 F. Supp. 3d 291 (S.D.N.Y. 2019)....................33

*Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020)....................5

*Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*,
82 F.4th 1262 (D.C. Cir. 2023)....................46

*Andy Warhol Found. v. Goldsmith*,
11 F.4th 26 (2d Cir. 2021), *aff'd on other grounds*, 598 U.S. 508 (2023)....................51

*Arista Recs. LLC v. Lime Grp. LLC*,
784 F. Supp. 2d 398 (S.D.N.Y. 2011)....................36

*Arista Recs. LLC v. Usenet.com, Inc.*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009)....................27

*AU New Haven, LLC v. YKK Corp.*,
2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019)....................29, 33

*Bartz v. Anthropic*,
787 F.Supp.3d 1007 (N.D.Cal.2025)....................16

*Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011)....................21, 22

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
666 F. Supp. 3d 328 (S.D.N.Y. 2023)....................19, 20, 21

*Capri Sun GmbH v. Am. Beverage Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022)....................18, 29

*Chen-Oster v. Goldman, Sachs & Co.*,
325 F.R.D. 55 (S.D.N.Y. 2018)....................50, 52

*Choi v. Tower Rsch. Cap. LLC*,
2022 WL 602710 (S.D.N.Y. Feb. 18, 2022)....................42

*Daniels-Feasel v. Forest Pharms., Inc.*,
2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021)....................14, 15

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................14, 15

*Elysium Health-ChromaDex Litig.*,
2022 WL 421135 (S.D.N.Y. 2022)....................................................................................30

*Faulkner v. Arista Recs., LLC*,
46 F. Supp. 3d 365 (S.D.N.Y. 2014)...............................................................................45

*Fiataruolo v. United States*,
8 F.3d 930 (2d Cir. 1993)..............................................................................................5, 18

*Google Digital Advert. Antitrust Litig.*,
763 F. Supp. 3d 563 (S.D.N.Y. 2025)...............................................................................2

*Gussack Realty Co. v. Xerox Corp.*,
224 F.3d 85 (2d Cir. 2000)..........................................................................................17, 34

*Hewitt v. Metro-N. Commuter R.R.*,
244 F. Supp. 3d 379 (S.D.N.Y. 2017)..........................................................................6, 18

*In re M/V MSC Flaminia,*
2017 WL 3208598 (S.D.N.Y. 2017)...............................................................................34

*In re Rezulin,*
309 F. Supp. 2d 531 (S.D.N.Y. 2004)...............................................................................45

*Kadrey v. Meta*,
788 F.Supp.3d 1026 (N.D.Cal.2025) ........................................................................16, 51

*Member Servs., Inc. v. Sec. Mut. Life Ins. Co. of N.Y.*,
2010 WL 3907489 (N.D.N.Y. Sep. 30, 2010) ................................................................21

*Micone v. Sarene Servs., Inc.*,
2025 WL 736638 (E.D.N.Y. Mar. 8, 2025) ....................................................................32

*Molly C. v. Oxford Health Ins., Inc.*,
2024 WL 4850813 (S.D.N.Y. Nov. 21, 2024) ..................................................27, 29, 33

*N.Y.C. Transit Auth. v. Express Scripts, Inc.*,
588 F. Supp. 3d 424 (S.D.N.Y. 2022)...............................................................................5

*Pac. Life Ins. Co. v. Bank of N.Y. Mellon*,
571 F.Supp.3d 106 (S.D.N.Y. 2021)...............................................................................32

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
716 F. Supp. 2d 220 (S.D.N.Y. 2010)...............................................................................32

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*,
49 F.Supp.3d 385 (S.D.N.Y. 2014) ...............................................................................39

*Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*,
280 F.R.D. 147 (S.D.N.Y. 2012) ....................2

*Rowe Ent. Inc. v. William Morris Agency, Inc.*,
2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003)....................39

*S.E.C. v. U.S. Env't, Inc.*,
2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ....................5

*Seltzer v. Green Day, Inc.*,
725 F.3d 1170 (9th Cir. 2013) ....................51

*Source One Dental, Inc. v. Patterson Cos.*,
2018 WL 2172667 (E.D.N.Y. May 10, 2018) ....................52

*Suboxone Antitrust Litig.*,
2020 WL 6887885 (E.D. Pa. 2020) ....................32

*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*,
112 F. Supp. 3d 122 (S.D.N.Y. 2015)....................16

*UMG Recordings, Inc. v. Lindor*,
531 F. Supp. 2d 453 (E.D.N.Y. 2007) ....................26

*United States v. Dukagjini,*
326 F.3d 45 (2d Cir. 2003)....................20

*United States v. Leech*,
2026 WL 1113346 (S.D.N.Y. Apr. 24, 2026)....................23, 24

*United States v. Morgan*,
53 F. Supp. 3d 732 (S.D.N.Y. 2014)....................22

*Wills v. Amerada Hess, Corp.*,
379 F.3d 32 (2d Cir. 2004)....................52

*WRT Energy Sec. Litig.*,
246 F.R.D. 185 (S.D.N.Y. 2007) ....................4

**Rules**

Rule 26 ....................19

Rule 37 ....................4

Rule 702 .................... *passim*

Rule 703 ....................26

Rule 704(a)....................................................................................................................5

**Other Authorities**

Aerni et al., *Measuring Non-Adversarial Reproduction of Training Data in Large Language Models*...................................................................................................28

Brigham et al., *Fundamentals of Financial Management* § 4.3 (11th ed.)..................................41

Chu-Carroll et al., *Textual Resource Acquisition and Engineering* (2012)..................................26

Golan et al., *Cite and Seek: Automated Literary Reference Mining at Corpus Scale* (2026)........................................................................................................26

*Identifying the Economic Implications of Artificial Intelligence for Copyright Policy: Context and Direction for Economic Research*, available at https://tinyurl.com/3c27cash..............................................................................................43

*Mosaic LLM Litig.,* No. 3:24-CV-02653 ....................................................................................43

Piktus et al., *The ROOTS Search Tool: Data Transparency for LLMs* (2023).............................25

Ross et al., *Fundamentals of Corporate Finance* §§ 3.3–3.4 (10th ed.).......................................41

Swann et al., *Bi-layer Deep Learning with Neural Networks and Large Language Models for Cognitive Biometrics* (2025).........................................................................26

## Table of Abbreviations

| | |
|---|---|
| New York Times | NYT |
| Ziff Davis | ZD |
| Daily News Plaintiff | DNP |
| Center for Investigative Reporting | CIR |
| Robot Exclusion Protocol | REP |
| Plaintiffs' Daubert Motion, ECF 2067 | Mot. |
| Natural Language Processing | NLP |

## INTRODUCTION

Explaining source-code functionality is not speculating about anyone's state of mind. Identifying other sources of text is not deciding copyright law. And economic analysis is not unreliable merely because it undermines Plaintiffs' claims. Yet Plaintiffs' Joint Daubert Motion rests on these kinds of mischaracterizations of Defendants' experts' opinions, repeatedly attacking expert opinions never offered, mischaracterizing opinions actually offered, and recasting disagreements with expert analyses and conclusions as grounds for exclusion.

As demonstrated below, Defendants' experts more than satisfy Rule 702. They are qualified to render their opinions, and their testimony will help the Court. Their opinions rest on sufficient facts and data, including extensive analyses of business documents, datasets, and source code. Those opinions reflect reliable methodologies including peer-reviewed techniques and industry-standard approaches.

Plaintiffs ignore these foundations and instead repeatedly attack Defendants' experts for not adopting Plaintiffs' preferred assumptions and conclusions. Once Rule 702 is satisfied, such disagreements are tested through cross-examination and competing evidence, not exclusion. Plaintiffs' Motion should be denied.

## ARGUMENT

### I. THE 20 MILLION CHATGPT CONVERSATION SAMPLE

Plaintiffs move to exclude OpenAI's reliance on the representative sample of 20 million ChatGPT conversations ("Merits Sample")[2] while their experts opine on the same evidence.[3] This one-sided request should be denied.

---

[2] ECF2067 (Plaintiffs' Daubert Motion, hereinafter "Mot.") 1, 5–6.
[3] News Plaintiffs relied on the Merits Sample in their expert reports and at summary judgment. *See* ECF1728(15–31).

*First*, Plaintiffs do not contend that OpenAI's experts applied an unreliable methodology or otherwise violated Rule 702. Instead, Plaintiffs seek exclusion upon baseless allegations of discovery violations addressed in a separate sanctions motion, which does not challenge the reliability of OpenAI's expert opinions and has nothing to do with Rule 702.

*Second*, Class Plaintiffs waived this exclusion argument. News Plaintiffs filed the underlying sanctions motion. Class Plaintiffs neither joined the motion nor identified any independent discovery violation or resulting prejudice justifying the "harsh remedy" of preclusion sanctions in OpenAI's defense against Class Plaintiffs' case. *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012) (evidentiary sanctions "should be imposed only in rare situations"); *see also Google Digital Advert. Antitrust Litig.*, 763 F. Supp. 3d 563, 577 (S.D.N.Y. 2025) ("In an MDL … each action is formally a separate case and the law of the case doctrine does not apply in a separate action."). Class Plaintiffs cannot obtain preclusion without establishing any basis for that relief in their own case.

*Third*, News Plaintiffs' extraordinary request for evidentiary sanctions is meritless for the reasons OpenAI articulated in opposing that motion:[4]

- OpenAI never "misrepresented" its technical capabilities for searching ChatGPT outputs. OpenAI consistently explained that searching the full history of ChatGPT outputs required retrieving and decompressing a representative sample, precisely how the Merits Sample was created.[5]

---

[4] ECF1672.
[5] *Id.* 3, 16–21. "What OpenAI told the Court was and remains true"—OpenAI could not systematically "search compressed chat records in a data warehouse of 50-billion-plus conversations with complete metadata." *Id.* 3. That OpenAI previously searched much smaller,

- Nor did OpenAI violate the Preservation Order, which did not require OpenAI to engage in "wholesale preservation" or stop all "deletion processes."[6]
- Plaintiffs have not been prejudiced. They had the opportunity to analyze the same Merits Sample as OpenAI—in addition to other conversation samples requested in discovery—and a Court-ordered sampling exercise confirmed that excluding the relatively small number of conversations that users chose not to retain had no meaningful impact on its representativeness.[7]

Indeed, News Plaintiffs' campaign for evidentiary sanctions is an aggressive attempt to hide from the Court what Plaintiffs admit is uniquely probative evidence relevant to fair use: how millions of people use ChatGPT and whether users "turned to ChatGPT as a substitute" for News Plaintiffs' reporting. *See, e.g.*, Mot. 32. As a cross-section of ChatGPT conversations, the Merits Sample provides the only representative evidence of ChatGPT usage from December 2022 through November 2024, directly addressing substitution,[8] which is why Plaintiffs want to prevent the Court from considering it. Years of discovery have "revealed no evidence whatsoever" … "that ChatGPT systematically reproduced Plaintiffs' work."[9] As a result,

---

non-representative samples of conversation data—over a very limited period with far less metadata than what Plaintiffs demanded—does not suggest otherwise.

[6] *Id.* 2, 4, 8–11, 19, 24–26. In response to the Order, OpenAI took "the unprecedented step of provisionally retaining, in a segregated legal-hold database, all consumer ChatGPT logs generated between April 14, 2025 (i.e., 30 days prior to the order) and September 26, 2025, when the order terminated," and OpenAI repeatedly explained how it was complying with the Order in public filings, discovery hearings, and confidential settlement conferences.

[7] ECF1672 (3, 12–15, 27–31).

[8] *Id.* 30.

[9] *Id.* 1,38.

Plaintiffs do not contest the evidence on the merits but instead seek a windfall by preventing OpenAI (but not Plaintiffs themselves) from relying on it.[10]

The stakes are too high for this case to turn on a manufactured discovery sanctions motion. The Court's fair-use ruling will likely carry precedential weight. Both sides have already put Merits Sample analyses before the Court on summary judgment. A ruling of such significance should rest on a complete record—including findings drawn from the Merits Sample, uniquely probative evidence of how people actually used ChatGPT during the relevant period—not narrowed by an unwarranted, one-sided evidentiary sanction.[11] Accordingly, Plaintiffs' motion relating to the Merits Sample should be denied.

## II. DR. CHRIS CALLISON-BURCH

OpenAI's expert Dr. Callison-Burch provides technical background on large language models and how OpenAI built and trained ChatGPT. He explains how those models generalize from pre-training data by learning statistical patterns and relationships in human language and how that learning—combined with post-training efforts—enables generation of new content. Plaintiffs do not challenge these technical opinions; instead, they object[12] to his use, in a few paragraphs in his 442-paragraph report, of the phrase "highly transformative" and his statement that ChatGPT creates new content that has a "further purpose and different character" than its training data.[13] Plaintiffs argue Callison-Burch's use of such terminology amounts to improper legal conclusions. But using terminology that appears in fair-use jurisprudence does not convert

[10] Plaintiffs would have their experts cherry-pick from the Merits Sample while prohibiting OpenAI's experts from offering rebuttal, but Rule 37 does not countenance this. Any sanctions must be tailored to cure prejudice, not "tilt [the playing field] too far in favor of the party seeking sanctions." *WRT Energy Sec. Litig.*, 246 F.R.D. 185, 200 (S.D.N.Y. 2007).

[11] ECF1672 at 5.

[12] Mot. 7.

[13] ECF1863(Ex.483) ¶¶9–13, 265–269, 308.

technical analysis into an impermissible legal opinion, consistent with the approach taken by Plaintiffs' technical experts.[14] Plaintiffs' request should be denied.

*First*, Callison-Burch offers technical explanations of how ChatGPT operates, not legal conclusions. His opinions "provide[] the technical background to help inform a decision [by a judge or jury] about whether" OpenAI's alleged use was transformative, *i.e.*, they inform the factfinder's assessment of fair use without purporting to decide that ultimate legal question.[15] Such opinions are permitted. *See, e.g., Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 32–33 (S.D.N.Y. 2020) (expert who "reache[d] factual conclusions accompanied by [ ] analysis on mixed questions of law" did not provide "improper legal testimony"); *Fiataruolo v. United States*, 8 F.3d 930, 942 (2d Cir. 1993) (expert testimony "offered as part of a longer exposition…was not a simple bald assertion of the law"). Callison-Burch's explanations of how models process training data and generate outputs are within his technical expertise, not opinions on whether OpenAI's conduct satisfies the legal standard for fair use.

*Second*, under Rule 704(a), "[a]n opinion is not objectionable just because it embraces an ultimate issue." Indeed, courts regularly allow expert opinions that "embrace an ultimate issue to be decided by the jury," particularly where that issue touches upon factual questions. *N.Y.C. Transit Auth. v. Express Scripts, Inc.*, 588 F. Supp. 3d 424, 445 (S.D.N.Y. 2022); *S.E.C. v. U.S. Env't, Inc.*, 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002). Here, Callison-Burch describes the technical differences between training data and model outputs and confirms that "OpenAI's LLMs are designed to learn statistical patterns and relationships in human language by generalizing from pre-training data, which serves an innovative and entirely different and new

---

[14] ECF1806(Ex.B)¶¶33–34 (providing "opinions regarding OpenAI and the four fair use factors," including that "OpenAI's use of News Plaintiffs' content was not transformative").
[15] ECF1877-13(Ex.635)10:14–20.

purpose as compared to the original works, and unlocks the door to the generation of new and creative text by the users of these models."[16] That his opinions bear on the legal inquiry into transformativeness does not render them inadmissible legal conclusions.

Plaintiffs' request is also overbroad. Even if the Court finds Callison-Burch's scattered uses of the phrases "transformative" and "further purpose and different character" are improper (they are not), such a finding would not support blanket exclusion of his opinions—all of which are grounded in technical factual discussion. At most, exclusion must be limited to any specific phrases the Court finds objectionable, leaving Callison-Burch's technical opinions intact. *See Hewitt v. Metro-N. Commuter R.R.*, 244 F. Supp. 3d 379, 394 (S.D.N.Y. 2017) (excluding only legal terminology from expert's otherwise permissible testimony).

## III. DR. SANJAY KRISHNAN

### A. Krishnan Properly Analyzed Plaintiffs' Experts' False Positives.

News Plaintiffs misunderstand Dr. Krishnan's "false positives" analysis. Krishnan, a computer science professor at the University of Chicago, did not purport to decide whether text is copyrightable or who owns it. He tested whether Plaintiffs' experts identified records that matched what they claimed as Plaintiffs' copyrighted works. His technical assessment of Plaintiffs' methodologies was proper.

Plaintiffs' experts purport to quantify copies of Plaintiffs' Asserted Works in OpenAI's training data. NYT and DNP expert Goldstein opined that Defendants "copied Plaintiffs' Asserted Works" and reported counts of alleged "***plaintiff*** content."[17] CIR and Intercept expert

[16] ECF1863(Ex.483)¶308; *see also* §VII.A (addressing models "generating outputs based on generalization from the statistical patterns the models learned during pre-training, rather than by operating as systems designed to reproduce text from its training sets").
[17] ECF1819(Ex.A)¶260 (emphasis added).

Wenger likewise reported "copies" of Reveal, Mother Jones, and Intercept asserted works in the training data.[18] And ZD expert Delorey claimed to identify millions of "copies of ***Ziff Davis copyrighted works***," and described his "Exact Match" category as showing that "[t]he complete ***copyrighted work*** is present in the training data."[19]

But Krishnan identified records classified as copies of Plaintiffs' works that instead matched third-party materials (an Associated Press article[20]), historical documents, or other content that did not support the experts' claimed classifications.[21] He characterized these mismatches as "false positives" because the results did not satisfy criteria Plaintiffs' experts purported to measure, not because he reached independent legal conclusions about copyrightability, ownership, or fair use.

For example, Krishnan identified as false positives the following training data records Goldstein classified as "copies" of NYT Asserted Works: an Associated Press article,[22] a John Ashbery poem written in 1948,[23] and President Lincoln's Second Inaugural Address.[24]

---

[18] ECF1858(Ex.A) 40.
[19] ECF1774(Ex.A) ¶¶22, 189 (emphasis added).
[20] ECF2146 Fig.A.5.
[21] ECF2180(Ex.A) ¶36(d).
[22] ECF2146 Fig.A.5.
[23] *Id*. Fig.A.7.
[24] *Id*. Fig.A.13.

**Krishnan Decl. Fig.A.13: A "Copy" of a NYT "Asserted Work" Identified by Goldstein**

**Figure A.13: Asserted Work Is an Inaugural Address by Abraham Lincoln[215]**

| Training Data Material | Asserted Work |
|---|---|
| Transcript of President Abraham Lincoln's Second Inaugural Address (1865)<br><br>Fellow Countrymen:<br><br>At this second appearing to take the oath of the presidential office, there is less occasion for an extended address than there was at the first. Then a statement, somewhat in detail, of a course to be pursued, seemed fitting and proper. Now, at the expiration of four years, during which public declarations have been constantly called forth on every point and phase of the great contest which still absorbs the attention, and engrosses the energies of the nation, little that is new could be presented. The progress of our arms, upon which all else chiefly depends, is as well known to the public as to myself; and it is, I trust, reasonably satisfactory and encouraging to all. With high hope for the future, no prediction in regard to it is ventured.<br><br>On the occasion corresponding to this four years ago, all thoughts were anxiously directed to an impending civil-war. All dreaded it—all sought to avert it. While the inaugeral address was being delivered from this place, devoted altogether to saving the Union without war, insurgent agents were in the city seeking to destroy it without war—seeking to dissolve the Union, and divide effects, by negotiation. Both parties deprecated war; but one of them would make war rather than let the nation survive; and the other would accept war rather than let it perish. And the war came.<br><br>[…]<br><br>Fondly do we hope—fervently do we pray—that this mighty scourge of war may speedily pass | A concert work using the text of President Lincoln's Second Inaugural Address was dropped from the official program of President Nixon's Second Inaugural because the Inaugural Committee reportedly considered the words embarrassing in today's context. The full text of the address delivered by President Lincoln at his Second inaugural on March 4, 1865, follows:<br>■<br>[Fellow Countrymen:] At this second appearing to take the oath of the Presidential office, there is less occasion for an extended address than there was at the first. Then a statement, somewhat in detail, of a course to be pursued, seemed fitting and proper. Now, at the expiration of four years, during which public declarations have been constantly called forth on every point and phase of the great contest which still absorbs the attention, and engrosses the to take the oath of the Presidential office, there is less occasion for an extended address than there was at the first. Then a statement, somewhat in detail, of a course to be pursued, seemed fitting and proper. Now, at the expiration of four years, during which public declarations have been constantly called forth on every point and phase of the great contest which still absorbs the attention, and engrosses the enerergies [sic] of the nation, little that is new could be presented. The progress of our arms, upon which all else chiefly depends, is as well known to the public as to myself; and it is, I trust, reasonably satisfactory and encouraging to all. With high hope for the future, no prediction in regard to it is ventured.On the occasion corresponding to this four years ago, all thoughts were anxiously directed to an impending civil-war. All dreaded it—all sought to avert it. While the inaugeral [sic] address was being delivered from this place, devoted alto[…]gether to saving the Union without war, insurgent agents were in the city seeking to destroy it without war—seeking to dissol[v]e the Union, and divide effects, by |

| Training Data Material | Asserted Work |
|---|---|
| away. Yet, if God wills that it continue, until all the wealth piled by the bond-man's two hundred and fifty years of unrequited toil shall be sunk, and until every drop of blood drawn with the lash, shall be paid by another drawn with the sword, as was said three thousand years ago, so still it must be said "the judgments of the Lord, are true and righteous altogether."<br><br>With malice toward none; with charity for all; with firmness in the right, as God gives us to see the right, let us strive on to finish the work we are in; to bind up the nation's wounds; to care for him who shall have borne the battle, and for his widow, and his orphan—to do all which may achieve and cherish a just, and a lasting peace, among ourselves, and with all nations.<br><br>[...] | negotiation. Both parties deprecated war; but one of them would make war rather than let the nation survive; and the other would accept war rather than let it perish. And the war came.<br><br>[…]<br><br>Fondly do we hope—fervently do we pray—that this mighty scourge of war this terrible war, as the woe due to those by whom the offence came, shall we discern therein any departure from those divine attributes which the believers in a Living God always ascribe to Him? Fondly do we hope—fervently do we pray—that this mighty scourge of war speedily Yet, if God wills that it continue, until all the wealth piled by the bond-man's two hundred and fifty years of unrequited toil shall be sunk, and until every drop of blood drawn with the lash, shall be paid by another drawn with the sword, as was said three thousand years ago, so still it must be said "the judgments of the Lord, are true and righteous altogether." With malice toward none; with charity for all; with firmness in the right, as God gives us to see the right, let us strive on to finish the work we are in; to bind up the nation's wounds; to care for him who shall have borne the battle, and for his widow, and his orphan —to do all which may achieve and cherish a just, and a lasting peace, among ourselves, and with all nations until every drop of blood drawn with the lash, shall be paid by another drawn with the sword, as was said three thousand years ago, so still it must be said "the judgments of the Lord, are true and righteous altogether." With malice toward none; with charity for all; with firmness in the right, as God gives us to see the right, let us strive on to finish the work we are in; to bind up the nation's wounds; to care for him who shall have borne the battle, and for his widow, and his orphan —to do all which may achieve and cherish a just, and a lasting peace, among ourselves, and with all nations. |
| **Asserted Work URL:** https://www.nytimes.com/1973/01/20/archives/lincolns-second-inaugural-address.html | |
| **Coverage Score:** 87.9% | |

Among Wenger's matches, Krishnan identified book excerpts[25] and records consisting nearly entirely of third-party content authored by the Columbia Journalism Review[26] and CNN.[27]

**<u>Krishnan Decl. Fig.B.7: "Copy" of a *Mother Jones* "Asserted Work" Identified by Wenger</u>**

[25] ECF2146 Fig.B.25.

[26] *Id*. Fig.B.5.

[27] *Id*. Fig.B.7.

**Figure B.7: Asserted Work Is Quoting from Third-Party Statements or Interviews (Example 1)[230]**

| Training Data Material | Asserted Work |
|---|---|
| Pete Buttlieg endorsed Joe Biden tonight at an event in Texas.<br>Here is CNN:<br>"When I ran for president we made it clear that the whole idea was about rallying the country together to defeat Donald Trump and to win the era for the values that we share," Buttigieg said at a campaign stop.<br>"And that was always a goal that was much bigger than me becoming president and it is in the name of that very same goal that I am delighted to endorse and support Joe Biden for President."<br>There was also this moment which was super sweet:<br>Despite the acrimony, it is common for candidates who once sparred in a primary to come together once one drops out.<br>That much was made clear Monday night when Biden told supporters that Buttigieg reminds him of his son, Beau, who died of brain cancer in 2015 at the age of 46.<br>"I don't think I've ever done this before, but (Buttigieg) reminds me of my son, Beau. I know that may not mean much to most people, but to me it's the highest compliment I can give any man or woman," Biden said.<br>"Like Beau, he has a backbone like a ramrod. I really mean this. I think about it," Biden said.<br>You can watch it here:<br>Thank you for subscribing! | Get your news from a source that's not owned and controlled by oligarchs. Sign up for the free Mother Jones Daily.<br><br>Pete Buttlieg endorsed Joe Biden tonight at an event in Texas.<br><br>Here is CNN:<br><br>"When I ran for president we made it clear that the whole idea was about rallying the country together to defeat Donald Trump and to win the era for the values that we share," Buttigieg said at a campaign stop.<br><br>"And that was always a goal that was much bigger than me becoming president and it is in the name of that very same goal that I am delighted to endorse and support Joe Biden for President."<br>There was also this moment which was super sweet:<br><br>Despite the acrimony, it is common for candidates who once sparred in a primary to come together once one drops out.<br>That much was made clear Monday night when Biden told supporters that Buttigieg reminds him of his son, Beau, who died of brain cancer in 2015 at the age of 46.<br>"I don't think I've ever done this before, but (Buttigieg) reminds me of my son, Beau. I know that may not mean much to most people, but to me it's the highest compliment I can give any man or woman," Biden said.<br>"Like Beau, he has a backbone like a ramrod. I really mean this. I think about it," Biden said.<br>You can watch it here: |
| **Asserted Work URL:** https://www.motherjones.com/2020-elections/2020/03/mayor-pete-endorses-joe-biden/ | |

| Training Data Material | Asserted Work |
|---|---|
| **TD Matches Claimed:** 3 | |
| **Jaccard Similarity:** .956-.96 | |

Among Delorey's matches, Krishnan identified a statement issued by the FCC,[28] the settlement agreement in *U.S. v. Microsoft*,[29] and the tracklist from a videogame soundtrack.[30]

**Krishnan Declaration Fig.C.27: ZD "Confirmed Match"**

[28] ECF2146 Fig.C.5.
[29] *Id*. Fig.C.9.
[30] *Id*. Fig.C.27.

**Figure C.27: Asserted Work Quotes Track List of Third-Party Videogame Soundtrack[257]**

| Training Data Material | Asserted Work |
|---|---|
| Rockstar Games and Interscope Records Announce Box Set Soundtrack Details for Grand Theft Auto: San Andreas<br>November 16, 2004 11:38 AM ET NEW YORK--(BUSINESS WIRE)--Nov. 16, 2004- 8-CD Box Set Follows the November 22nd European and November 23rd North American releases of the Grand Theft Auto: San Andreas Double CD featuring the bonus DVD, 'The Introduction' Rockstar Games, the world-renowned publishing label of Take-Two Interactive Software, Inc. (NASDAQ: TTWO), and Interscope Records, a part of Universal Music Group, proudly announce the details of the 8-CD box set soundtrack to Grand Theft Auto: San Andreas, the latest installment in the best-selling Grand Theft Auto franchise. The box set is scheduled for release on December 7th, 2004 in North America and December 6th, 2004 throughout Europe.<br>With the game set in the early 1990's, the Grand Theft Auto: San Andreas soundtrack features one of the most dynamic selections of music ever assembled. The music spans the entire FM radio dial of the West Coast during this particularly influential period in American music and culture. The 8-CD box set will feature over 80 music tracks as well as some of the satirical commercials and witty DJ dialogue emblematic of the Grand Theft Auto franchise. Each disc of the box set will feature a style of music available in Grand Theft Auto: San Andreas' many in-game radio stations - from Willie Nelson to Public Enemy, Rick James to Humble Pie, Soundgarden to James Brown, En Vogue to Black Uhuru - making this one of the most diverse and powerful collections in music history.<br>The complete track listing for the 8-CD box set is as follows:<br>CD1 - Bounce FM 1. Bounce FM Intro 2. Kool & | Rockstar Games and Interscope Records have announced that following on the heels of the double CD Grand Theft Auto: San Andreas soundtrack that will be released on November 23rd, the two partners will unleash a massive 8-CD box set musical companion to the game on December 7th, 2004. The 8-CD box set will feature over 80 music tracks as well as some of the satirical commercials and witty DJ dialogue culled from the game. Each disc of the box set will feature a different style of music as heard in Grand Theft Auto: San Andreas ' many in-game radio stations. The artists included on the set run the gamut from Willie Nelson to Public Enemy , Humble Pie to Rick James , Soundgarden to James Brown, En Vogue to Black Uhuru, thus providing fans with one of the most diverse selections of music in video game history. The complete track listing for the 8-CD box set is as follows: CD1 - Bounce FM 1. Bounce FM Intro 2. Kool & The Gang - Hollywood Swingin' 3. Rick James - Cold Blooded 4. The Gap Band - You Dropped A Bomb On Me 5. Cameo - Candy 6. Ronnie Hudson - West Coast Poplock 7. You're On Bounce FM 8. Zapp - I Can Make You Dance 9. Dazz Band - Let It Whip 10. Roy Ayers - Running Away 11. Ohio Players - Funky Worm 12. Maze - Twilight 13. That Was Bounce FM 14. Glory Hole Theme Park: Fun With Strangers 15. Eris Pump Up Shoes<br><br>[...] |

| Training Data Material | Asserted Work |
| --- | --- |
| The Gang - Hollywood Swingin' 3. Rick James - Cold Blooded 4. The Gap Band - You Dropped A Bomb On Me 5. Cameo - Candy 6. Ronnie Hudson - West Coast Poplock 7. You're On Bounce FM 8. Zapp - I Can Make You Dance 9. Dazz Band - Let It Whip 10. Roy Ayers - Running Away 11. Ohio Players - Funky Worm 12. Maze - Twilight 13. That Was Bounce FM 14. Glory Hole Theme Park: Fun With Strangers 15. Eris Pump Up Shoes<br><br>[...] | |
| **Asserted Work URL:** https://www.ign.com/articles/grand-theft-auto-san-andreas-8-cd-box-set | |
| **Jaccard Similarity**: 59.28% | |
| **Containment**: 95.24% | |

These examples illustrate the methodological problem Krishnan identified: matching on overlapping text does not necessarily establish that a "matched" record is a copy of an Asserted Work. This falls squarely within his technical expertise and the proper scope of a rebuttal opinion. He did not purport to adjudicate the copyright status of the underlying materials.

Plaintiffs' experts' information-retrieval methodologies require a qualitative definition of what is being searched for (*e.g.*, copies of Plaintiffs' Asserted Works), a quantitative heuristic for finding it, and rigorous validation that accounts for false positives and false negatives. Whether a theory is scientific depends on "its falsifiability, or refutability, or testability,"[31] and when Plaintiffs' experts claimed that their methodologies reliably retrieved "copies" of "copyrighted work," Krishnan tested whether that claim was false. The third *Daubert* reliability factor—the "known or potential rate of error" of the expert's method—***presupposes*** the possibility of a measurable error rate. *Daniels-Feasel v. Forest Pharms., Inc.*, 2021 WL 4037820, at *4 (S.D.N.Y. Sept. 3, 2021). ***None*** of Plaintiffs' experts even tried to identify their own error rates, which is contrary to the standards of information retrieval and *Daubert*'s admonition that error

[31] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993).

rates are the hallmark of good science.[32] Yet Plaintiffs seek to forbid Krishnan from testing or refuting ***their*** methods based on obvious false positives or systematic methodological errors. If Krishnan cannot opine on "false positives," Plaintiffs' experts' methods are not falsifiable and therefore not scientific. *Daubert*, 509 U.S. at 593 ("generating hypotheses and testing them to see if they can be falsified…is what distinguishes science from other fields of human inquiry"); *see also Daniels-Feasel*, 2021 WL 4037820, at *7 (excluding expert opinion in part for failing to identify error rate and employing methodology that was "virtually standardless").

**B. Krishnan's "Metadata Matching" Analysis Was Likewise Proper.**

Class Plaintiffs' expert Shan opines about the presence of Class Plaintiffs' Asserted Works on lists purporting to describe the books in Library Genesis and Books3 ("LibGen metadata" and "Books3 metadata"). Plaintiffs seek to bar Krishnan from attacking Shan's "LibGen metadata" analysis,[33] but Krishnan ***will not*** challenge Shan's findings regarding the presence of the Asserted Works in the LibGen metadata (Shan found ~30 such works). He ***will*** challenge the methodological infirmities in Shan's analyses of the Books3 metadata—something Plaintiffs are not contesting here. Should Shan or another Class Plaintiff expert offer opinions regarding other works contained in the LibGen metadata (beyond the 30) in the future, Krishnan and OpenAI reserve all rights to critique such analyses. Because Plaintiffs seek to exclude an opinion Krishnan does not offer, their motion should be denied as moot.

[32] ECF2055 (9–11, 19–20, 23–24).
[33] Mot. 8–9.

## IV. DR. BRANDI NONNECKE

### A. Nonnecke Never Opined That Shadow Library Usage Was Common Industry Practice.

Class Plaintiffs seek to exclude an opinion Dr. Nonnecke never offered: that OpenAI's use of "shadow libraries," including LibGen, was "common industry practice."[34] She only once mentions LibGen, noting that Plaintiffs' experts criticized OpenAI's use of it.[35] Rather, she addresses the broader industry practice of using "large quantities of publicly available data" to train LLMs.[36] As she opines, "responsible AI frameworks do not prescribe categorical technical or operational rules governing the use of datasets based on disputed provenance or copyright status."[37] Nothing warrants exclusion.

Class Plaintiffs likewise miss the mark in attacking her reliance on Callison-Burch.[38] Nonnecke cited Callison-Burch not for any LibGen proposition, but for his findings concerning "the use of large quantities of publicly available data" in training LLMs, which was proper.[39] "[An] expert is permitted to rely on facts, opinions, and data not of the expert's own making—including analyses performed or findings made by another expert in the case." *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015); *see also*

---

[34] Mot. 2, 16–17.
[35] ECF2066(Ex.25) ¶85.
[36] *Id*. Even if Nonnecke had offered the broader opinion Plaintiffs attribute to her, it would have been well supported. *See, e.g.*, *Bartz v. Anthropic*, 787 F.Supp.3d 1007 (N.D.Cal.2025) (detailing Anthropic's use of LibGen); *Kadrey v. Meta*, 788 F.Supp.3d 1026 (N.D.Cal.2025) (Meta's use of LibGen); ECF1863(Ex.456) 401:20–405:8 (use of online books datasets by a variety of developers); Decl. of Paven Malhotra ISO Defs. Opp. to Plaintiffs' Daubert Motion ("Malhotra Decl.") (Ex.1) 393:11–394:18 (same).
[37] ECF2066(Ex.25) ¶85.
[38] Mot. 2, 16–17.
[39] ECF2066(Ex.25) ¶85; *see also* ECF2066(Ex.8) ¶¶85–86 (noting "web-scraped text [is] an essential resource for advancing language-understanding systems" and highlighting the use of "digitized books for training [LLMs]"); ECF2066(Ex.7) ¶314 (noting he was "not aware of any mainstream LLMs that were not trained on a large dataset containing general internet data").

*Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94–95 (2d Cir. 2000). Class Plaintiffs' "without factual basis" argument thus fails.[40]

**B. Class Plaintiffs Cannot Put Responsible AI At Issue And Then Bar Rebuttal.**

Class Plaintiffs' relevance argument is another strawman. They assert that "everyone was doing it" is not a defense and thus "common industry practice" is irrelevant to infringement.[41] But Nonnecke offers no opinion on infringement and does not suggest that common industry practice establishes a defense to it. Her opinions instead address whether OpenAI's practices were consistent with responsible AI frameworks.[42] That issue is relevant because Plaintiffs' own experts criticized OpenAI's responsible AI practices.[43] Having put responsible AI frameworks at issue, Plaintiffs cannot bar Nonnecke's rebuttal.

## V. DR. NICK FEAMSTER

**A. Feamster Offers Technical Opinions, Not Legal Conclusions.**

OpenAI expert Dr. Feamster opines on the operation of OpenAI's Browse/Search functionality. He analyzed ChatGPT conversation records, source code, system prompts, post-training mitigations and testing evaluations to form his understanding and opinions regarding that functionality.[44] He explained how the Browse/Search functionality synthesizes information from multiple online sources, employs anti-regurgitation safeguards, and minimizes the information relied upon from any one source.[45] He also explained how the Browse/Search

[40] Mot. 16.
[41] *Id.* 2, 17.
[42] ECF2066(Ex.25)¶85.
[43] *See, e.g.*, ECF1825(Ex.A) ¶80; ECF1800(Ex.A) 59; ECF1806(Ex.A)¶54.
[44] *See, e.g.*, ECF1851(Ex.410) ¶¶180, 238, 331–332, Figs. 32–33; ECF1854(Ex.423) ¶¶171–172.
[45] ECF1851(Ex.410)¶334.

functionality extracts and synthesizes factual information from retrieved sources to generate responses that do not depend on reproducing any particular source's expression.[46]

News Plaintiffs do not challenge these technical opinions. Instead, as with Callison-Burch, they focus on Feamster's use of the word "transformative" to describe the operation of Browse/Search, arguing that his use of this term amounts to an improper legal conclusion.[47] But the use of a term that also appears in fair-use analysis does not, by itself, transform a technical opinion into a legal conclusion. *See supra* §II.

Feamster makes clear that he uses the word "transformative" to explain technical functionality, not offer legal opinions. He testified that he "us[ed] the word transform…to describe the operation of browse and search and what…those services do to online sources on which they rely."[48] For example, he describes the "multi-source synthesis approach" of OpenAI's Browse process as "transformative" because it "generates synthesized content of a different nature from the underlying web content, and with a further purpose."[49] That is a factual description of how the technology operates. His determinations are "couched [ ] specifically" on his expert analysis, *Fiataruolo,* 8 F.3d at 942, and the inferences he drew "would not be apparent without the benefit of experience or specialized knowledge." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 133 (S.D.N.Y. 2022).

In addition, if the Court finds Feamster's use of "transformative" impermissible, the appropriate remedy would be to limit that term, not exclude the underlying technical opinions. *Hewitt*, 244 F. Supp. 3d at 394; *see supra* §II. Feamster's conclusions that OpenAI's Browse tool

---

[46] *Id*. ¶322.
[47] Mot. 18.
[48] *See* Malhotra Decl.(Ex.2) 145:25–146:4.
[49] ECF1851(Ex.410)¶334.

retrieves and synthesizes factual information and generates new text grounded in the retrieved information constitute admissible expert testimony.

### B. Feamster Properly Consulted With OpenAI Engineers To Corroborate His Independent Technical Analysis.

News Plaintiffs also attack Feamster's reliance on conversations with OpenAI engineers to corroborate his conclusions about discrete technical functions of OpenAI's Browse tool. Plaintiffs complain these engineers were "previously undisclosed" and not deposed.[50] But experts routinely consult individuals with firsthand technical knowledge, and Feamster's opinions rest on extensive independent analysis, not merely on information from OpenAI employees.

*First*, "'it is not uncommon for experts to rely on interviews with third parties in forming their opinions.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 355 (S.D.N.Y. 2023). Nothing is untoward about Feamster's decision to verify his understanding of a few discrete technical functionalities with OpenAI engineers, especially in response to unsupported assertions by Plaintiffs' experts regarding those functionalities.

*Second*, Plaintiffs' complaint that the engineers were not disclosed under Rule 26(a) or deposed does not warrant excluding Feamster's opinions. Nothing restricts an expert witness to consulting only individuals identified in a Rule 26 disclosure or previously deposed, and Plaintiffs cite no case imposing such a restriction. Indeed, "expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions." *Better Holdco*, 666 F. Supp. 3d at 363 (rejecting objection to expert who interviewed employees not identified in Rule 26 disclosures) (quoting

[50] Mot. 19.

*United States v. Dukagjini*, 326 F.3d 45, 57 (2d Cir. 2003)). It is standard practice for an expert analyzing complex technology to consult engineers who helped develop that technology.[51] Nor were Plaintiffs prejudiced. These engineers were identified in OpenAI discovery documents, including documents Plaintiffs used as deposition exhibits regarding Browse.[52] Plaintiffs' decision not to depose the engineers or question OpenAI's Browse corporate designee about these issues does not render Feamster's independently supported technical opinions inadmissible. Feamster properly corroborated his analysis of OpenAI's Browse functionality by confirming a few technical specifics with employees who worked on it. *See Better Holdco*, 666 F. Supp. 3d at 363.

*Finally*, Plaintiffs' claim that Feamster "relied on these conversations" for "conclusory opinion[s]" mischaracterizes both his methodology and the record.[53] Feamster conducted a multifaceted analysis drawing on his expertise in internet technologies to explain the design and function of OpenAI's RAG products. He formulated his opinions based on his review of, among other things, documents and data produced in discovery (including source code), public-facing webpages, and fact witness depositions. His brief conversations with OpenAI engineers supplemented and corroborated that independent analysis; they did not replace it. *Better Holdco,* 666 F. Supp. 3d at 364.

For example, Feamster cites conversations with two OpenAI researchers in his server log analysis, where he opines that remaining requests from OpenAI bots might reflect unintentional

[51] Plaintiffs' objection is especially unpersuasive given their own expert, Malackowski, similarly relied on conversations with ZD employees who were neither disclosed nor deposed. Malhotra Decl.(Ex.3) 5–6, 85, 88, 95.
[52] Plaintiffs also questioned at least 13 OpenAI employees on Browse functionality and explored Feamster's conversations with them during his deposition.
[53] Mot. 19–20.

software bugs or testing activity.[54] In reaching this conclusion, Feamster reviewed OpenAI's source code, which he found to be consistent with the REP, and server log data, which showed bot behavior that was largely consistent with the REP.[55] Thus, Feamster's explanation for the remaining requests was grounded in his own examination of source code and observed bot behavior, with discrete employee conversations providing additional confirmation of his technical analysis. Feamster was not merely a "conduit" for OpenAI talking points or the employees he consulted. While Feamster may have "gleaned…specific pieces of information after meeting with [ ] witnesses…the opinion is entirely his own." *Better Holdco*, 666 F. Supp. 3d at 363; *see also Member Servs., Inc. v. Sec. Mut. Life Ins. Co. of N.Y.*, 2010 WL 3907489, at *23 (N.D.N.Y. Sep. 30, 2010).

News Plaintiffs mischaracterize the evidentiary foundation for Feamster's opinions by isolating individual citations from the surrounding analysis. During Feamster's deposition, Plaintiffs' counsel pointed to certain sentences in his report and asserted that the only cited support for them was conversations with OpenAI employees.[56] Feamster explained why this was incorrect, observing that the sentences were surrounded by additional sources in the paragraph supporting the same point.[57] Plaintiffs' argument that his opinion lacks independent foundation ignores the other evidence he expressly cited. And while Plaintiffs also complain about the absence of notes from these interviews, that alone is not grounds for exclusion "[w]here the substance of the interviews is incorporated into the body of the report[.]" *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2011 WL 6288415, at *11 (S.D.N.Y. Dec. 15, 2011).

---

[54] ECF1854(Ex.423) ¶¶86, 100.
[55] *Id.*¶¶85, 100, 186–195; ECF1856(Ex.446) ¶¶58–59.
[56] *See, e.g.,* Malhotra Decl.(Ex.2) 38:17–39:3.
[57] *Id.* 39:20–41:2. Feamster also testified that these conversations "were quite short, in some cases." *Id.* 34:2–12.

Feamster confirmed he documented the substance of his discussions in his reports.[58] Rule 702 does not require Feamster to disregard the knowledge of engineers who developed the system he evaluated, particularly where he independently examined the underlying technical evidence and reached his own conclusions.

### C. Plaintiffs' Technical Criticisms Do Not Undermine The Reliability Of Feamster's Analysis.

Finally, News Plaintiffs argue that Feamster's scripts in rebuttal to Stricchiola's server-log analysis "contradict the methodology set forth in his report[.]"[59] But the implementation choices Plaintiffs challenge neither materially affect his conclusions nor contradict his methodology.

Plaintiffs' objections raise two technical issues: (1) which status code responses indicate that a robots.txt file is effectively "unavailable" to a crawler under the REP, and (2) how the 24-hour caching window contemplated by the REP is implemented. Feamster properly grounds his methodology and analysis of both issues.[60] Plaintiffs do not establish that resolving either dispute in their favor would materially alter his findings. Their objections concern implementation and weight, not grounds for exclusion. *United States v. Morgan*, 53 F. Supp. 3d 732, 741 (S.D.N.Y. 2014) ("the possibility that a different conclusion could be drawn … does not undercut the reliability of the conclusion that was drawn, as long as the expert has 'good grounds' for the chosen interpretation.").

Regarding the first issue, Plaintiffs' assertion that Feamster applied status codes incorrectly is simply wrong. While the REP identifies 400–499 as ***examples*** of unavailable status

[58] *Id.* 36:23–37:3 ("The documentation for [the substance of discussions with OpenAI employees] is contained in my reports.").
[59] Mot. 21–22.
[60] ECF1854(Ex.423)¶59; ECF1856(Ex.446)¶42.

codes, it does not strictly prescribe which codes indicate that a resource is unavailable. Additional status codes may indicate a resource is unavailable under the REP where the requested file is not successfully retrieved.[61] Feamster reasonably treats redirect responses (300–399 status codes) as fetch failures because Plaintiffs' server logs do not establish that the requested robots.txt file was ultimately retrieved. Furthermore, Feamster correctly does ***not*** classify the status codes in the 500–599 range as unavailable, as those are described in the REP as "unreachable" due to server and network errors.[62] And even if Feamster adjusted his scripts to only consider 400–499 (excluding 429) status codes as unavailable, as Stricchiola proposes,[63] this small modification would not meaningfully change his conclusions. *See United States v. Leech*, 2026 WL 1113346, at *25 (S.D.N.Y. Apr. 24, 2026) ("slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible").

Regarding the second issue of 24-hour robots.txt caching, News Plaintiffs allege that Feamster "rounded down the timestamp" of each fetch, which resulted in filtering out requests made "*more than* 24 hours" after a failed fetch.[64] But Plaintiffs' annotations of the purported rounding issue only show the *beginning* of each 24-hour time period and ignore that Feamster's

[61] ECF1854(Ex.423)¶47.

[62] Plaintiffs incorrectly claim that Feamster considers "all requests to robots.txt files that return status codes except 200, 500 and 502" as "fetch failure[s]." While Plaintiffs cite a portion of Feamster's code listing status codes 200, 500 and 502, Ex. 32 at p.9, Plaintiffs fail to mention that [redacted] *See* Malhotra Decl.(Ex.4). By explicitly identifying the only 500-range codes that actually occur in the data, Feamster's code correctly accounts for the entire 500–599 range.

[63] Stricchiola wrongly declines to treat 301 status codes as unsuccessful fetches. A 301 code means the requested resource was not served at the requested address, and Plaintiffs' data does not establish that the robots.txt file was ever successfully retrieved. Further, Plaintiffs' reliance on Stricchiola's "overcount[]" calculations is misleading because they are the result of Stricchiola's modified scripts which go beyond the annotations in Ex. 32 highlighted in Plaintiffs' motion.

[64] Mot. 22.

scripts compute an exact 24-hour time period.[65] While this approach shifts the beginning of the 24-hour window, it does not "inflate" the period beyond 24 hours, as Plaintiffs claim. Rather, the scripts set the beginning of the 24-hour window to the start of the hour in which the fetch failure occurred, but compute an exact 24-hour period from that point. In any event, Plaintiffs [redacted].[66] This does not impact Feamster's core opinion that Plaintiffs' logs show behavior consistent with the REP rather than systematic disregard of robots.txt.[67] *See Leech*, 2026 WL 1113346, at *26 (holding that disputes over the time window chosen for the expert's analysis were "quintessentially a factual dispute that may be resolved by the fact finder.").

## VI. DR. TAYLOR BERG-KIRKPATRICK

### A. Berg-Kirkpatrick Reliably Applied Widely Accepted NLP Principles.

OpenAI's LLMs are not designed to "regurgitate" their training data and incorporate safeguards designed to prevent regurgitation. Berg-Kirkpatrick performed extensive analyses proving this, including a study examining user chats from the Merits Sample. His findings were consistent with Plaintiffs' own identified regurgitations in fewer than 0.0001% of sampled conversations.[68] Yet News Plaintiffs attack the filtering Berg-Kirkpatrick performed on instances where there was some overlap between the Asserted Works and the Merits Sample. News Plaintiffs object to his use of third-party databases and his use of manual matching.

[65] Mot. Ex.32; Malhotra Decl.(Ex.5) (annotated to illustrate 24-hour window calculation).
[66] Mot. 22; ECF1798(Ex.D) ¶¶35, 37, 40–41.
[67] ECF1856(Ex.446) ¶27.
[68] *See* ECF1749 at 4.

Neither objection warrants exclusion. Berg-Kirkpatrick's methodology employed established natural language processing ("NLP") techniques to distinguish potentially relevant text matches from common quotations, boilerplate, and other third-party material. Plaintiffs' experts employed substantially similar techniques in their "regurgitation" analyses.[69] Plaintiffs' challenge is merely a pretext for their dissatisfaction with how few regurgitations Berg-Kirkpatrick and Plaintiffs' own experts found in the sample.[70]

**1. Using Third-Party Datasets For Filtering Is Accepted And Reliable.**

To perform his regurgitation study, Berg-Kirkpatrick first identified 25-word matches that appeared in both a ChatGPT output and a News Plaintiffs' Asserted Work. Next, he compared those matches against text from publicly available, third-party datasets to identify matches to those sources. More specifically, he applied automated filters to identify and exclude boilerplate sequences and other third-party text, including religious and historical texts, famous quotes, and public domain content.[71]

Automated classification methods like those Berg-Kirkpatrick applied are generally accepted in the NLP research community; such automation is necessary to conduct efficient text-matching at scale where identified text must be checked against an enormous corpus of non-target results. *See, e.g.*, Piktus et al., *The ROOTS Search Tool: Data Transparency for LLMs* (2023), Proceedings of the 61st Annual Meeting of the Association for Computational Linguistics, 304–314. Courts have held that an expert's methods are reliable where "others in his

---

[69] ECF1858(Ex.A) 105; Malhotra Decl.(Ex.6) ¶19; Malhotra Decl.(Ex.7) 306:19–307:7, 310:7–12.
[70] Mot. 2.
[71] ECF1750(¶19).

field, conducting a similar analysis, would have proceeded in the same way[.]" *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 457 (E.D.N.Y. 2007).

Berg-Kirkpatrick's application of this automated filtering process is reliable because his datasets are commonly used by NLP researchers in similar contexts, including the Goodreads Quotes,[72] the WikiQuote,[73] and the Quotes-500K datasets.[74] As Berg-Kirkpatrick explained, the quote datasets he used "are kind of the bread and butter of [his] academic field[.]"[75] His selection of these datasets thus reflected established research practices, not an ad hoc methodology devised for litigation. Rule 703 countenances an expert's reliance on data that others "in the particular field would reasonably rely on…in forming an opinion on the subject[.]" Contrary to Plaintiffs' assertion, Berg-Kirkpatrick validated the datasets before using them. He "looked at…subsamples of this data" and was "familiar with many of these datasets…worked with them and [knew] their contents."[76] Nothing more is required under Rules 702 and 703.

Plaintiffs' experts did not identify any errors in Berg-Kirkpatrick's application of filtering methodology.[77] Indeed, they used similar methodologies, further confirming that Berg-

---

[72] *See, e.g.,* Golan et al., *Cite and Seek: Automated Literary Reference Mining at Corpus Scale* (2026) IEEE Access (using Goodreads Quotes Dataset to identify sources of referenced text).
[73] Chu-Carroll et al., *Textual Resource Acquisition and Engineering* (2012) IBM Journal of Research and Development (using WikiQuote to identify the origin of quotes).
[74] Swann et al., *Bi-layer Deep Learning with Neural Networks and Large Language Models for Cognitive Biometrics* (2025) IEEE Transactions on Emerging Topics in Computing (using Quotes-500K as a reference collection of "other author" text).
[75] Malhotra Decl.(Ex.8) 177:11–14.
[76] *Id*. 177:14–25. *See also id*. 174:8–16 ("I know these datasets from my prior work in academia…And what I know about them is that they're very large, and that predominantly they contain quotes by public figures and other items that are not a part of the plaintiffs asserted works.").
[77] Wenger wholesale adopted Berg-Kirkpatrick's methodology and script into her own analysis. ECF1858(Ex.D)47–49.

Kirkpatrick's approach to filtering texts is widely accepted.[78] His approach cannot be inherently unreliable where Plaintiffs adopted similar techniques.

*Finally*, that "[the] datasets ***were not*** solely third-party content" does not change this result. Plaintiffs do not quantify the incidence with which their content appears in the third-party datasets. In any event, "[i]mperfect data [ ] goes to the weight of the expert's opinion, not its admissibility, and is not grounds for exclusion." *Molly C. v. Oxford Health Ins., Inc.*, 2024 WL 4850813, at *12–13 (S.D.N.Y. Nov. 21, 2024). As Berg-Kirkpatrick explained, these datasets are "very large" and "the point [of] large-scale data analysis is that such corner cases [ ] don't actually affect the validity of the results."[79] When Plaintiffs' experts noted very limited examples of Plaintiffs' content in the datasets used for filtering, Berg-Kirkpatrick analyzed these claims and identified only two additional possible regurgitations of 25-word excerpts of News Plaintiffs' Asserted Works, which did not impact his overall conclusions.[80] Such a "small modification to a reliable method will not render an opinion" inadmissible. *Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009).

---

[78] All five experts who studied regurgitation by OpenAI's models (Berg-Kirkpatrick for OpenAI and Shan, Wenger, Goldstein, and Delorey for Plaintiffs) acknowledged that Plaintiffs' works contain excerpts of third-party texts, and subsequently the need to differentiate between regurgitation of "the journalist's original prose" and text not "attributable to [Plaintiffs] as original work[.]" ECF1774(Ex.A) ¶¶121, 139. Shan and Berg-Kirkpatrick assembled expert-selected datasets of text not authored by Plaintiffs and filtered possible "regurgitations" that appeared in those datasets. Malhotra Decl.(Ex.6) ¶20; ECF1863(Ex.461) ¶198. Wenger, Berg-Kirkpatrick, Shan and Delorey manually classified possible "regurgitations" as original to the Plaintiffs or third-party texts. ECF1858(Ex.D) 48; ECF1863(Ex.461) ¶202; Malhotra Decl. (Ex.7) 306:19–307:7, 310:7–12.

[79] Malhotra Decl.(Ex.8) 174:8–23.

[80] ECF1750 (¶27).

### 2. Berg-Kirkpatrick's Manual Filtering Does Not Constitute Legal Testimony.

Plaintiffs' argument that Buboerg-Kirkpatrick's manual filtering of text matches amounts to "testimony on issues of law" fares no better.[81] Berg-Kirkpatrick and his annotation team "identified and filtered out many instances of text not authored by Plaintiffs, including from religious and legal texts, famous speeches, and non-news media content like books, podcasts, and movies."[82] This data provenance exercise is well within Berg-Kirkpatrick's NLP expertise. The purpose of Berg-Kirkpatrick's manual filtering was to "determine whether there existed a separate source for the matched 25-grams in the output."[83] Through this process, Berg-Kirkpatrick factually determined whether the matched text was unique to an Asserted Work or whether the text was available elsewhere. *See Aluminum*, 336 F.R.D. at 32–33 (expert who "reache[d] factual conclusions" did not provide "improper legal testimony"). It is standard methodological practice in LLM regurgitation analysis to classify text matches into distinct categories, distinguishing "common idioms" and "verbatim quotations" from "distinctive" regurgitations of target text. *See* Aerni et al., *Measuring Non-Adversarial Reproduction of Training Data in Large Language Models*, Int'l Conf. on Learning Representations (2025). For example, without conducting legal analysis, an NLP researcher could review and confirm that the matched text Plaintiffs attribute to a NYT article (Mot. 25) is copied verbatim from speeches by American agriculturalist Norman Borlaug before the article was published.[84]

---

[81] Mot. 25.
[82] ECF1750 (¶20).
[83] *Id*. ¶20.
[84] *See* Malhotra Decl.(Ex.10) (containing message ID B2df9b81066ac31fc5ea7abf7b7d9696, labeled "not regurgitation" at Ex.53 row 55). The NYT article Plaintiffs refer to in their Motion appears in the February NYT 1006 summary, but the article does not appear in the later iterations of NYT 1006 summaries.

Plaintiffs' conclusory attempt to recast Berg-Kirkpatrick's manual filtering as a legal determination fails, as he does not come close to "tell[ing] the jury what legal conclusion to draw from certain data" or "force the facts into a legal mold[.]" *Capri Sun GmbH*, 595 F. Supp. 3d at 133.

**B. Berg-Kirkpatrick's "600 Annotation" Study Is Reliable.**

ZD's expert Delorey tested OpenAI's models by supplying them with prompts and then examining the outputs for alleged reproductions of ZD's Asserted Works. Berg-Kirkpatrick and his annotation team classified a sample of those alleged reproductions into six categories and found at least 74% of the 1.4 million alleged reproductions were actually "text that was not authored by the Plaintiffs but nevertheless was included in both ChatGPT's outputs and the Plaintiffs' Asserted Works."[85] ZD attacks these findings as biased, lacking any coherent methodology, and dependent upon a non-representative sample.[86] Each of these attacks fails. *See AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763, at *26 (S.D.N.Y. Mar. 19, 2019) (denying exclusion motion where movant failed to show assumptions were unsound or data were unrepresentative); *Molly C.*, 2024 WL 4850813, at *13–14 (expert opinion need not be based on "the best possible evidence" but "upon good grounds, based on what is known").

**1. Berg-Kirkpatrick's Study Was Not Biased.**

ZD asserts that Berg-Kirkpatrick's study was biased because it "did not permit the annotators to categorize any output as a 'match' or a 'copy' of a ZD Asserted Work."[87] Not so.

---

[85] ECF1885(Ex.804) ¶148.
[86] Mot. 26–27.
[87] *Id*. It is unclear why Plaintiffs expect Berg-Kirkpatrick to apply "match" as a category when Delorey avoided "match" when describing results from his "Model Inspection Analysis." *See* Malhotra Decl.(Ex.7) 254:15–23 ("Q. …Is 'match' the right word? … A. I used 'reproduction' usually…").

One annotator category was "Fragment," which captured "fragmented overlapping text that matches text from Plaintiffs' Asserted Works."[88] In other words, annotators could classify text that "match[ed]...a Ziff Davis Asserted Work."[89] And, contrary to Plaintiffs' claims, Berg-Kirkpatrick conservatively ***did not*** assert that "Fragment" represented "text that was not authored by the Plaintiffs."[90] Plaintiffs disregard the "Fragment" category because it does not conform to their narrative, but that does not change the fact that Berg-Kirkpatrick's framework did allow annotators to identify text matching Plaintiffs' Asserted Works. *Cf. Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *6 (S.D.N.Y. Feb. 11, 2022) (rejecting argument that expert's survey was "biased and lacked objectivity" and finding expert adequately tested relevant proposition notwithstanding bias accusations).

**2. Berg-Kirkpatrick Properly Articulated His Methodology.**

ZD next asserts that Berg-Kirkpatrick failed to apply any coherent methodology.[91] Not so. His methodology was set out in detail in his reports and the supporting materials produced in discovery. He manually reviewed a representative random sample of 600 outputs that Delorey alleged were "reproductions." In composing the sample, he chose 200 outputs uniformly at

---

[88] ECF1885(Ex.804)¶160. This definition is similar to Delorey's own belated recharacterization of his results: "By the technical definition of the things that I measured, there is overlapping text between the record on the right and the record on the left." Malhotra Decl.(Ex.7)125:12–19 ("So I've defined a term 'reproduction' in my report which is defined as an OpenAI model output which matches a Ziff Davis asserted work at one of these three [textual similarity] thresholds."). *See also id*. 269:1–8.

[89] Mot. 26 as "Fragment[s]."

[90] *Compare* Mot. 27 with ECF1885(Ex.804) (Table 19) (describing "Fragment" category as "Short fragments of text that are incoherent without context and extent of text matching is unclear").

[91] *Id*.

random from each of three categories classified by Delorey.[92] Berg-Kirkpatrick had to identify the alleged overlapping text before classifying the alleged matching text because Delorey failed to provide the alleged overlapping text.[93] Once Berg-Kirkpatrick located the overlapping passages, annotators he supervised categorized all 600 outputs into one of six groups.[94] Berg-Kirkpatrick summarized his methodology, categorization and results in his report, and based on the classifications, he concluded that the majority of Delorey's outputs contained de minimis amounts of text matching ZD's Asserted Works or included text that was not authored by ZD.

Brushing aside this methodology identified in the expert reports, working papers, source code, and supporting material OpenAI produced, ZD latches onto Berg-Kirkpatrick's deposition testimony and isolated instances where he could not recall from memory all the precise details regarding the steps taken in conducting the "600 Annotations" study. Berg-Kirkpatrick sat for two full days of deposition, and the line of questioning regarding the "600 Annotations" study came in the last 30 minutes of 11+ hours on the record. ZD repeatedly instructed Berg-Kirkpatrick to answer without consulting his reports and even introduced an exhibit that it prohibited him from reviewing before answering their question. *See, e.g.,* Malhotra Decl. Ex.9 at 493:4–8 (emphasis added) ("Q. To the best of your knowledge, ***without consulting your report***, are you aware of any studies that you did with respect to the base models that Mr. Delorey looked at for his reproduction analysis?"); *id.* 495:7–12 (emphasis added) ("A. I understand part of your question to be an imperative that I must not look at my report; is that correct? Q. For

---

[92] The three categories are (1) "Articles with Reproduction," (2) "Rouge-L > 0.5," and (3) "Rouge-L > 0.8." The methodology is detailed in Appendix C, §A of Dr. Berg-Kirkpatrick's rebuttal report.
[93] The methodology is provided in Appendix C, §B of Berg-Kirkpatrick's rebuttal report.
[94] The categories were third-party content, overlap involving less than 10-grams, information about products or events, titles, fragments, and not locatable.

purposes of this question, ***I've asked you not to look at your report***."). Plaintiffs' claim that Berg-Kirkpatrick "does not know" and "could not explain" his analysis under these circumstances unreasonably treats the deposition as a memory test, which it is not. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 227 n.45 (S.D.N.Y. 2010) ("[L]apses in memory [during deposition] are traditionally challenged through cross-examination and do not render [expert's] opinion testimony unreliable.").

Plaintiffs' accusation that Berg-Kirkpatrick did not know "what instructions were provided to the annotators" is also wrong.[95] He testified that he provided verbal instructions and discussed the classification descriptions with the annotators before they performed the classification.[96] Even if Berg-Kirkpatrick did not perfectly recall certain details of his analysis at his deposition, that does not undermine its reliability. *Suboxone Antitrust Litig.*, 2020 WL 6887885, at *25 (E.D. Pa. Nov. 24, 2020) (expert's "brief lapse of recall during deposition" did not warrant exclusion, particularly considering expert's report was over 100 pages and included extensive reference to study).[97] The relevant question under Rule 702 is whether Berg-Kirkpatrick reliably applied an identifiable methodology, not whether he could recite every

[95] Mot. 27.

[96] Malhotra Decl.(Ex.9) 453:11–17, 456:9–11, 464:4–6.

[97] Plaintiffs' authorities are distinguishable. In *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, 571 F.Supp.3d 106 (S.D.N.Y. 2021), the excluded expert "did not substantially participate in the preparation of his report[,]" could not identify anything he wrote or what his assistants did, and did not know the source of the key assumption on which he relied. *Id.* 115–17. Further, the court there agreed that "merely failing to recall who wrote what" is not grounds for exclusion, and reaffirmed that an expert may rely on work he "supervised, directed, or participated in[.]" *Id.* 115. The court in *Micone v. Sarene Servs., Inc.*, 2025 WL 736638 (E.D.N.Y. Mar. 8, 2025) likewise excluded only opinions for which the expert could not recall ***any*** document on which she relied. *Id.* at *30. By contrast, here Berg-Kirkpatrick personally designed the annotation study, instructed annotators under his direction, documented the study's design and results, and testified accordingly at his deposition.

implementation detail from memory. His report, supporting materials, and testimony establish that he did.

### 3. Berg-Kirkpatrick Used A Representative Sample For His Study.

Finally, ZD's suggestion that Berg-Kirkpatrick's 600 annotation sample ***may*** be unrepresentative is unfounded. ZD provides no evidence that the sample Berg-Kirkpatrick used is not a representative random sample. This alone is grounds for denial. *AU New Haven, LLC*, 2019 WL 1254763, at *26 (declining to exclude expert analysis where movant did not show "[expert's] sample [was] in fact unrepresentative").

Nor did Berg-Kirkpatrick ask ZD to "rel[y] solely on [his] *ipse dixit*" regarding the random sample.[98] He provided ZD with (1) the script he used to randomly sample from Delorey's data,[99] (2) a detailed description of the sampling procedure,[100] and (3) information needed to identify the 600 randomly selected "reproductions" in Delorey's complete data.[101] ZD had access to everything needed to verify this as a representative random sample, particularly since it is a subsample of its own expert's data.

Rather than identify a defect in the sampling procedure or demonstrate that it produced unreliable results, ZD merely speculates that the sample might be unrepresentative. Such speculation does not establish a failure to satisfy Rule 702. Disputes about errors in methodology and sampling "go to weight rather than admissibility." *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 326 (S.D.N.Y. 2019); *see also Molly C.,* 2024 WL 4850813, at *12.

---

[98] Mot. 28.
[99] Malhotra Decl.(Ex.11).
[100] ECF1885(Ex.804) ¶¶304–309.
[101] Malhotra Decl.(Ex.12); *see also* ECF1774(Ex.C) ¶86.

## VII. MS. BARBARA FREDERIKSEN-CROSS

### A. Frederiksen-Cross Is Fully Qualified To Render Her Technical Opinions.

Ms. Frederiksen-Cross does not hold herself out as an expert in LLM training or model behavior, nor do her opinions require that expertise. Instead, she draws on 39 years of unchallenged experience analyzing source code and relies on OpenAI's witnesses and designated LLM experts (where needed) to inform her technical opinions. What Plaintiffs call opinions on "LLM training," "model behavior," and "memorization" in fact concern the technical design, operation, and results of specific code. These source-code opinions are not beyond Frederiksen-Cross's expertise merely because the software operates within an LLM training process.

*"LLM Training":* Frederiksen-Cross opined on OpenAI's text-extractor software, properly relying on factual documents, witness testimony, and the opinions of Callison-Burch, OpenAI's expert on LLM training. Callison-Burch described the kind of data required to train LLMs.[102] OpenAI documentation and testimony likewise explain that OpenAI sought human-authored language data for training, whereas repetitive boilerplate was unhelpful.[103] Frederiksen-Cross then applied her expertise analyzing source code and confirmed that, consistent with the training-data objectives described by Callison-Burch and the factual evidence, OpenAI's software implemented the functionality of extracting language data and minimizing boilerplate.[104] *See Gussack Realty Co.*, 224 F.3d at 94–95 (expert "may rely on data that she did not personally collect"); *M/V MSC Flaminia*, 2017 WL 3208598, at *22 (S.D.N.Y.

---

[102] ECF1918-3(Ex.1171) ¶43.
[103] *Id.* ¶¶43–46 & nn.14–19.
[104] *Id.* ¶¶70–149.

July 28, 2017) ("well established that an expert may rely upon another expert to form an opinion").

*"Model Behavior":* Frederiksen-Cross explained how OpenAI's software implements a Bloom filter during training to "mask"—*i.e.*, not train on—frequently appearing token spans. She analyzed and explained the source-code file implementing logic that defines configurable n-gram and frequency thresholds, and she cited internal documents confirming the settings applied to GPT-4.[105] Her "masking" opinion—identifying the code's inputs, thresholds, and resulting treatment of matching tokens—is analysis she is fully qualified to perform. Plaintiffs' characterization of that analysis as an opinion about model behavior does not change its technical foundation: she examined the code implementing the masking functionality and explained its operation.

*"Memorization":* Frederiksen-Cross analyzed the code file "[redacted]" that implements the Bloom filter's "pruning" logic and properly opined that her code analysis does not support Goldstein's characterization of pruning as a "memorization study." She explained that the code operates on token spans rather than articles and does not define "memorization" or correlate any probability threshold to memorization.[106] That is a technical assessment of what the code measures and implements, not an independent opinion about whether OpenAI's models memorize training data.

**B. Frederiksen-Cross Does Not Opine On Mental State.**

Plaintiffs concede Frederiksen-Cross's source-code expertise enables her to opine on the "design and functionality" of OpenAI's text extractors, including how they were "optimized" for

---

[105] *Id.* ¶¶155–57 & nn.121–25.
[106] ECF1918-3(Ex.1171) ¶¶181–87.

certain functions and not for others. Mot. 35–36. She provided precisely that in responding to Plaintiffs' experts' opinions on OpenAI's text extraction.[107] She properly opined on the source-code design of OpenAI's text extractors, not on any individual's subjective intent when developing them. *See Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 413–414 (S.D.N.Y. 2011) (testimony regarding product design and functionality does not amount to impermissible opinion regarding state of mind).

As noted, Frederiksen-Cross analyzed OpenAI's code and explained its consistency with Callison-Burch's opinions and OpenAI documents and testimony regarding the kinds of data that are useful for training LLMs.[108] Based on her code analysis, she opined that "[t]o the extent OpenAI's text extractors bypass purported CMI, that result is incidental to and not the central purpose and function of those text extractors."[109] Her explanation of the text extractors' "central purpose and function" reflects her analysis of source-code design and functionality and is equivalent to opining that the text extractors are "optimized" for extracting natural-language text. *See Arista*, 784 F. Supp. 2d at 414. Her analysis showed that the code identifies and retains natural-language text useful for machine learning and not repetitive boilerplate, navigation elements, and link-dense material. She confirmed the code does not identify and remove content solely because it is CMI.[110] Her testing also confirmed the extractors sometimes retained CMI, further showing that CMI removal is not their defining function.[111] She cited corroborating

---

[107] ECF1774(Ex.A) ¶¶231–53; ECF1819(Ex.A) ¶¶536–43; ECF1858(Ex.A) §IV.
[108] ECF1918-3(Ex.1171) ¶¶39–47, 66–149.
[109] *Id.* ¶28.
[110] ECF1918-3(Ex.1171) ¶¶70–137.
[111] *Id.* ¶¶138–49.

testimony and interviews to inform the context for OpenAI's code design.[112] None of this is an improper opinion about mental state.

## VIII. DR. AVI GOLDFARB

### A. Goldfarb Is Qualified To Evaluate The Economic Significance Of Data Access And Collaboration Agreements.

News Plaintiffs assert that Dr. Goldfarb is not qualified to opine on the economic significance of data access and collaboration agreements entered into by OpenAI and others because he is "not a licensing expert," lacks expertise "in reading legal agreements," and is not an accounting expert.[113] But Plaintiffs do not challenge Goldfarb's qualifications as an economist, nor could they. Instead, they misconstrue his assignment. Goldfarb does not interpret the agreements as a lawyer or value intellectual property as an accountant. He evaluates what the agreements reveal about the existence and economic characteristics of a supposed licensing market Plaintiffs claim OpenAI has harmed. That inquiry falls squarely within his economic expertise.

Contrary to Plaintiffs' mischaracterizations, Goldfarb does not offer opinions on "intellectual property valuation," "accounting," or the legal implications of provisions in OpenAI's agreements.[114] He opines about the existence of an ***economic market*** and whether Plaintiffs are positioned to participate in such a market.[115] Analyzing whether a market exists is an economic question well within the province of an economist. That he examined contracts—the very contracts Plaintiffs contend support the existence of a market—is of no moment.

---

[112] *Id.* ¶¶56–70, 115, 121, 127, 131, 133, 136–37.
[113] Mot. 29–31.
[114] *Contra* Mot. 29–31.
[115] ECF1863-10(Ex.467) §VII.

*First*, it is standard fare for economists to investigate the existence of markets and, as Goldfarb testified, that inquiry involves "investigat[ing] the kinds of contracting activity happening in that domain[.]"[116] Critically, News Plaintiffs ignore that Goldfarb has the expertise to opine about the economic significance of contracting activity as it relates to the conditions and existence of a market.[117]

*Second*, Plaintiffs' argument, if accepted, would improperly exclude standard economic analysis and opinions whenever the underlying market evidence includes contracts. Plaintiffs cite (and OpenAI is aware of) no case disallowing an economist's opinion on the existence or non-existence of a market simply because contracts were part of the evidence that the expert needed to consider.

**B. Goldfarb's Traffic And Engagement Data Do Not Contain Sample Bias.**

Plaintiffs' attacks on Goldfarb's traffic and engagement analyses rest on hypothetical concerns about sample construction that he expressly tested and found did not alter his conclusions. Plaintiffs identify no evidence that the challenged sample definitions materially biased his results, and any disagreement can be addressed on cross-examination.

*First*, Plaintiffs' claim of "bias" is a difference of opinion (a mistaken one), not a methodological error. Plaintiffs allege that, in analyzing consumer behavior using data from third-party provider Comscore, Goldfarb excluded two categories of users.[118] He addressed these criticisms. His Reply Report tested each sample composition concern that Plaintiffs' experts

[116] ECF1846-26(Ex.377) 322:9–22.
[117] *Id*. 322:24–323:6.
[118] Users who "regularly visit DNP, then used ChatGPT in a single month and stopped visiting DNP and started using ChatGPT" and users who "regularly visit DNP websites on a desktop computer, then started using ChatGPT on a mobile device regularly." Mot. 32.

raised in their rebuttal reports and found that none changed his conclusions.[119] Plaintiffs' claim of sample bias has thus been tested against the data and did not change the results.

*Second*, neither of Plaintiffs' hypothetical examples supports excluding Goldfarb's analysis of traffic and engagement data. Plaintiffs' first hypothetical—a relevant user who regularly visited a DNP property, then stopped visiting DNP after using ChatGPT in a single month and started using ChatGPT instead—is self-contradictory.[120] Such a user would be included in Goldfarb's sample because of their continued use of ChatGPT after no longer visiting a DNP property. Plaintiffs' second hypothetical—a relevant user who visits a DNP property on a desktop device but then switches to instead using ChatGPT on a mobile device—fares no better. Goldfarb analyzed both desktop and mobile data from Comscore, and Plaintiffs' experts offer no evidence that this hypothetical group of users is common, material, or directionally capable of changing Goldfarb's conclusions.[121]

### C. News Plaintiffs' Critique Of Goldfarb's Trend Analysis Is Unfounded And Underscores Their Experts' Failure To Offer Empirical Evidence Of Harm.

Plaintiffs next fault Goldfarb's trend analysis for failing to establish causation.[122] Goldfarb conducted both descriptive trend analyses and econometric analyses designed to assess causation. Plaintiffs criticize the former for not doing the work of the latter, while disregarding the causal analyses he performed.

---

[119] ECF1869-14(Ex.498) V.A-V.B; ECF1869-15(Ex.499) IV.C.
[120] Mot. 32.
[121] Plaintiffs fail to identify similarities between the testimony excluded in their cited cases and Goldfarb's opinions, and there are none. *See Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F.Supp.3d 385, 400 (S.D.N.Y. 2014) (expert improperly excluded "major" data variable in regression analysis); *Rowe Ent. Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *1–3, 9 (S.D.N.Y. Sept. 15, 2003) (expert excluded where sample was selected by plaintiff's lawyers, who were "choosing contracts that looked interesting to them").
[122] Mot. 33–34. To the extent Plaintiffs incorporate their arguments about Tucker, Mot. §I(D), OpenAI incorporates its opposition to those arguments. *Id.* 34.

*First*, Plaintiffs are wrong that Goldfarb never addressed causation.[123] Where the data allowed it, he ran a causal econometric analysis using Comscore user-level data. His main design was a difference-in-differences ("DiD") analysis. It compared each user's visits to Plaintiffs' sites before and after that user's first use of ChatGPT with the same-period change for users who did not use ChatGPT. That comparison accounts for time-specific factors common to both groups, "such as seasonality, major news events, or general changes in browsing."[124] He supplemented that analysis with event-study and matched-sample analyses, along with a series of robustness checks.[125] This is the type of "offset[ting]" analysis Plaintiffs claim is missing.[126]

Plaintiffs' hypothetical, in which a 10% boost from some outside factor masks a 9% decline caused by ChatGPT, is precisely the type of confounding effect the user-level comparison is designed to detect.[127] Plaintiffs separately challenge how Goldfarb defined his Comscore samples,[128] but they do not argue that this analysis fails to account for the factors they identify.

*Second*, Goldfarb did not offer the trend evidence as a standalone causal estimate. He used it descriptively: to examine the data, identify general patterns, and see whether the alleged harm appears in observed outcomes. Trend analysis is an informative tool to examine data

[123] *Id.* 33–34.
[124] ECF1863-10(Ex.467) ¶¶228–36; Malhotra Decl.(Ex.13) ¶¶214–16; ECF1899(Ex.474) ¶¶154–72.
[125] *See* ECF1863-10(Ex.467) ¶¶240–246; Malhotra Decl.(Ex.13) ¶¶217–223.
[126] Mot. 14.
[127] *Id.* 14–15.
[128] *Id.* 32.

patterns.[129] If ChatGPT had caused persistent harm to Plaintiffs' traffic, one would expect to see it in the trends.[130]

*Third*, Plaintiffs' argument does not align with their experts' methods. CIR and Intercept's expert did "not attempt to ascribe specific driving causal factors for any harm."[131] ZD's expert conceded that his results are a "statistical association" and not evidence of causation.[132] The NYT and DNP expert noted that "there are many factors that make it challenging to isolate the direct harm [from Defendants' products] in a quantitative way."[133] Plaintiffs seek to exclude Goldfarb's analyses for allegedly not establishing causation, even though their experts acknowledge the limits of observational evidence and offer no comparable causal analysis establishing harm from ChatGPT. Unlike those experts, Goldfarb supplemented descriptive evidence with econometric analyses designed to isolate the effects associated with ChatGPT use.

### D. Goldfarb Properly Used Asset-Turnover Ratio To Respond To Plaintiffs' Rebuttal Criticism.

ZD seeks to exclude Goldfarb's conclusions that rest upon an asset-turnover ratio by wrongly claiming his analysis was untimely (it was raised in his reply report) and because he turned to the website Investopedia to provide a definition for the ratio.[134] Neither argument attacks the methodological reliability of the ratio in economic analysis, and neither supports

[129] *See, e.g.,* Acemoglu, "Tasks, automation, and the rise in US wage inequality," *Econometrica* 90 (2022): 1973-2016.
[130] ECF1863-10(Ex.467) ¶¶144–147, 156–160; Malhotra Decl.(Ex.13) ¶¶166–190.
[131] Malhotra Decl.(Ex.14) 84:23–93:7.
[132] Malhotra Decl.(Ex.15) 157:6–168:11; 122:23–124:2.
[133] Malhotra Decl.(Ex.16) 93:18–94:4.
[134] Mot. 34–35.

exclusion. The asset-turnover ratio is a standard financial measure, and Goldfarb properly used it to address criticisms raised in Plaintiffs' rebuttal report.

*First*, the asset-turnover ratio, total revenue divided by total assets, is a standard metric taught in introductory corporate finance.[135] Both inputs come from ZD's own 10-Ks.[136] Providing a definition for the ratio drawn from Investopedia does not make it unreliable. Indeed, Class Plaintiffs' expert Michael Lasinski cited Investopedia when defining a different economic term.[137] As to reliability, ZD provides no analysis whatsoever suggesting use of the asset-turnover ratio is an unreliable methodology, and ZD neither disputes the inputs nor offers competing calculations. Nor does dividing one reported figure by another require an accounting credential or prior use. Goldfarb used it for an economic purpose: to test whether ZD's revenue trends reflect changes in the company's scale. That does not justify excluding his opinion.

*Second*, Goldfarb's use of the asset-turnover ratio in his reply report was not untimely. ZD's expert ***rebuttal*** report argued that ZD's revenue trends should account for acquisitions and divestitures.[138] Goldfarb then addressed that critique in his reply report.[139] He measured ZD's reported revenue against its reported assets, a straightforward way to account for changes in scale, including acquisitions and divestitures.[140] Plaintiffs call this a "tacit[] acknowledg[ment]" of error,[141] but it is the opposite. Penalizing an expert for engaging with the other side's criticism

---

[135] *See* Ross et al., *Fundamentals of Corporate Finance* §§ 3.3–3.4 (10th ed.) ("[a]sset use efficiency (as measured by total asset turnover)"; Brigham et al., *Fundamentals of Financial Management* § 4.3 (11th ed.) (total assets turnover ratio "is calculated by dividing sales by total assets"). *See also* ECF1869-15(Ex.499) ¶188 & n.246.
[136] *Id.* & nn.247–50.
[137] ECF1825(Ex.B) ¶385 n.1318 (citing Investopedia definition of "trailing twelve months").
[138] Malhotra Decl.(Ex.18) ¶¶6 & 35.
[139] ECF1869-15(Ex.499) ¶¶184–185 & nn.239–43.
[140] *Id.* ¶¶184–188.
[141] Mot. 34.

would turn the reply process on its head. *See Choi v. Tower Rsch. Cap. LLC*, 2022 WL 602710, at *2 (S.D.N.Y. Feb. 18, 2022) (permitting new analysis to "rebut specific criticisms").

## IX. DR. CATHERINE TUCKER

Plaintiffs do not challenge the qualifications of Microsoft's expert economist Dr. Tucker, which are beyond dispute.[142] Tucker issued five deeply analytical reports that discuss at length business records from Plaintiffs and third-party sources, concluding that none of the Plaintiffs have demonstrated harm in their traditional markets attributable to ChatGPT and Copilot.[143] The reports cite mountains of evidence, and Tucker had access to the entire discovery record.[144] Plaintiffs quibble with Tucker's selection of evidence, and argue she should have conducted different analyses. Neither position has merit.

### A. An Outline Of Issues Does Not Render Tucker's Opinions Unreliable.

Plaintiffs first seek to exclude Tucker because she prepared an initial outline of issues to guide her analysis, and then her reports primarily relied on evidence from Plaintiffs rather than from Defendants. Mot. 11–13. As to the outline, Plaintiffs ignore that Tucker came to this matter with considerable existing knowledge about the economics of big data, AI, and copyright—she previously studied the failure of big data markets and the effects of snippet regulation on news publishing, and published a chapter on AI economics in the February 2025 U.S. Copyright Office publication, *Identifying the Economic Implications of Artificial Intelligence for Copyright Policy: Context and Direction for Economic Research*, available at

---

[142] ECF1726, Appx. A-B; ECF1733, Appx. A-B; *see also* Malhotra Decl.(Ex.17) 33:4–36:18.
[143] ECF1726 (¶¶11, 16–145); ECF1733 (¶¶11, 16–104).
[144] Malhotra Decl.(Ex.17) 21:1-12; 52:3–53:10.

https://tinyurl.com/3c27cash.[145] Tucker also was previously retained as an expert in another book author class action. *Mosaic LLM Litig.*, No. 3:24-CV-02653 (N.D.Cal.).[146]

Plaintiffs distort this knowledge and experience, arguing that Tucker "formed her opinions without reviewing any of the evidence in this case, and only after forming her opinions did she ask her support team at Analysis Group to fill in the evidence." Mot. 11. In the face of five well-supported reports, the notion that Tucker did not rely on the evidentiary record is absurd. The testimony Plaintiffs cite establishes something quite different: Tucker began outlining "the points I was thinking or the analysis I was considering doing," and then directed her team to identify relevant evidence from the voluminous record for her consideration and analysis.[147] That is a conventional analytical process, not evidence of a predetermined conclusion. An economist with Tucker's experience would naturally identify the economic issues and likely relevant points to assess market harm before undertaking the analysis necessary to form her opinions. As Tucker explained, "[w]ell, because I'm an economist, there are certain things that I asked for which are relevant to my economic analysis."[148] Plaintiffs identify no testimony establishing that Tucker reached her conclusions before reviewing the evidence. This is not a legitimate Rule 702 attack.

Nor does Plaintiffs' criticism that Tucker should have more extensively discussed *Defendants'* internal documents show that she disregarded contrary evidence. Mot. 12. By its nature, analysis of fourth-factor harm necessarily entails close examination of *Plaintiffs'* data, including records of book sales, royalties, revenue, subscriptions, donations, website traffic, and

---

[145] ECF1726, Appx. A; ECF1733, Appx. A; Malhotra Decl.(Ex.17) 33:4–36:16.
[146] ECF1726(Appx. B) 1; ECF1733(Appx. B) 1.
[147] Malhotra Decl.(Ex.17) 54:6–55:8.
[148] *Id.* 54:9–11.

conversion rates—which Tucker clearly did.[149] Microsoft is not a commercial book or news publisher, and the presentation that Plaintiffs emphasize, reflecting views of Dr. Brent Hecht (a Microsoft researcher and computer scientist) about compensating people for the use of their data, are personal opinions that do nothing to establish whether Plaintiffs experienced market harm. Unlike the Microsoft agreements Tucker did discuss, such unsubstantiated musings are not the type of data Tucker ordinarily considers as an economist. *See* ECF1733 ¶214 (statements by individuals in research positions at Microsoft are "not evidence that a functioning market for licensing data for training or ground[ing] general-purpose LLMs exists"); ECF1726 ¶141 (same). Nevertheless, Tucker had access to all Defendants' discovery materials and confirmed that "[i]t was the case that when I was writing my report, I had access to all materials I asked for, and felt I needed to write the report."[150] Plaintiffs had ample opportunity in seven hours of deposition to cross-examine Tucker about her selection of evidence, but failed to ask a single question concerning the documents about which they now complain.

The cases cited by Plaintiffs are inapposite. *Faulkner v. Arista Recs., LLC*, 46 F. Supp. 3d 365, 380–81 (S.D.N.Y. 2014), involved an expert who failed to analyze royalty records despite acknowledging they were important, limiting his review to documents supplied by counsel. Similarly, in *Rezulin*, 309 F. Supp. 2d 531, 550 (S.D.N.Y. 2004), the expert admitted that he wrote a declaration without having the underlying evidence available. These are a far cry from outlining initial thoughts, obtaining relevant evidence, and then presenting opinions supported by extensive analysis of that evidence. Plaintiffs' disagreement does not establish unreliability.

---

[149] ECF1726 (¶11, 16–145); ECF1733 (¶¶11, 16–104).
[150] Malhotra Decl.(Ex.17) 54:2–5.

**B. Tucker's Reliable Market Analyses Did Not Require Regressions.**

In the face of Tucker's findings that [redacted],[151] Plaintiffs argue that Tucker should have also conducted regressions. Mot. 14. Plaintiffs argue that regressions were necessary to determine whether unidentified factors might have offset otherwise undetectable harm from Defendants' products. *Id.* But Plaintiffs identify no objective evidence of such offsetting effects, much less establish that a regression was necessary.

Tucker performed *multiple* analyses of voluminous data regarding asserted harm from substitution. First, she performed a qualitative analysis examining whether Plaintiffs' Asserted Works and Defendants' products have similar characteristics and serve similar needs and could even be considered economic "substitutes" (an analysis the Motion ignores).[152] Tucker concluded there were no such similarities,[153] an opinion independently confirmed by Amir and Bail. Amir found that less than 2% of respondents used Copilot for information related to "current events" and less than 2% used it for "writing."[154] Bail similarly found minimal usage of Copilot for current events or writing.[155]

Next, Tucker conducted multiple quantitative analyses.[156] She explained her process of first "assessing whether the introduction of a new product or policy had an effect on an existing product[.]"[157] Then, "[i]f the data indicate such a change with, for example, a change in the trends, further analysis may then be appropriate to assess whether the introduction caused the

---

[151] ECF1726 (¶11, 16–145); ECF1733 (¶¶11, 16–104).
[152] ECF1726 (¶¶47–60); ECF1733 (¶¶94–104).
[153] *Id.*
[154] ECF1716 (¶¶9(b), 9(c), 45–60).
[155] ECF1719 (¶¶96–104, 110–113).
[156] ECF1733 (¶18; ECF1726 ¶18).
[157] ECF1733 (¶21).

observed change and to distinguish its effect from the effects of other relevant factors."[158] Tucker thus began with the threshold question: whether Plaintiffs' economic performance exhibited the deterioration that their hypothesis of substitution would predict.

After extensive analysis of Plaintiffs' book sales, royalties, revenue, subscriptions, donations, website traffic, and conversion rates, Tucker found [redacted] *See Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, 82 F.4th 1262, 1270–72 (D.C. Cir. 2023) (copyright plaintiffs suffered no harm where "sales have increased over that time").

158 *Id.*

NYT Revenue For All Products, by Revenue Type and Quarter[159]




[159] ECF1733 at 23 (Fig.2).

Number of NYT Active Subscribers, by Month.[160]

[redacted]

[160] ECF1733 at 26 (Fig.3).

Number of Daily Average Pageviews of NYT "Core" Product, by Month[161]

[redacted]

[161] ECF1733 at 63 (Fig.12).

Conversion Rate on Web Platforms for NYT "Core" Product, by Month[162]

[redacted]

If Plaintiffs suffered market harm following the introduction of ChatGPT and Copilot, it would surface in the trends that Tucker examined.[163] Plaintiffs respond that favorable trends could theoretically mask harm offset by unrelated developments. While that argument could go to weight, and not reliability, it is entirely unsupported.

First, Tucker's analyses assess actual economic performance, reflecting the net effect of the various forces operating in Plaintiffs' markets. *See generally Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55 (S.D.N.Y. 2018). Defendants' burden on the fourth factor was to come forward with sufficient evidence to negate a conclusion of significant harm in traditional

[162] ECF1733 at 54 (Fig.9).

[163] Malhotra Decl.(Ex.17) 90:19–91:7, 135:24–138:2.

markets. *Andy Warhol Found. v. Goldsmith*, 11 F.4th 26, 49 (2d Cir. 2021), *aff'd on other grounds*, 598 U.S. 508 (2023). Tucker's report did so without need for any regression analyses. This was legally sufficient and, as she explained, consistent with economic principles. Second, Plaintiffs provided no support for their hidden-factors hypothesis. Because Defendants must prove a negative (absence of harm), courts routinely recognize the significance of a copyright plaintiff's failure to rebut evidence showing an absence of market harm. *See Kadrey*, 788 F. Supp. 3d at 1056 ("[W]here a defendant introduces evidence of a lack of market harm, 'and the plaintiff fails to introduce empirical evidence countering such a showing, the fourth factor should be weighed in the defendant's favor.'") (citing *Patry on Fair Use* §6:13; *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013)).

Yet, Plaintiffs offered no contrary empirical evidence—their interrogatory responses do not identify facts suggesting that they were poised to break out with some ahistorical stunning performance.[164] Nor did Plaintiffs identify such evidence in *their* expert reports. Tucker reviewed Plaintiffs' expert reports and did not see "anything which suggests that there was some countervailing force that I failed to take account of which could be an alternative explanation of why I find absolutely no impact."[165]

Against this backdrop, it was not incumbent upon Tucker to use a regression analysis to confirm the absence of speculative offsetting factors. Indeed, News Plaintiffs' expert Malackowski opined that such an analysis would not even have been possible.[166] Tucker's methodology is rooted in economic principles that were reliably applied to record evidence. Rule

[164] ECF1816-132; ECF1801-20.
[165] Malhotra Decl.(Ex.17) 138:11–23. While CIR attempted an independent analysis of so-called other factors, that analysis failed to show that Copilot or ChatGPT had any causal impact on CIR's web traffic. *See* ECF2063-12 (95:22–96:14).
[166] ECF2063-11 (344:11–345:2, 345:14-346:17).

702 does not require an expert to eliminate every hypothetical alternative explanation before offering otherwise reliable opinions. Her opinions are plainly admissible. *See Aluminum*, 336 F.R.D. at 28; *see also Source One Dental, Inc. v. Patterson Cos.*, 2018 WL 2172667, at *8–9 (E.D.N.Y. May 10, 2018) (denying motion to exclude).

Plaintiffs' regression cases are inapposite. In those, the "threshold inquiry" (that a change had in fact occurred) was already met, thereby resulting in the need to run a regression to determine the cause of that change—circumstances absent here. *See, e.g., Wills v. Amerada Hess, Corp.*, 379 F.3d 32 (2d Cir. 2004) (expert undertook regression analysis to identify the *cause* of plaintiff's illness). Plaintiffs cite no authority for a requirement that an economist must disprove every alternative hypothesis, particularly where there is no obvious evidence of an unusual scenario. Nor could they—as this is not the Rule 702 standard for regressions. *See Chen-Oster*, 325 F.R.D. at 71 (regression analysis need only control for "major factors" to be admissible; failure to include other variables goes to weight, not admissibility). Absent evidence to support the notion that Plaintiffs suffered significant harm, or clear indications that they would have had an ahistorical performance but for the launch of Defendants' products, there was no need for a regression. Plaintiffs have not established that failure to perform a particular type of analysis renders Tucker's opinions inadmissible.

## CONCLUSION

Defendants respectfully request the Court deny Plaintiffs' Motion.

Dated: October 29, 2026

Respectfully submitted,[167]

*/s/ Paven Malhotra*
**KEKER, VAN NEST & PETERS LLP**
Robert A. Van Nest (pro hac vice)
rvannest@keker.com
R. James Slaughter (pro hac vice)
rslaughter@keker.com
Paven Malhotra
pmalhotra@keker.com
Michelle S. Ybarra (pro hac vice)
mybarra@keker.com
Reid P. Mullen (pro hac vice)
rmullen@keker.com
Nicholas S. Goldberg (pro hac vice)
ngoldberg@keker.com
633 Battery St.
San Francisco, CA 94111
Telephone: 415.391.5400

*/s/ Lily Li*
**MORRISON & FOERSTER LLP**
Joseph C. Gratz (pro hac vice)
jgratz@mofo.com
Tiffany Cheung (pro hac vice)
tcheung@mofo.com
Caitlin Sinclaire Blythe (pro hac vice)
cblythe@mofo.com
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000

Lily Li (pro hac vice)
YLi@mofo.com
755 Page Mill Road
Palo Alto, CA 94304
Telephone: 650.813.5600

*/s/ Allison S. Blanco*
**LATHAM & WATKINS LLP**
Andrew M. Gass (pro hac vice)
andrew.gass@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415.391.0600

Herman H. Yue
herman.yue@lw.com
Luke A. Budiardjo
luke.budiardjo@lw.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200

Elana Nightingale Dawson (pro hac vice)
elana.nightingaledawson@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

Allison S. Blanco
Allison.Blanco@lw.com
650 Town Center Dr #20
Costa Mesa, CA 92626
Telephone: Al+1.714.755.8293

*Attorneys for Defendant OpenAI*

*/s/ Lisa T. Simpson*__________________

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Annette L. Hurst (admitted pro hac vice)
Daniel Justice (admitted pro hac vice)
Robert Scott Shwarts
Catherine Lui (admitted pro hac vice)
Amanda H. Schwartz (admitted pro hac vice)
Ana Mendez-Villamil (admitted pro hac vice)
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
ahurst@orrick.com
djustice@orrick.com
aschwartz@orrick.com
amendez-villamil@orrick.com

Christopher J. Cariello
Lisa T. Simpson
Marc Shapiro

[167] All parties whose electronic signatures are included in this filing have provided consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

Vanessa Sorrentino
Hilda Obeng
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-3778
Facsimile: (212) 506-5151
ccariello@orrick.com
lsimpson@orrick.com
mrshapiro@orrick.com
vsorrentino@orrick.com
hobeng@orrick.com

Sheryl Koval Garko (admitted pro hac vice)
Laura Brooks Najemy (admitted pro hac vice)
222 Berkeley Street
Boston, MA 02116
Telephone: (617) 880-1800
Facsimile: (617) 880-1801
sgarko@orrick.com
lnajemy@orrick.com

Isaac Sawlih Behnawa (admitted pro hac vice)
Johnathan Vaknin (admitted pro hac vice)
355 S. Grand Ave. Suite 2700
Los Angeles, CA 90071
Telephone: (213) 612-2179
Facsimile: (213) 612-2499
ibehnawa@orrick.com
jvaknin@orrick.com

Monica Svetoslavov (admitted pro hac vice)
Louis Andrew Schreiber
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
msvetoslavov@orrick.com
aschreiber@orrick.com

**FAEGRE DRINKER BIDDLE & REATH LLP**
Jeffrey S. Jacobson
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 248-3191
jeffrey.jacobson@faegredrinker.com

Jared B. Briant (admitted pro hac vice)
Kirstin L. Stoll-DeBell (admitted pro hac vice)
Timothy Scull (admitted pro hac vice)
Shelby Pickar-Dennis (admitted pro hac vice)
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone: (303) 607-3588
jared.briant@faegredrinker.com
kirstin.stolldebell@faegredrinker.com
timothy.scull@faegredrinker.com
shelby.pickar-dennis@faegredrinker.com

Lora A. Brzezynski (admitted pro hac vice)
Brianna Lynn Silverstein (admitted pro hac vice)
Faith Maggard (admitted pro hac vice)
1500 K Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 230-5000
lora.brzezynski@faegredrinker.com
brianna.silverstein@faegredrinker.com
faith.maggard@faegredrinker.com

Carrie A. Beyer (admitted pro hac vice)
320 South Canal Street, Suite 3300
Chicago, IL 60606-5707
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
carrie.beyer@faegredrinker.com

Elizabeth M.C. Scheibel (admitted pro hac vice)
2200 Wells Fargo Center, 90 S. 7th Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
elizabeth.scheibel@faegredrinker.com

Andrew Lawrence Van Houter
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7018
Facsimile: (973) 360-9831
Andrew.vanhouter@faegredrinker.com

*Attorneys for Defendant Microsoft Corporation*

**CERTIFICATE OF WORD COUNT COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the foregoing Memorandum of Law complies with the Court's order of August 7, 2026 (ECF 1664), as it contains 11,882 words, according to the word processing program used to prepare it.

*/s/ Paven Malhotra*
Paven Malhotra
*Attorney for Defendant OpenAI*