# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION.<br><br>This Document Relates To: All Cases | 1:25-md-03143-SHS-OTW |

**AMICUS CURIAE BRIEF OF PROFESSORS PAMELA SAMUELSON AND CHRISTOPHER JON SPRIGMAN IN SUPPORT OF NEITHER PARTY**

JASON M. SCHULTZ
Professor of Law
New York University School of Law
Furman Hall
245 Sullivan Street
New York, NY 10012
Tel: (212) 992-7365
Email: jason.schultz@exchange.law.nyu.edu

*Attorney for Amicus Curiae Professors Pamela Samuelson and Christopher Jon Sprigman*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTEREST OF AMICI ........ 1

SUMMARY OF THE ARGUMENT ........ 2

ARGUMENT ........ 3

I. This Court Should Reject Plaintiffs' Argument that the Court Should Infer That Market Dilution Is Harming Copyright Markets ........ 3

A. The Market Dilution Theory of Harm Is Inconsistent with Longstanding Copyright Principles and Case Law ........ 6

B. *Hachette* Provides No Support for the Market Dilution Theory ........ 8

II. Early Empirical Research Aiming to Test Market Dilution Does Not Support Plaintiffs' Claims ........ 9

A. The Utility of the Early Research is Limited by a Significant Conceptual Shortcoming ........ 9

B. The Existing Empirical Research on Market Dilution Suffers from Some Definitional and Methodological Problems ........ 10

III. If Market Dilution Exists in Some Sectors, Any Harm It Causes Would Be Collective in Nature and Legislatures, Not Courts, Are More Appropriate Venues for Addressing Such Harms ........ 14

CONCLUSION ........ 18

# TABLE OF AUTHORITIES

## CASES

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021), *aff'd,* 598 U.S. 508 (2023) ........ 8

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ........ 7

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ........ 5, 7

*Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025) ........ 4

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ........ 7

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ........ 7, 8

*Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 126 F.4th 589 (8th Cir.), *cert. denied*, 146 S. Ct. 329 (2025) ........ 5

*Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) ........ 8

*Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025) ........ passim

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ........ 6

*Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) ........ 6

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ........ 5

## STATUTES

17 U.S.C. § 107(4) ........ 6

17 U.S.C. §§ 1002-1008 ........ 17

Audio Home Recording Act (AHRA), Pub. L. No. 102–563, 106 Stat. 4237 (1992) ........ 17

Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, 109 Stat. 336 ........ 18

## OTHER AUTHORITIES

American Law Institute, Restatement of Copyright (Tentative Draft No. 5) (2024) ........ 6

Christophe Geiger & Vincenzo Iaia, *The Forgotten Creator: Towards a Statutory Remuneration Right for Machine Learning of Generative AI*, 52 Computer L. & Sec. Rev. 1 (2024), https://www.sciencedirect.com/science/article/pii/S0267364923001358 ................................ 15

Christopher Jon Sprigman, *Copyright, Meet Antitrust: The Supreme Court's* Warhol *Decision and the Rise of Competition Analysis in Fair Use*, 134 Yale L.J. Forum 298 (2025)........................ 1

Gary S. Lutzker, Note, *Dat's All Folks:* Cahn v. Sony *and the Audio Home Recording Act of 1991—Merrie Melodies or Looney Tunes*?, 11 Cardozo Arts & Ent. L.J. 145 (1992)............ 17

Giancarlo Frosio, *Should We Ban Generative AI, Incentivize It or Make It a Medium for Inclusive Creativity?*, *in* A Research Agenda for EU Copyright Law (Enrico Bonadio & Caterina Sganga, eds., Edward Elgar 2024) ............................................................................... 16

H.R. Rep. No. 104-274, at 12-13 (1995) ......................................................................... 18

Imke Reimers & Joel Waldfogel, *AI and the quantity and quality of creative products: Have LLMs boosted creation of valuable books?*, National Bureau of Economic Research (NBER) working paper 34777 (NBER, 2026) ......................................................................... 13, 14

J. P. Quintais, *Generative AI, copyright and the AI Act*, 56 Comput. Law Secur. Rev. 1 (2025) . 17

K. Ren et al., *Hitting a Moving Target: Test-Time Adaptation for AI Text Detection under Continual Distribution Shift*, arXiv preprint, arXiv:2606.25152 (accepted to NeurIPS, 2026) 12

Martin Senftleben, *Generative AI and Author Remuneration,* 54 IIC–Int'l Rev. Intellectual Property & Competition Law, 1535–1560 (2025), https://link.springer.com/content/pdf/10.1007/s40319-023-01399-4.pdf ................................ 16

Pamela Samuelson, Abhishek Nagaraj, and Christopher Jon Sprigman, *Market dilution, fair use, and generative AI*, 394 Science 275 (2026), https://www.science.org/doi/full/10.1126/science.ael4888 ................................................... 1, 9

Pamela Samuelson, *Assessing the Feasibility of Collective Licensing of In-Copyright Works as Training Data for Generative AI Systems*, 123 (30) Proceedings of the Nat'l Acad. Sci. (July 20, 2026), www.pnas.org/doi/10.1073/pnas.2509769122 ..................................................... 15

Pamela Samuelson, *Fair Use Defenses in Disruptive Technology Cases*, 71 UCLA L. Rev. 1484 (2024)........................................................................................................................ 1

Pangram Model Card, https://www.pangram.com/research/model-card/pangram-3-3 ................ 12

Samuel Goldberg & Tai Lam, *Generative AI & Creative Goods: Market Expansion, Crowd-Out, and Copyright*, Stanford University Graduate School of Business Research Paper (2025; revised July 2026) ....10, 11

Shoumik Saha & Soheil Feizi, *Almost AI, Almost Human: The Challenge of Detecting AI-Polished Writing*, in Findings of the Ass'n for Computational Linguistics: ACL 2025 (2025), doi:10.18653/v1/2025.findings-acl.1303 .... 12

Thad McIlroy, *Is AI Flooding Markets for Books, and Diluting Their Value?*, Future of Publishing, July 29, 2026, https://thefutureofpublishing.com/2026/07/is-ai-flooding-the-market-for-books-and-diluting-their-value/ .... 12

Tuhin Chakrabarty et al., *Generative AI floods and dilutes the market for books*, arXiv:2607.20349 [cs.CL] (2026) ....11, 12, 13

U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training* (pre-publication version May 2025) .... 4

U.S. Dept. of Justice, Statement of Interest of the United States, *In re OpenAI Litigation*, No. 25-md-3143-SHS-OTW (S.D.N.Y. 2026) .... 4

**TREATISES**

4 William F. Patry, Patry on Copyright (2026) .... 6, 9

William F. Patry, Patry on Fair Use (2025) .... 5

## INTEREST OF AMICI

Amici have no stake in the outcome of this litigation. No party or its counsel authored or funded any part of this brief. Amici's interest is in the sound development of copyright law, and they submit this brief to assist the Court in evaluating the market dilution theory of harm that Plaintiffs advance.

Pamela Samuelson is the Richard M. Sherman Distinguished Professor of Law at Berkeley Law School and Faculty Co-Director of the Berkeley Center for Law & Technology. She has been teaching, writing and speaking about copyright law and the challenges that advanced technologies have posed for that law for more than 40 years. She has written numerous articles about fair use and new technologies. Most relevant to this lawsuit is Pamela Samuelson, *Fair Use Defenses in Disruptive Technology Cases*, 71 UCLA L. Rev. 1484 (2024).

Christopher Jon Sprigman is the Murray and Kathleen Bring Professor of Law and Co-Director of the Engelberg Center on Innovation Law and Policy, at the New York University School of Law. Sprigman also served as the Reporter for the American Law Institute's recently completed Restatement of the Law, Copyright, and has written numerous articles about copyright law, including about theories of harm in the fair use analysis. Most relevant to this lawsuit is Christopher Jon Sprigman, *Copyright, Meet Antitrust: The Supreme Court's* Warhol *Decision and the Rise of Competition Analysis in Fair Use*, 134 Yale L.J. Forum 298 (2025).

This brief amicus curiae expands on points developed in an article amici co-authored with economist Abhishek Nagaraj. *See* Pamela Samuelson, Abhishek Nagaraj, and Christopher Jon Sprigman, *Market dilution, fair use, and generative AI*, 394 *Science* 275 (2026), https://www.science.org/doi/full/10.1126/science.ael4888.

## SUMMARY OF THE ARGUMENT

Market dilution—the prediction that generative AI outputs will flood creative markets and crowd out human-authored works—is a novel and speculative theory of harm. It also contradicts settled copyright principles, including leading Second Circuit decisions, which recognize market harm only where a defendant has appropriated protected expression from the plaintiff's work. Courts therefore should not infer that dilution has occurred or is likely. Plaintiffs must identify the markets they claim are harmed and prove that harm with empirical evidence.

As a theory of copyright harm, market dilution is, moreover, both conceptually problematic and empirically unproven. The conceptual problem lies in the theory's view that the market for creative works is a binary—that is, a zero-sum competition in which wholly "AI-authored" works displace wholly "human-authored" works. That ignores a category of creative works that is emerging as an important part of copyright markets—*works authored by humans using AI as a tool*. Until market dilution theory develops a conceptual framework that fully acknowledges these "hybrid" works, and the value of the human authorship those works contain, the theory cannot reliably measure whatever harm AI may cause.

There is also the question of proof. At this early stage of the theory's—and the technology's—life, it remains unknown whether dilution is occurring, or is likely to occur, in *any* market. There is insufficient evidence about whether AI is more likely to displace or to aid, and thereby encourage, human authorship. Nor is there reliable data regarding likely consumer demand for varieties of AI-generated works. Given this uncertainty, courts should require proof that dilution is occurring or is likely to occur in a particular market, rather than infer it, as Plaintiffs urge.

Early empirical studies testing this novel theory provide some insights into how markets are being affected by AI systems, but the results thus far are equivocal. To begin, the literature has no shared definition of market dilution. Research aimed at testing the theory's validity must define the term and also account for AI-assisted, human-authored (i.e., hybrid) works. Some empirical studies suggest that hybrid works are expanding markets, attracting new entrants, and causing market diversification. There is also some evidence that authors who previously created works without AI assistance are using generative AI tools to extend their skills and produce novel creations that will open new markets for public enjoyment.

Finally, even if empirical evidence eventually shows that some markets or market segments are being diluted in ways that undermine authorial incentives, such harms would most likely affect all authors who participate in those markets or market segments, and not just plaintiffs in individual infringement cases. Moreover, such harms would be caused not by any one developer of generative AI who might be a defendant in an infringement lawsuit but by all developers whose models were being used to create new works. Because collective harms require collective solutions, the appropriate venue for addressing market displacement caused by generative AI—assuming it is occurring—is Congress, not courts.

## ARGUMENT

### I. This Court Should Reject Plaintiffs' Argument that the Court Should Infer That Market Dilution Is Harming Copyright Markets

In the year or so since one court endorsed the market dilution theory of harm in *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025), plaintiffs in numerous generative AI copyright lawsuits, including this litigation, have sought to defeat fair use defenses by

claiming that markets for their works are being diluted by AI-generated outputs.[1] The *Kadrey* court did not define what it meant by market dilution, but observed that

> [g]enerative AI has the potential to flood the market with endless amounts of images, songs, articles, books, and more. People can prompt generative AI models to produce these outputs using a tiny fraction of the time and creativity that would otherwise be required. So by training generative AI models with copyrighted works, companies are creating something that often will dramatically undermine the market for those works, and thus dramatically undermine the incentive for human beings to create things the old-fashioned way.

*Id*. at 1034-35. The court further stated that if Kadrey had alleged and provided empirical evidence to show that Meta's Llama model was diluting the market for the plaintiffs' books, Meta's fair use defense would have failed. *Id*. at 1036. But because Kadrey proffered no such evidence, the court ruled in Meta's favor. *Id*.

Amici share Judge Alsup's skepticism about the market dilution theory of harm expressed in another generative AI copyright case, and in particular, that theory's compatibility with longstanding copyright principles. *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1031–32 (N.D. Cal. 2025) ("Authors contend generically that training LLMs will result in an explosion of works competing with their works. . . . This is not the kind of competitive or creative displacement that concerns the Copyright Act. The Act seeks to advance original works of authorship, not to protect authors against competition.").

---

[1] A U.S. Copyright Office report also expressed receptivity to this theory. *See* U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training* 64-66 (pre-publication version May 2025). However, the U.S. Department of Justice has filed a Statement of Interest criticizing the Office's report on the market dilution theory. *See* U.S. Dept. of Justice, Statement of Interest of the United States at 16 n.17, *In re OpenAI, Inc. Copyright Infringement Litigation*, No. 25-md-3143-SHS-OTW (S.D.N.Y. 2026).

The market dilution theory of market harm is also highly speculative, as the *Kadrey* decision recognized. *Kadrey*, 788 F. Supp. 3d at 1035, 1052-56. Courts have rightly rejected challenges to fair use defenses when copyright owners have offered only speculative evidence about market harms. *See, e.g.*, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 452-54 (1984) (reviewing evidence predicting that videotape recorders would harm market for Universal's movies and concluding that the evidence was too speculative to defeat fair use defenses); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 100–01 (2d Cir. 2014) (rejecting harm argument as speculative). *See also Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 126 F.4th 589, 600 (8th Cir.), *cert. denied*, 146 S. Ct. 329 (2025) ("Mindful of the . . . folly of allowing purely hypothetical market injuries to influence our assessment of fair use, we credit a plaintiff's assertion of harm in a potential market only if the harm is nonspeculative.").

That said, even if this type of harm were cognizable under copyright law, amici agree with the *Kadrey* court that courts should not *infer* it but should require empirical evidence to support it. *Kadrey*, 788 F. Supp. 3d at 1056-57. Amici also agree with the *Kadrey* court that the burden of establishing relevant affected markets is on plaintiffs in copyright infringement cases, *id*. at 1038, and that while putative fair users bear the burden of persuasion on fair use overall, that does not mean they bear that burden as to every factor. *Id.* (citing William F. Patry, Patry on Fair Use § 2:5 (2025)). Finally, amici agree with the *Kadrey* court that if market dilution exists and is potent enough to affect authorial incentives, it is likely to impact different market segments differently. *Id*. at 1035, 1052-56 (speculating that markets for romance and spy novels are more likely than markets for memoirs or books by prominent authors to be diluted). Empirical evidence about book or news markets as a whole may say very little about which markets are being most or least affected by generative AI.

### A. The Market Dilution Theory of Harm Is Inconsistent with Longstanding Copyright Principles and Case Law

The market dilution theory conflicts with settled copyright case law, which treats defendants as infringers only when they have appropriated a substantial quantum of protected expression from particular works and thereby supplanted demand for those works. *See, e.g.*, 4 William F. Patry, Patry on Copyright, §10:155.40 (2026); American Law Institute, Restatement of Copyright § 7.01(a) (Tentative Draft No. 5) (2024) ("To prove infringement . . . a plaintiff must prove . . . copying of protected expression from the copyrighted work sufficient to constitute 'improper appropriation.'").

Copyright law has long permitted the creation of works that compete with existing works, so long as the new works do not infringe. *See, e.g.*, *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522-23 (9th Cir. 1992) (fair use to make reverse engineering copies of plaintiff's program to access information necessary to make compatible but non-infringing works that compete with the plaintiff's works). *See also Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 602-08 (9th Cir. 2000) (reverse engineering copies made to build a compatible emulator that competes with plaintiff's video game console protected as fair use).

Proponents of the dilution theory do not contend that AI-generated works appropriate protected expression from *any* human-authored work. The theory rests solely on the concern that AI-generated works will compete with human-authored works as a class, including the Plaintiffs' works.

The market dilution theory also diverges from the Second Circuit's settled understanding of the fourth fair use factor. That factor asks about "the effect of the use upon the potential market for or value of *the copyrighted work*," 17 U.S.C. § 107(4) (emphasis added). It does not ask about markets for a class of works. Factor four "is concerned with only one type of economic

injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." *HathiTrust*, 755 F.3d at 99. The question is whether the copy "brings to the marketplace a competing substitute for the original, or its derivative," such that potential purchasers may choose the copy over the original. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015). *See also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006) (harm in transformative markets not cognizable under fourth statutory fair use factor).

Relatedly, lost sales are not cognizable as "harm" unless they are attributable to the copying of protected expression. In *Authors Guild v. Google*, the court acknowledged that Google's "snippet view" might cost an author some sales by giving a researcher a fact the researcher might otherwise have bought the book to obtain. But that "type of loss of sale," the court explained, "will generally occur in relation to interests that are not protected by the copyright." 804 F.3d at 224. Dilution claims fail for the same reason. Whatever competitive pressure AI-assisted works exert comes from their existence as new works in the market, not from any appropriation of a plaintiff's expression.

Nor does the Supreme Court's instruction to consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for the original, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (citation omitted), provide a way around this limit. That inquiry aggregates the defendant's use to gauge its substitutive effect on the market for the original and its derivatives. It does not convert competition from noninfringing works into harm to "the copyrighted work." *Campbell* itself recognized that a use may suppress demand for the original

without causing cognizable harm: when a parody "kills demand for the original, it does not produce a harm cognizable under the Copyright Act." *Id.* at 591–92.

### B. *Hachette* Provides No Support for the Market Dilution Theory

Plaintiffs rely on *Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) to support their argument that this Court should infer market dilution harms. But *Hachette* framed the inquiry as "not whether the second work would *damage* the market for the first . . . but whether it *usurps* the market for the first by offering a competing substitute." *Id.* at 189 (quoting *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 48 (2d Cir. 2021), *aff'd,* 598 U.S. 508 (2023)). The *Hachette* court inferred harm because the Internet Archive distributed complete copies of the publishers' own books, which served as direct substitutes for licensed editions. *Id.* at 190, 193.

Market dilution proposes a theory of harm that is categorically different. It would count as cognizable harm the competition from works that are not copies of any parts of the plaintiffs' works, contain none of their protected expression, and substitute for them only in the sense that any new book may compete with every other book in its genre.

The consequences of accepting this theory would reach well beyond this case and beyond AI. Musicians routinely copy recordings to learn a genre, and art students copy paintings to master a style. If such copying, followed by the creation of noninfringing works that compete in the same market, could defeat fair use, copyright owners would have a claim against competition itself. Copyright law has always rejected such claims by requiring that the competing work *itself* appropriate protected expression. Abandoning that requirement in AI cases would invite many more such claims and turn copyright into something it was never intended to be: a weapon

against competition writ large. *See* 4 Patry on Copyright, *supra*, § 10:155.40 (calling the market dilution theory "nuts").

## II. Early Empirical Research Aiming to Test Market Dilution Does Not Support Plaintiffs' Claims

### A. The Utility of the Early Research is Limited by a Significant Conceptual Shortcoming

The mere presence of many new works in which AI plays some role will not necessarily cause "dilution" and drive human authors from copyright markets. From a consumer welfare standpoint, a greater abundance of new creative works is a positive development. To understand whether harm from market dilution is likely, one must develop a more nuanced conception of market effects. That cannot happen until the market dilution theory resolves a threshold conceptual issue: how to treat works that are created by humans with the assistance of AI.[2]

On this point, the *Kadrey* court's framing—that AI outputs generated by unskilled amateurs will flood markets for human-authored works that are the products of highly skilled professionals—implicitly embraced a false binary: that works are either 100% AI-generated or 100% human-authored. This framing fails to acknowledge, or to account for, the effect of works authored by humans with the assistance of AI. Amici refer to these as "hybrid" works. Early evidence suggests that many new works fall into this category: AI-assisted but human-authored. It makes little sense to understand competition from hybrid works—even hybrid works that involve a great deal of human creativity in their production—as categorically "diluting" the market for works made without AI. That approach would allow a drop of AI to condemn a work, ignoring human authorship and erasing the work's human element.

---

[2] Several paragraphs of this brief derive from our *Science* article. *See* Samuelson, Nagaraj, & Sprigman, *supra*, 394 *Science* at 276-77.

The question is how to account for the value of the human authorship in particular categories of hybrid works. A complete account is beyond the scope of this brief, but the extent of AI use will likely be a critical factor. Whether a particular hybrid work should count as human-authored, in whole or in part, will likely depend not only on what share of its content is AI-generated, but also on the particular role AI played in its creation, which can vary substantially. Hybrid works differ in how much human ingenuity and effort go into conceptualizing and executing the work as a whole, prompting the AI, and often revising the initial outputs.

### B. The Existing Empirical Research on Market Dilution Suffers from Some Definitional and Methodological Problems

Like much early research, the first generation of empirical studies of market dilution is incompletely theorized and methodologically uneven, and its flaws must be addressed before it can guide courts or policymakers. Some of these studies make valuable contributions, but their implications are equivocal or debatable.

1. Samuel Goldberg & Tai Lam Study of Stock Photo Market[3]

Consider the Goldberg & Lam study of the effects of a policy change permitting AI-generated images to enter a large marketplace for stock photos. The paper finds that the introduction of AI images led to a 136% increase in the number of images posted to the platform and a 47% increase in the number of artists posting photos. The paper further finds that this market growth was accompanied by a 15% decline in the number of non-AI photos posted to the marketplace and a 29% decline in the number of artists posting non-AI images. Goldberg & Lam at 4.

---

[3] Samuel Goldberg & Tai Lam, *Generative AI & Creative Goods: Market Expansion, Crowd-Out, and Copyright*, Stanford University Graduate School of Business Research Paper (2025; revised July 2026); http://dx.doi.org/10.2139/ssrn.5152649.

Such evidence might be taken to indicate that AI is causing market dilution because of the decline in non-AI photos. Yet the Goldberg & Lam findings also suggest that AI usage expanded the market. The number of images sold increased by 81% and the quality of images modestly increased as well. *Id.* at 32-34.

To contextualize these results, we must consider the extent of AI use and the identity of those producing AI-generated outputs. The photo platform's policy change required identification and labeling of photos produced with any assistance from AI. If, as seems likely, the category of works on the platform labeled "GenAI" includes a large number of human-AI hybrid works, then the Goldberg & Lam study did not find market dilution but rather that AI spurred market growth, specifically by those skilled in the use of AI as a tool. Consider also that of the 1.7 million new images posted in the relevant markets, almost half came from incumbents. Of all new AI images, 26.3% came from previously active sellers. *Id.* at 80. The Goldberg & Lam story does not appear to be one of "dilution" or displacement. Rather, the story is about market growth and diversification.

2. Tuhin Chakrabarty et al. Study of Market for Self-Published Genre Books[4]

Another recent paper by Chakrabarty et al. reports on a study of self-published genre fiction primarily available on Amazon. It claims that the entry of "substantial AI" texts diluted the market for books in which no AI text was detected. The authors analyzed 14,419 books

[4] Tuhin Chakrabarty et al., *Generative AI floods and dilutes the market for books*, arXiv:2607.20349 [cs.CL] (2026) ("Chakrabarty et al"). Amici understand that the Plaintiffs have informed the Court that they do not intend to rely on this article in support of their summary judgment motions and that they have withdrawn a supplemental economic report discussing that study's findings. The Court has since struck both the paper and the supplemental report. We discuss the article here because it is one of the relatively few studies that investigate the market dilution concept, and because amici question whether this non-peer-reviewed article is credible in its report about the impacts of generative AI on the market for self-published genre fiction. Amici believe that the Chakrabarty et al. analysis suffers from scientific validity issues, and that the authors significantly overclaim the extent to which their paper offers evidence of market dilution.

"sold"[5] primarily on Amazon between 2023 and 2026. They used AI-detection software to assess whether or to what extent those books were AI-generated.[6] The paper defines "substantial AI" texts as those for which the software detected more than 25% of the text coming from AI. Chakrabarty et al. at 1. It asserts that such books were responsible for the significant growth of the self-published book market in this time period. *Id*. at 10. The paper concludes that the total market revenue for self-published genre fiction did not expand as fast as the number of books, causing revenue per book to decline. *Id*. It characterizes this decline in revenue as market dilution. *Id*. at 10-11. This is a very different conception of market dilution than the court expressed in *Kadrey*.

This paper attempts to examine the different degrees of AI assistance involved in producing works. It reports that works whose contents included no AI-detected content constituted 62.9% of the titles in the sample and enjoyed 72.5% of the revenues, while

---

[5] The study's sample consists heavily of books available through Kindle Unlimited, a subscription service which does not typically "sell" copies of books but measures usage in terms of the number of pages its subscribers read of books in its corpus. *See* Thad McIlroy, *Is AI Flooding Markets for Books, and Diluting Their Value?*, Future of Publishing, July 29, 2026, https://thefutureofpublishing.com/2026/07/is-ai-flooding-the-market-for-books-and-diluting-their-value/ (explaining why its author is skeptical of the Chakrabarty et al. paper's conclusions and why the paper's reliance on Kindle Unlimited has distortionary effects). The Chakrabarty et al. paper admits that the authors could not break down whether "sales" of books in the sample were "à la carte purchases" or Kindle Unlimited reads. Chakrabarty et al. at 13. A Kindle Unlimited subscriber borrowing a book priced for sale at $5 has not necessarily made a $5 purchase, and because the authors provide no methodology for converting from page reads to "sales", their revenue figures are not meaningful indicators of Kindle Unlimited transactions.

[6] The paper's results rest on Pangram, an AI detection tool that infers AI use from statistical patterns in texts. The most recent Pangram Model Card, *see* https://www.pangram.com/research/model-card/pangram-3-3, reports few false positives (i.e., false indications that human-written text was AI-generated) from the company's internal testing. But the specific settings Pangram tested do not resemble the experimental settings in the Chakrabarty et al. study. To assess the reliability of their results using Pangram, Chakrabarty et al. should have but did not test Pangram's false-positive rate with books published before generative AI.

Past research has demonstrated the significance of this problem. *See* K. Ren et al., *Hitting a Moving Target: Test-Time Adaptation for AI Text Detection under Continual Distribution Shift*, arXiv preprint, arXiv:2606.25152 (accepted to NeurIPS, 2026) (finding that AI text-detection tools are vulnerable to various forms of "distribution shift" in human writing; in particular, change in human writing over time ("temporal drift") produces false positives (real human writing labeled as AI)). *Id*. at 10. A 2025 study tested 12 AI detectors, including Pangram, on about 15,000 samples of human writing edited by AI. *See* Shoumik Saha & Soheil Feizi, *Almost AI, Almost Human: The Challenge of Detecting AI-Polished Writing*, in Findings of the Ass'n for Computational Linguistics: ACL 2025, at 25414 (2025), doi:10.18653/v1/2025.findings-acl.1303. The detectors often struggled to distinguish degrees of AI assistance, and classified human-authored and minimally AI-edited text ("AI polished" text) as entirely AI-generated.

substantial AI books represented 20% of the titles and 11.3% of the revenues. *Id.* at 3. However, many of the works Chakrabarty et al. characterize as "substantial AI" works are more accurately described as human-authored-AI-assisted "hybrid" works. For that reason, the paper misfires when it asserts that the entry of these works necessarily "diluted" the market for human-authored works. Once the human authorship in these works is accounted for, it is more likely that the market for human authored works expanded, rather than being diluted.[7]

Further, the paper understates how much its results depend on the extent of AI assistance. As the paper's definition of "substantial AI" changes from more than 25% to more than 50%, the share of revenue attributed to these works shrank by 37%. *Id.* at 25-26. The paper does not report results from works that were 100% AI-generated.

The upshot is that the paper's headline results—that the entry of AI-generated works reduced the market share of human authored works and diluted the market—depends on counting all works with AI content over 25% as, in effect, having been produced entirely by machine. The paper offers no reason why the threshold should be set so low, or why the human authorship in these works should be ignored.

3. Imke Reimers & Joel Waldfogel Study of Published Book Markets[8]

Another recent paper found no evidence of market dilution. The Reimers & Waldfogel paper examines data on millions of published books on Amazon between 2022 and 2025, a period in which AI models became more adept at producing long text passages. The paper reports that the introduction of AI was associated with a flood of new books (the number of

---

[7] The strength of such an effect is an empirical question because not all new entries represent entirely novel work, and there is the concern that AI-assisted work might drive homogenization of content. Moreover, not all AI-generated works were created by new entrants. Chakrabarty et al. reports that of the 824 sellers who released a substantial AI book, just under half (374) had previously created at least one human-authored work. Chakrabarty et al. at 30.

[8] Imke Reimers & Joel Waldfogel, *AI and the quantity and quality of creative products: Have LLMs boosted creation of valuable books?*, National Bureau of Economic Research (NBER) working paper 34777 (NBER, 2026).

books on Amazon nearly tripled between 2022 and 2025). Reimers & Waldfogel at 2. However, the explosive growth of what the authors refer to as "LLM-affected" books[9] (a label suggesting that most are hybrid works) does not appear to have displaced human authors (both the number and quality of human-authored works remained stable). *Id.* at 3.

The authors report that although LLM-affected books were of lower average quality relative to books as to which no AI-generated content was detected, enough LLM-affected books were of sufficiently high quality that their introduction into the market modestly benefited consumers (raising consumer surplus by 7% over the period). *Id.* By examining market dilution through the lens of incumbents and entrants, this analysis speaks to a clearer definition of market dilution. However, even this study measures AI adoption through textual analysis of a 1000-word preview which cannot capture how much human input went into a work.

## III. If Market Dilution Exists in Some Sectors, Any Harm It Causes Would Be Collective in Nature and Legislatures, Not Courts, Are More Appropriate Venues for Addressing Such Harms

Courts can adjudicate specific copyright claims of specific plaintiffs against specific defendants. Under settled law, courts recognize market harm only when a particular defendant's work copies protected expression from a plaintiff's work and meaningfully harms the market for that work. In contrast, market dilution, assuming it exists, would represent a collective harm to all human authors in the affected markets or market segments. Courts are not equipped to address harms of that scope. Neither plaintiffs nor defendants in any particular copyright infringement lawsuit are likely to have the kind of evidence required to assess the market-wide harm or to propose market-wide remedies. In addition, no single generative AI developer defendant could plausibly be responsible for dilution on its own, because all developers of generative AI systems

[9] "LLM" stands for "large language model," a type of AI that is trained on and generates text.

would likely have contributed to this sort of market-wide harm. Moreover, no plaintiff or group of plaintiffs can adequately represent the interests of many creators who are not plaintiffs in those cases but would nonetheless be affected by the outcome of the plaintiffs' claims. Collective harms require collective solutions. It is Congress, not courts in individual cases, that can best address collective harms. Congress has the power to hold hearings, to compel the production of information necessary to assess the prospect of market-wide harm, and to fashion new rules to curb any market-wide effects in markets for creative works. Those powers extend far beyond the evidentiary and remedial reach of any court.

While some commentators, including the judge in *Kadrey*, 788 F. Supp. 3d at 1038, have suggested that licensing could address market dilution harms, amici are skeptical that this kind of private ordering is practicable. Because harms from dilution would affect entire authorial communities, not just individual authors, and because those harms would plausibly be attributable to all generative AI developers, not just to one defendant, it would be virtually impossible for private parties, without legislative intervention, to devise a workable licensing regime.

Concerns about the impacts of generative AI systems for human authors and human authorship have been voiced in the EU as well as in the U.S.[10] Numerous European copyright scholars have endorsed collective licensing regimes under which generative AI developers would be obliged to provide copyright owners with remuneration for AI-related uses of in-copyright materials.[11] These scholars have urged the European Commission to initiate legislative proposals

---

[10] For a fuller discussion of these concerns, *see* Pamela Samuelson, *Assessing the Feasibility of Collective Licensing of In-Copyright Works as Training Data for Generative AI Systems*, 123 (30) Proceedings of the Nat'l Acad. Sci. (July 20, 2026), www.pnas.org/doi/10.1073/pnas.2509769122. Several paragraphs of this brief derive from that article.

[11] *See, e.g.*, Christophe Geiger & Vincenzo Iaia, *The Forgotten Creator: Towards a Statutory Remuneration Right for Machine Learning of Generative AI*, 52 Computer L. & Sec. Rev. 1 (2024), https://www.sciencedirect.com/science/article/pii/S0267364923001358; Giancarlo Frosio, *Should We Ban*

to enact generative AI remuneration regimes. Amici agree with those scholars that policy interventions to address harms to authorial markets should come from legislatures, not from courts.

Professor Giancarlo Frosio, for example, recommends adoption of a levy regime for licensing generative AI training on in-copyright works under which "statutory remunerations could be linked to specific categories of works or right-holders, based on an empirical review of the creative markets most significantly disrupted by AI-generated creativity." Frosio, *supra* 83 n. 11. He thinks this levy system should take account of generative AI's market substitution effects on human authorship, consider the unique combinatorial nature of AI outputs, lower transaction costs compared to traditional copyright models, and support human-authored creativity, which could then provide more data for further training of AI models. Frosio would limit remuneration to those creators whose works are "significantly affected by AI." *Id*.

Professor Martin Senftleben's collective licensing proposal would allow training to proceed without advance compensation but would impose a levy on generative AI developers' commercialization of their products and services.[12] Senftleben, *supra* n. 12, at 1549. Senftleben argues that requiring remuneration at the training stage would hinder both the development of high-quality, unbiased AI systems and innovation in AI industries. *Id*. at 1554-56.

Amici are less sanguine than European proponents of collective licensing seem to be that authors and other right-holders would reap substantial revenues from remuneration schemes. At

*Generative AI, Incentivize It or Make It a Medium for Inclusive Creativity?*, *in* A Research Agenda for EU Copyright Law (Enrico Bonadio & Caterina Sganga, eds., Edward Elgar 2024); Martin Senftleben, *Generative AI and Author Remuneration,* 54 IIC–Int'l Rev. Intellectual Property & Competition Law, 1535–60 (2025), https://link.springer.com/content/pdf/10.1007/s40319-023-01399-4.pdf.

[12] Professor Senftleben's proposed levy on generative AI products and services has some advantages over training-data-based collective licensing options. It would support model developers' uses of the widest range of inputs for training models, keep entry barriers lower than an opt-out regime, provide financial support for human creators and their works of authorship, and avoid consuming the bulk of collected levies in administering payouts to millions of individual creators.

present, it is impossible to assess how much value particular inputs have contributed to models on which they were trained. *See* J. P. Quintais, *Generative AI, copyright and the AI Act*, 56 *Comput. Law Secur. Rev.* 1, 14 (2025). Because of the massive size of training data sets and the inability to pinpoint the value added by particular inputs, it seems likely that the costs of administering the licenses may be very high in relation to payouts to millions of individual right-holders.

Congress has a track record of responding to technological disruptions to copyright markets by providing a collective response to perceived collective harms to affected industries. In 1992, for example, Congress enacted the Audio Home Recording Act (AHRA) in response to the recording industry's concerns that the introduction of digital audio tape (DAT) recording systems would harm the market for selling recorded music. Pub. L. No. 102–563, 106 Stat. 4237 (1992). In enacting that law, Congress took account not only of the interests of the recording industry, but also the interests of music publishers, the consumer electronics industry and the public.[13] It allowed DAT technologies to be developed as long as manufacturers installed copy-control technology that limited the making of so-called "second generation" digital copies (i.e., a digital copy produced from another digital copy) and imposed a royalty on DAT machines and tapes to provide compensation to music and sound recording copyright owners; it also immunized consumer copying of music. 17 U.S.C. §§ 1002-1008.

Then in 1995 the recording industry persuaded Congress that it should be able to control digital transmissions of sound recordings on the Internet (e.g., Internet radio). So Congress granted the industry an exclusive right to publicly perform recordings by digital audio

---

[13] See, e.g., Gary S. Lutzker, Note, *Dat's All Folks:* Cahn v. Sony *and the Audio Home Recording Act of 1991—Merrie Melodies or Looney Tunes*?, 11 Cardozo Arts & Ent. L.J. 145, 170 (1992) (discussing the origins of the AHRA).

transmission. Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, 109 Stat. 336. But once again, Congress considered the interests of all stakeholders in amending the copyright act to provide a balanced solution—one that, as the House Report on the legislation explained, took into account both the promise of the "new digital transmission technologies[, which] may permit consumers to enjoy performances of a broader range of higher-quality recordings than has ever before been possible," and "the livelihoods of the recording artists, songwriters, record companies, music publishers and others who depend upon revenues derived from traditional record sales." H.R. Rep. No. 104-274, at 12-13 (1995).

This history of Congressional responsiveness to copyright industry concerns about collective harms due to technological change suggests that a sound way forward with respect to possible—and thus far unproven—collective harms caused by AI to authorial markets is for Congress to do the investigation and assessment necessary to properly understand whether harm is likely, and, if so, to what extent. Congress can then design remedies tailored to forestall that harm or compensate for it.

## **CONCLUSION**

For these reasons, amici respectfully urge the Court to reject Plaintiffs' market dilution theory as inconsistent with copyright law. At a minimum, the Court should decline to infer dilution and should require Plaintiffs to prove it with empirical evidence. If market dilution proves real, Congress, not this Court, is the appropriate forum for a remedy.

Respectfully submitted,

JASON M. SCHULTZ
Professor of Law

*By: /s/ Jason M. Schultz*

JASON M. SCHULTZ
Professor of Law
New York University School of Law
Furman Hall
245 Sullivan Street
New York, NY 10012
Tel: (212) 992-7365
Email: jason.schultz@exchange.law.nyu.edu

*Attorney for Amicus Curiae*
*Professors Pamela Samuelson and*
*Christopher Jon Sprigman*

October 30, 2026

**CERTIFICATE OF WORD COUNT AND WORD LIMITATION COMPLIANCE**

The undersigned certifies, as per Local Civil Rule 7.1(c), that the length of the accompanying Amicus Curiae Brief of Professors Pamela Samuelson and Christopher Jon Sprigman, excluding the caption, table of contents, table of authorities, date, signature block, and this certificate is 6000 words, since his word-processing program states the word count is 6000 words. The brief is set in 12-point Times New Roman type, double-spaced, with one-inch margins, in compliance with Local Civil Rule 7.1(b).

Respectfully submitted,

JASON M. SCHULTZ
Professor of Law

*By: /s/ Jason M. Schultz*

JASON M. SCHULTZ
Professor of Law
New York University School of Law
Furman Hall
245 Sullivan Street
New York, NY 10012
Tel: (212) 992-7365
Email: jason.schultz@exchange.law.nyu.edu

*Attorney for Amicus Curiae Professors Pamela Samuelson and Christopher Jon Sprigman*

October 30, 2026