# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE:**<br><br>**OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION**<br><br>This Document Relates To: All Related Cases | MDL No. 1:25-md-03143 (SHS) (OTW)<br><br>Hon. Sidney H. Stein |

**[PROPOSED] BRIEF OF HUMAN CONSENT FOUNDATION, CREATIVE ARTISTS AGENCY, LLC, MUSIC ARTISTS COALITION, NATIONAL ASSOCIATION OF VOICE ACTORS, WRITER, INC., CREATORS COALITION ON ARTIFICIAL INTELLIGENCE, CATE BLANCHETT, NICK HEXUM & STEVEN SODERBERGH AS *AMICI CURIAE***

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* make the following corporate disclosures.

- **Human Consent Foundation ("HCF")** is a non-profit public benefit corporation. HCF has no parent corporation, does not issue stock, and no publicly held corporation owns 10% or more of any interest in it.
- **Creative Artists Agency, LLC ("CAA")** is a limited liability company. CAA's parent entity is CAA Holdings, LLC, and no publicly held corporation owns 10% or more of any interest in it.
- **Music Artists Coalition ("MAC")** is a 501(c)(6) organization. MAC has no parent corporation, does not issue stock, and no publicly held corporation owns 10% or more of any interest in it.
- **National Association of Voice Actors ("NAVA")** is a 501(c)(6) organization. NAVA has no parent corporation, does not issue stock, and no publicly held corporation owns 10% or more of any interest in it.
- **Writer, Inc. ("WRITER")** is a corporation. WRITER has no parent corporation, and no publicly held corporation owns 10% or more of its stock.
- **Creators Coalition on Artificial Intelligence ("CCAI")** is a 501(c)(3) organization. CCAI has no parent corporation, does not issue stock, and no publicly held corporation owns 10% or more of any interest in it.

## STATEMENT REGARDING AUTHORSHIP AND FUNDING

This brief was not authored in whole or in part by a party or a party's counsel. No party or party's counsel contributed money intended to fund the preparation or filing of this brief; and no person other than the *amici curiae* and/or their members contributed money intended to fund the preparation and/or filing of this brief.

**TABLE OF CONTENTS**

I. INTERESTS OF AMICI CURIAE......1

II. INTRODUCTION......4

III. ARGUMENT......5

A. Collective Licensing of Dispersed Rights Holders Is Established Practice......5

B. Machine-Readable Consent Infrastructure Is Feasible and In Use Now......7

C. The Licensing Market Is Established for Premium Content and Emerging for Broader Categories......12

D. The Licensing Market was Operational and Accessible......16

E. The Fourth Factor Analysis Must Reflect the Market Realities......18

IV. CONCLUSION......19

# TABLE OF AUTHORITIES


**CASES** **PAGE(S)**

*Am. Geophysical Union v. Texaco, Inc.*,
60 F.3d 913 (2d Cir. 1994)....4, 5, 19

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....4, 5, 19

*In re Terrorist Attacks on Sept. 11, 2001*,
No. 03 MDL 1570 (GBD)(SN), 2022 WL 17326181 (S.D.N.Y. Nov. 29, 2022)....1

*Ziff Davis, Inc. v. OpenAI, Inc.*,
No. 1:25-cv-04315 (S.D.N.Y.), ECF No. 667....2

**STATUTES**

17 U.S.C. § 102(a)....5

17 U.S.C. § 106....19

17 U.S.C. § 107(4)....19

**OTHER AUTHORITIES**

*400 Publications Are Now Partnering with Us on Our News AI Pilot Program*, Google: The Keyword (Oct. 15, 2026), https://blog.google/products-and-platforms/products/news/news-ai-pilot-update-publishers....13

*About* BMI, BMI, https://www.bmi.com/about (last visited Oct. 28, 2026)....6

*About*, Music Artists Coal., https://www.musicartistscoalition.com/about (last visited Oct. 28, 2026)....2

*About*, RSL Standard, https://rslstandard.org/about (last visited Oct. 28, 2026)....8

*About*, Writer, https://writer.com/company/about/ (last visited Oct. 28, 2026)....2

*About Us*, Creative Artists Agency, https://www.caa.com/about-us (last visited Oct. 28, 2026)....2

*Adobe Firefly FAQ*, Adobe, https://helpx.adobe.com/firefly/get-set-up/learn-the-basics/adobe-firefly-faq.html (last visited Oct. 28, 2026)....18

AGICOA, *2024 Annual Report*, https://annual-report-2024.agicoa.org/home....6

*Amazon to Pay NYT Up to $25 Million for AI Licensing*, PYMNTS (July 30, 2025), https://www.pymnts.com/news/artificial-intelligence/2025/amazon-paying-new-york-times-25-million-dollars-ai-licensing....................17

*A New Framework for AI Permissions*, Lexology (June 17, 2026), https://www.lexology.com/library/detail.aspx?g=70d8ff7e-543c-4be7-a9fd-c73edfaa1ecb....................11

*A New Framework for AI Permissions in Entertainment: RSL Media's Human Consent Standard*, Mondaq (July 14, 2026), https://www.mondaq.com/unitedstates/trademark/1817008/a-new-framework-for-ai-permissions-in-entertainment-rsl-medias-human-consent-standard....................1

Andrew Eichner, *File Sharing: A Tool for Innovation, or a Criminal Instrument?* B.C. Intell. Prop. & Tech. F., Sept. 2011, https://sites.bc.edu/iptf/2010/11/08/file-sharing-a-tool-for-innovation-or-a-criminal-instrument/....................5

Björn Ulvaeus, President, CISAC, *The Future Needs Creators,* Opening Keynote Address at the AI for Good Global Summit, Geneva (July 9, 2026) (transcript available at https://www.cisac.org/sites/main/files/files/2026-07/COM26-0653_The_Future_Needs_Creators_Full_Transcript_of_Bjorn_Opening_Keynote_AI_for_Good_Summit_2026_2026-07-10_EN%20%281%29.pdf)....................16

Chris Cooke, *NMPA Unveils AI Licensing Deals with Udio and Klay with 50/50 Split for Songs and Recordings*, Complete Music Update (June 11, 2026), https://completemusicupdate.com/nmpa-unveils-ai-licensing-deals-with-udio-and-klay-with-50-50-split-for-songs-and-recordings ....................14

CISAC, *Global Collections Report 2025*, https://www.cisac.org/Newsroom/news-releases/cisac-global-collections-report-2025....................6

*CISAC's Most Relevant Electronic Data Exchange Formats*, CISAC, https://www.cisac.org/formats (last visited Oct. 28, 2026) ....................11

*Collective Management of Copyright and Related Rights*, WIPO, https://www.wipo.int/en/web/copyright/collective-management (last visited Oct. 28, 2026). ....................7

Elizabeth Dilts Marshall, *ASCAP's Elizabeth Matthews Is Looking Out for Songwriters — And Protecting Their Futures*, Billboard (Apr. 17, 2026), https://www.billboard.com/pro/elizabeth-matthews-women-in-music-executive-of-the-year....................6

Emilia David, *Vox Media and The Atlantic Sign Content Deals with OpenAI*, The Verge (May 29, 2024), https://www.theverge.com/2024/5/29/24167072/openai-content-copyright-vox-media-the-atlantic. ....................17

Emma Roth, *George Clooney, Tom Hanks, and Meryl Streep Back New 'Human Consent Standard' for AI Licensing*, The Verge (May 12, 2026), https://www.theverge.com/ai-artificial-intelligence/928534/rsl-media-human-consent-standard ........ 8

Emma Roth, *Microsoft Says It's Building an App Store for AI Content Licensing*, The Verge (Feb. 3, 2026), https://www.theverge.com/news/873296/microsoft-publisher-content-marketplace-ai-licensing ........ 14

Fact.MR, *AI Training Data Licensing and Royalty Brokerage Services Market* (June 2026), https://www.factmr.com/report/ai-training-data-licensing-and-royalty-brokerage-services-market ........ 18

*File Sharing: A Tool for Innovation, or a Criminal Instrument?*, B.C. Intell. Prop. & Tech. F., Sept. 2011, https://sites.bc.edu/iptf/2010/11/08/file-sharing-a-tool-for-innovation-or-a-criminal-instrument/ ........ 5

*Frequently Asked Questions*, Ent. ID Registry Ass'n, https://www.eidr.org/faq (last visited Oct. 28, 2026) ........ 11

Gabriella Castillo, *The Music Lawyers Guide to Sync, Streaming, and Licensing Deals, GPSolo* (Am. Bar Ass'n), Nov./Dec. 2025, https://www.americanbar.org/groups/gpsolo/resources/magazine/2025-nov-dec/music-lawyers-guide-sync-streaming-licensing-deals/ ........ 7

GMR, *FAQ*, https://globalmusicrights.com/faq (last visited Oct. 28, 2026) ........ 6

Google, *YouTube Copyright Transparency Report*, https://transparencyreport.google.com/youtube-copyright/intro ........ 9

H.R. Rep. No. 94-1476 (1976) ........ 5

Hannah Miller & Dina Bass, *Microsoft Signs AI-Learning Deal with News Corp.'s HarperCollins*, Bloomberg (Nov. 19, 2024), https://www.bloomberg.com/news/articles/2024-11-19/microsoft-signs-ai-learning-deal-with-news-corp-s-harpercollins ........ 12

Human Consent Found., *Human Consent Standard 1.0 Draft Specification* §§ 1–3 (Draft, Aug. 8, 2026), https://humanconsent.org/hcs ........ 1

Int'l Org. for Standardization, ISO 2108:2017, *Information and Documentation — International Standard Book Number (ISBN)* (2017), https://www.iso.org/standard/65483.html ........ 11

Int'l Org. for Standardization, ISO 3901:2019, *Information and Documentation — International Standard Recording Code (ISRC)* (2019), https://www.iso.org/standard/64817.html. ........ 11

Int'l Org. for Standardization, ISO 27729:2024, *Information and Documentation — International Standard Name Identifier* (ISNI*)*, https://www.iso.org/standard/87177.html. ....................11

Jenni Reid, *ABBA's Successful Avatar Show in London Offers a Glimpse at a Daring New Direction for Live Music*, CNBC (Dec. 29, 2022), https://www.cnbc.com/2022/12/29/abba-voyage-avatar-show-in-london-offers-glimpse-of-future-for-live-music.html. ....................15

LLM Pulse, *Every AI Content Licensing Deal, Mapped*, LLM Pulse (July 9, 2026), https://llmpulse.ai/blog/ai-content-licensing-deals ....................14

Nat'l Ass'n of Voice Actors, https://navavoices.org (last visited Oct. 28, 2026)....................2

*ONIX FAQs*, EDItEUR, https://www.editeur.org/74/FAQs (last visited Oct. 28, 2026) ....................11

*Our Approach to Generative AI*, Adobe, https://www.adobe.com/ai/overview/firefly/gen-ai-approach.html (last visited Oct. 28, 2026) ....................18

Press Release, ASCAP, *Venues Refuse to Pay Songwriters* (Oct. 20, 2026), https://www.ascap.com/press/2026/10/10-20-venues-refuse-pay-songwriters ....................6

Press Release, *Cloudflare, Inc., Cloudflare Strengthens Content Offering to AI Companies with Acquisition of Human Native* (Jan. 15, 2026), https://cloudflare.net/news/news-details/2026/Cloudflare-Strengthens-Content-Offering-to-AI-Companies-with-Acquisition-of-Human-Native/default.aspx ....................13

Press Release, Veritone, *Veritone Announces Strategic Partnership with CAACreative Artists Agency for the Launch of the CAAvault* (May 14, 2024), https://www.veritone.com/newsroom/press-releases/veritone-announces-strategic-partnership-with-creative-artists-agency-for-the-launch-of-thecaavault ....................14

Rebecca Szkutak, *Deal Dive: Human Native AI Is Building the Marketplace for AI Training Licensing Deals*, TechCrunch (June 8, 2024), https://techcrunch.com/2024/06/08/deal-dive-human-native-ai-is-building-the-marketplace-for-ai-training-licensing-deals....................13

Reporters Without Borders, *The AI Media Landscape: 71% of AI Deals Made with Media Outlets in Anglophone Countries* (Sept. 11, 2026), https://rsf.org/en/ai-media-landscape-71of-ai-deals-made-media-outlets-anglophone-countries....................13

*Retail AI Terms Tracker*, The Fashion L. (Sept. 17, 2026), https://www.thefashionlaw.com/retail-ai-terms-tracker ....................13

Richard Lawler, *OpenAI Is Paying Dotdash Meredith at Least $16 Million a Year to License Its Content for AI,* The Verge (Nov. 18, 2024), https://www.theverge.com/2024/11/18/24300144/openai-is-paying-dotdash-meredith-at-least-16-million-a-year-to-license-its-content-for-ai..........................................17

*RSL Media's Human Consent Standard*, JD Supra (June 16, 2026), https://www.jdsupra.com/legalnews/rsl-media-s-human-consent-standard-a-5809993..........................................1

SAG-AFTRA, *Contract Bulletin: A.I. Digital Replicas* (July 2024), https://www.sagaftra.org/sites/default/files/sa_documents/Contract%20Bulletin%20-%20A.I.%20Digital%20Replicas.pdf ..........................................18

*Standards*, DDEX, https://www.ddex.net/standards (last visited Oct. 28, 2026)..........................11

Todd Spangler, *The CAA Vault, Which Stores AI Clones of Talent, Taps Veritone as Tech Partner*, Variety (May 14, 2024), https://variety.com/2024/digital/news/caa-vault-talent-ai-clones-veritone-1236001187/. ..........................................15

U.S. Copyright Office, *Copyright and Artificial Intelligence*, *Part 3: Generative AI Training* (pre-publication version May 2025)..........................................4

Violetta Hondza*, Training AI Models on Copyrighted Works Under EU Law* (Stanford-Vienna Transatlantic Tech. L. F., EU Law Working Paper No. 150, 2026), https://law.stanford.edu/wp-content/uploads/2026/10/EU-Law-WP-150-Hondza.pdf ..........................................5

*Who We Are*, Creators Coalition on A.I., https://www.creatorscoalitionai.com/#who-we-are (last visited Oct. 28, 2026) .......................3

*Who We Are*, SoundExchange, https://www.soundexchange.com/who-we-are (last visited Oct. 28, 2026)..........................................6

Xuanhe Zhou et al., *A Survey of LLM × DATA* (June 1, 2025) (unpublished manuscript) (arXiv:2505.18458v3), https://arxiv.org/abs/2505.18458 ..........................................9

## I. INTERESTS OF *AMICI CURIAE*.

Human Consent Foundation ("HCF"), Creative Artists Agency, LLC ("CAA"), Music Artists Coalition ("MAC"), National Association of Voice Actors ("NAVA"), Writer, Inc. ("WRITER"), The Creators Coalition on AI ("CCAI"), Cate Blanchett, Nick Hexum and Steven Soderbergh (collectively, the "*Amici*"), respectfully submit this brief to help, support, and assist the Court by correcting the factual record regarding the operational realities of the AI data licensing market based on their "unique information or perspective."[1]

***HCF*** is a nonprofit organization that develops and maintains the Human Consent Standard ("HCS"), an openly published, XML-based technical specification developed with industry stakeholders that allows individuals and rights holders to identify how artificial intelligence systems may process their creative works and likenesses.[2] To operationalize this standard, HCF runs the Human Consent Registry, the centralized infrastructure where these machine-readable declarations are published and made discoverable and queryable to AI systems at web scale.[3] HCF does not license works, collect royalties, operate a marketplace, or sell data.[4]

Much like the organizations that maintain the foundational protocols that govern web traffic and domain resolution (such as the HTTP and DNS), HCF exists solely to develop, publish

[1] *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD)(SN), 2022 WL 17326181, at *1 (S.D.N.Y. Nov. 29, 2022).

[2] *See* Human Consent Found., *Human Consent Standard 1.0 Draft Specification* §§ 1–3 (Draft, Aug. 8, 2026), https://humanconsent.org/hcs; *see also A New Framework for AI Permissions in Entertainment: RSL Media's Human Consent Standard*, Mondaq (July 14, 2026), https://www.mondaq.com/unitedstates/trademark/1817008/a-new-framework-for-ai-permissions-in-entertainment-rsl-medias-human-consent-standard (describing HCS as a machine-readable protocol covering creative works, identity, likeness, voice, characters, and marks).

[3] *See* Human Consent Found., *supra* note 1, §§ 2, 3.1.1, 3.1.5 (defining "Registry" and "Registry-Wide Default Policies"); *see also RSL Media's Human Consent Standard*, JD Supra (June 16, 2026), https://www.jdsupra.com/legalnews/rsl-media-s-human-consent-standard-a-5809993 (describing the free public registry that AI platforms can query).

[4] *See* Human Consent Found., *supra* note 2, § 1.

and maintain the Human Consent Standard as an open public resource. HCF has no commercial interest in the outcome of this litigation.

***CAA*** is a talent agency serving clients across film, television, music, sports, brands, and Creator Economy.[5] Through its representation of creators and rights holders, CAA has experience with the licensing and clearance of creative rights, including issues arising from emerging technologies. CAA has no commercial interest in the outcome of this litigation.

***MAC*** advocates for artists in the music industry.[6] MAC focuses on "protecting the rights, financial security, and creative freedoms of musicians."[7] Its work gives MAC a perspective on the rights and licensing interests of music creators affected by emerging uses of creative works. MAC has no commercial interest in the outcome of this litigation.

***NAVA*** is "a social impact non-profit association created to advocate and promote the advancement of the voice acting industry through action, education, inclusion, and benefits."[8] It represents voice actors in approximately 47 states and 22 countries. NAVA brings the perspective of professional voice actors whose industry is actively being impacted by emerging AI technologies. NAVA has no commercial interest in the outcome of this litigation.

***WRITER*** is an enterprise AI platform built for the world's leading marketing and revenue teams.[9] It has developed and built its own family of models, Palmyra, which has informed its perspective on how to respect third party rights while likewise creating highly performant models. WRITER has no commercial interest in the outcome of this litigation.

---

[5] *See About Us*, Creative Artists Agency, https://www.caa.com/about-us (last visited Oct. 28, 2026).

[6] *See About*, Music Artists Coal., https://www.musicartistscoalition.com/about (last visited Oct. 28, 2026).

[7] *Id.*

[8] *See* Nat'l Ass'n of Voice Actors, https://navavoices.org (last visited Oct. 28, 2026).

[9] *See About*, Writer, https://writer.com/company/about/ (last visited Oct. 28, 2026).

***CCAI*** is a nonprofit 501(c)(3) organization founded by film, television and digital content professionals to address the effects of artificial intelligence on creative work.[10] More than 6,000 creators have signed on to its mission, across eleven profession groups ranging from writers, performers and directors to post-production, visual effects, craft workers, studio staff and independent creators.[11] CCAI is technology-agnostic. It takes no position for or against AI and instead works to establish shared, community-led standards for its use in creative industries. CCAI has no commercial interest in the outcome of this litigation.

***Cate Blanchett*** is an actor and producer, a co-founder of HCF, and a co-author of the HCS.[12] Her experience as both a creator and producer provides a practical perspective on consent and rights-clearance practices in the creative industries. She has no commercial interest in the outcome of this litigation.

***Nick Hexum*** is a singer, songwriter and producer, and a co-author of the HCS.[13] His work as both a creator and with HCF provides a perspective on the development of consent infrastructure for creative works in the AI context. He has no commercial interest in the outcome of this litigation.

***Steven Soderbergh*** is a filmmaker, cinematographer and editor, and a founding board member of HCF.[14] His experience in filmmaking and production provides a practical perspective on rights clearance and licensing in the creative industries. He has no commercial interest in the outcome of this litigation.

---

[10] *See Who We Are*, Creators Coalition on A.I., https://www.creatorscoalitionai.com/#who-we-are (last visited Oct. 28, 2026).

[11] *See id.*

[12] *See* Human Consent Found., supra note 2.

[13] *See id.*

[14] *See id.*

## II. INTRODUCTION.

In their Motions for Summary Judgment, Defendants assert that clearing rights for AI data ingestion, training, and grounding is cost-prohibitive, technically unfeasible, and unsupported by any existing market or valuation framework. *Amici*[15] offer this submission to correct these mischaracterizations by demonstrating the existence of proven collective licensing infrastructure, scalable machine-readable consent protocols, and an active, functioning market for licensing creative works across the AI development pipeline.

The Fourth Fair Use Factor asks whether the defendants' use harms the market for the plaintiffs' work. Courts look to markets that are "traditional, reasonable, or likely to be developed."[16]

Defendants have argued that licensing creative works for AI training is cost-prohibitive. Defendants also claim there is no settled means of valuing training data.[17] The facts demonstrate otherwise. The creative industries already have in place a proven infrastructure and workflows to clear rights for dispersed works at scale and cost-effectively.[18]

The litigation record itself confirms that major technology companies are now successfully executing complex, high-value licensing agreements.[19] The successful completion of these

---

[15] Appendix A is offered to inform the Court of the breadth of support among creators and other stakeholders for the licensing and consent frameworks described herein. Each of the creators and rights holders identified on Appendix A have expressed their support for positions set forth in this brief. However, this brief is submitted solely on behalf of the organizational and individual *Amici* identified above.

[16] *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 930 (2d Cir. 1994); *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 592 (1994).

[17] *See* Def. Microsoft Corp.'s Mem. of Law in Supp. of Mot. for Summ. J. in Books Pls.' Consol. Cases at 28, ECF No. 1973 ("Microsoft Books Mem.").

[18] *See* U.S. Copyright Office, *Copyright and Artificial Intelligence*, *Part 3: Generative AI Training* 104 (pre-publication version May 2025).

[19] *See* Class Pls.' Mem. of Law in Supp. of Mot. for Partial Summ. J. at 37, ECF No. 1982 ("Class Pls.' Mem.") (documenting more than 120 licenses and an outlay "well-north of $1 billion").

transactions demonstrates that the market exists and is functional.[20] These licensing deals align with how traditional rights clearances are conducted, which require "upstream authorization" prior to use, confirming large-scale licensing is practically feasible.[21]

Defendants also argue that no licensing market existed for AI training at the time of initial model ingestions.[22] However, the Fourth Fair Use Factor explicitly protects markets that are "likely to be developed."[23] Copyright law is technology-neutral. The emergence of a disruptive technology does not extinguish underlying copyrights. It simply forces the market to adapt.[24] Historical precedent demonstrates that, when distribution technology outpaces existing licensing frameworks, the market does not die. The market builds new infrastructure.[25] Just as the advent of peer-to-peer networks, like Napster, preceded the creation of collective digital frameworks, the current wave of AI development has catalyzed a licensing market for significant segments of creative content.[26]

## III. <u>ARGUMENT.</u>

### A. Collective Licensing of Dispersed Rights Holders Is Established Practice.

The creative industries have operated collective licensing frameworks for over a century,

---

[20] *See* Violietta Hondza, *Training AI Models on Copyrighted Works Under EU Law* 138–39 (Stanford-Vienna Transatlantic Tech. L. F., EU Law Working Paper No. 150, 2026), https://law.stanford.edu/wp-content/uploads/2026/10/EU-Law-WP-150-Hondza.pdf (documenting growth of direct licensing deals).

[21] *See infra* Part III.A

[22] *See* Def. Microsoft Corp.'s Mem. of Law in Supp. of Mot. for Summ. J. in News Pls.' Consol. Cases at 29, ECF No. 1975 ("Microsoft News Mem.") (arguing "no such market existed or was likely to develop prior to the advent of web grounding itself").

[23] *Texaco*, 60 F.3d at 930; *see also Campbell*, 510 U.S. at 592.

[24] *See* H.R. Rep. No. 94-1476, at 51–52, 66 (1976); *see also* 17 U.S.C. § 102(a).

[25] *See* Andrew Eichner, *File Sharing: A Tool for Innovation, or a Criminal Instrument?*, B.C. Intell. Prop. & Tech. F., Sept. 2011, at 6–8, https://sites.bc.edu/iptf/2010/11/08/file-sharing-a-tool-for-innovation-or-a-criminal-instrument/ (discussing voluntary collective licensing and the historical adoption of collective licensing by ASCAP and BMI for radio).

[26] *See id.*; *see also* Class Pls.' Mem. at 37.

and those frameworks now administer rights at scale that directly address the "dispersed owner" concern.[27] These organizations exist because collective licensing solves a transaction-cost problem. They operate as centralized clearinghouses that manage rights for entire repertoires through blanket licenses and automated, meta-data driven systems, rather than requiring individual negotiations for each work. For example:

- **CISAC,** the International Confederation of Societies of Authors and Composers, represents more than 5 million creators through 228 member societies in 111 countries, collecting approximately €14 billion annually.[28]

- **ASCAP**, The American Society of Composers, Authors and Publishers, licenses over 20 million musical works on behalf of more than 1.1 million songwriters, composers, and publishers.[29]

- **BMI**, Broadcast Music, Inc., licenses over 25 million musical works.[30]

- **GMR,** Global Music Rights, licenses over 134,000 musical works.[31]

- **AGICOA**, the Association for the International Collective Management of Audiovisual Works, monitors the lifecycle use of over 1.6 million audiovisual works registered by more than 23,000 rightsholders.[32]

- **SoundExchange** maintains a database of more than 165 million unique sound recordings and distributes digital performance royalties to more than 850,000 creators across over 3,000 digital service providers.[33]

---

[27] *See* Elizabeth Dilts Marshall, *ASCAP's Elizabeth Matthews Is Looking Out for Songwriters — And Protecting Their Futures*, Billboard (Apr. 17, 2026), https://www.billboard.com/pro/elizabeth-matthews-women-in-music-executive-of-the-year; *see also About* BMI, BMI, https://www.bmi.com/about (last visited Oct. 28, 2026).

[28] *See* CISAC, *Global Collections Report 2025*, https://www.cisac.org/Newsroom/news-releases/cisac-global-collections-report-2025 (reporting €13.97 billion in 2024 across 228 societies in 111 countries).

[29] *See* Press Release, ASCAP, *Venues Refuse to Pay Songwriters* (Oct. 20, 2026), https://www.ascap.com/press/2026/10/10-20-venues-refuse-pay-songwriters.

[30] *See* About BMI, *supra* note 18.

[31] *See* GMR, *FAQ*, https://globalmusicrights.com/faq (last visited Oct. 28, 2026).

[32] *See* AGICOA, *2024 Annual Report*, https://annual-report-2024.agicoa.org/home (listing 1,683,620 works and 23,805 rightsholders).

[33] *See Who We Are*, SoundExchange, https://www.soundexchange.com/who-we-are (last visited Oct. 28, 2026).

The music and publishing industries successfully solved this exact transactional problem a century ago through collective management.[34] As observed by *amicus*, Nick Hexum, a multi-platinum musician and lead singer of the band 311, who brings over three decades of experience navigating complex fractional ownership and collective licensing structures:

> In the music business, a single track can involve dozens of songwriters, producers, and publishers. It is incredibly complex. But we don't just throw our hands up, we rely on our collective licensing systems to track ownership and make sure everyone gets paid. The idea that AI training data is somehow 'too complex' to license ignores the fact that the music industry has been solving this exact problem for generations.[35]

This process is further validated by regulatory analysis. The U.S. Copyright Office's May 2025 report on AI and Copyright recognized that collective licensing, through organizations such as ASCAP and the Copyright Clearance Center, can reduce "thousands or even millions of transactions to a manageable number," which undercuts claims that large-scale clearance is impossible.

**B. Machine-Readable Consent Infrastructure Is Feasible and In Use Now.**

For a century, the creative sectors have relied on human-mediated contracts, collective management organizations, and private databases to track ownership and clear rights at scale.[36] The fundamental mechanisms for clearing dispersed rights have existed for decades. Transitioning this process to accommodate automated, web-scale AI-ingestion requires machine-readable

---

[34] *See supra* notes 18–24.

[35] The foregoing statement was provided by Mr. Hexum to undersigned counsel for purposes of this submission.

[36] *See* Gabriella Castillo, *The Music Lawyer's Guide to Sync, Streaming, and Licensing Deals, GPSolo* (Am. Bar Ass'n), Nov./Dec. 2025, https://www.americanbar.org/groups/gpsolo/resources/magazine/2025-nov-dec/music-lawyers-guide-sync-streaming-licensing-deals/; *see also Collective Management of Copyright and Related Rights*, WIPO, https://www.wipo.int/en/web/copyright/collective-management (last visited Oct. 28, 2026).

translation. Modern technical specifications, such as the Human Consent Standard, simply automate and adapt the century-old collective licensing frameworks (like those used by ASCAP and BMI) for the modern web.[37] They allow rights holders to publish their permissions in a machine-readable format that AI systems can be programmed to check and comply with prior to training.[38] Furthermore, guilds, agencies and government bodies can publish baseline permissions or prohibitions for their entire membership or jurisdiction at once.[39]

This same framework resolves the historical fragmentation of publicity and likeness rights. By enabling individuals to publish identity-based permissions or prohibitions at scale, the architecture centralizes declarations that would otherwise require individual, human-mediated contracts for every use.[40]

The technical viability of this approach is rooted in the foundational architecture of the web itself. As Eckart Walther, one of the co-authors of the original RSS (Really Simple Syndication) protocol, observes:[41]

> Just as music and video platforms use digital fingerprints to identify content and apply licensing rules, the Human Consent Standard extends that approach to AI by allowing creative industries to define and publish machine-readable rights declarations that enable AI platforms to recognize and respect creative rights at internet scale.[42]

---

[37] *See* Human Consent Found., *supra* note 1; *see also* ASCAP, *supra* note 20.

[38] *See* Human Consent Found., *supra* note 1.

[39] *See id.* § 3.1.9.

[40] *See id.; see also* Emma Roth, *George Clooney, Tom Hanks, and Meryl Streep Back New 'Human Consent Standard' for AI Licensing*, The Verge (May 12, 2026), https://www.theverge.com/ai-artificial-intelligence/928534/rsl-media-human-consent-standard.

[41] *See* Human Consent Found., *supra* note 1; *see also About*, RSL Standard, https://rslstandard.org/about (last visited Oct. 28, 2026) (identifying Eckart Walther as *Technical Steering Committee* chair and RSS co-creator).

[42] The foregoing statement was provided by Mr. Walther to undersigned counsel for purposes of this submission.

Machine-readable consent protocols are opt-in systems. The absence of an exclusion tag is not a signal of consent; it is simply the default state of the web. This mirrors the Copyright Act, where exclusive rights vest automatically upon creation. Treating the mere failure to implement a technical tag as an "implied license" inverts both web architecture and copyright law. This shifts the burden of securing permission or license from the party seeking to use that work onto every creator to affirmatively opt out. *Amici* take no position on the specific implied-license defenses raised here, but submit only that technical silence is not legal consent.

AI developers already possess and routinely exercise the capability to curate and filter training datasets at web scale. Early AI models trained on raw, indiscriminate web crawls like Common Crawl, and frequently produced skewed, biased, or harmful outputs. In response, the industry built automated data curation pipelines to filter this raw data for quality, toxicity and personally identifiable information (PII) prior to training.

This demonstrates that content-based filtering for quality, toxicity and PII is routine.[43]

A prominent and well-documented example is YouTube's "Content ID System." Deployed to the collective works of the music and film industries, Content ID uses automated algorithms to scan massive volumes of user-uploaded content against a comprehensive, centralized database of trusted rights-owner declarations (*i.e.*, audio and visual fingerprints).[44] This system successfully manages rights clearance, blocking, and revenue routing at internet scale and has paid more than $12 billion to rightsholders, including millions of dispersed musicians and creators.[45]

Modern machine-readable consent standards, such as the Human Consent Standard, apply

---

[43] *See, e.g.*, Xuanhe Zhou et al., *A Survey of LLM × DATA* (June 1, 2025) (unpublished manuscript) (arXiv:2505.18458v3), https://arxiv.org/abs/2505.18458

[44] *See* Google, *YouTube Copyright Transparency Report*, https://transparencyreport.google.com/youtube-copyright/intro (last visited Oct. 28, 2026).

[45] *See id.*

a related principle. Just as digital music and video services use digital fingerprinting to identify audio and video content, HCS defines "semantic fingerprints" to enable AI systems to identify a broader array of creative rights subjects, and provides centralized, automated verification against a trusted database of rights holder declarations at the AI input and generation stage that expands to cover a broader array of creative rights subjects, including identity and likeness, literary, musical, audiovisual and visual art works, fictional characters and worlds and marks.

As noted by *amicus* Steven Soderbergh, an Academy Award-winning director with extensive operational experience in independent digital distribution and complex rights management:

> I've directed 40 films and almost 40 hours of television and every one of them involved a chain-of-permissions for music, locations, likenesses, and screenplays. There has been an infrastructure for all of this for over a century, and to imply or accept that we are starting from zero on this issue blatantly disregards the well-established, trusted and effective workflows that keep our industry, and those who work in it, running.[46]

As observed by *amicus* Cate Blanchett, whose decades of work in film and theater, both as an actor and producer, have involved rigorous adherence to chain-of-title protocols and digital rights management:

> I've been working in film and theater for over 30 years, and in that time, the principle has never changed. If someone wants to use my face, my voice or my image, they ask me first. There is a contract. There is a conversation. This isn't a new idea or a complicated legal framework, it is simply how we treat each other in this industry. Consent isn't a barrier to creativity, it is the foundation of it.[47]

The metadata infrastructure required to identify dispersed rights holders is already

---

[46] The foregoing statement was provided by Mr. Soderbergh to undersigned counsel for purposes of this submission.

[47] The foregoing statement was provided by Ms. Blanchett to undersigned counsel for purposes of this submission.

structured and operational. Established global databases, including ISBN (International Standard Book Number),[48] ISRC (International Standard Recording Code for sound recordings),[49] EIDR (Entertainment ID Registry for audiovisual works),[50] and ISNI (International Standard Name Identifier for identities and performing rights organization registries,[51] *e.g.*, ASCAP and BMI), provide the machine-readable identifiers required to map complex chains-of-title.[52] The creative industries routinely utilize collective licensing frameworks and bulk metadata services like DDEX (Digital Data Exchange),[53] ONIX (Online Information eXchange), and CISAC'S CWR (Common Works Registration)[54] to resolve these identifiers and clear permissions at scale.[55]

Modern, machine-readable consent standards build directly upon this existing, interoperable infrastructure by establishing a dedicated registry for the AI era. This registry allows any individual or rights holder to publish explicit, machine-readable declarations regarding AI training and generation: to permit it, to prohibit it, or to permit it subject to specific terms such as licensing or payment.[56] This enables automated systems to query these declarations and comply

---

[48] *See* Int'l Org. for Standardization, ISO 2108:2017, *Information and Documentation — International Standard Book Number (ISBN)* (2017), https://www.iso.org/standard/65483.html.

[49] *See* Int'l Org. for Standardization, ISO 3901:2019, *Information and Documentation — International Standard Recording Code (ISRC)* (2019), https://www.iso.org/standard/64817.html.

[50] *See Frequently Asked Questions*, Ent. ID Registry Ass'n, https://www.eidr.org/faq (last visited Oct. 28, 2026).

[51] *See* Int'l Org. for Standardization, ISO 27729:2024, *Information and Documentation — International Standard Name Identifier* (ISNI*)*, https://www.iso.org/standard/87177.html.

[52] *See supra* notes 36–39.

[53] *See Standards*, DDEX, https://www.ddex.net/standards (last visited Oct. 28, 2026).

[54] *See CISAC's Most Relevant Electronic Data Exchange Formats*, CISAC, https://www.cisac.org/formats (last visited Oct. 28, 2026) (describing Common Works Registration (CWR) as "a standard format for the registration of musical works").

[55] *See supra* notes 41–42; *see also ONIX FAQs*, EDItEUR, https://www.editeur.org/74/FAQs (last visited Oct. 28, 2026).

[56] *See* Human Consent Found., *supra* note 1; *see also A New Framework for AI Permissions*, Lexology (June 17, 2026), https://www.lexology.com/library/detail.aspx?g=70d8ff7e-543c-4be7-a9fd-c73edfaa1ecb.

with the chosen conditions at web scale.

Defendants point to the long tail of unregistered or informally published content on the internet as proof that clearance is impossible.[57] However, the historical absence of pre-existing metadata does not create a legal exemption for ingestion or generation. Open, non-proprietary consent standards and their associated identifiers allow any creator or rights holder, from a major studio to an individual blogger, to easily attach machine-readable consent declarations to their digital assets, or to declare consent once for the underlying work, identity, likeness, or mark wherever it appears, closing the metadata gap.[58]

### C. The Licensing Market Is Established for Premium Content and Emerging for Broader Categories.

The licensing market for AI training data is established for premium, registered, and collective repertoires and is emerging for broader categories. Defendants and third parties are actively using these agreements to license content for AI use.[59]

For news and textual content, publisher agreements have been standardized. OpenAI has entered into numerous agreements to license textual content, including historical archives and ongoing updates.[60] Similarly, Microsoft has executed numerous contracts with book and news publishers granting the right to use their content in AI training.[61]

---

[57] *See* Microsoft Books Mem. at 28 (arguing that training requires works by "millions of authors" who are "dispersed, difficult to identify, and costly to negotiate or contract with on an individual basis," and that "there remains no settled, workable means of valuing any given piece of training data"); *see also* OpenAI Books Mem. at 38 (contending the transaction costs of licensing individual works "would vastly exceed the marginal benefit of those works").

[58] *See* Human Consent Found., *supra* note 1.

[59] *See* Class Pls.' Mem. at 37.

[60] *See* News Pls.' Corrected Combined Rule 56.1 Statement ¶ 147, *Ziff Davis, Inc. v. OpenAI, Inc.*, No. 1:25-cv-04315 (S.D.N.Y.), ECF No. 667.

[61] *See e.g.,* Hannah Miller & Dina Bass, *Microsoft Signs AI-Learning Deal with News Corp.'s HarperCollins*, Bloomberg (Nov. 19, 2024), https://www.bloomberg.com/news/articles/2024-11-19/microsoft-signs-ai-learning-deal-with-news-corp-s-harpercollins.

Third parties also transact using Data Service Agreements (DSAs). Amazon, for example, has entered into numerous DSAs granting it the right to reproduce, modify, and prepare derivative works based upon, and otherwise exploit provider data for generative AI activities.[62] Additional GenAI providers including Google, Meta, Perplexity, ProRata.ai and Mistral AI have entered similar agreements with news publishers.[63]

Furthermore, a robust ecosystem of third-party data exchanges and licensing marketplaces has emerged to facilitate aggregate AI licensing. These specialized platforms connect publishers and rights holders directly with GenAI companies, streamlining the monetization of digital data at scale.[64]

The established market is not static; it is rapidly expanding and publicly visible. For example, Google's AI news program now includes over 400 publications globally, including a recent, multi-year AI licensing partnership with CNN, the Financial Times, and Axios.[65] Similarly, Microsoft launched the Publisher Content Marketplace (PCM) to enable AI developers to license premium content directly. The National Music Publishers Association (NMPA) has established template agreements with standardized revenue splits that independent publishers can

---

[62] *See Retail AI Terms Tracker*, The Fashion L. (Sept. 17, 2026), https://www.thefashionlaw.com/retail-ai-terms-tracker.

[63] *See* Reporters Without Borders, *The AI Media Landscape: 71% of AI Deals Made with Media Outlets in Anglophone Countries* (Sept. 11, 2026), https://rsf.org/en/ai-media-landscape-71of-ai-deals-made-media-outlets-anglophone-countries.

[64] *See* Press Release, *Cloudflare, Inc., Cloudflare Strengthens Content Offering to AI Companies with Acquisition of Human Native* (Jan. 15, 2026), https://cloudflare.net/news/news-details/2026/Cloudflare-Strengthens-Content-Offering-to-AI-Companies-with-Acquisition-of-Human-Native/default.aspx; *see also* Rebecca Szkutak, *Deal Dive: Human Native AI Is Building the Marketplace for AI Training Licensing Deals*, TechCrunch (June 8, 2024), https://techcrunch.com/2024/06/08/deal-dive-human-native-ai-is-building-the-marketplace-for-ai-training-licensing-deals.

[65] *See 400 Publications Are Now Partnering with Us on Our News AI Pilot Program*, Google: The Keyword (Oct. 15, 2026), https://blog.google/products-and-platforms/products/news/news-ai-pilot-update-publishers.

readily adopt.[66]

The licensing market for AI training data operates on a highly adaptable, tiered model that accommodates both premium assets and dispersed works. For high-value complex assets, the industry relies on bespoke, human mediated negotiations, as demonstrated by the multi-million-dollar agreements between technology companies and major publishers.[67] Conversely, for the long tail of dispersed works, the industry utilizes the collective licensing frameworks and machine-readable registries described above.[68] This dual-track approach shows that the market can clear rights at scale. Because generative AI datasets are inherently multimodal, they ingest copyrighted works alongside personal identity. The industry's successful deployment of machine-readable infrastructure to manage these complex identity rights serves as a direct proof-of-concept for copyright clearance. If the market can automate clearance for fragmented personal rights, the transaction-cost barriers for copyrighted works are equally surmountable. Major industry entities are now deploying these frameworks efficiently.[69]

At the agency level, CAA launched the CAA Vault in 2023, a full-service solution for the capture, storage and licensing of individuals' digital likeness, voice, and intellectual property.[70]

---

[66] *See* Emma Roth, *Microsoft Says It's Building an App Store for AI Content Licensing*, The Verge (Feb. 3, 2026), https://www.theverge.com/news/873296/microsoft-publisher-content-marketplace-ai-licensing; *see also* Chris Cooke, *NMPA Unveils AI Licensing Deals with Udio and Klay with 50/50 Split for Songs and Recordings*, Complete Music Update (June 11, 2026), https://completemusicupdate.com/nmpa-unveils-ai-licensing-deals-with-udio-and-klay-with-50-50-split-for-songs-and-recordings.

[67] *See* LLM Pulse, *Every AI Content Licensing Deal, Mapped*, LLM Pulse (July 9, 2026), https://llmpulse.ai/blog/ai-content-licensing-deals.

[68] *See supra* Parts I & IIIII.A–B.

[69] *See* Press Release, Veritone, *Veritone Announces Strategic Partnership with CAACreative Artists Agency for the Launch of theCAAvault* (May 14, 2024).), https://www.veritone.com/newsroom/press-releases/veritone-announces-strategic-partnership-with-creative-artists-agency-for-the-launch-of-thecaavault.

[70] *See* Todd Spangler, *The CAA Vault, Which Stores AI Clones of Talent, Taps Veritone as Tech Partner*, Variety (May 14, 2024), https://variety.com/2024/digital/news/caa-vault-talent-ai-clones-veritone-1236001187/.

As noted by Alexandra Shannon, head of strategic development at *amicus* CAA, regarding the operational deployment of these frameworks:

> We saw the technology emerging early on and built the CAA Vault to give the artists we represent a secure way to manage and license their digital identities. The platform ensures that the artists consent, have control, and are compensated fairly for their works, all of which are established before any use occurs. The existence of this infrastructure proves that a scalable, consent-based licensing market is an active, functioning reality.[71]

While these initial deployments involve high-profile entities, they serve as the necessary proof of concept and foundational example for the broader market. Just as the ISBN system and early collective management organizations were initially adopted by major publishers before scaling to independent creators, these enterprise-level frameworks demonstrate the technical and legal viability of the model. Because open, non-proprietary protocols exist, they provide a scalable framework that can be adopted by any rights holder or intermediary, independent of institutional backing or resources.

Finally, this infrastructure scales to complex, multi-party projects. In 2021, members of ABBA simultaneously licensed their name, image and likeness ("NIL") rights, to create their digital avatars for the "ABBA Voyage" concert experience, alongside their underlying musical copyrights.[72] Clearing four distinct identities and music catalogs for a single digital production demonstrates that multi-rightsholder alignment is a routine business practice and not a technical impossibility. As referenced by ABBA Co-founder and CISAC President, Björn Ulvaeus, in his Opening Keynote at the United Nations' AI for Good Global Summit in July 2026:

> This is not simply about protecting today's artists. It is about making

[71] The foregoing statement was provided by Ms. Shannon to undersigned counsel for purposes of this submission.

[72] *See* Jenni Reid, *ABBA's Successful Avatar Show in London Offers a Glimpse at a Daring New Direction for Live Music*, CNBC (Dec. 29, 2022), https://www.cnbc.com/2022/12/29/abba-voyage-avatar-show-in-london-offers-glimpse-of-future-for-live-music.html.

> sure there are artists tomorrow. If human creators cannot earn a living, fewer people will devote years to mastering an instrument, finding their voice, or writing songs that matter, and if that happens, AI itself will eventually have less original news, human creativity from which to learn. Fairness is just not morally right. It is how we keep the well from running dry.
>
> We are sitting right now at a fork in the road. The legal cases now moving through courts around the world will help determine whether licensing becomes the foundation of this new industry, or whether free extraction does. The decisions made over the next few years will shape the creative economy for decades and decades. I'm not pessimistic. I have lived through the cassette, CD, the MP3, Napster, streaming.
>
> Every time our industry found a way to embrace new technology while protecting the human creator. Every time, people had to make difficult decisions. And every time the decisions that lasted were reasonable ones. Human creativity is not just content; it is not just data.
>
> It is testimony, a life lived, a grief that became a lyric, a love that became a melody, a specific, unrepeatable experience of a human being in a particular time and place, transformed into something another human can feel that is what trained these models, and the people whose lives work became part of those models deserve to share in what they have made possible.[73]

This infrastructure is rightsholder-led, built with input from artists, agencies, and rights organizations, and is designed to solve the exact transaction-cost and chain-of-title problems cited by Defendants.

**D. The Licensing Market was Operational and Accessible.**

1. *Market benchmarks and scalable valuation mechanisms exist.*

Recent licensing transactions and settlements have established specific, verifiable market benchmarks for AI training data and demonstrated that valuation mechanisms are operational and

[73] Björn Ulvaeus, President, CISAC, *The Future Needs Creators*, Opening Keynote Address at the AI for Good Global Summit, Geneva (July 9, 2026) (transcript available at https://www.cisac.org/sites/main/files/files/2026-07/COM26-0653_The_Future_Needs_Creators_Full_Transcript_of_Bjorn_Opening_Keynote_AI_for_Good_Summit_2026_2026-07-10_EN%20%281%29.pdf).

scalable.[74] Public reporting confirms that major technology companies have executed annual licensing agreements with prominent news organizations, including The New York Times (reported at approximately $20-25 million per year),[75] DotDash Meredith (reported around $16 million per year),[76] and the Financial Times (reportedly worth $5-10 million).[77]

These transactions reflect a functional, established valuation range for training data. Furthermore, recent industry-wide template agreements, such as those established by the NMPA with AI music companies, feature standardized 50/50 revenue splits that independent publishers can readily adopt.[78] Collectively, these developments confirm that a negotiated, scalable valuation mechanism for training data is practical and achievable for broad catalogs.

2. *Industry leaders are actively extending proven licensing frameworks.*

These developments establish that the mechanisms to manage multi-rightsholder transaction costs are not only well-established, but are being actively adapted for the AI era by leaders across both the creative and technology sectors. Licensing at scale is not inherently impossible.

For example: SAG-AFTRA has established industry-wide agreements governing the licensed use of digital replicas. By setting standardized terms for consent and compensation for thousands of members simultaneously, it demonstrates that complex, multi-party likeness rights

---

[74] *See* Class Pls.' Mem. at 37; *see also* LLM Pulse, *supra* note 55.

[75] *See Amazon to Pay NYT Up to $25 Million for AI Licensing*, PYMNTS (July 30, 2025), https://www.pymnts.com/news/artificial-intelligence/2025/amazon-paying-new-york-times-25-million-dollars-ai-licensing.

[76] *See* Richard Lawler, *OpenAI Is Paying Dotdash Meredith at Least $16 Million a Year to License Its Content for AI*, The Verge (Nov. 18, 2024), https://www.theverge.com/2024/11/18/24300144/openai-is-paying-dotdash-meredith-at-least-16-million-a-year-to-license-its-content-for-ai.

[77] *See* Emilia David, *Vox Media and The Atlantic Sign Content Deals with OpenAI*, The Verge (May 29, 2024), https://www.theverge.com/2024/5/29/24167072/openai-content-copyright-vox-media-the-atlantic.

[78] *See* Cooke, *supra* note 54.

can be managed and scaled efficiently, mirroring the collective frameworks long utilized in music and publishing.[79]

Major technology companies are actively participating in this shift, showing that rights cleared development is a viable business practice. Adobe, for instance, has structured the development of its Firefly model to rely on training with licensed and public domain content, including Adobe Stock, coupled with the implementation of open provenance standards like Content Credentials to track digital rights. This demonstrates that building scalable, rights-cleared AI systems is a viable business practice for the technology sector.[80]

Market analysts project continued growth in AI training data licensing and royalty brokerage services through 2036, reflecting a shift away from indiscriminate web scraping toward paid content access and royalty routing.[81]

### E. The Fourth Factor Analysis Must Reflect the Market Realities.

When a market is established and actively growing, it cannot be dismissed as speculative or infeasible. *Amici* provide these industry practices to ensure the Court's evaluation of the Fourth Factor is grounded in the actual functioning mechanics of the modern creative economy, rather than the false assumptions about market impossibility.

The Fourth Factor asks whether a market is traditional, reasonable, or likely to be developed, not whether every rightsholder chooses to transact.[82] A functioning market includes

---

[79] *See* SAG-AFTRA, *Contract Bulletin: A.I. Digital Replicas* (July 2024), https://www.sagaftra.org/sites/default/files/sa_documents/Contract%20Bulletin%20-%20A.I.%20Digital%20Replicas.pdf.

[80] *See Our Approach to Generative AI*, Adobe, https://www.adobe.com/ai/overview/firefly/gen-ai-approach.html (last visited Oct. 28, 2026); *Adobe Firefly FAQ*, Adobe, https://helpx.adobe.com/firefly/get-set-up/learn-the-basics/adobe-firefly-faq.html (last visited Oct. 28, 2026).

[81] *See* Fact.MR, *AI Training Data Licensing and Royalty Brokerage Services Market* (June 2026), https://www.factmr.com/report/ai-training-data-licensing-and-royalty-brokerage-services-market.

[82] *See Texaco*, 60 F.3d at 930; *see also Campbell*, 510 U.S. at 592; 17 U.S.C. § 107(4).

the right to say no.[83] The fact that some rights holders will always say no does not provide a legal basis to eliminate permissions and consents altogether. Indeed, all markets are predicated on the participation of a willing buyer and willing seller. Any framework or practice that presumes permission or bypasses the right to refuse undermines this foundational market dynamic.

*Amici* emphasize that the existence of these scalable frameworks does not suggest nor should it be interpreted to mean that AI training is subject to a compulsory licensing regime or a reasonable royalty default. The mechanisms described herein are designed to facilitate affirmative, opt-in licensing and preserve the rights holder's fundamental statutory right to refuse permission entirely and to negotiate bespoke, premium terms for high-value assets rather than being forced into a standardized, mandatory fee structure.

## IV. **CONCLUSION.**

*Amici* submit the foregoing for the Court's consideration.

[83] *See* 17 U.S.C. § 106; *see also* Human Consent Found., *supra* note 1, § 1.2.

Dated: October 30, 2026

Respectfully submitted,

*/s/Marc E. Ackerman*
Marc E. Ackerman (NY #2540136)
**BASS, BERRY & SIMS PLC**
230 Park Avenue
3rd Floor, West Office 417
New York, NY 10169
646-502-9678
marc.ackerman@bassberry.com

Kathryn Hannen Walker (TN #20794)
(*pro hac vice pending*)
Robert L. Brewer (TN #20640)
(*pro hac vice pending*)
**BASS, BERRY & SIMS PLC**
21 Platform Way South, Suite 3500
Nashville, TN 37203
(615) 742-6200
kwalker@bassberry.com
rbrewer@bassberry.com

*Attorneys for [Proposed] Amici Curiae Human Consent Foundation, Creative Artists Agency, LLC, Music Artists Coalition, National Association of Voice Actors, Writer, Inc., Creators Coalition on Artificial Intelligence, Cate Blanchett, Nick Hexum, and Steven Soderbergh*

**CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMITATION**

Pursuant to Local Civil Rule 7.1(c) and the Court's August 7, 2026 Order (Dkt. No. 1663), undersigned counsel certifies that the foregoing brief complies with the applicable 6,000-word limit. The brief contains approximately 5,521 words, as determined by the word-count function of the word-processing software used to prepare it, excluding the corporate disclosure statement, statement regarding authorship and funding, caption, table of contents, table of authorities, signature block, and this certificate.

*/s/Marc E. Ackerman*
Marc E. Ackerman

## Appendix A

Anne Hathaway, Actor
Ariana DeBose, Actor and Singer
Bette Midler, Musician, Actor, Producer and Author
Christian Vesper, Film and Television Executive and Producer
Christine Vachon, Producer
Dame Emma Thompson, Actor and Screenwriter
Dame Helen Mirren, Actor
Dan Levy, Actor, Writer, Producer and Director
Dave Eggers, Writer, Editor and Publisher
Francesca Amfitheatrof, Designer
Greg Berlanti, Director, Producer and Writer
Julia Roberts, Actor and Producer
Madonna, Singer, Songwriter, Producer and Actor
Melody Walker, Songwriter
Nina Gregory, Journalist and Founder
Olivia Wilde, Actor, Director, Writer and Producer
Paul Feig, Director, Producer and Writer
Ram Bergman, Producer
Rian Johnson, Director, Producer and Writer
Richard Louderback, Artist and Illustrator
Robert De Niro, Actor and Producer
Ron Howard, Filmmaker and Actor
Rosario Dawson, Actor
Scarlett Johansson, Actor and Producer
Stan Lee Foundation, Public Charity Dedicated to Literacy and the Narrative Arts
Vince Gilligan, Writer, Producer and Director