# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT<br>LITIGATION | Case No. 1:25-md-3143 (SHS) (OTW) |
| This Document Relates To:<br><br>1:25-cv-04315-SHS-OTW<br>1:23-cv-11195-SHS-OTW<br>1:23-cv-08292-SHS-OTW | Hon. Sidney H. Stein |

# BRIEF OF *AMICUS CURIAE* KHOSLA VENTURES, LLC IN SUPPORT OF DEFENDANT OPENAI, INC.'S MOTIONS FOR SUMMARY JUDGMENT

DATED: October 30, 2026

Brendan P. Cullen*
cullenb@sullcrom.com
Laura K. Oswell*
oswelll@sullcrom.com
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone: (650) 461-5600
Facsimile: (650) 461-5700

*Counsel for amicus curiae Khosla Ventures, LLC*

* Applications for *pro hac vice* admission pending

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ........ 1
INTRODUCTION ........ 2
ARGUMENT ........ 5
I. Fair Use Is the Constitutional Safety Valve that Keeps Copyright Aligned with Its Progress-Promoting Purpose. ........ 5
II. The Development of Generative AI Is Consistent with Copyright's Progress-Promoting Purpose. ........ 6
III. Fair Use in AI Training Is Necessary To Protect U.S. Investment and Innovation in Generative AI. ........ 12
A. A Ruling that AI Training Is Not Fair Use Will Harm Competition that Is Necessary To Drive Innovation across the AI Ecosystem. ........ 12
B. A Ruling against Fair Use Will Slow Investment. ........ 15
CONCLUSION ........ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Authors Guild, Inc.* v. *HathiTrust*,
755 F.3d 87 (2d Cir. 2014)....................6

*Authors Guild* v. *Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)....................5, 6, 7

*Cariou* v. *Prince*,
714 F.3d 694 (2d Cir. 2013)....................7

*Cartoon Network LP* v. *CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008)....................17

*Feist Publ'ns, Inc.* v. *Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)....................5

*Google LLC* v. *Oracle Am., Inc.*,
593 U.S. 1 (2021).................... *passim*

*Mayo Collaborative Servs.* v. *Prometheus Lab's, Inc.*,
566 U.S. 66 (2012)....................16, 17

*Nat'l Collegiate Athletic Ass'n* v. *Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984)....................15

*Sega Enters. Ltd.* v. *Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992), *as amended* (Jan. 6, 1993) ....................6

*Sony Comput. Ent., Inc.* v. *Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ....................6

*Sony Corp. of Am.* v. *Universal City Studios, Inc.*,
464 U.S. 417 (1984)....................6

*Twentieth Century Music Corp.* v. *Aiken*,
422 U.S. 151 (1975)....................5

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8.................... *passim*

**Other Authorities**


Ufuk Akcigit & Sina T. Ates, *What Happened to U.S. Business Dynamism?*, 131 J. POL. ECON. 2059 (2023), https://doi.org/10.1086/724289 ....................16

Jonathan M. Barnett, *The Case Against Preemptive Antitrust in the Generative AI Ecosystem* (Univ. S. Cal. Gould Sch. of L., Ctr. for L. & Soc. Sci. Rsch. Paper Series No. 24-19, 2024), https://ssrn.com/abstract=4829989 ....................10

BIPARTISAN HOUSE TASK FORCE ON A.I., 118TH CONG., REPORT ON ARTIFICIAL INTELLIGENCE (Comm. Print 2024), https://www.speaker.gov/wp-content/uploads/2024/12/AI-Task-Force-Report-FINAL.pdf .................... *passim*

Julie Bort, *PrismML Hopes Its Tiny LLM Will Change How We All Use AI*, TECHCRUNCH (Sep. 17, 2026), https://techcrunch.com/2026/09/17/prismml-hopes-its-tiny-llm-could-change-how-we-all-use-ai/ ....................10

Alexandra Bruell, *News Corp, Meta in AI Content Licensing Deal Worth Up to $50 Million a Year*, WALL ST. J. (Mar. 3, 2026), https://www.wsj.com/business/media/news-corp-meta-in-ai-content-licensing-deal-worth-up-to-50-million-a-year-d4fbf244 ....................14

Mike Butcher, *Sweden's Lovable, an App-Building AI Platform, Rakes in $15M after Spectacular Growth*, TECHCRUNCH (Feb. 25, 2025), https://techcrunch.com/2025/02/25/swedens-lovable-an-app-building-ai-platform-rakes-in-16m-after-spectacular-growth/ ....................11

ANUPAM CHANDER, GLOBAL COPYRIGHT RISKS FOR AI TRAINING (2025), https://www.thefai.org/posts/global-copyright-risks-for-ai-training ....................17, 18

MICHAEL CHUI ET AL., MCKINSEY & CO., THE ECONOMIC POTENTIAL OF GENERATIVE AI (2023), https://www.mckinsey.com/capabilities/tech-and-ai/our-insights/the-economic-potential-of-generative-ai-the-next-productivity-frontier....................8

COUNCIL OF ECON. ADVISERS, ECONOMIC REPORT OF THE PRESIDENT (2024), https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/03/ERP-2024.pdf ....................4, 9, 15

Shivaram V. Devarakonda & Vilma Chila, *Patent Eligibility Uncertainty and the VC Financing of Novel Technologies*, 35 INDUS. & CORP. CHANGE 55 (2026), https://doi.org/10.1093/icc/dtaf024....................16

*Generative AI Could Raise Global GDP by 7%*, GOLDMAN SACHS (Apr. 5, 2023), https://www.goldmansachs.com/insights/articles/generative-ai-could-raise-global-gdp-by-7-percent ....................8

*Generative AI Raises Competition Concerns*, FTC (June 29, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/06/generative-ai-raises-competition-concerns ....................13

Germán Gutiérrez & Thomas Philippon, *Declining Competition and Investment in the U.S.* (Nat'l Bureau of Econ. Rsch., Working Paper No. 23583, 2017), https://www.nber.org/system/files/working_papers/w23583/w23583.pdf ....................16

David Hamilton, *Reddit Strikes $60M Deal Allowing Google To Train AI Models on Its Posts, Unveils IPO Plans*, AP NEWS (Feb. 22, 2024), https://apnews.com/article/google-reddit-ai-partnership-a7f131c7cb4225307134ef21d3c6a708 ....................14

Seth Hays, *AI Training and Copyright Infringement: Solutions from Asia*, TECHPOLICY (Oct. 30, 2024), https://www.techpolicy.press/ai-training-and-copyright-infringement-solutions-from-asia/ ....................18

A. Sasha Hoyt, *The Impact of Uncertainty Regarding Patent Eligible Subject Matter for Investment in U.S. Medical Diagnostic Technologies*, 79 WASH. & LEE L. REV. 397 (2022), https://scholarlycommons.law.wlu.edu/wlulr/vol79/iss1/8 ....................17

*Thesis*, KHOSLA VENTURES, https://www.khoslaventures.com/about (last visited Oct. 27, 2026) ....................1

Aarti Krishnan et al., *A Generative Deep Learning Approach to De Novo Antibiotic Design*, 188 CELL 5962 (2025), https://doi.org/10.1016/j.cell.2025.07.033 ....................9

Edward Lee, *Fair Use and the Origin of AI Training*, 63 HOU. L. REV. 105 (2025), https://houstonlawreview.org/article/147422-fair-use-and-the-origin-of-ai-training ....................18

Mark A. Lemley & Bryan Casey, *Fair Learning*, 99 TEX. L. REV. 743 (2021), https://texaslawreview.org/wp-content/uploads/2021/03/Lemley.Printer.pdf ....................14

Josh Lerner, *Lost in the Clouds: The Impact of Changing Property Rights on Investment in Cloud Computing Ventures* (Nat'l Bureau of Econ. Rsch. Working Paper No. 21140, 2015), https://www.nber.org/papers/w21140 ....................17

Josh Lerner & Ramana Nanda, *Venture Capital's Role in Financing Innovation: What We Know and How Much We Still Need to Learn*, J. ECON. PERSPS., Summer 2020, https://doi.org/10.1257/jep.34.3.237 ....................2

Daryl Lim & Peter K. Yu, *The Antitrust-Copyright Interface in the Age of Generative Artificial Intelligence*, 74 EMORY L.J. 847 (2025), https://scholarship.law.tamu.edu/facscholar/2215 ....................18

Ingrid Lunden, *Will AI Get an A+ in Edtech? MagicSchool Raises $15M To Find Out*, TECHCRUNCH (June 27, 2024), https://techcrunch.com/2024/06/27/magicschool-thinks-ai-in-the-classroom-is-inevitable-so-its-aiming-to-help-teachers-and-students-use-it-properly.............................11

MCKINSEY DIGIT., EXPLORING OPPORTUNITIES IN THE GENERATIVE AI VALUE CHAIN (2023), https://www.mckinsey.com/capabilities/quantumblack/our-insights/exploring-opportunities-in-the-generative-ai-value-chain ............................10, 11, 13

CAMERON MILLER ET AL., DATA CATALYST INST., THE ECONOMIC IMPORTANCE OF FAIR USE FOR THE DEVELOPMENT OF GENERATIVE ARTIFICIAL INTELLIGENCE (2025), https://datacatalyst.org/the-economic-importance-of-fair-use-for-the-development-of-generative-artificial-intelligence/ ......................................13

4 Nimmer on Copyright (2026) .........................................................................................7

ORG. FOR ECON. COOP. & DEV., ARTIFICIAL INTELLIGENCE MARKETS: RECENT DEVELOPMENTS AND COMPETITION ISSUES (2026), https://doi.org/10.1787/d531d73f-en ........................................................................15

ORG. FOR ECON. COOP. & DEV., COMPETITION AND INNOVATION: A THEORETICAL PERSPECTIVE (2023), https://doi.org/10.1787/4632227c-en....................................................15

ORG. FOR ECON. COOP. & DEV., *Competition in the Age of AI* (Org. for Econ. Coop. & Dev. A.I. Working Paper No. 62, 2026), https://doi.org/10.1787/6f88a1ea-en ..........................................................................16

ORG. FOR ECON. COOP. & DEV., FINANCING SMES AND ENTREPRENEURS 2026: AN OECD SCOREBOARD (2026), https://doi.org/10.1787/075d8058-en.........................................2

ORG. FOR ECON. COOP. & DEV., VENTURE CAPITAL INVESTMENTS IN ARTIFICIAL INTELLIGENCE THROUGH 2025 (2026), https://doi.org/10.1787/a13752f5-en....................10, 12

OXFORD ECONS., THE ECONOMIC IMPORTANCE OF FLEXIBLE COPYRIGHT REGIMES FOR AI TRAINING IN APAC (2026), https://www.oxfordeconomics.com/wp-content/uploads/2026/08/20260812-AI-Copyright_Report.pdf ..................................... *passim*

PITCHBOOK & NAT'L VENTURE CAP. ASS'N, Q1 2026 PITCHBOOK-NVCA VENTURE MONITOR (2026), https://nvca.org/wp-content/uploads/2026/04/Q1-2026-PitchBook-NVCA-Venture-Monitor.pdf.........................................................................9

PITCHBOOK & NAT'L VENTURE CAP. ASS'N, Q4 2025 PITCHBOOK-NVCA VENTURE MONITOR (2026), https://nvca.org/wp-content/uploads/2026/01/q4-2025-pitchbook-nvca-venture-monitor.pdf...................................................................9

Ilan Price et al., *Probabilistic Weather Forecasting with Machine Learning*, 637 NATURE 84 (2025), https://doi.org/10.1038/s41586-024-08252-9 ..........................................8

Charles Rollet, *Fastino Trains AI Models on Cheap Gaming GPUs and Just Raised $17.5M Led by Khosla*, TECHCRUNCH (May 7, 2025), https://techcrunch.com/2025/05/07/fastino-trains-ai-models-on-cheap-gaming-gpus-and-just-raised-17-5m-led-by-khosla/ .......... 10

Matthew Sag, *The False Hope of Content Licensing at Internet Scale*, PROMARKET (Nov. 19, 2025), https://www.promarket.org/2025/11/19/the-false-hope-of-content-licensing-at-internet-scale/ .......... 14, 15

Matthew Sag, *Copyright and the AI Action Plan*, MATTHEW SAG (Mar. 20, 2025), https://matthewsag.com/copyright-and-the-ai-action-plan/ .......... 18

SHA SAJADIEH ET AL., INST. FOR HUMAN-CENTERED AI, STANFORD UNIV., ARTIFICIAL INTELLIGENCE INDEX REPORT 2026 (2026), https://doi.org/10.48550/arXiv.2606.15708 .......... 8

Pamela Samuelson, *Fair Use Defenses in Disruptive Technology Cases*, 71 UCLA L. REV. 1484 (2024), https://ssrn.com/abstract=4631726 .......... 14

Iuri Struta, *GenAI Investors Target App-Makers in 2024 as Foundation Model Focus Fades*, S&P GLOBAL (Apr. 16, 2024), https://www.spglobal.com/market-intelligence/en/news-insights/articles/2024/4/genai-investors-target-app-makers-in-2024-as-foundation-model-focus-fades-81163387 .......... 11

U.S. COPYRIGHT OFF., IDENTIFYING THE ECONOMIC IMPLICATIONS OF ARTIFICIAL INTELLIGENCE FOR COPYRIGHT POLICY: CONTEXT AND DIRECTION FOR ECONOMIC RESEARCH (Brent A. Lutes ed., 2025), https://www.copyright.gov/economic-research/economic-implications-of-ai/Identifying-the-Economic-Implications-of-Artificial-Intelligence-for-Copyright-Policy-FINAL.pdf .......... 13, 15

*Vinod Khosla*, KHOSLA VENTURES, https://www.khoslaventures.com/team/vinod-khosla (last visited Oct. 27, 2026) .......... 2

Yihui Wang et al., *A Generative Artificial Intelligence Approach for the Discovery of Antimicrobial Peptides Against Multidrug-Resistant Bacteria*, 10 NATURE MICROBIOLOGY 2997 (2025), https://doi.org/10.1038/s41564-025-02114-4 .......... 9

Joseph L. Watson et al., *De Novo Design of Protein Structure and Function with RFdiffusion*, 620 NATURE 1089 (2023), https://doi.org/10.1038/s41586-023-06415-8 .......... 9

Kyle Wiggers, *OpenAI-Backed Legal Tech Startup Harvey Raises $100M*, TECHCRUNCH (July 23, 2024), https://techcrunch.com/2024/07/23/openai-backed-legaltech-startup-harvey-raises-100m/ .......... 11

Zhenze Yang et al., *De Novo Design of Polymer Electrolytes Using GPT-Based and Diffusion-Based Generative Models*, NPJ COMPUTATIONAL MATERIALS ART., Dec. 19, 2024, https://doi.org/10.1038/s41524-024-01470-9 .......................................... 8

Claudio Zeni et al., *A Generative Model for Inorganic Materials Design*, 639 NATURE 624 (2025), https://doi.org/10.1038/s41586-025-08628-5 .......................................... 8

Marinka Zitnik, *AI-Enabled Drug Discovery Reaches Clinical Milestone*, 31 NATURE MED. 2490 (2025), https://doi.org/10.1038/s41591-025-03832-2 .............................. 9

Khosla Ventures, LLC respectfully submits this brief as *amicus curiae* in support of Defendant OpenAI, Inc.'s ("OpenAI") Motions for Summary Judgment.

**INTEREST OF AMICUS CURIAE**

Khosla Ventures is a venture-capital firm based in Menlo Park, California, founded in 2004 by Vinod Khosla, co-founder of Sun Microsystems. Khosla Ventures raises long-dated funds from institutional investors and deploys that capital as equity into cutting-edge technology companies from their earliest stages through growth, focusing on ventures where technical and market outcomes are highly uncertain. Beyond capital investment, Khosla Ventures also provides "venture assistance" — hands-on operating and technical support — to help startups navigate the difficult path from formation to scale. Since its founding, Khosla Ventures has guided numerous ventures to develop their nascent, unproven ideas into category-defining companies.[1] Khosla Ventures' portfolio companies span a wide range of industries, including consumer technology, enterprise software, financial technology, manufacturing, logistics, robotics, medical technology, healthcare, sustainability, and climate. Today Khosla Ventures manages approximately $25 billion in assets across its various early- and late-stage funds.

Khosla Ventures was among the earliest institutional investors in machine learning and generative artificial intelligence ("AI"), and was the first venture-capital investor in OpenAI in 2019. Khosla Ventures invests across the entire AI ecosystem, from foundation and applied AI models, to enterprise AI agents, AI-enabled consumer applications, and physical AI, including next-generation robotics and autonomous systems. Khosla Ventures' engagement with AI reflects more than a decade of work by Mr. Khosla, who has written and spoken publicly since at least

---

[1] *See Thesis*, KHOSLA VENTURES, https://www.khoslaventures.com/about (last visited Oct. 27, 2026) (noting Khosla Ventures' early, category-defining investments across climate, food, space, digital health, and commerce).

2012 on the economic and social implications of machine learning and AI.[2] And Khosla Ventures' investment and operating team members have founded and led AI companies, designed AI systems, and conducted AI-related research.

Khosla Ventures' more than two decades of experience allocating capital to high-risk technology ventures gives it a unique, practical perspective on how the fair-use ruling that this Court adopts will shape capital allocation, competition, and the development of socially beneficial AI across all sectors of the economy. Khosla Ventures' perspective is grounded in the broader role that venture capital plays in the American innovation economy. Venture-capital firms are the dominant source of financing for high-potential startups commercializing novel, high-risk concepts and technologies.[3] Since at least the 1980s, venture capital has enabled successive waves of transformative innovation, from semiconductors and mainframe computing to personal computing, biotechnology, and the internet. The enduring role of venture capital in enabling new technologies gives funds like Khosla Ventures a unique perspective on the dynamics of innovation, including how legal rules like fair use promote technological advancement.

## INTRODUCTION

The purpose of copyright law, like other intellectual property laws, is to protect the incentives to create new works that benefit society as a whole. *See* U.S. Const. art. I, § 8, cl. 8

---

[2] *See Vinod Khosla*, KHOSLA VENTURES, https://www.khoslaventures.com/team/vinod-khosla (last visited Oct. 27, 2026) (citing articles authored by Mr. Khosla on AI and machine learning that were published from 2012 to 2026).

[3] Josh Lerner & Ramana Nanda, *Venture Capital's Role in Financing Innovation: What We Know and How Much We Still Need to Learn*, J. ECON. PERSPS., Summer 2020, at 239, https://doi.org/10.1257/jep.34.3.237; ORG. FOR ECON. COOP. & DEV., FINANCING SMEs AND ENTREPRENEURS 2026: AN OECD SCOREBOARD 56 (2026), https://doi.org/10.1787/075d8058-en (recognizing that "[v]enture capital (VC) in particular is especially important for innovative start-ups" and "firms pursuing disruptive innovations with uncertain returns").

(vesting Congress with the power "[t]o promote the Progress of Science and useful Arts" through copyright). The doctrine of fair use is the safety valve that keeps copyright aligned with its progress-promoting purpose and the mechanism by which copyright law adapts to "significant changes in technology." *Google LLC* v. *Oracle Am., Inc.*, 593 U.S. 1, 19 (2021).

The question in this case is whether the use of copyrighted works to train foundation AI models, like OpenAI's large language models, is fair use and consistent with copyright's constitutional mandate. It is. OpenAI used enormous volumes of long-form text to extract unprotectable facts and ideas, linguistic rules, and statistical patterns in human language to build general-purpose AI models whose downstream uses bear no resemblance to any original work's expressive content. That is the same kind of transformative, non-expressive use — copying undertaken not to exploit a work's expressive content but to build something functionally new — that courts repeatedly have held to be fair use across waves of technological change over the past 50 years, from digital book databases to reverse-engineered video games and the Android mobile-phone platform.

Generative AI is perhaps the most consequential technology of the 21st century. It is projected to add trillions of dollars annually to the global economy, and it is already producing concrete advances across the sciences and engineering — in drug discovery, materials science, weather forecasting, and therapeutic protein design, among other fields — with benefits reaching

billions of people worldwide.[4] Congress and the Executive Branch alike have recognized AI as critical to our nation's interests ranging from national security to precision agriculture.[5]

Reaping the full potential of AI's public benefit will require continued investment across the AI ecosystem. Indeed, with the support of venture-capital funding, startups are driving the next wave of AI innovation by building novel AI applications that harness the power of foundation models, including those developed by OpenAI. Using copyrighted works to train those foundation models is fair use under well-established precedent — and preserving that protection is necessary to allow the unprecedented capabilities of those models to reach the far larger downstream ecosystem of startups that build on them.

A ruling that AI training is not fair use would undermine copyright's progress-promoting purpose in two related ways. It would harm competition by requiring every AI developer to negotiate individual licenses with thousands or millions of copyright holders — an exercise practically impossible for anyone other than maybe the largest firms and the most sophisticated rightsholders, and one that would sharply raise fixed entry costs in an already-concentrated market. And the legal uncertainty it would create would chill future investment — and therefore innovation — and risk driving investment capital away from U.S. developers.[6] The resulting burdens would fall hardest not on the well-capitalized incumbents that

---

4 *See infra* Section II.

5 *See generally* BIPARTISAN HOUSE TASK FORCE ON A.I., 118TH CONG., REPORT ON ARTIFICIAL INTELLIGENCE (Comm. Print 2024), https://www.speaker.gov/wp-content/uploads/2024/12/AI-Task-Force-Report-FINAL.pdf; COUNCIL OF ECON. ADVISERS, ECONOMIC REPORT OF THE PRESIDENT (2024), https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/03/ERP-2024.pdf.

6 *See* OXFORD ECONS., THE ECONOMIC IMPORTANCE OF FLEXIBLE COPYRIGHT REGIMES FOR AI TRAINING IN APAC 4 (2026), https://www.oxfordeconomics.com/wp-content/uploads/2026/08/20260812-AI-Copyright_Report.pdf.

can absorb them, but on the startups that depend on venture-capital funding to compete — the very companies that are driving competition and diffusing AI's benefits across the economy.

Fair use exists precisely to prevent copyright law from being used against the innovation it was designed to advance. To fulfill copyright's constitutional mandate "[t]o promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8, the Court should hold that the use of copyrighted works in training OpenAI's large language models constitutes fair use as a matter of law.

## ARGUMENT

### I. Fair Use Is the Constitutional Safety Valve that Keeps Copyright Aligned with Its Progress-Promoting Purpose.

Copyright is a constitutional instrument designed to promote scientific discovery and artistic creativity for public benefit. *See* U.S. Const. art. I, § 8, cl. 8; *Twentieth Century Music Corp.* v. *Aiken*, 422 U.S. 151, 156 (1975). "The ultimate goal of copyright is to expand public knowledge and understanding," and "while authors are undoubtedly important intended beneficiaries of copyright, the ultimate, primary intended beneficiary is the public, whose access to knowledge copyright seeks to advance by providing rewards for authorship." *Authors Guild* v. *Google, Inc.* ("*Google Books*"), 804 F.3d 202, 212 (2d Cir. 2015). Moreover, a secondary use that draws only on unprotectable ideas, facts, or functional information from an existing work — rather than exploiting the work's protected expression — falls outside the scope of copyright altogether. *See Feist Publ'ns, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 344-51 (1991).

The doctrine of fair use is the safety valve that prevents the "rigid application of the copyright statute" from suppressing the very innovation that it was designed to advance. *Oracle*, 593 U.S. at 18. Indeed, Congress codified fair use with the intention that it would adapt to and foster technological innovation: "there is no disposition to freeze the doctrine in the statute,

especially during a period of rapid technological change." *Sony Corp. of Am.* v. *Universal City Studios*, *Inc.*, 464 U.S. 417, 448 n.31 (1984) (quoting H.R. Rep. No. 94-1476, at 65-66 (1976)). For more than four decades, courts have applied the flexible fair-use doctrine to enable the development of new technologies. *See id.* at 430 & n.11 ("From its beginning, the law of copyright has developed in response to significant changes in technology."). Even when it involved verbatim or wholesale copying, fair use has been applied to the development of television-recording technology, *id.* at 449-50, 454-55, the creation of new videogame products, *Sega Enters. Ltd.* v. *Accolade, Inc.*, 977 F.2d 1510, 1522-27 (9th Cir. 1992), *as amended* (Jan. 6, 1993) (videogame cartridges); *Sony Comput. Ent., Inc.* v. *Connectix Corp.*, 203 F.3d 596, 603-08 (9th Cir. 2000) (PlayStation emulator), and the full-text digitization of millions of copyrighted books to build a searchable database, *Authors Guild, Inc*. v. *HathiTrust*, 755 F.3d 87, 97-101 (2d Cir. 2014); *Google Books*, 804 F.3d at 225. And in 2021, the Supreme Court held that Google's verbatim copying of thousands of lines of Java API was fair use because Google "reimplemented" the copied code for the "building of a [new] system" — a "use [that] was consistent with that creative 'progress' that is the basic constitutional objective of copyright itself." *Oracle*, 593 U.S. at 30-31, 40.

## II. The Development of Generative AI Is Consistent with Copyright's Progress-Promoting Purpose.

Just as fair use has enabled successive waves of technological advancement for decades, researchers and startup companies that are at the forefront of developing socially beneficial AI depend on fair use in AI training. The fair-use inquiry in this case turns on whether the challenged use of Plaintiffs' works is "transformative" and whether it would serve as a substitute that harms the market for the original works in a way that would undermine the incentives that copyright is designed to protect. *See Google Books*, 804 F.3d at 214 ("The more the appropriator is using the copied material for new, transformative purposes, the more it serves

copyright's goal of enriching public knowledge and the less likely it is that the appropriation will serve as a substitute for the original or its plausible derivatives.").

The use of copyrighted works for training AI models fits squarely within the line of cases discussed above that involved copying of existing works undertaken not to exploit the works' expressive content but to build something functionally new. In addition, the use of copyrighted works in training AI models is consistent with the constitutional purpose of copyright because it transforms written text into new products that offer "highly creative and innovative tool[s]" and enormously important public benefits. *See Cariou* v. *Prince*, 714 F.3d 694, 706 (2d Cir. 2013) ("If the original work is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings — this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." (cleaned up)); *Oracle*, 593 U.S. at 30, 35-36 (directing courts to "take into account the public benefits the copying will likely produce"). Indeed, general-purpose AI models have myriad potential downstream uses that bear no resemblance to the expressive content or purpose of the works on which the models are trained. Under decades of precedent, that is fair use. *See* 4 Nimmer on Copyright § 13F.10[A][3] (2026) (explaining that fair use historically has been applied to allow the copying of works for transformative technological uses).

Generative AI is creating extraordinary public benefit and, with continued investment, that benefit is expected to grow exponentially. Analysts project that generative AI will add between $2.6 and $4.4 trillion to the global economy annually[7] and that it "could drive a 7% (or almost $7 trillion) increase in global GDP and lift productivity growth by 1.5 percentage points

---

[7] MICHAEL CHUI ET AL., MCKINSEY & CO., THE ECONOMIC POTENTIAL OF GENERATIVE AI 3 (2023), https://www.mckinsey.com/capabilities/tech-and-ai/our-insights/the-economic-potential-of-generative-ai-the-next-productivity-frontier.

over a 10-year period."[8] Generative AI is leading to advances across the sciences and engineering at an exponential rate,[9] including, just to name a few, weather forecasting,[10] materials science,[11] and energy storage.[12] In medicine, for example, generative AI is facilitating the discovery of drug

---

8 *Generative AI Could Raise Global GDP by 7%*, GOLDMAN SACHS (Apr. 5, 2023), https://www.goldmansachs.com/insights/articles/generative-ai-could-raise-global-gdp-by-7-percent.

9 *See generally* SHA SAJADIEH ET AL., INST. FOR HUMAN-CENTERED AI, STANFORD UNIV., ARTIFICIAL INTELLIGENCE INDEX REPORT 2026 (2026), https://doi.org/10.48550/arXiv.2606.15708; BIPARTISAN HOUSE TASK FORCE ON A.I., *supra* note 5.

10 *See, e.g.*, Ilan Price et al., *Probabilistic Weather Forecasting with Machine Learning*, 637 NATURE 84, 90 (2025), https://doi.org/10.1038/s41586-024-08252-9 (presenting a generative AI tool that "open[s] a new front in weather forecasting, promising greater accuracy, efficiency and accessibility across a wide range of settings").

11 *See, e.g.*, Claudio Zeni et al., *A Generative Model for Inorganic Materials Design*, 639 NATURE 624, 631 (2025), https://doi.org/10.1038/s41586-025-08628-5 ("Generative models are promising for tackling inverse design tasks as they can efficiently explore new structures with desired properties.").

12 *See, e.g.*, Zhenze Yang et al., *De Novo Design of Polymer Electrolytes Using GPT-Based and Diffusion-Based Generative Models*, NPJ COMPUTATIONAL MATERIALS ART., Dec. 19, 2024, at 2, https://doi.org/10.1038/s41524-024-01470-9 ("With the recent advances in generative AI . . . we have witnessed the development of high-performance generative methodologies in molecular and crystal generation.").

candidates,[13] novel antibiotics,[14] and advances in therapeutic protein design.[15] Congress and the Executive Branch both have recognized AI's strategic importance to our national interests, citing applications ranging from national security to precision agriculture.[16]

Venture capital plays a key role in enabling these revolutionary benefits. In 2024, venture-capital investment in AI in the U.S. exceeded $104 billion in deal value, a figure that rose to more than $221 billion in 2025.[17] In just the first quarter of 2026, venture-capital investment in AI expanded to $237.3 billion, representing 88.8% of all venture dollars.[18] The U.S. continues to

---

[13] *See, e.g.*, Marinka Zitnik, *AI-Enabled Drug Discovery Reaches Clinical Milestone*, 31 NATURE MED. 2490, 2491 (2025), https://doi.org/10.1038/s41591-025-03832-2 (generative AI "can rapidly identify tractable targets and generate candidate molecules, shortening the early discovery timeline, as demonstrated with rentosertib").

[14] *See, e.g.*, Aarti Krishnan et al., *A Generative Deep Learning Approach to De Novo Antibiotic Design*, 188 CELL 5962, 5965 (2025), https://doi.org/10.1016/j.cell.2025.07.033 (identifying two highly potent compounds with "generative deep-learning-guided design of antibiotic candidates"); Yihui Wang et al., *A Generative Artificial Intelligence Approach for the Discovery of Antimicrobial Peptides Against Multidrug-Resistant Bacteria*, 10 NATURE MICROBIOLOGY 2997 (2025), https://doi.org/10.1038/s41564-025-02114-4.

[15] *See, e.g.*, Joseph L. Watson et al., *De Novo Design of Protein Structure and Function with RFdiffusion*, 620 NATURE 1089 (2023), https://doi.org/10.1038/s41586-023-06415-8 ("[W]e obtain a generative model of protein backbones that achieves outstanding performance" across diverse functional tasks).

[16] *See generally* BIPARTISAN HOUSE TASK FORCE ON A.I., *supra* note 5; COUNCIL OF ECON. ADVISERS, *supra* note 5.

[17] *See* PITCHBOOK & NAT'L VENTURE CAP. ASS'N, Q4 2025 PITCHBOOK-NVCA VENTURE MONITOR 8-9 (2026), https://nvca.org/wp-content/uploads/2026/01/q4-2025-pitchbook-nvca-venture-monitor.pdf.

[18] *See* PITCHBOOK & NAT'L VENTURE CAP. ASS'N, Q1 2026 PITCHBOOK-NVCA VENTURE MONITOR 7, 12 (2026), https://nvca.org/wp-content/uploads/2026/04/Q1-2026-PitchBook-NVCA-Venture-Monitor.pdf.

be the global leader in venture-capital-backed AI innovation, with 75% of venture-capital-backed AI deal value going to U.S. companies.[19]

In addition to the development of foundation AI models, venture-backed companies are developing smaller task-specific language models that require less training data and thus are "less costly to assemble and train."[20] For example, venture-capital-backed AI startup Fastino has trained small AI models to "focus[] on a specific task a company might need, like redacting sensitive data or summarizing corporate documents."[21] Startups are also driving AI innovation by adapting foundation models to develop AI applications for specific consumer or business purposes by "fine-tuning" the models, such as by feeding the models additional data or adjusting their parameters.[22] For example, the venture-capital-funded legal-AI startup Harvey adapted OpenAI's GPT-3 model by feeding it legal data sets and testing different prompts "to generate legal

---

19 ORG. FOR ECON. COOP. & DEV., VENTURE CAPITAL INVESTMENTS IN ARTIFICIAL INTELLIGENCE THROUGH 2025, at 1-2 (2026), https://doi.org/10.1787/a13752f5-en.

20 Jonathan M. Barnett, *The Case Against Preemptive Antitrust in the Generative AI Ecosystem* 10 (Univ. S. Cal. Gould Sch. of L., Ctr. for L. & Soc. Sci. Rsch. Paper Series No. 24-19, 2024), https://ssrn.com/abstract=4829989.

21 Charles Rollet, *Fastino Trains AI Models on Cheap Gaming GPUs and Just Raised $17.5M Led by Khosla*, TECHCRUNCH (May 7, 2025), https://techcrunch.com/2025/05/07/fastino-trains-ai-models-on-cheap-gaming-gpus-and-just-raised-17-5m-led-by-khosla/. Another example is venture-capital-funded AI startup PrismML, which is developing AI reasoning models that are "so small they can fit on PCs and smartphones." Julie Bort, *PrismML Hopes Its Tiny LLM Will Change How We All Use AI*, TECHCRUNCH (Sep. 17, 2026), https://techcrunch.com/2026/09/17/prismml-hopes-its-tiny-llm-could-change-how-we-all-use-ai/.

22 MCKINSEY DIGIT., EXPLORING OPPORTUNITIES IN THE GENERATIVE AI VALUE CHAIN 7-9 (2023), https://www.mckinsey.com/capabilities/quantumblack/our-insights/exploring-opportunities-in-the-generative-ai-value-chain.

documents that were far better than those that the original foundation model could create."[23] This ecosystem exemplifies the transformative purpose of AI training: foundation models supply reusable computational capabilities, and downstream startups convert those capabilities into independent, novel creations that bear no resemblance to the underlying training inputs.

The market for these downstream applications is expanding rapidly, driven by unprecedented levels of venture-capital investment in AI. Industry observers report that investors are increasingly shifting focus "from the companies building foundational models to the companies making applications built on top of those models"[24] and expect that the development of end-user applications presents the greatest opportunity for innovation and value creation in the AI space over the next several years.[25] Much like other major waves in technological development over the past 50 years, venture capital is the dominant source of financing for high-potential

---

[23] *Id.* at 7; Kyle Wiggers, *OpenAI-Backed Legal Tech Startup Harvey Raises $100M*, TECHCRUNCH (July 23, 2024), https://techcrunch.com/2024/07/23/openai-backed-legaltech-startup-harvey-raises-100m/. Other examples include Lovable, another venture-capital-backed AI startup that uses foundation models from OpenAI, Google, and Anthropic to create an application that allows people without any coding or software knowledge to build fully deployed web applications, and MagicSchool AI, which uses APIs from OpenAI and Anthropic to develop education tools that teachers use to create lesson plans, quizzes, and course materials tailored to differing levels of learning. Mike Butcher, *Sweden's Lovable, an App-Building AI Platform, Rakes in $15M after Spectacular Growth*, TECHCRUNCH (Feb. 25, 2025), https://techcrunch.com/2025/02/25/swedens-lovable-an-app-building-ai-platform-rakes-in-16m-after-spectacular-growth/; Ingrid Lunden, *Will AI Get an A+ in Edtech? MagicSchool Raises $15M To Find Out*, TECHCRUNCH (June 27, 2024), https://techcrunch.com/2024/06/27/magicschool-thinks-ai-in-the-classroom-is-inevitable-so-its-aiming-to-help-teachers-and-students-use-it-properly.

[24] Iuri Struta, *GenAI Investors Target App-Makers in 2024 as Foundation Model Focus Fades*, S&P GLOBAL (Apr. 16, 2024), https://www.spglobal.com/market-intelligence/en/news-insights/articles/2024/4/genai-investors-target-app-makers-in-2024-as-foundation-model-focus-fades-81163387.

[25] MCKINSEY DIGIT., *supra* note 22, at 7.

startups building these applications.[26] A rule preserving fair use for AI training is therefore essential both to the developers of AI models and to the far larger downstream ecosystem of startups, researchers, and applied AI companies whose work depends on continued access to those models.

### III. Fair Use in AI Training Is Necessary To Protect U.S. Investment and Innovation in Generative AI.

Fair use exists precisely to protect transformative secondary uses that deliver extraordinary public benefits and thereby further copyright's constitutional mandate to "promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8; *see Oracle*, 593 U.S. at 35-36. A ruling that AI training is not fair use would produce the opposite result: it would increase concentration in the AI market at the expense of the startups that drive AI innovation, and it would chill U.S. investment by raising legal risks for new developers and greatly increasing the cost of AI development's most critical input — quality, large-scale training data. These increased risks and costs would become a prohibitive barrier to entry for many small, promising companies that would otherwise drive the next generation of AI technologies.

#### A. A Ruling that AI Training Is Not Fair Use Will Harm Competition that Is Necessary To Drive Innovation across the AI Ecosystem.

Barriers to entry in the AI market are enormous: developing a single model can cost tens or hundreds of millions of dollars and requires access to large and diverse data sets for pretraining, compute infrastructure, and scarce machine-learning talent.[27] The barriers to entry for

---

[26] ORG. FOR ECON. COOP. & DEV., *supra* note 19, at 2 ("Many of today's most transformative AI-based products and services, especially in generative AI since late 2022, grew through critical stages of venture backing.").

[27] *See* MCKINSEY DIGIT., *supra* note 22, at 4-5; *Generative AI Raises Competition Concerns*, FTC (June 29, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/06/generative-ai-raises-competition-concerns.

AI startups would only become higher without fair use. Whether an emerging company is developing its own model or fine-tuning existing foundation models for a novel application, access to the highest quality and quantity of training data is critical to success.[28] Exposure to potential copyright liability dramatically increases the cost and risk of obtaining quality data, disproportionately burdening the smallest, newest, and most innovative companies.[29] That could "effectively halt[] model development in the U.S., particularly by startups and smaller AI firms."[30]

Without the protection of fair use, AI developers would be subject to a cost-prohibitive licensing regime in which they must obtain individual licenses from individual copyright holders before their works are used for AI training. But "because training sets are likely to contain millions of different works with thousands of different owners, there is no plausible option simply to license all of the underlying photographs, videos, audio files, or texts for the new use."[31] "It is effectively impossible to find that many copyright owners and negotiate that many

---

28 U.S. COPYRIGHT OFF., IDENTIFYING THE ECONOMIC IMPLICATIONS OF ARTIFICIAL INTELLIGENCE FOR COPYRIGHT POLICY: CONTEXT AND DIRECTION FOR ECONOMIC RESEARCH 41 (Brent A. Lutes ed., 2025), https://www.copyright.gov/economic-research/economic-implications-of-ai/Identifying-the-Economic-Implications-of-Artificial-Intelligence-for-Copyright-Policy-FINAL.pdf; *Generative AI Raises Competition Concerns*, *supra* note 27.

29 CAMERON MILLER ET AL., DATA CATALYST INST., THE ECONOMIC IMPORTANCE OF FAIR USE FOR THE DEVELOPMENT OF GENERATIVE ARTIFICIAL INTELLIGENCE 11 (2025), https://datacatalyst.org/the-economic-importance-of-fair-use-for-the-development-of-generative-artificial-intelligence/ (copyright risk and data costs "are particularly burdensome for startups and smaller companies").

30 *Id.* at 4.

31 Mark A. Lemley & Bryan Casey, *Fair Learning*, 99 TEX. L. REV. 743, 748 (2021), https://texaslawreview.org/wp-content/uploads/2021/03/Lemley.Printer.pdf ("So allowing a copyright claim is tantamount to saying, not that copyright owners will get paid, but that the use won't be permitted at all.").

licenses."[32] Although some of the largest AI companies have struck multi-million-dollar access or licensing deals with major internet outlets or publishers,[33] a general licensing market is unworkable for emerging AI companies *and* for the millions of individual copyright holders.[34] Imposing a licensing regime might create private benefits for the largest and most sophisticated copyright holders, but would do nothing for countless smaller copyright holders, who cannot practicably negotiate licenses with each AI developer.[35] Because the marginal value that any one work contributes to a large training corpus is trivially small, impossible to measure precisely, and far below the administrative costs of arranging a license, for smaller copyright holders, "no willing licensing transactions will occur."[36] If a licensing regime were held to be required, but is impossible as a practical matter, access to the data needed for innovation by AI companies,

---

[32] *Id.* at 759; *see also* OXFORD ECONS., *supra* note 6 ("Negotiating licences or permissions with individual rightsholders for such uses can thus be operationally complex and economically prohibitive. For larger models which require data at scale, this approach is practically infeasible for all AI developers.").

[33] *See* Matthew Sag, *The False Hope of Content Licensing at Internet Scale*, PROMARKET (Nov. 19, 2025), https://www.promarket.org/2025/11/19/the-false-hope-of-content-licensing-at-internet-scale/; *see*, *e.g.*, Alexandra Bruell, *News Corp, Meta in AI Content Licensing Deal Worth Up to $50 Million a Year*, WALL ST. J. (Mar. 3, 2026), https://www.wsj.com/business/media/news-corp-meta-in-ai-content-licensing-deal-worth-up-to-50-million-a-year-d4fbf244; David Hamilton, *Reddit Strikes $60M Deal Allowing Google To Train AI Models on Its Posts, Unveils IPO Plans*, AP NEWS (Feb. 22, 2024), https://apnews.com/article/google-reddit-ai-partnership-a7f131c7cb4225307134ef21d3c6a708.

[34] Sag, *supra* note 33.

[35] Pamela Samuelson, *Fair Use Defenses in Disruptive Technology Cases*, 71 UCLA L. REV. 1484, 1566-68 (2024), https://ssrn.com/abstract=4631726 (licensing would "be very difficult to administer given the staggeringly large number of copyright owners and of works and of types of works used as AI training data—literally in the billions").

[36] U.S. COPYRIGHT OFF., *supra* note 28, at 36-37.

especially smaller companies, would "grind to a halt."[37] The result would be increased market concentration and reduced competition.

AI's potential to "deliver large economic and social gains" will "depend[] to a large extent on whether AI markets remain innovative and competitive."[38] Competitive markets foster innovation by encouraging companies to differentiate themselves, secure a competitive edge, and increase profits.[39] The result is "the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress." *Nat'l Collegiate Athletic Ass'n* v. *Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.27 (1984). By contrast, highly concentrated, less dynamic markets present "concerns on long run economic growth, incentives to innovation and consumer welfare."[40] Research suggests that such entrenchment reduces innovation and correlates to limits in the diffusion of knowledge[41] — the very opposite of copyright's purpose.

**B. A Ruling against Fair Use Will Slow Investment.**

Legal risk and uncertainty are among the most important factors to investment decision-making. In AI development, "access to training data is an important input," and whether

---

37 Sag, *supra* note 33.

38 ORG. FOR ECON. COOP. & DEV., ARTIFICIAL INTELLIGENCE MARKETS: RECENT DEVELOPMENTS AND COMPETITION ISSUES 1-2 (2026), https://doi.org/10.1787/d531d73f-en.

39 *See* ORG. FOR ECON. COOP. & DEV., COMPETITION AND INNOVATION: A THEORETICAL PERSPECTIVE 10-11 (2023), https://doi.org/10.1787/4632227c-en; COUNCIL OF ECON. ADVISERS, *supra* note 5, at 278 ("[C]ompetition generally encourages innovation at the technological frontier.").

40 ORG. FOR ECON. COOP. & DEV., *Competition in the Age of AI* 15 (Org. for Econ. Coop. & Dev. A.I. Working Paper No. 62, 2026), https://doi.org/10.1787/6f88a1ea-en.

41 *See* Germán Gutiérrez & Thomas Philippon, *Declining Competition and Investment in the U.S.* 58-59 (Nat'l Bureau of Econ. Rsch., Working Paper No. 23583, 2017), https://www.nber.org/system/files/working_papers/w23583/w23583.pdf; *see also* Ufuk Akcigit & Sina T. Ates, *What Happened to U.S. Business Dynamism?*, 131 J. POL. ECON. 2059, 2062-63 (2023), https://doi.org/10.1086/724289.

"copyrighted materials can be used to train AI models" directly affects "the costs, risks, and incentives faced by developers" and investors.[42]

Ample evidence shows that where a core input is subject to legal uncertainty, venture-capital investment slows down. For example, litigation between 2010 and 2013 concerning the patent eligibility of nucleotide sequences yielded a 4.5% monthly decline in the likelihood that new biotech startups would receive venture-capital funding.[43] And in the four years following the Supreme Court's holding that disease-diagnostic technologies are patent ineligible in *Mayo Collaborative Services* v. *Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), venture-capital investment in disease-diagnostic technology "was nearly $9.3 billion lower than it would have been absent *Mayo*."[44] By contrast, economists estimate that when the Second Circuit resolved uncertainty regarding the copyright implications of cloud-computing services in *Cartoon Network LP* v. *CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), venture-capital firms invested approximately $728 million to $1.3 billion more in cloud-computing companies over a two-and-a-half-year period than they otherwise would have.[45] A ruling that AI training is not fair use would almost certainly have a chilling effect on investment necessary for innovation.[46] The harm of

---

42 OXFORD ECONS., *supra* note 6, at 4.

43 *See* Shivaram V. Devarakonda & Vilma Chila, *Patent Eligibility Uncertainty and the VC Financing of Novel Technologies*, 35 INDUS. & CORP. CHANGE 55, 59-61, 69 (2026), https://doi.org/10.1093/icc/dtaf024.

44 *See* A. Sasha Hoyt, *The Impact of Uncertainty Regarding Patent Eligible Subject Matter for Investment in U.S. Medical Diagnostic Technologies*, 79 WASH. & LEE L. REV. 397, 436, 445-46 (2022), https://scholarlycommons.law.wlu.edu/wlulr/vol79/iss1/8.

45 Josh Lerner, *Lost in the Clouds: The Impact of Changing Property Rights on Investment in Cloud Computing Ventures* 2-3 (Nat'l Bureau of Econ. Rsch. Working Paper No. 21140, 2015), https://www.nber.org/papers/w21140.

46 OXFORD ECONS., *supra* note 6, at 5 ("[F]irms may be less willing to invest in model development, research activity, and other higher value segments of the AI value chain.").

reduced investment will fall disproportionately on startups that depend on venture-capital funding to compete.

Persistent uncertainty as to the legal status of AI training, or a rule against fair use, would also risk driving investment capital overseas, away from U.S. developers. "Countries with more permissive copyright frameworks tend to experience faster growth in research output, software development, and venture formation."[47] Japan, for example, "provides a relatively flexible framework" for copyright laws,[48] and is considered a "'paradise' for machine learning."[49] The Japanese Copyright Act permits the use of copyrighted works for text and data mining and for AI training, regardless of how the content was obtained, provided that the use is not for the purpose of "enjoy[ing] the thoughts or sentiments expressed in a work."[50] Singapore has a similarly flexible copyright framework in relation to AI training.[51] To the extent that uncertainty persists or the law develops against fair use for AI training, the U.S.'s status as a global leader in AI would be jeopardized. That risk is particularly acute with respect to China, where the government has

---

[47] *Id.* at 8.

[48] *Id.* at 16.

[49] ANUPAM CHANDER, GLOBAL COPYRIGHT RISKS FOR AI TRAINING 15 (2025), https://www.thefai.org/posts/global-copyright-risks-for-ai-training (citation omitted).

[50] *See* OXFORD ECONS., *supra* note 6, at 40.

[51] *See id.* at 15-16; Seth Hays, *AI Training and Copyright Infringement: Solutions from Asia*, TECHPOLICY (Oct. 30, 2024), https://www.techpolicy.press/ai-training-and-copyright-infringement-solutions-from-asia/.

declared AI leadership a strategic priority and channeled substantial state-directed investment into AI development, and the use of copyrighted works for AI training appears largely unconstrained.[52]

In sum, an adverse ruling on fair use in AI training would frustrate — not further — the constitutional purpose of copyright and fair use. Far from incentivizing creativity, such a ruling would entrench dominant incumbents at the expense of innovative startups, chill investment, and risk ceding American leadership in AI to foreign jurisdictions with more permissive legal frameworks. This is precisely the sort of public harm that the Supreme Court in *Oracle* directed courts to consider in assessing fair use. *See* 593 U.S. at 35-36. To fulfill copyright's constitutional mandate "[t]o promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8, the Court should hold that the use of copyrighted works in training OpenAI's large language models constitutes fair use as a matter of law.

## CONCLUSION

Khosla Ventures respectfully urges the Court to grant OpenAI's Motions for Summary Judgment.

---

[52] *See* Edward Lee, *Fair Use and the Origin of AI Training*, 63 HOU. L. REV. 105, 110-12, 227-28 (2025), https://houstonlawreview.org/article/147422-fair-use-and-the-origin-of-ai-training; Daryl Lim & Peter K. Yu, *The Antitrust-Copyright Interface in the Age of Generative Artificial Intelligence*, 74 EMORY L.J. 847, 898 (2025), https://scholarship.law.tamu.edu/facscholar/2215 (discussing China's goal "to become the world's major AI innovation center by 2030" and its state-driven regulatory model); CHANDER, *supra* note 49, at 8, 17-18 (stating that China "has failed to provide regulatory clarity, while signaling support for innovation"); BIPARTISAN HOUSE TASK FORCE ON A.I., *supra* note 5, at 49-50; *see also* Matthew Sag, *Copyright and the AI Action Plan*, MATTHEW SAG (Mar. 20, 2025), https://matthewsag.com/copyright-and-the-ai-action-plan/ ("There is little doubt that if the Chinese Communist Party deems copyright law an impediment to its AI ambitions, the law in China will change almost instantaneously, and very likely retrospectively.").

DATED: October 30, 2026

Respectfully submitted,

*/s/ Brendan P. Cullen*
Brendan P. Cullen*
cullenb@sullcrom.com
Laura K. Oswell*
oswelll@sullcrom.com
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone: (650) 461-5600
Facsimile: (650) 461-5700

*Counsel for amicus curiae Khosla Ventures, LLC*

* Applications for *pro hac vice* admission pending

**CERTIFICATE OF COMPLIANCE**

This brief complies with the Court's type-volume limitation for *amicus* briefs filed "in connection with the summary judgment motions in this multidistrict litigation" (ECF No. 1663) because it contains 5,165 words, excluding the portions exempted by S.D.N.Y. Local Civil Rule 7.1(c).

DATED: October 30, 2026

*/s/ Brendan P. Cullen*
Brendan P. Cullen