UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>1:23-cv-08292-SHS-OTW<br>1:23-cv-10211-SHS-OTW<br>1:25-cv-03482-SHS-OTW | 1:25-md-03143-SHS-OTW<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang<br><br>ORAL ARGUMENT REQUESTED<br><br>PUBLIC VERSION — REDACTED |

**OPENAI'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT IN THE CLASS CASES**

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................1

II. ARGUMENT ....................................................................................................2

A. The Fair Use Inquiry Should Center on OpenAI's Purpose in Training LLMs....................................................................................................2

1. Under Supreme Court and Second Circuit Precedent, the Fair Use Analysis Is Organized Around the Purpose of the Use...............................2

2. Each Alleged Act of Copying Was Part of the Same Use and Served the Same Training Purpose ...............................................5

B. OpenAI's Alleged Use Was Fair Use ...............................................7

1. Factor One....................................................................................................7

2. Factor Two ....................................................................................................14

3. Factor Three ....................................................................................................15

4. Factor Four....................................................................................................15

III. CONCLUSION....................................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Geophysical Union v. Texaco*,
60 F.3d 913 (2d Cir. 1995)....................3, 13

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023).................... *passim*

*Arica Inst., Inc. v. Palmer*,
970 F.2d 1067 (2d Cir. 1992)....................9, 15, 16, 17

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014)....................3, 20

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015).................... *passim*

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007, 1025-26 (N.D. Cal. 2025).................... *passim*

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)....................18, 20, 21

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....................14, 20, 22

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
2020 WL 264146 (S.D.N.Y. Jan. 17, 2020) ....................6

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
821 F.3d 265 (2d Cir. 2016)....................3, 14

*Google, LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)....................12, 14, 20, 21

*Graham v. Prince*,
2023 WL 3383029 (S.D.N.Y. May 11, 2023) ....................12

*Hachette Book Group, Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) ....................3, 22

*Jartech, Inc. v. Clancy*,
666 F.2d 403 (9th Cir. 1982) ....................14

*Kadrey v. Meta Platforms, Inc.*,
788 F.Supp.3d 1026 (N.D. Cal. 2025) ............................................................ *passim*

*Kadrey v. Meta Platforms, Inc.*,
No. 3:23-cv-03417, ECF 767 (N.D. Cal. July 8, 2026) ............................................................4

*Lennon v. Premise Media Corp.*,
556 F.Supp.2d 310 (S.D.N.Y. 2008)............................................................14

*Medical Imaging & Tech. All. v. Libr. of Cong.*,
189 F.4th 1150 (D.C. Cir. 2026)............................................................16

*NXIVM Corp. v. Ross Institute*,
364 F.3d 471 (2d Cir. 2004)............................................................4, 13, 16

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ............................................................4, 13

*Romanova v. Amilus Inc.*,
138 F.4th 104 (2d Cir. 2025) ............................................................9, 10, 11

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ............................................................ *passim*

*Sony Computer Enter., Inc.* v. *Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ............................................................ *passim*

*Thomson Reuters Enter. Centre GmbH v. ROSS Intelligence Inc.*,
193 F.4th 271 (3d Cir. 2026) ............................................................ *passim*

*Whyte Monkee Prods., LLC v. Netflix, Inc.*,
174 F.4th 761 (10th Cir. 2026) ............................................................11

*Wright v. Warner Books, Inc.*,
953 F.2d 731 (2d Cir. 1991)............................................................9, 15

**Federal Statutes**

17 U.S.C. § 107............................................................2, 13

17 U.S.C. § 109............................................................13

# TABLE OF CITATION CONVENTIONS

| **Document** | **Citation Abbreviation** |
|---|---|
| OpenAI's Memorandum of Points and Authorities in Support of Motion for Summary Judgment | OpenAI-Class Mot. |
| Class Plaintiffs' Memorandum of Law in Opposition to OpenAI Defendants' Motion for Summary Judgment | Class Opp. |
| OpenAI's Statement of Undisputed Material Facts in Support of its Motions for Summary Judgment | OSUF |
| Class and News Plaintiffs' Response to OpenAI's Statement of Undisputed Material Facts in Support of its Motions for Summary Judgment | CRSUF |
| OpenAI's Opposition to Class Plaintiffs' Motion for Summary Judgment | OpenAI-Class Opp. |
| Class Plaintiffs' Corrected Rule 56.1 Statement of Undisputed Material Facts in Support of Class Plaintiffs' Motion for Partial Summary Judgment | CSUF |
| Defendants' Response to Class Plaintiffs' Rule 56.1 Statement | RCSUF |
| Class Plaintiffs' Counterstatement of Material Facts in Opposition to OpenAI's Motion for Summary Judgment | ASUF |
| OpenAI's Counterstatement to Class Plaintiffs' Statement of Additional Material Facts | OCASUF |

## I. INTRODUCTION[1]

Plaintiffs' opposition relies on rank speculation that cannot defeat OpenAI's motion for summary judgment. Plaintiffs speculate about other authors that may someday face competition for works that are not asserted in this case. They speculate about markets that might someday emerge. They speculate about future AI technologies that might generate books—technologies that are not at issue here. But speculation is no substitute for the fair-use analysis the Copyright Act requires. The question is not whether Plaintiffs object to how OpenAI obtained their books, whether AI-generated works might compete with unnamed human authors someday, or whether Plaintiffs would prefer to license their works for training. It is whether OpenAI's use of the particular Asserted Works to train the In-Scope Models,[2] which are general-purpose language models, is fair use. On that question, the answer is clear. The undisputed record establishes a highly transformative use without cognizable market harm.

Plaintiffs' contrary arguments do not withstand scrutiny. No authority supports Plaintiffs' attempt to treat each alleged act of copying as a separate "use" requiring a separate fair-use analysis. There is no genuine dispute that all copies Plaintiffs complain about were for the common purpose of training LLMs, and not for any other purpose.

That training purpose is spectacularly transformative. OpenAI put the Asserted Works to a new use that is entirely different from the purpose for which Plaintiffs wrote their books, and it did so without republishing any meaningful amount of protected expression to users. Plaintiffs' assertion that OpenAI's LLMs could, at some future time, be used to write new, non-infringing books that compete with books generally is immaterial. This speculation is untethered from the

---

[1] In all quotations appearing herein, all internal quotation marks, citations, alterations, and the like have been omitted, and all emphases added, unless otherwise noted.
[2] *See* MDL ECF 707 at 1.

Asserted Works and from the evidence. It is also legally non-cognizable. In the Second Circuit, competition from non-infringing works is not "substitution" and does not weigh against fair use. If anything, it weighs in favor of fair use.

Plaintiffs' baseless assertions of harm fail for similar reasons. The "market dilution" they claim is from competition with new works, not works that copy protected expression from any of the Asserted Works. This type of "harm" is not cognizable as a matter of law, and even if it were, Plaintiffs present no evidence to rebut OpenAI's showing that Plaintiffs have suffered no such harm. In fact, they concede they have no "empirical evidence" of harm.

Despite years of extensive discovery, Plaintiffs have ***no*** evidence to support their claims. They repeatedly raise the specter of "piracy" and make dire predictions about the future of the books industry but fail to grapple with the undisputed evidence showing that none of the individual Plaintiffs in this case have been harmed in any way by OpenAI's transformative use.

For these reasons, the Court should grant OpenAI's motion for summary judgment.

## II. ARGUMENT

### A. The Fair Use Inquiry Should Center on OpenAI's Purpose in Training LLMs

The Court must assess fair use in light of the "purpose and character of the use." 17 U.S.C. § 107(1). There is no genuine dispute that OpenAI's alleged downloading and distribution of the Asserted Works were for the purpose of training LLMs. OSUF ¶ 104; RCSUF ¶¶ 941, 945–947, 949–951, 953–954, 957–958.

#### 1. Under Supreme Court and Second Circuit Precedent, the Fair Use Analysis Is Organized Around the Purpose of the Use

The Supreme Court has consistently analyzed fair use according to the overall purpose for which the defendant used the work, rather than evaluating individual copies independently of the common purpose they served. OpenAI-Class Opp. at 9–12 (discussing *Campbell* and

*Warhol*). So has the Second Circuit. *Id.* (discussing *Google Books*, *HathiTrust*, *NXIVM*, *Texaco*, *TVEyes*, and *Hachette*); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 821 F.3d 265, 270 n.4 (2d Cir. 2016) (declining to consider separately the fair-use status of defendant's "internal database" of copyrighted works because that analysis "is bound up with whether the ultimate use of the internal copies is permissible"). In fact, *Google Books* rejected the same argument that Plaintiffs make here—that the Court must assess acquisition of books without reference to the transformative purpose for which they were acquired. OpenAI-Class Mot. at 24 (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214–19 (2d Cir. 2015) ("*Google Books*")).

Plaintiffs have no meaningful response to *Google Books*. They observe that the court separately analyzed search and snippet view, Class Opp. at 10, but that supports OpenAI, not Plaintiffs. Search and snippet view were two ***different uses*** with two ***different purposes***. *Google Books*, 804 F.3d at 216–18 (search identified books containing a term of interest, while snippet view supplied context from an identified book allowing the searcher to assess whether that book is relevant). But where, as here, two acts of copying serve the ***same purpose***, they are analyzed together. That is why *Google Books* did not separately analyze Google's scanning of library books, which served both transformative purposes (search and snippet view). *Id.* at 217–18.

*Texaco* does not support Plaintiffs' position either. *Contra* Class Opp. at 9, 11. The court there held that photocopying scientific journal articles was not transformative because the copying served the same purpose as the originals: making the articles available for scientists to read. *Am. Geophysical Union v. Texaco*, 60 F.3d 913, 919 (2d Cir. 1995). The court did not hold that acquisition of a work must be assessed separately from the purpose for which it was acquired. *Id.*; OpenAI-Class Opp. at 11–12.

Out-of-circuit authorities are in accord. *Kadrey* held that downloading books must be

evaluated in light of its overall purpose—training LLMs. *Kadrey v. Meta Platforms, Inc.*, 788 F.Supp.3d 1026, 1047–48 (N.D. Cal. 2025). The court declined to treat downloading "wholly separately" from training, finding that "[b]ecause Meta's ultimate use of the plaintiffs' books was transformative, so too was Meta's downloading of those books." *Id.*[3]; OpenAI-Class Opp. at 10 (discussing *Perfect 10*, *Connectix*, and *Sega*).

Whether a copy is acquired by "unlawful" means is irrelevant to this analysis. *Contra* Class Opp. at 10–11. None of the above cases turn on the lawfulness of the initial acquisition. In fact, *NXIVM Corp. v. Ross Institute* forecloses the argument that the provenance of a work dictates whether to separate the initial acquisition from later use. 364 F.3d 471 (2d Cir. 2004). The court there noted "that the unpublished manuscript from which quotations were taken . . . was acquired in an unauthorized fashion," but nonetheless analyzed the overall purpose of the use and found it transformative. *Id.* at 477–79. If the provenance of a copy had any bearing on how to organize the fair use analysis, *NXIVM* would have said so. Similarly, in *Perfect 10, Inc. v. Amazon.com, Inc.*, the Ninth Circuit noted that Google had copied images from infringing websites for Image Search, but it conducted a single fair use analysis, holding that Google's overall purpose was transformative. 508 F.3d 1146, 1164 n.8 (9th Cir. 2007).

Plaintiffs' only support for their position is a passage from *Bartz v. Anthropic PBC* that the court expressly noted was *dicta*. Class Opp. at 5, 10; 787 F.Supp.3d 1007, 1025–26 (N.D. Cal. 2025) ("But this order need not decide this case on that rule."). That *dicta* is inconsistent with the Supreme Court and Second Circuit authorities discussed above.

[3] The later *Kadrey* order Plaintiffs rely on, Class Opp. at 11, denied interlocutory review because final judgment would permit appeal; it did not withdraw the holding. *Kadrey v. Meta Platforms, Inc.*, No. 3:23-cv-03417, ECF 767 (N.D. Cal. July 8, 2026).

### 2. Each Alleged Act of Copying Was Part of the Same Use and Served the Same Training Purpose

OpenAI downloaded books for training, not for other purposes. RCSUF ¶ 941 (OpenAI's corporate designee testified that "the intention of all of the data that [OpenAI] collect[s] is for the purposes of training"); OSUF ¶ 104; CSUF ¶¶ 186, 188, 195–197, 402; RCSUF ¶¶ 944–948. So were the alleged "distributions." Plaintiffs' contrary arguments raise no genuine dispute of material fact for several reasons.

***First***, the technical details regarding how OpenAI stored training data after downloading it are immaterial. *Contra* Class Opp. at 12. Regardless of where it is stored, the undisputed evidence confirms that the data was downloaded for training, and there is no evidence that it was used for any other purpose. RCSUF ¶ 941. Plaintiffs identify no contemporaneous evidence suggesting otherwise. *Bartz* is different because Anthropic downloaded books for purposes beyond training, including building a "central library" of "all the books in the world" to retain "forever," and kept copies as a "permanent, general-purpose resource" even after deciding not to use them for training. 787 F.Supp.3d at 1014, 1033. While the court in *Bartz* cited evidence about the way Anthropic handled books internally, it did so to corroborate the contemporaneous evidence establishing Anthropic's distinct library-building purpose. There is no such evidence or purpose here.[4]

***Second***, Plaintiffs' claim that the Asserted Works could be used for purposes other than training is pure speculation. Class Opp. at 12. After years of discovery, they fail to identify any

---

[4] Plaintiffs mischaracterize the evidence they point to. The testimony and OpenAI policies they cite do not establish unrestricted internal access to books, much less retention of books for any purpose other than training LLMs. RCSUF ¶¶ 253–256. The Slack threads and files they cite concern a ***third party*** (Library Genesis)'s metadata database and potential use of that metadata to identify and evaluate books for experimental training. OCASUF ¶ 50. They are ***not*** evidence of "searching tools" for an internal, general-purpose OpenAI library. *Contra* Class Opp. at 12.

such uses. The activities they identify—training classifiers, filtering data, and conducting instruction-following experiments—are steps in model training. CRSUF ¶ 104; RCSUF ¶¶ 262–265.

***Third***, any alleged "distributions" were for training. Project Mango collected data to train LLMs; Microsoft temporarily accessed some tokenized GPT-3 training data to test training software; the [redacted] and it excluded the accused books datasets; and Project Taxi tested Bing Index data for potential use as training data (by running small training experiments). RCSUF ¶¶ 573–574, 597–604, 949–956. Contractors in the book-summarization project evaluated model-generated summaries through a portal displaying short book excerpts, one at a time, to test experimental training techniques. RCSUF ¶¶ 572, 607, 957–958. These activities were all exclusively for training, not any other purpose. OpenAI-Class Opp. at 6–8, 37.[5]

***Fourth***, the fact that OpenAI did not train on every book it downloaded is irrelevant. Class Opp. at 12. OpenAI downloaded the books for the purpose of training its LLMs. That some data initially intended for that purpose was later excluded from the training dataset does not retroactively alter the purpose for which the data was downloaded. *Kadrey*, 788 F.Supp.3d at

---

[5] Nor did OpenAI waive this argument. *Putnam*, the authority Plaintiffs cite, concerned an unpleaded statute of limitations defense raised in a footnote and a successive summary judgment request. *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 264146, at *1–2 (S.D.N.Y. Jan. 17, 2020). The alleged distributions here are part of the same training use addressed in the main text, OpenAI-Class Mot. at 23–25, and further addressed in OpenAI's opposition to Plaintiffs' motion for summary judgment. OpenAI-Class Opp. at 6–8, 37. There is no waiver, particularly given that Plaintiffs failed to plead a "distribution" claim in their Amended Complaint. OpenAI-Class Mot. at 24 n.15; OpenAI-Class Opp. at 37. Plaintiffs try to excuse this failure by pointing to the Court's order regarding notice of the downloading theory, MDL ECF 707 at 4–5, but that order did not address the unpleaded "distribution" claim.

1048 (rejecting the argument that downloading books to evaluate their suitability as training data required a separate justification); *Google Books*, 804 F.3d at 210, 216–17 (holding digitization fair notwithstanding Google's exclusion of certain types of books from snippet view).

**B. OpenAI's Alleged Use Was Fair Use**

OpenAI used the Asserted Works for a highly transformative purpose, did not display any meaningful portion of the books to ChatGPT users, and caused Plaintiffs no cognizable harm.

**1. Factor One**

There is no genuine dispute that Plaintiffs wrote their books to be read and enjoyed by a human audience, CRSUF ¶ 95, while OpenAI's alleged reproductions were for a fundamentally different purpose—to train general-purpose LLMs. OpenAI-Class Mot. at 19–23; OpenAI-Class Opp. at 16. This use was "highly," "quintessentially," and "spectacularly" transformative. *Kadrey*, 788 F.Supp.3d at 1044; *Bartz*, 787 F.Supp.3d at 1021–22, 1026.

**a. OpenAI's Use Is Undisputably Transformative**

OpenAI's research papers and the unrebutted testimony of OpenAI's researchers confirm that OpenAI's purpose in pretraining LLMs is to expose the models to enough text so the models can understand the underlying patterns of language and to improve the models' ability to generalize (*i.e.*, to apply what the models have learned to new, previously unseen data), rather than to republish protected expression from the works used in training. OpenAI-Class Mot. at 20–21.

Plaintiffs attempt to manufacture a fact dispute by characterizing pretraining as "compression" and "memorization" of protected expression that is "encoded" into the model. Class Opp. at 22–25. That is both wrong and immaterial. Regardless of how one characterizes the pretraining process, there is no genuine dispute that (1) use of books to pretrain an LLM is a fundamentally different purpose than writing a book for human readers, and (2) OpenAI's

models are not designed to republish protected expression from Plaintiffs' books. Plaintiffs cite no authority holding or even suggesting that factor one turns on purported "disputes" of this type.

*Google Books* disposes of this argument. Google copied and retained "complete digital copies of entire books," 804 F.3d at 217; or, in Plaintiffs' parlance, Google "compressed" and "memorized" the entirety of the books. And Google's product was shown to "regurgitate" up to 16% of the books at issue. *Id*. at 222–23. Despite that, the Second Circuit found Google's use was transformative because the copying was done for a different purpose and did not substitute for protected expression in the original books. *Id*. at 216–18; *Bartz*, 787 F.Supp.3d at 1021 ("tak[ing] for granted" that "training entailed 'memoriz[ing]' works by 'compress[ing]' copies of those works" but finding it transformative). The Second Circuit focused on what is "made accessible to a public," not whether text was retained internally, *i.e.*, "memorized." 804 F.3d at 221–22. Thus, even if model weights sometimes retained protected expression from training data, that fact alone would not make training "substitutive." Class Opp. at 22–24.

There is no genuine dispute that OpenAI's models are not designed to republish Plaintiffs' works. *Contra* Class Opp. at 24–25. Plaintiffs concede that OpenAI employs extensive "anti-regurgitation" measures and that the real-world evidence shows that regurgitation is exceedingly rare. OpenAI-Class Mot. at 12–13, 21–22; CRSUF ¶ 91. Their own expert examined more than a hundred million conversation logs and found alleged regurgitations in 0.00003% of them. OSUF ¶ 91; CRSUF ¶ 91; RCSUF ¶ 986. Even after a concerted effort by Plaintiffs' expert to force OpenAI's models to regurgitate, involving over 5.3 million prompts, the expert generated only three excerpts that exceeded 300 contiguous words, and the longest passage was a publicly-available excerpt of *A Game of Thrones* constituting 0.62% of that book. CRSUF ¶¶ 86–88; OpenAI-Class Opp. at 4–5, 19.

### b. Competition from New Works that Do Not Republish Protected Expression Does Not Weigh Against Fair Use

Plaintiffs' argument that OpenAI's use cannot be transformative because some people might use OpenAI's LLMs to write books that compete with Plaintiffs' books fails for several reasons. OpenAI-Class Opp. at 16–21 (collecting cases rejecting this argument).

***First***, the Second Circuit has made clear that competition from new works that do not contain creative expression from the originals is not the kind of "substitution" copyright guards against. *See, e.g., Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992); *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991). The Second Circuit recently confirmed that a use that does not "allow[] public access to the copy . . . assure[s] that the copied work [does not] serve as a substitute for the original in the marketplace." *Romanova v. Amilus Inc.*, 138 F.4th 104, 115 (2d Cir. 2025). The Ninth Circuit has held the same. *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523–24 (9th Cir. 1992) (copying that "facilitat[es] the entry of a new competitor" affirmatively favors fair use); *Sony Computer Enter., Inc*. v. *Connectix Corp*., 203 F.3d 596, 606–07 (9th Cir. 2000) (competing work that does not contain plaintiff's protected expression was a "legitimate competitor in the market").

Plaintiffs largely ignore the principle embraced by these cases. They do not address *Arica* or *Wright*, and they omit the portions of *Romanova*, *Sega* and *Connectix* that discuss competition from new works that do not republish protected expression from the originals. *See* Class Opp. at 18–19. Instead, they primarily rely on *Warhol* and *ROSS*, neither of which supports their argument. *See id.*

In *Warhol*, the Court found that a Warholized photo of Prince was substitutive not simply because it "competed" with the original but because it republished protected expression from the original for the same purpose. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,* 598

U.S. 508, 535–38 (2023). The Court did not address harm from new works that lack protected expression from the originals. *See* OpenAI-Class Opp. at 18; *Romanova*, 138 F.4th at 115.

*ROSS* does not dictate a contrary result. Class Opp. at 18–20. The Third Circuit found that ROSS used Westlaw headnotes to develop a legal research platform serving the "same ultimate purpose" as Westlaw. *Thomson Reuters Enter. Centre GmbH v. ROSS Intelligence Inc.*, 193 F.4th 271, 284 (3d Cir. 2026). The court expressly distinguished ROSS's use from the use at issue here, where copyrighted works are used to train a generative AI model that is capable of generating entirely new text on a vast array of subjects. *Id.* at 284 n.7. In any event, the Second Circuit precedent discussed above recognizes that products may serve the same function or audience and still be transformative. OpenAI-Class Opp. at 20–21.

***Second***, Plaintiffs' suggestion that OpenAI designed its LLMs specifically to generate books to compete with Plaintiffs' books is wrong and immaterial. Plaintiffs point to documents showing that OpenAI's LLMs can be used for writing generally or that OpenAI wanted to make its LLMs better at writing. Class Opp. at 19–20. These documents have nothing to do with the Plaintiffs in this case, nor do they suggest that OpenAI's goal was to build LLMs to write books.[6] Even if OpenAI had designed such an LLM, it would not preclude a finding of transformativeness under the authorities discussed above.

Plaintiffs also suggest that *Bartz* and *Kadrey* are distinguishable because neither had

[6] For example, one of the statements Plaintiffs cite, read in full, urges using AI to "invent entirely new things." RCSUF ¶ 750. Similarly, the researcher whose public remark Plaintiffs cite about completing George R.R. Martin's series testified that it did not describe his actual research goal and that his work concerned writing quality "across a broad set of capabilities." RCSUF ¶ 727. The document that described "writing" as "one of the top use cases on ChatGPT" identifies a broad range of "writing" such as communications (emails, texts, and chats); marketing materials (blogs, tweets, and LinkedIn posts); work documents (reports, proposals, memos, and briefs); personal writing; academic writing; and creative writing (stories and poems). RCSUF ¶¶ 723–724.

evidence showing that the LLMs at issue were designed to create competing works. However, as discussed above, there is no such evidence that OpenAI's LLMs were designed to create competing works, and even if there were, that evidence would be immaterial. Indeed, both *Bartz* and *Kadrey* rejected arguments similar to the argument Plaintiffs make here. In both cases, factor one favored fair use despite evidence that actual or potential uses of the models included "writ[ing] as accurately and as compellingly as [plaintiffs]." *Bartz*, 787 F.Supp.3d at 1017; *see also Kadrey*, 788 F.Supp.3d at 1045 ("[O]ne possible use of Llama is to generate text with similarities to unprotectable aspects of the plaintiffs' books[.]").

**c. OpenAI's Use of the Asserted Works Was Justified**

Plaintiffs misread *Warhol* in arguing that OpenAI's transformative use was not "justified" because no individual work is necessary to pretrain an LLM. Class Opp. at 25–26. The *Warhol* Court confirmed that "[i]n a broad sense, a use that has a distinct purpose is justified because it furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." 598 U.S. at 531–32. No further justification is needed. *See id.*; *Whyte Monkee Prods., LLC v. Netflix, Inc.*, 174 F.4th 761, 786 (10th Cir. 2026) (analyzing *Warhol* and holding that where a use is "transformative in this broad sense, then no independent justification is likely to be necessary"); *see also* OpenAI-Class Opp. at 21–22. OpenAI's use served an entirely distinct purpose from the originals and is therefore justified in a broad sense.

Even if further justification were needed, OpenAI's use would still be justified because its LLMs provide a "valuable service to the public . . . without allowing public access to the copy." *Romanova*, 138 F.4th at 115. As *Romanova* recognizes, necessity is not the only permissible justification. *Id.* (listing several types of justifications). If it were, *Bartz* and *Kadrey* would have come out differently, and no LLM could ever be transformative because no

individual work is ever necessary to training.

Finally, even if "reasonable necessity" were required,[7] there is no dispute that training OpenAI's LLMs required an enormous amount of text. OpenAI-Class Mot. at 27. "Because using so many works was reasonably necessary, using any one work for *actually training* LLMs was about as reasonable as the next." *Bartz*, 787 F.Supp.3d at 1030 (emphasis in original).

**d. Plaintiffs' Remaining Arguments Fail**

Plaintiffs argue that *Google Books* and so-called "intermediate copying" cases are distinguishable because they address only "necessary" copying of "functional elements." Plaintiffs are wrong for at least two reasons. ***First***, Plaintiffs' suggestion that the copied material in *Google Books*, *Sega*, and *Connectix* was purely functional is incorrect. Each of those cases involved copying protected expression, and the courts found fair use anyway. *Google Books*, 804 F.3d at 208–10, 216–18, 222–23 (Google copied entire books); *Sega*, 977 F.2d at 1522–23, 1526–27 (expressly acknowledging that Accolade copied protected expression); *Connectix*, 203 F.3d at 603–05 (noting that Connectix copied the protected expression in the Sony BIOS multiple times). ***Second***, *Oracle* and *Google Books* make clear that the copying need not be strictly necessary to find a use transformative. In *Google, LLC v. Oracle Am., Inc.*, the Supreme Court held that Google's reimplementation of the Java SE API declarations was fair use, even though Google could have written its own API from scratch or chosen a different API to copy. 593 U.S. 1, 27–29, 35 (2021). In *Google Books*, the Second Circuit did not require Google to prove that no different corpus could have produced a useful service. 804 F.3d at 221–23.

---

[7] Necessity may be more relevant where the defendant republishes protected expression from the original to comment on it, such as in parodies. *See Warhol*, 598 U.S. at 510–11; *Graham v. Prince*, 2023 WL 3383029, at *8 (S.D.N.Y. May 11, 2023). This reasoning is inapplicable here because OpenAI does not republish any meaningful amount of protected expression.

**e. Plaintiffs' Allegations of Piracy Are Irrelevant**

Fair use does not depend on whether the defendant had authorized access to the work. *Contra* Class Opp. at 5–7; *NXIVM*, 364 F.3d at 475–76; *Perfect 10*, 508 F.3d at 1164 n.8. As *Kadrey* explained: "To say that [the defendant's] downloading was 'piracy' and thus cannot be fair use begs the question because the whole point of fair use analysis is to determine whether a given act of copying was unlawful." 788 F.Supp.3d at 1046; MDL ECF 2407-1 at 5 (Amicus Brief of Electronic Frontier Foundation) (noting that if Congress had wanted to make "lawful acquisition" a predicate to fair use, it knew how to do so; comparing 17 U.S.C. § 109(a) with § 107); OpenAI-Class Opp. at 23–24 (addressing same argument).

Plaintiffs claim that OpenAI's argument is like a "patron of the Pirate Bay" claiming that his acquisition of a pirated movie is fair because he later quoted from the film as part of a "review" on "Metacritic." Class Opp. at 2. But, unlike that patron or the employees in the *Texaco* case, OpenAI did not create copies of Plaintiffs' books to read them. There is no evidence that anyone at OpenAI read any downloaded copies for enjoyment, or that the copies were stored in a manner designed for them to be read for enjoyment. Section II.A.2, *supra*.

This distinction is dispositive of Plaintiffs' argument. In other cases concerning the creation of multiple copies of the same work—*i.e.*, initial copies created to acquire a work, and subsequent copies made for a fair use—courts analyze the initial copy by looking to its "purpose." 17 U.S.C. § 107(1). When the initial copy was created to serve the work's ordinary function, such as downloading books to read or music to listen to, the copying is less likely to be transformative. *See Texaco*, 60 F.3d at 918 (copy made "for the same basic purpose that one would normally seek to obtain the original—to have it available on [a] shelf for ready reference"). That is so even if the defendant was motivated to create the copy for some broader mission, like to "write a music review" or to "do[] research." Class Opp. at 2; *Texaco*, 60 F.3d at

924; *Warhol*, 598 U.S. at 544–45 (fair use hinges on "objective inquiry" into "what the user does with the original work" rather than "subjective intent of the user").

But where, as here, the initial copy was created not for ordinary consumption, but instead to facilitate a transformative use, courts evaluate that initial copy in light of the ultimate use. *See Flo & Eddie*, 821 F.3d at 270 n.4 (whether creation of "internal database" containing plaintiffs' works was fair use is "bound up with whether the ultimate use of the internal copies is permissible"); *Jartech, Inc. v. Clancy*, 666 F.2d 403, 406–07 (9th Cir. 1982) (rejecting argument that surreptitious copying of film was standalone act of infringement because defendant made copies "not for subsequent use and enjoyment," but rather for a fair use purpose). This is what the Second Circuit did in *Google Books*, despite the plaintiffs arguing that scanning books should be analyzed independently from the subsequent use of those books to develop Snippet View and Search. 804 F.3d at 212–29; Brief for Plaintiffs-Appellants in *Google Books*, 2014 WL 1509692, at *32–36; *see also* Section II.A.1, *supra*.

#### f. Commerciality Does Not Carry Presumptive Force Against Fair Use

For the reasons stated in OpenAI's motion for summary judgment, OpenAI-Class Mot. at 25–26, commerciality does not tilt this factor against fair use, particularly in light of the transformative nature of OpenAI's use. *See Oracle*, 593 U.S. at 32; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 583 (1994).

### 2. Factor Two

Copying to make use of unprotected elements in a work does not weigh against fair use under factor two. *See* OpenAI-Class Mot. at 26. In any event, Plaintiffs do not contest that "[t]he second factor has rarely played a significant role in the determination of a fair use dispute." *Google Books*, 804 F.3d at 220; *accord Lennon v. Premise Media Corp.*, 556 F.Supp.2d 310, 325

(S.D.N.Y. 2008).

**3. Factor Three**

Pretraining the In-Scope Models undisputedly required enormous volumes of text. OpenAI-Class Mot. at 27. Plaintiffs' argument regarding strict "necessity" fails for the reasons discussed above. *See* Section II.B.1, *supra*. Plaintiffs do not even address *Kadrey* and *Bartz*, which held that factor three favors fair use because copying entire books to train LLMs was "reasonably necessary." *Bartz*, 787 F.Supp.3d at 1030; *Kadrey*, 788 F.Supp.3d at 1050. And Plaintiffs ignore the rule that what matters for factor three is not the amount copied, but "the amount and substantiality of what is thereby made accessible to a public for which it may serve as a competing substitute." *Google Books*, 804 F.3d at 222.

There is no genuine dispute that alleged regurgitation of protected expression from Plaintiffs' books is extremely rare, and that any text matching text from Plaintiffs' books is far too short to constitute a "significantly competing substitute for the copyrighted work." *Id.*; *see Bartz*, 787 F.Supp.3d at 1029–30; *Kadrey*, 788 F.Supp.3d at 1050; OSUF ¶¶ 82, 90.

**4. Factor Four**

OpenAI's transformative use caused no cognizable harm to Plaintiffs. OpenAI-Class Mot. at 28–39; OpenAI-Class Opp. at 26–37.

**a. Market Dilution Is Not a Cognizable Theory of Harm**

Plaintiffs' primary theory of harm is "market dilution." But the Second Circuit has been clear that competitive harm from non-infringing works is not cognizable. *Arica*, 970 F.2d at 1077–78 ("Defendant . . . is perfectly entitled to create a competing work."); *Wright*, 953 F.2d at 739 ("The effect on the market must be attributable to the seven instances in which the biography takes Wright's expression."). The type of "substitution" that courts consider under factor four is substitution for the protected expression in the original—not general competition in the

marketplace. *See Arica*, 970 F.2d at 1077–78; MDL ECF 2328-1 ("Amicus Brief of Authors Alliance") (addressing this flawed theory in detail). Other courts have held the same. *See Medical Imaging & Tech. All. v. Libr. of Cong.*, 189 F.4th 1150, 1162 (D.C. Cir. 2026) (increased competition in medical-device repair services did not establish cognizable harm where the secondary use did not substitute for protected software); *Sega*, 977 F.2d at 1523; *Connectix*, 203 F.3d at 606–07; *Bartz*, 787 F.Supp.3d at 1031–32.

Plaintiffs cite no controlling authority that has found cognizable harm from new works that do not republish creative expression from the originals. Instead, they incorrectly rely on two out-of-circuit cases. But the discussion of market dilution in *Kadrey* is *dicta* that is contrary to Second Circuit law and has been sharply criticized by leading commentators. *See* OpenAI-Class Opp. at 28–29. And Plaintiffs' interpretation of *ROSS* is incorrect and directly conflicts with Second Circuit law. *See id.* at 20–21. The Second Circuit has consistently held that "the relevant market effect" under factor four is from "the effect of defendants' use of that expression[,] . . . not the effect of defendants' work as a whole." *NXIVM*, 364 F.3d at 482 (quoting *Wright*, 953 F.2d at 739). Plaintiffs disregard this authority, arguing that in *ROSS*, the Third Circuit found "that harms which stemmed from copying works 'to create a competing legal-research platform' were cognizable . . . even where the competing product did not serve the plaintiff's underlying copyrighted material to users." Class Opp. at 37. That is simply not the law in the Second Circuit.

In *Arica*, the district court recognized that the allegedly infringing, competing self-help books appealed to the same audience as the original. 970 F.2d at 1079. But the Second Circuit rejected the notion that general competition is sufficient and found that factor four favored fair use because the competing self-help book made only marginal amounts of the plaintiff's

expressive content available to readers. *Id.* The case for fair use is even stronger here: Plaintiffs claim harm from general competition arising from third-party creation of new non-infringing works, not from OpenAI's products themselves. And, as in *Arica*, OpenAI's products make (at most) only marginal amounts of the Asserted Works' expressive content available to users—and only do so extremely rarely. OSUF ¶¶ 85–91.

The fact pattern in *ROSS* is distinguishable. There the infringing product was a legal-research platform that competed directly with Thomson Reuters's Westlaw for the same customers, charged prices comparable to Westlaw, and used Thomson Reuters's headnotes for the same purpose "to help users find judicial opinion passages responsive to their searches." *ROSS*, 193 F.4th at 284. ROSS also offered no evidence to show a lack of harm in the traditional market for legal-research platforms. *Id.* at 288. In contrast, OpenAI's general-purpose LLMs are not substitutes for books, and OpenAI has offered evidence rebutting Plaintiffs' alleged harm due to market dilution. *Compare id.*, *with* OSUF ¶¶ 125–127.

Plaintiffs' attempts to distinguish controlling Second Circuit case law are unavailing. *See* Class Opp. at 38–40. Plaintiffs argue that, unlike *Google Books*, "competing outputs derive directly from the exploitation of Plaintiffs' protected expression." *Id.* at 38–39. This argument ignores the relevant fourth-factor inquiry from *Google Books*: whether the use "results in widespread revelation of sufficiently ***significant portions of the original*** as to make available a significantly competing substitute." 804 F.3d at 223. OpenAI's products reveal far less of a book's expressive material to users than the Google Books service. OpenAI-Class Mot. at 29; OpenAI-Class Opp. at 19. For most Asserted Works, there is no evidence of regurgitation at all. OSUF ¶¶ 82–84; CSUF ¶ 550. And Plaintiffs do not dispute that the longest contiguous text that their expert could force to be generated after 5.3 million prompts was an excerpt that is widely

available on the internet for free and amounts to only 0.62% of the book at issue. CRSUF ¶¶ 85–89.

Plaintiffs attempt to distinguish *NXIVM*, *Bill Graham*, and *Campbell* by arguing that in those cases, the use of plaintiffs' works was required to achieve defendants' transformative purpose. *See* Class Opp. at 39. That is merely a restatement of Plaintiffs' legally erroneous "reasonably necessary" argument and should be rejected for the reasons stated above. *See* Section II.B.1, *supra*. Regardless, it does not show that "market dilution" is cognizable harm.

Plaintiffs also misrepresent the Ninth Circuit's holding in *Sega*. They assert that "there was 'nothing in the record that suggest[ed] that [the defendant] had copied any' of the works' creative elements" and "there was no evidence the copying had 'significantly affected the market for Sega's [games].'" Class Opp. at 38 (alterations in original). But Accolade copied Sega's copyrightable code wholesale (including any and all "creative elements" in that code) in the course of its internal reverse engineering efforts, and the Ninth Circuit acknowledged that "Accolade's disassembly of Sega's software undoubtedly 'affected' the market for Genesis-compatible games in an indirect fashion." *See Sega*, 977 F.2d at 1523, 1525; *see also Connectix*, 203 F.3d at 607 (noting that Sony will lose some console sales and profits to Connectix's Virtual Game Station). Nonetheless, the court held that factor four favored fair use because competition from works that do not republish protected expression from the original is non-cognizable. *Sega*, 977 F.2d at 1524; *see also Connectix*, 203 F.3d at 607–08 (same). In other words, *Sega* explicitly rejected the same type of market dilution harm that Plaintiffs claim here. *See Sega*, 977 F.2d at 1523.

**b. Plaintiffs Fail to Rebut OpenAI's Showing of No Harm**

Even if market dilution were cognizable, Plaintiffs have suffered none. OpenAI's economic expert, Dr. Gregory Leonard, conducted five distinct analyses of sales and pricing data

across the trade book industry and for the Asserted Works. OSUF ¶¶ 125–129. All five analyses confirmed that the release of OpenAI's LLMs was not associated with a systematic change in the sales or prices of the books being analyzed. *Id.* Plaintiffs do not rebut Dr. Leonard's analysis with an empirical analysis of their own.

Instead, Plaintiffs note that Dr. Leonard did not analyze ebook sales. But ebooks account for only 10% of trade book net revenue while print books (the preferred format for purchase by consumers) represent 76.4% of trade book net revenue in the United States. Leonard Reply Decl. ¶ 16. Plaintiffs identify no evidence that ebooks would be affected differently than print books, nor could they when their own expert said he could not "identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." OSUF ¶ 131. The only evidence in the record shows that there is no systemic market impact on book sales from ChatGPT. To the extent that Plaintiffs suggest that their expert, Mr. Lasinski, "show[ed] that Plaintiffs have experienced sales declines following the introduction of OpenAI's models," this argument blatantly misrepresents the record. Class Opp. at 33. Plaintiffs admit that Mr. Lasinski "did not perform an . . . event study of [the] Asserted-Work sales" and that he did not identify any ChatGPT-generated book that caused anyone to lose a sale. *See* CRSUF ¶¶ 130–131.

Plaintiffs also claim Dr. Leonard failed to address [redacted] *See* Class Opp. at 33. [redacted] *See* RCSUF ¶ 961. [redacted] *See id.* ¶¶ 962–969.

Plaintiffs' other evidence is immaterial. They point to anecdotal examples of AI-

generated books earning prizes, publishing deals, and sales; Dr. Shan's tests showing that the In-Scope Models can generate books; and Plaintiffs' belief that they have been harmed. Class Opp. at 33–34. None of this evidence identifies any market harm to the specific Plaintiffs in this case or the Asserted Works, nor does it trace any such harm to OpenAI's LLMs.

Plaintiffs' failure to rebut OpenAI's evidence or come forward with any empirical analysis of their own is telling. *Kadrey* itself acknowledged that it was "unlikely . . . that AI-generated books would meaningfully siphon sales away from well-known authors who sell books to people looking for books by those particular authors." 788 F.Supp.3d at 1052. Plaintiffs have no response. *Kadrey* also set forth the sort of evidence a plaintiff would need for alleged harm from dilution to "ma[ke] a difference," including evidence showing (1) what the AI-generated books at issue are, (2) whether they compete with the plaintiff's particular works, (3) what impact competition has on the plaintiff's book sales, and (4) whether a model's ability to output competitive content would be affected if the LLM was not trained on the plaintiff's books. *Id.* at 1054–56. Plaintiffs still have no response. Instead, they ask the Court simply to speculate that either Plaintiffs themselves or some unidentified authors will be impacted in some way. This speculation would not be enough even if "market dilution" were cognizable, which it is not.

#### c. Plaintiffs Have Not Been Harmed in Any Cognizable Licensing Market

Harm from a lost licensing fee in a "transformative market" is not cognizable as a matter of law. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614–15 (2d Cir. 2006); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 100 (2d Cir. 2014); *see also Oracle*, 593 U.S. at 38. Plaintiffs fail to grapple with this fundamental principle. *See* Class Opp. at 35–36.

Plaintiffs cite *Campbell*'s discussion of protectable derivative markets, but *Campbell* said nothing about market harm in a transformative market. *See* 510 U.S. at 592–93. Similarly,

although the Third Circuit found licensing-market harm in *ROSS*, that case did not address whether the market at issue was a transformative market, and the Third Circuit's finding that a market for licensing headnotes existed was based on evidence that Thomson Reuters was using its headnotes to train its own AI search products. *See ROSS*, 193 F.4th at 288. Moreover, licensing headnotes to train a non-generative AI legal research tool is vastly different from licensing billions of works to train a general-purpose LLM, a difference Plaintiffs do not address.

Plaintiffs attempt to distinguish *Kadrey* and *Bartz* by incorrectly arguing that those cases had different records regarding transformativeness and substitutive purpose. But Plaintiffs' "substitutive purpose" argument is incorrect as a matter of law. *See* Section II.B.1, *supra*. And regardless, both *Bartz* and *Kadrey* rejected similar arguments on transformativeness and substitutive purpose. *See* 787 F.Supp.3d at 1017–19, 1021–22; 788 F.Supp.3d at 1045.

Even if harm to a transformative market were cognizable, Plaintiffs' claim would still fail. They concede that they have not received payment for selling or licensing their books for LLM training and that they were not approached to license their books for LLM training before this lawsuit was filed. CRSUF ¶¶ 121, 124. [redacted] RCSUF ¶ 978; *see also* MDL ECF 1707 ¶¶ 21–25. Similarly, Plaintiffs point to the existence of intermediaries and independent collective licensing organizations, but this proves OpenAI's point: none of these organizations has successfully licensed trade book content for pretraining LLMs. *See* Class Opp. at 32; Leonard Reply Decl. ¶¶ 17–25. Plaintiffs' assertion that OpenAI was willing to pay for books is immaterial. *See* Class Opp. at 32; *Bill Graham*, 448 F.3d at 615 ("[A] publisher's willingness to pay license fees . . . does not establish that the publisher may not, in the alternative, make fair use of [the work]."); 

*see also Oracle*, 593 U.S. at 38 (efforts to obtain a license did not defeat fair use). So too is Plaintiffs' purported willingness to license their works for this transformative purpose. *See* Class Opp. at 32.

**d. Alleged Lost Sales from OpenAI's Initial Download Are Not Cognizable and Are Insufficient as a Matter of Law**

Plaintiffs do not respond to and thus concede the point that the loss of royalties from a single book sale per Plaintiff does not deprive them of "significant revenues" such that factor four would tilt against fair use. *See* OpenAI-Class Mot. at 35–36; OpenAI-Class Opp. at 36.

Instead, Plaintiffs argue that if the unauthorized downloading of books became widespread, they would be significantly harmed. *See* Class Opp. at 13–15. This argument misconstrues the law. The relevant inquiry considers the impact of "unrestricted and widespread conduct ***of the sort engaged in by the defendant***." *Campbell*, 510 U.S. at 590; *Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163, 193 (2d Cir. 2024). Thus, the conduct at issue is not "piracy" of books for human consumption, it is the use of books to train LLMs. *See* OpenAI-Class Opp. at 9–10, 37. That use has not caused any cognizable harm to Plaintiffs, and widespread use of the same kind will not do so, either.

Plaintiffs' remaining points concerning harm from "piracy" are pure speculation. They speculate that OpenAI's conduct "normalized piracy" based on the *ipse dixit* of their expert, Mr. Seeley, and a misleading citation to a statement from a third-party shadow library, Anna's Archive, from which Plaintiffs do not even allege OpenAI downloaded books at all. Class Opp. at 13–14. They cite no evidence showing that the Asserted Works lost any sales because of "piracy," that such piracy was inspired by OpenAI's download of the Asserted Works, or that any harm would be significant enough to tip factor four against fair use.

Plaintiffs also speculate that OpenAI's downloading of books further harmed them

because OpenAI's network configuration enabled PEX messages, which allegedly would make third parties' downloads of the same torrent files faster. *Id.* at 14. But Plaintiffs present no evidence that any third party benefitted from OpenAI's network configuration, and their own expert concedes that "[redacted]." MDL ECF 1767, Ex. B ¶ 43.

**e. Benefit from OpenAI's Use**

Plaintiffs do not dispute that OpenAI's products help people in many useful ways, including helping humans to research and write new books.[8] OSUF ¶¶ 132–133, 135; CRSUF ¶ 135; *see also generally* MDL ECF 2112-1 (Amicus Brief of Kevin Kelly) (documenting the ways in which writers are using AI to create new, non-infringing works and the ways in which AI has advanced science and technology); MDL ECF 2403-1 (Amicus Brief of Sarah Siskind et al.) (documenting the ways in which AI enables independent artists to compete by reducing the amount of time and money spent on administrative tasks and the ways in which AI facilitates discovery of human-created works). These benefits weigh in favor of fair use.

## III. CONCLUSION

The Court should grant OpenAI's motion for summary judgment.

[8] Plaintiffs argue that the Court need not consider these benefits because the Asserted Works are not strictly necessary to achieve these benefits. This argument fails because Plaintiffs again misconstrue the "reasonably necessary" inquiry. *See* Section II.B.1, *supra*.

Dated: November 20, 2026

Respectfully submitted,

**LATHAM & WATKINS LLP**
Andrew M. Gass (*pro hac vice*)
*andrew.gass@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415.391.0600

Sarang V. Damle
*sy.damle@lw.com*
Luke A. Budiardjo
*luke.budiardjo@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200

Elana Nightingale Dawson (*pro hac vice*)
*elana.nightingaledawson@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

**KEKER, VAN NEST & PETERS LLP**
Robert A. Van Nest (*pro hac vice*)
*rvannest@keker.com*
R. James Slaughter (*pro hac vice*)
*rslaughter@keker.com*
Paven Malhotra
*pmalhotra@keker.com*
Michelle S. Ybarra (*pro hac vice*)
*mybarra@keker.com*
Reid P. Mullen (*pro hac vice*)
*rmullen@keker.com*
Nicholas S. Goldberg (*pro hac vice*)
*ngoldberg@keker.com*
633 Battery St.
San Francisco, CA 94111
Telephone: 415.391.5400

**MORRISON & FOERSTER LLP**
Joseph C. Gratz (*pro hac vice*)
*jgratz@mofo.com*
Tiffany Cheung (*pro hac vice*)
*tcheung@mofo.com*
Caitlin Sinclaire Blythe (*pro hac vice*)
*cblythe@mofo.com*
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000

Lily Li (*pro hac vice*)
*YLi@mofo.com*
755 Page Mill Road
Palo Alto, CA 94304
Telephone: 650.813.5600

**CERTIFICATE OF COMPLIANCE**

In accordance with Local Civil Rule 7.1(c), I hereby certify that the foregoing OPENAI'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT IN THE CLASS CASES is 7496 words, exclusive of the caption page, table of contents, table of authorities, and signature block. The basis of my knowledge is the word count feature of the word-processing system used to prepare this memorandum.

Dated: November 20, 2026 By: ____________________