**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This document relates to:<br><br>Case No. 1:23-cv-08292-SHS-OTW<br>Case No. 1:23-cv-10211-SHS-OTW | 25-md-3143 (SHS) (OTW)<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang<br><br>REDACTED—PUBLIC VERSION |

**CLASS PLAINTIFFS' RESPONSE TO DEFENDANTS' ADDITIONAL STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO CLASS PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, David Baldacci, Taylor Branch, Michael Connelly, Sylvia Day, Jonathan Franzen, Christopher Golden, Andrew Sean Greer, John Grisham, David Henry Hwang, Matthew Klam, George R.R. Martin, Jodi Picoult, Stacy Schiff, James Shapiro, The Authors Guild, Belfry Holdings, Inc., Columbus Rose, Ltd., Daring Greatly Corporation, Gattopardo, LLC, Hieronymus, Inc., Sylvia Day LLC, and Wo & Shade LLC (collectively, "Class Plaintiffs") respectfully submit the following response to Defendant Microsoft's ("Microsoft") contended undisputed material facts in support of its Motion for Summary Judgment.

**IX. Defendant OpenAI's Additional Facts Pursuant to Local Rule 56.1(b)**

| | |
|---|---|
| 941. OpenAI's corporate designee testified that "the intention of all of the data that [OpenAI] collect[s] is for the purposes of training." C. Blythe Opp. Decl. Ex. 21 (I. Sohl 30(b)(1) Tr. (Dec. 10, 2025)) at 114:25–115:2. | **Disputed.** Mr. Sohl did not testify in his capacity as a corporate designee that "the intention of all of the data that [OpenAI] collect[s] is for the purposes of training." Mr. Sohl offered the quoted testimony in his personal capacity when he was asked [redacted]<br><br>Further, extensive admissible evidence demonstrates that OpenAI acquired and used data for purposes other than training production models. [redacted]<br><br>Indeed, OpenAI could not use millions of the LibGen books for training at the time it acquired them because they were PDFs that its text-extraction pipeline could not process. [redacted] |

| | |
|---|---|
| | [redacted] Class Plaintiffs' SUF ¶¶ 239, 241–42, 466. [redacted] OpenAI's acquisition of millions of PDF books therefore served no functional role in training the models at issue. [redacted] |
| 942. OpenAI sought to obtain "a diverse set of text over many topics." C. Blythe Opp. Decl. Ex. 62 (N. Ryder 30(b)(6) Tr. (Jan. 29, 2026)) at 44:3–44:7. | [redacted] |

| | |
|---|---|
| | [redacted] |
| 943. OpenAI considered books another "natural topic of diverse material[.]" C. Blythe Opp. Decl. Ex. 62 (N. Ryder 30(b)(6) Tr. (Jan. 29, 2026)) at 44:17–45:9. | **Undisputed** that Mr. Ryder testified: "And so books was another, you know, natural topic of diverse material [redacted]." C. Blythe Opp. Decl. Ex. 62 at 44:17–45:9. |

| | |
|---|---|
| | **Disputed** to the extent OpenAI contends it did not also seek out books because they were high-quality data. Mr. Ryder's "diverse material" testimony does not address quality, and OpenAI's contemporaneous documents treated books as a quality benchmark rather than merely a topical category. [redacted] |
| 944. Books comprised only one category of data, alongside data such as source code, math problems, legislative materials, and public web data. C. Blythe Opp. Decl. Ex. 62 (N. Ryder 30(b)(6) Tr. (Jan. 29, 2026)) at 44:17–45:9. | **Undisputed** that books comprised one category of the data OpenAI used to train its models.<br><br>**Disputed** to the extent OpenAI contends that books were not a significant or uniquely valuable category of training data. [redacted] |

| | |
|---|---|
| | [redacted] |
| 945. OpenAI witnesses testified that OpenAI downloaded a "small fraction" of The Pile "for the purpose of evaluating a very small model on it." C. Blythe Opp. Decl. Ex. 42 (S. Jain 30(b)(1) Tr.) at 316:23–317:3; C. Blythe Opp. Decl. Ex. 41 (A. Paino 30(b)(6) Tr.) at 214:14–21, 215:12-216:8 (OpenAI used a "small fraction" of The Pile to run "small-scale experiments" in 2021). | **Undisputed** that Mr. Jain and Mr. Paino gave the quoted testimony.<br><br>**Disputed** that OpenAI downloaded only a "small fraction" of The Pile. Neither witness had personal knowledge of what was downloaded. [redacted] |

| | |
|---|---|
| | [redacted] |
| 946. OpenAI's "very small scale" experiments done on a portion of The Pile involved "[v]ery, very tiny models" that "required a very little amount of data to train." C. Blythe Opp. Decl. Ex. 41 (A. Paino 30(b)(6) Tr.) at 215:12–19. | [redacted] |

| | |
|---|---|
| | Otherwise, **Disputed** as unsupported by the cited evidence, and **Disputed** that OpenAI only acquired and used "a portion" or a "very little amount of data to train" from The Pile. [redacted] |
| 947. These experiments were run in order to obtain "some basic understanding of the quality of The Pile datasets" relative to OpenAI's existing training data, which was "the full extent of that work." C. Blythe Opp. Decl. Ex. 41 (A. Paino 30(b)(6) Tr.) at 215:12–25. | **Undisputed** that Mr. Paino gave the testimony quoted in Class Plaintiffs' Response to ASOF, *supra* ¶ 946, including that the researcher [redacted]<br><br>Otherwise, **Disputed** as unsupported by the cited evidence for the reasons stated in Class Plaintiffs' Response to ASOF, *supra* ¶¶ 945–946, [redacted] |

| | |
|---|---|
| | [redacted] |
| 948. OpenAI did not use any books from Books3 to train any In-Scope Model. C. Blythe Opp. Decl. Ex. 41 (A. Paino 30(b)(6) Tr.) at 214:14–216:10. | [redacted]<br><br>Otherwise, **Disputed** as unsupported by the cited evidence. |
| 949. OpenAI's corporate designee testified the data actually transferred to Microsoft was only a "subset" of GPT-3's | **Undisputed** that Mr. Gaffney testified that the data actually transferred to Microsoft was a "subset" of GPT-3's training data. |

| | |
|---|---|
| training data. C. Blythe Opp. Decl. Ex. 78 (B. Gaffney 30(b)(6) Tr.) at 147:13–148:25. | **Disputed** to the extent OpenAI contends the "subset" was immaterial in size or content. [redacted] |
| 950. The later transfer of GPT-3 training data was for [redacted]. C. Blythe Opp. Decl. Ex. 61 (J. Huynh 30(b)(6) Tr.) at 186:5-12. | **Undisputed** that in November 2021 OpenAI shared access to GPT-3 training datasets and [redacted]<br><br>**Disputed** to the extent OpenAI contends that this was the only transfer of GPT-3 training data between the parties, or that the transfers were disconnected from commercial objectives or exclusively for any model training. [redacted] |

| | |
|---|---|
| | [redacted] |
| 951. The goal was to use the data to [redacted], not to evaluate the data. C. Blythe Opp. Decl. Ex. 61 (J. Huynh 30(b)(6) Tr.) at 189:20-23. [redacted] *Id.* at 187:3-17. | **Undisputed** that Mr. Huynh gave the quoted testimony describing [redacted]<br><br>**Disputed** to the extent OpenAI contends [redacted]<br><br>Further **Disputed** to the extent OpenAI contends the transferred data excluded Plaintiffs' works, for the reasons stated and based on the evidence set forth in Class Plaintiffs' Response to ASOF ¶¶ 949, 950, 952. |

| | |
|---|---|
| 952. Only three of GPT-3's five component datasets were transferred and the datasets did not include the Library Genesis–derived Books1 and Books2 datasets. Books Ex. 275 at OPCO_MDL_001653588. | **Undisputed** that the cited document reflects that three of GPT-3's five component datasets were identified for transfer.<br><br>**Disputed** to the extent OpenAI contends that no LibGen-derived book data was ever made available to Microsoft. [redacted] |
| 953. Project Taxi included the transfer of portions of the Bing Index data so that OpenAI could evaluate the value of the data for training out-of-scope "internal-only research models." C. Blythe Opp. Decl. Ex. 49 (I. Sohl 30(b)(6) Tr. (Dec. 9, 2025)) at 344:19–24, 345:10–19, 345:16–20; C. Blythe Opp. Decl. Ex. 22 (Q. Yuan 30(b)(1) Tr.) at 77:18–21; C. Blythe Opp. Decl. Ex. 62 (N. Ryder 30(b)(6) Tr. (Jan. 29, 2026)) at 66:1–4. | **Undisputed** that Project Taxi involved OpenAI's acquisition of Bing Index data from Microsoft, and that OpenAI evaluated that data for training purposes notwithstanding Microsoft's admonition that OpenAI was [redacted]<br><br>**Disputed** that the transfer was limited to "portions" of the Bing Index. [redacted] |

| | |
|---|---|
| | [redacted]<br><br>Further **Disputed** to the extent OpenAI contends the purpose was confined to evaluating out-of-scope internal research models. OpenAI sought the Bing Index from the outset of the Microsoft relationship and pressed for it through 2021 and 2022, and it obtained the index only by paying Microsoft [redacted] |
| 954. OpenAI used the Bing Index data to train "internal-only research models for evaluation purposes." C. Blythe Opp. Decl. Ex. 49 (I. Sohl 30(b)(6) Tr. (Dec. 9, 2025)) at 345:10–13; *see also id.* at 445:17–18 ("Project Taxi was used for training, but not training a production model."). | [redacted]<br><br>[redacted] |

| | |
|---|---|
| | [redacted] |
| 955. OpenAI did not include the portions of Bing Index data in production-model training. C. Blythe Opp. Decl. Ex. 49 (I. Sohl 30(b)(6) Tr. (Dec. 9, 2025)) at 345:16–20. | **Undisputed** that Mr. Sohl gave the cited testimony.<br><br>**Disputed** to the extent OpenAI contends that the Bing Index data conferred no benefit on its production models. [redacted] |

| | |
|---|---|
| | [redacted] |
| 956. OpenAI eventually deleted the data. C. Blythe Opp. Decl. Ex. 49 (I. Sohl 30(b)(6) Tr. (Dec. 9, 2025)) at 346:3–9. | **Undisputed** that OpenAI deleted the Bing Index data in late 2023. Nelson Decl. Ex. 57(a) at 346:3–9; Nelson Decl. Ex. 170; Class Plaintiffs' SUF ¶ 596. |
| 957. For the "book summarization project," OpenAI used a custom-built web portal to display very short snippets to contractors evaluating model generated summaries. C. Blythe Opp. Decl. Ex. 23 (J. Wu 30(b)(1) Tr.) 126:19–127:23, 128:14–129:1. | **Undisputed** that OpenAI used a custom-built web portal to display text to contractors evaluating model-generated summaries.<br><br>**Disputed** that contractors were shown only "very short snippets." The project included sending full-text copies to third-party contractors. Nelson Decl. Ex. 235.[redacted] |

| | |
|---|---|
| 958. The project tested experimental training techniques by examining whether breaking difficult tasks into smaller, more readily evaluated subtasks could improve model training. *See* C. Blythe Opp. Decl. Ex. 35 at OPCO_MDL_000000048, -050, -059; C. Blythe Opp. Decl. Ex. 23 (J. Wu 30(b)(1) Tr.) 121:23–122:8. | **Undisputed** that one thing the book-summarization project tested was whether decomposing difficult tasks into smaller, more readily evaluated subtasks could improve model training.<br><br>**Disputed** to the extent OpenAI contends that the project did not also aim at improving its models' abilities to summarize books.<br><br>Further **Disputed** to the extent OpenAI contents that the project was a purely experimental exercise unrelated to commercial model capabilities. [redacted] |
| 959. [redacted] | [redacted] |

| | |
|---|---|
| [redacted]. C. Blythe Opp. Decl. Ex. 70 ([redacted]) 182:21–184:1. | [redacted] |

| | |
|---|---|
| | [redacted] |
| 960. [redacted] s. *See* C. Blythe Opp. Decl. Ex. 70 ([redacted]) 182:21–184:1, 222:4–11. | [redacted]<br><br>[redacted] |

| | |
|---|---|
| | [redacted] |
| 961. [redacted]. G. Leonard Opp. Decl. ¶ 25. | **Undisputed** that [redacted]<br><br>[redacted] |

| | |
|---|---|
| | [redacted] |
| 962. The majority of the Asserted Works are adult fiction trade books by well-known authors and published by the Big 5 publishers. G. Leonard Opp. Decl. ¶ 14. | **Undisputed** that the majority of the Asserted Works are adult trade books by well-known authors published by the Big 5 publishers.<br><br>**Disputed** to the extent OpenAI contends that this composition establishes that the Asserted Works do not compete with self-published or AI-generated titles. [redacted]. Moreover, many of the Asserted Works are not adult fiction, such as works by Taylor Branch, Stacy Schiff, and James Shapiro. *See* Class Plaintiffs' SUF ¶¶ 9–12, 53–61 and Appendix A Nos. 41–42 and 184–189. |

| | |
|---|---|
| 963. OpenAI's expert, economist Dr. Gregory Leonard, noted that traditionally published books such as the Asserted Works are substantially differentiated from, and thus experience little competitive effect from, self-published works. G. Leonard Opp. Decl. ¶¶ 15, 19. | **Disputed.** Dr. Leonard's differentiation opinion does not account for the record evidence that AI-generated and self-published titles compete directly with traditionally published trade books for the same consumers, retail placement, and search visibility. Plaintiff Sylvia Day (Wolicki) testified that writers are "competing for distribution space" and that "books are competing for real estate, eyeballs, algorithm priority." Nelson Decl. Ex. 1020 at 127:20–128:21. Plaintiff David Baldacci testified that he saw two AI-generated summary titles appear on Amazon the day his book was released, and that AI-generated books have been "flooding the market" to the point that Amazon limited the number of titles an account may publish per day. Lasinski Decl. Ex. B ¶ 397; Nelson Decl. Ex. 5 at 227:3–229:20. Ms. Rasenberger testified that marketplaces "are likely and already are getting . . . diluted with . . . these AI-generated books that, for the most part, people . . . do buy and -- often by mistake," making it "much harder for the author-written books . . . to be discovered," particularly on Amazon where discovery depends on search. Nelson Decl. Ex. 46(b) at 21:7–22:16. [redacted] Finally, AI-assisted text is not confined to self-published works: Hachette withdrew the novel *Shy Girl* in March 2026 over suspected AI use, which *The New* |

| | |
|---|---|
| | *York Times* reported was the first book from a major publishing house pulled on that basis. Lasinski Decl. Ex. B ¶ 369. |
| 964. Self-published books are often limited to digital formats, and self-published authors do not receive an advance against royalties. G. Leonard Opp. Decl. ¶ 15. | **Undisputed** that self-published authors generally do not receive an advance against royalties.<br><br>**Disputed** that self-published books are "often limited to digital formats." [redacted] Other direct-publishing and print-on-demand platforms, including IngramSpark, Barnes & Noble Press, Draft2Digital, Lulu, Apple Books, Google Play, and Kobo, likewise distribute self-published works across formats and retailers. Nelson Decl. Ex. 1006 at FICTION-0255316.<br><br>**Disputed** to the extent OpenAI contends that format or advance structure makes self-published and AI-generated titles non-competing; Bookstat data shows self-published authors capturing 50 percent of e-book unit sales, [redacted] |
| 965. Self-published books do not have the extensive marketing resources and relationships that traditional publishers have built to reach target audiences. G. Leonard Opp. Decl. ¶ 15. | **Undisputed** that large traditional publishers maintain sales, marketing, and publicity teams and longstanding trade relationships. |

| | |
|---|---|
| | **Disputed** to the extent OpenAI contends that self-published authors lack effective means to reach readers or that the difference prevents competition. The Authors Guild's 2022 income study found that full-time self-published authors spent approximately $9,653 on book marketing in 2022, roughly three times the $3,061 spent by full-time traditionally published commercial authors, and published more new titles than those authors. Nelson Decl. Ex. 1006 at FICTION-0255392–93. Self-published authors reach readers through Amazon and social-media advertising, Kindle Unlimited, e-mail newsletters, and discount promotion programs, which full-time authors using Kindle Unlimited rate as the most effective marketing channels available. *Id.* at FICTION-0255410; Nelson Decl. Ex. 1007 at FICTION-0165786. Conversely, traditional publishers devote little marketing support to most titles outside the front list. Nelson Decl. Ex. 1010 at NON-FICTION-0108094–095.<br><br>Further **Disputed** to the extent OpenAI contends marketing resources are the operative constraint as discovery on Amazon turns on search and algorithmic placement rather than publisher publicity. *See* Class Plaintiffs' Response to ASOF, *supra* ¶ 963. |
| 966. Factors driving demand for self-published works are typically different than factors driving demand for traditionally published books. For example, author loyalty and reputation are strong drivers of the demand for books. G. Leonard Opp. Decl. ¶ 17. | **Undisputed** that author loyalty and reputation are drivers of demand for books.<br><br>**Disputed** to the extent OpenAI contends that this difference insulates Plaintiffs' works from competition with AI-generated titles. The record shows that AI-generated titles are designed to |

| | |
|---|---|
| | exploit precisely those drivers by trading on established authors' names and forthcoming releases. Ms. Rasenberger testified that some AI-generated books "will use an author's name to try to siphon off sales that way," and that AI writers target books with "a lot of presales," with literary agents reporting that almost "every new book" is targeted. Nelson Decl. Ex. 46(a) at 86:13–88:24; Lasinski Decl. Ex. B ¶ 382. Some authors have found books sold under their own names that they did not write. Lasinski Decl. Ex. B ¶ 398.<br><br>Further **Disputed** to the extent OpenAI contends demand factors differ categorically; both traditionally published and self-published titles are sold on the same platforms, compete in the same genre categories, and depend on the same search and recommendation systems for discovery. *See* Class Plaintiffs' Response to ASOF, *supra* and *infra* ¶¶ 963, 969. |
| 967. Similarly, publisher support is a driver of demand because large publishers' sales, marketing, and publicity teams promote the discovery of traditionally published titles. G. Leonard Opp. Decl. ¶ 18. | **Undisputed** that large publishers maintain sales, marketing, and publicity teams that promote the discovery of traditionally published titles.<br><br>**Disputed** to the extent OpenAI contends that publisher support meaningfully insulates Plaintiffs' works from competition. Publishers concentrate marketing on a small number of expected bestsellers and devote little or no support to most titles, and the contraction of book reviewing and local media has made discovery harder across the board. Nelson Decl. Ex. 1010 at 093–95. Much of book purchasing now occurs on Amazon, where discovery depends on search rather than browsing, [redacted] |

| | |
|---|---|
| | [redacted] *See supra*, Class Plaintiffs' Response to ASOF ¶¶ 961, 963; Lasinski Decl. Ex. B at ¶ 380. |
| 968. Only about one quarter of readers find books by browsing or keyword searching. G. Leonard Opp. Decl. ¶ 18. | **Disputed.** While Dr. Leonard's declaration states: [redacted] Instead, that paragraph cites a *Publishers Weekly* article recapping a "talk at DigiCon 2016" where Rakuten Kobo CEO Michael Tamblyn "discussed data on the differences between selling fiction and nonfiction. Fiction, he said, has a relatively well-known sales breakdown, with 50% of online fiction sales coming from online search—meaning the readers know exactly the book they want—25% coming via retailer merchandising, and another 25% coming from recommendations generated by the retailer's site." Nelson Decl. Ex. 1009. The article added: "Tamblyn offered an overview of Kobo's global e-book retailing operations ('27 million readers, most of whom are not in the U.S.')." *Id.* The source therefore describes a single retailer's 2016 figures for its predominantly non-U.S. e-book customer base rather than consumer research on how readers find books; and it says nothing at all about the percentage of readers that "find books by browsing or keyword searching." |

| | |
|---|---|
| 969. Given the structural differences, self-published books are less likely to access similar drivers of demand and channels of discovery. G. Leonard Opp. Decl. ¶¶ 15, 19. | **Disputed.** The structural differences Dr. Leonard identifies do not establish that self-published or AI-generated titles access different drivers of demand or channels of discovery. Both traditionally published and self-published titles are sold through the same dominant retailer and compete within the same genre categories, search results, recommendation systems, and subscription programs. [redacted] The testimony that books compete for "real estate, eyeballs, algorithm priority" and that Amazon-based discovery depends on search is set out in Class Plaintiffs' Response to ASOF ¶ 963, *supra*, [redacted] |
| 970. In July 2023, Authors Guild CEO Mary Rasenberger wrote that, absent a workable licensing solution for AI training, the Guild's alternatives were to "do nothing and then the training is de facto accepted as fair use" or sue AI companies, which she described as "extremely risky if we do not already have a licensing solution that works for the AI companies." C. Blythe Opp. Decl. Ex. 79 (FICTION-0166829) at FICTION-0166829. | **Undisputed** that in July 2023, Ms. Rasenberger wrote: "Thanks for your comments. I really appreciate your taking the time to look at it and give us your thoughts. I am attaching the revised draft which is now clearly limited to collective licensing for visual and literary works where rights are often owned by individual creators. I hope this resolves your concerns sufficiently so that you will support us or at least agree not to oppose us. The practical alternative for us is to do nothing and then the training is de facto accepted as fair use; or we sue the AI companies – which is |

| | |
|---|---|
| | extremely risky if we do not already have a licensing solution that works for the Al companies, and will take 5 or more years to resolve[.]" C. Blythe Opp. Decl. Ex. 79.<br><br>**Disputed** to the extent OpenAI contends that Ms. Rasenberger did not believe a market for AI licensing was likely to develop at the time of this communication. When asked about this email during her deposition, Ms. Rasenberger explained: "under factor 4, you look at whether there is a marketplace; I understand that. But it's one -- but the factor is, is there a market likely to -- current or likely to develop market. And there is no reason why there wasn't a marketplace here. It could be easily developed." Nelson Decl. Ex. 1021 at 188:3–8. Testifying about this same email, Ms. Rasenberger explained that in 2023 she "naively thought all we had to do is go to the AI companies and say, let's just make a deal. Let's do licensing," that "[t]hese were the conversations I was having with your clients," and that "we would create the licenses that were needed," because "[t]here is nothing at all to prevent the creation of licensing for books except for the unwillingness on the part of the AI companies." *Id.* at 186:25–187:11. She further explained that the risk the email identified was the risk of litigation rather than the infeasibility of licensing: "yes, it's risky. Litigation is risky. I didn't want to litigate. . . . And I represented that to your companies. We don't want to litigate. Let's just -- let's not waste the money. Let's not waste the time. Let's just figure this out. It is not rocket science." *Id.* at 187:13–20. |

| | |
|---|---|
| | Further **Disputed** because Ms. Rasenberger's contemporaneous documents, both before and after July 2023, reflect her view that licensing for AI training was achievable and that the Authors Guild was actively building it. On January 31, 2023, she wrote to the President of the Association of American Publishers that she had "been talking to creator groups . . . and AI developers about a licensing solution for generative AI training," that "there is some growing interest among creators in getting licenses for training generative AI on existing works," and that "[t]he AI developers I have spoken to are not rejecting this out of hand," because "[t]hese AI machines are so expensive to build that paying some royalties to creators is chump change to them. But it has to be simple and give them clear rights." Nelson Decl. Ex. 1016. In its October 30, 2023 comments to the Copyright Office, the Guild stated that "there is no indication that AI licensing markets have failed or are likely to do so," and that solutions were "being considered, including one by the Authors Guild, that would create a licensing platform for authors and publishers to license books for training." Nelson Decl. Ex. 1019 at -357, -343. |
| 971. At a December 2023 Authors Guild Council meeting, CEO Mary Rasenberger stated that the Guild needed to "set up a platform now" for licensing books to AI companies because "[i]t will help the litigation," explaining that "[w]e need to show that there is a licensing market that will be harmed and that AI companies should be utilizing." C. Blythe Opp. Decl. Ex. 80 (FICTION-0060987) at FICTION-0060993–94. | **Undisputed** that this language appears in a meeting summary prepared by Isabel Howe. **Disputed** to the extent OpenAI contends that the Authors Guild sought licensing agreements with AI companies to enhance its position in this litigation. As set out in Class Plaintiffs' Response to ASOF ¶ 970, *supra*, admissible evidence reflects that Ms. Rasenberger was actively pursuing AI licensing for books for training before this litigation was filed. |

| | |
|---|---|
| 972. Authors Guild Chief Legal Officer Kevin Amer testified that the Guild "stopped pursuing creating a licensing platform itself" and, to his knowledge, never obtained publisher participation in that effort. C. Blythe Opp. Decl. Ex. 82 (K. Amer 30(b)(1) Tr.) at 304:22–306:3. | **Undisputed** that Mr. Amer gave the quoted testimony.<br><br>**Disputed** that the Authors Guild stopped pursuing a licensing platform because it never obtained publisher participation. Mr. Amer testified that he had no knowledge of why the Guild changed course beyond the email he was shown. Blythe Ex. 82 at 305:7–13. Ms. Rasenberger testified that the Authors Guild's own platform project ended because one of the Authors Guild's external partners "decided he didn't want to fund it." Nelson Decl. Ex. 1022 at 54:2–10. The Authors Guild then entered a nonexclusive partnership with Created by Humans, an AI training licensing platform which has executed agreements. *Id.* at 54:23–55:1, 176:19–178:22. |
| 973. The Authors Guild entered into a partnership with Created by Humans. C. Blythe Opp. Decl. Ex. 1 (M. Rasenberger 30(b)(6) Tr. (Feb. 13, 2026)) at 54:23–55:10. | **Undisputed** that the Authors Guild entered into a nonexclusive partnership with Created by Humans. Nelson Decl. Ex. 1022 at 54:23–55:1. |
| 974. Authors Guild CEO Mary Rasenberger testified that she did not believe Created by Humans had generated licensing revenue. C. Blythe Opp. Decl. Ex. 1 (M. Rasenberger 30(b)(6) Tr. (Feb. 13, 2026)) 58:11–59:10. | **Undisputed** that when asked "do you know how much revenue Created by Humans has generated from licensing to this point," Ms. Rasenberger responded: "I don't know for a fact, but I don't believe they have -- they have any revenue yet from licensing." C. Blythe Opp. Decl. Ex. 1 at 58:11–17.<br><br>**Disputed** to the extent OpenAI contends that it establishes that Created by Humans has generated no licensing revenue. Not only did Ms. Rasenberger qualify the testimony OpenAI relies on by stating, "I don't know for a fact," but later noted that she did not |

| | |
|---|---|
| | "have current information," that her knowledge was "all secondhand," and that [redacted] when she last spoke with Created by Humans. Nelson Decl. Ex. 1022 at 58:11–59:23. She further testified she "wouldn't be privy to all of that information." *Id.* 60:3–10.<br><br>Further **Disputed** to the extent OpenAI contends that other licensing platforms have not executed licenses for books for AI training. *Id.* at 60:13–61:3, 63:7–64:17; Lasinski Decl. Ex. B ¶¶ 60–70. |
| 975. Authors Guild CEO Mary Rasenberger testified that LLM developers approached about licensing with Created by Humans were either "not interested" or non-responsive to outreach. C. Blythe Opp. Decl. Ex. 1 (M. Rasenberger 30(b)(6) Tr. (Feb. 13, 2026)) 59:2–10. | **Undisputed** that Ms. Rasenberger gave the quoted testimony.<br><br>[redacted]<br><br>Further **Disputed** to the extent OpenAI contends that licensing platforms for books for AI training have been unsuccessful. As Class Plaintiffs' expert Michael Lasinski explained, multiple intermediaries facilitate book licensing for AI uses, including the |

| | |
|---|---|
| | Copyright Clearance Center, which launched a collective licensing subscription for internal AI systems in July 2024, integrated AI rights into its Annual Copyright License in November 2024, and announced an "AI Systems Training License" in March 2025 covering works from hundreds of publishers that it compensates by royalty. Lasinski Decl. Ex. B ¶¶ 60–62; Class Plaintiffs' SUF ¶¶ 831–832. Both OpenAI and Microsoft have executed book licenses. Class Plaintiffs' SUF ¶¶ 791–92, 812, 814, 821. [redacted] |
| 976. Plaintiff Michael Connelly testified that "Well, I said earlier that [ChatGPT] wouldn't replace writers. What I mean is it can't replace – I don't think a machine-generated character-driven story will carry the heart and soul of something that comes from a human." C. Blythe Opp. Decl. Ex. 88 (M. Connelly 30(b)(6)/30(b)(1) Tr.) 156:1–9. | **Undisputed** that Mr. Connelly gave the quoted testimony.<br><br>**Disputed** to the extent OpenAI contends Mr. Connelly did not view ChatGPT as a threat to his livelihood. In the remainder of the answer that OpenAI omitted from its quotation, Mr. Connelly stated: "And the part about it still being a threat, it still means that -- you know, what I'm saying is they're not going to replace writers, but it could put them out of business if, you know, if copyrights are not respected." C. Blythe Opp. Decl. Ex. 88 at 156:10–14. Moreover, in his deposition, when asked if ChatGPT would cause him to lose sales, Mr. Connelly responded: "the possibility is very high, in my view, that that has happened." Nelson Decl. Ex. 922 at 77:6–12. |

| | |
|---|---|
| 977. Plaintiff Jonathan Franzen has said that "the current versions [of OpenAI's LLMs] are risibly awful at generating prose that I might have written." C. Blythe Opp. Decl. Ex. 89 (J. Franzen 30(b)(1) Tr.) 42:5–20. | **Undisputed** that Mr. Franzen gave the quoted testimony about an email he sent in May 2023.<br><br>**Disputed** that Mr. Franzen maintains that belief. When asked if there was "[a]ny reason to believe that the state of affairs might have changed," Mr. Franzen responded: "The general tendency of tech to become more powerful would be a reason to believe that." Nelson Decl. Ex. 1023 at 44:23–45:3.<br><br>Further **Disputed** to the extent OpenAI contends Mr. Franzen does not believe OpenAI's LLMs are a threat to his livelihood. Mr. Franzen expressly testified that OpenAI poses "some threat to my future livelihood." *Id.* at 46:9–47:7. |
| 978. Jordan Usdan, the GM, Data Strategy and Ops at Microsoft AI, testified that Microsoft's agreement with [redacted]." C. Blythe Opp. Decl. Ex. 77 (J. Usdan 30(b)(6) Tr.) at 271:3–13. | **Undisputed** that Mr. Usdan gave the quoted testimony on February 11, 2026.<br><br>**Disputed** that the testimony reflects Microsoft's view of the agreement before this litigation. [redacted] |

| | |
|---|---|
| | [redacted]<br><br>**Disputed** further that the opt-in rate establishes [redacted]<br><br>**Disputed** further that the deal was a [redacted] |
| 979. The [redacted] C. Blythe Opp. Decl. Ex. 90 at OPCO_MDL_004600927, OPCO_MDL_004600931. | **Undisputed.** |

| | |
|---|---|
| 980. The [redacted] C. Blythe Opp. Decl. Ex. 90 at OPCO_MDL_004600930. | **Disputed.** The preamble of the [redacted]<br><br>[redacted] |
| 981. In [redacted] | **Undisputed** that [redacted] |

| | |
|---|---|
| [redacted] C. Blythe Opp. Decl. Ex. 91 at OPCO_MDL_004649467-470. | [redacted] |
| 982. [redacted]. C. Blythe Opp. Decl. Ex. 91 at OPCO_MDL_004649467-470. | **Undisputed** that [redacted]<br><br>**Disputed** as unsupported by the cited evidence, for the reasons stated in Class Plaintiffs' Response to ASOF, *supra* ¶ 981. |
| 983. [redacted] C. Blythe Opp. Decl. Ex. 92 at OPCO_MDL_004590656–57. | **Undisputed.** |
| 984. [redacted] C. Blythe Opp. Decl. Ex. 92 at OPCO_MDL_004590656. | **Undisputed** that under [redacted] |

| | |
|---|---|
| | [redacted] C. Blythe Opp. Decl. Ex. 92 at OPCO_MDL_004590657.<br><br>Otherwise, **Disputed** as unsupported by the cited evidence. |
| 985. [redacted] C. Blythe Opp. Decl. Ex. 92 at OPCO_MDL_004590656. | **Undisputed** that [redacted]<br><br>**Disputed** to the extent OpenAI contends that [redacted] |
| 986. Plaintiffs' expert examined approximately 338 million outputs from 108 million conversation logs and identified reproductions of 30 or more words from just seven of Plaintiffs' works in only 31 conversations—a per-conversation regurgitation rate of 0.00003%. ECF 1735, OAI SUF 91; T. Berg-Kirkpatrick Opp. Decl. ¶ 17. | **Undisputed** that Dr. Shan conducted a study of conversation logs in which he "identified reproductions of 30 or more near-verbatim words . . . from 7 Plaintiff works across 31 conversations and 33 chat responses." Gratz Decl. Ex. 95 ¶ 154.<br><br>**Disputed** that any regurgitation rate can be extrapolated from that sample. As Dr. Shan explained: "The search misses genuine reproductions for at least three independent reasons: which conversations I could examine, what I compared them against, and how the logs were sampled. Because of the format of the production and computational limits, I searched only the |

| | |
|---|---|
| | conversations that named an Asserted Work's author and set the rest aside, so any reproduction in a conversation that did not name the author was never counted. I also matched against OCR-derived copies of the books, whose scanning artifacts can break exact word matches and cause real reproductions to be missed. Because I understand that the produced logs were not assembled using search terms assembled by the Class Plaintiffs in this case, the set which I searched may itself under-represent regurgitation. Each of these can only lower the count, so the reported rate is a lower bound on how often these models reproduce the books." Shan Decl. Ex. F ¶ 56.<br><br>**Disputed** further because the conversation samples are not representative of model behavior. The samples do not reach the earlier periods when regurgitation would have been more prevalent; OpenAI redacted the logs, including the names of fictional characters from Plaintiffs' works, which impedes identification of infringing outputs; and the 20 million-conversation "Merits Sample" is the subject of Plaintiffs' pending sanctions motion (ECF 1618) and pending Daubert motion (ECF 2059). Shan Decl. Ex. A ¶¶ 151–153; Shan Decl. Ex. F ¶¶ 56–57. [redacted] Nelson Decl. Ex. 294 at |

| | |
|---|---|
| | OPCO_MDL_001841468; Nelson Decl. Ex. 1018 at 243:05–245:07.<br><br>**Disputed** further because direct testing of the models shows materially higher reproduction. Dr. Shan measured per-attempt reproduction of 30 or more words of Plaintiff-book text at rates of 1.0 percent for GPT-4, 15 percent for GPT-4-base, and 0.05 to 0.33 percent for the other chat-tuned production models, reaching 41 percent for a single work, and he recovered a passage of 1,899 words from *A Game of Thrones*. Shan Decl. Ex. D ¶¶ 26, 31–35. |

**IX. Defendant Microsoft's Additional Facts Pursuant to Local Rule 56.1(b)**

| | |
|---|---|
| Pursuant to Local Rule 56.1(b), Microsoft incorporates by reference Facts 1-33 as stated in its Statement of Undisputed Material Facts In Support of Defendant Microsoft's Motion for Summary Judgment, filed on September 4, 2026. ECF 1694 ¶¶ 1-33. Microsoft understands that Plaintiffs will be responding to those facts in connection with their opposition to that motion, and therefore Microsoft does not repeat those facts here. | **Disputed.** This is not an appropriate undisputed fact. To the extent that the Court considers this "fact," Class Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts Nos. 1-33 as though fully restated herein. |

Dated: November 20, 2026

*/s/ Justin A. Nelson*

Justin A. Nelson
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: 713.651.9366 jnelson@susmangodfrey.com
***Interim Lead Counsel for Class Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2026, I caused the foregoing document to be electronically filed with the Clerk of the United States District Court for the Southern District of New York using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Tyler Alabanza-Behard*
Tyler Alabanza-Behard