**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This document relates to:<br><br>No. 1:23-cv-08292-SHS-OTW<br>No. 1:23-cv-10211-SHS-OTW<br>No. 1:25-cv-03482-SHS-OTW | 25-md-3143 (SHS) (OTW)<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang<br><br>REDACTED—PUBLIC VERSION |

**OPENAI'S COUNTERSTATEMENT TO CLASS PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

# TABLE OF CONTENTS[1]

**Page**


A. OPENAI'S AWARENESS OF MEMORIZATION AND LIBRARY GENESIS ........... 4

B. DEFENDANTS UNDERSTOOD THEIR MODELS COULD REPLACE AUTHORS ........ 9

C. CLASS PLAINTIFFS WERE WILLING TO LICENSE THEIR WORKS FOR AI TRAINING ........ 12

D. OPENAI'S CONDUCT HAS HARMED CLASS PLAINTIFFS AND THE MARKETPLACE FOR BOOKS ........ 18

E. AN EMERGING AND GROWING LICENSING MARKET EXISTS FOR BOOKS FOR LLM TRAINING ........ 46

F. OPENAI'S INTERNAL UNDERSTANDING OF COMPRESSION, PIRACY, AND SAFETY RISKS ........ 51


[1] OpenAI Defendants use the headings Plaintiffs provided in Class Plaintiffs' Counterstatement of Material Facts in Opposition to OpenAI's Motion for Summary Judgment (ECF 2247) for the Court's convenience only. OpenAI does not respond to those headings and OpenAI's use of those headings should not be construed or treated as an admission. For clarity, to the extent any response is required, OpenAI disputes the contents of those headings.

Pursuant to Local Civil Rule 56.1, Defendant OpenAI respectfully submits this Response to Class Plaintiffs' Statement of Material Facts. ECF No. 2247.

Pursuant to this Court's Order dated October 7, 2026 (ECF No. 2092), OpenAI provides its response in column format and has attempted to streamline its response for the benefit of the Court. For the Court's convenience and to avoid further lengthening this response, OpenAI does not repeat any supporting authority for the issues below in every response. Instead, OpenAI states these objections plainly and incorporates the below authority into each of those responses.

**Immaterial.** Statements designated "Immaterial" are statements that, even if true, do not help resolve any question currently before the Court on summary judgment, i.e., they do not "affect the outcome of the suit under the governing law." *I.M. v. United States*, 362 F. Supp. 3d 161, 190 (S.D.N.Y. 2019). The statements are "immaterial" if they "do not provide any basis to rule in favor of either party for summary judgment even if they are disputed." *See Parks v. Lebhar-Friedman, Inc.*, No. 04-cv-7133-DCP-KNF, 2008 WL 3833802, at *4 (S.D.N.Y. Aug. 11, 2008). Statements designated as "Immaterial" below thus are not legally significant because they do not impact an element of any claim or defense at issue in OpenAI's summary judgment motions. OpenAI's designation of certain statements as "immaterial" does not concede that any statement not designated as such is material for purposes of adjudicating OpenAI's Motions, or for any other purpose.

**Not Supported by Cited Evidence.** Statements designated as "Not Supported by Cited Evidence" are statements with incorrect citations or where the cited evidence does not support the statement. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) (A "Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in

the record. Where … the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.”).

**Not Supported by Admissible Evidence.** Statements designated as “Not Supported by Admissible Evidence” are not supported by admissible evidence as required by Local Rule 56.1, and therefore are not properly before the Court. S.D.N.Y. Local Rule 56.1(d) (“Each statement by the movant … must be followed by citation to evidence that would be admissible[.]”); *Epstein v. Kemper Ins. Cos.,* 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) (statements in a Rule 56.1 statement “are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, ... or do not cite to supporting evidence”).

**Expert Opinion Subject to Rule 702.** Statements designated as “Expert Opinion Subject to Rule 702” are purportedly supported by the opinions of Plaintiffs’ experts against whom OpenAI and Microsoft have filed a motion to exclude pursuant to Fed. R. Evid. 702. *See* ECF 2050, 2055. In the event the Court grants the relief sought in Defendants’ motion and excludes the testimony and opinions of Plaintiffs’ experts, Plaintiffs may not rely on them to support their statements of fact. *See* Fed. R. Civ. P. 56(c)(2).

**Improper Legal Argument.** Statements designated as “Improper Legal Argument” constitute improper attorney argument and/or are conclusory. These arguments require no response. *Epstein*, 210 F. Supp. 2d at 314 (statements in a Rule 56.1 statement “are inappropriate if they are conclusory or argumentative[.]”); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 369 (S.D.N.Y. 2025) (quoting *Kesner v. Buhl*, 590 F. Supp. 3d 680, 691 (S.D.N.Y. 2022)) (the Court sets aside “[t]he portions of [a responding party’s] 56.1 Statement that contain legal argument bereft of factual matter[.]”).

**Incomplete.** Statements designated "Incomplete" are statements where Plaintiffs "introduce[d] all or part of a statement" and OpenAI introduces "any other part—or any other statement—that in fairness ought to be considered at the same time" pursuant to Federal Rule of Evidence 106.

This counterstatement also uses the following abbreviations and citations for briefs, Rule 56.1 statements, and record materials filed in connection with the parties' cross-motions for summary judgment in the Books Plaintiffs' case:

| **Citation** | **Document** |
|---|---|
| J. Gratz Decl. Ex. | Exhibit filed with Joseph C. Gratz Declaration in Support of OpenAI's Motions for Summary Judgment, filed on September 4, 2026, or the Joseph C. Gratz Declaration in Support of OpenAI's Counterstatements to Class Plaintiffs' and News Plaintiffs' Statements of Additional Material Facts and Reply in Support of OpenAI's Motions for Summary Judgment, filed contemporaneously herewith |
| C. Blythe Opp. Decl. Ex. | Exhibit filed with Caitlin Sinclaire Blythe Declaration in Support of Defendants' Opposition to Class Plaintiffs' Motions for Summary Judgment |
| Books Ex. | Exhibit filed with the Declaration of Justin A. Nelson in Support of Books Plaintiffs' Motion for Summary Judgment |
| Books Opp. Ex. | Exhibit filed with the Declaration of Justin A. Nelson in Support of Books Plaintiffs' Opposition to OpenAI's Motion for Summary Judgment |
| C. Callison-Burch Decl. (Nov. 20, 2026) | Declaration of Expert Chris Callison-Burch in Further Support of OpenAI's Motion for Summary Judgment |
| G. Leonard Decl. (Nov. 20, 2026) | Declaration of Expert Gregory Leonard in Further Support of OpenAI's Motion for Summary Judgment |
| J. Rodzvilla Decl. (Nov. 20, 2026) | Declaration of Expert John Rodzvilla in Further Support of OpenAI's Motion for Summary Judgment |

### A. OpenAI's Awareness of Memorization and Library Genesis

| | |
|---|---|
| 1. An internal OpenAI document dated March 31, 2020, and authored by OpenAI employee Benjamin Mann, stated: "Large models appear to be capable of memorizing data after seeing it only once, so seeing it again both overfits and wastes training compute." Nelson Decl. Ex. 981 at -726. | 1. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Undisputed that the quoted text appears in the cited document. Disputed to the extent this Paragraph suggests that OpenAI trains neural networks to only memorize datasets or that the quoted language concerns training objectives or possibilities concerning the Accused Models. The exhibit cited provides no support for the quoted statement, and since it pre-dates even GPT-3, it has no relevance to the Accused Models.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |
| 2. At his deposition, Ben Mann agreed that "Large models appear to be capable of memorizing data after seeing it only once, so seeing it again both overfits and wastes training compute." Nelson Decl. Ex. 913 at 327:4–17. | 2. **Disputed in Part – Incomplete; Immaterial.** Undisputed that Mr. Mann testified that the quoted statement was his opinion as of March 31, 2020. Disputed that Plaintiffs' characterization of Mr. Mann's testimony is accurate or complete. Pursuant to Fed. R. Evid. 106, Mr. Mann further responded that [redacted] Books Opp. Ex. 913 (B. Mann 30(b)(1) Tr. (Mar. 3, 2025)) at 327:4–17.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |
| 3. In a March 2020 draft of OpenAI's May 2020 paper titled "Language Models are Few-Shot Learners," OpenAI stated: "A major methodological concern with language models pretrained | 3. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Undisputed that the quoted text appears in the cited document. Disputed to the extent this Paragraph suggests that |

| | |
|---|---|
| on a broad swath of internet data, particularly large models with the capacity to memorize vast amounts of content, is potential contamination of downstream tasks by having their test or development sets inadvertently seen during pre-training." Nelson Decl. Ex. 982 at -315. | OpenAI trains neural networks to only memorize datasets or that the quoted language concerns training objectives or possibilities concerning the Accused Models. Dr. Callison-Burch discussed this portion of the GPT-3 paper and stated: "To 'reduce such contamination,' OpenAI worked to identify and 'remove any overlaps with the development and test sets of all benchmarks studie[d] in this paper.' When OpenAI identified a 'bug' in this process that 'caused [it] to ignore some overlaps,' it undertook an exhaustive analysis of the 'remaining overlaps' to evaluate their possible impact on the paper's results. The fact that OpenAI conducted such an exhaustive analysis of data contamination further supports my conclusion that OpenAI sought to improve the models' ability to generalize, rather than to simply memorize training data." C. Callison-Burch Decl. (Nov. 20, 2026) Ex. A (C. Callison-Burch Opening Rep.) ¶ 295.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |
| 4. And in another presentation, OpenAI explained that anti-regurgitation efforts are "fighting against the exact training objective here." Nelson Decl. Ex. 298 at -653. | 4. **Disputed in Part – Not Supported by Cited Evidence.** Undisputed that the quoted text appears in the cited document. Disputed as to the characterization of the cited document and quoted text. First, the pincite to Books Ex. 298 at "-653" is incorrect, as the Bates numbers for this exhibit end at OPCO_MDL_001900480. Additionally, the assertion that anti-regurgitation efforts are "fighting against the exact training objective" materially mischaracterizes Books Ex. 298 and how it addresses combating regurgitation. The goal of an LLM is generalization, not to generate text similar to its training data. *See, e.g.*, ECF 1748 (C. Callison-Burch Decl.) ¶¶ 65–66; Books Ex. 751 (C. Callison-Burch Opening Rep.) ¶¶ 268–271. |

| | |
|---|---|
| <br>We're fighting against the exact training objective here | OpenAI's corporate designees repeatedly testified that "the top level goal is generalization," and "generalizing to unseen data so that the model can do interesting new things." *See* J. Gratz Decl. Ex. 20 (N. Ryder 30(b)(6) Tr. (Jan. 29, 2026)) at 185:2–18; J. Gratz Decl. Ex. 22 (A. Paino 30(b)(6) Tr. (Jan. 22, 2026)) at 61:4–15.<br>Books Ex. 298 continues on to explain that memorization arises from data duplication and is not a training objective. Books Ex. 298 at OPCO_MDL_001900469. Books Ex. 298 further describes "Masked Training" as a concrete mitigation strategy and concludes that OpenAI "[c]an prevent regurgitation in LMs by clever masking" and that the approach is "mostly working." *Id.* at OPCO_MDL_001900471, OPCO_MDL_001900480. Books Ex. 298 also reports that anti-regurgitation measures reduced the probability of reproducing a specific code snippet from 2.6% to approximately $3\times10^{-6}$% (a reduction of approximately 870,000×). *Id.* at OPCO_MDL_001900477. |
| 5. OpenAI's senior leadership disclaimed knowledge of Library Genesis at their depositions even though LibGen was named in the Slack channels they joined, the threads they wrote in, and the documents they circulated. | 5. **Disputed – Not Supported by Admissible Evidence; Immaterial.** Books Plaintiffs' assertion contravenes Local Rule 56.1(d) by citing no record evidence and, for that reason, should be disregarded.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because they do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |
| 6. Greg Brockman testified that "I really was not familiar with Library Genesis -- in fact, even the name 'Library Genesis,' I would not have been able to tell you prior to this litigation," Nelson Decl. Ex. 953 at 41:2–6, yet Brockman himself wrote in a January 2022 internal thread that "I know we're ditching libgen" and asked whether public-domain books were available "through libgen", Nelson Decl. Ex. 840 at -374. | 6. **Disputed in Part – Not Supported by Cited Evidence; Incomplete.** Undisputed that the quoted text appears in the cited documents. However, disputed that Plaintiffs' characterization of Mr. Brockman's testimony is accurate or complete. Pursuant to Fed. R. Evid. 106, immediately after the cited testimony, Mr. Brockman stated "[t]he word 'LibGen' I would have recognized," and that "[he] would not have been able to tell you that 'LibGen' |

| | |
|---|---|
| | means Library Genesis" prior to the start of this litigation. Books Opp. Ex. 953 (G. Brockman 30(b)(1) Tr.) at 41:7–13.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |
| 7. Samuel Altman, asked whether he had heard of Library Genesis before this litigation, answered "I don't recall with certainty," despite sending and receiving numerous presentations discussing Library Genesis. Nelson Decl. Ex. 944 at 204:22-24; *see, e.g.*, Nelson Decl. Ex. 327 at -135 (draft paper describing Library Genesis as a training data source, containing comments from Altman, *see* Nelson Decl. Ex. 983 at 10–11); Nelson Decl. Ex. 357 at -698, -726 (presentation from Apr. 19, 2019 OpenAI Board of Directors meeting at which Altman presented); Nelson Decl. Ex. 991 at -103, -104 (presentation from June 14, 2019 OpenAI All Hands meeting at which Altman presented). | 7. **Disputed in Part – Not Supported by Cited Evidence; Incomplete; Immaterial.** Undisputed that the cited deposition transcript contains the quoted testimony. However, disputed that Plaintiffs' characterization of Mr. Altman's testimony is accurate or complete. Pursuant to Fed. R. Evid. 106, Mr. Altman testified that "[he didn't] think [he] would have read [the Microsoft presentation materials] in such detail," and that he did not recall being familiar with LibGen at the time of the Microsoft presentations. J. Gratz Decl. Ex. 306 (S. Altman 30(b)(1) Tr.) at 221:10–16. He further clarified that he did not think he "would have been specifically aware of LibGen, or at least [he didn't] recall it now [over five years later]." *Id.* at 221:17–222:5.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |
| 8. Brad Lightcap, OpenAI's Chief Operating Officer, testified "I don't have personal experience with LibGen, and . . . I've never had personal contact with whatever that is," Nelson Decl. Ex. 984 at 25:10–14, notwithstanding the April 6, 2021 "#large-book-dataset" Slack thread he joined, in which OpenAI personnel discussed that "libgen1 is 110k docs, libgen2 is 450k docs," Nelson Decl. Ex. 694 at -095. | 8. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Undisputed that the cited deposition transcript contains the quoted testimony and that Mr. Lightcap was listed as a member of the "#large-book-dataset" Slack channel. Disputed as to the characterization that Mr. Lightcap knew what Library Genesis was due to a "Slack thread he joined." Mr. Lightcap did not send any messages in Books Ex. 694, nor did he testify that he had ever read any of the messages in that Exhibit. Thus, |

| | |
|---|---|
| | Plaintiffs' assumption that Mr. Lightcap necessarily had personal experience with LibGen simply because he was once added to a Slack channel where "libgen1" and "libgen2" appeared is not supported by the cited evidence.<br>Further, when asked whether he was informed that GPT-3 was trained on books, Mr. Lightcap testified: "No. Again, I'm not a researcher, and I don't have intimate knowledge of the training mix of data in our language models." J. Gratz Decl. Ex. 307 (B. Lightcap 30(b)(1) Tr.) at 38:15–20.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |
| 9. Ben Chess similarly disclaimed any recollection of his role in creating the LibGen dataset. Asked whether he "helped create the LibGen dataset," he answered, "I don't remember creating it. I agree this document said that." Nelson Decl. Ex. 963 at 112:11–18. Yet Chess was among the persons responsible for copying LibGen into a dataset for OpenAI, Shan Decl. Ex. A ¶ 50, and was thanked by name for that work at a company-wide "All Hands" meeting on June 14, 2019. Nelson Decl. Ex. 991 at -103, -104 ("thanks! … @bchess All the new datasets (webtext2, wiki, libgen, commoncrawl)"). | 9. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Undisputed that the cited deposition transcript contains the quoted testimony. Disputed that the cited evidence supports the assertion that Ben Chess "cop[ied] LibGen into a dataset for OpenAI." Plaintiffs cite Shan Decl. Ex. A ¶ 50, which relies on OPCO_MDL_000136957 for this contention. Mr. Chess [redacted] " Books Ex. 234 at OPCO_MDL_000136960. Mr. Chess testified that [redacted], and when shown Books Ex. 234, he stated [redacted] C. Blythe Opp. Decl. Ex. 12 (B. Chess 30(b)(1) Tr.) at 81:5–10, 82:6–83:22. Further disputed as Books Opp. Ex. 991 does not state that Mr. Chess "cop[ied] LibGen into a dataset for OpenAI" or describe precisely what Chess's role was in relation to LibGen. |

| | |
|---|---|
| | Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |

**B. Defendants Understood Their Models Could Replace Authors**

| | |
|---|---|
| 10. Numerous OpenAI executives and employees understood that OpenAI's models could be used to replace authors. | 10. **Disputed – Not Supported by Admissible Evidence; Immaterial.** Books Plaintiffs' assertion contravenes Local Rule 56.1(d) by citing no record evidence and, for that reason, should be disregarded.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |
| 11. During his deposition, OpenAI employee Leo Gao testified that "writing seems like something that is a pretty obvious application" of OpenAI's GPT-3. Nelson Decl. Ex. 985 at 86:19–25. | 11. **Disputed in Part – Incomplete.** Undisputed that the quoted text appears in the cited testimony. However, pursuant to Fed. R. Evid. 106, OpenAI objects because Plaintiffs' characterization of Mr. Gao's testimony is inaccurate and misleading. Mr. Gao was asked the leading question: "You understood that the OpenAI API would be quite useful for writing; correct?" Books Opp. Ex. 985 (L. Gao 30(b)(1) Tr.) at 86:19–20. Mr. Gao then responded "I mean, I have no recollection of that in particular, but I mean, it's a language model. Writing seems like something that is a pretty obvious application; yes." *Id.* at 86:22–25. |
| 12. He further testified that "it didn't take that long for us" to understand that "OpenAI GPT-3 could be used for creative writing." *Id.* at 87:7–14. | 12. **Disputed in Part – Incomplete.** Undisputed that the cited deposition transcript contains the quoted testimony. However, pursuant to Fed. R. Evid. 106, OpenAI objects because Plaintiffs' |

| | |
|---|---|
| | characterization of Mr. Gao's testimony is inaccurate, partially misattributed, and misleading. During his deposition, Mr. Gao was shown Books Ex. 673, a Discord chat transcript from July 2020 involving individuals unassociated with OpenAI. Plaintiffs' counsel then asked the leading question of whether "it was immediately apparent that it -- the OpenAI GPT-3 could be used for creative writing." Books Opp. Ex. 985 (L. Gao 30(b)(1) Tr.) at 87:7–10. Mr. Gao responded: "I can't recall exactly how obvious it was, but judging from this transcript, it didn't take that long for us to think of it." *Id.* at 87:12–14.<br>Further, disputed to the extent Plaintiffs suggest that "us" refers to OpenAI or OpenAI employees. As mentioned above, the discussion Mr. Gao was referring to was a Discord chat transcript from July 2020 between individuals unassociated with OpenAI. *See* Books Ex. 673. Further, Mr. Gao was not an employee of OpenAI at the time of this discussion. Books Ex. 20 (L. Gao 30(b)(1) Tr.) at 12:10–14. |
| 13. On July 20, 2020, Tarun Gogineni publicly wrote on X: "i rest easy knowing that even if GRRM dies early, GPT-5 will autocomplete his series." Nelson Decl. Ex. 744. | 13. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Undisputed that the cited X post contains the quoted text. However, disputed to the extent Plaintiffs suggest that writing the last two books of *A Song of Ice and Fire* was Mr. Gogineni's actual goal at OpenAI. Mr. Gogineni testified that "I think it would be very unfair to characterize that as my research goal -- having been just, frankly, inaccurate." C. Blythe Opp. Decl. Ex. 68 (T. Gogineni 30(b)(1) Tr.) at 71:9–11. Mr. Gogineni also testified that "I would say that nothing I have to do in my day-to-day has anything to do with that and is about improving model writing quality overall across a broad set of capabilities." *Id.* at 71:17–20.<br>Mr. Gogineni further explained that his tweets "represent fleeting thoughts. They don't even represent necessarily things that I feel are true, even in the moment. But the platform |

| | |
|---|---|
| | encourages incendiary and Overton window-stretching -- getting people to think about AI progress and dramatizing it" and that his tweets are "not meant to represent my official views, anyone else's official views, but generally fleeting thoughts in the moment." *Id.* at 69:18–23, 70:16–18. Further disputed to the extent Plaintiffs attribute Mr. Gogineni's personal social media posts as statements from OpenAI. *See* Books Ex. 744.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |
| 14. In March 2023, LinkedIn co-founder Reid Hoffman emailed Microsoft CEO Satya Nadella: "As promised, attached is your custom version of my new book Impromptu - a travelog of the future, exploring how AI can elevate humanity. I co-authored it with GPT-4 to show just how productive and creative humans can be with this tool." Nelson Decl. Ex. 986. | 14. **Disputed in Part – Immaterial.** This Paragraph concerns an email between LinkedIn and Microsoft to which OpenAI was not a party, and it does not describe any conduct by OpenAI. Further, this fact is not legally significant because it does not impact an element of any claim or defense at issue in Defendants' summary judgment motions. To the extent a response is required, OpenAI does not dispute that Books Opp. Ex. 986 contains the quoted language. |
| 15. During his deposition, Mr. Nadella was asked: "So if I understand you correctly, a human could use AI to generate the book and become an author him or herself?" Nelson Decl. Ex. 883 at 281:15–17. Mr. Nadella responded: "That is correct." *Id.* at 281:18. | 15. **Disputed in Part – Incomplete; Immaterial.** This Paragraph concerns testimony by Microsoft's CEO and does not describe any conduct by OpenAI. To the extent a response is required, OpenAI does not dispute that Books Opp. Ex. 883 contains the quoted language. Further, this fact is not legally significant because it does not impact an element of any claim or defense at issue in Defendants' summary judgment motions. However, pursuant to Fed. R. Evid. 106, the question followed Mr. Nadella's testimony that [redacted] Books Opp. Ex. 883 (S. Nadella 30(b)(1) Tr.) at 281:8–11. |

| | |
|---|---|
| 16. Mr. Nadella was further asked, referring to the March 2023 email from Hoffman: "And he is providing you with his own customer version of his book, right?" *Id.* at 282:6–7. Mr. Nadella confirmed: "He is." *Id.* at 282:8. | 16. **Disputed in Part – Immaterial.** This Paragraph concerns testimony by Microsoft's CEO about an email to which OpenAI was not a party, and it does not describe any conduct by OpenAI. Further, this fact is not legally significant because it does not impact an element of any claim or defense at issue in Defendants' summary judgment motions. To the extent a response is required, OpenAI disputes that Plaintiffs accurately transcribed the question. |
| 17. OpenAI's Sam Altman also testified that Mr. Hoffman sent him a book he co-wrote with ChatGPT, explaining "he made, like, a custom version of it for me with like a special chapter, which I thought was like a cool example of the technology. That -- you could do a different one for every person." Nelson Decl. Ex. 1000 at 188:19–189:04. | 17. **Disputed in Part – Incomplete.** Undisputed that the quoted text appears in the cited testimony. However, pursuant to Fed. R. Evid. 106, OpenAI objects because Plaintiffs' characterization of Mr. Altman's testimony is inaccurate and misleading. Mr. Altman further testified that he did not expect customized books made with AI to become widespread, stating: "So my guess -- and obviously no one knows what's going to happen here, but my guess is that to a surprising degree, the super custom stuff have -- is more than limited in its appeal. And it'll have a place, and people will, you know, like, do very customized fan fiction with themselves in it or whatever. But on the whole, we want -- we will want the shared cultural objects, and there's something deep there." Books Opp. Ex. 1000 (S. Altman 30(b)(1) Tr.) at 189:17–190:1. |

### C. Class Plaintiffs Were Willing to License Their Works for AI Training

| | |
|---|---|
| 18. Every Class Plaintiff that was asked in their deposition testified that they would be willing to license their works for generative AI training. | 18. **Disputed in Part – Immaterial.** Undisputed that certain Books Plaintiffs testified that they would consider or be open to licensing their works for generative AI training under certain conditions. However, this fact is immaterial because Books Plaintiffs' claim of "harm from the loss of fees paid to license a work for a transformative purpose is not cognizable." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1052 (N.D. Cal. |

| | |
|---|---|
| | 2025). Further, Books Plaintiffs' willingness to license their works for generative AI training is immaterial. *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 100 (2d Cir. 2014) ("[I]t is irrelevant that the Libraries might be willing to purchase licenses in order to engage in this transformative use (if the use were deemed unfair)."). Further disputed as Plaintiffs' assertion contravenes Local Rule 56.1(d) by citing no record evidence and should be disregarded. To the extent Plaintiffs rely on the deposition testimony cited in the subsequent paragraphs, OpenAI disputes any suggestion that the cited testimony implies that Books Plaintiffs would be willing to license their works for AI training under terms acceptable to any counterparty. Books Plaintiffs have admitted that they all "have not received payment for selling or licensing their books for LLM training." ECF 2202 (Books Pls.' Resp. to OpenAI's Rule 56.1 Statement) ¶ 121. Books Plaintiffs have also admitted that none of them were "approached to license their books for LLM training before this lawsuit was filed." *Id.* ¶ 124. |
| 19. David Baldacci agreed that he would consider licensing his works for "AI training" if someone approached him about it. Nelson Decl. Ex. 920 at 210:19–211:6. | 19. **Disputed in Part – Immaterial.** Undisputed that Mr. Baldacci testified [redacted] Books Opp. Ex. 920 (D. Baldacci Tr.) at 210:19–211:6. Disputed to the extent Plaintiffs suggest Mr. Baldacci [redacted]. Mr. Baldacci [redacted] *Id.* at 212:5–11, 213:16–215:2. This fact, however, is ultimately immaterial because Books Plaintiffs' claim of "harm from the loss of fees paid to license a work for a transformative purpose is not cognizable." |

| | |
|---|---|
| | *Kadrey*, 788 F. Supp. 3d at 1052. Further, Books Plaintiffs' willingness to license their works for generative AI training is immaterial. *See HathiTrust*, 755 F.3d at 100 ("[I]t is irrelevant that the Libraries might be willing to purchase licenses in order to engage in this transformative use (if the use were deemed unfair)."). |
| 20. Sylvia Day testified that if asked to license her works for training a large language model, she would "absolutely present [the offer] to [her] team and negotiate" and her "primary goal is to monetize [her] work in every way possible." Nelson Decl. Ex. 919 at 157:16–24. | 20. **Disputed in Part – Immaterial.** Undisputed that the cited deposition transcript contains the quoted testimony. However, disputed to the extent Plaintiffs suggest that Ms. Day [redacted]. Indeed, Ms. Day testified [redacted] Books Opp. Ex. 919 (S. J. Wolicki Tr.) at 157:16–158:24. [redacted] *Id.* at 157:25–158:16.<br><br>This fact, however, is ultimately immaterial because Books Plaintiffs' claim of "harm from the loss of fees paid to license a work for a transformative purpose is not cognizable." *Kadrey*, 788 F. Supp. 3d at 1052. Further, Books Plaintiffs' willingness to license their works for generative AI training is immaterial. *See HathiTrust*, 755 F.3d at 100 ("[I]t is irrelevant that the Libraries might be willing to purchase licenses in order to engage in this transformative use (if the use were deemed unfair)."). |
| 21. John Grisham agreed that he would be "willing to sit down with an artificial intelligence company and license [his] asserted works for training AI models." Nelson Decl. Ex. 925 at 182:16–22. | 21. **Disputed in Part – Immaterial.** Undisputed that Mr. Grisham answered [redacted] Books |

| | |
|---|---|
| | Opp. Ex. 925 (J. Grisham Tr.) at 182:16–22. However, disputed to the extent Plaintiffs suggest that Mr. Grisham [redacted] Mr. Grisham testified [redacted] *Id.* at 184:13–24. When asked [redacted] *Id.* at 182:23–183:9.<br>This fact, however, is ultimately immaterial because Books Plaintiffs' claim of "harm from the loss of fees paid to license a work for a transformative purpose is not cognizable." *Kadrey*, 788 F. Supp. 3d at 1052. Further, Books Plaintiffs' willingness to license their works for generative AI training is immaterial. *See HathiTrust*, 755 F.3d at 100 ("[I]t is irrelevant that the Libraries might be willing to purchase licenses in order to engage in this transformative use (if the use were deemed unfair)."). |
| 22. Taylor Branch testified that he would consider an offer to "licens[e] [his] books for use" as AI training data. Nelson Decl. Ex. 921 at 110:4-7. | 22. **Disputed in Part – Immaterial.** Undisputed that Mr. Branch testified he would "consider" an offer to "licens[e] [his] books for use ... [i]f an offer were made." J. Gratz Decl. Ex. 308 (T. Branch Tr.) at 110:4–7. However, disputed to the extent Plaintiffs suggest that Mr. Branch has identified terms on which he would license his works, or has executed a license, for AI training. Mr. Branch testified that he has not attempted to license any of his books for AI training and has not been approached with any offer to license his Asserted Works for that purpose. *Id.* at 108:21–109:3.<br>This fact, however, is ultimately immaterial because Books Plaintiffs' claim of "harm from the loss of fees paid to |

| | |
|---|---|
| | license a work for a transformative purpose is not cognizable." *Kadrey*, 788 F. Supp. 3d at 1052. Further, Books Plaintiffs' willingness to license their works for generative AI training is immaterial. *See HathiTrust*, 755 F.3d at 100 ("[I]t is irrelevant that the Libraries might be willing to purchase licenses in order to engage in this transformative use (if the use were deemed unfair).""). |
| 23. Stacy Schiff testified that she would be "willing to discuss licensing" her works for AI training. Nelson Decl. Ex. 928 at 195:14-196:2. | 23. **Disputed in Part – Immaterial.** Undisputed that Ms. Schiff testified [redacted] Books Opp. Ex. 928 (S. Schiff Tr.) at 196:1–2. However, disputed to the extent Plaintiffs suggest that Ms. Schiff [redacted] *Id.* at 195:19–23. When asked [redacted] *Id.* at 196:3–13.<br>This fact, however, is ultimately immaterial because Books Plaintiffs' claim of "harm from the loss of fees paid to license a work for a transformative purpose is not cognizable." *Kadrey*, 788 F. Supp. 3d at 1052. Further, Books Plaintiffs' willingness to license their works for generative AI training is immaterial. *See HathiTrust*, 755 F.3d at 100 ("[I]t is irrelevant that the Libraries might be willing to purchase licenses in order to engage in this transformative use (if the use were deemed unfair)."). |
| 24. Michael Connelly, Christopher Golden, Andrew Sean Greer, George R.R. Martin, Jodi Picoult, and James Shapiro gave comparable testimony. Nelson Decl. Ex. 922 at 156:17–25; Nelson Decl. Ex. 923 at 89:19–90:7; Nelson Decl. Ex. 924 at 112:17–22; Nelson Decl. Ex. 926 at 140:13–141:3, 141:24–142:5, | 24. **Disputed in Part – Immaterial.** Undisputed that the cited Plaintiffs expressed conditional willingness to consider licensing their works for AI training or to discuss compensation for such use. However, disputed to the extent Plaintiffs suggest that the cited Plaintiffs have executed licenses for AI training. Books |

| | |
|---|---|
| 151:24–152:10, 153:1–3; Nelson Decl. Ex. 927 at 77:7-22. *See also* Lasinski Decl. Ex. B at ¶ 238 (analyzing authors' willingness to participate in the licensing market, including an Authors Guild survey finding that 95 percent of writers think they should be compensated for use of their works in developing generative AI). | Plaintiffs have admitted that they all "have not received payment for selling or licensing their books for LLM training." ECF 2202 (Books Pls.' Resp. to OpenAI's Rule 56.1 Statement) ¶ 121. Books Plaintiffs have also admitted that none of them were "approached to license their books for LLM training before this lawsuit was filed." *Id.* ¶ 124.<br>Further disputed to the extent Plaintiffs suggest that the referenced Authors Guild survey establishes authors' willingness to license their works for AI training or, by itself, the existence of a market for licensing trade books for that purpose. The finding that 95% of respondents believed authors should be compensated for use of their works in developing generative AI does not establish willingness to authorize such use. *See* ECF 1825-2 (M. Lasinski Rebuttal Rep.) ¶ 238 & n.860 (citing FICTION-0000558). [redacted] G. Leonard Decl. (Nov. 20, 2026) Ex. A (G. Leonard Opening Rep.) ¶ 265 & n.587 (citing FICTION-0000556–571, at FICTION-0000559); *see also* ECF 1825-2 (M. Lasinski Rebuttal Rep.) ¶ 238 n.858.<br>This fact, however, is ultimately immaterial because Books Plaintiffs' claim of "harm from the loss of fees paid to license a work for a transformative purpose is not cognizable." *Kadrey*, 788 F. Supp. 3d at 1052. Further, Books Plaintiffs' willingness to license their works for generative AI training is immaterial. *See HathiTrust*, 755 F.3d at 100 ("[I]t is irrelevant that the Libraries might be willing to purchase licenses in order to engage in this transformative use (if the use were deemed unfair)."). It is also immaterial to the extent it seeks to discuss non-Plaintiff authors' willingness to license their books as training data; those authors are not parties to the litigation and their works have not been asserted in this case. |

**D. OpenAI's Conduct Has Harmed Class Plaintiffs and the Marketplace for Books**

| | |
|---|---|
| 25. Similarly, numerous Class Plaintiffs confirmed in their depositions that they view OpenAI's products as a threat to their livelihoods. | 25. **Disputed in Part – Immaterial.** Undisputed that certain named Plaintiffs expressed, in isolated deposition testimony, generalized concerns or hypothetical future concerns about AI's potential impact on their livelihoods. Disputed as Plaintiffs' assertion contravenes Local Rule 56.1(d) by citing no record evidence and should be disregarded. To the extent Plaintiffs rely on the deposition testimony cited in subsequent paragraphs, OpenAI disputes any suggestion that the cited testimony reflects the uniform, confirmed, or evidentiary position of Books Plaintiffs as a group, or that it establishes any cognizable harm.<br><br>To the contrary, Jonathan Franzen testified [redacted] J. Gratz Decl. Ex. 105 (J. Franzen Tr.) at 46:5–8; John Grisham [redacted] Books Opp. Ex. 925 (J. Grisham Tr.) at 176:22–177:8; Christopher Golden testified [redacted], J. Gratz Decl. Ex. 113 (C. Golden Tr. (Mar. 17, 2025)) at 300:11–14; Taylor Branch testified [redacted], J. Gratz Decl. Ex. 308 (T. Branch Tr.) at 73:1–8; James Shapiro testified [redacted] J. Gratz Decl. Ex. 309 (J. Shapiro Tr.) at 238:17–239:3; Stacy Schiff testified [redacted], Books Ex. 51 (S. Schiff Tr.) at 46:23–47:19; and George R.R. Martin testified [redacted] J. Gratz Decl. Ex. 97 (G. Martin Tr.) at 216:24–217:5.<br><br>Dr. Gregory Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Plaintiffs to lose any book sales. |

| | |
|---|---|
| | *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Plaintiffs' own publishing-industry expert, Mark Seeley, conceded [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Plaintiffs' conjecture about the harms they might suffer because of generative AI tools is ultimately immaterial. *See Kirbaran v. Target Corp.*, 720 F. Supp. 3d 267, 273 (S.D.N.Y. 2024), *aff'd*, 2025 WL 973050 (2d Cir. Apr. 1, 2025) (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 26. In his deposition, David Baldacci stated: "outputs that they can put together will compete against my work." Nelson Decl. Ex. 920 at 221:20–25. | 26. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Mr. Baldacci's deposition transcript contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of actual competitive harm, as the remainder of Mr. Baldacci's testimony confirms that this statement is impermissibly speculative. *See* Fed. R. Evid. 602.<br>Mr. Baldacci testified [redacted] Books Ex. 5 (D. Baldacci Tr.) at 229:6–20, and [redacted] *id.* at 227:7–228:6. OpenAI's expert, Dr. Gregory Leonard, found no empirical evidence that OpenAI's in-scope LLMs caused Mr. Baldacci or |

| | |
|---|---|
| | other Plaintiffs to lose book sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17.<br>Mr. Baldacci's conjecture about unspecified outputs that "will compete against [his] work" is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 27. Mr. Baldacci added: "With my recent publication of 'Nash Falls,' there were a couple of AI books that were published the same day that were summaries of my books that offered, you know, a summary of David Baldacci's 'Nash Falls' that you can read in lieu of my book. It was selling for a lower price." Nelson Decl. Ex. 920 at 227:7–12. | 27. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Mr. Baldacci's deposition transcript contains the quoted testimony. However, disputed as Books Opp. Ex. 920 does not contain the cited pages.<br>Disputed to the extent Plaintiffs rely on this isolated statement as evidence that the referenced AI-generated summary book was created using OpenAI's products at all. *See* Fed. R. Evid. 602. Indeed, when asked [redacted] Books Ex. 5 (D. Baldacci Tr.) at 228:8–12. He further acknowledged that [redacted] *Id.* at 228:19–21.<br>Further disputed to the extent Plaintiffs rely on Mr. Baldacci's quoted statement as evidence that AI-generated material caused him any harm or lost sales. Mr. Baldacci testified that [redacted] *id.* at 229:6–20, and |

| | |
|---|---|
| | that [redacted] *Id.* at 227:7–228:6.<br>Further, Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Mr. Baldacci or other Plaintiffs to lose book sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17.<br>Mr. Baldacci's conjecture about unspecified outputs that "will compete against [his] work" is ultimately immaterial. *See* *Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 28. In his deposition, Taylor Branch testified: "AI can generate automatically without involvement of any human being an artificial product that draws on my copyrighted material without a license and offer it to anybody to slap their names on it and sell it and thereby displace the market for me." Nelson Decl. Ex. 921 at 126:13–19. | 28. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Mr. Branch's deposition transcript at Books Opp. Ex. 921 contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of actual market displacement, as Mr. Branch's own testimony confirms it is impermissibly speculative. *See* Fed. R. Evid. 602.<br>Mr. Branch testified that he [redacted] J. Gratz Decl. Ex. 308 (T. Branch Tr.) at 28:9–17, 126:20–22. Mr. Branch further testified [redacted] *Id.* at 73:1–8. |

| | |
|---|---|
| | Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Mr. Branch or other Plaintiffs to lose book sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Further, Plaintiffs' publishing-industry expert, Mark Seeley, [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Mr. Branch's conjecture about unspecified outputs that may have harmed him is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 29. Sylvia Day similarly testified: "And I am harmed any time somebody produces a book in my style because of that machine. … I know the machine has ingested my work. I know that it has my style and my technique within it. And I am aware that the reason why it's in that machine is so that it can copy and reproduce my work." Nelson Decl. Ex. 919 at 145:13–21. | 29. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Ms. Day's (Sylvia Wolicki's) deposition transcript at Books Opp. Ex. 919 contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of actual harm or copying, as Ms. Day's own testimony confirms this belief was impermissibly speculative. *See* Fed. R. Evid. 602.<br>When asked directly whether [redacted] J. Gratz Decl. Ex. 310 (S. J. Wolicki Tr.) at 145:22–146:7. Ms. Day further testified [redacted] *Id.* at 147:15– |

| | |
|---|---|
| | 19. And when asked [redacted] *Id.* at 156:4–15.<br>Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Plaintiffs, including Ms. Day, to lose sales or otherwise suffer market harm, and opined that outputs from OpenAI's models are not substitutes for the Asserted Works. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Meanwhile, Plaintiffs' publishing-industry expert, Mark Seeley, [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Ms. Day's conjecture about unspecified outputs that may have harmed her is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). Further, Ms. Day's contention [redacted] *Roberts v. Gallery*, 755 F. Supp. 3d 235, 241 (E.D.N.Y. 2024) ("[C]opyright law does not protect ideas, concepts, styles and processes."). |
| 30. Ms. Day added: "I believe that the flooding of the market of AI-generated books, again, is creating an unnatural level of competition that will eventually have the possibility of making human creative writing an unsustainable career." Nelson Decl. Ex. 919 at 148:19–23. | 30. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Ms. Day's deposition transcript at Books Opp. Ex. 919 contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of actual or impending harm, as the quoted |

| | |
|---|---|
| | statement is impermissibly speculative, *see* Fed. R. Evid. 602, and the balance of Ms. Day's testimony confirms the absence of any concrete harm to her.<br><br>Immediately before making the quoted statement, Ms. Day testified, [redacted] J. Gratz Decl. Ex. 310 (S. J. Wolicki Tr.) at 148:17–19. When asked directly [redacted] *Id.* at 149:14–21. Ms. Day further testified [redacted] *Id.* at 149:8–12.<br><br>Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Plaintiffs, including Ms. Day, to lose sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Meanwhile, Plaintiffs' publishing-industry expert, Mark Seeley, [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br><br>Ms. Day's conjecture about unspecified outputs that may have harmed her is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). Further, Ms. Day's contention [redacted] |

| | |
|---|---|
| | *Roberts*, 755 F. Supp. 3d at 241 ("[C]opyright law does not protect ideas, concepts, styles and processes."). |
| 31. In his deposition, Christopher Golden stated: "I see it on social media every day. Other authors talking about various books, writers talking about how, I've done seven books this week and, you know, they've sold this many copies, all using AI. So, essentially, what's happening is that authors like me have had their materials stolen and fed into the LLM and using, you know, our stories, our styles, our ideas, the -- you know, the AI is producing, potentially long-term, millions of competitive works that are, in my opinion, lesser. But, more importantly, you know, generated from stolen work and competing with the victims of that theft. I see it every single day. I see -- I saw references to a particular romance publisher and romance authors saying that they're losing their contracts because the romance publisher is actually engaging in publishing books in this manner." Nelson Decl. Ex. 931 at 42:19–43:14. | 31. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Mr. Golden's deposition transcript at Books Opp. Ex. 931 contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of actual harm to Mr. Golden or any connection to OpenAI specifically, as Mr. Golden's own testimony confirms that his account is based on unverified social media hearsay rather than personal knowledge or evidence tied to OpenAI's products. *See* Fed. R. Evid. 602; Fed. R. Evid. 802.<br>When asked [redacted] J. Gratz Decl. Ex. 311 (C. Golden Tr. (Feb. 10, 2026)) at 44:7–23. Regarding the referenced [redacted] *Id.* at 45:9–22. Mr. Golden further testified, [redacted] J. Gratz Decl. Ex. 113 (C. Golden Tr. (Mar. 17, 2025)) at 300:7–14.<br>Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Plaintiffs, including Mr. Golden, to lose book sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. |

| | |
|---|---|
| | Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Meanwhile, Plaintiffs' publishing-industry expert, Mark Seeley, conceded [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Mr. Golden's conjecture about unspecified outputs that may have harmed him is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). Further, Mr. Golden's contention [redacted] *Roberts*, 755 F. Supp. 3d at 241 ("[C]opyright law does not protect ideas, concepts, styles and processes."). |
| 32. In his deposition, Andrew Greer testified: "This is a substitution for buying and reading my book." Nelson Decl. Ex. 924 at 134:25–135:01. | 32. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Mr. Greer's deposition transcript at Books Opp. Ex. 924 contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of actual market substitution or harm, as Mr. Greer's own surrounding testimony confirms the statement was impermissible speculation about a single exhibit made in litigation rather than evidence of any real-world substitution or lost sale. *See* Fed. R. Evid. 602.<br>Mr. Greer confirmed [redacted] Books Opp. Ex. 924 (A. Greer Tr.) at 133:2–7. Mr. Greer further testified that [redacted] |

| | |
|---|---|
| | [redacted] *Id.* at 134:3–18.<br>Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Plaintiffs, including Mr. Greer, to lose book sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Meanwhile, Plaintiffs' publishing-industry expert, Mark Seeley, conceded [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Mr. Greer's conjecture about [redacted] *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 33. John Grisham testified: "there is a very real risk that we could be eliminated or seriously damaged by the flood of cheap books, legal thrillers." Nelson Decl. Ex. at 175:9–11. | 33. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial**. Undisputed that Mr. Grisham's deposition transcript at Books Opp. Ex. 925 contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of actual or impending harm, as Mr. Grisham's own surrounding testimony confirms this statement was impermissibly speculative. *See* Fed. R. Evid. 602.<br>When asked whether [redacted] |

| | |
|---|---|
| | [redacted] Books Opp. Ex. 925 (J. Grisham Tr.) at 176:11–21. Mr. Grisham further confirmed [redacted] *Id.* at 176:22–25. He also acknowledged that [redacted] *Id.* at 175:24–176:10.<br>Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Plaintiffs, including Mr. Grisham, to lose book sales, citing this same admission. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Meanwhile, Plaintiffs' publishing-industry expert, Mark Seeley, conceded [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Mr. Grisham's conjecture about future risks based on generative AI tools is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 34. George R.R. Martin testified: "As AI gets better and better and better, which I do think it will, you don't need the writers so much." Nelson Decl. Ex. 926 at 101:13–15. | 34. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Mr. Martin's deposition transcript at Books Opp. Ex. 926 contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of harm, as Mr. Martin confirmed this statement was impermissibly speculative. *See* Fed. R. Evid. 602. Mr. Martin testified [redacted] |

| | |
|---|---|
| | [redacted] J. Gratz Decl. Ex. 97 (G. Martin Tr.) at 216:24–217:5.<br>Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Plaintiffs, including Mr. Martin, to lose book sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Meanwhile, Plaintiffs' publishing-industry expert, Mark Seeley, conceded [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Mr. Martin's conjecture about future harms based on generative AI tools is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 35. Mr. Martin added: "Or alternatively if it's really good, then they think, Well, I don't need to buy the George Martin edition." Nelson Decl. Ex. 926 at 214:16–18. | 35. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Mr. Martin's deposition transcript at Books Opp. Ex. 926 contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of actual market harm, as Mr. Martin's own testimony, in the same answer, confirms this was impermissible speculation. *See* Fed. R. Evid. 602.<br>Mr. Martin explained [redacted] |

| | |
|---|---|
| | [redacted] Books Opp. Ex. 926 (G. Martin Tr.) at 213:20–214:25.<br>Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Plaintiffs, including Mr. Martin, to lose book sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Meanwhile, Plaintiffs' publishing-industry expert, Mark Seeley, conceded [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Mr. Martin's conjecture about future harms based on generative AI tools is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 36. In her deposition, when asked "[d]o you believe that ChatGPT is an existing threat to your livelihood as an author because it can replace your work," Stacy Schiff confirmed "Yes." Nelson Decl. Ex. 928 at 43:19–22. | 36. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Ms. Schiff's deposition transcript at Books Opp. Ex. 928 contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of actual harm, as Ms. Schiff's own surrounding testimony confirms [redacted] and that this statement was impermissibly speculative. *See* Fed. R. Evid. 602.<br>When asked, [redacted] |

| | |
|---|---|
| | [redacted] Books Ex. 51 (S. Schiff Tr.) at 44:18–25. [redacted] *Id.* at 45:11–46:6.<br>Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Plaintiffs, including Ms. Schiff, to lose book sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Meanwhile, Plaintiffs' publishing-industry expert, Mark Seeley, conceded [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Ms. Schiff's conjecture about her alleged harms based on ChatGPT is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 37. In his deposition, Michael Connelly stated: "it took my books and now it can make my stories available through not the – my contracted license way of doing -- delivering my books to readers." Nelson Decl. Ex. 922 at 77:2–5. | 37. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Mr. Connelly's deposition transcript at Books Opp. Ex. 922 contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of actual harm, as Mr. Connelly's own testimony confirms [redacted] *See* Fed. R. Evid. 602.<br>Mr. Connelly testified that [redacted] |

| | |
|---|---|
| | [redacted]. J. Gratz Decl. Ex. 312 (M. Connelly Tr.) at 86:21–87:15.<br>Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Mr. Connelly or other Plaintiffs to lose book sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Meanwhile, Plaintiffs' publishing-industry expert, Mark Seeley, conceded [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Mr. Connelly's conjecture about his alleged harms based on ChatGPT is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 38. Mr. Connelly added: "And the part about it still being a threat, it still means that -- you know, what I'm saying is they're not going to replace writers, but it could put them out of business if, you know, if copyrights are not respected." Nelson Decl. Ex. 922 at 156:10–14. | 38. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Mr. Connelly's deposition transcript at Books Opp. Ex. 922 contains the quoted testimony. However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of actual or present harm, as the statement is explicitly conditional and impermissibly speculative, *see* Fed. R. Evid. 602, and Mr. Connelly's surrounding testimony confirms [redacted]<br>Mr. Connelly clarified [redacted] |

| | |
|---|---|
| | [redacted] J. Gratz Decl. Ex. 312 (M. Connelly Tr.) at 156:1–14. As with his other testimony, Mr. Connelly [redacted] *Id.* at 86:21–87:15.<br>Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Plaintiffs, including Mr. Connelly, to lose book sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Meanwhile, Plaintiffs' publishing-industry expert, Mark Seeley, conceded [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Mr. Connelly's conjecture about his alleged harms based on ChatGPT is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 39. In his deposition, James Shapiro testified: "I believe that AI will do and is doing harm to me as an author by making available my words and ideas and style and discoveries that are hard-earned and for which I paid, when necessary, to cover copyrighted materials. So I believe that it won't replace me as a writer, but I believe that it harms and will harm my ability to write and sell books." Nelson Decl. Ex. 955 at 67:13–20. | 39. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Undisputed that Mr. Shapiro's deposition transcript at Books Opp. Ex. 955 contains the quoted testimony, which itself confirms his belief "that it won't replace [him] as a writer." However, disputed to the extent Plaintiffs rely on this isolated statement as evidence of harm to Mr. Shapiro's ability to write and sell books, as Mr. Shapiro's own testimony confirms [redacted] |

| | |
|---|---|
| | [redacted] *See* Fed. R. Evid. 602.<br>When asked directly whether [redacted] J. Gratz Decl. Ex. 309 (J. Shapiro Tr.) at 237:20–238:7. When asked again whether [redacted] *Id.* at 238:17–239:3.<br>Dr. Leonard found no empirical evidence that OpenAI's in-scope LLMs caused Plaintiffs, including Mr. Shapiro, to lose book sales. *See* ECF 1729 (G. Leonard Decl.) ¶ 10. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Meanwhile, Plaintiffs' publishing-industry expert, Mark Seeley, conceded [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Mr. Shapiro's conjecture about his alleged harms based on ChatGPT is ultimately immaterial. *See Kirbaran*, 720 F. Supp. 3d at 273 (a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal quotation marks omitted)). |
| 40. This harm is further reflected in the marketplace for books. As Class Plaintiffs' expert Mark Seeley explained: "The notion that authors would acquiesce to Defendants' infringement in exchange for the perceived benefits of AI is inconsistent with real | 40. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Improper Legal Argument; Immaterial.** Undisputed that the cited source contains the quoted language. However, disputed that the cited |

| | |
|---|---|
| world evidence. Public reporting reveals that authors are sounding the alarm about AI-generated works that imitate their works." Seeley Decl. Ex. B ¶ 35. | paragraph establishes harm to the market for Plaintiffs' Asserted Works or harm attributable to any AI tool. Specifically, the cited paragraph includes public reporting speculating that works were created by AI, but does not establish that any reported work was generated by ChatGPT, Copilot, or any other generative AI tool. The cited paragraph does not establish that any AI-generated work caused Plaintiffs to lose sales. Indeed, Mr. Seeley testified [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8. Additionally, Books Plaintiffs have not identified a single book generated by ChatGPT or Copilot that infringes the Asserted Works and is available for sale. ECF 1726 (C. Tucker Decl.) ¶¶ 45–46, 59–60, 87–88. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17.<br>Further, OpenAI disputes Plaintiffs' reliance on public reporting summarized in the cited paragraph, and authors' out-of-court statements therein, to establish the truth of the reported allegations concerning alleged AI-generated works. Such reporting and the statements recorded therein constitute hearsay offered for their truth, and are therefore inadmissible.<br>OpenAI also disputes the characterization of conduct as "infringement," which is an improper legal conclusion rather than a statement of fact.<br>OpenAI also responds that the facts set forth in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from AI-generated books is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1692 (Microsoft |

| | |
|---|---|
| | Opening MSJ Br. re Books) at 30–32; ECF 1983 (OpenAI Opening MSJ Br. re Books) at 31–34. Moreover, any alleged harms to non-party authors are immaterial to whether Books Plaintiffs have demonstrated any harm. |
| 41. Among others, Mr. Seeley noted:<br>A 2024 report from National Public Radio noted concerns raised by the author Kara Swisher about unauthorized purported biographies, and the sociology author Marie Arana who found that a recent book of hers had been mimicked (but using a slightly different title and listing another author).<br>Author Leland Vittert discovered that "[s]everal AI deepfakes" of his recent "bestselling book 'Born Lucky'" have "been sold on Amazon, leading some to accidentally purchase the books without realizing they are not authored by" Vittert.<br>Broadcast journalist Savannah Guthrie "notic[ed] fake books being advertised as companion workbooks to her book" 39 and author Lisa Sun "spotted fake workbooks in the suggested books field right under her legitimate book's Amazon listing page."<br>Author Jane Friedman, who has written three books, "found six more bearing her name on Amazon last summer." 41 According to Friedman, these fake books were "likely AI-generated"—their availability "coincided with the explosion of AI writing tools, and it was exactly the kind of generic, vague, not very good writing that I would expect."<br>Journalist Catherine Tsalikis discovered a book on Amazon that imitated both the cover and text of | 41. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Immaterial.** Undisputed that the cited source contains the quoted language. However, disputed that the cited paragraph establishes harm to the market for Books Plaintiffs' Asserted Works or harm attributable to any AI tool. Specifically, the cited paragraph includes public reporting speculating that works were created by AI, but does not establish that any reported work was generated by ChatGPT, Copilot, or any other generative AI tool. Further, the cited paragraph does not establish that any AI-generated work caused Plaintiffs to lose sales. Indeed, Mr. Seeley testified [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8. Additionally, Books Plaintiffs have not identified a single book generated by ChatGPT or Copilot that infringes the Asserted Works and is available for sale. ECF 1726 (C. Tucker Decl.) ¶¶ 45–46, 59–60, 87–88. Plaintiffs' damages expert, Michael Lasinski, stated that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17.<br>Further, OpenAI disputes Plaintiffs' reliance on public reporting summarized in the cited paragraph, and authors' out-of-court statements therein, to establish the truth of the reported allegations concerning alleged AI-generated works. Such reporting and the statements recorded therein constitute hearsay offered for their truth, and are therefore inadmissible. |

| | |
|---|---|
| her own work. 43 Tsalikis "concluded it was written by artificial intelligence," describing the text as "a weird mirror image, like a refracted image of words . . . . The sentiment is the same, but the words are different."<br>Author Jessica Waite found "an AI fake on Amazon" that "ripped off the title, cover and content" of her book. 45 Additionally, Waite discovered "a fake prequel under [Waite's] name, linked to Waite's author profile on Amazon."<br>*Id.* | OpenAI also responds that the facts set forth in this Paragraph are immaterial and therefore disputed for the reasons set forth in Paragraph 40 (*i.e.*, market dilution is not a cognizable harm). Moreover, any alleged harms to non-party authors are immaterial to whether Books Plaintiffs have demonstrated any harm. |
| 42. Class Plaintiffs' expert Ben Zhao similarly explained: "One of the major concrete harms of LLMs is the massive proliferation of what is now commonly called AI slop, i.e., automated content that has little meaning other than being low qualify mimics of human created content. … Similar trends were quickly found on more commercial platforms like Amazon, where the vibrant book market was flooded with unlabeled, low quality AI-books that were turning away customers who could not immediately identify which were human written books without first paying for the purchase." Zhao Decl. Ex. B ¶¶ 134–135. | 42. **Disputed in Part – Not Supported by Admissible Evidence; Expert Opinion Subject to Rule 702; Immaterial.** Undisputed that the cited source contains the quoted language. However, disputed that the quoted language establishes the asserted harm. [redacted] C. Blythe Opp. Decl. Ex. 70 ([redacted]) at 58:25–59:10, 73:19–74:10, 177:18–178:1, 182:21–184:1, 222:4–11. To the extent Plaintiffs assert harm from market dilution or competition from noninfringing AI-generated books, OpenAI disputes that such harm is legally cognizable, for the reasons stated in Defendants' response to Books Plaintiffs' Statement ¶ 774. *See* ECF 2237 (Defs.' Resp. to Books Pls.' Rule 56.1 Statement) ¶ 774.<br>The asserted facts are also not supported by admissible evidence. In the cited paragraphs, Dr. Zhao relies on non-party news publications to establish the alleged proliferation of AI-generated content. OpenAI objects to Plaintiffs' reliance on those |

| | |
|---|---|
| | publications and the out-of-court statements offered for the truth of their content, because they constitute inadmissible hearsay.<br>Further, the facts stated in this Paragraph are disputed because the evidence cited in support, including certain opinions of Dr. Zhao on which this statement relies, is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent that the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br>OpenAI also responds that the facts set forth in this Paragraph are immaterial and therefore disputed for the reasons set forth in Paragraph 40 (*i.e.*, market dilution is not a cognizable harm). |
| 43. Dr. Zhao added: "Beyond just outputting an overwhelming volume of AI slop, it is clear that LLMs were used by bad actors to target and take away profits from individual authors by replicating, imitating, or summarizing human written books and trying to displace them on the marketplace. Unfortunately, without significant changes by AI model trainers, this wave of AI slop is unlikely to stop any time soon." *Id.* at ¶ 135. | 43. **Disputed in Part – Not Supported by Admissible Evidence; Expert Opinion Subject to Rule 702; Immaterial.** Undisputed that the cited source contains the quoted language. However, OpenAI disputes that outputs from any of the accused OpenAI LLMs displace Books Plaintiffs' works in the marketplace. Books Plaintiffs offer no support for this assertion. Indeed, Books Plaintiffs' factor-four and damages expert, Michael Lasinski, admitted that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Further, Mr. Seeley, Books Plaintiffs' expert opining on the publishing industry, described [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8. Additionally, Books Plaintiffs have not identified a single book generated by ChatGPT or Copilot that infringes the Asserted Works and is available for sale. ECF 1726 (C. Tucker Decl.) ¶¶ 45–46, 59–60, 87–88. |

| | |
|---|---|
| | OpenAI disputes Plaintiffs' reliance on public reporting in the cited paragraph, and authors' out-of-court statements therein, to establish the truth of the reported allegations concerning alleged AI-generated works. Such reporting and the statements recorded therein constitute hearsay offered for their truth, and are therefore inadmissible.<br>Further, the facts stated in this Paragraph are disputed because the evidence cited in support, including certain opinions of Dr. Zhao on which this statement relies, is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent that the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br>OpenAI also responds that the facts set forth in this Paragraph are immaterial and therefore disputed for the reasons set forth in Paragraph 40 (*i.e.*, market dilution is not a cognizable harm). |
| 44. Class Plaintiffs' expert Michael Lasinski explained the economic mechanisms through which this marketplace harm operates: "The harm to authors operates through at least two concurrent market mechanisms. The first is volume-driven: the entry of a large quantity of new, competing content directly into the marketplace where Plaintiffs' works are sold. The second is quality-driven: to the extent that the introduction of AI-generated content meets or exceeds consumer acceptance levels, those works can more directly compete with Plaintiffs' works, thereby introducing a level of competition that did not exist before." Lasinski Decl. Ex. B ¶ 411. | 44. **Disputed in Part – Not Supported by Cited Evidence; Expert Opinion Subject to Rule 702; Immaterial.** Undisputed that the cited source contains the quoted language. However, OpenAI disputes that the cited opinion establishes harm to the market for Plaintiffs' Asserted Works, because it describes general mechanisms of competition without an empirical demonstration that OpenAI's accused models have caused, or are likely to cause, harm to the market for the Asserted Works. The existence of additional content in the marketplace does not itself establish substitution of Plaintiffs' Asserted Works, or lost sales, and Mr. Lasinski's analysis is expressly conditional on AI-generated works "meet[ing] or exceed[ing] consumer acceptance levels[.]" Mr. Lasinski admitted that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz |

| | |
|---|---|
| | Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. Mr. Seeley, Books Plaintiffs' expert opining on the publishing industry, described [redacted] C. Blythe Opp. Decl. Ex. 75 (M. Seeley Tr.) at 298:7–299:8.<br>Further, the facts stated in this Paragraph are disputed because the evidence cited in support, including certain opinions of Mr. Lasinski on which this statement relies, is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent that the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br>OpenAI also responds that the facts set forth in this Paragraph are immaterial and therefore disputed for the reasons set forth in Paragraph 40 (*i.e.*, market dilution is not a cognizable harm). |
| 45. As to the volume-driven mechanism, Mr. Lasinski explained that "[t]he evidence provided by the 2026 Reimers and Waldfogel study demonstrates that there has been a significant increase in the supply of books in the market, driven specifically by the proliferation of AI-generated content," and that this [redacted] Lasinski Decl. Ex. B ¶ 410. | 45. **Disputed in Part – Not Supported by Cited Evidence; Expert Opinion Subject to Rule 702; Immaterial.** Undisputed that the cited source contains the quoted language. However, the rest of this Paragraph is disputed because it is not supported by the cited evidence. Specifically, Mr. Lasinski's cited sources do not support his "volume-driven mechanism" theory. The Reimers and Waldfogel paper makes no causal claim attributing new titles on Amazon to ChatGPT or Copilot specifically. Further, the Reimers and Waldfogel paper states that it has not been peer-reviewed or subjected to the NBER Board review accompanying NBER publications. *See* Books Ex. 762 at title page. Reimers and Waldfogel also conclude that the books they detected as containing AI text "are less appealing to consumers," and "have very little usage." *See id.* at 3. [redacted] |

| | |
|---|---|
| | [redacted] Books Ex. 761 ¶ 5. It is therefore insufficient to establish the asserted proliferation of AI-generated books on a marketplace-wide scale.<br>Further, the facts stated in this Paragraph are disputed because the evidence cited in support, including certain opinions of Mr. Lasinski on which this statement relies, is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent that the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br>OpenAI also responds that the facts set forth in this Paragraph are immaterial. Any increased supply of AI-generated content does not change the fact that Plaintiffs have not demonstrated any harm based on OpenAI's accused LLMs. Indeed, Mr. Lasinski admitted that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. To the extent Plaintiffs claim that they have been harmed under a market dilution theory, that theory is non-cognizable for the reasons set forth in Paragraph 40. |
| 46. Mr. Lasinski explained that the same study "provides informative evidence of these harms," including "[d]irect evidence . . . that AI-containing books have lower quality, and their rising share . . . drives the overall decline" in average book quality, and that "works can be created using AI quickly at lower cost and have lower prices than human-created works, on average," such that "[a]s the quality of AI-generated books increases, so does the likelihood of pricing pressure relative to the copyrighted books." *Id.* ¶¶ 411–412. | 46. **Disputed in Part – Not Supported by Cited Evidence; Expert Opinion Subject to Rule 702; Immaterial.** Undisputed that the cited source contains the quoted language. However, OpenAI disputes that the findings described establish harm to Books Plaintiffs. The cited paragraphs do not establish that lower production costs or lower prices for books containing AI-generated content have caused, or are likely to cause, a harm to the market for Books Plaintiffs' Asserted Works. Mr. Lasinski's speculation that "[a]s the quality of AI-generated books increases, |

| | |
|---|---|
| | so does the likelihood of pricing pressure relative to the copyrighted books" is conditional, and does not establish that such pricing pressure has occurred or is likely to affect the Asserted Works. Mr. Lasinski also testified that [redacted] J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 97:20–23. Furthermore, [redacted] C. Blythe Opp. Decl. Ex. 70 ([redacted] 30(b)(6) Tr.) at 74:9–10.<br>Further, the facts stated in this Paragraph are disputed because the evidence cited in support, including certain opinions of Mr. Lasinski on which this statement relies, is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent that the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br>OpenAI also responds that the facts set forth in this Paragraph are immaterial. Any increased supply of AI-generated content does not change the fact that Plaintiffs have not demonstrated any harm based on OpenAI's accused LLMs. Indeed, Mr. Lasinski admitted that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. To the extent Plaintiffs claim that they have been harmed under a market dilution theory, that theory is non-cognizable for the reasons set forth in Paragraph 40. |
| 47. Mr. Lasinski also identified survey evidence that authors are already experiencing this harm, explaining that "[r]esearch from the University of Cambridge in November 2025 found that 39 percent of novelists reported their income had already been | 47. **Disputed in Part – Not Supported by Cited Evidence; Expert Opinion Subject to Rule 702; Immaterial.** Undisputed that the cited source contains the quoted language. However, disputed that the survey results establish that Books Plaintiffs are |

| | |
|---|---|
| negatively affected by GenAI, with 85 percent expecting their future income to be similarly affected," a figure that "aligns closely with an ITW survey of authors, which found that approximately 76 percent expect AI to negatively impact author incomes over the next 10 years." *Id.* ¶ 396. | "already experiencing this harm." None of these surveys demonstrate any harm that Books Plaintiffs have suffered, nor could they when Mr. Lasinski admitted that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. The cited paragraph describes survey respondents' self-reported experiences concerning generative AI (without any specific reference to the accused OpenAI LLMs).<br>Further, the facts stated in this Paragraph are disputed because the evidence cited in support, including certain opinions of Mr. Lasinski on which this statement relies, is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent that the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br>OpenAI also responds that the facts set forth in this Paragraph are immaterial and therefore disputed for the reasons set forth in Paragraph 40 (*i.e.*, market dilution is not a cognizable harm). |
| 48. Mr. Lasinski also discussed accounts of displacement reported by authors outside this litigation. He noted that author Jess Michaels told *The New York Times*: "The glut of the A.I. work makes discoverability very difficult . . . . You're talking about directly pirating my work, putting it into an engine so that you can produce a 'Jess Michaels-type book,' and then glutting the market with it. I cannot tell you how soul-crushing it is . . . . It essentially erases actual authors." Mr. Lasinski further noted that, according to *The New York Times*, sales of Ms. Michaels's books "have been so dismal that she might stop publishing." Lasinski Decl. Ex. D ¶ 6 & n.16. | 48. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Expert Opinion Subject to Rule 702; Immaterial.** Undisputed that the cited source contains the quoted language. However, disputed to the extent that it implies that sales of Books Plaintiffs' works have been displaced. Ms. Michaels is not a plaintiff, nor is there any evidence that any ChatGPT-generated book has harmed her. Mr. Lasinski admitted that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17. |

| | |
|---|---|
| | Additionally, the asserted facts are not supported by admissible evidence, as required by Local Rule 56.1, and are therefore not properly before the Court. Specifically, the assertion relies on two layers of hearsay—*i.e.*, Mr. Lasinski quoting a New York Times article that, in turn, purports to quote Ms. Michaels.<br>Further, the facts stated in this Paragraph are disputed because the evidence cited in support, including certain opinions of Mr. Lasinski on which this statement relies, is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent that the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br>OpenAI also responds that the facts set forth in this Paragraph are immaterial and therefore disputed for the reasons set forth in Paragraph 40 (*i.e.*, market dilution is not a cognizable harm). |
| 49. Mr. Lasinski similarly noted that best-selling author Tim Ferriss reported that his agent, "who has decades of statements to compare against, put it bluntly: 2025 was the first big drop, 2026 looks more severe, and the only thing that's really changed in that timeframe is the acceleration of AI." Lasinski Decl. Ex. C at n.227. | 49. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Expert Opinion Subject to Rule 702; Immaterial.** Undisputed that the cited source contains the quoted language. However, OpenAI disputes that the cited evidence establishes harm to Books Plaintiffs based on any alleged infringement by OpenAI. Mr. Ferriss is not a plaintiff, nor is there any evidence that any ChatGPT-generated book has harmed him. Mr. Lasinski admitted that he did not have the "data necessary to identify a specific, just-prompted-by-ChatGPT book that would have caused another author to lose a sale." J. Gratz Decl. Ex. 313 (M. Lasinski Tr.) at 99:21–100:17.<br>Additionally, the asserted facts are not supported by admissible evidence, as required by Local Rule 56.1, and are therefore not properly before the Court. Specifically, the cited evidence relies on layers of hearsay. Plaintiffs rely, for the truth of the matter of the matter asserted, on out-of-court statements |

| | |
|---|---|
| | made by Mr. Ferriss recounting statements purportedly made by his agent.<br>Further, the facts stated in this Paragraph are disputed because the evidence cited in support, including certain opinions of Mr. Lasinski on which this statement relies, is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent that the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br>OpenAI also responds that the facts set forth in this Paragraph are immaterial and therefore disputed for the reasons set forth in Paragraph 40 (*i.e.*, market dilution is not a cognizable harm). |
| 50. OpenAI employee Ben Mann created internal tools—specifically an internal database—which permitted OpenAI employees to identify specific LibGen books using metadata. Nelson Decl. Ex. 989; Nelson Decl. Ex. 990. He referred to at least one tool as a "metadata-based libgen filter." Nelson Decl. Ex. 881. | 50. **Disputed in Part – Not Supported by Cited Evidence.** Undisputed that Mr. Mann described the material linked in Books Opp. Ex. 881 as a "metadata-based libgen filter." Books Opp. Ex. 881 at OPCO_MDL_000492617. However, that description on its face specifies a filter, not a database, and one for which Mr. Mann testified [redacted]. Books Ex. 33 (B. Mann 30(b)(1) Tr.) at 142:1–9.<br>OpenAI disputes that the other cited evidence establishes that Mr. Mann created an internal database for identifying specific LibGen books. First, Books Opp. Ex. 990 does not provide evidence of an "internal database" or "tool" for "identify[ing] specific books." Instead, it shows Mr. Ouyang asking if there "was a way to easily look up metadata about a book" in order to "estimate the fraction of our dataset that's weird / not suitable for [a model research project]." Books Opp. Ex. 990 at OPCO_MDL_000499407. Mr. Ouyang testified "I don't recall" when asked whether he "solve[d] the problem discussed in this thread." J. Gratz Decl. Ex. 314 (L. Ouyang Tr.) at 199:22–200:7. |

| | |
|---|---|
| | Additionally, the Slack exchange in Books Opp. Ex. 989 directs employees to a README file with the comment: "this is how you get the db and pull out metadata." Books Opp. Ex. 989 at OPCO_MDL_000498176. Plaintiffs omit the README's instructions, which do not point to an OpenAI "internal database," but instead provide a link to LibGen's website where one could access LibGen's database of metadata. *See* OPCO_NDCAL_SRCCODE00000408, lines 46–58. Thus, the "database" identified in Plaintiffs' cited evidence is a LibGen database accessible on the public internet, not an internal database. Moreover, when asked what he recalled concerning the public database referenced in the Slack thread, Mr. Ouyang testified: "Not much. I don't recall if I even looked at it." J. Gratz Decl. Ex. 314 (L. Ouyang Tr.) at 203:14–20. |
| 51. In an order denying Motion for Leave to Appeal in *Kadrey et al v. Meta Platforms*, 3:23-cv-03417-VC, ECF No. 767, Judge Chhabria wrote: "The motion for leave to file an interlocutory appeal is denied. To be sure, the issue presented in the motion is a difficult one, and Judge Alsup's opinion makes a good point. But it won't be long before a final judgment is entered in at least one of the Meta cases before this Court. That judgment will allow the issue presented in the current motion, along with many other important issues relating to the use of copyrighted materials in the training of AI models, to be presented to the Court of Appeals as part of a tidy package." Nelson Decl. Ex. 880. | 51. **Disputed in Part – Improper Legal Argument; Immaterial.** Undisputed that the quoted dicta appears in the cited order. However, this Paragraph does not contain a fact. Plaintiffs recite this Paragraph to make an improper legal argument or draw an improper legal conclusion requiring no response. |

### E. An Emerging and Growing Licensing Market Exists for Books for LLM Training

| | |
|---|---|
| 52. As Class Plaintiffs' expert Michael Lasinski explained in his reports, the "factual record in this matter supports the existence of an emerging and growing licensing market for | 52. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Undisputed that the cited source contains the quoted language. However, this fact is immaterial and therefore disputed because Books Plaintiffs' claim of "harm from the loss of fees |

| | |
|---|---|
| acquiring access and use rights to copyrighted bools for LLM training and/or output." Lasinski Decl. Ex. B ¶ 48. | paid to license a work for a transformative purpose is not cognizable," and whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *see also Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1032 (N.D. Cal. 2025).<br>Further disputed that the record supports the existence of an emerging or growing licensing market for trade books applicable to Books Plaintiffs' Asserted Works. The existence of agreements involving access to data for LLM training does not establish the existence of a market for Books Plaintiffs' trade books. OpenAI's expert Dr. Leonard analyzed the data agreements produced in this matter and concluded that they do not establish a current or emerging licensing market in which Books Plaintiffs could participate. ECF 2135-1 (G. Leonard Opp. Decl. Ex. A) ¶¶ 287–291. [redacted] *Id.* ¶ 290. |
| 53. First, as Mr. Lasinski explained, "a range of entities, including AI content aggregators, intermediaries, and trade groups, along with platforms, have emerged to secure rights to real-world content and facilitate transactions involving licensing and use of such data." *Id.* ¶ 59. | 53. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Undisputed that the cited source contains the quoted language. However, this fact is immaterial and therefore disputed because Books Plaintiffs' claim of "harm from the loss of fees paid to license a work for a transformative purpose is not cognizable," and whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *see also Bartz*, 787 F. Supp. 3d at 1032.<br>Further disputed to the extent that this Paragraph implies that the factual record supports the existence of a licensing market for trade books applicable to Books Plaintiffs' Asserted Works. |

| | |
|---|---|
| | The existence of entities that facilitate licensing transactions for LLM training does not establish the existence of a market in which Books Plaintiffs could participate. OpenAI's expert Dr. Leonard analyzed the data agreements produced in this matter and concluded that they do not establish a current or emerging licensing market for Books Plaintiffs' trade books. ECF 2135-1 (G. Leonard Opp. Decl. Ex. A) ¶¶ 287–291. Indeed, [redacted] *Id.* ¶ 290. |
| 54. These entities "demonstrate a broad ecosystem of participants engaged in the licensing, exchange, and use of data and content for LLM training and/or output," with "scale and increasing sophistication... further evidenced by significant investment activity, including millions of dollars in funding, acquisitions... and backing from large technology companies such as Cloudflare and Microsoft." *Id.* at ¶ 103. | 54. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Undisputed that the cited source contains the quoted language. However, this fact is immaterial and therefore disputed because Books Plaintiffs' claim of "harm from the loss of fees paid to license a work for a transformative purpose is not cognizable," and whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *see also Bartz*, 787 F. Supp. 3d at 1032.<br>Further disputed to the extent that this Paragraph implies that the record supports the existence of a licensing market for trade books applicable to Books Plaintiffs' Asserted Works. The existence of licensing agreements for some forms of training data in the purported "ecosystem" does not establish a market for trade book licensing. OpenAI's expert Dr. Leonard analyzed the data agreements produced in this matter and concluded that they do not establish a current or emerging licensing market in which Books Plaintiffs could participate. ECF 2135-1 (G. Leonard Opp. Decl. Ex. A) ¶¶ 287–291. [redacted] |

| | |
|---|---|
| | [redacted]. *Id.* ¶ 290. |
| 55. Second, "the record supports that books generally, as a category (and not limited to academic books), provide unique and highly valuable characteristics important for LLM training, operation, and performance." *Id.* at ¶ 346–347; *see also* Zhao Decl. Ex. A ¶¶ 14–72. | 55. **Disputed in Part – Expert Opinion Subject to Rule 702; Immaterial.** Undisputed that the cited source contains the quoted language. However, disputed that books are uniquely valuable for LLM training, or that Books Plaintiffs' Asserted Works are uniquely valuable to LLM training, operation, or performance. OpenAI's expert Dr. Callison-Burch opined that "[n]o individual work or set of works is required to achieve a diverse distribution of data" and that "any individual source, particularly in a given domain, is entirely fungible." Books Ex. 751 (C. Callison-Burch Opening Rep.) ¶ 328. Similarly, Microsoft's expert Dr. Lafferty explained that books' potential usefulness "does not mean that commercially published copyrighted books are uniquely necessary to general LLM capability." Books Ex. 727 (J. Lafferty Rebuttal Rep.) ¶ 65; *see also* C. Callison-Burch Decl. (Nov. 20, 2026) Ex. B (C. Callison-Burch Rebuttal Rep.) ¶¶ 52–55.<br>To the extent Books Plaintiffs offer this assertion to claim there is a functioning licensing market for their works, this fact is immaterial and therefore disputed. Books Plaintiffs' claim of "harm from the loss of fees paid to license a work for a transformative purpose is not cognizable," and whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *see also Bartz*, 787 F. Supp. 3d at 1032.<br>Further, the facts stated in this Paragraph are disputed because the evidence cited in support, including certain opinions of Dr. Zhao regarding the usefulness of books as training data on which this statement relies, is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent that the Court excludes the challenged opinions, Plaintiffs |

| | |
|---|---|
| | may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 56. Third, "the book market is well-versed in structuring agreements that grant licensing rights for specific uses of copyrighted works and in compensating rights holders for these uses." *Id.* at ¶ 42–43. | 56. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Undisputed that the cited source contains the quoted language. However, disputed to the extent that this Paragraph implies that there is a functioning or potential licensing market for trade books as LLM training data. The cited paragraphs do not establish that the rights, economic characteristics, or commercial arrangements associated with existing agreements are comparable to any that would be used for LLM training.<br>Further, OpenAI's expert, Mr. Rodzvilla, opined that existing licensing frameworks in trade publishing are not a suitable comparison for LLM training licensing because they govern distribution of books in different reading formats, rather than the distinct use of book text to train LLMs, and noted that the Authors Guild has stated that AI training rights are not equivalent to existing publishing rights. J. Rodzvilla Decl. (Nov. 20, 2026) Ex. A (J. Rodzvilla Reply Rep.) ¶¶ 16–17.<br>To the extent Books Plaintiffs offer this assertion to claim there is a functioning or likely-to-be-developed licensing market for their works, this fact is immaterial and therefore disputed. Books Plaintiffs' claim of "harm from the loss of fees paid to license a work for a transformative purpose is not cognizable," and whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *see also Bartz*, 787 F. Supp. 3d at 1032. |

**F. OpenAI's Internal Understanding of Compression, Piracy, and Safety Risks**

| | |
|---|---|
| 57. Ilya Sutskever—one of OpenAI's co-founders and former Chief Science Officer—explained that LLM training is compression in research memos sent to Bill Gates as part of OpenAI's demonstrations of early versions of GPT-3 that had been trained on LibGen. Nelson Decl. Ex. 901 at -111, -133-36. | 57. **Disputed in Part – Not Supported by Cited Evidence.** Undisputed that Dr. Sutskever is one of OpenAI's co-founders and its former Chief Scientist, and that the cited evidence contains a discussion of compression in LLM training. However, OpenAI disputes that this Paragraph establishes that LLM training is equivalent to compression of the LLM's training data. *See infra* ¶ 58.<br>Additionally, disputed that the cited evidence establishes Plaintiffs' characterization of the document as a memo authored by Dr. Sutskever and sent to Bill Gates, or that the cited evidence establishes that LibGen was the source of training data for the models discussed in Books Opp. Ex. 901. The disputed propositions are not supported by the cited evidence. The face of the document does not identify Dr. Sutskever as its author. *See* Books Opp. Ex. 901. Nor does the cited document identify LibGen as a source for training data for the models discussed therein. *See id.* |
| 58. Specifically, the memo explained that the "training of GPT-2-type models is compression . . . A GPT-type model is maximizing the likelihood of all its training data, which happens to be almost precisely equivalent to compressing it. … [a] GPT-2 style large deep neural network…compresses only the training data. . . ." Nelson Decl. Ex. 901 at -111, -133-36 (emphasis added). | 58. **Disputed in Part – Incomplete.** Undisputed that the cited source contains the quoted language. However, OpenAI disputes the implication that "compression" in this context is similar to memorization, involves storing recoverable copies of training data, or otherwise compresses the training data itself. The memo is referring to "compression" in a different sense. Pursuant to Fed. R. Evid. 106, the memo clarifies that "[t]o compress the data they're trained on, neural networks must learn ***abstract generalizable representations*** of the relevant semantic concepts. For example, when reading a book, we easily remember the plot but not the precise phrasing of various sentences, because the latter don't help predict the rest of the book and other books." |

| | |
|---|---|
| | Books Opp. Ex. 901 at OPCO_MDL_001817109 (emphasis added).<br>OpenAI's expert Dr. Callison-Burch explained that, in the context of LLM training, the only "compression" that might occur is the compression of *information* contained in the training data, or "the identification of general patterns manifested across the training data;" the specific training data text itself is ***not*** being compressed. C. Callison-Burch Decl. (Nov. 20, 2026) Ex. C (C. Callison-Burch Reply Rep.) ¶¶ 103, 107; *see also id.* ¶¶ 104–112. Finally, Dr. Sutskever himself has confirmed that this was only a hypothesis and LLMs' capabilities "can definitely be explained without alluding to this [compression] theory." *See* Simons Inst. for Theory of Computing, *An Observation on Generalization*, YouTube (Aug. 14, 2023) (31:07–31:41). |
| 59. In a discord message dated July 13, 2020, OpenAI researcher Leo Gao stated: "can we adopt Books2 as a euphemism for yarrharr data too." Nelson Decl. Ex. 786. | 59. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Undisputed that the cited source contains the quoted language. However, OpenAI disputes the characterization that Mr. Gao was an OpenAI employee at the time he made this statement. Mr. Gao did not join OpenAI until approximately October 2021, over a year after the cited Discord message. C. Blythe Opp. Decl. Ex. 37 (L. Gao 30(b)(1) Tr.) at 12:20–13:5.<br>Further disputed that the cited evidence supports the implication that Mr. Gao had actual knowledge of OpenAI's training data at the time. At the time of the Discord message, Mr. Gao was not an OpenAI employee, and he went on to speculate about "what OA porobably [sic] has," rather than speaking as an employee with firsthand knowledge. Books Ex. 786.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |

| | |
|---|---|
| 60. When asked in his deposition whether this "means pirated data," Mr. Gao testified: "I don't recall exactly what I was thinking, but looking at it today, it seems likely to be — it seems likely to be a humorous way to refer to that, yes." Nelson Decl. Ex. 20 at 103:12–17. | 60. **Disputed in Part – Not Supported by Cited Evidence; Incomplete; Improper Legal Argument; Immaterial.** Undisputed that the cited source contains the quoted text. However, disputed to the extent that Books Plaintiffs suggest that this testimony establishes that Mr. Gao knew the source of OpenAI's training data when he made the July 2020 statement. Mr. Gao was not an OpenAI employee at the time he made the statement discussed in the cited testimony. *See* C. Blythe Opp. Decl. Ex. 37 (L. Gao 30(b)(1) Tr.) at 12:20–13:5. His contemporaneous follow-up in the Discord thread discussed in this testimony speculates about "what OA porobably [sic] has," rather than asserting knowledge of OpenAI's actual training data sources. Books Ex. 786. Further, pursuant to Fed. R. Evid. 106, when asked what he meant by "yarrharr data," Mr. Gao testified: "I mean, I don't remember what I was thinking at the time. I can -- I can only speculate." C. Blythe Opp. Decl. Ex. 37 (L. Gao 30(b)(1) Tr.) at 103:9–11.<br>Further disputed to the extent Books Plaintiffs rely on Mr. Gao's use or interpretation of the phrase "yarrharr data" to imply that OpenAI acquired or used data unlawfully. That characterization constitutes improper attorney argument and/or a legal conclusion, rather than a fact. It thus requires no response.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |
| 61. He further confirmed that "Yarrhar is something a pirate might say." *Id.* at 103:18–20. | 61. **Disputed in Part – Not Supported by Cited Evidence; Incomplete; Improper Legal Argument; Immaterial.** Undisputed that Mr. Gao answered "[y]es" when asked the leading question: "Yarrharr is something a pirate might say; right?" However, disputed to the extent that Books Plaintiffs |

| | |
|---|---|
| | suggest this testimony establishes that Mr. Gao knew the source of OpenAI's training data when he made the July 2020 statement. Mr. Gao was not an OpenAI employee at the time he made the statement discussed in the cited testimony. *See* C. Blythe Opp. Decl. Ex. 37 (L. Gao 30(b)(1) Tr.) at 12:20–13:5. His contemporaneous follow-up in the Discord thread discussed in the cited testimony speculates about "what OA porobably [sic] has," rather than asserting knowledge of OpenAI's actual training data sources. Books Ex. 786. Further, pursuant to Fed. R. Evid. 106, when asked what he meant by "yarrharr data," Mr. Gao testified: "I mean, I don't remember what I was thinking at the time. I can -- I can only speculate." C. Blythe Opp. Decl. Ex. 37 (L. Gao 30(b)(1) Tr.) at 103:9–11.<br>Further disputed to the extent Books Plaintiffs rely on Mr. Gao's use or interpretation of the phrase "yarrharr data" to imply that OpenAI acquired or used data unlawfully. That characterization constitutes improper attorney argument and/or a legal conclusion, rather than a fact. It thus requires no response.<br>Additionally, the facts stated in this Paragraph are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Plaintiffs do not rely on this Paragraph in their Opposition. |
| 62. OpenAI's leadership recognized that competitive pressure to commercialize could lead to unsafe deployment. At his deposition, Sam Altman was shown a document titled "Consolidated Deal Priorities and Asks from the Safety Working Group," which stated, under its bolded Number 2, that "[a] race to commercialize could cause unsafe deployment." Nelson Decl. Ex. 1000 at 230:7–13; Nelson Decl. Ex. 1001. | 62. **Disputed in Part – Incomplete; Immaterial.** Undisputed that the cited source contains the quoted language, and that Mr. Altman was shown Books Opp. Ex. 1001 in his deposition. However, disputed to the extent Books Plaintiffs suggest that the cited evidence establishes that OpenAI deployed models unsafely in response to competitive pressure. Both Books Opp. Ex. 1001 and Mr. Altman's deposition testimony describe hypothetical risks, not actual events. Pursuant to Fed. R. Evid. 106, Mr. Altman further testified that the purpose of the document was to |

| | |
|---|---|
| | "increase the ability to deliver safely on our mission." Books Opp. Ex. 1000 (S. Altman 30(b)(1) Tr.) at 230:1–6.<br>Further, the cited sources establish no connection to copyright infringement or the acquisition of copyrighted training data. *See id.* at 230:7–13; Books Opp. Ex. 1001. Therefore, the purported facts set forth in this Paragraph are immaterial and have no bearing on the claims or defenses. |
| 63. Asked whether he "still believe[s] . . . that a race to commercial could cause unsafe deployment," Mr. Altman answered: "It could, yeah." Nelson Decl. Ex. 1000 at 230:14–16. Asked whether he "certainly believed it at the time," Mr. Altman testified: "I believed it at the time, and I believe it now." *Id.* at 230:17–19. | 63. **Disputed in Part – Immaterial.** Undisputed that the cited source contains the quoted testimony. However, disputed to the extent Books Plaintiffs suggest that the cited testimony establishes that OpenAI deployed models unsafely in response to competitive pressure. Mr. Altman's deposition testimony describes hypothetical risks, not actual events.<br>Further disputed to the extent that Books Plaintiffs imply that references to "unsafe deployment" concern copyright infringement or the acquisition or use of copyrighted training data. The cited testimony does not establish that connection. *See* Books Opp. Ex. 1000 (S. Altman 30(b)(1) Tr.) at 230:14–17. Therefore, the facts set forth in this Paragraph are immaterial and thus disputed because these facts have no bearing on any claim or defense in this litigation. |
| 64. Asked why "a race to commercialize [would] cause unsafe deployment," Mr. Altman testified: "Well, I think if one company believed they could bring a product to market faster by cutting safeguards, you could see a company that felt tremendous commercial pressure need to do that." *Id.* at 230:20–231:1. Asked whether that meant "[t]o ignore what's in the best interest of society to -- in order to get to market quicker," Mr. Altman answered: "Yeah." *Id.* at 231:2–5. | 64. **Disputed in Part – Immaterial.** Undisputed that the cited source contains the quoted testimony. However, disputed to the extent Books Plaintiffs suggest that the cited evidence establishes that OpenAI deployed models unsafely in response to competitive pressure. Mr. Altman's deposition testimony describes hypothetical risks, not actual events.<br>Further disputed to the extent that Books Plaintiffs imply that references to "unsafe deployment" and the "best interest of society" concern copyright infringement or the acquisition or use of copyrighted training data. The cited testimony does not establish that connection. *See* Books Opp. Ex. 1000 (S. Altman |

| | |
|---|---|
| | 30(b)(1) Tr.) at 230:14–17. Therefore, the facts set forth in this Paragraph are immaterial and thus disputed because these facts have no bearing on any claim or defense in this litigation. |
| 65. In his deposition, Mr. Altman further testified: “We have made extraordinary progress on being able to train models on very small amounts of data with very large amounts of compute, and I expect the future of training these models to look much more like that.” Nelson Decl. Ex. 1000 282:21–25. | 65. **Disputed in Part – Not Supported by Cited Evidence.** Undisputed that the cited source includes the quoted testimony. However, disputed to the extent that Plaintiffs imply that the Accused Models could have been trained to comparable capabilities using materially less data. Mr. Altman’s testimony described research progress and his expectation concerning “the future of training.” Books Opp. Ex. 1000 (S. Altman 30(b)(1) Tr.) at 282:21–25. The cited testimony does not identify particular models, quantify the amounts of data involved, or establish that those methods were available when the Accused Models were trained. *See id.* |

Dated: November 20, 2026

Respectfully submitted,

*/s/ Allison S. Blanco*[*]
**LATHAM & WATKINS LLP**
Andrew M. Gass (*pro hac vice*)
*andrew.gass@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415.391.0600

Sarang V. Damle
*sy.damle@lw.com*
Luke A. Budiardjo
*luke.budiardjo@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200

Elana Nightingale Dawson (*pro hac vice*)
*elana.nightingaledawson@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

*/s/ Joseph C. Gratz*
**MORRISON & FOERSTER LLP**
Joseph C. Gratz (*pro hac vice*)
*jgratz@mofo.com*
Tiffany Cheung (*pro hac vice*)
*tcheung@mofo.com*
Caitlin Sinclaire Blythe (*pro hac vice*)
*cblythe@mofo.com*
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000

Lily Li (*pro hac vice*)
*YLi@mofo.com*
755 Page Mill Road
Palo Alto, CA 94304
Telephone: 650.813.5600

*/s/ Robert A. Van Nest*
**KEKER, VAN NEST & PETERS LLP**
Robert A. Van Nest (*pro hac vice*)
*rvannest@keker.com*
R. James Slaughter (*pro hac vice*)
*rslaughter@keker.com*
Paven Malhotra
*pmalhotra@keker.com*
Michelle S. Ybarra (*pro hac vice*)
*mybarra@keker.com*
Reid P. Mullen (*pro hac vice*)
*rmullen@keker.com*
Nicholas S. Goldberg (*pro hac vice*)
*ngoldberg@keker.com*
633 Battery St.
San Francisco, CA 94111
Telephone: 415.391.5400

*Attorneys for Defendant OpenAI*

[*] All parties whose electronic signatures are included in this filing have provided consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.