**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: OpenAI, Inc. Copyright Infringement Litigation<br><br>This Document Relates To:[1]<br><br>No. 1:23-cv-08292<br>No. 1:23-cv-10211<br>No. 1:23-cv-11195<br>No. 1:24-cv-03285<br>No. 1:24-cv-04872<br>No: 1:24-cv-01515<br>No: 1:25-cv-04315 | Case No. 1:25-md-03143-SHS-OTW<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang<br><br>**REDACTED - PUBLIC VERSION** |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY**

[1] Microsoft is not a party to Case Nos. 1:24-cv-01515 or 1:25-cv-04315.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1
ARGUMENT ........ 2
I. BOOKS PLAINTIFFS' EXPERTS ........ 2
A. Zhao ........ 2
1. Zhao's "Marshaling" of the Record and Impermissible State-of-Mind Testimony ........ 2
2. Zhao's "Memorization" Opinions Leave an Analytical Gap ........ 3
3. AI Risk ........ 3
B. Lasinski ........ 4
C. Seeley ........ 5
II. NEWS PLAINTIFFS' TECHNICAL EXPERTS ........ 6
A. Goldstein ........ 6
1. "Copies" Opinion ........ 6
2. CMI Opinion ........ 7
3. Analyses of Copilot Logs ........ 8
4. "Technical Collaboration" Opinions ........ 10
B. Wenger ........ 10
1. Training Data Text-Matching ........ 10
2. "Non-Regurgitation" ........ 11
3. CMI Removal ........ 12
4. Copilot Extrapolations ........ 12
C. Delorey ........ 13
1. "Copies" Opinion ........ 13
2. CMI Opinion ........ 14
D. Etzioni ........ 14
III. NEWS PLAINTIFFS' INDUSTRY EXPERTS ........ 15
A. Stricchiola ........ 15
1. Two Lists Do Not Make A Causal Analysis ........ 15
2. Meta Tag Opinion ........ 16
B. Krein ........ 16
C. Bell, Owen, Cross ........ 17

## TABLE OF CONTENTS

Page


1. Market Harm and Substitution ... 17
2. Unreliable Business Surveys ... 18
3. Bell's Lists ... 19

D. Tease ... 19

IV. NEWS PLAINTIFFS' HARM EXPERTS ... 20

A. Malackowski ... 20

B. McDonald ... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d 537 (S.D.N.Y. 2013)....16

*Authors Guild v. Google, Inc.*,
804 F.3d 202, 224 (2d Cir. 2015)....1

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87, 99 (2d Cir. 2014)....1

*In re AXA Equitable Life Ins. Co. COI Litig.*,
595 F. Supp. 3d 196, 255 (S.D.N.Y. 2022)....3

*Baker v. Saint-Gobain Performance Plastics Corp.*,
2024 WL 4189385 (N.D.N.Y. Sept. 12, 2024)....3, 10

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
214 F. Supp. 2d 530, 539–40 (D. Md. 2002)....20

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....5

*Comput. Assocs. Int'l, Inc. v. Altai, Inc.*,
982 F.2d 693 (2d Cir. 1992)....6

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....8, 9

*Deere & Co. v. Kinze Mfg., Inc.*,
2024 WL 1235569 (S.D. Iowa Feb. 8, 2024)....19

*Doe 1 v. GitHub, Inc.*,
191 F.4th 1061 (9th Cir. 2026)....7

*Emmerich Newspapers, Inc. v. Particle Media, Inc.*,
190 F.4th 356 (5th Cir. 2026)....7

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
2015 WL 539489 (S.D.N.Y. Feb. 10, 2015)....9, 13

*Forte v. Liquidnet Holdings, Inc.*,
675 F. App'x 21 (2d Cir. 2017)....9, 10, 19

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....................6, 18, 20

*In re Gen. Motors LLC Ignition Switch Litig.*,
2015 WL 9480448 (S.D.N.Y. Dec. 29, 2015) ....................4

*Hachette Book Grp. Inc. v. Internet Archive*
115 F.4th 163 (2d. Cir. 2024) ....................1, 5, 18, 20

*Highland Cap. Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005)....................2, 3

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
103 F. Supp. 2d 268 (S.D.N.Y. 2000)....................5

*Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*,
2022 WL 2530456 (S.D.N.Y. Mar. 9, 2022) ....................18

*In re Keurig*,
2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ....................17

*Kohls v. Ellison*,
2025 WL 66514 (D. Minn. Jan. 10, 2025)....................14

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................3, 9, 14

*Larball Publ'g Co., Inc. v. Lipa*,
2025 WL 936536 (S.D.N.Y. Mar. 27, 2025) ....................7

*Laumann v. Nat'l Hockey League*,
117 F. Supp. 3d 299 (S.D.N.Y. 2015).................... *passim*

*Ledoux v. Outliers, Inc.*,
2026 WL 2408808 (W.D. Wash. Aug. 18, 2026) ....................14

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
32 F. Supp. 3d 453 (S.D.N.Y. 2014)....................2, 9

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018)....................3, 8

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005)....................3, 9, 10

*Orellana v. Lopez*,
2025 WL 2733642 (S.D.N.Y. Sept. 24, 2025)....................4

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010)....3

*Price v. L'Oréal USA, Inc.*,
2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020)....11, 12

*Rutledge v. Walgreen Co.*,
182 F.4th 168 (2d Cir. 2026)....17

**Statutes**

17 U.S.C § 401....14

17 U.S.C. § 1202(b)(1)....19

17 U.S.C. § 1202(c)....7

**Other Authorities**

Fed. R. Evid. 403....11

Fed. R. Evid. 702.... *passim*

Fed. R. Evid. 702 Advisory Committee's Note to 2023 Amendment....1

## TABLE OF ABBREVIATIONS

| Abbr. | Full Citation |
|---|---|
| Amended Notice | Defendants' Amended Notice of Motion and Rule 702 Motion to Exclude Expert Testimony (*filed herewith*) |
| DN Plaintiffs | Plaintiffs in the *Daily News LP, et al. v. Microsoft Corporation, et al.*, No. 1:24-cv-03285 |
| ECF_82 | Court Order Denying Defendants' Motions to Set Aside Discovery Orders |
| ECF_1769 | Declaration of Dr. Jonathan L. Krein in Support of News Plaintiffs' Partial Motion for Summary Judgment |
| ECF_1787 | Declaration of Ben Y. Zhao, Ph.D. in Support of Class Plaintiffs' Partial Motion for Summary Judgment |
| ECF_1794 | Declaration of Emily Bell in Support of News Plaintiffs' Partial Motion for Summary Judgment |
| ECF_1798 | Declaration of Jessie Stricchiola in Support of News Plaintiffs' Partial Motion for Summary Judgment |
| ECF_1800 | Declaration of James E. Malackowski in Support of News Plaintiffs' Partial Motion for Summary Judgment |
| ECF_1804 | Declaration of Mark Seeley in Support of Class Plaintiffs' Partial Motion for Summary Judgment |
| ECF_1811 | Declaration of Taylor Owen in Support of News Plaintiffs' Partial Motion for Summary Judgment |
| ECF_1819 | Declaration of Tom Goldstein in Support of News Plaintiffs' Partial Motion for Summary Judgment |
| ECF_1825 | Declaration of Michael J. Lasinski in Support of Class Plaintiffs' Partial Motion for Summary Judgment |
| ECF_1858 | Declaration of Emily Wenger in Support of News Plaintiffs' Partial Motion for Summary Judgment |
| ECF_1875 | Declaration of Michael McDonald in Support of News Plaintiffs' Partial Motion for Summary Judgment |

| Abbr. | Full Citation |
|---|---|
| ECF_2057 | Declaration of Padma Priya Gaggara in Support of Microsoft Corporation's Rule 702 Motion |
| ECF_2061 | Declaration of On Amir, Ph.D. In Support of Defendants' Motion to Exclude Testimony from Plaintiffs' Experts Under Fed. R. Evid. 702 |
| ECF_2063 | Declaration of Paven Malhotra in Support of Defendants' Joint Rule 702 Motion to Exclude Expert Testimony |
| ECF_2180 | Declaration of Sanjay Krishnan, Ph.D. in Support of OpenAI's Opposition to News Plaintiffs' Motion for Partial Summary Judgment |
| ECF_2202 | Class and News Plaintiffs' Response to OpenAI's Statement of Undisputed Material Facts in Support of its Motions for Summary Judgment |
| ECF_2216 | OpenAI's Opposition to News Plaintiffs' Motion for Partial Summary Judgment |
| ECF_2253 | Defendants' Response to News Plaintiffs' Rule 56.1 Statement |
| ECF_2552 | Microsoft's Reply Memorandum of Law in Support of Motion for Summary Judgment in News Plaintiffs' Consolidated Cases |
| ECF_2566 | Second Declaration of Emily Wenger in Support of News Plaintiffs' Partial Motion for Summary Judgment |
| Notice | Defendants' Notice of Motion and Rule 702 Motion to Exclude Expert Testimony, ECF 2050 |
| Mot. | Memorandum of Law in Support of Defendants' Rule 702 Motion to Exclude Expert Testimony, ECF 2055 |
| Najemy Ex. | Declaration of Laura Najemy in Support of Defendants' Reply Memorandum of Law in Support of Rule 702 Motion to Exclude Expert Testimony (*filed herewith*) |
| Nelson Ex. | Corrected Declaration of Justin Adatto Nelson in Support of Books Plaintiffs' Partial Motion for Summary Judgment, ECF 2034 |

| Abbr. | Full Citation |
|---|---|
| NYT | The New York Times |
| NYT ECF | *The New York Times Company v. Microsoft Corporation et al.*, 1:23-cv-11195-SHS-OTW (S.D.N.Y.) |
| Opp. | Plaintiffs' Amended Opposition to Defendants' Rule 702 Motion to Exclude Expert Testimony, ECF 2500 |
| ZD | Ziff Davis |

# INTRODUCTION

Plaintiffs bear the burden of "demonstrat[ing] to the Court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." 2023 Amendment Committee Notes on Rules. Plaintiffs seek to improperly shift that burden in two ways.

*First*, they cite *Hachette Book Grp. Inc. v. Internet Archive*, 115 F.4th 163 (2d. Cir. 2024), at least fifteen times in seeking a Rule 702 exception for their economic harm experts. But *Hachette* does not apply under Rule 702 or to this case. Its discussion of the evidence sufficient for factor four on the merits nowhere suggests the Second Circuit has eschewed Rule 702 in fair use cases. Moreover, *Hachette* involved a secondary use functionally identical to the traditional market. Usurpation required little proof there, but that is not the standard where, as here, the secondary use is highly transformative. *Id.* at 190; *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99 (2d Cir. 2014) (economic harm from transformative uses "does not count because such uses, by definition, do not serve as substitutes for the original work"). Plaintiffs must instead show a "meaningful or significant effect" on the value of the work. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 224 (2d Cir. 2015). Because such an effect must be "'certainly impending,' rather than merely 'conjectural' or 'hypothetical,'" *HathiTrust*, 755 F.3d at 101 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)), ordinary proof of harm requirements apply.

*Second*, Plaintiffs dismiss their technical experts' flaws and mistakes as mere "examples," ignoring the import for method. The Motion identified significant problems, including failures to use a representative sample when extrapolating to a population, as well as a raft of obviously incorrect outcomes. Plaintiffs respond that Defendants have not established unreliability, but that was never Defendants' burden. Plaintiffs, as proponents, have not shown

reliable methodologies, reliably applied.

## ARGUMENT

## I. BOOKS PLAINTIFFS' EXPERTS[2]

### A. Zhao

#### 1. Zhao's "Marshaling" of the Record and Impermissible State-of-Mind Testimony

Plaintiffs concede that Zhao [redacted] Opp. 1. That is counsel's work. Simply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702. *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005). Rule 702 permits an expert to summarize technical documents beyond a layperson's comprehension, not to string together emails jurors can read for themselves. *See In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 462 (S.D.N.Y. 2014) ("*Longtop*").

Plaintiffs deny that Zhao offers state-of-mind opinions (Opp. 1–2), but his reports repeatedly tell the jury what Defendants purportedly *knew* and why they acted—*e.g.*, [redacted] and [redacted]" ECF_1787(Ex.A) ¶20; ECF_1787(Ex.B) ¶¶72-73, 77, 107, 110-11; ECF_1787(Ex.C) ¶¶22, 35. None of these assertions is a technical finding. "[E]xperts may not offer opinions concerning a party's knowledge of information at any

---

[2] Plaintiffs complain that challenged portions of the Zhao, Lasinski, and Seeley Reports are "listed in Defendants' notice but not discussed in their memorandum." *See* Opp. 9-10. The chart in the Notice identifies all opinions whose reliability is discussed in the Memorandum; an Amended Notice with an updated chart mapping them is filed herewith.

given time." *Highland*, 379 F. Supp. 2d at 470 (citation omitted). An expert "may opine that a defendant had access to information, but [he] may not opine that the defendant knew that information." *Baker v. Saint-Gobain Performance Plastics Corp.*, 2024 WL 4189385, at *3 (N.D.N.Y. Sept. 12, 2024).

Nor should exclusion be deferred to trial. Opp. 2. On this score, Plaintiffs rely on *In re AXA Equitable Life Ins. Co. COI Litig.*, but that case deferred objections only as to "isolated opinions or sentences," 595 F. Supp. 3d 196, 255 (S.D.N.Y. 2022); these assertions pervade all three reports and should be excluded now.

**2. Zhao's "Memorization" Opinions Leave an Analytical Gap**

Plaintiffs do not dispute that Zhao never tested whether the accused models memorized Plaintiffs' works. Zhao therefore cannot establish that *these* models memorized *these* works. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153–54 (1999). Zhao's untested opinion is merely a "hypothesis" and inadmissible. *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 284–85, 293 (S.D.N.Y. 2018). To the extent Zhao relies on Shan's testing (Opp. 2-3), that makes him a conduit, not an expert applying his own method. *See Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005).

**3. AI Risk**

Zhao's "AI Risk" opinions merely summarize third-party materials on a subject—societal risk—entirely outside his technical expertise. *See, e.g.*, Najemy (Ex.1) 11:16–19, 248:2–4, 255:15–21, 260:11–16, 266:21–267:7. Plaintiffs point to no credentials, papers, or experience establishing otherwise. Opp. 3; *see Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 468 (S.D.N.Y. 2010) (precluding expert testimony on matters outside expert's established expertise and beyond proper scope of a rebuttal witness).

Nor are these opinions proper rebuttal. [redacted], Najemy (Ex.4) ¶¶7-8, 31-32; Zhao speculates about unrelated *societal* risks, a new subject, not "similar testimony." ECF_1787(Ex.B) ¶¶112–165; *In re Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 9480448, at *7 (S.D.N.Y. Dec. 29, 2015); s*ee also Orellana v. Lopez*, 2025 WL 2733642, at *7 (S.D.N.Y. Sept. 24, 2025) (rebuttal "is not the proper place for presenting new arguments").

**B. Lasinski**

Lasinski opines that "Defendants' alleged [] infringement . . . has negatively impacted the ***Plaintiffs*** in the form of lost revenues from book sales," Opp. 4 (citing ECF_1825(Ex.A) ¶14) (emphasis added)—but he never analyzed ***Plaintiffs'*** revenue or sales data, or any consumer data at all. Evidence that AI-generated books are "flood[ing]" the market, *id.*, does not establish harm to Plaintiffs. That requires market data, such as revenue, sales, or consumer surveys, showing consumers bought or will buy AI-generated books ***instead of*** Plaintiffs' works. Lasinski simply assumed, without testing, that more books meant more competition to Plaintiffs. That error requires exclusion. *See Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315, 319–20 (S.D.N.Y. 2015) (expert's failure to evaluate market evidence warrants exclusion).

Plaintiffs admit Lasinski performed neither a "quantitative analysis" of price effects, Opp. 6, nor any "independent synthetic control or event study of Asserted-Work sales." ECF_2202, 120. And their insistence that Lasinski "analyzed" [redacted], Circana, and Plaintiffs' "data" is beside the point. Opp. 6. He never used those data to test whether AI-generated books displaced sales of the Asserted Works, instead he used them only to critique Defendants' experts' methods or data sources. Opp. 5 (Lasinski used Leonard's own Circana regressions to "undercut [his] conclusions" and Plaintiffs' data to identify "discrepancies" in the Circana data). [redacted] (Opp. 4–

5)—not that consumers would otherwise have bought the Asserted Works. The Reimers study, Opp. 4, even were it admissible, cuts against Plaintiffs. It found that "the arrival of LLMs does *not* appear to have displaced activity by incumbent authors[.]" Nelson Ex.762 at 29 (emphasis added). That leaves Lasinski with no empirical analysis—either his own or a third party's—showing that AI-generated books reduced Plaintiffs' sales or revenues.

Plaintiffs' excuses for Lasinski's lack of empirical support fail. The cases requiring experts to analyze market data are not limited to their subject matter; they hold that ***any*** expert opining on market behavior or economic harm needs a "data-driven basis" for their opinion. *Laumann*, 117 F. Supp. 3d at 316, 319–20; *cf. Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) (error to use assumptions rather than available data). Nor does *Hachette* create an exception to Rule 702 for harm experts in any fair use case, let alone this one. *See supra* at 1. Having offered expert opinions on market harm, Plaintiffs must show they satisfy Rule 702.

### C. Seeley

Plaintiffs fail to establish that Seeley's opinions are relevant or reliably supported.

*First*, Seeley's piracy opinion does not address what factor four considers: widespread "conduct of the sort engaged in by the defendant[.]" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). The studies he relies on concern individuals downloading books to read them, whereas AI companies obtain books "for other purposes." Najemy (Ex.2) 97:7–20, 262:12–17. Those studies do not address the purported harms Seeley attributes to *Defendants'* conduct: lost licensing fees and the creation of competing works. ECF_2063(Ex.14) 293:19–25. *Hachette* does not bridge that gap.

*Second*, Plaintiffs mischaracterize Defendants' reliability objection to Seeley's digital piracy opinion. The problem is not that Seeley failed to replicate studies, but that his conclusions

outrun the evidence. He extrapolates from *video* piracy to *book* piracy by assuming the very equivalence he must show, ECF_2063(Ex.14) 99:3–24; ECF_1804(Ex.C) ¶64, and treats findings as significant even though their authors reported them as *statistically insignificant.* ECF_2063(Ex.14) 106:2–24; ECF_1804(Ex.C) ¶¶26-27, 49. That is "*ipse dixit.*" *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("*Joiner*"). These are admissibility defects, not matters of weight.

*Finally*, Seeley's "normalization" opinion lacks a reliable basis. ECF_1804(Ex.A) ¶¶36-52, 63-76; ECF_1804(Ex.C) ¶¶66-69. "Evidence" that *other* AI developers used shadow libraries (or thought Defendants did so) cannot establish that Defendants caused that conduct, much less encouraged piracy generally. Similarly, the web-traffic reports he cites attribute nothing to Defendants, and he admits he [redacted] ECF_2063(Ex.14) 284:8–13. That is a methodological defect, not an apportionment issue. *Joiner*, 522 U.S. at 146.

## II. NEWS PLAINTIFFS' TECHNICAL EXPERTS.

### A. Goldstein

#### 1. "Copies" Opinion

Plaintiffs do not defend Goldstein's failure to examine his results for false positives or otherwise validate that his text "matches" are relevant "copies," claiming the issue is moot because they dropped the four erroneous results Defendants identified. *Compare* Mot. 9–11 *with* Opp. 10–11. Those examples were demonstrative, not exhaustive; withdrawing them cures nothing and confirms unquantified errors among his millions of "matches." Plaintiffs cannot meet the 702 burden by assuming the rest of Goldstein's results are sound.

Plaintiffs' authorities confirm the flaw. *Comput. Assocs. Int'l, Inc. v. Altai, Inc.* requires any "copying" analysis to separate protected expression from unprotectable material, 982 F.2d

693, 706–713 (2d Cir. 1992), which Goldstein failed to do. *Larball Publ'g Co., Inc. v. Lipa*, is inapposite. It involved transcribing songs to assist the jury evaluating substantial similarity, 2025 WL 936536, at *6–7 (S.D.N.Y. Mar. 27, 2025), not what Goldstein offers: an opinion on what qualifies as an infringing "copy."

**2. CMI Opinion**

Goldstein's CMI-removal opinion assumes that (1) each extracted string was CMI for an Asserted Work, and (2) its absence from a record's text field establishes removal. Mot. 11–13. Plaintiffs recast these as legal disputes but 702 asks whether Goldstein reliably applied his method.

Plaintiffs argue that Goldstein's review of "thousands" of WARC files is sufficient "validation," Opp. 11, but it confirmed only that his script extracted the selected strings, *not* that the strings were accurate CMI for Asserted Works. *Id.* 11–12. Nor do Plaintiffs' responses to Krishnan's examples, including their critique of his copyright notice tally, *id.* 12–13, establish the accuracy of the CMI identifications underlying Goldstein's reported counts. Accordingly, Goldstein fails to reliably identify accurate CMI information "conveyed in connection with" the Asserted Works as required under 17 U.S.C. § 1202(c).

Goldstein's search for "missing" CMI was also flawed. Plaintiffs do not dispute that Goldstein searched only the text field, ignoring others, like the URL field, where OpenAI preserved CMI.[3] Mot. 12–13. OpenAI need not prove every URL is CMI to establish this methodological failure. *See Emmerich Newspapers, Inc. v. Particle Media, Inc.*, 190 F.4th 356,

[3] Plaintiffs' assumption that liability attaches even if CMI is retained elsewhere cannot be squared with the DMCA's double scienter requirement or the plain language of "removal," which "requires taking away . . . attribution information from an existing work." *Doe 1 v. GitHub, Inc.*, 191 F.4th 1061, 1069 (9th Cir. 2026).

385 (5th Cir. 2026) ("URLs may constitute CMI"). Goldstein categorically ignored fields without examining whether they preserved the information he classified as removed.

### 3. Analyses of Copilot Logs

***Unrepresentative-Sample.*** Plaintiffs say Goldstein calculated "how frequently Copilot uses News Plaintiffs' content" and "how frequently users turn to Copilot for news." Opp. 15. He *did not* and could not; the 8.2 million logs Goldstein used were not randomly sampled but retrieved using keywords that "included the News Plaintiffs' names as well as their domains." ECF_1819(Ex.D) ¶52. No rate across the billion-conversation population can be derived from them.

That the set "reflects the conversation data that Microsoft agreed to produce," *Id.* (Ex.C) ¶287, does not make it representative of Copilot usage. *In re Mirena*, 341 F. Supp. 3d at 253. It reflects *what News Plaintiffs requested*—they could have sought a random sample but chose not to. Goldstein cannot be permitted to misrepresent a biased census of keyword hits as a random sample from which rates in the population can be derived.

***4-Gram-Counts.*** Plaintiffs do not dispute either defect Microsoft identified. Mot. 14–15. They concede that Goldstein's 4-gram counts include text from users' own prompts and aggregate matches across multiple Asserted Works. Opp. 15–16. Those concessions are fatal, as Goldstein's supplement acknowledges by removing "n-grams that appear in user inputs." ECF_1819(Ex.D) ¶¶27–28. His opening-report counts lack that safeguard and must be excluded.

Four-word windows compound the problem. Four-word sequences are the stuff of ordinary English. Aggregating dozens of them from different articles into one conversation-level "hit" says nothing about whether protectable expression from any particular work was reproduced, yet it yields a headline figure of "over a million hits." *Id.* (Ex.A) ¶398. Those numbers would mislead a jury. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595

(1993); *Nimely*, 414 F.3d at 397.

***RAG-"Leak"-Analysis.*** Goldstein also counts as RAG "leaks" conversations in which Copilot matched a 16-word passage from a grounding source. Plaintiffs do not dispute that the conversations need not involve Plaintiffs' works at all, arguing that does not matter because Copilot's "propensity to display its grounding data" is relevant to "how Copilot works" and to fair use. Opp. 16. Fair use, however, concerns the works in suit. A statistic treating a passage from a retailer's website the same as one from the NYT has no "valid scientific connection to the pertinent inquiry" and should be excluded. *Daubert*, 509 U.S. at 591–92; *see Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 24 (2d Cir. 2017).

***Domain-and-"Impressions"-Counts.*** Goldstein next counts how often Copilot cited News Plaintiffs' web domains and concludes that "[f]or each impression . . . Microsoft likely copied substantial portions of News Plaintiffs' articles." ECF_1819(Ex.A) ¶418. Nothing in his method connects citations to the copying of content; that step rests only on *ipse dixit*. *Kumho Tire*, 526 U.S. at 157; *Laumann*, 117 F. Supp. 3d at 315. Bare tallies and opinions on "likely" copying would mislead more than help. *Longtop,* 32 F. Supp. 3d at 460, 462.

***Unvalidated-Gemini-Filter.*** Goldstein's untimely supplement purports to sort original prose from quotation by sending passages to Google's "Gemini-3.1-Pro-Preview" model with a prompt he wrote. ECF_1819(Ex.D) ¶28. Plaintiffs defend the filter as "conservative" and argue that Microsoft has shown no error, Opp. 17–18, but they identify no validation, no comparison to human review, no error rate, and no test of consistency for this novel methodology. That inverts the burden, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 539489, at *6–7 (S.D.N.Y. Feb. 10, 2015) ("*Nomura*"), and ignores core reliability factors, *Daubert*, 509 U.S. at 594. Nor is the filter "conservative": the prompt counts *any* "mix of author-written prose and

third-party content" as a match. ECF_1819(Ex.D) ¶28.

**4. "Technical Collaboration" Opinions**

Plaintiffs represent that "Goldstein will not testify about Microsoft's legal duties." Opp. 19. That concession should be enforced, but it does not resolve the Motion. Goldstein opines that Microsoft had "the practical ability to supervise and control training," "assisted OpenAI in its infringement," and "could have—and should have—stepped in and put an end to OpenAI's infringement." ECF_1819(Ex.A) ¶¶547, 559. Those are legal arguments about the elements the secondary-liability theories and "tell the jury what result to reach." *Nimely*, 414 F.3d at 397 (citation omitted).

Plaintiffs invoke *Baker* and *Scott* for the proposition that experts may help jurors understand "highly technical documents." Opp. 18. But *Baker* involved a dense chemical-engineering study, 2024 WL 4189385, at *3, and *Scott excluded* testimony on a company's "motivation or intent," 315 F.R.D. at 46–47. Section XIV of Goldstein's report explains no technical documents. It narrates a commercial relationship—contracts, projects, investment figures—cloaking the story in an unearned aura of expertise likely to mislead. *See Nimely*, 414 F.3d at 397.

**B. Wenger**

Plaintiffs' opposition confirms that Wenger's challenged opinions rest on unvalidated inputs, untested assumptions, and analyses that do not measure what they purport to.

**1. Training Data Text-Matching**

Plaintiffs have not disputed the reasons to exclude Wenger's text-matching analysis. *First*, Plaintiffs do not dispute that Wenger "relied on Plaintiffs to identify their works" without validating them. Opp. 19. "A failure to validate data by itself can constitute grounds for excluding an expert report." *Forte*, 675 F. App'x at 24.

*Second*, Plaintiffs do not dispute that Wenger's "copies" include third-party and empty records; they argue that Defendants only identified "18 examples" of false positives. Opp. 19.[4] The examples are demonstrative; requiring an exhaustive list would invert the burden to Defendants. ECF_2180(Ex.H) ¶96 n.119. Belittling obviously problematic false positives is not a substitute for demonstrating reliability. *Price v. L'Oréal USA, Inc.*, 2020 WL 4937464, at *7 (S.D.N.Y. Aug. 24, 2020). Plaintiffs also concede Wenger "did not opine that these matches are substantially similar 'copies,'" Opp. 19, so her repeated use of "copy" would mislead the jury.

**2. "Non-Regurgitation"**

Plaintiffs concede Wenger's base-model, keyword, and summarization analyses do not measure regurgitation rates. *Id.* 20. They should be excluded to the extent relied upon for that purpose.

Rules 403 and 702 bar them for any other purpose. Plaintiffs offer the base-model analysis to demonstrate OpenAI's models have the "***capacity*** to memorize and regurgitate." *Id.* But the analysis has minimal probative value: OpenAI does not dispute its models have this capacity—regurgitation is a rare, unintended bug, not a feature, ECF_2253-1, ¶930; ECF_2216, 5. Wenger's use of "regurgitation(s)" more than 40 times in 5 pages, ECF_1858(Ex.A) 79-83, invites the jury to believe she measured actual regurgitation rates.

Plaintiffs offer Wenger's keyword and summarization analyses as "probative of substitution." Opp. 20. That relitigates a summary-output theory this Court rejected. NYT ECF 514 at 40-42. Further, the summarization analysis identifies only user requests for summaries, not whether ChatGPT generated them. *See* Mot. 20; Opp. 20.

---

[4] Plaintiffs concededly asked Wenger to drop not only the 18 false positives but also 7,315 other URLs absent from their own Rule 1006 summary. ECF_2566, ¶18. Wenger repeatedly corrected her errors, yet the analysis is still wrong.

### 3. CMI Removal

Plaintiffs concede the identified CMI-removal false positive is a "downstream effect of Wenger's text-matching methodology," Opp. 22, which makes the analysis unreliable.

Plaintiffs defend Wenger's opinion that OpenAI acquired Plaintiffs' CMI from Common Crawl by pointing to her review of code for "the crawler on which Common Crawl's was based." Opp. 20–21. But that is not CCBot, Common Crawl's actual crawler. Wenger never examined CCBot's code and offers no evidence that it works the same way. ECF_2063(Ex.58) 143:4-11. Even if the crawler Wenger reviewed operated exactly like CCBot, that would not establish that CMI appeared in the files CCBot captured. As Wenger admitted, CMI could change when a page's HTML changed. ECF_2063(Ex.58) 140:11-20. Her review of fewer than 1% of the available snapshots and her *ipse dixit* that a "peer reviewer would deem [it] reasonable" cannot fill that gap. Mot. 20–21; Opp. 21. Plaintiffs' response that Defendants cite "no evidence of any changes," Opp. 21 n.7, again improperly shifts their burden. *See Price,* 2020 WL 4937464, at *7. Wenger's WebText opinion, which extends these assumptions, similarly fails.

Plaintiffs do not dispute that Wenger's CMI presence and removal tests used different search terms, Opp. 22—a mismatch she confirmed can produce false positives. ECF_2063(Ex.58) 143:12-25, 145:2-147:24, 149:21-150:16, 151:13-25.

Finally, Defendants' response regarding URLs containing CMI, *see supra* Section II.A.2, applies equally here.

### 4. Copilot Extrapolations

Plaintiffs argue that Defendants forfeited any challenge to Wenger's match criteria because the Motion "identifies no flaws." Opp. 23. But the Motion challenged the extrapolation as resting on "a single day's Copilot user rate" and a "biased census," Mot. 22, and Plaintiffs responded on the merits. Opp. 23.

On those merits, Plaintiffs' say only that Defendants "offer no evidence" that the assumptions are wrong. *Id.* That again inverts the burden.

Moreover, Wenger's extrapolation starts by "assum[ing] that the 8.2 million sample is *representative*" of Copilot conversations generally. ECF_1858(Ex.F) 115 (emphasis added). It is not: the logs were not selected randomly but chosen by keyword matching Plaintiffs' publications and domains. *Id.* (Ex.A) 105. Where representativeness is "fundamental to [the] analysis," it "cannot be assumed." *Nomura*, 2015 WL 539489, at *7.

Wenger then manually reviewed hits only for Mother Jones, deriving "true hit rates of 8% and 16.4%, and "assume[d]" those rates hold for every other publication. ECF_1858(Ex.A) 107–09. She multiplied the results by "7.5 million average daily Copilot users" drawn from a single day in February 2024, again simply assuming that day was somehow representative. *Id.* 106. The formulas lend a veneer of rigor to invented assumptions, but an expert may not "substitute[] mathematical assumptions for actual" data. *Laumann*, 117 F. Supp. 3d at 315.

**C. Delorey**

**1. "Copies" Opinion**

Plaintiffs claim OpenAI does not "criticize . . . the soundness of [Delorey's] science." Opp. 23. It does. Delorey claims to count copies of ZD's works; he actually counts matched text, whatever its source. Mot. 23-24.

Plaintiffs also claim Krishnan [redacted]. *See* Opp. 23-24. In fact, [redacted], *id.* (emphasis added), which persisted even after Delorey's untimely revision. ECF_2180, Fig. C.1 *et. seq.* (alleged "copies" include public court filings and government statements).

And Plaintiffs concede Delorey offers no opinion regarding ZD's ownership of the identified "copies." Opp. 24. His "millions of copies" figure thus includes works ZD cannot

assert and is misleading. Mot. 23–24.

### 2. CMI Opinion

Plaintiffs say OpenAI does not challenge Delorey's identification of "removed" CMI and argue that information can qualify as "CMI" without meeting 17 U.S.C § 401's requirements. Opp. 25. But they do not dispute that CMI must convey information about ***ownership of the relevant Asserted Work***—precisely what Delorey failed to establish. He applied unvalidated heuristics, treated notices from non-ZD entities as copyright notices (a point Plaintiffs ignore), did not search entire training records, and ignored that OpenAI retained the title information in 80% of accused "removals." Mot. 24-25; *supra* Section II.A.2.

### D. Etzioni

Plaintiffs dismiss Etzioni's AI-hallucinated figures as "demonstratives" with "numerical errors." Opp. 26 n.10. But the figures formed the basis of his opinions. *See, e.g.*, ECF_2063(Ex.4) 148:13-15 (relying on Figure 1 for data-quality opinion); *id.* 143:2-8 (offering Figure 3's "specific measurement" as an opinion); *id.* 135:12-136:7.

Etzioni admitted the graphs he relied on did not meet the "intellectual rigor" of his field, as is required for expert admissibility. *Kumho Tire*, 526 U.S. at 152; ECF_2063(Ex.4) 144:17-19; Najemy (Ex.3) 153:15-18, 153:22-154:9. But despite withdrawing the graphs, Etzioni's opinions remain. Experts who "abdicate their independent judgment and critical thinking skills in favor of ready-made AI-generated answers" must be excluded. *Kohls v. Ellison*, 2025 WL 66514, at *3-4 (D. Minn. Jan. 10, 2025); *Ledoux v. Outliers, Inc.*, 2026 WL 2408808, at *7 (W.D. Wash. Aug. 18, 2026) (excluding entire report despite withdrawal of AI-impacted portions).

Etzioni's paragraphs 225-229 on Copilot's alleged substitutive function must also be struck: he conceded that the users he describes might never have visited a news site at all.

ECF_2063(Ex.4) 247:23-250:5; 287:11-288:2. Plaintiffs misconstrue a Microsoft internal dashboard as showing [redacted], Opp. 27, but the dashboard [redacted]. ECF_1806(Ex.A) ¶¶225-229. His opinion that [redacted] is likewise pure conjecture. *Id.* ¶228.

## III. NEWS PLAINTIFFS' INDUSTRY EXPERTS

### A. Stricchiola

#### 1. Two Lists Do Not Make A Causal Analysis

Stricchiola presents two lists of click-through rates (CTRs) for two different products, Bing and Bing Chat. Plaintiffs do not dispute that the lists are untethered to any causal methodology, that she analyzed no traffic or conversion data, or that she is not "[redacted]" ECF_2063(Ex.15) 96:24-97:1. The most Stricchiola could do with the two lists is conclude that one set of numbers is smaller than another—which jurors can do themselves. Yet Plaintiffs build all their experts' claims of "economic or substitutional harm," Opp. at 28, on this flawed leap from an ordinal comparison to causation. Rule 702 does not permit that leap.

Despite conceding no causal study, Stricchiola nonetheless purports to draw causal conclusions from these lists:

- [redacted]
- [redacted]
- [redacted]

Malackowski similarly credits Stricchiola's "analysis" for causation it does not establish:

[redacted]

[redacted]

Stricchiola admittedly did no causal analysis. Her CTR lists, and other experts' opinions relying on them, should be excluded.[5]

### 2. Meta Tag Opinion

Stricchiola opines that Microsoft disregards meta tags. ECF_1798(Ex.A) ¶¶280-297. Plaintiffs do not address the flaw in that opinion: faced with her own finding of 99+% NOARCHIVE *compliance* for The Times, she never checked the "last crawl date" data that would readily explain her starkly different DN Plaintiffs' results. *See* ECF_2552, 8-9; ECF_2057 ¶¶ 5-7. Ignoring an obvious alternative explanation renders her opinion unreliable.

## B. Krein

Krein claims OpenAI crawled [redacted] after ZD's robots.txt files prohibited crawling. ECF_1769(Ex.B) ¶19. But ZD now concedes that Krein counted requests, *not* distinct pages. Opp. 32.

Nor are his tallies reliable. Across five report iterations, Krein acknowledged his own errors and repeatedly changed his conclusions. Mot. 32–33. Plaintiffs admit he initially analyzed the wrong dataset and do not dispute that post-deposition corrections *reduced purported violations by 65.9%.* Opp. 32; ECF_1769(Ex.C) ¶¶4, 6.

Krein's methodology for dating robots.txt restrictions remains unreliable. He generally

---

[5] Plaintiffs' reliance on *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537 (S.D.N.Y. 2013) is misplaced. While looking at CTRs to help evaluate that defendant's claim of being a search engine, that case says nothing about the causal connections regarding substitution Plaintiffs seek to draw here. *See* ECF_2552, 10-11.

prioritized ZD's internal revision logs over archived robots.txt snapshots without explaining why, Opp. 31; ECF_2063(Ex.8) 115:1–12, 117:10–118:11, though he admitted the two sources differed by up to [redacted] days, *id.* 132:20–135:5, 136:9–139:16, sometimes chose snapshots when they showed earlier restrictions, *id.* 115:13–116:14, and, as Plaintiffs do not deny, used revision-history dates for some properties and not others. Mot. 32–33; ECF_2063(Ex.52) Lines 129–169.

Plaintiffs call Krein's repeated corrections "scientific," Opp. 32, but picking and choosing among conflicting evidence without a reliable method is not. *Rutledge v. Walgreen Co.*, 182 F.4th 168, 191 (2d Cir. 2026); *see also In re Keurig,* 2025 WL 354671, *4 (S.D.N.Y. Jan. 30, 2025) ("[T]he cumulative effect of . . . flaws mandates exclusion."). And their 94.8% "agreement" figure merely compares two totals Krein calculated. Opp. 31; ECF_1769(Ex.C) ¶¶7–8.

Krein's market substitution opinion should also be excluded. Performing arithmetic on Berg-Kirkpatrick's pricing figures is not expert analysis; Krein admitted that his cost calculation does not establish market substitution; and Krein performed no substitution analysis. Opp. 33; ECF_2063(Ex.8) 204:8–205:17.

### C. Bell, Owen, Cross

Plaintiffs argue that Bell, Owen, and Cross need not have analyzed relevant data because they have industry experience, reviewed third-party studies, and relied on Plaintiffs' own analyses. Opp. 33-36. But none reliably connects their sources or experience to Defendants' products and the Asserted Works. Their harm and substitution opinions rest on assumption rather than method.

#### 1. Market Harm and Substitution

None examined Plaintiffs' audience metrics or financial data, conducted a survey, or performed any statistical analysis of whether ***Defendants' products*** affected the market for the

Asserted Works. Mot. 34–35.[6] The "logical inferences" of *Hachette* (Opp. 33) are of no help with a highly transformative secondary use. *See supra* at 1.

Instead, these experts rely on third party studies of *other* products, and Plaintiffs do not dispute that the cited studies fail to address whether readers substitute Defendants' products for Plaintiffs' journalism. Opp. 34-35; Mot. 34-35. Plaintiffs offer no basis for applying research about Google AI Overviews to ChatGPT or Copilot, arguing only that it bears on "widespread conduct." Opp. 34–35. But that fourth-factor inquiry requires analysis of the conduct at issue *in this lawsuit*, and Plaintiffs sued Microsoft and OpenAI, not Google. The cited studies leave an unbridged "analytical gap." *Joiner*, 522 U.S. at 146.

Worse, Plaintiffs' reliance on Google evidence contravenes their successful effort to block Defendants' discovery into Google and other third-party AI tools as "irrelevant to the market harm inquiry." *See* NYT ECF 429 at 9-12; *see also* NYT ECF 344 (denying defendants' motion to compel discovery on third party GenAI tools); NYT ECF 293 at 3; NYT ECF 432 at 13–14; ECF_82. Judicial estoppel bars Plaintiffs from using Google as both sword and shield. *Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*, 2022 WL 2530456, at *18 (S.D.N.Y. Mar. 9, 2022*), report and recommendation adopted*, 2024 WL 5154462 (S.D.N.Y. Dec. 18, 2024).

**2. Unreliable Business Surveys**

Bell and Owen rely on the NYT Brand Tracker and Daily News GenAI surveys. Plaintiffs do not engage with Dr. Amir's explanation of why those surveys are unreliable as evidence of substitution, including: leading questions and priming, and wide discrepancies between the

[6] Cross's "materials-reviewed" appendix listing CIR and Intercept financial documents, Opp. 34, is not evidence of an analysis. Cross performed none.

questions asked and the conclusions drawn. ECF_2061, ¶¶8(a)-(c), 9–62.

Plaintiffs instead recast the surveys as "one of a number of inputs" that "corroborate" other sources, so that any flaws go to weight. Opp. 35. But the experts rely on these business reports as affirmative proof of substitution, *see* ECF_1794(Ex.A) ¶¶117-118; ECF_1811(Ex.A) ¶135; ECF_1800(Ex.A), 48-50, and these surveys and Stricchiola's CTR tables are News Plaintiffs *only* ostensibly empirical "proof" of substitution. One flawed input cannot bootstrap another.

No reasonable expert would treat the results from such flawed, non-litigation surveys as causal proof of substitution. *See* ECF_2061 ¶¶9–62. Plaintiffs try to distinguish *Hayden*, *Munoz*, and *Forte* as cases involving uncritical reliance on a party's materials, Opp. 36, but that is exactly what Bell and Owen did here. Mot. 35–36.

#### 3. Bell's Lists

Bell's "news websites" list specifies no criteria for whether a publisher does "original reporting" or "employ[s] journalists." Mot. 36. Plaintiffs restate Bell's sources, but neither they nor her materials identify written, testable criteria. And her "pink slime websites" list, as Plaintiffs concede, merely aggregated third-party work *without verification.* Opp. 36.

### D. Tease

Plaintiffs do not address Tease's fair-use opinions. Nor can they rebrand her scienter conclusions as hypothetical advice. Tease does not describe legal custom; she concludes OpenAI's conduct was not fair use and OpenAI had reasonable grounds to know CMI removal would further or conceal infringement. Labeling those conclusions as "reasonable copyright lawyer" advice does not change their function: resolving fair use and § 1202(b)(1)'s scienter requirement. *Deere* excluded Tease's conclusions that a party violated its disclosure duty and opinions about what counsel believed, as should this Court. *See Deere & Co. v. Kinze Mfg., Inc.*, 2024 WL 1235569,

at *8 (S.D. Iowa Feb. 8, 2024).

## IV. NEWS PLAINTIFFS' HARM EXPERTS

### A. Malackowski

News Plaintiffs concede that Malackowski looked for evidence of harm in their revenue, subscription, and traffic data but found nothing; the data is "inconclusive" because of "too many countervailing facts within the marketplace."[7] Opp. 38. Yet he opines that AI is harming Plaintiffs anyway. That is worse than *ipse dixit*: his conclusion contradicts the data. *Laumann*, 117 F. Supp. 3d at 319.

*Hachette* does not excuse Malackowski's lack of empirical evidence of harm. *See supra* at 1. Plaintiffs' effort to recast *Berlyn*, *Inc. v. Gazette Newspapers, Inc.* as limited to expertise likewise fails. That expert was excluded for failing to conduct "independent market research." 214 F. Supp. 2d 530, 539–40 (D. Md. 2002).

Plaintiffs next argue Malackowski "***did*** analyze data:" principally the previously discussed inadmissible surveys (*supra* Section III.C.2) and Stricchiola's CTR lists (*supra* Section III.A.1). Nor can Malackowski rely on Google AI Overviews when Plaintiffs themselves kept it out of the case during discovery. *Supra* Section III.C.1. None of those materials are admissible, and none show that users turn to ChatGPT or Copilot ***instead*** of News Plaintiffs' content, as opposed to alongside it.

Finally, Plaintiffs argue Malackowski's lack of empirical evidence showing substitution goes to "conclusions" not methodology. Opp. 39. But "conclusions and methodology are not entirely distinct," *Joiner*, 522 U.S. at 146. Here, Malackowski simply assumes his conclusion:

---

[7] If, as Plaintiffs argue, no expert can "parse out" the many factors affecting traffic and revenue, Opp. 38 n.16, neither can Malackowski. Plaintiffs cannot fault Defendants' experts for attempting that analysis while defending Malackowski's decision to skip it and simply infer harm.

that [redacted] translate to market harm. His methodology cannot explain why, if [redacted], Plaintiffs' financial data was "inconclusive." This lack of sufficient data is "fundamental and fatal." *Laumann*, 117 F. Supp. 3d at 315.

**B. McDonald**

Plaintiffs mischaracterize Defendants' challenge as faulting McDonald for failing to "identify individual diverted users or quantify lost subscriptions and advertising revenue." Opp. 40. The actual problems are that he ignored revenue data showing Plaintiffs' revenue flat or rising, and never reliably tied any [redacted] to generative AI. Plaintiffs do not defend the former, and fail to salvage McDonald's traffic analysis.

Plaintiffs do not claim that TollBit data itself shows AI caused [redacted]. They say McDonald "confirmed" the link by "analyzing ChatGPT and Copilot responses to his news-related questions." *Id*. But he asked each chatbot a single question, ***once***: "I am interested in learning about current events with context about what they mean. Is that something people use you for?" ECF_1875(Ex.A) 13-14. He then simply took the chatbots' word for it—without verifying that answer against user behavior, or even repeat testing. That is anecdote not science.

Likewise, Plaintiffs insist McDonald's regression includes generative AI usage—but cite nothing and ignore McDonald's contrary testimony. ECF_2063(Ex.12) 92:6-13; 148:5-9. As a fallback, Plaintiffs recast McDonald's regression as "descriptive regression evidence concerning market trends," Opp. 41, implying (without authority) some lower standard. Either way, McDonald's regression fails: if offered for causation, omitting the causal variable is fatal; if merely descriptive, it cannot show ***why*** [redacted]

Dated: November 25, 2026 Respectfully submitted,[8]

*/s/ Annette L. Hurst*

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Annette L. Hurst (admitted pro hac vice)
Daniel Justice (admitted pro hac vice)
Amanda H. Schwartz (admitted pro hac vice)
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759
ahurst@orrick.com
djustice@orrick.com
aschwartz@orrick.com

Christopher J. Cariello
Lisa T. Simpson
Marc Shapiro
Vanessa Sorrentino
Hilda Obeng
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-3778
Facsimile: (212) 506-5151
ccariello@orrick.com
lsimpson@orrick.com
mrshapiro@orrick.com
vsorrentino@orrick.com
hobeng@orrick.com

Sheryl Koval Garko (admitted pro hac vice)
Laura Brooks Najemy (admitted pro hac vice)
222 Berkley Street
Boston, MA 02116
Telephone: (617) 880-1800
Facsimile: (617) 880-1801
sgarko@orrick.com
lnajemy@orrick.com

[8] All parties whose electronic signatures are included in this filing have provided consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

Isaac Sawlih Behnawa (admitted pro hac vice)
Johnathan Vaknin (admitted pro hac vice)
355 S. Grand Ave. Suite 2700
Los Angeles, CA 90071
Telephone: (213) 612-2179
Facsimile: (213) 612-2499
ibehnawa@orrick.com
jvaknin@orrick.com

Monica Svetoslavov (admitted pro hac vice)
Louis Andrew Schreiber
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
msvetoslavov@orrick.com
aschreiber@orrick.com

**FAEGRE DRINKER BIDDLE & REATH LLP**
Jeffrey S. Jacobson
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 248-3191
jeffrey.jacobson@faegredrinker.com

Jared B. Briant (admitted pro hac vice)
Kirstin L. Stoll-DeBell (admitted pro hac vice)
Timothy Scull (admitted pro hac vice)
Shelby Pickar-Dennis (admitted pro hac vice)
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone: (303) 607-3588
jared.briant@faegredrinker.com
kirstin.stolldebell@faegredrinker.com
timothy.scull@faegredrinker.com
shelby.pickar-dennis@faegredrinker.com

Lora A. Brzezynski (admitted pro hac vice)
Brianna Lynn Silverstein (admitted pro hac vice)
Faith Maggard (admitted pro hac vice)
1500 K Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 230-5000
Facsimile: (202) 842-8465
lora.brzezynski@faegredrinker.com

brianna.silverstein@faegredrinker.com
faith.maggard@faegredrinker.com

Carrie A. Beyer (admitted pro hac vice)
320 South Canal Street, Suite 3300
Chicago, IL 60606-5707
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
carrie.beyer@faegredrinker.com

Elizabeth M.C. Scheibel (admitted pro hac vice)
2200 Wells Fargo Center, 90 S. 7th Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
elizabeth.scheibel@faegredrinker.com

Andrew Lawrence Van Houter
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7018
Facsimile: (973) 360-9831
Andrew.vanhouter@faegredrinker.com

*Attorneys for Defendant Microsoft Corporation*

*_/s/ Paven Malhotra_*
**KEKER, VAN NEST & PETERS LLP**
Robert A. Van Nest (pro hac vice)
rvannest@keker.com
R. James Slaughter (pro hac vice)
rslaughter@keker.com
Paven Malhotra
pmalhotra@keker.com
Michelle S. Ybarra (pro hac vice)
mybarra@keker.com
Reid P. Mullen (pro hac vice)
rmullen@keker.com
Nicholas S. Goldberg (pro hac vice)
ngoldberg@keker.com
633 Battery St.
San Francisco, CA 94111
Telephone: 415.391.5400

*/s/ Caitlin Sinclaire Blythe*
**MORRISON & FOERSTER LLP**
Joseph C. Gratz (pro hac vice)
jgratz@mofo.com
Tiffany Cheung (pro hac vice)
tcheung@mofo.com
Caitlin Sinclaire Blythe (pro hac vice)
cblythe@mofo.com
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000

Lily Li (pro hac vice)
YLi@mofo.com
755 Page Mill Road
Palo Alto, CA 94304
Telephone: 650.813.5600

*/s/ Herman H. Yue*
**LATHAM & WATKINS LLP**
Andrew M. Gass (pro hac vice)
andrew.gass@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415.391.0600

Sarang V. Damle
sy.damle@lw.com
Herman H. Yue
herman.yue@lw.com
Luke A. Budiardjo
luke.budiardjo@lw.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200

Elana Nightingale Dawson (pro hac vice)
elana.nightingaledawson@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

*Attorneys for Defendant OpenAI*

## CERTIFICATE OF WORD COUNT COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the foregoing Memorandum of Law complies with the Court's order of August 7, 2026 (ECF 1664), as it contains 5997 words, according to the word processing program used to prepare it.

*/s/ Annette L. Hurst*
Annette L. Hurst
*Attorney for Defendant*
*Microsoft Corporation*