**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION<br><br>This document relates to:<br>No. 1:23-cv-08292<br>No. 1:23-cv-10211<br>No. 1:23-cv-11195<br>No. 1:24-cv-03285<br>No. 1:24-cv-04872<br>No. 1:24-cv-01515<br>No. 1:25-cv-04315 | Case No. 25-md-3143-SHS-OTW<br><br>Hon. Sidney H. Stein<br><br>**CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL UNDER THE STIPULATED PROTECTIVE ORDER**<br><br>***REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*** |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**JOINT *DAUBERT* MOTION AND MOTION TO STRIKE**

## TABLE OF CONTENTS

**ARGUMENT** .... 1

I. 20 Million ChatGPT Conversation Sample .... 1

II. Dr. Catherine Tucker .... 2

III. Dr. Chris Callison-Burch .... 3

IV. Dr. Sanjay Krishnan .... 3

V. Dr. Brandi Nonnecke .... 4

VI. Dr. Nick Feamster .... 5

A. Legal Opinion .... 5

B. Conduit for Undisclosed OpenAI Employee Consultation .... 6

C. Methodological Errors .... 7

VII. Dr. Taylor Berg-Kirkpatrick .... 10

A. NLP Principles .... 10

B. The "600 Annotations" Study .... 12

VIII. Ms. Barbara Frederiksen-Cross .... 15

A. Qualification .... 15

B. Mental State .... 16

IX. Dr. Avi Goldfarb .... 18

A. Lack of Licensing Expertise .... 18

B. Sample Bias .... 18

C. Trend Analysis .... 19

D. Asset-Turnover Ratio .... 19

**CONCLUSION** .... 21

# TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. National Railroad Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ........ 11

*Arista Recs. LLC v. Lime Grp. LLC*,
784 F. Supp. 2d 398 (S.D.N.Y. 2011) ........ 16, 17

*AU New Haven LLC, v YKK Corporation*,
No. 15-cv-3411, 2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019) ........ 15

*Beard v. Helman*,
No. 4:21-cv-00680, 2025 WL 3172849 (M.D. Penn. Nov. 12, 2025) ........ 18

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
666 F. Supp. 3d 328 (S.D.N.Y. 2023) ........ 6

*Capri Sun GmbH v. Am. Beverage Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022) ........ 12

*Emmerich Newspapers, Inc. v. Particle Media, Inc.*,
629 F. Supp. 3d 497 (S.D. Miss. 2022) ........ 3

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........ 16

*Hewitt v. Metro-N. Commuter R.R.*,
244 F. Supp. 3d 379 (S.D.N.Y. 2017) ........ 3

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992) ........ 3

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ........ 12

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
No. 14-MC-2542, 2026 WL 2015552 (S.D.N.Y. July 10, 2026) ............................................ 11

*In re Lyondell Chem. Co.*,
567 B.R. 55 (Bankr. S.D.N.Y. 2017), aff'd, 585 B.R. 41 (S.D.N.Y. 2018)............................... 1

*In re Mirena IUD Prods. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) ........................................................................... 10

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) ........................................................................... 16

*Molly C. v. Oxford Health Ins., Inc.*,
No. 21-cv-10144, 2024 WL 4850813 (S.D.N.Y. Nov. 21, 2024) ........................................... 11

*S.E.C. v. U.S. Env't, Inc.*,
No. 94-cv-6608, 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002)............................................... 3

*Souza v. Exotic Island Enters.*,
68 F.4th 99 (2d Cir. 2023) ........................................................................................... 13

*Yang Feng Zhao v. City of New York*,
No. 07-cv-3636, 2008 WL 3928238 (S.D.N.Y. Aug. 20, 2008) ............................................. 15

## TABLE OF CITATION CONVENTIONS

| Citation | Document | ECF No. |
|---|---|---|
| Mem. | Plaintiffs' Memorandum of Law in Support of Joint Daubert Motion and Motion to Strike | 2067 |
| Def-Opp | Defendants' Memorandum of Law in Opposition to Plaintiffs' Joint *Daubert* Motion and Motion to Strike | 2354 |
| OAI-News-MSJ | OpenAI's Memorandum of Law in Support of Motion for Summary Judgment on News Plaintiffs' Claims | 1749 |
| News-MSJ-Opp | News Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment | 2118 |
| OAI-News-MSJ-Opp | OpenAI's Opposition to News Plaintiffs' Motion for Partial Summary Judgment | 2216 |
| OAI-News-MSJ-Rep | Reply Brief in Support of OpenAI's Motion for Summary Judgment in the News Cases | 2572 |
| Ex. | Exhibits to Declarations of Davida Brook and Jennifer B. Maisel | 2066, 2350, and those filed concurrently with this brief |
| Stricchiola Decl. | Declaration of Jessie Stricchiola | Filed concurrently with this brief |

## ARGUMENT

### I. 20 Million ChatGPT Conversation Sample

OpenAI does not dispute that Drs. Berg-Kirkpatrick, Feamster, and Callison-Burch relied exclusively on the flawed 20 million sample of ChatGPT conversations to support their analyses and conclusions about ChatGPT that Plaintiffs seek to exclude. *See e.g.* Ex. 1 [Berg-Kirkpatrick Opening Rpt.] ¶368 (characterizing the 20 million sample "[redacted]"); Ex. 3 [Feamster Opening Rpt.] ¶180 ("[redacted]"). OpenAI could have informed its experts about the sampling issues with the ChatGPT logs, including OpenAI's destruction of billions of logs and subsequent substitution and/or destruction of over 10% of the sample, and provided those experts with other conversation data. It instead chose, for whatever strategic reasons, not to do so. It must bear the consequences of that choice. *In re Lyondell Chem. Co.*, 567 B.R. 55, 113 (Bankr. S.D.N.Y. 2017), aff'd, 585 B.R. 41 (S.D.N.Y. 2018) ("[C]ourts have rejected or discredited expert testimony where an expert's analysis utilizes 'cherry-picked' data to distort results or produce misleading results.").

OpenAI tries to spin this part of Plaintiffs' motion as an attempt to "hide" unfavorable evidence, but as set forth in News Plaintiffs' concurrently filed Motion for Summary Judgment on OpenAI's Infringement of News Plaintiffs' Content Used for Retrieval Augmented Generation and Outputs, the 20 million ChatGPT sample—flawed as it is—actually ***supports*** Plaintiffs' infringement allegations and position on fair use. Nor can OpenAI shield its experts' reliance on this corrupted sample because Class Plaintiffs did not formally join the sanctions motion. Opinions resting on corrupted data are unreliable regardless of which Plaintiffs sought sanctions. Both Plaintiff groups moved to exclude these opinions, Mem.5-7, and OpenAI's authorities are unrelated to *Daubert* and waiver.

## II. Dr. Catherine Tucker

Defendants' opposition tries to reframe Tucker's process as beginning with an "***initial outline of issues*** to guide her analysis." Def-Opp.43 (emphasis added). But this post-hoc attorney ipse dixit is contradicted by Tucker's own testimony: "[redacted] Ex. 22 [Tucker Dep. Tr.], 51:7-10 (emphasis added). Tellingly, and dispositively, Defendants did not submit a declaration from Tucker attempting to explain or change her testimony. The Court should therefore accept as true Tucker's own words and reject counsel's attempted revision.

Defendants mischaracterize Plaintiffs' argument as a complaint that Tucker "should have more extensively discussed *Defendants*' internal documents." Def-Opp.44. But Tucker did not consider Defendants' documents because, as she admitted, she formed her opinions without looking at any of Defendants' documents. The fact that Tucker testified as an expert in a separate case on the same broad subject matter does not absolve her of her obligation to consider the record in this case.

Defendants' efforts to distinguish the cited cases fail. Def-Opp.45. Both cases are directly on point.

All of Tucker's opinions should be excluded as unreliable because, contrary to the scientific process, they were formed before reviewing the record, not after.[1]

[1] Plaintiffs stand on the independent argument in their opening memorandum of law that Tucker's trend analysis is unreliable and should be excluded.

## III. Dr. Chris Callison-Burch

OpenAI cannot salvage Callison-Burch's opinions that certain activities are "highly transformative." First, OpenAI never explains how the challenged opinions are anything but legal opinions. *See* Def-Opp.4-6. Nor could it; "transformativeness" is a legal concept. Second, OpenAI ignores *Emmerich Newspapers, Inc. v. Particle Media, Inc.*, 629 F.Supp.3d 497, 500-01 (S.D. Miss. 2022) (excluding "legal issues regarding fair use" testimony). Third, none of OpenAI's authorities concern fair use, and several support exclusion. *See Hewitt v. Metro-N. Commuter R.R.*, 244 F.Supp.3d 379, 394 (S.D.N.Y. 2017) (precluding "expert testimony that expresses a legal conclusion") (quoting *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992)); *S.E.C. v. U.S. Env't, Inc.*, No. 94-cv-6608, 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002) (testimony may not "track the language of the statute"). Fourth, OpenAI's overbreadth argument is a strawman. Plaintiffs seek exclusion of the identified opinions, *see* Mem.7, not the entire report.

## IV. Dr. Sanjay Krishnan

OpenAI does not dispute that Krishnan lacks legal expertise concerning issues of copyrightability and ownership. OpenAI argues instead that Krishnan's "false positive" opinions were the result of robust scientific testing. Def-Opp.14. But this argument ignores that Krishnan himself admits his "false positives" are allegedly "false" precisely because of his legal determinations about ownership or copyrightability. Mem.10. OpenAI claims Krishnan "did not purport to decide whether text is copyrightable or who owns it," (Def-Opp.6), but Krishnan's reports are quite clear that this is precisely what he did. Specifically, he opined that [redacted]

Ex. 15 [Krishnan NYT/DNP Rebuttal Rpt.], ¶109. He also opined that [redacted]

[redacted]. Ex. 15, ¶110. And he opined that other articles are false positives because they "[redacted]." Ex. 15, ¶125. These are all legal determinations.

OpenAI identifies a few works (out of millions) that contain public texts or wire content. Def-Opp.7-14. News Plaintiffs have now removed these works from their motions. Regardless, Krishnan is not permitted to testify as to legal issues, including, for example, whether "[redacted]" (Ex. 15, ¶245(a)-(b)) – issues as to which he lacks any expertise.

Finally, OpenAI now concedes that Krishnan will not challenge Shan's LibGen metadata analysis. Because OpenAI reserves the right to offer that criticism later, the opinion should be excluded, not denied as moot.

## V. <u>Dr. Brandi Nonnecke</u>

OpenAI now represents that Nonnecke "never offered" the opinion "that OpenAI's use of 'shadow libraries,' including LibGen, was 'common industry practice.'" Def-Opp.16. The Court should hold OpenAI to that representation and preclude Nonnecke from testifying, and OpenAI from arguing through her, that using LibGen or other shadow libraries was "common industry practice" or otherwise "consistent with responsible AI frameworks." Def-Opp.16-17. An order is warranted because OpenAI still argues in a footnote that such an opinion "would have been well supported," Def-Opp.16 n.36, yet Nonnecke's report cites nothing of the kind. Attorney argument cannot supply a foundation the expert never provided.

## VI. Dr. Nick Feamster

### A. Legal Opinion

Defendants argue that Feamster uses the word "transformative" "to explain technical functionality, not offer a legal opinion." Def-Opp.18. This is belied by Feamster's own report, which explains his understanding of the term "transformative" as tied to the first fair use factor. Ex. 3 [Feamster Opening Rpt.], ¶¶45-46, 258. Feamster's subsequent uses of "transform" and "transformative" mirror his recited definition of "transformative" and sometimes also include phrases directed to other fair use factors. *E.g.*, Ex. 3, ¶¶258 ("[redacted]") (emphasis added), 320 ("[redacted]") (emphasis added), 334 ("[redacted]") (emphasis added).

Consistently, when asked in deposition about the meaning of "transformative purpose" in his report, Feamster's response reflected the legal definition: [redacted]" Ex. 107 [Feamster Depo. Tr.] 146:13-147:6 (quoting Ex. 28 [Feamster Reply Rpt.] at ¶322); Ex. 3, ¶¶45-46.

Finally, Defendants request that the Court only "limit" use of the term "transformative" and "not exclude the underlying technical opinion." But there is no "technical opinion" underlying Feamster's legal "transformativeness" opinions. These opinions should be excluded.

### B. Conduit for Undisclosed OpenAI Employee Consultation

Defendants argue that Feamster's conversations with undisclosed OpenAI engineers were to "verify his understanding" or "supplemented and corroborated his independent analysis." Def-Opp.19-21. Not so. All the testimony that News Plaintiffs challenge here involves Feamster serving as a mere conduit for the undisclosed witness statements. Feamster's opinions do not synthesize or interpret the statements of Messrs. Pronin, Balfour, and Reid. Feamster simply regurgitates those statements. *See Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F.Supp.3d 328, 363-64 (S.D.N.Y. 2023).

For example, two challenged opinions concern conclusions that OpenAI's Browse service purportedly "respected" certain user agents. *See, e.g.*, Mem.20. That is an important, disputed issue in the case (*see* OAI-News-MSJ-14; OAI-News-MSJ-Opp-12 n.9), and Feamster is merely repeating Mr. Pronin's undisclosed and unsworn statement that Browse "respected" these agents. This is not reliable or permissible expert testimony.

As another example, Feamster relies solely on conversations with Reid and Balfour for his "opinion" that OpenAI bots accessing News Plaintiff websites in violation of robots.txt disallows "could be attributable to software bugs or testing systems." Mem.20. Defendants argue that "[i]n reaching this conclusion, Feamster reviewed OpenAI's source code…which showed bot behavior that was largely consistent with the REP." Def-Opp.21. But Feamster's reports show otherwise. While Feamster did review OpenAI's source code, that was in connection with his opening report—where Feamster concluded that [redacted]" Ex. 3, ¶48. Later, in Feamster's rebuttal report, he reviewed Plaintiffs' server logs and concluded that [redacted]. Ex. 27 [Feamster Rebuttal Rpt.] ¶¶32-104. The challenged opinion concerns ***why*** the acknowledged robots.txt bypasses

occurred, and the ***sole basis*** for Feamster's opinion that [redacted]" There is no citation or indication that Feamster's source code analysis in his opening report played a role in this "opinion." Rather, he simply regurgitated what Messrs. Reid and Balfour told him.

Defendants accuse News Plaintiffs of "mischaracteriz[ing] the evidentiary foundation for Feamster's opinions by isolating individual citations from the surrounding analysis." Def-Opp.21-22. Not so. There is no additional support for these challenged "opinions"—Feamster merely repeated what he was told. *See* Ex. 27, ¶¶86, 100. Because these "conduit" opinions are no more than regurgitations of what undisclosed OpenAI employees told him, they should be excluded.

### C. Methodological Errors

Feamster's methodological errors ***led to mistakenly overcounting*** "fetch failures" and requests made following "fetch failures" by ***nearly a million*** for Daily News Plaintiffs and ***nearly 71.4 million*** for Ziff Davis. Mem.22. In plain English, a "fetch failure" occurs when a bot cannot read a robots.txt file, and the type of failure is indicated by a status code. Under the Robots Exclusion Protocol ("REP"), the bot is permitted to access the website for a 24-hour window following only certain types of fetch failures. Feamster mischaracterized tens of millions of times OpenAI's bots accessed Plaintiffs' content as "in compliance with the REP" because he erroneously identified other status codes as "fetch failures" permitting subsequent access to Plaintiffs' websites and miscalculated the 24-hour window following these other types of fetch failures. This issue is relevant to Defendants' alleged license defense—including on summary judgment—because OpenAI's robots.txt bypasses show that Plaintiffs cannot simply "opt-out" of

OpenAI's infringement. *E.g.*, OAI-News-MSJ.14; OAI-News-MSJ-Opp.12 n.9; OAI-News-MSJ-Rep.12-13.

OpenAI's opposition attempts to isolate the two deficiencies in Feamster's methodology and treat them separately. This is improper because, due to the nature of Feamster's scripts, the effect of the errors compound. Even accepting Feamster's methodology for determining a 24-hour window, in assessing the scope associated with mischaracterized fetch failures one needs to consider both: (1) how many status codes were mischaracterized as "fetch failures" and (2) how many requests were made within the 24-hour period of those requests.[2]

Three status codes that Feamster wrongly counted as "fetch failures"—301, 304, and 429—are worth highlighting.

301 status codes correspond to a server redirect. *See* Ex. 108 [RFC 9309 Robots Exclusion Protocol] at 2.3.1.2. Feamster counts 9,931 (DNP) and 192,223 (ZD) requests as having 301 status codes, corresponding to 963,667 (DNP) and 42,739,473 (ZD) requests made within 24 hours of these 301 status codes exclusively (i.e., not within 24-hours of any other "fetch failure" status code). Stricchiola Decl., ¶4. Defendants' opposition argues that the 301 status codes should qualify as "unsuccessful fetches." Specifically, OpenAI argues:

> While the REP identifies 400–499 as examples of unavailable codes, it does not strictly prescribe which codes indicate that a resource is unavailable. Additional status codes may indicate a resource is unavailable under the REP where the requested file is not successfully retrieved. ***Feamster reasonably treats redirect responses (300–399 status codes) as fetch failures because Plaintiffs' server logs do not establish that the requested robots.txt file was ultimately retrieved.***

---

[2] OpenAI is correct that the issue with the 24-hour window is *skewing* of the window so the start-time improperly occurs prior to the fetch failure, rather than enlargement of the 24-hour period. For the purpose of identifying the number of requests within 24-hours of receiving a 301, 304, or 429 status code, Plaintiffs apply Feamster's "shifted" 24-hour window. *See also* Stricchiola Decl., ¶4.

Def-Opp.22-23. OpenAI cites ***nothing*** to support the emphasized sentence. Moreover, Feamster admitted in his report that redirect codes are distinct from "fetch failure" responses. *Compare* Def-Opp.23 n.63 *with* Ex. 27, ¶47 n.1 (quoting Robots Exclusion Protocol proposed standard that "The crawlers SHOULD follow at least five consecutive redirects, even across authorities"). Because Feamster's code treats 301 status codes as "fetch failures" without applying the criteria for 301 redirects that Feamster cites, his code is flawed. Mem.22; *see also* Ex. 32 [annotated Feamster scripts].

304 status codes signal performance optimization, not errors. *See, e.g.,* Ex. 109 [https://http.dev/304] at 1. They tell the crawler it should use its saved copy of the robots.txt file because the file has not changed. As explained above, Defendants argue that 300–399 status codes constitute "redirects" (Def-Opp.23), but 304 status codes ***are not*** redirects and neither Defendants nor Feamster cite any support to show otherwise. *See, e.g.,* Ex. 109 at 1. Feamster wrongly counts 2,238,408 (ZD) requests as "fetch failures" when in actuality these requests resulted in 304 status codes, corresponding to 3,426,319 (ZD) requests made within 24 hours of these 304 status codes exclusively (i.e., not within 24-hours of any other "fetch failure" status code). Stricchiola Decl., ¶4. For ZD, there are an additional 15,493,726 requests that follow both a 304 status code and 301 status code in overlapping 24-hour windows. *Id.*

429 status codes mean that the bot has made "too many requests." This code issues in response to a client (e.g., OpenAI) sending too many requests to a server in a given time period. ***Defendants do not dispute that a 429 status code is not a "fetch failure."*** Def-Opp.23; *see also* Ex. 27 ¶283, n.353 (citing description of "429 Too Many Requests" status). Notwithstanding, and without any basis for doing so, Feamster's code counts 3,562 (DNP) and 9,751 (ZD) requests as receiving 429 status codes, corresponding to 27,970 (DNP) and 62 (ZD) requests made within 24-

hours of these 429 status codes exclusively (i.e., not within 24-hours of any other "fetch failure" status code). Stricchiola Decl., ¶4.

In total, Feamster wrongly counts 991,942 (DNP) and 64,111,649 (ZD) requests following "fetch failures" as "in compliance with the REP" due to his false characterization of 301, 304 and 429 status codes. *Id.* And these are just three examples—there are other status codes he similarly mischaracterizes (*e.g.*, 302, 307, 308), leading again to mischaracterization of subsequent requests as "in compliance with the REP". This is not a "vanishingly small percentage of requests" as OpenAI contends (Def-Opp.24), and allowing Feamster to present this unreliable opinion at trial will mislead and confuse the jury regarding OpenAI's retrieval of Plaintiffs' content.

## VII. Dr. Taylor Berg-Kirkpatrick

### A. NLP Principles

#### 1. Third-Party Datasets

OpenAI defends Berg-Kirkpatrick's contaminated filter sets as "commonly used by NLP researchers in similar contexts" (Def-Opp.26), but none of the cited papers defends ***automatic exclusion*** based on regurgitation hits against a third-party dataset. The "Cite and Seek" paper, the closest analogue, had humans annotate every filter hit and found one in six were wrong. Ex. 110 ["Cite and Seek" paper] at 10–11, 15. The memorization literature Berg-Kirkpatrick cites in his report also did not automatically filter results by authorship or public-domain status: one study called it "extremely challenging" (Ex. 111 [Aerni, *Measuring Non-Adversarial Reproduction Of Training Data In Large Language Models*] at 10); another, co-authored by OpenAI expert Callison-Burch, said it "would require a different set of research methodologies" (Ex. 112 [Lee et al., *Deduplicating Training Data Makes Language Models Better*] at 9). Berg-Kirkpatrick thus "exceed[ed] the limitations the authors themselves placed on these studies." *In re Mirena IUD Prods. Liab. Litig.*, 169 F.Supp.3d 396, 431 (S.D.N.Y. 2016).

Even after Plaintiffs identified contaminated examples (*e.g.*, News Plaintiffs' content appearing in "third party" datasets), Berg-Kirkpatrick still never independently audited the dataset or redid the automatic filtering. Ex. 35(a) [Berg-Kirkpatrick Aug. 3, 2026 Depo. Tr.] at 181:17-182:25. OpenAI's claim that mis-filtered hits are immaterial "corner cases" (Def-Opp.27) rests on *ipse dixit*: Berg-Kirkpatrick did not know whether further contamination existed because he did not audit, yet he still deemed the flagged examples "[redacted]." Ex.. 35(a) at 182:5-10. Given the sampling, one missed output means thousands of regurgitations.

OpenAI's comparison to Plaintiffs' experts' results is irrelevant to the *Daubert* inquiry and not analogous because Plaintiffs' experts reviewed data that Berg-Kirkpatrick chose not to analyze. *See Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("district court must focus on the principles and methodology employed by the expert").

*Molly C.* addressed imperfect ***input data***, not a flawed ***methodology***. *Molly C. v. Oxford Health Ins., Inc.*, No. 21-cv-10144, 2024 WL 4850813, at *12 (S.D.N.Y. Nov. 21, 2024). Unlike *Molly C.*, Berg-Kirkpatrick's filtering datasets are not input data to which his methodology is applied; rather, these datasets are core components of the methodology itself. Plaintiffs' challenge is "not merely a question of [Berg-Kirkpatrick] using imperfect inputs or data," but rather that Berg-Kirkpatrick's contaminated filtering datasets "go[] to the very heart of [his] 'approach' or methodology." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MC-2542, 2026 WL 2015552, at *8 (S.D.N.Y. July 10, 2026).

2. <u>Manual Filtering</u>

OpenAI does not dispute that Berg-Kirkpatrick and his team of Keystone Strategy annotators all lack copyright expertise. Instead, OpenAI recasts the classification that these individuals performed as a "data provenance exercise." Def-Opp.28 (citing Aerni's note that some matches are "common idioms"). But there is no daylight between a "data provenance exercise"

and copyrightability determinations. *See* Ex. 111 [Aerni] at 10 (recognizing "it is hard to distinguish reproduction of common idioms from problematic memorization" and reporting match counts, including those identified as potential "common idioms").

Berg-Kirkpatrick admitted he [redacted]—legal determinations he disclaims competence to make. Ex. 35(b) [Berg-Kirkpatrick Aug. 4, 2026 Depo. Tr.] at 332:11–17.

OpenAI's cases support News Plaintiffs' motion. Both stand for the principle that an expert ***cannot*** usurp the role of the factfinder, which is precisely what the challenged Berg-Kirkpatrick opinions are doing. *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 32 (S.D.N.Y. 2020); *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F.Supp.3d 83, 135 (S.D.N.Y. 2022). In *Capri Sun*, the Court highlighted that the challenged expert opinions stated that the evidence was "consistent with" or "suggests" that the trademark is "likely" famous, but left the ultimate determination to the jury. *Id.* at 132-33. In contrast, Berg-Kirkpatrick ***actually removed*** articles based on ***his own conclusions*** that they were "not Plaintiff-generated texts" (and despite the fact that Plaintiffs published the matching texts). *See* Mem.24-25.

For these reasons, the challenged opinions should be excluded.

### B. The "600 Annotations" Study

#### 1. Biased Methodology Only Allows Annotators to Support OpenAI's Theory

OpenAI does not dispute that there was no vehicle for the annotators to affirm any of Mr. Delorey's findings of genuine, non-coincidental memorization and reproduction across all nine tested OpenAI models. Def-Opp.29-30; Ex. 60 [Delorey Opening Rpt.] ¶291. Rather, the annotators were required to assign each reproduction into one of six categories – all of which are

designed to challenge Delorey's results. In a last dich effort to save the study, OpenAI tries to recast the "Fragment" category as validating Delorey's identification of genuine, non-coincidental reproduction. Def-Opp.30. But that is not the definition of "Fragment" that Berg-Kirkpatrick gave in his report (or to the annotators); he defined fragments as "[s]hort fragments of text that are incoherent without context and extent of text matching is unclear." Ex. 4 [Berg-Kirkpatrick Rebuttal] ¶148; Ex. 36 [Berg-Kirkpatrick Addendum] ¶24; Ex. 35(b) [Berg-Kirkpatrick Dep. Tr.] at 463:18-464:22 (referring to Ex. 4, ¶148 and testifying: "[redacted]"). Berg-Kirkpatrick's annotation study is plainly designed to validate OpenAI's theories and accordingly should be excluded. *See Souza v. Exotic Island Enters.*, 68 F.4th 99, 114 (2d Cir. 2023) (affirming exclusion of expert's survey because respondents were not provided with a "don't know" option nor instructed "not to guess").

2. Incoherent Methodology for Categorizing the Outputs of Delorey's Study

OpenAI mischaracterizes Ziff Davis's argument as relying solely on Berg-Kirkpatrick's failure to recall at deposition the instructions he provided his annotators. Def-Opp.30-31. But those are not disclosed anywhere. *Id.* While Berg-Kirkpatrick purports to have provided instructions, neither Berg-Kirkpatrick nor OpenAI can show anywhere in his report (or otherwise) what instructions Berg-Kirkpatrick provided to his annotators for categorizing the outputs because those instructions are not there. *Id.*; Ex. 35(b) at 456:7-8. OpenAI erroneously points to the portions of Berg-Kirkpatrick's report describing the mechanics of retrieving Mr. Delorey's output comparisons—not the critical portion of the study—which do not explain how the annotators were instructed to categorize Mr. Delorey's outputs. Def-Opp.30-31; Ex. 35(b) at 468:10-19 ("I didn't write down all the words I said in talking about the various studies.").

For example, Berg-Kirkpatrick provided no explanation of how the annotators were expected to proceed or prioritize categories if content fit into more than one category, such as "less

than 10-gram," "third-party," and "information about products or events." Ex. 35(b) at 463:19–466:2; Mem.27-28. He also failed to disclose what (if any) definitions he provided for the categories, such as what content qualifies as "third party." Ex. 35(b) at 468:10-19. Berg-Kirkpatrick also could not explain what tools (if any) were used to measure inter-annotator agreement (*i.e.*, whether the annotators were reviewing results the same way). Mem.28. At bottom, Berg-Kirkpatrick did not apply any reliable methodology for his "600 annotations" study, and OpenAI does not contest that he could not articulate any such methodology (including annotator instructions) at deposition. Def-Opp.30-32. OpenAI latches onto its own say-so that Berg-Kirkpatrick personally designed the study, Def-Opp.32-33, but that argument misses the point. The lack of clear identification of what the annotators were instructed to do and how inter-annotator agreement was measured makes Dr. Berg-Kirkpatrick's "600 annotations" study precisely the type of junk science *Daubert* is meant to exclude.

Brushing aside the clear gaps in Berg-Kirkpatrick's reports, OpenAI focuses on deposition questions taken out of context. Def-Opp.31-32. Those questions are immaterial to Plaintiffs' *Daubert* motion, which does not implicate whether base models were tested. Further, even when asked to answer, without reviewing his report for every single question, Berg-Kirkpatrick did review the report. Ex. 35(b) at 490:14-502:22 ("[redacted]"). Berg-Kirkpatrick's failure to answer simple questions about his report[3] without pages of circular, non-responsive tangents raises serious concerns about the reliability of his methodology. *Id.*

---

[3] When asked about base models, Dr. Berg-Kirkpatrick finally responded with testimony about [redacted]. Ex. 35(b) at 498:10-18 ("[redacted]").

3. No Showing that Berg-Kirkpatrick's Sample is Representative, Statistically Significant, or Random

Based on a sample of 750 reproductions out of more than a *million*, Berg-Kirkpatrick concludes that "[redacted]." Ex. 4, ¶148. But there is no evidence the sample is random. Berg-Kirkpatrick did not disclose his randomization seed. Ex. 37 [June 16, 2026 Email from A. Blanco]; Ex. 35(b) at 482:17-490:3 (could not recall how the randomization was performed). Accordingly, Plaintiffs could not verify that Berg-Kirkpatrick's selection was random. Ex. 34 [Delorey Reply Rpt.] ¶ 85, 106.

Moreover, Berg-Kirkpatrick does not conduct any analysis to demonstrate that his conclusions from just 750 outputs can be extrapolated to the entire population of over a million.[4] Instead of showing how it is purportedly representative, OpenAI tries to shift its burden to Ziff Davis. But that burden lies with Berg-Kirkpatrick and OpenAI as the proponent of his opinions. *Yang Feng Zhao v. City of New York*, No. 07-cv-3636, 2008 WL 3928238, at *2 (S.D.N.Y. Aug. 20, 2008).

## VIII. Ms. Barbara Frederiksen-Cross

### A. Qualification

OpenAI does not dispute that Frederiksen-Cross is not an expert in LLM training or model behavior. ***Nor does OpenAI defend the opinions Plaintiffs actually seek to exclude.*** *See* Ex. 50

[4] Defendants' authority is distinguishable. In *AU New Haven LLC, v YKK Corporation*, No. 15-cv-3411, 2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019), the expert offered a "justifiable reason" to demonstrate the representativeness of the sample. *Id.* at *26. Here, Berg-Kirkpatrick has not conducted any analysis to show that his sample is representative. Mem. 28-29. The Court also noted that an "expert cannot extrapolate from a nonrandom sample without a reason to believe the sample is in fact representative of the whole population." *AU New Haven*, 2019 WL 1254763, at *26.

[Frederiksen-Cross News Rebuttal Rpt.] ¶¶28,43,44,46,50,151,152,181-191. Instead, its opposition defends opinions Plaintiffs do not challenge.

As to "LLM training," Plaintiffs do not challenge Frederiksen-Cross's opinions concerning the "functionality" of OpenAI's software (Def-Opp.34). Rather, Plaintiffs seek to exclude her opinions concerning desirability or usefulness of using certain texts for LLM training (Mem.35), and OpenAI offers no defense of them.

Likewise, Plaintiffs do not challenge Frederiksen-Cross's analysis of the "masking" source code logic, including its inputs and the thresholds it defines. Plaintiffs instead object to her opinions addressing *how* masking impacts downstream model behavior (Mem.35), which (here again) OpenAI does not address. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997) (upholding exclusion where the Respondent "failed to reply" to the specific criticism of his experts).

As to memorization, there is no foundation for Frederiksen-Cross's opinion that the pruning source code "does not define 'memorization' or correlate any probability threshold to memorization." Def-Opp.35. Opining that a heuristic "does not necessarily correspond" to memorization is itself a statement about what memorization is—a subject that Frederiksen-Cross admits she "do[es] not know or understand in the first place." *See In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 549 (S.D.N.Y. 2004).

**B. Mental State**

OpenAI seemingly agrees that experts may not opine on a party's subjective intent, yet defends Frederiksen-Cross's opinions that cross that line into impermissible testimony. OpenAI contends that *Arista Recs. LLC v. Lime Grp. LLC*, 784 F.Supp.2d 398 (S.D.N.Y. 2011) supports its position (Def-Opp.35-36) but ignores that the expert's opinion in *Arista* was admissible because

he did "***not*** cross the line into unreliable speculation about the ***intended purpose*** of various LimeWire design features." 784 F.Supp.2d at 414 (emphasis added). Frederiksen-Cross, in contrast, impermissibly opines on the purpose of the text extractors, as well as OpenAI's intent when implementing them. *See* Ex. 50, §VIII.1 ("[redacted]") (emphasis added), ¶28 ("[redacted]") (emphasis added).

OpenAI also attempts to defend Frederiksen-Cross's reliance on statements by OpenAI staff on the grounds that it "inform[ed] the context for OpenAI's code design" (Def-Opp.36-37), but again, the testimony she cites relates to OpenAI's subjective intent and purpose behind the text extractors. *See* Ex. 50, ¶¶43 n.15 (citing OpenAI deposition testimony about "[redacted]) (emphasis added), 56 ("[redacted]") (emphasis added), 65 ("[redacted]") (emphasis added), 136 [redacted]) (emphasis added).

For the foregoing reasons and the reasons stated in Plaintiffs' opening *Daubert* motion, the Court should limit Frederiksen-Cross's opinions to the technical design and functionality of OpenAI's text extractors. *See Arista*, 784 F.Supp.2d at 414 (admitting expert testimony related to the "*design* and *functionality* of the LimeWire program" that does not implicate the "parties' state of mind") (emphasis in original).

## IX. Dr. Avi Goldfarb

### A. Lack of Licensing Expertise

OpenAI admits that Goldfarb lacks licensing expertise. Def-Opp.37. It admits that he is not a licensing expert, has no expertise in interpreting or characterizing intellectual property agreements, and lacks specialized knowledge or experience in accounting or intellectual property valuation. *Id.* OpenAI argues that Goldfarb has general economic expertise, but that does not provide a reliable basis for his opinions [redacted]. *See, e.g.*, *Beard v. Helman*, No. 4:21-cv-00680, 2025 WL 3172849, *7 (M.D. Penn. Nov. 12, 2025) ("While Dr. Austin has an impressive background in economics, he has no experience, knowledge, or training relating to license agreements of the kind at issue in this case. So, while he may be qualified to testify regarding general economic matters, he lacks the requisite qualifications to be admitted as an expert on economic damages of the more specific area of art licensing agreements.").

### B. Sample Bias

Defendants argue that Goldfarb addressed Plaintiffs' *Daubert* criticisms in his reply report and showed that neither criticism changed his results. Def-Opp.38-39. Not so.

Plaintiffs posited in their opening brief that a "relevant user" may regularly visit DNP websites on a desktop computer, then start using ChatGPT on a mobile device as a substitute for visiting DNP sites. Mem.32. These users are not captured in Goldfarb's analyses. His opening report looked solely at desktop data, and his reply report looked solely at mobile data. Goldfarb's data is unable to track users whose activity is split between desktop and mobile. Moreover, Goldfarb failed to consider Ziff mobile data at all.

Also, if a person visits DNP websites, visits ChatGPT in a single month during the test period, and then subsequently uses ChatGPT in place of DNP websites following the test period, that is also not captured by Goldfarb's analysis. Mem.32. Goldfarb's analysis arbitrarily ends seven months prior to the issuance of his opening report, and thus, the sample misses many months' worth of potential substitution data.

These are mere examples of the core point: Goldfarb cherry-picked his samples to get the result he wanted. As such, these opinions should be excluded.

### C. Trend Analysis

Defendants point to Goldfarb's "differences-in-differences" analysis as providing the causation analysis Plaintiffs allege is missing from Goldfarb's "trend" analysis. For the reasons briefed (sample bias), that methodology does not reliably show that ChatGPT did not cause market harm. Mem.33-34.

Defendants admit that the trend analysis was not offered "as a standalone causal estimate" but rather was "used … descriptively." Def-Opp.40. Defendants claim without analysis that "[i]f ChatGPT had caused persistent harm … one would expect to see it in the trends." *Id*. at 41. This is not sound economic reasoning or a reliable basis on which to opine that there is a lack of any market harm.

### D. Asset-Turnover Ratio

Defendants defend the legitimacy of the "asset-turnover ratio" concept, not the reliability of Goldfarb's application.[5] Simply dividing consolidated revenue by consolidated assets does not

[5] Goldfarb introduced the analysis only in reply, although its underlying information was available when he submitted his opening report, and admitted he had never previously applied it in his career. Ex. 39, at 260:3-12, 266:18-23.2. Even assuming the analysis properly responded to rebuttal criticism, responsiveness does not establish reliability.

establish that acquisition and divestiture effects have been controlled. Mem.34-35. Those effects are substantial, and the failure to account for them undermines reliance on aggregate revenue trends as evidence that OpenAI's products caused no harm.

For example, Ziff acquired CNET on September 12, 2024, and reported $83.2 million in incremental 2024 revenue from businesses acquired that year. Ex. 113 [Ziff's 2025 Form 10-K], at 81-82. Goldfarb agreed that [redacted]. Ex. 39, at 258:12-259:15. Those admissions undermine his reliance on aggregate revenue trends to infer no harm. In other words, simply adding acquired assets to the denominator of Goldfarb's equation does not itself distinguish revenue added through acquisitions from changes in the performance of Ziff's existing businesses. Goldfarb asserts that [redacted]. *See* Ex. 49 [Goldfarb ZD Reply Rpt.], ¶188.

Defendants characterize the ratio as merely a "scale" test, but Goldfarb expressly states that it "[redacted]." ECF1763 [Goldfarb Decl. in Support of Motion for Summary Judgment], ¶53. Rule 702(d) requires a reliable application to the facts, and a financial metric pulled from *Investopedia* does not supply that foundation. Ziff does not challenge the ratio in the abstract; it challenges Goldfarb's failure to demonstrate why that ratio reliably supports his conclusion about ChatGPT's effects on Ziff's businesses. Accordingly, the Court should exclude Figure 6 of Goldfarb's Ziff Davis Reply Report and the accompanying acquisition-control and no-harm opinions resting on it.

**CONCLUSION**

For the reasons set forth above and in Plaintiff' opening brief, Plaintiffs' Joint *Daubert* Motino and Motion to Strike should be granted.

Dated: November 25, 2026

Respectfully submitted,

*/s/ Justin A. Nelson*
Justin A. Nelson (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Tel.: 713-651-9366
jnelson@susmangodfrey.com

*Interim Lead Counsel for Class Plaintiffs*

*/s/ Davida Brook*
Davida Brook
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: 310-789-3100
dbrook@susmangodfrey.com

*Counsel for The New York Times Company*
*News Plaintiffs' Liaison Counsel*

## CERTIFICATE OF WORD COUNT COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the foregoing Reply complies with the Court's order of August 7, 2026 (ECF 1664), as it contains 5,801 words, according to the word processing program used to prepare it.

*/s/ Justin A. Nelson*